```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2   *********************************************************************
     UNITED STATES OF AMERICA
 3
                                      Docket No. 94-CR-381(C)
 4   v.                               New Orleans, Louisiana
                                      Tuesday, September 15, 2009
 5
     PAUL HARDY
 6   *********************************************************************

 7
                     TRANSCRIPT OF ATKINS HEARING PROCEEDINGS
 8           HEARD BEFORE THE HONORABLE HELEN G. BERRIGAN
                     UNITED STATES DISTRICT JUDGE
 9                            VOLUME II

10

11   APPEARANCES:

12   FOR THE PLAINTIFF:          UNITED STATES ATTORNEY'S OFFICE
                                 BY:  MICHAEL E. McMAHON, ESQ.
13                                    MARK A. MILLER, ESQ.
                                 500 Poydras Street, Room HB-210
14                               New Orleans, LA 70130

15
     FOR THE DEFENDANT:          HERBERT V. LARSON, JR., ESQ.
16                               650 Poydras St., Suite 2105
                                 New Orleans, LA 70130
17

18                               MARILYN MICHELE FOURNET, ESQ.
                                 715 St. Ferdinand
19                               Baton Rouge, LA 70802

20
     Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR
21                               500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana 70130
22                               (504) 589-7776

23

24
        Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

```
 1                           I N D E X

 2

 3   WITNESSES FOR THE DEFENDANT:                    PAGE/LINE:

 4   MARK D. CUNNINGHAM

 5     Continued Direct Examination by Mr. Larson    204/1

 6     Cross-Examination by Mr. Miller               204/21

 7     Redirect Examination by Mr. Larson            325/13

 8

 9   LIONEL HARDY

10     Direct Examination by Ms. Fournet            362/3

11     Cross-Examination by Mr. McMahon             391/10

12     Redirect Examination by Ms. Fournet          417/2

13

14   OLEVIA THERESA MINOR

15     Direct Examination by Ms. Fournet            419/14

16     Cross-Examination by Mr. Miller              437/5

17     Redirect Examination by Ms. Fournet          444/15

18

19

20

21                       EXHIBIT INDEX

22                                                   PAGE/LINE:

23

24   Defense Exhibit 32                              348/19

25
```

<u>P R O C E E D I N G S</u>

(TUESDAY, SEPTEMBER 15, 2009)

(MORNING SESSION)


    (OPEN COURT.)

        THE COURT:  Dr. Cunningham, you're still under oath.

        MR. MILLER:  Your Honor, before we begin we had another

report dropped on us this morning, well, this is not actually my

witness, it will be Mr. McMahon's witness, it's about Ms. Swanson

completing other additional interviews.  This is becoming a

recurring problem, Judge, and at some point something needs to be

done.

        MR. LARSON:  Judge, Judge, Judge, Judge, if I could, our

expert reports for the phase on November 30th are due today.

That's a report for the November 30th phase.  So we will produce

all four reports from our experts as ordered by the court by the

end of today.

        THE COURT:  Okay.

        MR. LARSON:  That's what he's got.

        THE COURT:  All of that's moot, all right.  Let's go

forward.

        MR. LARSON:  Your Honor, I had just two matters of

clarification and Mr. Miller has allowed me to do this to clarify.

        THE COURT:  Okay.

                CONTINUED DIRECT EXAMINATION

1  BY MR. LARSON:

2  Q.  First, Dr. Cunningham, yesterday you had a slide that purported

3  to describe severe mental retardation as defined by the DSM-IV-TR,

4  and, in fact, your slide had, I think, moderate mental retardation?

5  A.  It was a description for moderate, I repeated the description

6  for moderate rather than providing the description for severe.  And

7  I've now provided that on the screen, and will provide a hard copy

8  of the slide later today.

9  Q.  And this was slide No. 15?

10  A.  Yes, sir, that's correct.  This is a substitution for the one

11  that is in the printout and that I displayed yesterday.

12  Q.  And, Dr. Cunningham, I asked you yesterday when you had first

13  become involved with Paul Hardy.  Did you go back and check your

14  records?

15  A.  Yes, sir, I did.

16  Q.  And when was that?

17  A.  That was in early February, 1996.

18          MR. LARSON:  Thank you.  I tender the witness.

19          THE COURT:  All right.

20                         CROSS-EXAMINATION

21  BY MR. MILLER:

22  Q.  So slide 15 is wrong?

23  A.  The prior slide 15 was incorrect, it repeated the description

24  that had been on a prior slide as a description for moderate mental

25  retardation.

1    Q.   So the short answer is you were wrong?

2    A.   I made a clerical error, yes, sir.

3    Q.   Clerical error, you gave the wrong definition for severe mental

4    retardation, correct?

5    A.   I corrected it in my testimony yesterday, the slide was

6    incorrect.

7    Q.   Why don't you try answering my question.  Was it wrong, was

8    your slide wrong?

9    A.   The slide was wrong, yes, sir.

10   Q.   And that has to do with attention to detail, correct?

11   A.   Yes, sir.

12   Q.   And you're a detail guy, correct?

13   A.   I try to be.

14   Q.   It's your job in your profession to be cognizant of details,

15   people's live, people's background, people's characteristics?

16   A.   Yes, sir, that's the aspiration.

17   Q.   It's important to be thorough.

18   A.   Yes, sir, on the issue that's before you.

19   Q.   You were unable to simply take a definition from a book and put

20   it in a slide?

21   A.   I made a clerical error.

22   Q.   You were wrong.

23          THE COURT:  Let's move on.

24   BY MR. MILLER:

25   Q.   Now, you've indicated about your board qualifications.  I think

1  you indicated that you're qualified in how many states?

2  A.  I'm licensed in 16 states.

3  Q.  Sixteen states, I'm sorry, so 16 states, Doctor, all of which

4  are death penalty states?

5  A.  Yes, sir, that's correct.

6  Q.  You are not licensed in any non-death penalty states.

7  A.  That's correct.

8  Q.  And the reason for that is because --

9  A.  Well, actually that's not correct, I am licensed in New York,

10  it is a non-death penalty.

11  Q.  It has the death penalty for the murder of police officers.

12  A.  I did not know that.  As far as I knew, there was not a state

13  penalty for murder, a death penalty for murder in New York, to my

14  knowledge.

15  Q.  And the reason you have these licenses in death penalty states

16  is because that's what you do, you testify in death penalty cases.

17  A.  I have the licenses in those states because those are

18  jurisdictions that had called me.  Typically, death penalty cases

19  are the only ones, only criminal cases that have sufficient budgets

20  to bring in an expert from out of state.

21  Q.  You make your money testifying in death penalty cases.

22  A.  No, sir.  I make part of my income from testifying in death

23  penalty cases, I make a significant proportion of it working in

24  death penalty cases.

25  Q.  What percentage of your income is derived from death penalty

1  work?

2  A.  Capital sentencing, about 60 to 70 percent.

3  Q.  And what about in capital issues not in sentencing?

4  A.  That would likely add about another 10 percent to the total.

5  Q.  So that's 80 percent of your salary?

6  A.  Some place depending on the year between 60 and 80 percent.

7  Q.  Now, you testified in other times that 90 percent of your work

8  is death penalty related; would that be a fair assessment?

9  A.  I have testified to that effect.  When I went back and actually

10  ran the numbers a couple of years ago, that turned out to be an

11  overestimate.

12  Q.  And what is the remaining 20 percent of your practice?

13  A.  I work in non-death criminal cases, some civil cases as well.

14  Q.  Approximately how much money do you make a year testifying in

15  death penalty cases or doing death penalty-related work?

16  A.  Let me add, I have concerns about revealing my annual income

17  because I believe it creates a security hazard for my family, but

18  if ordered to do so.

19  Q.  Well, how does it create a security hazard for your family,

20  Doctor?

21  A.  By putting this on the record in open court where transcripts

22  go into jail s and other criminals have access to them.  Although

23  my income is not a huge number as compared to attorneys and

24  physicians and that kind of thing, to somebody who is sitting in a

25  jail, that might well seem like a lot of money and target me.

1   Q.  Doctor, how much money did you make last year testifying in

2   death penalty cases or doing death penalty-related work?

3   A.  I can't tell you last year specifically.  I can tell you that

4   it is approximately a net income of about, approximately 300,000,

5   give or take.

6   Q.  Now, you indicated that you have written various articles?

7   A.  Yes, sir.

8   Q.  And that you do not receive compensation from them.

9   A.  I described not direct compensation, there may be compensation

10  that derives, as I said yesterday, from increasing my stature and

11  subsequently I may be called on more cases.

12  Q.  Part of the reason you write is to make yourself more salable.

13  A.  No, sir, that's not correct.

14  Q.  You have a web site, correct?

15  A.  I do.

16  Q.  What is the purpose of the web site?

17  A.  The web site is to reflect my practice and services, to make it

18  easier for people to access and understand what publications are

19  available.  There is certainly a marketing component to it.

20  Q.  Right.  You want to be hired to do this kind of work.

21  A.  Yes.  And I also desire that good science be disseminated

22  broadly.

23  Q.  And the more you can put on your résumé the more likely you

24  are, you believe, to be hired, correct?

25  A.  No, sir.  The more accurate the résumé will be.  I have not

1  sought everything that I could possibly put on the résumé.

2  Q.  Well, you indicated that writing articles was a hobby.

3  A.  Yes, sir.

4  Q.  Now, there was no hobby section on your web site.

5  A.  This is a hobby that has scholarly implications.

6  Q.  It was listed in publications and other learned treatises,

7  correct?

8  A.  Yes, sir.

9  Q.  And you've indicated, too, something about your peer review,

10  you've had things peer reviewed?

11  A.  Yes, sir.

12  Q.  So, because something is peer reviewed doesn't mean it's right?

13  A.  That's correct.

14  Q.  So we understand, peer review is where you submit your article

15  to a, I guess a board of some sort made up of other professionals,

16  correct?

17  A.  Generally, there is an editorial board that reviews it, that

18  may be changing.  In other words, some of the reviewers will not

19  formally sit on the editorial board of the journal, they may be ad

20  hoc reviewers, but there is a panel of scholars that review the

21  paper.

22  Q.  They review it for things like content?

23  A.  Yes, sir.

24  Q.  Methodology?

25  A.  Yes, sir.

1   Q.  And I imagine style, spelling, things of that nature?

2   A.  Yes, sir.

3   Q.  And then they make a decision whether or not it's worthy of

4   publication?

5   A.  Yes, sir.  Whether it requires revisions.

6   Q.  And whether it's even appropriate for that particular type of

7   journal.  It may not be the right one for that journal, it might

8   not be a good fit, correct?

9   A.  That's correct.

10  Q.  But it's not a statement that anything in your article is

11  correct or that it's the lay of the land, so to speak?

12  A.  It doesn't create certainty.  It is a screen that is intended

13  to enhance the quality and the likelihood that the methodology is

14  sound and the information is correct.  But it doesn't always work

15  that way.  There are certainly journal articles that I've read that

16  were published that I thought had gotten things incorrect.

17  Q.  So we understand, there are peer-reviewed articles on either

18  sides of issues?

19  A.  Yes, sir, depending on the issue.

20  Q.  Now, you also indicated that, I guess, you're a -- you're

21  boarded by the American Board of Professional Psychology, correct?

22  A.  That's correct.

23  Q.  And that has approximately 3,000 psychologists?

24  A.  I don't know the total of all of the APA boards combined.

25  Q.  Well, there's approximately how many psychologists or members

1  of the American Psychology Association, the APA?

2  A.  Well, there are 160,000 members, about 80,000 of whom have

3  doctorate degrees.

4  Q.  Would it be a fair statement that less than five percent are

5  boarded?

6  A.  I would say that is approximately correct.

7  Q.  So, typically, psychologists are not boarded by the APA.

8  A.  We're not typically board certified by the American Board of

9  Professional Psychology, which is the primary board certification

10  organization that's recognized by APA.

11  Q.  Now, you indicated that you testified in capital cases, and I

12  believe you testified in Shields and in other cases that you've

13  always testified in capital cases for defendants?

14  A.  I've never testify for anyone, but I've always been called in

15  capital cases by the defense.

16  Q.  And I take it you have essentially testified in one of three

17  areas, one:  Future dangerousness, correct?

18  A.  Violence risk assessment is what you would term that.

19  Q.  Second one is mental retardation?

20  A.  Yes, sir.

21  Q.  And the third I'll just call kind of a catchall for any other

22  sort of maybe mental diseases and disorders that you might --

23  A.  I would describe those as adverse developmental factors.  Those

24  are all -- well, I've also testified regarding mental state at the

25  time of the offense in capital cases, I've testified regarding

1    competency to stand trial.

2    Q.  The context of penalty phases --

3    A.  Also competency to be executed.  I am trying to remember

4    whether I've done a competency to waive Miranda rights in a capital

5    case, I've done that in non-capital cases.  Those are the general

6    areas -- I've also testified in capital cases about mental state

7    issues relating to emergency situations, which is kind of a

8    variation on mental state, not formally mental disorder, but how

9    people respond under crisis.

10   Q.  So in short, always for defendants, defendants cases?

11   A.  Well, in capital cases.  I've always been called by the

12   defense.

13   Q.  All right.  That's my question.

14   A.  Yes, sir.

15   Q.  And you're paid approximately 300 to $360 an hour to do this,

16   correct, presently?

17   A.  In the capital cases, all of them have been at $300 an hour or

18   less.  I have not had a privately-retained capital case that I can

19   recall.

20   Q.  And in this case, you say you have at least 120 hours in?

21   A.  Yes, sir.

22   Q.  And you're getting paid for every hour that you're here this

23   week, so that would be in addition?

24   A.  The hours that I'm actually either preparing for the hearing or

25   I'm in court, it's not a 24-hour meter.

1   Q.  No, I understand.  So about another 40 hours this week?

2   A.  Yes, sir, depending on how long I'm here, it may be more.  I've

3   been working very long days.

4   Q.  So it's going on 160 hours now, at 300 bucks an hour?

5   A.  Yes, sir.

6   Q.  Now, if you had stuck to your original diagnosis from 1996, you

7   wouldn't be making that money here today, would you?

8   A.  I would not be called if I believed that -- I would not be

9   called by the defense.  I anticipate that you would call me and I

10  would be paid for that time, but I would not have been called by

11  the defense.

12  Q.  Trust me when I say we'll never call you.

13          What I'm saying is, they would not have called you here

14  as a witness had you stuck by your original diagnosis?

15  A.  That's likely correct.  Actually, it wasn't a diagnosis but had

16  I -- actually, I found a diagnosis in this case that I did not find

17  then, so had I stuck by a finding that there was not mental

18  retardation, I would not have been called by the defense in this

19  matter.

20  Q.  You called your prior testimony regrettable.

21  A.  Yes, sir, as I look at it now.

22  Q.  What you're saying, then, is you were wrong?

23  A.  I was correct in light of the best science that I knew at that

24  time.  I no longer believe that that reflects a proper view of the

25  field.

1    Q.  You testified he had an IQ of 85 was your belief.

2    A.  No, sir.  No, sir, I testified that his IQ score was 73.  I

3    said that I thought that underestimated his actual intellectual

4    horsepower by about 15 points.

5    Q.  You thought, in reality, it was up around 88?

6    A.  In terms of broad intellectual capability, yes, sir.

7    Q.  But now we have it down in the 60s?

8    A.  Based on the Flynn Effect, yes, sir.

9    Q.  And you're going to make over $40,000 testifying to that fact?

10   A.  I am paid that for the work that I do.  The testimony is --

11   Q.  Are you going to be paid $40,000, sir?

12   A.  I anticipate so, yes, sir, perhaps more.

13   Q.  Now, certain attorneys use you on a regular basis, correct,

14   death penalty attorneys?

15   A.  There are some that have used me more than once.  I don't know

16   that I would say that it's regular, but I have been called more

17   than once by the same attorney.

18   Q.  Patrick Berrigan?

19   A.  Yes, sir.

20   Q.  How many times has Berrigan used you?

21   A.  Two or three times out of the 135 cases where I've testified.

22   Q.  You've been in Kansas City at least three times, correct?

23   A.  Well, you might remind me of the cases.  I recall about three

24   times that he's called me.

25   Q.  You testified for him in Nashville.

1    A.  I was called by the defense in a case in Nashville.

2    Q.  By Berrigan?

3    A.  Yes, sir.

4    Q.  So there are certain attorneys that turn to you when they need

5    death penalty-type testimony, defense lawyers?

6    A.  As I've described, yes, sir, there are some that have repeated.

7    Most are new, but there are instances that repeat --

8    Q.  Customers?

9    A.  Well, of retention from the same attorney.

10   Q.  Now, in this particular case, you testified previously that you

11   thought life without parole is a just sentence?

12   A.  If that's what the jury decided.

13   Q.  No, no.  Do you remember what you testified to, that that would

14   be a just sentence, life without parole?

15   A.  Yes, sir.  The context of that of what I would intend would be

16   if that's what the jury decided, that is a just sentence, it was

17   not to advocate a particular sentence.

18   Q.  Why are you concerned at all with what they would testify to or

19   what their determination would be?  I mean, why is it a concern of

20   yours?  You're a scientist, I thought.

21   A.  Yes, sir, I am.

22   Q.  And my understanding is, and I quote --

23   A.  You can direct me to a page number.

24            MR. LARSON:  We would ask the witness be shown --

25            MR. MILLER:  118, 118 of your prior testimony.

1          THE COURT:  Do you have it there, the date?

2          MR. MILLER:  It's his prior testimony, I'm sorry.  It

3    would have been April 30th, 1996.

4          THE WITNESS:  Yes, sir, I see that.

5    BY MR. MILLER:

6    Q.  And your answer as to Mr. McMahon's question, "So what you're

7    saying, in effect, is that it's society's fault that Paul Hardy

8    ended up executing Kim Marie Groves, is that what you're saying?

9    No, I'm saying that Paul Hardy didn't live his life in a vacuum,

10   either personally or socially; and just like all of the rest of us,

11   the forces that impacted on him had some effect on the choices he

12   made.  Clearly he is the person responsible, he will spend the rest

13   of his life in federal prison.  That is a just sentence."

14         You made a value judgment as to what a just sentence in

15   this case was, sir?

16   A.  Well, no, sir, I described the factual reality that one way or

17   another he will spend the rest of his life in prison.  He'll either

18   spend it in prison until he dies naturally or he'll spend it in

19   prison until he is executed, but he will spend the rest of his life

20   in prison.

21   Q.  The fact is that he will spend the rest of his life in prison,

22   that is a just sentence, is a value judgment on your part?

23   A.  No, sir, it is a statement that he has been found responsible

24   for his conduct and because he's been found responsible for it, the

25   question is, as you saw, that it's society fault, and the response

```
 1    is no, he is responsible for his conduct and because he is
 2    responsible, he will then spend the rest of his life in federal
 3    prison, and that's just because he is responsible for his conduct.
 4    Q.  That's not what you said.
 5    A.  Yes, sir, it is.  He will spend the rest of his life in federal
 6    prison.
 7    Q.  Judge Berrigan can make that call.
 8    A.  Yes, sir.
 9    Q.  What is your view of the death penalty?
10    A.  I don't have an advocacy position on the death penalty.
11    Q.  You have been dealing with death penalty issues since when?
12    A.  1995.
13    Q.  Would you vote for a death sentence?
14    A.  If I were on a jury --
15    Q.  Yes.
16    A.  -- and I thought it was appropriate, yes, sir.
17    Q.  You have no moral compulsion again the death penalty?
18    A.  Not as a punishment.  Again, I have many opinions about the
19    reliability of its administration and the necessity of an
20    extraordinarily high degree of reliability.  But I don't have a
21    moral opposition to the death penalty.
22    Q.  In the appropriate case you could vote for it?
23    A.  Yes, sir.
24    Q.  Have you ever collaborated before with Dr. Swanson on a case?
25    A.  Not on a case where I have been called to testify.  And I am
```

1    not aware of whether my participation on that other case was

2    revealed.  I don't recall a case where I was called to testify

3    where she was involved.

4    Q.  Whether or not it was revealed or not, have you ever

5    collaborated with her before on a case?

6    A.  Yes, sir, one case comes to mind.

7    Q.  Have you ever written any articles together, done any seminars

8    together or anything of that nature?

9    A.  No.

10   Q.  I want to talk a little bit about this case --

11   A.  Let me say, I didn't collaborate with her, I was also on the

12   case.  She came to her opinion, I came to mine.  I consulted with

13   her in the course of that, but I would not characterize that as a

14   collaboration.

15   Q.  All right.  How many cases have you worked on at the same time?

16   A.  One that I can recall.

17   Q.  Was it this case or was it a case in addition?

18   A.  Well, this would be the second case.

19   Q.  Now, in this particular case as far as the mental retardation

20   issue, you've done no independent investigation; is that correct?

21   A.  No, sir, that's not correct.  I was directly involved in

22   interviewing Mr. Hardy and correcting the IQ administration that

23   Dr. Tetlow had done.  I interviewed third parties at that time.

24   I've done no independent investigation of adaptive functioning on a

25   systematic basis in terms of directly performing that.  I have done

1   my own independent review, but I haven't directly interviewed

2   anyone associated with a comprehensive adaptive behavior

3   assessment.

4   Q.  So all of your interviews would have been conducted, Doctor, in

5   1996?

6   A.  Yes, sir.  With the exception of a couple of telephone

7   interviews of a New Orleans long-term career school teacher.

8   Q.  Any other testing that you've done since 1996?

9   A.  No, sir.

10  Q.  So it would be a fair statement that, in this particular case,

11  you reviewed Dr. Swanson's report and made a determination as to

12  the validity or correctness of it?

13  A.  I did review Dr. Swanson's report in the course of my work in

14  this case, and I have found her methodology to be sound and the

15  conclusions to flow appropriately from the methodology and

16  observations that she reported.  I wasn't present at the time that

17  the interviews were done, so I don't have firsthand knowledge of

18  that.  But the information that I reviewed was consistent with her

19  findings.  And, of course, then I subsequently reviewed the

20  videotapes that were done by Dr. Hayes and the transcripts of those

21  and a large volume of records.

22  Q.  And you also, I should say, critiqued Dr. Hayes's report also?

23  A.  I reviewed and ultimately critiqued it, yes, sir.

24  Q.  As far as Dr. Swanson's report goes, you indicated that you

25  reviewed the information provided to you.  You're sort of at the

1   mercy of that information, so to speak, correct?

2   A.  In regard to my appraisal of her report, yes, sir.

3   Q.  If it's faulty or incomplete or if there were serious omissions

4   or there was other evidence out there, it might affect what your

5   ultimate conclusion is as to the correctness of what her findings

6   are?

7   A.  Yes, sir.

8   Q.  Now, you indicated that you also, obvious from your testimony,

9   you critiqued Dr. Hayes's report?

10  A.  Yes, sir.

11  Q.  I want to ask you a couple of questions about just the process

12  itself, not necessarily her report but what you all do.  Is it a

13  fair statement that the more information you gather the better?

14  A.  Not necessarily.  It depends on whether the information that's

15  gathered is relevant to the issue before you.  And so information

16  can be gathered that is irrelevant to the issue under

17  consideration.

18  Q.  Let's put it in terms of relevant information.  Isn't it

19  more -- isn't it a better practice to gather as much -- just kind

20  of follow me here, I may be a little inexact.

21  A.  Yes, sir.

22  Q.  To gather as much information as possible and then cull it, in

23  the sense that this is maybe not reliable, the person probably

24  didn't observe this, the person who gave me the information has

25  some sort of mental disease, for whatever reason, you discard it,

1   but it is better to gather all together at one time and then make a

2   decision as to its reliability and relevance.  Would that be a fair

3   statement?  It's a lot of --

4   A.  Yes, sir, the general principle.  The more relevant information

5   that's gathered the better.

6   Q.  And that would include listening in this particular case to the

7   recordings?

8   A.  Again, depending on what they are.  For example, the recordings

9   of doctor -- well, the most important information from Dr. Hayes is

10  her transcript because that's the most accessible way to actually

11  go through those interviews.  Now, after that, the observation of

12  the recordings may provide some additional information that wasn't

13  on the transcripts.  And so I would say the transcripts are

14  primary.  If there is an opportunity, then the videos are of

15  secondary in terms of Dr. Hayes's work.

16  Q.  That wasn't exactly my question.  My question is this:  In this

17  particular case, would it be important to listen to the recordings

18  of Paul Hardy during the time he was committing the offenses?

19  A.  Not necessarily, no.  The AAMR describes that neither verbal

20  behavior nor criminal behavior are dispositive of whether somebody

21  is a person with mild mental retardation.  So those, in fact, may

22  not be relevant to the issue at hand.

23  Q.  But you certainly want to listen to them in making that

24  decision, correct?

25  A.  Again, it has to do with how much the volume of information to

1    look at and how much time is available to do that, so I don't --

2    Q.  I am not asking you -- let's assume you have all of the time in

3    the world to do it.  Listening to him in his environment in 1994

4    would be important.

5    A.  If you have all of the time in the world, that would be one of

6    the things to do.  I don't say that it's important, but it's one of

7    the things that could be done.

8    Q.  Prison recordings of him interacting with his family,

9    interacting with his friends, maybe interacting with coconspirators

10   would be something you would want to do?

11   A.  Again, not necessarily.  It depends on how much time is

12   available and how you allocate those resources and what's on those.

13   Q.  Assuming you had time, it would be something you would want to

14   do?

15   A.  If there was unlimited time, yes, sir.

16   Q.  You would want to consider his behavior in jail?

17   A.  Again, depending on the nature of it.  The issue is his

18   adaptive functioning in the open community, not in an institutional

19   setting.  And so observing somebody in an institutional setting may

20   not tell you very much about their adaptive functioning unless they

21   win the chess championship or are observed running the

22   institutional computer system, those kinds of things.  They are

23   certainly behaviors if at an extreme end of the scale.  But simply

24   to observe somebody interacting on a unit, talking to other people,

25   going out to recreation, those kind of things, that would not be

1    particularly relevant information.

2    Q.  Might be to another psychologist, maybe not to you, but it

3    could be to another psychologist?

4    A.  They would need to use extreme caution in using institutional

5    behaviors to infer adaptive capability in the open community.

6    Q.  Police officers, what police officers, prison guards may have

7    observed in a person certainly would be relevant to that?

8    A.  Again, you have to use real cautions there.  It's one of the

9    things that we talked about, Dr. MacVaugh and I, in the paper that

10   we have and that other scholars have commented on, that there is a

11   potential that correctional observers may be biased themselves,

12   have their own agendas about -- or alliances in regard to the

13   issue.  And also that their observations are restricted to a

14   correctional setting.  And third, that they are not trained in what

15   somebody looks like who has mild mental retardation.  So there are

16   real cautions about relying on correctional personnel.

17   Q.  But certainly it's something you can consider?

18   A.  It's something to consider.

19   Q.  And when we talk about biases of correctional officers, all

20   witnesses come with biases?

21   A.  Some more than others.  As you have, for example, somebody like

22   Vance Ceaser, who knew Mr. Hardy growing up and hasn't seen from

23   him or heard from him in years since, the bias issue in that kind

24   of situation is pretty minimal.

25   Q.  Correct.  But --

1    A.  Other individuals you'll have to weigh what their level of bias

2    might be.

3    Q.  And that's part of what you do?

4    A.  Well, mostly you report what people tell you.  I suppose there

5    is some selection that has to do with bias.  Ideally, you describe

6    the information, you also identify if you believe there to be bias

7    issues, so that your findings are as transparent as possible and

8    then the trier of fact sorts it out.

9    Q.  Certainly the mother of his children would come with certain

10   biases, correct?

11   A.  There's that potential.

12   Q.  And that's something that has to be considered, when using that

13   person as a source of information and making findings about things

14   such as adaptive functioning?

15   A.  Yes, sir.  It's a difficult situation because the individuals

16   who are going to have the closest observation are also going to be

17   people -- historically, developmentally, are also the people that

18   are likely to have some relationship with the individual.  And so

19   it becomes potentially impossible to identify a source with close

20   observation who isn't laboring under at least the potential for

21   some relationship bias.

22   Q.  Now, you've indicated that you have provided in the past

23   testimony in mental retardation cases in a capital setting,

24   correct?

25   A.  Yes, sir.

```
 1   Q.  And you've received certain kind of training in that area?

 2   A.  There are no workshops that I've attended that have

 3   addressed -- let me think about this.  I've gone to capital

 4   sentencing workshops.  I don't recall --

 5   Q.  Again, my question wasn't exact.  Have you received training in

 6   recognizing mental retardation, not in capital --

 7   A.  Yes, sir, yes, sir.

 8   Q.  What was that training?

 9   A.  Well, that training, as I described, was beginning as an

10   undergraduate, in the psychology courses that I took, mental

11   retardation was an issue that was discussed in abnormal psychology

12   in individual intellectual assessment, in practicum courses, I

13   think there were some other seminars, I am trying to remember, it

14   was a developmental course.  That was something that was discussed

15   in passing, as I recall, not a lot of emphasis about that on

16   internship.

17          In the post doctoral program at Yale, there was some

18   discussion about mental retardation.  In seminars that

19   I've attended -- well, and I described I was a teaching assistant,

20   then I taught a course in individual intelligence testing that also

21   involved teaching about the identification of mental retardation

22   and other developmental disabilities, and that I've read

23   extensively in the course of my professional career about the

24   issue.

25   Q.  You don't hold any degrees or any licenses or certifications as
```

1    that as a specialty, do you?

2    A.  I don't think there is a degree in mental retardation, I don't

3    think there is -- there's not a specialty or board.  There may

4    be -- you know, I think AAMR may have sort of a fellow status for

5    people that are particularly recognized in the field, but I have

6    never worked in a dedicated MR facility, I did not do an internship

7    in a state school or a facility.  That's not a primary career focus

8    that I have.

9    Q.  Have you attended -- and, actually, you sort of started

10    answering my question before I clarified.  Have you ever attended

11    any seminars or classes in conjunction with mental retardation in

12    an Atkins setting or concerning Atkins issues?

13    A.  Yes, sir.  These would be seminars in capital training

14    conferences presented by psychologists who are then providing

15    training to attorneys, or sometimes psychologists who are in

16    attendance, mitigation investigators, social workers, I have

17    attended those.

18    Q.  How many actual assessments have you made regarding mental

19    retardation?

20    A.  I can't tell you that number.

21    Q.  Your best estimate, sir.

22    A.  In all --

23    Q.  All context.

24    A.  In all context, it would, the grossest estimate, perhaps 50.

25    Q.  How many of them were in a non-death penalty context?

1    Understanding that you're making a general approximation.

2    A.  Let me tell you why I pause.  In any of the over 200 capital

3    cases that I've been involved in, if I thought there was mental

4    retardation present, I would proceed to evaluate that or recommend

5    intellectual assessment.  On many occasions that's done, and the

6    person has an IQ score that is 77, 80, 85 or more, and so then

7    there's no -- that is essentially ruled out, the presence of mental

8    retardation, and so it then doesn't proceed on.

9         If that's the standard, there are -- in my clinical work

10   and in my forensic work, there are thousands, many thousands of

11   cases where I've excluded mental retardation as a finding in the

12   course of the assessment that I was otherwise doing with this

13   individual.  So that makes it, so that makes it much more difficult

14   to identify.  I guess I am trying to come up with a number where a

15   finding of mental retardation was present as opposed to this very

16   large volume of persons where that was excluded as a diagnosis.

17   Q.  Back in 1996 you didn't recommend that Paul Hardy be further

18   studied for mental retardation?

19   A.  I recommended that the intellectual assessment be done, I did

20   not recommend that there be subsequent comprehensive adaptive

21   behavior assessment, that's correct.

22   Q.  Neither did the three other psychiatrists, all doctors also,

23   correct?

24   A.  There were no psychiatrists, but the psychologists --

25   Q.  I'm sorry, I meant psychologists, I apologize.

1    A.  Yes, the psychologists did not recommend it, to my knowledge.

2    Q.  Getting back to it.  How many actual assessment -- I'll move

3    on.

4        Let me go at it this way:  What percentage of your

5    referrals regarding mental retardation have been in a non-death

6    penalty context?

7    A.  The majority of them, most of the -- the MR determinations that

8    I have made in a criminal non-death penalty context have involved

9    competency to stand trial.  And I've done probably -- I can't

10   even give you -- 200, 300 of those determinations.  And until

11   recently, part of the standard in Texas was to identify whether

12   this was a mentally retarded person as part of that determination.

13   So those would predominate where that was specifically looked at.

14       And in all of the 200 or more capital cases where I've

15   consulted, that has been an issue that's on the screen, that, based

16   on other information, might or might not proceed to an assessment.

17       I am not trying to avoid your question, it's just it's

18   difficult for me to answer in precise -- to answer it precisely.

19   Q.  We'll move on to something else.

20   A.  Yes, sir.

21   Q.  It's my understanding that approximately one percent of

22   individuals are mentally retarded in general population?

23   A.  No, sir.  The portion of the curve that is below 70 is 2.3

24   percent.  Now, what percentage of those are identified as mentally

25   retarded may -- well, represent a smaller number.  Obviously, that

1  position on the curve is only one of the criteria, and there would

2  be adaptive deficits as well.  But assuming that those correspond

3  with each other you would expect about two and a half percent of

4  the population to fall within the below-70 zone.  About five

5  percent if you say 75 or below.

6  Q.  Using the two percent, two and a half percent, what you're

7  saying here is that two and a half percent, that Paul Hardy --

8  excuse me.  97.5 percent of all of the people in this country have

9  more intelligence and better adaptive skills than Paul Hardy?

10  A.  Yes, sir.

11  Q.  97.5?

12  A.  Yes, sir.

13  Q.  He ran a drug organization for a number of years.  Do you think

14  somebody with a finding of -- mental retardation can do that?

15  A.  Yes, sir.  That's why AAMR identifies that criminal behavior

16  not be used as a measure of adaptive functioning in determining

17  mental retardation.

18  Q.  He had to get product, correct?

19  A.  Yes, sir.

20  Q.  He had to get his crew together, correct?

21  A.  There would be people who worked with him or for him, depending

22  on the nature of his --

23  Q.  The answer to my question is yes?

24  A.  You said get people, they may well come to him to work.  I

25  don't know the mechanism of how his associates came to be

1    affiliated with him or what the nature of their relationship was.

2    Q.  He had to enforce discipline, he was the boss.

3    A.  Depending on the nature of the crew.

4    Q.  He had to arrange for purchases, he had to manage people,

5    correct?

6    A.  Again, depending -- the complexity of that is going to depend

7    on how many people are there and what does it involve, do they

8    bring things to him, does he have to go and get it.  It may be no

9    more complicated than running a lemonade stand.  It also involves

10   getting product and having customers and --

11   Q.  Doctor, you know because you're familiar with this case, this

12   wasn't running a lemonade stand.  He was running dope in and out of

13   the Florida project.  He controlled an entire area.  How can

14   somebody with -- who is mentally retarded be able to do something

15   like that?  How?

16   A.  I would be glad to respond.

17   Q.  Respond.

18   A.  I was using the lemonade stand as an analogy.

19   Q.  This isn't a lemonade stand, this is a dope business.

20          THE COURT:  Let him -- please don't interrupt.

21          THE WITNESS:  If you'll let me -- I'm sorry.  I used the

22   lemonade stand as an analogy that involves elements of securing the

23   product, preparing it, going to a location that the child believes

24   there will be customers, doing things to invite the customers to

25   come, involving the next-door neighbor or a younger sibling to

1  participate in this with you, giving them a share of it, chasing

2  your sibling off if they set up a stand right next to you.  In

3  other words, this is not Wall Street business.  This is relatively

4  simple, that you pick up a product, you carry it over and then you

5  sell it at a markup.  It may be cooked up by somebody else.

6          The enforcement of territory may also involve relatively

7  primitive responses.  It's not rocket science to get a gun and

8  shoot somebody with it, it's tragic; and socially destructive and

9  personally destructive, but it's not rocket science.

10          If this is the meddling drug cartel and we're talking

11  about money laundering and international banking and a very large

12  organization, then just like a corporation, that is a very complex

13  thing to operate.  A street-level crew is not a terribly

14  intellectually challenging operation.  And is within the

15  capabilities of someone who is a person with mild mental

16  retardation.

17  BY MR. MILLER:

18  Q.  You have him functioning, what, as a 10 year old?

19  A.  I describe this as being within the range of an 8 to 11 year

20  old.

21  Q.  So it's your testimony, Doctor, that an 8 to 11 year old could

22  manage a drug operation in the Florida projects in New Orleans in

23  1994, that's your testimony?

24  A.  In terms of the intellectual --

25  Q.  Yes or no?

1   A.   It's not a question that can be answered yes or no, sir.

2   Q.   You have him operating between 8 and 11, correct?

3   A.   Yes, sir.

4   Q.   And you say he can operate a drug organization because it's

5   relatively simple, correct?

6   A.   Yes, sir.

7   Q.   Therefore, an 8 to an 11 year old could run a drug operation in

8   the Florida projects?

9   A.   No, sir.  An 11 year old could not because they would not have

10  social standing or intimidation in that setting.  But someone who

11  is functioning mentally at that age, who is a full grown adult and

12  also an adult who is willing to engage in violence, that person can

13  control the drug organization or the sale of drugs in a particular

14  project.

15  Q.   You indicated in Shields that mental retardation was not a

16  permanent condition; is that correct?

17  A.   It may or may not be a permanent condition for those who are on

18  the cusp of that mild mental retardation borderline range.  That's

19  why DSM doesn't describe that if this is ever been diagnosed, it

20  has been a permanent condition all through child -- all through the

21  rest of one's life.  Instead, there is a recognition that

22  individuals may experience some change in their IQ score with time

23  or may have changes in their adaptive capabilities at some other

24  time in their life.

25  Q.   Do you believe he is mentally retarded today?

1   A.  I don't have contemporaneous IQ data, but, yes, sir, I believe

2   he continues to be mentally retarded based on the behaviors that he

3   exhibited in the interview with Dr. Hayes and after viewing that

4   videotape and identifying the thought processes and that kind of

5   thing that I think are consistent with that.  But that is a

6   tentative conclusion.  If a determination were to be made of how he

7   sits today definitively, then contemporaneous IQ testing would need

8   to be performed.

9   Q.  So if we had a contemporaneous IQ test, we would know or at

10  least we would have a good idea?

11  A.  We would know where he is today, yes, sir.

12  Q.  Now, would you expect that somebody who is mentally retarded to

13  be able to engage in abstract thinking?

14  A.  Yes, sir.  On a continuum, not as fully and completely as

15  someone who has greater intellectual capability, but someone with

16  mild mental retardation is not incapable of abstract thinking.  And

17  that's what -- to read at all requires abstract thinking.  To use

18  any kind of idiom requires some degree of abstract thinking.  Even

19  to watch a movie requires the ability to abstract that what you're

20  seeing is a representation of actual life.  So, sure, it's a

21  continuum, not a "they can" or "they cannot".

22  Q.  Have you listened to any of his calls from the Orleans Parish

23  prison within the last couple of years, those telephone calls?

24  A.  Not in the last couple of years, no.

25  Q.  I want you to listen to this.

1          MR. MILLER:  It's about 15 minutes, your Honor.  The call

2    occurred on the 8th of September of 2008 in Orleans Parish prison.

3          THE COURT:  What was the date again?

4          MR. MILLER:  The 8th of September.

5          THE COURT:  Of this year?

6          MR. MILLER:  2008.

7      (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

8    BY MR. MILLER:

9    Q.  Doctor, during that conversation the defendant was speaking

10   with a woman I guess he referred to as Q.  Would it be a fair

11   statement that during that conversation he disagreed with her about

12   some of the things that she was relating?

13   A.  Yes, sir.

14   Q.  Would it also be a fair statement that he used the phrase

15   "walked in someone else's shoes," something to that effect?

16   A.  Yes, sir.

17   Q.  Indicated that I take my hat off to y'all?

18   A.  Yes, sir.

19   Q.  Told her she was beautiful in spirit?

20   A.  Yes, sir.

21   Q.  Indicated that he was learning a lot about himself?

22   A.  From his interactions with mental health professionals, yes,

23   sir.

24   Q.  Which is what you hope happens, correct?

25   A.  Actually, in an assessment context, it's irrelevant whether he

1   is learning anything, the goal is to assess him.  But there's the

2   possibility that he has been given feedback, he is certainly in

3   court hearing things that would result in at least superficial

4   insight.

5   Q.  Well, here he also talks about reasons why he may have done the

6   things he's done in his life.  He also provided reasons for that,

7   correct?

8   A.  Yes, sir, he alluded -- again, that was in the context of

9   interactions with mental health professionals.

10  Q.  He indicated at one point, I believe, and I'm paraphrasing, but

11  essentially that his environment was more significant than

12  genetics, correct, the nature versus nurture type?

13  A.  Gee, I didn't hear him say anything about "nature v. nurture."

14  Q.  No, no, I said --

15  A.  He did talk about the corruptive --

16  Q.  It's kind of my lemonade stand, I am just kind of paraphrasing.

17  A.  Yes, sir.  It adds a level of abstraction that's well beyond

18  him saying that he was, to use his language with apologies, that he

19  was fucked up by growing up in the projects.

20  Q.  But he's showing some insight into his particular situation,

21  correct?

22  A.  Yes, sir.

23  Q.  He also discussed his feelings, correct?

24  A.  Yes, sir.

25  Q.  Discussed a certain amount of love for his family, correct?

1   A.  Did describe that, yes, sir.

2   Q.  A certain amount of empathy for the person with whom he was

3   speaking?

4   A.  Yes, sir -- well, he disputed her position that women have a

5   harder lot in life to some degree, but, yes, sir, he displayed

6   some --

7   Q.  He indicated that he loved her --

8   A.  Oh, yes, sir.

9   Q.  -- that he couldn't say anything bad about her.

10  A.  Yes, sir, affirmed her.

11  Q.  Said she was a good mother because she could cook and clean?

12  A.  Yes.

13  Q.  Which might also explain why he doesn't do it and expects

14  others to do it, correct?

15  A.  No, sir, I wouldn't treat that as an explanation of that.

16  Q.  You examined Shannon Shields; is that correct?

17  A.  Yes, sir.

18  Q.  And you performed a -- you were tasked to determine whether or

19  not he was suffering from mental retardation?

20  A.  Yes, sir.

21  Q.  Shields had been previously tested, I think you did that in

22  2005; is that correct, sir?

23  A.  It's my general recollection.  And again, I might request that

24  the court instruct me to testify about details of that cases since

25  my releases of information in that matter were only to testify in

1    that case, not to discuss it elsewhere.  So I would request that

2    the court order me to testify about that involvement in Shannon

3    Shields if I am to go forward with the details.

4            THE WITNESS:  Your Honor, I only have a release to

5    testify in that case, that's what I was released to do.  So if I am

6    going to testify about it now and talk about my assessment and

7    opinions and that kind of thing, because I don't have a release of

8    information, I would request that the court order me to respond.

9            THE COURT:  Please respond to Mr. Miller's questions.

10           THE WITNESS:  Thank you, ma'am.

11   BY MR. MILLER:

12   Q.  I believe it was in 2005 again, Doctor?

13   A.  That's my general recollection, yes.

14   Q.  And Shields had been previously -- he was charged with a

15   capital offense, obviously?

16   A.  Yes, sir.

17   Q.  And he had been previously tested in 1997 at age 16, correct?

18   A.  There were approximately four assessments that were performed

19   on him.  If I could retrieve my computer, I can speak more

20   specifically.

21           MR. LARSON:  Your Honor, I would simply object to the

22   relevancy of this.  First, it's beyond the scope of direct

23   examination; second, I am assuming that he is attempting to use it

24   for bias purposes or demonstrating bias on the part of

25   Dr. Cunningham.  But I am not sure what going into the specifics of

1    the --

2              MR. MILLER:  He critiqued --

3              THE COURT:  Well, let's see where it goes.  Go ahead,

4    Mr. Miller.

5    BY MR. MILLER:

6    Q.  I believe you testified, and you may -- I believe you testified

7    in Shields that he had been tested at ages 8, 11, 13, 16 and at age

8    24 with scores ranging between 68 and 73 uncorrected.

9    A.  Actually, I thought there was an administration when he was

10   about age 18.  Can I get my computer?

11   Q.  You sure may.

12   A.  Thank you.

13             Mr. Shields received Wechsler full scale assessments at

14   age 7, age 10, age 13, age 15 and then when I assessed him at age

15   23.

16   Q.  You testified in Shields at page 374 that they occurred at age

17   8, 11, 13, 16 and 24.

18   A.  That's possible.  The dates -- I am looking at the years of the

19   assessments, and so it's possible based on his date of birth that I

20   am a little bit off.

21   Q.  And was the 24, the age 24, the one that you administered?

22   A.  Yes, sir.

23   Q.  Prior to the one that you administered, the scores would all

24   have been either borderline or below the 70 number uncorrected; is

25   that correct?

```
 1   A.  I have 69, 73, 70 and 68 prior to my testing.
 2   Q.  In spite of those prior numbers, you still chose to do an
 3   examination of him, correct?
 4   A.  Yes, sir.
 5   Q.  And which test did you employ?
 6   A.  The WAIS-III.
 7   Q.  Now, did you videotape that?
 8   A.  No, sir.
 9   Q.  So there's no -- videotaping allows the critiquing of your
10   methodology, how you administered the test, correct?
11   A.  Yes, sir, it would.  But you can do some critiquing from the
12   test protocol itself, but that doesn't provide as full an account
13   as the videotape.
14   Q.  Do you ever videotape your testing?
15   A.  I don't recall that I have ever videotaped my testing.
16   Q.  Do you feel that it interferes with your ability to test?
17   A.  No, sir.
18   Q.  And a videotape would allow a critiquing for things like
19   professional development, correct?
20   A.  For professional development.
21   Q.  In the sense that somebody could come in and say you're doing
22   this well, you're doing that wrong, that sort of thing?
23   A.  Yes, sir.  There would be some confidentiality issues
24   associated with that.  But conceivably, if it was utilized in that
25   way, it could be used for professional development.
```

1    Q.  Now, you were not ordered by the court to perform a mental --

2    excuse me, to give him an IQ test --

3              THE COURT:  Are we talking about Hardy or Shields?

4              MR. MILLER:  Excuse me, your Honor, I'm stumbling.

5    Shields.

6    BY MR. MILLER:

7    Q.  You were not ordered by the court to give him -- to perform any

8    testing, correct?

9    A.  No, sir.  I had been retained by the defense under the funding

10   appointment by the court, and the defense asked me to test him.

11   Q.  And that was a decision, a professional decision you made to go

12   ahead and test him at that particular time, correct?

13   A.  Yes, sir.

14             MR. LARSON:  Your Honor, we haven't been provided with

15   copies of the slides that the government --

16             MR. MILLER:  It's just a summary of his testimony.  It is

17   also cross-examination.

18             MR. LARSON:  Well, I understand that, your Honor, but if

19   we're going to provide them with copies, I think we should be

20   provided with copies of their slides, whatever they may be.

21             MR. MILLER:  They're cross-examination slides.

22             THE COURT:  Go ahead, go ahead.

23             MR. MILLER:  They're not that complex anyway.

24   BY MR. MILLER:

25   Q.  Now, I just want to draw some differences between Mr. Shields

1  and Mr. Hardy, correct?

2  A.  Yes, sir.

3  Q.  Shields consistently tested in the mentally retarded IQ range,

4  correct?

5  A.  Yes, sir, uncorrected -- well, actually there was one score of

6  73, and let me turn to that.  He obtained a full scale IQ score of

7  73 in 1992 when he was approximately age 10.  So that would be in

8  the below-75 range but above 70.

9  Q.  That does not apply to Mr. Hardy, correct?

10  A.  Mr. Hardy's uncorrected scores have been above 70.  Mr. Shields

11  had three scores prior to my assessment that were at 70 or below

12  uncorrected.

13  Q.  Shields was identified as learning disabled while in school,

14  correct?

15  A.  That's correct.

16  Q.  He was identified as a behavior problem in school, too,

17  correct?

18  A.  Yes, sir.

19  Q.  And he received SSI beginning when he was in grade -- I don't

20  know, but at some point, may have actually been past his 18th

21  birthday, but I remember from your testimony that he did receive

22  some SSI income for a mental impairment.  Is that correct?

23  A.  Yes, sir.  Early on, best I can tell, it was in response to a

24  borderline -- the initial assessment was borderline intellectual

25  functioning and behavior-related difficulties.  The Social Security

1   determination that was made when he was about age 18 or 19

2   identified him as being mentally retarded.  Prior to that he had

3   been identified as borderline intelligence with some behavior

4   psychological disturbance.

5   Q.  None of these things apply to Mr. Hardy, correct?  He was not

6   identified as learning disabled while in school?

7   A.  I don't have elementary school records.  We do know that he was

8   placed in a lower class than Vance Ceaser according to Mr. Ceaser's

9   report.  It's unclear what the designations are of some of his high

10  school courses in terms of what they mean.

11  Q.  Can you point me to anything in your records that shows that he

12  was identified as learning disabled?

13  A.  No, sir, not a formal classification, no.

14  Q.  Did he receive SSI income?

15  A.  No, sir, there is no indication he ever received -- was ever

16  evaluated for SSI.

17  Q.  So the answer would be he never received any?

18  A.  He never received any, that's correct.

19  Q.  And was he ever identified as a behavior problem in school?  Do

20  you have any documents to show that?

21  A.  I don't think I do, no.

22  Q.  Now, had an IQ test been done on Mr. Hardy within the last

23  year, it would have alleviated all of this talk about the Flynn

24  Effect, would it not?

25  A.  No, sir.  No, sir.  It would give a contemporaneous indication

1  of his IQ score at this time.  Now, if the issue is, what is his IQ

2  today --

3  Q.  Yes.

4  A.  -- then an IQ score that's administered today is the best

5  reflection of that.  If the question is, what was his IQ in 1996 or

6  1994, then the test that's administered proximate to that is going

7  to be the preferable instrument.

8  Q.  If you gave him an IQ test today, would that test have to be,

9  in your opinion, would it have to be normed because of the Flynn

10  Effect?

11  A.  If you gave him a WAIS-IV, it's been so recently standardized

12  that there would be a negligible Flynn Effect.  We would still be

13  within three years of standardization, and it wouldn't amount to a

14  point at this time.

15  Q.  We wouldn't have any malingering issues, you would be able to

16  determine whether or not he was trying hard if we did one today?

17  A.  Well, apparently not.  There were three malingering measures

18  that were done with the assessment in '96 and yet there is dispute

19  that he did not give his best effort on that assessment.  I can

20  only assume that were that repeated today with malingering measures

21  it would potentially again be disputed whether he was making his

22  best effort.

23  Q.  And you have no ethical, you have no ethical bars to testing

24  him; is that correct?

25  A.  No, sir.  It is correct, I have no ethical bars.

1  Q.  Now, we have talked about the Flynn Effect.  You did not apply

2  that in 1996, correct?

3  A.  That's correct.

4  Q.  But it was known in 1996?

5  A.  Yes, sir.

6  Q.  In fact, in your --

7  A.  Not to me but it was known.

8  Q.  1984 I believe is when he began writing about it, correct?

9  A.  Yes, sir, that's correct.

10  Q.  And you cited several articles in your 2009 report reflecting

11  articles from the '80s, correct?

12  A.  Yes, sir, that's correct, I did.

13  Q.  And it was your job as a psychologist to know about this stuff,

14  correct?

15  A.  Yes, sir, that's correct.

16  Q.  But this was before Atkins, wasn't it?

17  A.  Yes, sir, 1996 was before Atkins.

18  Q.  So the whole Flynn Effect really didn't have any sort of

19  importance in the capital case world?

20  A.  Yes, sir, it still would.  It would still -- it was still

21  important to identifying an accurate IQ score and was still

22  important to the classification to which somebody had been

23  assigned.  Had I been aware of the Flynn Effect and applied it, I

24  likely would have proceeded to have referred him for mental

25  retardation -- a more complete mental retardation assessment.  So

1  that my own lack of knowledge of the Flynn Effect at that time had

2  impact on what subsequently unfolded in the course of my evaluation

3  and consultation.

4  Q.  Wait a second.  Hadn't you just gotten that big appointment to

5  some board in 1996?

6  A.  You know, I passed my forensic boards in 1995 after several

7  years of extraordinarily intensive study.

8  Q.  Okay.  But you didn't know about the Flynn Effect?

9  A.  This was a piece of science that I still did not access in

10  spite of all of that study.

11  Q.  Right over your head.

12  A.  It wasn't over my head, it's simply that I didn't access that.

13  Q.  You missed it?

14  A.  Yes, sir.  It was not being discussed in the forensic seminars

15  that I had been attending up to that time.  There certainly have

16  been many important publications since then.  The *American*

17  *Psychologist* article that Kanaya published and others that have

18  substantially raised the visibility of this, so it was a finding

19  that would most appropriately have been considered and applied in

20  1996.  At that time I did not have knowledge of it, though I would

21  agree I should have.

22  Q.  Nobody was applying it in 1996.

23  A.  No, sir, that's not correct.

24  Q.  Can you point to any persons in the capital case world who was

25  applying the Flynn Effect to IQ scores?

1  A.  In 1996 --

2  Q.  Yes or no?

3  A.  This was my third case, I didn't know the capital world at that

4  time.

5          THE COURT:  Yeah, let him --

6          MR. MILLER:  Judge, I just asked him yes or no, was there

7  anybody, and who was it.

8          THE COURT:  Well, can you give a yes or no answer?

9          THE WITNESS:  No, ma'am.

10         THE COURT:  Okay.  Then give the answer that you can

11  give.

12         THE WITNESS:  I didn't know the capital case community in

13  1996.  That was about my -- this case was perhaps my third capital

14  case to participate in.

15  BY MR. MILLER:

16  Q.  When did you start using the Flynn Effect, applying it?

17  A.  I don't know that I can tell you for sure.  Approximately

18  several years.  I think it was the Kanaya, Scullin and Ceci article

19  that brought this to my attention.  I may have seen something prior

20  to that.  But I took particular note of that study.

21  Q.  As opposed to Atkins you began applying; is that correct?

22  A.  That was published, that study was published after Atkins.

23  Q.  So it was not until after Atkins that you started applying the

24  Flynn Effect?

25  A.  It was not until after Atkins that potentially I became aware

1    of the Flynn Effect.  Again, I can't tell you exactly when that

2    was.  Certainly that paper was part of what brought it to my

3    attention.  I may have had awareness of it prior to that, I just

4    don't recall.

5    Q.  And again, giving that -- what was that thing you called in

6    1995, what was that again?

7    A.  That's when I became board certified --

8    Q.  Board certified.

9    A.  -- in forensic psychology by the American Board of Professional

10   Psychology.

11   Q.  Which is about the time you started doing all of your work in

12   death penalty cases, correct?

13   A.  I was contacted to do my first death penalty case actually in

14   response to an announcement of my board certification that I sent

15   out in the west Texas area.

16   Q.  So the answer to my question would be yes?

17   A.  Yes, I believe that's correct.

18              THE COURT:  What was the paper you said that?

19              THE WITNESS:  That was the *American Psychologist* paper,

20   your Honor, and that is cited, that is Kanaya, Scullin and Ceci

21   2003, so that would be actually six years ago, and that was in the

22   *American Psychologist*, the full cite is provided on slide No. 29.

23              THE COURT:  All right.

24   BY MR. MILLER:

25   Q.  Now, the Flynn Effect, as I understand it, Doctor, is a number

based on an averaging of several different types of tests, correct?

A.  Yes and no.  That .3 is what's been identified on full scale

Wechsler scales.  There are some IQ tests that are more -- that are

measures, more predominantly measures of fluid as opposed to

crystallized intelligence, and there the Flynn Effect may be as

much as two or three times greater than it is on crystallized IQ

assessments.  Wechsler scale involves both fluid and crystallized,

other tests are more fluid and intelligence based.  So it actually

can be tracked for any particular test as a broad principle using

full scale IQ scores.  It's been identified as occurring in about

.3 per year.

Q.  It is also -- or excuse me.  It is my understanding that it is

based on an overall average of the general population, correct?

A.  Yes, sir, that's fair.  Although I provided testimony to

describe its potential differential movement at different places on

the curve, that IQ curve, but, yes, sir, it is based on general

population.

Q.  And you can't tell us with any certainty whether or not it

applies in an individual sense?

A.  No, sir, that's not correct.  Psychological certainty and

medical certainty are always based on the application of group data

to the individual case, that's what that certainty rests on.  And

so that's the nature of my science and that is what allows me to

speak with reasonable certainty on any issue is group data applied

to the individual case.

1   Q.  Everybody's score, no matter who it is, are you telling us

2   their scores will always invariably go up .3 every year, an

3   individual?

4   A.  The individual's score will be whatever their score is.  It's

5   the group as a whole that is moving in relationship to them, that's

6   what requires the adjustment.

7        Now, I described a number of studies that have done

8   test-retest with the same person using old norms and new norms as a

9   mechanism of demonstrating what that degree of movement is over

10  time.  As I described, depending on where somebody is on that

11  curve, Flynn believes that it applies at all levels.  There is some

12  research that supports that.  I've described that down below an IQ

13  score of 65, outside the zone that we're concerned with here,

14  there's also research that indicates that it may not be moving at

15  the same speed.

16       But in answer to your question, the best data that we

17  have is applied to the individual is that this is a reliable

18  phenomenon and to ignore it, to not incorporate it, is to treat an

19  IQ score as if it's something reified as if from God as opposed to

20  a designation that reflects someone's position relative to the

21  group as a whole, which is the meaning of IQ.

22  Q.  The only place it's applied is in the context of capital cases?

23  A.  No, sir.  If you read the Kanaya paper, Kanaya, et al., paper,

24  you'll identify their discussion of applications of this in special

25  education, in disability determinations, that this does not simply

1    have implications in the capital arena.  It's in the capital arena

2    that it has life and death implications, but it is a phenomenon

3    that has psychometric significance beyond this.

4    Q.  You're familiar with this, I believe this is one of the

5    articles you quoted, correct?

6    A.  Yes, sir, it is, I described that.

7    Q.  This is Hagan, Drogin, and it's titled:  "Adjusting IQ Scores

8    for the Flynn Effect:  Consistent With the Standard of Practice."

9    A.  Yes, sir.

10   Q.  And he concludes this, or the article concludes, I guess:

11   "Three conclusions emerge:  First and foremost, adjusting obtained

12   scores and recalculating norm means on the basis of the Flynn

13   Effect do not represent the convention and custom in psychology.

14   Adjusting obtained IQ scores for this purpose is not the standard

15   of practice.

16        "Second, recalculating an individual's actual data likely

17   violates standardization procedures and departs from training

18   practices, prevailing cannons, guidelines, most treatises, and test

19   instruction manuals.  In addition, the prevailing consensus calls

20   for publishers to update norms periodically.

21        "Third, when choosing IQ tests or reviewing archival test

22   data, psychologists should carefully consider potential compromises

23   in validity and the differential impact of such compromises in

24   light of race, culture, age, gender and the weighing of cognitive

25   demand of the instrument.  Commenting on these issues in the report

1    narrative is appropriate, but adjusting the numerical scores is

2    not, is not.  The practicer should heed the practice standard to

3    use the most current version of a test.

4          "The current accepted convention does not support

5    subtracting IQ points in a way that departs from the requirements

6    of the test manual.  Evaluators must also be aware that there is no

7    agreed-upon method for how diagnostic conclusions should be

8    influenced by the Flynn Effect.  Psychologists cannot conclude that

9    adjusting scores is a generally-accepted practice in evaluations

10   for special education, parental rights termination, disability, or

11   any other purpose."

12   A.  That's what it says.  I disagree with some elements of that, as

13   do other scholars, but that's what this paper says.

14   Q.  What that paper is saying is that there is no agreed-upon

15   standard in your discipline as to what to do with the Flynn Effect?

16   A.  They cite Young, et al., 2007 for that proposition.  There are

17   others that say differently.

18          THE COURT:  Can we go back to the first page of that?

19          MR. MILLER:  Can we go back one.

20          THE WITNESS:  I have a copy of that paper if it's

21   relevant to provide.

22          MR. MILLER:  I think it was in his materials, yes.

23          THE COURT:  Okay.  You can take it down.

24   BY MR. MILLER:

25   Q.  And also, I believe, are you familiar with the technical report

1   to the -- and I always say this wrong, Doctor, so I am going to ask

2   you to correct me -- WAIS, W-A-I-S?

3   A.  The WAIS?

4   Q.  III?

5   A.  Yes, sir.

6   Q.  The response to Flynn, they also indicate, and these are the

7   people, WAIS-III technical report in response to Flynn indicates

8   that they don't believe there should be any adjustment for the

9   Flynn Effect.

10  A.  If you'll direct me to a page number.

11  Q.  I'm sorry, I'll just hand you the document.

12          MR. MILLER:  Permission to approach?  I'm sorry, your

13  Honor.

14          THE COURT:  Yes.

15          THE WITNESS:  This is not from the technical manual, this

16  is a technical report promulgated by the publishers of the WAIS.

17  BY MR. MILLER:

18  Q.  Right.

19  A.  (WITNESS READS DOCUMENT.)  Yes, sir, they assert a rise of .17

20  rather than .3 per year.  So they dispute Flynn's assertion that

21  it's inflating by .3.  This test's publishers, and it says the test

22  publisher does not endorse the recommendation made by Flynn to

23  adjust WAIS-III scores.

24          The publisher has a proprietary interest in this

25  instrument, I should add that, as we're talking about what their

1  recommendations for adjustments, as well as their assertions of how

2  much inflation is occurring in the test scores.

3        But they're identifying a Flynn Effect, they're

4  identifying it at a slower rate, at about half the rate.  This is

5  for the WAIS-III, not for the WAIS-R that we were talking about,

6  but for the WAIS-III as -- across the period of its utilization.

7  Q.  Okay.  Doctor, they're saying not to adjust for the Flynn

8  Effect, correct?

9  A.  Not to adjust WAIS-III scores, not to adjust -- they are

10 acknowledging the inflation, they're saying that they do not

11 endorse a recommendation to adjust WAIS-III scores.

12 Q.  Thank you.

13        THE COURT:  Mr. Miller, we've been at it for about an

14 hour and a half.  I don't want to cut you short, but if --

15        MR. MILLER:  I am going to finish up this morning, Judge,

16 but this would be a good place to take a break.

17        THE COURT:  We will take a 10-minute break.

18        THE DEPUTY CLERK:  All rise.

19    (WHEREUPON, A RECESS WAS TAKEN.)

20    (OPEN COURT.)

21        THE DEPUTY CLERK:  All rise.

22        THE COURT:  Have a seat, please.

23 BY MR. MILLER:

24 Q.  Doctor, I think when we ended, I just have one -- maybe one or

25 two more questions about the Flynn Effect.

1    A.  Yes, sir.

2    Q.  You referred to the Kanaya report?

3    A.  Yes.

4    Q.  And the title of that was the "Flynn Effect and U.S. Policies,"

5    is that correct, is that the article?

6    A.  "The Flynn Effect and U.S. Policies:  The Impact of Rising IQ

7    Scores on American Society via Mental Retardation Diagnoses."

8    Q.  If you could turn to page -- do you have it in front of you,

9    sir?

10   A.  I can turn to it.  I have that.

11   Q.  It says in Caveats and Conclusions, it said:  "In closing, we

12   bring to the readers' attention some strengths and weaknesses --

13   A.  Give me just a moment to catch up.

14   Q.  I'm sorry, Doctor.

15   A.  Yes, I see that.

16   Q.  It says, "In closing, we bring to the readers' attention some

17   strengths and weaknesses of the present analyses."  And then it

18   goes on.  It says, "As a result of the fairly large sample size of

19   the present study, we were able to systematically estimate the size

20   of the Flynn Effect among mild MR and borderline individuals using

21   both initial testings and later reevaluations."

22            Correct?

23   A.  Yes.

24   Q.  Now, is Kanaya talking about himself -- I take it it is a him?

25   Is it a him or --

1    A.  No, it's a herself actually.

2    Q.  It's a herself, okay.  Thank you.  Herself, she is talking

3    about her study, correct?

4    A.  Yes, sir, that's correct.  And the coauthors.

5    Q.  And the coauthors.  And then she says:  "As previously

6    mentioned, Flynn himself did not include the mildly retarded (or

7    the gifted) in his large, systematic analysis, and all of the

8    published research done on MR individuals mentioned in the

9    introduction," and then he has some citations, "has used

10   comparatively small sample sizes or solely used children who were

11   not already classified as MR as opposed to those who were not."

12          Correct?

13   A.  That's what it says.  This does not acknowledge the data on

14   adults that I described in my testimony.  But in their literature

15   review they're identifying only studies with children.

16   Q.  Thank you.  I want to move on to the -- yesterday you spoke

17   about the Texas Tech -- Texas case of Ex Parte Briseno?

18   A.  Yes, sir.

19   Q.  Am I saying that right?

20   A.  Briseno.

21   Q.  Briseno.  Would it be a fair statement that Paul Hardy would

22   not qualify under that standard?

23   A.  The seven factors that are listed, and I can go through them, I

24   have not thought of that question.  But to the extent that those

25   apply or were descriptive of moderate to severe mental retardation

1    and he is in the mild range, then certainly a case could be made

2    that -- let me just go through those factors one by one and look at

3    them again.

4         There are arguments that can be made with each of those

5    factors.  And I would additionally point out regarding Briseno that

6    there has not yet been a case where the individual had a qualifying

7    IQ score and where there was expert testimony that this was a

8    person with mental retardation who was then excluded from a mental

9    retardation finding because their MR wasn't bad enough as defined

10   by Briseno.  To my understanding, that has not yet been tested.

11        There would be discussions about -- Paul Hardy would be on

12   a continuum of each of these factors.  He would tend to be on the

13   higher end, but limitations that he has to some extent vis-a-vis

14   most of these factors could be identified

15   Q.  So the answer, the short answer would be you don't know, it

16   could go either way?

17   A.  The short answer, broadly he would probably not under these

18   seven factors, although there are features of him that do meet,

19   that are on a continuum described by these factors.

20   Q.  Jumping to something else here very quickly.  Outside of your

21   evaluation, your review, I guess, your evaluation and review of

22   Dr. Swanson and Dr. Swanson, do you know of anyone else, any other

23   trained person, either a psychologist, psychiatrist or social

24   worker, who has ever suggested that Hardy was mentally retarded?

25   A.  Outside of the current -- of individuals currently retained by

1    the defense --

2    Q.  Yes.

3    A.  -- in this matter, I do not know of anyone else who has

4    identified him as a person with mental retardation.

5    Q.  Have you -- outside of these, again using those evaluations,

6    has anyone ever suggested that he was learning disabled?

7    A.  I don't know that an assessment was done of that either way.

8    Not that he is or that he isn't.  I don't know that an assessment

9    was ever done.

10   Q.  So again, the short answer would be, you have no documentation

11   that reflects that he was ever diagnosed as learning disabled?

12   A.  Or ever even assessed for learning disability.

13   Q.  And you don't have any documentation which would show that he

14   is receiving any kind of government benefit as a result of a mental

15   disability; is that correct?

16   A.  That's correct.

17   Q.  I want to talk now about your 1996 report.  I'm sure you have a

18   copy of it up there with you.

19   A.  Give me just a moment to retrieve that.  What is the date that

20   you have?

21   Q.  I'm sorry, Doctor, I show a four-page report and actually it's

22   undated.

23   A.  All right.  Let me look.

24   Q.  Oh, no, here, I'm sorry, April the 18th of 1996.

25   A.  Let me try to retrieve that.

```
 1              THE COURT:  Is that report in any of the exhibit books,

 2   do you know, either side?

 3              MR. LARSON:  We did not include it in ours, your Honor.

 4              THE COURT:  All right.  It's not in yours.

 5              MR. MILLER:  Judge --

 6              THE COURT:  Out of an abundance of caution the answer is

 7   no?

 8              MR. MILLER:  No.  I'll provide the court with a copy.

 9              THE WITNESS:  Yes, I have that.

10   BY MR. MILLER:

11   Q.  Now, Doctor, mental retardation, I take it, is an Axis 2 --

12   A.  That's correct.

13   Q.  -- diagnosis?

14   A.  Yes, sir.

15   Q.  Now, at the time that you prepared this report you were board

16   certified, correct?

17   A.  In forensic psychology, that's correct.

18   Q.  And it reflects that you reviewed a fairly significant amount

19   of documentation prior to making your diagnosis, correct?

20   A.  Yes, sir.

21   Q.  I mean, including not only the circumstances surrounding the

22   crime, apparently you spoke with various witnesses, persons who

23   knew him who were not necessarily involved in the crimes, correct?

24   A.  Not witnesses of the offense --

25   Q.  Right.
```

```
 1   A.  -- but family members, third parties, yes, sir.

 2   Q.  I know there's a word for those kind of persons.

 3   A.  Collateral sources.

 4   Q.  Sources, I'll call them the sources of information.

 5   A.  Yes, sir.

 6   Q.  And one of them, obviously, that you spoke with was Toni Van

 7   Buren, correct?

 8   A.  Yes, sir, that's correct.

 9   Q.  Have you reviewed Toni Van Buren's interview with Dr. Swanson?

10   A.  Her description of the findings from that interview?

11   Q.  Yes.

12   A.  Yes, sir, I have.

13   Q.  Somewhat different than your interview of Ms. Van Buren; would

14   that be a fair statement?

15   A.  In terms of it being focused on adaptive behavior where mine

16   was not, that's correct.

17   Q.  I want to approach --

18             MR. MILLER:  May I approach, your Honor?

19             THE COURT:  Yes.

20   BY MR. MILLER:

21   Q.  Do you recognize these notes?  It's a long time ago, but ask

22   you if you recognize those?

23   A.  Yes, sir, I do, I have the originals here with me.

24   Q.  Okay.  That'll make it easy.  Could you refer to those?

25   A.  Yes, sir, I have them here.  Thank you.
```

1    Q.  In those notes, she indicated that she knew Paul approximately

2    10 and a half years, correct?

3    A.  Yes, sir.

4    Q.  Going down to the third line.

5    A.  Yes, sir.

6    Q.  Since age 19, correct?

7    A.  No, sir, that's a four, I apologize for my handwriting.

8    Q.  That's a four?

9    A.  Yes, sir.

10   Q.  So since she was age 14?

11   A.  Yes, sir.

12   Q.  Okay.  I misunderstood, looked like age 19.

13   A.  The code is not easy to break, I apologize.

14   Q.  Now, did she describe the profound sort of deficits that were

15   contained in Dr. Swanson's interview?

16   A.  I did not inquire of those and did not obtain that description

17   as a result.

18   Q.  Well, she sort of indicates that he was a normally-functioning

19   human being, correct?

20   A.  She does not describe adaptive limitations as she's talking to

21   me.

22   Q.  She said he was a real good dad, correct?

23   A.  Yes, sir.

24   Q.  And again, I am trying to work through your handwriting.

25   A.  Yes, sir.  You might direct me to what page, what line.

1   Q.  We're talking about the first page.

2   A.  Yes, sir.

3   Q.  And we're going down --

4   A.  Yes, sir, about a third down, with the kids is real good dad,

5   spends all of the time he can with them, sit down and talk to them.

6   Q.  She does not give any indication that she was afraid to leave

7   the children with him for fear that he would be unable to care for

8   them, correct?

9   A.  She doesn't describe that one way or the other.

10  Q.  If you go to the second page.

11  A.  Yes, sir.

12  Q.  The first full paragraph it starts "Paul had"?

13  A.  Yes, sir.

14  Q.  What does that say there, if you could read that paragraph?

15  A.  "Paul had friends, real friendly person, did what he could to

16  help anybody.  Paul helped Mitchell pay his rent if needed it.

17  Paul took Ms. Julie into doctor and sat with her" -- and then this

18  is a parenthesis describing Ms. Julie -- "from Calliope, who died a

19  year ago, a neighbor of Paul's growing up."

20  Q.  So nothing in Ms. Van Buren's interview with you would have

21  alerted you or caused you to believe that he was suffering or that

22  he might possibly be suffering some from mental retardation; is

23  that correct?

24  A.  Yes, sir, that's correct.  Although, again, in fairness, that

25  may be a limitation of the range of my inquiry.

1   Q.  Approximately how many witnesses or sources of information did

2   you talk to about his life?

3   A.  Approximately six that I have here.  I would have to look at my

4   testimony to see if I identified any in addition to that.  But at

5   least six that I list on a cover sheet that I have from that time.

6   Let me turn to my testimony and see who else I might list.

7   Q.  I'd ask you maybe at page 11.

8   A.  Yes, sir, I have that.  Do you want me to count them or

9   identify them?

10  Q.  Well, let's identify them, if you would.

11  A.  Toni Van Buren, Faith Price, Javetta Cooper, Linda Hardy,

12  Lionel Hardy, Alicia Hardy, Marie Hardy, Terry Hardy, Mitchell

13  White, Tamantha Taylor, Jacquetta Franklin, those are the

14  individuals I spoke to.

15  Q.  And you also indicated that you heard the testimony of Gail

16  Stewart and a Mrs. Robinson?

17  A.  That's correct.  And also I heard the testimony of some of

18  those individuals who I had also interviewed.

19  Q.  I take it also from reading your report that you also had

20  reviewed prison records, partial school records, articles about the

21  school system in which he had been -- which he had attended.  A

22  fairly extensive review of his life, correct?

23  A.  Yes, sir, to the best of my ability.

24  Q.  You also in your report on page 2 indicated that you reviewed

25  his IQ scores, correct?

1    A.  That's correct.

2    Q.  And I don't see that they were normed.  What I mean by normed,

3    I think by that term I mean readjusted for the Flynn Effect,

4    correct?

5    A.  That's correct.

6    Q.  And on page 3 of your diagnosis is Axis 1, that he suffers from

7    what?

8    A.  I said rule out Attention Deficit/Hyperactivity Disorder, which

9    means whether he has it or not still needs to be determined.  To

10   the extent that it is present it's in partial remission.

11   Q.  Axis 2?

12   A.  Personality disorder not otherwise specified.

13   Q.  And again, mental retardation is an Axis 2 --

14   A.  Yes, sir.

15   Q.  -- diagnosis?

16   A.  That's correct.

17   Q.  And you did not diagnose that, correct?

18   A.  That's correct.

19   Q.  Axis 3, you have none, no diagnosis of any kind, correct?

20   A.  That would be physical problems, physical disorders.

21   Q.  Axis 4?

22   A.  Axis 4 relates to stresses that are present.  I identified

23   problems with the primary support group, problems related to social

24   environment, educational problems, occupational problems, housing

25   problems, economic problems, problems related to interactions with

```
 1   the legal system/crime and other psychosocial environmental
 2   problems.
 3   Q.  And then there's Axis 5, which is what; what is Axis 5?
 4   A.  Axis 5 is a global assessment of functioning, it's on a scale
 5   that ranges from zero to 100 and reflects the highest level of
 6   functioning in the preceding year, and I estimated that at 45 for
 7   the year preceding the alleged offense, which reflects a moderate
 8   degree of impairment.  I would have to look at a DSM to be reminded
 9   of precisely what the description is at a 45.  But that does
10   reflect problems in practical functioning.
11   Q.  But he is right in the middle of one and 100, correct?
12   A.  Well, it is certainly in the middle of from zero to 100.  A 45
13   does reflect impairments in social functioning.
14   Q.  Is 50 a mean, do most people fall around 50?
15   A.  I don't believe that's correct.
16   Q.  Where do most people fall?
17   A.  An unimpaired -- I think an unimpaired person in the community
18   you would expect to see them in the 70-plus range, maybe better.
19   Q.  Now, you also indicated in your testimony that you spoke with
20   Paul Hardy, correct?
21   A.  Yes, sir, that's correct.
22   Q.  And at page 10 of that testimony you were asked the question,
23   page 10, line 17, on February -- excuse me.  Line 16.
24   A.  Page 10 of my testimony?
25   Q.  Page 10 of your trial testimony in the first trial.
```

1  A.  Yes, sir, let me turn to that, I'm sorry.  I have that.

2  Q.  You were asked the following question:  "Now, why don't you

3  tell the jury what it is that you did.  A. On February the 26th I

4  spent approximately seven hours and 25 minutes interviewing and

5  evaluating Paul."

6  A.  That's correct.

7  Q.  "The next day on February the 27th I spent approximately nine

8  hours and 10 minutes evaluating and interviewing him.  So I've

9  spent about 16 and a half hours in direct evaluation and interview

10  of him."

11  A.  That's correct.

12  Q.  "I reviewed the testing reports and conferences with Dr. Tetlow

13  and Dr. Bianchini."

14  A.  Yes, sir.

15  Q.  "I completed a Wide Range Achievement Test-3 that Dr. Tetlow

16  had begun."

17  A.  Yes, sir.

18  Q.  "As a part of the interview that I did of Paul, there is a

19  particular interview called a psychopathy --"

20  A.  Psychopathy.

21  Q.  Thank you.

22  A.  Psychopathy.

23  Q.  "Psychopathy checklist revised that I went through with him as

24  well."

25  A.  Yes, sir.

1    Q.  "Because I am concerned with trying to verify as much data as I

2    can and to look at the context and at this person from as many

3    different avenues as I can, I engaged in a number of what are

4    called third-party interviews, that's talking to friends or

5    family."

6    A.  Yes, sir.

7    Q.  And then you've already related to the court, to her Honor,

8    what individuals that you interviewed, correct?

9    A.  Yes, sir, that's correct.

10   Q.  So you had his IQ scores, correct?

11   A.  Yes, sir.

12   Q.  You interviewed those various witnesses, including Toni Van

13   Buren, Faith Price, his family members, correct?

14   A.  Yes, sir.

15   Q.  You had his partial school records?

16   A.  Yes, sir.

17   Q.  I'm repeating myself, you spent 16 and a half hours with him?

18   A.  Yes, sir.

19   Q.  You had the reports of other psychologists, correct?

20   A.  Yes, sir.

21   Q.  And these are respected psychologists?

22   A.  Yes, sir.

23   Q.  I mean, you didn't find or even suspect that he was mentally

24   retarded?

25   A.  I identified that he was mentally deficient.  I testified to

1    that.  I did not identify him as mentally retarded.

2    Q.  Nobody did.

3    A.  To my knowledge, that's correct.

4    Q.  And you're a trained professional?

5    A.  Yes, sir.

6    Q.  And this is what you do for a living.

7    A.  Evaluating psychological disorders is what I do for a living

8    and now primarily as it applies to a court context.

9    Q.  You have a résumé that's about as thick as *War and Peace*,

10   correct?

11   A.  No, sir, it's only nine pages, I think.

12   Q.  I'm sorry, nine pages?

13   A.  *War and Peace* is somewhere over 1200.  I hope to get there some

14   day.

15   Q.  At the rate you're going you will.

16            Given all of your experience, all of your knowledge, all

17   of your training, all of your publication, 1996, you didn't think

18   he was mentally retarded.

19   A.  There's a very important difference.  My scientific

20   participation and evolution as a scientist has substantially been

21   since 1996.  In 1996 I had a single publication on my curriculum

22   vitae and that was a paper that had been written based on my

23   doctoral dissertation that was peer reviewed, and one publication

24   in a professional periodical from internship that was about

25   nocturnal enuresis, or bedwetting clinic that we had done.

1          So my evolution as a scientist has been a substantial

2     metamorphosis since 1996.  I thought I was a good professional and

3     a scientist at that time, there was still a great deal about the

4     nature of science and precision of it I've learned.

5          There are 40 publications since that time, and so I've

6     evolved significantly as a professional and a scientist.  That is a

7     continuing evolution, I continue to discover things as I continue

8     to read and develop every month that I wish that I had known the

9     month before.

10    Q.  Are you indicating that all of your work in the mid to late

11    '90s was suspect?

12    A.  No, sir, but it did not bring the degree of capability to bear

13    that I have today.

14    Q.  Now, your 2009 report you reach a different diagnosis; is that

15    correct?

16    A.  That's correct.

17    Q.  And as we've already indicated, that diagnosis is worth

18    approximately $40,000 to you, correct?

19          MR. LARSON:  Objection.

20          MR. MILLER:  Well, let me rephrase it.  I will, your

21    Honor.

22    BY MR. MILLER:

23    Q.  You made $40,000 in this particular case, correct?

24    A.  I anticipate that I will.  Someplace in that neighborhood.

25    Q.  Now, you'll agree that in your present report his scores

1    unnormed do not qualify him to be mentally retarded, correct?

2    A.  No, sir.  The IQ score of 73 is within the qualifying range for

3    mental retardation, which DSM-IV identifies as 75 or below.  It is

4    above a bright line of 70, it's within the DSM-IV qualifying range.

5    Because of the standard error of measurement, it crosses into the

6    below-70 zone.

7    Q.  I want to talk about the standard.  Are you familiar with a

8    regression to mean phenomenon?

9    A.  Yes, sir.  Yes, sir, I am.

10   Q.  The regression to mean phenomenon is essentially that when you

11   have an IQ score, when you're looking at that standard of error, a

12   person is more likely to move towards the mean than away from it,

13   correct?

14   A.  Yes, sir, that's why the standard error of measurement is

15   slightly inclined, so that it is larger on the upper end than it is

16   on the lower end.  For example, although we might say plus or minus

17   five it might actually be four on the lower side and five on the

18   upper side.  So, for example, if it were plus or minus five on an

19   IQ score of 73, the standard error of measurement might be 69 to

20   78, as opposed to five points on either side.

21   Q.  Glutting and Sattler, are you familiar with those two

22   individuals?

23   A.  Sattler, I am, yes, Sattler published a very influential text

24   on intellectual assessment and assessment of developmental

25   disabilities.

1   Q.  He indicated that a person -- the IQ score a person attains

2   actually has the greatest possibility of being their true IQ,

3   correct?  I mean, we don't give people ranges, we give them

4   numbers.

5   A.  Yes, sir, you give them a number.  Understanding that number,

6   though, is not a precise point.  I mean, the greatest likelihood,

7   the greatest probability is that that number is correct but there

8   is -- that's a probability.  That's why -- it may be that that

9   probability is as low as -- even to say there is a 60 percent

10  probability requires you to go one standard of error of measurement

11  on either side.  And so to say that precise score is correct is a

12  probability of less than 50 percent.  But that score has greater

13  probability than others.

14          The imprecision of the test results in the most accurate

15  statement being that there is a probability that the true score

16  lies within these ranges.  It's more convenient for us to say the

17  number is this, but that really mischaracterizes the instrument and

18  gives it greater accuracy, a mantle of greater accuracy than, in

19  fact, exists.

20  Q.  You're familiar with Tolskey, correct, David Tolskey?

21  A.  You may need to give me a complete title of the article, I

22  don't always remember the author.

23  Q.  No, I am just asking if you're familiar with him.

24  A.  I may be, I don't recall the name.

25  Q.  He was the author of -- how do you say that again, W-A-I-S?

1    A.  WAIS?

2    Q.  WAIS-III, is that correct?

3    A.  Yes, sir, then I would be.

4    Q.  Now, you indicated or do you agree with this general

5    proposition, you said this in 2003:  "Due to the statistical

6    finding that the true IQ is most likely to lie towards the

7    population mean of 100, the regression to the mean phenomenon, the

8    next likely location of the true IQ for those with IQs below 100 is

9    in the upper portion of the confidence band.  For example, if an

10   examinee obtained a WAIS-III full scale IQ of 72, the 95 percent

11   confidence band spans from 68 to 77."

12   A.  Yes, sir, that's what I just --

13   Q.  Let me finish.

14   A.  I'm sorry.

15   Q.  Then you can tell me yes or no, whether you agree with it or

16   not.  "The true IQ is thus likely to be 72.  The 95 percent

17   confidence band spans between 72 to 77.  A sound reason must thus

18   exist before it can be concluded that an examinee's true IQ is not

19   the attained IQ and especially that it is lower than the attained

20   IQ."

21           Do you disagree with that; just yes or no?

22   A.  Yes, sir, with a proviso that that's what we're talking about

23   by giving it four points on one side and five points on the other.

24   Q.  Okay.

25   A.  That there is a slight inclination.  That doesn't mean that it

1   is necessarily -- once you've done that at that point now you've

2   got a 95 percent confidence interval that spans that range, you've

3   allowed for a slight regression toward the mean.  It doesn't say

4   you can reliably then conclude the actual IQ score is on the higher

5   side, we've simply given a little bit greater range to allow for

6   that possibility.

7          Yes, sir, I would not -- and the second part, I would not

8   recommend that the IQ score simply be set aside, but it is most

9   accurately described as a range.  And as I said, I think it also

10  has to be viewed in light of the standardization that would be

11  contemporaneous to the administration of the test.  In other words,

12  that there be some Flynn Effect recognition as well.

13  Q.  Well, you don't get the -- what we're calling the standard --

14  SEM?

15  A.  Standard error of measurement.

16  Q.  You don't get that and the Flynn Effect --

17  A.  Oh, yes, sir.

18  Q.  -- you get one or the other?  You get both of them?

19  A.  Yes, sir.  The error is still there.  That's to say that even

20  after the score is -- first you would look at the impact of the

21  Flynn Effect.  I did that on the slides reflecting Flynn adjusted

22  IQ score.

23          If the Flynn Effect is taken into consideration, then

24  that score is -- the two scores that were obtained, even ignoring

25  the practice effect, was 68 and 71.  There is a standard error of

measurement that is around those scores.

Q. So you take the low end of the standard, the SEM, you take the lower number and then you --

A. No, sir, no.

Q. -- Flynn Effect that or you Flynn Effect it and then SEM it?

A. No, sir. No, you would adjust the Flynn Effect, that's what takes the score, you would subtract based -- and this is on slide, slide 38. The observed score, Dr. Tetlow's administration, the one that's unaffected by practice effects, that 73, the Flynn Effect adjustment is 5.4 points, that would be taken to say, were Paul Hardy's score of 73 compared to the population as it existed in 1996, at the maximum obsolescence of the WAIS-III, his score, that 73 would be somewhat below two standard deviations from the mean, that would approximate an IQ score of about 67 and a half.

There is a range of error that's around that. That range of error would be about four to five points on either side, that is anywhere from a 64 to 73.

Q. So it's your testimony that, let's say his score is 70, let's keep round numbers for me --

A. Yes, sir.

Q. -- and there's a Flynn Effect of three?

A. Yeah, if there were, in this case there is a Flynn Effect of five and a half.

Q. I want to stick with round numbers.

A. Yes, sir.

1   Q.  It works for me.  My lemonade stand, all right?

2   A.  Yes, sir.

3   Q.  So we're going down to 67?

4   A.  Yes, sir.

5   Q.  And that's when you apply the SEM?

6   A.  The SEM is applied either to that unadjusted score or the

7   adjusted score.  There is always an SEM, but it's not that you go

8   to the lower end of the SEM and then you add the Flynn Effect on,

9   too.

10  Q.  I understand.

11  A.  But instead, you would subtract -- you would adjust for the

12  Flynn Effect so that your standardization is contemporaneous, and

13  there is an error range, then, around that score.

14  Q.  Now, you indicated in your prior testimony, I am talking about

15  in 1996 --

16          THE COURT:  Mr. Miller, let me jump in.  Are these

17  studies part of your materials or, in an abundance of caution, are

18  you going to say no again?

19          MR. MILLER:  I'll say no, we can provide them.

20          MR. LARSON:  I haven't seen them, your Honor.

21          THE COURT:  Yeah, I mean, because to the extent that

22  you're -- I mean, I am trying to take notes, but it's --

23          MR. MILLER:  I will provide the court with a copy.

24          THE COURT:  If either side is quoting studies, I would

25  really like to have copies of them.

```
 1   BY MR. MILLER:
 2   Q.  Your prior testimony, I believe at page 19, you made --
 3   A.  Let me turn to that.
 4   Q.  You betcha.
 5   A.  I have that.
 6   Q.  You indicated, I guess, that he may have had an ADD diagnosis,
 7   correct?
 8   A.  It is -- I indicate that it's possible that he suffers from
 9   AD/HD.  There is no indication that a diagnosis was ever made.
10   Q.  And then on page 66 of that same testimony --
11   A.  Yes, sir.
12   Q.  -- you indicate, starting at about line 10:  "We already heard
13   discussions that -- heard the discussions about his verbal IQ
14   score, performance IQ score, full scale IQ score.  These would also
15   correspond to that fourth or fifth percentile range, and I would
16   suggest to you that these scores are probably about 15, that's 15
17   points lower than his true intellectual horsepower, and that
18   happens when you use national norms to arrive at that."
19            So in 1996 after having spent 16 and a half hours with
20   him, having the benefit of talked to four, excuse me, four or five
21   family members, various other sources of information, it was
22   your -- it was your professional opinion that his IQ score was
23   somewhere between 85, his true IQ score intellectual abilities was
24   between 85 and 90.  Correct?
25   A.  No, sir, I can't answer yes to the way -- yes or no to the way
```

1    you phrased that.  This opinion is not based on all of those

2    interviews, it is based on my judgment of the meaning of an IQ

3    score for an American black at that time based on the understanding

4    of the literature that I had at that time.  It wasn't to say that

5    was based on my impressions of him from the interview or from the

6    interviews of third parties.

7    Q.  Well, you felt comfortable indicating that he was -- let's put

8    it in layman's terms.  You were indicating here that he is smarter

9    than he was testing?

10   A.  Based on comparison to other blacks as opposed to a national

11   standardization, I am making a judgment based on which group you

12   compared him to.

13   Q.  So the answer to my question is yes.

14   A.  I don't recall your question, I'm sorry.

15   Q.  My question was, in layman's terms, you're telling the jury, in

16   this particular case, that he is smarter than he is testing?

17   A.  That's the implication of that.  There's some other -- you

18   know, I say as compared to national norms as compared to black

19   norms, there's some discussion around it, but at the end of the day

20   that would be the takeaway the jury is likely to have.

21   Q.  And you certainly felt comfortable giving that because you gave

22   that testimony?

23   A.  I did give that testimony.

24   Q.  And I think you indicated yesterday during your testimony that

25   it was your practice at the time to norm the IQ scores of African

1   American males some 15 points, did I understand that correctly or

2   did I --

3   A.  No, sir, I would never have adjusted those scores without

4   reporting what was actually obtained.  In the interpretation of

5   those scores at that time, it was my understanding or my best

6   interpretation of the existing research that those scores should be

7   compared to black norms as opposed to national norms.  I now

8   believe that that was incorrect and that it would have profound

9   discriminate impact were that to be implemented as policy.

10  Q.  Is discriminate impact in a psychological sense or is that just

11  kind of a feeling you have about the fairness of it all?

12  A.  It's not a feeling about it.  This would say that blacks would

13  not qualify for Social Security or special assistance unless they

14  had an IQ score of 55.  It means that in order to qualify for

15  special education programming in schools for intellectual

16  deficiency it would require an IQ score of 55.

17  Q.  So you're adjusting your scores to reach a certain social, what

18  you think is a social good?

19  A.  No, sir, it's to say that an implementation of that would, I

20  think, create great harm.  I also think it is an incorrect

21  understanding of the data.

22          Essentially, what I am concluding at this time is that

23  the IQ tests are biased against individuals who are African

24  Americans.  There was a greater view at that time that that was a

25  possibility.  I think the current view is less that the tests are

1    biased against African Americans.  The current view is more, this

2    is an observed real difference in ability in our society.  Now

3    we're talking about what does that mean?  Does that come from

4    social factors, cultural factors, environmental factors?  Is it

5    race based, what is this about, and that discussion of what causes

6    this and how can we account for it is still ongoing.  There are

7    still individuals who would say it's the test that discriminates

8    against measuring the ability of African Americans, but the larger

9    debate is into the reason for that discrepancy as opposed to the

10   test being unfair.  And so there's been some movement in science.

11        My current view has changed both as a result of the

12   change in the debate over time and the publication of additional

13   information.  It's also changed out of realization that the social

14   impact of using race-based norms would not, would be neither

15   benevolent nor fair to the individuals who would be affected by

16   that.

17        It also has been informed by the U.S. Supreme Court

18   decision in Saldano v. Texas, that said race cannot be used as a

19   consideration in capital sentencing.  And the application of

20   race-based norms does introduce a racial implication into these

21   proceedings.

22   Q.  I really -- I've forgotten my question.  I guess my question

23   is, do you adjust your scores or adjust your science to obtain a

24   certain social result; yes or no?

25   A.  No, sir.  The science --

```
1   Q.  That's all I want to know.
2   A.  -- the scientific basis doesn't change.  Certainly the
3   application of science is in recognition of social implications.
4   Q.  All right.  So it may be good science, but you don't apply it
5   because you don't like the social result?
6   A.  No, sir, that's not correct.  There is science that -- I mean,
7   science says that, from a scientific perspective I guess we would
8   be better off by maximizing, just like we do with animals, the best
9   genetic material --
10              MR. MILLER:  Judge, I am not sure this is answering my
11  question.  I think he answered my question.
12              THE COURT:  Yes, let's move on.
13              MR. MILLER:  We can move on to something else.
14              THE COURT:  Okay.
15  BY MR. MILLER:
16  Q.  You indicated in your testimony, I think at page 94, line 12,
17  you were talking about a risk assessment of Mr. Hardy, and you
18  indicated that the defendant has good adjustment to jail and he has
19  been on a work crew serving meals.  Correct?
20  A.  Let me turn to that.
21  Q.  I'm sorry, sir.  Page 94, lines 12 and 13.
22  A.  Yes, I have that.
23  Q.  You indicated he had made a good adjustment in jail and he's
24  been working on a work crew serving meals.
25  A.  Yes, sir.
```

1    Q.  And the next page, 95, at line five, you indicated:  "He has a

2    reasonable degree of cognitive adaptability, and by that, I mean

3    the ability to adapt to different settings:  The project world that

4    he lived in, in prison, and school, that he seems to be able to

5    shift cognitive sets."

6    A.  Yes, sir, that's correct.

7    Q.  And then you have the assets and rehabilitation programs of the

8    federal government, model federal prison system, and baked -- I

9    imagine that word is backed -- backed by the federal government.

10   A.  Yes, sir.

11   Q.  "Its prison system has more resources than the state system.

12   We would anticipate that there would be additional treatment

13   services brought to bear."

14           Is that correct?

15   A.  That's correct.

16           THE COURT:  What page are you on, Mr. Miller?

17           MR. MILLER:  I'm sorry, your Honor.  Page 95.  That's

18   Mr. -- excuse me, Doctor, I didn't mean that disrespectfully --

19   Dr. Cunningham's testimony, your Honor.

20           THE COURT:  All right.  Go ahead.

21   BY MR. MILLER:

22   Q.  And by talking about the ability to shift cognitive sets, what

23   we're talking to is some sort of executive functioning, planning,

24   sequencing, his ability to move from one situation to another with

25   a fair amount, at least you say with a reasonable degree of

1  adaptability.  Correct?

2  A.  Yes, sir.  Just like a child does who is 10 or 11, who adapts

3  from summer camp to school to home and neighborhood, that they

4  shift their behavior in response to the setting that they're in.

5  It's indicating that he has that capability, it's not inconsistent

6  with, again, with someone who is a person with mild mental

7  retardation or for a child who is ages 8 to 11.

8  Q.  And it's also consistent with normal people, people who aren't

9  suffering from mental retardation, to be able to move from the

10  project world to the prison world to the school world, correct?

11  A.  Yes, sir.  The more ability you have, the greater resources you

12  can bring to bear with those adaptations.  But, yes, sir, that's

13  why it's not a bright line that says normal people do this, people

14  with mental retardation do this.  Instead, it's continuum that's

15  qualitative.

16  Q.  Now, you indicated yesterday you had some dispute about the use

17  of the MMPI back in 1996, correct?

18  A.  With basing decisions about whether someone is malingering

19  mental retardation on that test.  And, more broadly, the validity

20  of it given his intellectual status and reading ability.

21  Q.  Well, at the time the MMPI was given to him because nobody

22  believed he was mentally retarded, correct?

23  A.  There had not been a determination that he was mentally

24  retarded at that time.  And my recollection of the order of things

25  is that the MMPI was given before the WRAT-R was administered.  So

1  his reading level may also not have been determined at the time

2  that it was administered by Tetlow.

3  Q.  Now, you indicated that you have reviewed the report of

4  Dr. Hayes; is that correct?

5  A.  Yes, sir, I have.

6  Q.  And you reviewed it thoroughly, correct?

7  A.  Yes, sir.

8  Q.  Now, you talked at some length yesterday about malingering?

9  A.  Yes, sir.

10 Q.  And I believe malingering is defined in the DSM at page 739, if

11 I am correct, The essential -- and I am quoting, "The essential

12 feature of malingering is the intentional production of false or

13 grossly exaggerated physical or psychological symptoms motivated by

14 extreme incentives such as avoiding military duty, avoiding work,

15 obtaining financial compensation, evading criminal prosecution or

16 obtaining drugs."

17         Correct?

18 A.  That's correct.

19 Q.  You're familiar with that language, I'm sure.

20 A.  Yes, sir.

21 Q.  It then says:  "Malingering should be strongly suspected if any

22 combination of the following is noted," and I think you may have

23 actually even had a slide on it.

24 A.  Yes, sir, I did.

25 Q.  And it provides us with the four circumstances which we should

```
 1   look at, correct?
 2   A.  Yes, sir.
 3   Q.  Or suggests four anyway.
 4   A.  Yes, the four contexts of that, that's on my slide 93.
 5   Q.  And there are certain tests that can be used for malingering,
 6   correct?  The Dot Counting Test.
 7   A.  Yes, sir.
 8   Q.  The Memory for 15 Test?
 9   A.  Yes, sir, 15 items.
10   Q.  For 15 items, I'm sorry, I can't read my writing or my typing
11   actually.  Portland Digit Recognition Test?
12   A.  Yes, sir.
13   Q.  These are all valid tests, correct?
14   A.  For that purpose, yes, sir.  And again, given what population
15   you're with, but they are all intended to identify or help identify
16   the malingering of cognitive or memory problems.
17   Q.  And you would agree, would you not, that it's not inappropriate
18   in the context of a capital prosecution to address the issue of
19   malingering, the exaggeration of symptoms or any kind of poor
20   effort in the testing process, correct?
21   A.  No, sir, that would be appropriate.  To have reasonable
22   skepticism and to consider malingering as a hypothesis.
23   Q.  Now, you indicated here yesterday, you talked about the --
24   about Dr. Hayes's report, which, again, you indicated at least
25   today that you've read -- you thoroughly, you thoroughly reviewed
```

1   and critiqued, correct?

2   A.  Yes, sir.

3   Q.  Do you have a copy of that with you?

4   A.  Yes, I do.

5   Q.  Could you show me where she actually said, because yesterday

6   you said she found specifically that he malingered.  Could you find

7   that, please?

8   A.  Yes, sir.  There are actually three places, as I recall.  Let

9   me try to find the third one as well.  The two places that I would

10  identify are on page 29.

11  Q.  Read that, please.

12  A.  "Based upon all of the information available to me at this

13  time, to a reasonable degree of psychological certainty,

14  Mr. Hardy's amount of effort expended on the 1996 and 2008

15  assessment measures was inconsistent.  As such, the results of the

16  1996 and 2008 assessment measures should not be considered an

17  adequate reflection of Mr. Hardy's level of functioning at the time

18  the measures were administered.  Rather these measures should only

19  be considered as Mr. Hardy's "minimum" level of functioning.  The

20  issue of malingering and response bias is not limited to just

21  Mr. Hardy's presentation."  Then --

22  Q.  Wait a second.  Where does it say that he malingered?

23  A.  Well, she says the issue of malingering and response bias is

24  not limited to just that.  She has just finished saying that the

25  test results should only be considered as a floor, a minimum, this

1    is after having an extensive discussion about -- or at least this

2    is the report details --

3    Q.  Dr. Cunningham, my question is --

4    A.  There is not a diagnosis of malingering, but she has drawn a

5    picture of a horse.

6    Q.  Doctor --

7    A.  She has not underwritten that this is a horse.

8    Q.  Answer my question.  You've testified 200 times, you know what

9    questions are, please answer my question.  She never says he

10   malingered, does she?

11   A.  She comes right up to the edge, she does not make that

12   diagnosis.  She dismisses the testing.

13   Q.  Wait a second, Doctor.  You spent two hours yesterday attacking

14   her, saying she said malingered.  You can't find it in the report,

15   can you?

16   A.  I described 13 instances where she -- inferences where she says

17   this is reflective or consistent with malingering.  I've got --

18   Q.  Doctor, would you agree with me she never said he malingered?

19   A.  You didn't allow me to say the rest of this.

20   Q.  Keep reading, Doctor, it's not there, I'll help you out.

21   A.  Okay.  She does not say the diagnosis here is malingering.  She

22   makes a very strong case for setting aside the IQ results for lack

23   of effort and associated with that as she is talking about that he

24   is -- his scores have dropped, for example, on subtests that should

25   have shown the greatest practice effects.  This is essentially

1    drawing a picture of a horse.  Now underneath it she has not

2    written this is a horse, but she has drawn -- there is an

3    inescapable conclusion that she is dismissing his IQ data.

4    Q.  Doctor, please find where she said he malingered.

5    A.  On page 56, again, coming right up to the edge.

6    Q.  No --

7    A.  To summarize -- let me describe --

8    Q.  Doctor, this question is simple, you're not a stupid man.

9    Where does she say he malingered?

10   A.  She does not come out and make a definitive statement he

11   malingered.

12   Q.  What she said is -- her finding is that he wasn't trying, which

13   is an entirely different proposition, isn't it, Doctor?

14   A.  No, sir, not in the context where he is being cooperative and

15   is giving an appearance of making good effort.

16   Q.  Doctor, if I am bored and I just don't give it my good effort,

17   that doesn't mean I am malingering, it just means I am bored.

18   A.  No, sir.  Dr. Bianchini found that he was paying attention,

19   that he was giving good effort to the task, that he was motivated.

20   In that case where somebody is attending and giving good effort and

21   is being motivated --

22   Q.  My question is --

23              MR. LARSON:  Your Honor --

24              THE COURT:  Mr. Miller, don't interrupt.

25              MR. MILLER:  Well, Judge, he is not answering my

1    question, that's the problem.

2            THE COURT:  Well, he -- speaking of horses, we've beaten

3    this one to a pulp.  So try to move on.

4    BY MR. MILLER:

5    Q.  So is it agreed she never said malingering?

6    A.  She does not make that definitive statement.  The report stands

7    strongly for that proposition.

8    Q.  How many times yesterday did you say she said that in the

9    report, Doctor, how many times?

10    A.  I don't believe I said that -- my recollection is not that she

11    says that he is malingering, I repeatedly identified inferences

12    that she offered in support of malingering.  I said I disagree with

13    her conclusion that he is malingering.  I think that conclusion is

14    inescapable from the report.

15    Q.  Doctor, what about serial sevens?

16    A.  Yes, sir.

17    Q.  You attacked Dr. Hayes on serial sevens.  Slide 83 of yours,

18    correct?

19    A.  I would not identify my testimony as an attack on Dr. Hayes.

20    It is a review and critique of the basis and adequacy of her

21    conclusions.

22    Q.  Doctor, yesterday you indicated that -- you talked about the

23    serial sevens and you only talked about it in two contexts,

24    correct?  You talked about it as far as Dr. Swanson giving her the

25    test -- giving him the test, excuse me, and Dr. Hayes giving him

1    the test, correct?

2    A.  Yes, sir.

3    Q.  Did you talk about when you did it in 1996?

4    A.  I did not.  Although I did give him serial sevens as well.

5    Q.  Now, this isn't what we call cherry picking, is it, just

6    picking two out and not giving us the other two?

7    A.  No, sir.  Dr. Hayes had made a point of making an inference of

8    what she observed based on the test results that were available to

9    her, and I described the best understanding of which of those were

10   within a standard area of measurement and which were not and how

11   you arrived at those.  Now, in that slide, I think I may be talking

12   as well about him using his fingers with her.

13   Q.  Right.

14   A.  But not with Dr. Swanson.

15   Q.  Now, with Dr. Swanson he was hardly able to perform, I think is

16   how you testified yesterday, correct?

17   A.  As I recall, Dr. Swanson identified that he was unable to do

18   serial sevens backwards with her.

19   Q.  And then Hardy completed in one minute and 15 seconds, and you

20   critiqued Dr. Hayes's methodology and how she did that, correct,

21   and how she scored it, correct?

22   A.  There's not a score that you get from doing serial sevens.  I

23   described that the nature of the task that she gave or how she

24   allowed Mr. Hardy to perform was not consistent with the task as

25   Dr. Swanson had presented it.

1    Q.  Doctor, do you find it at all significant that he completed it

2    in 30 seconds -- 36 seconds with no record -- with no errors in

3    1996 with Dr. Bianchini; yes or no, do you find it significant?

4    A.  You'll need to direct me to that test result.

5    Q.  Right here, here is Bianchini's report.

6    A.  Thank you.

7        It describes that he completed that task in 36 seconds

8    without error.

9    Q.  Right.  Now, Doctor, you're a thorough guy, correct; I mean,

10   that's your job, correct?

11   A.  I attempt to be.

12   Q.  Are you telling me this is the first time that you realized

13   that he did it for Dr. Bianchini?

14   A.  I recall reviewing Bianchini's results, let me turn to that.

15   No, sir, I had looked more carefully at the digit spans that

16   Dr. Bianchini did.  I had not identified this.

17   Q.  Do you think it was important if you were going to testify

18   about serial sevens that you look at everybody's reports so that

19   you see what he had done in the past?

20   A.  I simply missed it.  I did not see that Dr. Bianchini had

21   talked about this back in '96.

22   Q.  So you missed it?

23   A.  Yes, sir, I did.

24   Q.  This is sort of that computer you were talking about yesterday,

25   where the -- when the information starts coming out incomplete, we

1    might not want to rely on it?

2    A.  It is impossible for me to have a comprehensive recollection of

3    all of this.  It will be for the court to determine the extent to

4    which gaps in my knowledge have relevance for the credibility of

5    the rest.

6    Q.  Well, certainly you remember you gave him serial sevens without

7    error because that's in your capital sentencing evaluation at

8    page 2.

9    A.  Let me turn to that.  I describe that he did it slowly and that

10   he calculated out loud.  That means that he counted down as in 93,

11   92, 91, 90, 89.  In other words, what I observed was the same thing

12   that he did with Dr. Swanson, he is counting out loud.  Now, I

13   don't have a note here about whether he used his fingers at that

14   time --

15   Q.  That's in your report, Doctor?

16   A.  It's actually page one of the notes on page -- this is the

17   notes dated 2/27/96, page one, there is the actual representation

18   as I gave him serial sevens.  I've got "93 ..."  That means it's

19   taking him a long time to go to the next one.  And then he does end

20   up performing it all the way down to two, but it's slowly, and I

21   have a note that says slowly, comma, cal., C-A-L period -- that

22   means calculating -- out loud.  So he is counting downwards as he

23   does this.

24   Q.  Your administration sounds very similar to Dr. Hayes's.

25   A.  It's not that the administration is incorrect, the problem is

1  saying, when he does it with somebody else and he says he can't do

2  it, that that represents a discrepancy.  In fact, what I have here

3  reflects him doing it but counting downwards one at a time to get

4  there.

5  Q.  Page 2 of your report has serial sevens performed without

6  error, and no elaboration.  Apparently, you did not think that was

7  as important enough to include in your report; is that correct,

8  Doctor?

9  A.  The report is a substantial abbreviation and condensation of a

10  tremendous amount of records.  I did not describe in the report

11  what's reflected here on page one of these notes that were done on

12  February 27th, 1996.

13  Q.  And given that he was able to do it in 36 seconds with

14  Dr. Bianchini, he did it for you without error, isn't it indicative

15  of some sort of failure to give his best effort with Dr. Swanson

16  and Dr. Hayes?

17  A.  No, sir, no, sir.

18  Q.  Okay.

19  A.  Again, depending on, I don't know how far down Bianchini had

20  him go, whether he went all the way to zero, and I also don't know

21  that he didn't count out loud in the same way.  I only know how

22  this was performed for me, and this performance is very similar to

23  what he did with Dr. Swanson.

24  Q.  Thirty-six seconds is what Dr. Bianchini says, no finger

25  counting.

A.  Well, Bianchini doesn't describe finger counting one way or the

other, he just talks about the time to completion.  Now, someone

who is doing it rapidly might do serial sevens in 10 seconds or

less, I could give you a demonstration, I might be down to six.  So

36 is not a racehorse level.  That's giving you, you know, about

five seconds between each number.

Q.  You know of no intervening injuries or illnesses between the

time you and Dr. Bianchini gave those tests and the time that

Dr. Swanson and Dr. Hayes gave those tests, do you, Doctor?

A.  That's correct.

Q.  You also indicated that grades, that you were not likely to

depend on the grades, that they were somehow suspect; is that also

correct?

A.  I said that there are concerns about relying on grades and

achievement scores in this instance given the problems in the

permanent record that are observable and given the descriptions of

third parties about the school system and given the presence of

achievement testing irregularities in the New Orleans schools,

although, admittedly, those are occurring 10 years after he left

school or eight years after he left school.

Q.  Let me back up one, going to the serial sevens.  You indicated

how you gave them, how Dr. Hayes gave them.  You're unaware of how

Dr. Swanson administered that test, correct, because you were not

there?

A.  I was not there.

1    Q.  Anyway, going back to the grades, part of what you relied on

2    was the *Times Picayune,* I think; is that correct?

3    A.  That's correct.  Actually, what I relied on was their

4    reproduction of the data from individual schools as provided to the

5    *Times Picayune* by the school district.

6    Q.  One of the things you testified about was that there were no

7    special education classes, and as a result, he couldn't get that

8    sort of attention that he might have otherwise needed, correct?

9    A.  I described that there was not an organized special education

10   program of the sort that came to existence in these schools in the

11   1990s.

12   Q.  Again, you're a fairly thorough guy, correct?

13   A.  Yes, sir.

14   Q.  And you would have looked at his records, correct?

15   A.  Yes, sir, I have.

16   Q.  And you would have looked at the Booker T. Washington records,

17   correct?

18   A.  Yes, sir.

19   Q.  And at the bottom, what does that say?

20   A.  That says special education.

21   Q.  So special education was available because it's checked either

22   yes or no.  It's checked no for him, correct?

23   A.  It is not inconsistent with my testimony.  I described that of

24   the sort that exists, the organized application of it as we would

25   currently think of special education programs came into existence

1   in the schools primarily in the early 1990s.

2   Q.  Actually, by the mid '70s all schools in all states of the

3   Union pursuant to federal law had to have these sorts of programs;

4   you're aware of that, correct?

5   A.  Yes, sir, I'm aware of the law.  The compliance with that in

6   New Orleans was slow to come online, as I understand.

7   Q.  And would you go a little further, please.  It also indicates,

8   although they check no for him, there is a classification for

9   special education students, correct?

10  A.  Yes, sir, that's what identifies them.

11  Q.  So we know at the very least there's a special education

12  program and that they classify people for different special needs,

13  correct?

14  A.  Of some sort, again, not of the sort that exist in the modern

15  sense.  The description that I obtained of it was that there was no

16  organized screening of children, nor was there a dedicated program.

17  There was some remedial and tutoring that was available but that it

18  was of a very limited basis.

19  Q.  Well, we know that at least they were classifying according to

20  these, correct?

21  A.  We know that they created a form that reflected compliance with

22  the law.  Whether that reflects a functional utilization and

23  application of special education services as the rubber meets the

24  road in the schools cannot be determined by that form.

25  Q.  And that same form indicates that, at least grades for that

1    year, in Algebra I he got a C, in Speech he got a C plus.

2    A.  Let me turn to my notes.

3    Q.  You can read it right off of here from me, Doc, if you want, if

4    it makes it easy enough.  We can go over it together.

5              Reflects a grade in Algebra of C, correct, Algebra I?

6    Speech I, C plus; General Science, C; U.S. History, C; I don't know

7    what the next one is, but it has NM; then is says English III, C;

8    Library there is no grade; and then it shows P.E. as a C, correct?

9    A.  Yes, sir.  This shows date of withdrawal, he's dropped out of

10   school in November of '83.

11   Q.  That's fine, I'm just asking what the grades read, Doc.

12   A.  Yes, sir, that's what the grades say.

13   Q.  So he is doing okay, correct?

14   A.  Those are the grades that are assigned.  Whether they comport

15   to his performance, particularly in light of his withdrawing from

16   school that semester is unknown.

17   Q.  It also indicates that he is getting free lunches or that he is

18   Title I -- is Title I for the free lunch program; is that correct?

19   A.  If you could hand me the form again, if you would, please.

20   Q.  Or that he is obtaining free lunches, excuse me, not Title I

21   but free lunches.  Down at the bottom it says free lunch, yes or

22   no.

23   A.  Free lunch checked yes.

24   Q.  So either he or his mother was able to negotiate at least that

25   part of the system so that he could obtain that benefit, correct?

1   A.  I don't know what the mechanism is for identifying the children

2   for free lunch, whether that is school initiated or student

3   initiated or parent initiated.

4   Q.  And you also did not find, did you, anywhere on his -- in

5   review of his records where he was classified as mentally retarded

6   or developmentally disabled, correct?

7   A.  I find no indication of an assessment whatsoever.

8   Q.  So the answer to my question is, there is no such documentation

9   in his records.

10  A.  That's correct.

11         MR. MILLER:  Your Honor, I don't know if you want to

12  break for lunch now.  I want to look at some of his slides, so we

13  may have to sort of negotiate.

14         THE COURT:  All right.

15         MR. MILLER:  I only have probably about 45 minutes left,

16  your Honor, and I'll be done.

17         THE COURT:  Okay.  Well, I was going to ask you that,

18  too.  It's 11:50, let's be back here for one.  Okay.  One o'clock.

19         THE DEPUTY CLERK:  All rise.

20     (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

21

22                P R O C E E D I N G S

23              (AFTERNOON SESSION)

24

25     (OPEN COURT.)

```
 1            THE COURT:  Please sit down.  Mr. Miller.

 2            MR. MILLER:  Thank you, your Honor, not much longer.

 3   Thank you.

 4            THE COURT:  That's what they all say.

 5            MR. MILLER:  No, no, it's true.  This is actually the

 6   longest I think I've ever gone with this kind of thing, so . . .

 7            THE COURT:  Dr. Cunningham will be pleased to know.

 8            THE WITNESS:  Yes, ma'am.

 9   BY MR. MILLER:

10   Q.  Doctor, could you go to your slide 113, please.

11   A.  Yes, sir.  If it can be brought to the screen.  113?

12   Q.  Yes, sir, please.

13   A.  This one?

14   Q.  Yes.  And then my question is very brief.

15   A.  Yes, sir.

16   Q.  Did the defendant attend Chester Elementary School?

17   A.  Yes, sir.

18   Q.  Did he attend it subsequent to 1989?

19   A.  No, sir.  He attended it in the early to mid 1970s.

20   Q.  Now --

21   A.  Early to mid 1970s.  He was born in '67 and so he would have

22   started 1st grade, that would have been about '73.  So he is -- his

23   beginnings there would be about 16 years before this data begins.

24   Q.  And one of the dates you have squared is 3rd grade -- excuse

25   me, one of the areas you have squared is the 3rd grade, between
```

```
 1   1992 and 1994, correct?

 2   A.  That's correct.

 3   Q.  1994 was the date that Kim Groves was murdered, correct?

 4   A.  Yes, sir, that's correct.

 5   Q.  And in 1996 was the year actually that it was the first trial,

 6   correct?

 7   A.  Yes, sir, that's correct.

 8   Q.  That was the trial at which you testified, correct?

 9   A.  Yes, sir.

10   Q.  All right.  Thank you.

11           If you would, could you go to slide 64, but I'll try to

12   do these as kind of in a -- slowly working up.  I know I didn't do

13   it --

14   A.  That's no problem.  Thank you.

15   Q.  And this is really kind of just some shotgun questions.

16   A.  This one?

17   Q.  Yes.  In this particular slide you have a digit span for

18   WAIS-R, WSM-R; WAIS-R and WSM-R, is that how I'd say it?

19   A.  That's correct.  Yes, sir, that's fine.

20   Q.  And there seems to be an effect, he takes it in, let's start

21   with the WSM-R, Tetlow goes seven up to eight, correct?  WAIS-R,

22   excuse me.

23   A.  Tetlow gives the WAIS-R and he does seven digits forward, then

24   Martell gives the same subtest on the WAIS-R and Mr. Hardy does

25   eight digits forward.  In other words, Tetlow's you read
```

horizontally, Martell's you read horizontally, Bianchini's you read

horizontally.  So all of Tetlow's scores he -- Tetlow does digits

forward and digits backwards on the WAIS.  Martell does digits

forward on the WAIS-R and the WMS-R and he does digits backwards on

the WAIS-R and the WMS-R.

       Then Dr. Bianchini only gives the WMS-R as he relies on

Dr. Tetlow's WAIS-R.  And so he obtains eight digits forward and

two digits in reverse.  So the forward digits are in blue, the

digits backwards are in red.

Q.  Let me try to simplify it, at least for my purposes here.

Tetlow gives it February 21st, '96, gives the WAIS-R.  He scores a

seven on the digit span forward.

A.  That's correct.

Q.  Martell gives it to him on March 22nd or 23rd of the same year,

gives him eight.

A.  Yes, sir.  And then gives it -- and essentially the same

subtest that's on another test and he gets a six.

Q.  I am just --

A.  Yes, sir.

Q.  I just want to do the WAIS-R.

A.  Yes, sir.

Q.  So he goes up one point, correct?

A.  Yes, sir.  Although again, with the standard error of

measurement, that's entirely within normal, a kind of error

variability.  From a psychometric standpoint you can't really say

1    that one score is higher or lower than the other because they're

2    both so close to each other in terms of the precision of the scale.

3    Q.  Eight is a better score than seven, correct?

4    A.  That's correct.

5    Q.  On the WMS-R, Martell gives it to him in March of '96, he gets

6    a six; Bianchini gives it to him in April of '96, he gets an eight.

7    A.  That's correct.

8    Q.  Eight being a better score or higher score?

9    A.  Well, it is a higher number.  Again, these are all so close to

10   each other within the standard error of measurement that you can't

11   say psychometrically that they represent a different score.

12   Q.  The digit span backwards, Tetlow gives that in February of

13   '96 --

14   A.  Yes, sir.

15   Q.  -- gets a four; Martell, he gets a six.

16   A.  Yes, sir.  And then the same subtest on the WMS-R, he gets a

17   five.

18   Q.  Martell gives it to him in March of '96?

19   A.  Yes, sir.

20   Q.  So Tetlow gives it to him in February, he gets a four; Martell

21   gives it to him in March, he gets a six.

22   A.  A six and a five.

23   Q.  And then the backwards score, excuse me, then the WMS-R digit

24   span back, Martell gives it to him in March of '96, he gets a five,

25   correct?

A.  Yes.

Q.  And Bianchini gives it to him two and a half weeks later and he

gets a two.

A.  That's correct.

Q.  That's significantly lower than five; am I correct?

A.  Yes, sir, that's outside the standard error of measurement.

Q.  And it also is somewhat different than the entire pattern that

emerged from this testing, and by that I mean, Doctor, if you

follow:  seven to eight, it goes up; six to eight; four to six; it

seems to be some sort of maybe practice effect or he's more

comfortable with it.  But then in this last one there seems to be

something sort of out of the ordinary.  Is that a fair statement?

A.  No, sir.  You are giving meaning to fluctuations in performance

that have no psychometric meaning to them.  That's the whole point

of saying from a psychometric standpoint, from the normal variation

and performance that you would expect, this difference doesn't mean

anything, none of these differences are significantly different

from each other, they simply reflect normal variation in

performance, except for the two.  It is a departure from the

performance as displayed.  The eight is certainly consistent going

forward, but that digits backwards, that represents an outlier

score.  It would be fair to say something is going on with him at

the point that he produces that two.

Q.  Thank you.

A.  And you would not put a lot of confidence in that number.

1    That's the number that has a lot to do with index score for

2    concentration and attention, dropping from a scale score of 80 when

3    Martell gives it to a 70 when Bianchini gives it.  That, too, has a

4    component in that drop.

5    Q.  Could you go to slide No. 104, please.

6    A.  Yes, sir.  (WITNESS COMPLIES).  Yes, sir.

7    Q.  There you questioned or you indicated that the defendant had

8    some difficulty comprehending more complex inquiry.

9    A.  Yes, sir.

10   Q.  And in that slide Dr. Hayes asked the following question of

11   Paul Hardy during the course of his -- of her interview of him:

12   "Hayes:  Okay.  Do you know anything about your growing up?  Like

13   did your mama say that you talked on time or walked on time, or did

14   she say that you were slow or did she say that you were fast?  Some

15   families say, you know, once he started walking he started running,

16   you know.  Hardy:  Right.  Hayes:  You know, that sort of stuff.

17   Hardy:  Well, no."

18        So in that particular setting, Doctor, he is telling her,

19   no, nobody in his family did that.  And then he goes on to say,

20   "She was, like I said, she could work, you know, to try to buy us

21   clothes, you know."

22        Isn't it more likely he is telling her no she didn't

23   because she was out working trying to take care of us kids, isn't

24   that what his answer is to her question?

25   A.  No.  The inquiry is about what he knows about his own

1    developmental milestones.  He doesn't say, mom was gone so much

2    working she didn't know when I did those things.  He doesn't say,

3    mom never talked to me about that so I don't know.  Instead, he

4    keys off of mama and describes that mama would work and try to buy

5    us clothes.  In other words, he is then giving a characterization

6    about his mama, he is not responding to the inquiry which is about

7    his developmental milestones and whether he was informed by mama or

8    anybody else.

9    Q.  Isn't it just as likely he is saying she didn't tell me and

10   don't you talk about whether or not my mother talked to me about

11   these sorts of things, isn't he protecting his mother?

12   A.  I don't think so.  This is simply an illustrated instance of

13   this kind of problem in the interview.  I don't think that -- I

14   don't read a protective agenda into this.

15   Q.  You indicated that these are what we call developmental

16   milestones, Doctor?

17   A.  Yes, sir.

18   Q.  Wouldn't it be a fair statement that most of us don't know the

19   time in which we started walking and the time we started talking?

20   A.  Typically, only if it was delayed or early.  Sometimes, and

21   again, depends on the family, but with some routineness families

22   may discuss earlier delayed milestones, but I wouldn't be surprised

23   that somebody couldn't specify exactly when they did it.  The

24   significance of this is not that he doesn't know the answer, it's

25   that he doesn't respond to the question.  He responds to something

1   else.

2   Q.  So in your -- and we'll move on.

3          When he says no, you don't think that has any relevance

4   to the question that was asked?

5   A.  Not with what immediately follows it.

6   Q.  Could you go to slide No. 107, please.

7   A.  Yes, sir. (WITNESS COMPLIES).

8   Q.  This one I don't understand, it says interview responses

9   consistent with IQ in the MR range.  Discuss driving directions.

10  So you believe that the way that he did that indicated he was

11  mentally retarded?

12  A.  No, sir.  This slide stands for the proposition that he is not

13  trying to dial down his knowledge.  These are all areas where it

14  would be relatively easy for somebody to claim lack of knowledge.

15  In other words, if the notion -- if the idea that we're testing,

16  this is an alternative hypothesis to whether he is malingering or

17  whether he is, in fact, displaying good effort.

18          As he acknowledges or attempts to provide areas of

19  knowledge and competence, when it would be so easy to say I don't

20  know how to do that.  It supports the idea that he is making a good

21  effort and is trying to acknowledge what, in fact, he know s how to

22  do.

23  Q.  Talking girls into sex is not evidence of mental retardation, I

24  hope?

25  A.  No, sir.

1    Q.  All right.

2    A.  Although, again, I wouldn't use that as diagnostic either way,

3    but the fact that he says that and describes it is not somebody --

4    is not consistent with somebody who is trying to put across a

5    picture of being socially inept.

6    Q.  Could you go to slide 113, please.

7    A.  Yes, sir.  That one?

8    Q.  No, it's the Barona one, I'm sorry.

9    A.  I think Barona, let me see where that one is.  114 and 115.

10   Q.  If you go to the next one.

11   A.  Yes, sir.

12   Q.  In that particular thing, you scored his education at zero to

13   seven years.  Are you familiar with the instructions from the

14   Barona, Reynolds and the people, I guess, who designed the test, do

15   they indicate that you're supposed to sort of make it a functional

16   education as opposed to actually years spent in school?

17   A.  They describe simply years of education.  And I don't know that

18   it says, I can pull the article, I don't think it says years in

19   school.  My recollection is it says years of education.

20   Q.  If you would, please.

21   A.  Give me just a second.  I have it.

22   Q.  What does it say, Doctor?

23   A.  Six educational categories were used, and the values for each

24   of them are as follows:  "Zero to seven years of school, one; eight

25   years to nine years, three; 12 years, four; 13 to 15 years, five;

```
 1    16 or more years of school, six."
 2    Q.  So he got to the 11th grade, correct?  Just asking.
 3    A.  Yes and no.  He was ultimately placed in the 11th grade.  It's
 4    unclear whether that reflects his academic achievement.
 5    Q.  Now, if you were to change the education to 11 years, how would
 6    that change that calculation?
 7    A.  It's as I described yesterday.  If you change it to 11 years,
 8    then you would add 10 points, let me double-check that.  Yes, sir,
 9    you would multiply the number by three instead of by one, so that
10    would add 10 points to the estimate.
11    Q.  And as to occupation, you didn't sort of -- although education
12    you determined that you felt more comfortable using it as a
13    functional or achievement, occupation you put him as unskilled
14    laborer, correct?
15    A.  Well, there's a category, farm laborers, farm foreman and
16    laborers, that's an unskilled category.  Unskilled workers, that
17    equals one.
18    Q.  Is there something there for a small business person?
19    A.  There's managers, officials, proprietors, clerical and sales
20    worker s, that is a multiple of five; craftsman and foreman,
21    skilled workers is four; not in the labor force is three; operative
22    service workers, farmers and farm manager, semi-skilled is two;
23    farm laborers, farm foreman and laborer, unskilled workers equals
24    one.
25    Q.  Well, certainly if we're trying to give a functional
```

1    equivalence, running a drug business is a little bit more than

2    being an unskilled laborer.

3    A.   I think that it's not.

4    Q.   You don't?

5    A.   I don't think that it requires more than unskilled laborer to

6    be running a drug business.

7    Q.   What would you score Meyer Lansky?

8    A.   That would at least be in the position of managers, officials,

9    proprietors, clerical and sales workers, that would be a five.

10   Q.   If somebody were to make him a manager, how much would that

11   increase it?

12   A.   It depends on what he is managing.  If he is managing a farm,

13   then it would raise him from a one to a two on the multiple.  If he

14   is managing as in midlevel executive kind of thing, then it would

15   be a multiple of five.

16   Q.   And again, that would raise his score another eight or nine

17   points, correct?

18   A.   Each multiple adds 1.89, so if he's a two, it adds about two

19   points to the total or it gives you two more than what I've

20   represented here.  If he is, in fact, a midlevel executive, then it

21   would add about seven and a half points to the total that I have

22   there.

23   Q.   Let's go back, if we could, to -- I'm sorry, I hate to do this

24   to you, I only have two more.

25   A.   That's all right.

1    Q.   If we could go to slide No. 97, please.

2    A.   Yes, sir.  Yes, sir.

3    Q.   Now, he defined kilogram by gesturing?

4    A.   Yes, sir.

5    Q.   Yesterday you defined kilogram was 2.5 pounds, two and a half

6    pounds, which actually it's not, it's 2.2 pounds.  Now, he did it

7    by gesturing like this because that's what he did, right, he sold

8    kilograms of cocaine (INDICATING)?

9    A.   I don't know if he sold kilograms, but that would be about the

10   size of a kilogram of cocaine.

11   Q.   So, in a sense, and I don't mean this pejoratively, but he was

12   more correct than you were about what a kilogram is because a

13   kilogram to him is cocaine, correct?

14   A.   I can't tell you exactly where his hands were, whether they

15   were within 10 percent.  My estimate was within about 10 percent,

16   although not precise.  As he gestured that, I would expect that his

17   is about 10 percent.  The issue is not the accuracy of it, it's

18   whether it's done concretely or is expressed as an abstract

19   concept.

20   Q.   Yeah, but to him, to him, in his world, what he did for a

21   living, he sold dope.

22   A.   Yes, sir.

23   Q.   Kilogram to him is a noun in the first instance, I got a

24   kilogram.  Correct?

25   A.   It's likely both a noun and a measurement.

1    Q.  And there are non-mentally retarded persons who might -- who

2    are also in the drug business, if you said what's a kilogram would

3    go, about that much (DEMONSTRATING).

4    A.  That's correct.

5    Q.  So is it necessarily -- let me ask you this:  It's also

6    consistent with persons within normal ranges?

7    A.  Yes, sir.  As are most characteristics of mild mental

8    retardation, it's this continuum.  So it's his repeated use of

9    concrete processing that becomes increasingly meaningful.  And

10   again, you wouldn't diagnose somebody as MR simply by identifying

11   concrete processing.  It's to say, these are features of his

12   behavior that are consistent with the IQ score that's observed.

13   Q.  If you go to the last one, 100.

14   A.  Yes, sir.

15   Q.  You indicated that "food stamp dollars" was a misuse of

16   terminology?

17   A.  Yes, sir.

18   Q.  How are food stamps, how do food stamps, what do they come in

19   when people get them?

20   A.  Well, they come in coupons that have a monetary value.

21   Q.  Right.  And you know that in some communities they use them

22   just like money?

23   A.  They are traded for other things, yes.

24   Q.  And they're actually used in gambling, they're used in dice

25   games, they use them like dollars.

1    A.  Yes, sir, that's correct.

2    Q.  And you would expect people from those communities to refer to

3    them as dollars because that's what they are to them?

4    A.  I don't know that.  Although that's certainly possible.

5    Q.  Yesterday you talked about certain -- if I could just have a

6    second here -- you pointed out certain what I think that you would

7    characterize as deficiencies and the discussions about depression

8    with the defendant, correct?

9    A.  Yes, sir.

10   Q.  If we could go to 252.

11   A.  Is this page 252 of the transcript?

12   Q.  Of the transcript, yes.  And if we could pull it up.

13          MR. MILLER:  Your Honor, if I may just have a minute

14   here.  We're going to have to do this the old-fashioned way, your

15   Honor, I apologize.  I'm sorry, Judge.

16   BY MR. MILLER:

17   Q.  If you would, Doctor, it's page 252, a fair statement, if you

18   could read down at -- Dr. Hayes is speaking to him about whether or

19   not he's been treated for any sort of psychiatric problems, he

20   answers, no, I was out on the street.  Have you ever had any

21   depression or anxiety or bad nerves, bad nerves being sort of a

22   local term for mental disorders, correct?  Next page, please.

23   A.  Yes, sir.  I described the concrete response that he had made

24   to that term as well.  But, yes, sir, we have several terms that

25   are used, depression, anxiety or bad nerves.

1    Q.  Next page, 253.  And he says, "No, you know, I couldn't explain

2    it.  I think I was depressed on the street when, you know,

3    everybody would depend on me.  You know, do this, do that, I need

4    this, I need that, you know."  So she has talked to him about, at

5    least in this particular section, about whether or not he felt, at

6    any time felt depressed, correct?

7    A.  Let me see what the inquiry is, see what triggers that.  She is

8    talking about depression and anxiety and he then says that he was

9    depressed on the street.  So at this point they are both using the

10   word depressed.

11   Q.  Go to 260, Arthur, please.

12   A.  What page?

13   Q.  260, I'm sorry, Doctor.

14   A.  Thank you.

15   Q.  There she asks him, and the highlighting, it's my highlighting:

16   "Have you thought about hurting yourself since you've been in jail?

17   That day.  Have you ever had any psychiatric medications before?"

18   And this, we are talking about the day Curtis died.

19   A.  Yes, sir.

20   Q.  "Then I wanted to kill myself again.  My mama, when Lionel was

21   in jail, she was telling me, um, Lionel say do this, Lionel say do

22   that.  And Lionel didn't say that, you know, but I would just give

23   him money.  Okay, well Lionel, his word law, whatever he say he

24   gonna do it."

25            Next page.  That's where it ends.

1          But there at least she is talking about him, whether at

2    any time he's had any thoughts of suicide; is that correct?

3    A.  Yes, sir, there is an inquiry about that.  There is not a

4    follow-up on the nature of the thoughts, the persistence, whether

5    he prepared a weapon or a mechanism to use to accomplish that

6    suicide.  There's not an exploration of it, but there is an inquiry

7    about whether he has felt that.

8    Q.  You also ask him at 262 about any psychiatric medications he

9    may have had, correct?

10   A.  On 262?

11   Q.  Excuse me, 260, Doctor.  Going back, I didn't leave 260 yet,

12   line 18 and 19, sir.

13   A.  Yes, that's correct.

14   Q.  263, please, Arthur.  All right.  Here the doctor asks him

15   these questions about psychiatric issues that you may or may not

16   have had and in some of the questions it may seem a little strange,

17   but I want to make sure I ask them to you because sometimes people

18   go, oh, yeah, you know, and think it's not important.  He says,

19   "Okay," which assume that means he understands.  "Okay.  Have you

20   ever cut yourself or scratched yourself or used razor blades to cut

21   your skin?"  And then he --

22   A.  That's not typically an inquiry about depression.  That's the

23   kind of behavior that's exhibited by somebody who may have

24   borderline personality features, that kind of self-mutilation.

25   Depression and suicide gestures would be accompanied by something

1    more dramatic than scratch yourself.  That's a -- that sort of

2    self-mutilation is pointed toward assessment of a personality --

3    another personality-related issue.

4    Q.  And then we go to line 12.  "Have you ever in your life been --

5    you talked to me that you felt like you were depressed growing up.

6    Was this to the point where you felt you were hopeless and helpless

7    and worthless and like life wasn't worth living?  A.  Well, I say I

8    was depressed.  Like I said, you know, people, I had money and

9    people knew they could get it from me.  People what?  They knew

10   they could come get it from me, you know, they kind of come tell me

11   a sad-ass story, I'm gonna feel sorry for them, you know.  And like

12   I said, like the world is on my shoulder, you know, I --

13        Arthur, 264, please.  "I need this, you know, my rent

14   needed to be paid.  I was paying people rent and everything, you

15   know, and I wasn't getting the money back.  Just fear, you know,

16   just to get my face, you know, so I just got tired of it, you know,

17   so that would depress me.

18        "Q.  Were you like down to where you weren't enjoying

19   life, wasn't enjoying the things that usually you would enjoy?

20   Yeah, I got tired.  I didn't wanna sell drugs no more.  I'm sorry?

21   I got tired.  I didn't wanna sell drugs anymore, you know.  And

22   when was this?  I had went to church one day and Paul Morton, I

23   think it was '93 or '94.  Right before he went to jail?  Probably

24   so.

25        "Q.  Okay.  But I remember for sure, I know me and Toni

1    was together.  How long were you down and depressed for, you know?

2    I like I really --"

3            Keep going, Arthur, next.

4            And then he describes some of his feelings at that

5    particular time and what was going on in his life, is that correct,

6    without reading it into the record?

7    A.  (WITNESS READS DOCUMENT.)

8    Q.  Is that okay, Doctor?

9    A.  Yes, sir.

10   Q.  I mean, that's what's happening, correct?

11   A.  Yes, sir.

12   Q.  And then Dr. Hayes does not cut him off in any way, correct?

13   She allowed him to give his answer, correct?

14   A.  That's correct.

15   Q.  Arthur, keep going.  And then at the bottom of 265 to 266 she

16   asked him about crying spells, correct?

17   A.  Yes, sir.

18   Q.  And then she continues, and she asks him if he's got any

19   problem with concentrating or making decisions, and they discuss

20   that, correct?

21   A.  Well, there's not a discussion, she asks him about

22   concentration and making decisions.  He apparently doesn't clearly

23   understand what she's asking, "To like what?  I told you I was

24   selling drugs."  He is not tracking the inquiry.  And then, "Well,

25   you still have to make day-to-day decisions, like am I going to

1    sell to this person, you know."

2         And, again, he is not tracking that she is trying to tap

3    into his ability to make -- to act with initiative and decisions.

4    And so, instead, he responds to a more concrete aspect of the

5    question, well, I wasn't selling, I told you that guy's working for

6    me.  And so it is -- there are inquiries that she is making around

7    this.  He is having a hard time understanding what the question is

8    and is not answering it in a very direct way.

9         In this instance, Dr. Hayes does show some persistence in

10   asking about this because she continues at the bottom of the page,

11   "You still have to decide things like where do you want to eat

12   dinner every day and here you've got decisions, you know."

13   Q.  Next page, we can go to the next page, we can go on and

14   continue.

15   A.  Then he identifies, we'll, she's talking about, then bring it

16   into a correctional setting, am I going to get out of bed, go play

17   cards, play basketball, she is bringing the decision-making into

18   that correctional context as opposed to where he was just a moment

19   before talking about being depressed out in the world.

20        So he tracks with her, he quits talking about back in the

21   '90s and says, "Well, I got to do that to keep -- because otherwise

22   I'll just go crazy if I."  Then she cuts him off, and this is one

23   of those normalizing decisions, normalizing questions, but you

24   still have to make decisions; in other words, essentially asserting

25   or encouraging that he makes decisions there in jail.

1        And he says right.  And then she says even though they're

2   little ones, so she is now structuring the issue about whether or

3   not he makes choices and decisions in his behavior in a

4   correctional context based on information that she is offering and

5   encouraging.  We've left the discussion about depressive symptoms

6   prior to his coming to jail and whether or not he could operate

7   with initiative and interest and concentration and effectiveness in

8   those activities.

9   Q.  Well, he obviously understands what she is saying, correct?

10  You have to make decisions, right, even little ones, right, yeah,

11  well, I go to my mama's house to eat, you know.  I mean, that's his

12  world, correct?

13  A.  When you ask questions that only call for assent; in other

14  words, when she leads and says, but you still have to make

15  decisions, when the person says "right" in response to that, you

16  don't have very much information about what it is that they

17  understand about that.

18        And that's a recurrent problem through the interview,

19  that the questions are closed ended and at times represent her

20  assertions, her structuring, not unlike when she took the paper and

21  drew the streets for the directions.  She's putting structure and

22  inserting her own presence and capabilities and understandings into

23  the interview.

24  Q.  We'll just have to disagree on that, Doc.  Let's keep going.

25  A.  Yes, sir, this is the point right after that.  That is where

1    she then gives the whole depressive symptom complex, which is,

2    again, that major --

3    Q.  But she's already -- but she's already asked him all of the

4    questions, Doc.

5    A.  Well, she hasn't, no, sir.

6    Q.  Well, the only question -- well, go on since you are the one

7    that wanted to criticize, let's keep going, then.  Let's go to --

8    keep going.

9            What additional information does she get from him after

10   that?

11   A.  Go up just a little bit to 267, right there, right at the

12   bottom of 267, she is now offering the criteria for depression.

13   Generally your mood -- "but generally, your mood is depressed every

14   day or most of the day for at least two weeks."  He doesn't say --

15   she doesn't say how often was your mood depressed, but instead, she

16   offers the symptom.  And then he doesn't even respond, he just says

17   okay.  We don't have information --

18   Q.  Right.  So he doesn't bite, he doesn't bite and say, yeah, I

19   have these symptoms.  She's already asked him all of these

20   questions, Doctor.

21   A.  Well, no, sir, no, sir.  He's not --

22   Q.  Let me finish.  What were all of the things that she talked

23   about beforehand?

24   A.  There is an inquiry about is his mood depressed, although it's

25   not clear that they're talking about the same thing when we talk

 1    about depression, but they do both use the same term.  She doesn't

 2    then explore that to say tell me about it.

 3    Q.  Well, let me ask you in bullet form then.  Did they talk about

 4    depression at page 252?

 5    A.  Those words are used, yes, sir.

 6    Q.  Did they talk about suicide?

 7    A.  She asked him about thoughts of suicide, he tells her about

 8    some that's not clarified or explored.

 9    Q.  Does she talk about medications?

10    A.  She did ask him about medications.

11    Q.  Did she ask him about feeling hopeless and helpless?

12    A.  Yes, sir, she did.

13    Q.  264, did she ask him how long he had been depressed?

14    A.  She does ask, how long were you down and depressed for.

15    Q.  Does she ask him about crying?

16    A.  She did ask him about crying spells.

17    Q.  Did she ask him about concentration?

18    A.  If I could continue.

19    Q.  No, I'm asking you.  Did she ask him about crying?

20    A.  She did ask him about crying --

21    Q.  Did she ask him about concentration?

22          THE COURT:  Try not to talk over each other, please.

23    BY MR. MILLER:

24    Q.  She did ask about crying?

25    A.  Yes, sir.

1    Q.   And she did ask about concentration?

2    A.   Yes, sir.

3    Q.   Arthur, 61 and 63, please.

4    A.   Page 61?

5    Q.   Yes, I'm sorry, Doctor, 61 to 63.

6    A.   I have it.

7    Q.   I am just trying to get it up here.

8             This is the passage about football; is that correct?

9    A.   Yes, sir.

10   Q.   She had asked him, "Tell me what kind of things you did when

11   you were a little kid, what did you enjoy doing?"  He said, "I

12   liked playing football.  What position?  He said, uh.  Did you have

13   positions?  We didn't have positions, we just pitch and catch."

14            Now, it's your testimony that using the term "pitch and

15   catch" is inappropriate and therefore is indicative of mental

16   retardation, correct?

17   A.   No, sir.  It is incorrect terminology, and it is a single piece

18   of behavior, that kind of misuse of terminology, that is consistent

19   with mild mental retardation.  You would not use that -- you

20   wouldn't say it's indicative of because that gives it a greater

21   diagnostic significance than, in fact, it has.  But it is --

22   Q.   And it's also not necessarily improperly used.  Throwing the

23   ball back and forth is pitching and catching.

24   A.   Not with a football, no, sir.

25   Q.   In your world, Doctor, but in his world it might have been a

```
 1   term they used all the time, you don't know that.  That's the

 2   problem with that, Doctor, you're imposing your vocabulary, your

 3   use of the word pitch on somebody who grew up worlds apart from

 4   you, pitching and catching, pitching and catching.

 5   A.  That would be something --

 6   Q.  That's also a term used sexually in prison.  It's not

 7   improperly used, it's not just a baseball term.

 8           THE COURT:  Mr. Miller, I think you're testifying.

 9           MR. MILLER:  All right.

10   BY MR. MILLER:

11   Q.  What I'm saying is, is that may be a term that was used in his

12   world.

13   A.  It's possible.

14   Q.  And then he talks at some length about playing football, about

15   catching the football, about somebody being a quarterback, correct?

16   A.  She asked if -- did he ever quarterback.  He did not use the

17   word quarterback.  Dr. Hayes did.  On line 9 of page 62.

18   Q.  "I can throw the ball, I can catch, I can catch funny.  You

19   said you catch funny?  Yeah.  What do you mean?  I catch the ball

20   and I hug it, you know what I'm saying, but I catch it, though."

21           Normal -- not inconsistent with normal people talking

22   this way, correct?  Normal people can talk this way, not

23   necessarily indicative that somebody is mentally retarded?

24   A.  That's correct.  Him not knowing that -- him not being familiar

25   with the terminology "spiral" is not typical of a male who has
```

1    grown up in a major city in the '60s and '70s, '70s and '80s, but

2    the rest of this is not unremarkable.

3    Q.  173 to 175, please, Arthur.

4         Here he talks at some length about going to football

5    games in Atlanta with his friend Greg, and I'm assuming that's Greg

6    Williams, correct?

7    A.  Yes, sir.

8    Q.  He identifies a former coach, Jim Mora, correct?

9    A.  Let me catch up to what line we're on.

10    Q.  I'm sorry, Doctor, line 25.

11    A.  Yes, sir.

12    Q.  That was not a name suggested to him, correct?  He also used

13    the Colts, that is correct, correct?

14    A.  Yes, sir, as far as I know, I don't follow football closely.

15    Q.  And you're from a major metropolitan area, correct?

16    A.  Yes, sir.  I know about throwing and spirals, I just don't

17    track the players and coaches.

18    Q.  He remembers Mike Ditka being here, correct?

19    A.  Yes, sir.

20    Q.  Talks about Donovan McNabb playing quarterback.

21    A.  Yes, sir.  These are examples of offering information that

22    would otherwise not have to be offered, they're demonstrations of

23    knowledge and competence.

24    Q.  Well, she asks, "Who do you like?  Philadelphia."  He says,

25    "Why?  I like McNabb."  He likes the Eagles because he likes

1   Donovan McNabb, that's not --

2   A.  It's not indicative -- this stands for the -- or is supportive

3   of the idea that he is not trying to dumb down his responses to

4   her.  In fact, he is offering knowledge and competency that he

5   wouldn't have to and would be easy to play ignorant.

6   Q.  187 -- but anyway, in any event, he has a fair knowledge,

7   historical knowledge of -- and current knowledge of football in

8   both New Orleans and some other areas of the country; is that

9   correct?

10  A.  Yes, sir.

11  Q.  Go to 187 and 189.  We're almost done, your Honor.

12          Excuse me, that's still part of the football discussion,

13  but he is talking about the Mannings.  He knows the name Archie

14  Manning, he knows that he is the father of Peyton, as well as Eli

15  Manning?

16  A.  Yes, sir.

17  Q.  And he actually knew the name of the mother, Olivia.

18  A.  Yes, sir.

19  Q.  And he also talks about Michael Vick.

20  A.  Let me -- hang on a second.  I thought that Dr. Hayes offered

21  the name of the mom.  Hang on just a minute.  Dr. Hayes says, "I

22  know their mama, their mom is Olivia, but what's the daddy's name?"

23  Q.  You're right, thank you.

24  A.  And she offers Olivia.

25  Q.  Thank you.

1          And if we could go to 187 to 189.  The yellow portion.

2  A.  I have that.

3  Q.  There he talks about his job at the Ernst Cafe, correct?

4  A.  Yes, sir.

5  Q.  Was that employment covered or included in Dr. Swanson's

6  report?

7  A.  I don't recall that she had him at the Ernst Cafe.

8  Q.  And the fact that he could hold a job over an extended period

9  of time would be something that should be considered in making any

10  kind of evaluation about his adaptive abilities, correct?

11  A.  As a general proposition, yes, sir.  Being a busboy, if that's

12  what he is doing at a cafe, is entirely consistent with mild mental

13  retardation.  If he is running the restaurant, that's something

14  different.  But a low-level service job doesn't have that much

15  diagnostic significance.

16  Q.  Lastly, I think you indicated that you found that Dr. Tetlow

17  had misscored the test, correct?

18  A.  Yes, sir, that's correct.

19  Q.  And which test was that?

20  A.  That was the WAIS-R.

21  Q.  Did that give you any pause as to whether or not he

22  administered the rest of the test in any -- an improper manner?  He

23  didn't add the numbers right, correct?

24  A.  Well, he assigned two points for responses that should have

25  been single-point responses on one of the subtests.  And I did

1    scrutinize the rest of the test more carefully in response to that.

2    Q.  Do you know whether or not he gave the test according to

3    standardized instructions?

4    A.  I was not present and so I can't answer that.  I don't have

5    personal knowledge, observational knowledge of it.

6    Q.  Were you aware of whether or not he recorded it?

7    A.  I was not advised that there was a recording, as I recall.

8    Q.  And lastly, I think you indicated that a lack of empathy is

9    also indicative sometimes of mental retardation?

10   A.  Not a lack of empathy but a lack of recognition -- there is a

11   limitation on the emotional depth and emotional intimacy, and I

12   guess, and again, similar to a childlike status, that is typical of

13   someone, of a person with mild mental retardation.  Not that they

14   lack empathy or can't become concerned about the pain of another,

15   but the level of their emotional understanding and insight is

16   limited.

17   Q.  It is possible he just wasn't close to his brother, isn't it?

18   A.  Well, anything is possible.  They did seem to be close, they

19   spent a tremendous amount of time together, grew up side by side.

20   Went through these experiences together, they were in the same

21   room.  That would provide most individuals with a significant

22   degree of emotional understanding of this person who has been side

23   by side with them during these years and through these experiences.

24   Q.  It's also indicative, a lack of empathy, sometimes in

25   psychopaths; that's also correct, isn't it?

1    A.  Yes, that's a feature of psychopathy.

2    Q.  And he had an elevated score in that, although you did not --

3    nobody found him to be a psychopath, he did have an elevated score

4    on that particular test, correct?

5    A.  Elevated in a way that is consistent with individuals who are

6    in prison.

7              MR. MILLER:  Thank you.  I have nothing further, your

8    Honor.

9              THE WITNESS:  Thank you, sir.

10             MR. LARSON:  May I proceed?

11             THE COURT:  Yes.

12                       REDIRECT EXAMINATION

13   BY MR. LARSON:

14   Q.  Dr. Cunningham, when you re-evaluated your findings for 1996,

15   did compensation play any role whatsoever in your reevaluation?

16   A.  No, sir.

17   Q.  When you went back and looked at your previous testimony in

18   this case, did the thought that, well, if I change my testimony,

19   they'll hire me and I'll make $40,000 have anything to do with what

20   you were finding?

21   A.  No, sir, none whatsoever.  I am very -- fortunately, I am very

22   busy as a professional and don't have need of this case in order to

23   stay occupied.

24   Q.  Dr. Cunningham, is there an analogy you can draw between the

25   evaluation you performed then, your testimony in 1996, and your

1   current position based on scientific data with regard to those 15

2   IQ points?

3   A.   There is a continuing evolution in scientific understanding.   I

4   mean, there are drugs that are used that are subsequently

5   identified to have a side-effect profile that's untenable, and so

6   they are withdrawn from the use that was applied to them

7   previously.

8           You know, I guess one analogy that comes to mind, for

9   example, is that for a long time in medicine people were bled as a

10  treatment.   It was eventually understood that that's not a

11  scientifically valid response to disease and so they stopped doing

12  that.   That's an example -- those are a couple of examples of how

13  professional practice and understandings of professional practice

14  may evolve as science develops.

15          That may be part of where we are with applications of the

16  Flynn Effect as well, that it takes awhile for science to penetrate

17  practice, even though the science is very sound.

18  Q.   Dr. Cunningham, bottom line full stock, do either the DSM-IV

19  third revision or the definition of mental retardation found in the

20  AAMR, AAIDD require you or suggest or in any way compel the

21  addition of 15 points to someone's IQ because they're black?

22  A.   No, sir.   Neither the DSM-IV nor the AAMR would have prescribed

23  that then, nor do they now.

24  Q.   So, at present, to diagnose a diagnosis of mental retardation

25  is race neutral?

1    A.  Absolutely.

2    Q.  Now, Mr. Miller asked you about whether you would consider the

3    testimony of corrections officers in terms of their observations.

4    Is there caution that should be used in considering their

5    observations of a defendant to determine whether someone is

6    mentally retarded?

7    A.  Yes, sir.

8    Q.  And why -- what are those cautions, what are those precautions

9    once you take -- when looking at their testimony?

10   A.  The primary caution is that adapting to an institutional

11   environment is very different than operating in the open society.

12   The only observation a correctional officer is going to have of an

13   offender is how he operates within the very constrained and

14   structured and limited world of an institutional setting.  The

15   behaviors that are called for in that institutional setting, of

16   being familiar with the routine, coming out interacting with other

17   inmates, participating out in rec, all of those are within the

18   capability of someone who -- as a person with mild mental

19   retardation.  So if the observation is, he looks fine to me, well,

20   the demands that are on this person are very -- on the inmate are

21   very limited.

22        You can't just eyeball somebody and know whether or not

23   they are a person with mental retardation.  Remember, AAMR talks

24   about not relying on verbal interaction as a diagnostic barometer.

25   And yet the only data that the correctional officer is likely to

1    have is observation of that very constrained, adaptational world

2    and the verbal interactions of the inmate.

3         Now, I gave some instances of if the complexity of the

4    task is great enough in terms of what the inmate is doing, if he is

5    involved in their computer system and is writing software code for

6    them, it's not that that setting is without any diagnostic

7    significance, but you're going to have to see something more than

8    is exhibited by the typical inmate.

9         Now, the other thing that can happen is that the

10   correctional officers can have a sense of bias and allegiance to

11   the position of the state, as strongly or more so than the alliance

12   that the family might have on desiring a less onerous outcome.  And

13   so the correctional personnel may not be neutral attitudinally in

14   the descriptions that they give.

15   Q.  Dr. Cunningham, is one of the things that someone who is

16   evaluating a subject to determine whether they are mentally

17   retarded, is one of the things that they look to in terms of

18   adaptive behavior is the consistency of testimony from witnesses

19   across a broad spectrum of witnesses?

20   A.  Yes, sir.

21   Q.  And why is that?

22   A.  Two reasons:  First, as you have more data points and more

23   independent descriptions, it provides some corroboration,

24   particularly as those -- or those folks are interviewed

25   independently from each other.  That's number one.  Number two, all

1    of these individuals have a different window on the person's life

2    and may see them in different roles or at different periods of time

3    in their life.

4             So, for example, Toni Van Buren can tell us about him

5    when he is 18, 19 years old.  Theresa Minor can tell us about him

6    in his early and middle childhood.  Toni Van Buren can't tell us

7    about early and middle childhood.  And so different people have

8    different windows of time and interaction, as well as having

9    corroborative reference to each other.

10   Q.  Now, Mr. Miller made reference to criminal behavior.  Do either

11   the AAMR or AAIDD definition of mental retardation or the

12   DSM-IV-Text Revision exclude criminal behavior from a consideration

13   of whether someone is mentally retarded?

14   A.  It's not excluded in the diagnostic criteria.  The User's Guide

15   that AAMR has published describes the problems of and discourages

16   the use of criminal behavior and instructs against the use of

17   criminal behavior in a determination of mental retardation.  I

18   don't think -- I would have to look at DSM-IV again to see if they

19   make any description of criminal behavior in reference to the -- as

20   a specific exclusion.

21   Q.  Dr. Cunningham, in your review of the documents in 1996 and

22   since then, did you gain some familiarity with Paul Hardy's illegal

23   conduct with regard to selling drugs?

24   A.  I would describe that as to a limited degree.  My understanding

25   is that he intended to buy drugs in small quantities, a half a

1    kilogram or less; that he operated primarily out of a single

2    project, the Florida project; that he was implicated in a number of

3    homicides, all of which seem to have been carried out in a

4    relatively straightforward sort of way in terms of complexity of

5    execution; that there was discussion about at least one house being

6    bought in conjunction with a family member, the financing of that

7    uncertain.  That would be generally my understanding of his

8    criminal activity.

9    Q.  With regard to the drug dealing, did you ever see any

10    indication that, of any level of sophistication on the part of an

11    operation by Paul Hardy?

12    A.  Not beyond the pretty simple operation that I've just

13    described.  I didn't see, didn't understand that there was some

14    sort of citywide distribution, larger network, moving extremely

15    large quantities, acting as a middle man to distribute to others on

16    a higher-level basis, I did not see indications of that.

17    Q.  None of that?

18    A.  No.

19    Q.  Did you ever see any indication that Paul Hardy even knew how

20    to cook crack cocaine?

21    A.  No, sir.

22    Q.  Is someone who is mentally retarded capable of exchanging drugs

23    for money?

24    A.  Yes, sir.

25    Q.  Now, you listened to the telephone call that was played for you

1    from Orleans Parish prison --

2    A.  Yes, sir.

3    Q.  -- that was played.  Do you recall Mr. Hardy having a series of

4    answers where, in response to statements made by the woman on the

5    telephone conversation, his response was simply, right, right,

6    right?

7    A.  Yes.

8    Q.  What does that indicate with regard to somebody who may be

9    mildly mentally retarded?  Does it indicate an understanding or is

10   it simply an acknowledgment that something has been said?

11   A.  It is of uncertain meaning.  Many of us in conversation as the

12   other person is talking might say right, right, right.  And we

13   understand fully what's being said.  Alternatively, someone -- a

14   person with mild mental retardation might say right in a very

15   similar way and not know what they are being told.  That's the

16   problem when you're having a conversation with somebody who is

17   intellectually limited.  That's the reason why you don't ask them

18   yes/no questions or ones where they just say right because you

19   don't know what level of understanding is being communicated back.

20   Q.  Now, from that conversation, is that -- did you see evidence of

21   this type of problem in the interview, diagnostic interview, that

22   was being conducted by Dr. Hayes?

23   A.  Yes, I did.

24   Q.  Dr. Cunningham, are people who are mildly mentally retarded

25   capable of any insights into their own behavior?

A.  Yes, sir.  Again, it's on a continuum, it's on a limited basis,
particularly -- in the course of this interview, the telephone,
recorded telephone call, Mr. Hardy even attributes that he is
saying things that he has heard from the mental health
professionals who have worked with him.  And they sound like
interpretations that would come from a mental health professional
who was working with him in the context of these offenses, for
example, that he was afraid to love.

        And he referenced that he had talked to psychiatrists and
now sees things different, that he is learning a lot about himself.
He goes to that a couple of times, just about a couple of times,
each time it's in reference to interactions that he's had with
mental health persons.  Now, that reflects that he can -- that he
can repeat what has been said to him, that -- he's repeating it
appropriately, so it seems to reflect some degree of insight.  The
depth of insight that's attached to that is more limited.

        You know, for example, you know, he said that he always
wanted to be a good father, he wanted to be a better father than he
had himself.  Well, that seems to have been the intention that he
had even before he was placed in prison.  His behavior that he
exhibited to play with the children was a manifestation of that
intention.  It was missing the deeper level, which is then being
law-abiding, stable, doing things so that you can, in fact, remain
in their life from now on.  That it isn't just about playing with
them like you're another child and they're a playmate, that you do

1    things at a deeper level with a level of commitment to

2    responsibility.  It's an example of his having a superficial

3    recognition of being a father but not a more substantial one about

4    what that really does entail if you're going to functionally

5    perform that role.

6    Q.  Is it one of the stereotypes that surrounds mental retardation

7    and mild mental retardation, that people who are mildly mentally

8    retarded are not capable of any insights?

9    A.  That's correct, that would be a stereotype.

10   Q.  Are people who are mildly mental retarded capable of learning?

11   A.  Yes, sir.

12   Q.  Is it one of the stereotypes that surrounds mild mental

13   retardation that people who are mildly mentally retarded aren't

14   capable of learning?

15   A.  That's correct.  They will learn more slowly and there is a

16   ceiling on the complexity of information that they can learn and

17   how they apply it, but they can learn.

18   Q.  Are people who are mildly mentally retarded capable of some

19   level of abstract thinking?

20   A.  Yes, sir.

21   Q.  Is it one of the stereotypes that surrounds mild mental

22   retardation that they are not capable of abstract thinking on any

23   level?

24   A.  Yes, sir.

25   Q.  Ultimately with regard to this conversation that was played,

1    can you assess IQ from a conversation?

2    A.  No, sir.  Not a conversation of a person with mild mental

3    retardation who has reasonable verbal facility, no.  If they're --

4    the nature of their mental retardation is such that it particularly

5    affects their verbal expressive abilities, then you might see some

6    evidence.  But it's not -- it's not a reliable diagnostic sign.

7         In other words, when somebody is fluent, that's not a

8    certain indication that they are not mentally retarded.

9    Q.  And this conversation, I believe, took place in 2008?

10   A.  Yes, sir.

11   Q.  And if Paul Hardy was arrested in 1994, how long had he been

12   incarcerated at that time?

13   A.  Fourteen years.

14   Q.  Fourteen years in a structured environment?

15   A.  Yes, sir.

16   Q.  You were asked a number of questions about Shannon Shields,

17   Dr. Cunningham.  If you look at the indicia of mental retardation

18   that were present in Shannon Shields and then you look at Paul

19   Hardy, are you comparing apples and oranges psychologically in a

20   sense that you can't say, this man is not mentally retarded because

21   these factors that we found here weren't present?

22   A.  No, sir.  The diagnostic is not -- the diagnosis is not made by

23   comparison.  You know, the criteria for DSM-IV, AAMR are not

24   identify somebody who you reliably to believe to be mentally

25   retarded and see whether this guy is like him.  The pattern of

strengths and weaknesses will be different for each person.  The

extent to which they have the benefit of assessments are very

different.

There is a 20-year difference in age between Paul Hardy

and Shannon Shields.  So Shannon Shields is growing up in an era

where the special education assessment capabilities are

substantially greater than they were back in the early '70s.

Across the '70s here in New Orleans.  And so you're talking about

different eras of assessment.  So the meaning of where the

childhood IQ scores, you can't make an apples-to-apples comparison.

Q.  Dr. Cunningham, what impact on the expert community, in terms

of psychologists such as yourself, did the Atkins decision and the

Kanaya article have with regard to the need for precise

determinations of IQ?

A.  It much increased the awareness that this is an issue of

substantial significance.  The gravity of the determination that

rests on, at times a matter of just a few points, has increased the

degree of psychometric sophistication that then surrounds these

assessments, and that decision elevated those discriminations.

You know, before, certainly, mental retardation could be

offered as a mitigating factor, although there might be some --

concern in some quarters that would have a backlash of would then

people think that the person was a greater future risk if they had

a mental impairment.  But it was there as a mitigating factor.  It

wasn't a -- this is an up-or-down factor that you need to have a

1    clear understanding of.  So it brought the focus much greater on

2    making intellectual assessments a part of capital screening and

3    looking more carefully at that.

4         And the Kanaya paper much increased -- Kanaya, et al.,

5    much increased the awareness of this psychological community about

6    psychometric precision and evolution of these instruments and the

7    potential implications that those scores could have, in and out of

8    capital cases.

9    Q.  Dr. Cunningham, with regard to the Flynn Effect itself, to make

10   sure that it is clear, I guess, in everyone's mind, first, you know

11   what an individual's IQ score is on a given test; am I correct?

12   A.  On a given day on a given test.

13   Q.  And so what we actually have is -- the reason that it is

14   appropriate to consider basically scores as a collective group is

15   because that's what IQ means, it is a measurement with regards to a

16   group; am I correct?

17   A.  That's correct.  It describes an individual's position of

18   intellectual capability relative to the group.  It doesn't exist in

19   isolation, it is always in reference to the group.

20   Q.  And so what is happening, in essence, what the Flynn Effect is

21   correcting for is the movement of the group as a whole; am I

22   correct?

23   A.  Yes, sir, that's correct.  That's why the WAIS-III technical

24   manual described that the WAIS-R score would be about 105 at the

25   time the WAIS-III mean score was 100.  In other words, that during

1    the intervening years between 1978 and 1996, '97, the mean of the

2    distribution of the WAIS-R had increased from 100, as it was given

3    and standardized in 1978, the WAIS-III is describing that mean

4    today would be 105 at the time the WAIS-III is being released in

5    1997.

6           And so that's why I say, we have to renorm this thing

7    because there has been a gain of .3 points per year approximately,

8    this is new means about five points higher.  So that means, as the

9    WAIS-III is being released, if you are using the WAIS-R, two

10   standard deviations below 105 is not 70.  It's 75.

11   Q.  I want to come to that, Dr. Cunningham.

12           MR. LARSON:  And if I turn to get the overhead projector

13   on I need to hit doc cam?

14           THE COURT:  Karen knows.  Kim knows.

15   BY MR. LARSON:

16   Q.  And Mr. Miller asked you a number of questions about the

17   WAIS-III; am I correct?

18   A.  Yes, sir, that the psychological corporation that identified or

19   their assertion was that the inflation of the WAIS-III was not .3,

20   it was .17 per year.  And so they were saying -- their assertion

21   was the Flynn Effect has slowed for the WAIS-III.  They weren't

22   referencing the WAIS-R.

23   Q.  And Paul Hardy didn't take the WAIS-III, did he?

24   A.  No, sir, he took the WAIS-R right at the end of its life span.

25   Q.  And what does the WAIS-III manual tell you about the WAIS-R?

1    A.  It says, because there is a real phenomenon of IQ score

2    inflation over time, norms for a test of intellectual functioning

3    should be updated regularly, and gives the sources.  Data suggest

4    that an examinee's IQ score will generally be higher when outdated

5    rather than current norms are used.  The inflation rate of IQ

6    scores is about 0.3 points each year; therefore, if the mean IQ

7    score of the U.S. population on the WAIS-R was 100 in 1981, the

8    inflation might cause it to be about 105 in 1997.

9    Q.  And is that precisely the adjustment that you made for the

10   Flynn Effect in Mr. Hardy's IQ scores on slide No. 38 of your

11   slides?  And if you could go to slide No. 38.

12   A.  Yes, sir, I'm sorry, that would be easier.  Yes, sir, it is.

13   Q.  It's a 68?

14   A.  Yes, sir.

15   Q.  Now, that has -- right now, that number has nothing to do with

16   the standard error of measurement?

17   A.  That's correct.

18   Q.  That is where you start for the standard error of measurement;

19   am I correct?

20   A.  Yes, sir.

21   Q.  And what does the Flynn Effect have to do with regression to

22   the mean?

23   A.  Nothing.

24   Q.  What we have here, if you are going to take the standard error

25   of measurement is that -- but the standard error of measurement

1    does -- I'm sorry, the regression to the mean does argue that that

2    number is 95 percent valid, does it not, the 68?

3    A.  I'm sorry, can you repeat that?

4    Q.  The regression to the mean, the argument that the number we

5    have is 95 percent correct, the actual measured number is 95

6    percent correct, that would give you a 95 percent correctness for

7    that number of 68, would it not?

8    A.  No, sir.  When you take into consideration the standard error

9    of measurement, and let's say that the standard error of

10   measurement is four points, then you have a 95 percent likelihood

11   that the range of scores between 64 and 72 contain the true IQ.

12   Now, as it was pointed out on cross, the most probable actual score

13   or value is 68.  There's a 95 percent probability that it's between

14   64 and 72 or it would be smaller, you would say there is a 68

15   percent probability that it's between 66 and 70.  In other words,

16   the greater confidence you want to have, the wider the band is.

17           But there's not a 95 percent certainty that that's the

18   right score.  That's the most probable score with a band around it

19   on either side.

20   Q.  Okay.  So that's the correct interpretation of regression to

21   the mean, that number right there being the most probable accurate

22   score but within the 95 percent band?

23   A.  Yes, sir, that's the most probable score.  Regression to the

24   mean says that if you came back and tested again, there is some

25   likelihood that within that standard error of measurement that

1    there is somewhat greater likelihood on the high side and the low

2    side, it's pretty slight, like a point, so maybe it's actually four

3    and a half points one way and four points down the other way.

4    Q.  And with regard to the 71 there, that was not corrected for the

5    practice effect, was it, that's just --

6    A.  No, sir.  That's just how that one would be affected by the

7    application of that same Flynn adjustment.

8    Q.  You were asked a number of questions about previous diagnoses

9    of Paul Hardy as being mentally retarded, and you said there were

10   none.  Do you remember whether Dr. Bianchini made any findings with

11   regard to the possibility of cognitive deficits that were organic

12   in nature -- in origin, I'm sorry?

13   A.  Yes, sir.  He believed that there were neuropsychological

14   deficits, there were organically-based or physically-based brain

15   functioning problems.

16   Q.  And if those organically-based brain functioning problems

17   occurred onset before age 18, would those necessarily be factored

18   into a diagnosis of mental retardation?

19   A.  Yes and no.  Someone can be in a mild mental retardation

20   category and have neuropsychological deficits in some areas that

21   are worse than their general IQ capabilities are.  Alternatively,

22   the neuropsychological capabilities, if they exhibit, may be

23   generally consistent with their global intelligence.  So it's not

24   as if there is a diagnostic discrimination between one or the

25   other.

1  Q.  With regard to the interviews you conducted in 1996 of Toni Van

2  Buren and many other witnesses, at that time were you looking for

3  deficits in adaptive behavior?

4  A.  No, sir.

5  Q.  Were you looking to diagnose Paul Hardy as mentally retarded at

6  that time, for a diagnosis of mental retardation?

7  A.  I was not attempting to rule it in or out in the nature of the

8  inquires and interviews that I did.

9  Q.  Now, you did identify him as mentally deficient, did you not?

10 A.  Yes, sir.

11 Q.  And you were aware of his IQ scores at that time?

12 A.  Yes, sir.

13 Q.  Can you describe for the court the difficulty or the problems

14 or the issues involved in going from a recognition that somebody is

15 mentally deficient to an actual diagnosis that somebody meets the

16 criteria for mental retardation?

17 A.  Well, first, there would have to be a consideration that the IQ

18 score was one that would meet the diagnostic prong, that first

19 prong, of being an IQ score of approximately two standard

20 deviations below the mean or 75.  This potentially met that.

21 Again, had I been conversing with the Flynn Effect at that time and

22 realized that that put his score down in the 68 range, I think that

23 that would have triggered a greater concern and awareness of the

24 necessity of then more fully investigating mental retardation.

25          In the absence of that scientific perspective at that

1    time, it didn't trigger that additional consideration.

2          You know, today if someone presented with a 73, I

3    certainly would investigate adaptive behavior much more fully, and

4    that's what should have been done in this case as well.

5          Now, in fairness to me, I came into this case in early

6    February of 1996 and was on the stand 10 weeks later, and so that

7    was a very short window of time to be involved in trying to work up

8    a case in a fully and comprehensive sort of way.  That was also the

9    second or third capital case that I had been involved in.  Now I've

10   been involved in over 200.  And so this is sort of like -- this was

11   one of the early surgeries of this sort that I was involved in.

12   And so that also has a different perspective today in terms of

13   capability and awareness that it might have had at that time or

14   that it did have at that time.

15   Q.  Dr. Cunningham, I would ask you to turn to Dr. Hayes's report,

16   and I would ask you to turn specifically to page 23 of that report.

17   And does that indicate to you or did that indicate to you that

18   Dr. Hayes was attempting to make a determination of malingering?

19   A.  Yes, sir.  In the middle of the page, it says:  "Markers

20   indicative of malingering were evident in Mr. Hardy's psychological

21   assessment measures and available records."  I apologize, I did not

22   find that portion of the report when I was asked about that on

23   cross.

24   Q.  In fact, if you turn to page 27, what's the caption right

25   underneath the box?

1    A.  "Opinion regarding the issue of malingering or response bias."

2    Q.  And then again, if you turn to page 29, which you had already

3    described in terms of, I think in response to one of Mr. Miller's

4    questions, a response to the malingering, is there any other

5    reasonable conclusion that can be drawn from this report that

6    Dr. Hayes was attempting to make a determination whether Paul Hardy

7    was malingering?

8    A.  No, sir, I don't believe that there is an alternative

9    interpretation.

10   Q.  Would there -- is malingering a diagnosis or is it a finding

11   that can affect the validity of your diagnosis?

12   A.  It's both.  It can be made as a diagnosis, and it also would

13   certainly be an opinion or a recognition of a process that would

14   cause you to exclude or discount other data that was made available

15   to you.

16   Q.  And do you have an explanation as to why we would have

17   devoted -- Dr. Hayes would have devoted an entire section to

18   malingering in her report if she were not attempting to make a

19   finding regarding it to look at the validity of IQ scores from Paul

20   Hardy?

21   A.  Well, no, sir.  As I described it, there are -- in this

22   instance, based on the description of how he approached the testing

23   and the attitude that he had toward it and that kind of thing,

24   there are really only two options:  either this is a legitimate

25   reflection of his ability or he is deliberately attempting to dial

1    down his performance.  That he was distracted, preoccupied,

2    depressed, disinterested, apathetic, there is no indication of that

3    from any of the evaluators who are attending to his presentation

4    and attitude and demeanor in the course of the testing.

5            And so if you discount these results as being not a

6    reflection, a valid reflection of his ability, then you are saying

7    he is deliberately dialling it down.  And there is no reason to

8    apologize for that.  Either, if that's what you think and this is

9    the data you base that on, that's fine, make that case.  But to

10   say, I don't think that these scores are valid kind of looks like

11   malingering, guess it could be anything else, too, I just don't

12   think they're valid, I don't think that that is an

13   intellectually-honest approach.

14   Q.  Dr. Cunningham, if you could turn to page 25 of Dr. Hayes's

15   report to the third full paragraph.  Do you see where it says

16   "Mr. Hardy"?

17   A.  Yes.

18   Q.  Now, you were questioned about -- well, first, does Dr. Hayes

19   even mention Dr. Bianchini's backward sevens or your backward

20   sevens tests in this report?

21   A.  No.

22   Q.  Is there any indication that she even took them into

23   consideration?

24   A.  Apparently not.  The report is extremely voluminous and seems

25   to recount what she has considered.

1    Q.  For the purposes of her finding, then, she relied only on two

2    scores, am I correct, Dr. Swanson's and hers?

3    A.  You're talking about the serial sevens?

4    Q.  The serial sevens, two repetitions of the test.

5    A.  Yes, sir.  And the discrepancy between them.  It's not so much

6    whether he could do it or not but the assertion that there is a

7    discrepancy of performance.

8    Q.  And in terms of the discrepancy of the performance, the lowest

9    score would have been on Dr. Swanson's test; am I correct?

10   A.  That he performed the poorest with Dr. Swanson, that's correct,

11   as compared to me, Bianchini or Dr. Hayes.

12   Q.  As compared to all four tests?

13   A.  At least in terms of saying, I can't do it, apparently refusing

14   it.

15   Q.  What strategy -- and Dr. Martell, as you know, would be

16   identified as a prosecution expert.

17   A.  Yes, sir.

18   Q.  Can you tell me what strategy there would be, can you

19   articulate a malingering strategy taking all four tests into

20   consideration that would give your poorest performance before the

21   defense expert?

22   A.  No, sir.

23   Q.  Now, you indicated --

24            MR. LARSON:  May I approach, your Honor?

25            THE COURT:  Uh-huh.

BY MR. LARSON:

Q.  Do you recognize that as the scoring sheet from Dr. Bianchini?

A.  Yes, sir.  And this identifies what I alluded to on cross, I didn't pull this out at the time but that the serial sevens only continued to 65.  So it only reflected five subtractions in 36 seconds.  So that's, giving -- it's about seven seconds between each number that he is providing.

Q.  And to your -- with regard to the -- your familiarity with this test, is that a particularly good score in any way?

A.  No, sir, that's pretty slow.  I mean, somebody who has intact abilities, reasonable intelligence, again, it's relatively fast, you know, 93, 86, 79, 72, 65, 58, 51, that's maybe five or six seconds.  Now, to say this, you know, if we start timing and say 100, 93, 86, 79, that is a very different phenomena and particularly with what may be going on, if the person is kind of counting to himself at the same time.  That certainly does give time to use your fingers to do the calculation.

          THE COURT:  Mr. Larson, we've been at it about an hour and a half.

          MR. LARSON:  I am almost done, your Honor.

          THE COURT:  All right.  Keep going.

BY MR. LARSON:

Q.  Could you go to slide 115.

A.  Yes, sir.

Q.  You're familiar with the Barona article?

1    A.  Yes, sir, I have it with me.

2    Q.  Did the authors of that article intend for it to be used in any

3    way such as the way that Dr. Hayes has used it in her report?

4    A.  No, sir, not to dispute the score as obtained on an

5    administered test.  It was intended for group statistical data or

6    as a way of estimating IQ in the absence of having had a score.

7    And now we've got an intervening event that's happened, like a head

8    injury, and we're trying to retrospectively look back at what that

9    person's IQ was before the injury.  You never do this if they're

10   available to you to test.  Either -- or that you would use to

11   dispute a prior IQ score.

12   Q.  Without going to the transcripts again, Dr. Cunningham, you

13   were asked a number of questions about what Paul Hardy knew with

14   regard to football and the names of players.

15   A.  Yes, sir.

16   Q.  In your experience with intellectual capability, do 10 and 11

17   year olds know things about football?

18   A.  Yes, sir, depending on their interest.

19   Q.  Do they know the names of players?

20   A.  Yes, sir.

21   Q.  Have you ever seen any records from Ernst Cafe?

22   A.  No, sir.

23   Q.  Work records on behalf of Paul Hardy?

24   A.  No, sir.

25   Q.  Do we have anything other than self-reported information as to

1    how long he held that job, to your knowledge?

2    A.    To my knowledge, that's all there is.

3    Q.    Do we have anything other than self-reported information as to

4    what he was even paid for that job?

5    A.    No, sir.

6    Q.    What is the problem with self-reported information when you're

7    assessing somebody for mental retardation?

8    A.    It's a problem called masking.  It's a variation of masking,

9    which is that they may claim capabilities and history that, in

10   fact, they did not have.

11          Let me add, I would need to go back and look through my

12   family interviews to see if anybody referenced Ernst Cafe, I don't

13   remember that they did in my family interviews at that time.  But

14   to be certain, I would have to turn back through those pages; but

15   otherwise, I have no records about that.

16          MR. LARSON:  If I might have one minute, your Honor.

17          Your Honor, at this time in conjunction with the

18   testimony of Dr. Mark Cunningham, I would like to offer as Defense

19   Bench Book Exhibit 32 the slides that have been shown both on

20   direct and cross-examination.  I think they would facilitate --

21          THE COURT:  As demonstrative aids?

22          MR. LARSON:  As demonstrative aids.

23          MR. MILLER:  I have no objection.  We'll include ours

24   also with that.  There's no objection.

25          THE COURT:  Yeah, have you provided them?

1          MR. MILLER:  Right.  Correct.

2          THE COURT:  Okay.  That's fine.  Okay.

3          MR. LARSON:  I'm through your Honor.

4          THE COURT:  I have a couple of things I would like to ask

5    you, Dr. Cunningham.

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  First of all, just some factual stuff.  What

8    were the years that you were board certified in clinical and

9    forensic?

10          THE WITNESS:  I was board certified in forensic

11    psychology in early 1995.  I took the examine in January of '95,

12    was notified in February of 1995.  I became board certified in

13    clinical psychology in June of last year, been a long-standing

14    aspiration and I completed that process.

15          THE COURT:  Is it 2008?

16          THE WITNESS:  2008, yes, sir -- yes, ma'am.

17          THE COURT:  That's okay.

18          And prior to 1996, how many, roughly how many assessments

19    of mental retardation had you performed?

20          THE WITNESS:  Approximately -- my best estimate at that

21    time would be in the range of 30.  I'm trying to think of the

22    competency evaluations and the number of them that were performed.

23    Actually, it may be more than that.  I did a large number of

24    competency evaluations in that era.  It may be closer to 60 or 70.

25          THE COURT:  And as part of the competency assessment, you

1    would be assessing for mental retardation?

2              THE WITNESS:  Yes, ma'am.

3              THE COURT:  And do you have any idea, any guesstimate of

4    how many you've done since 1996, either as part of an overall

5    assessment or as focused on mental retardation?

6              THE WITNESS:  Well, as -- in terms of being aware of that

7    as part of an overall assessment, there would likely be over 200

8    times.  In terms of when that was an issue to specifically dial

9    down into and look at more carefully, that's going to be closer to

10   someplace around 15 to 20, I would think, it's a much smaller

11   proportion where that was then something to go into more carefully.

12   Maybe a little bit more than that.

13             THE COURT:  Now, would most of those be Atkins issues?

14             THE WITNESS:  Some mixture.  Some of that being cases,

15   capital cases where there was a necessity to follow-up with testing

16   that either I might do or refer them for neuropsych evaluation to

17   cover that at the same time.  And that's why it could be well more

18   than 20.

19             Of the ones that I did that had some Atkins component to

20   them or looking at Atkins more specifically, that may be more like

21   10 or 15 cases, where -- gee, the numbers are hard.  I apologize,

22   your Honor.

23             To try to review and think back which ones were the

24   determinations where that came up on the screen to say there looks

25   like there are deficiencies here, let's have this assessed; as

1    opposed to, we have a qualifying score, now what does that look

2    like.

3            THE COURT:  Have you done some post Atkins evaluations

4    for mental retardation, where you found there was not mental

5    retardation?

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  I need you to explain to me one more time,

8    and I know we've been over this several times, but what was the

9    basis back in 1996 that you suggested that Mr. Hardy's, I think as

10   you put it, intellectual horsepower was greater than what his IQ

11   score was and, you know, what was the basis for that and why do you

12   believe now that the basis was faulty?

13           THE WITNESS:  Yes, ma'am.  The basis for that was my

14   awareness of research that demonstrated that the distribution of IQ

15   scores for African Americans at the -- also distributed on a normal

16   curve, except it's a normal curve with a mean of 85 instead of a

17   mean of 100.  It looks just the same, it's just that normal curve

18   is moved back down the line.

19           So that means that with a mean of 85, that if someone has

20   an IQ score of 70, that's one standard deviation below the mean as

21   compared to other African Americans.

22           Now, then the question is, how do you account for that

23   finding that this normal curve is one standard deviation back from

24   what's observed among Caucasian, Asian Americans?  One possibility

25   is that the test is unfairly measuring the intellectual capability

1   of African Americans, that it is bias to that extent.

2          THE COURT:  Let me just stop you.  So what you're saying

3   is that there was research at that time that if you pulled out

4   African American males, those males?

5          THE WITNESS:  Males or females.

6          THE COURT:  African Americans, if you pulled them out and

7   charted their scores, that their bell, so to speak, was peaking

8   around 85 or rather than a hundred?

9          THE WITNESS:  That's correct.  That's correct.  And so

10  then if you say, well, I am going to compare Paul Hardy to national

11  norms, then he is down below the fifth percentile.  If you compare

12  him to African American norms, then he is less than one standard

13  deviation below the mean, he is at about the 20th percentile, maybe

14  a little bit higher.

15         And so I was responding, I was giving him the 15 points

16  that the test finds that African Americans score lower on.

17         THE COURT:  Because of potential bias in the testing?

18         THE WITNESS:  That would be an interpretation that the

19  test is biased, that it is penalizing African Americans by 15

20  points.  That view -- there are still some scholars who assert that

21  possibility.  The discussion, though, has moved more toward that

22  the idea of how do we account for that rather than that the test is

23  punishing these individuals, and so is this a phenomenon.  And the

24  most explosive interpretation is that it is a race-based, it's a

25  genetic phenomenon.  Other explanations are culture, environment,

1  nutrition, toxic exposure, those kinds of things.

2         But the discussion is moved away from the idea that the

3  test is penalizing these individuals and toward a discussion about

4  the differences in demonstrated -- or distribution of abilities is

5  real, what's causing this, what's happening.  And so my testimony

6  at that time was reflecting the idea that the test was penalizing

7  his intellectual performance.

8         THE COURT:  And that's one theory?

9         THE WITNESS:  That's one theory.  The research or the

10  discussion has progressively moved away from that theory.  You may

11  remember back from the 1980s, early 1990s, there was discussion of

12  IQ tests that were black centric, that asked about terminology and

13  things that were a part of that world, and there was much more

14  discussion about that it's the test.

15         In fact, some school districts quit using IQ tests

16  altogether because of allegations that these were not race-neutral

17  tests, because they were identifying many more black children as

18  being impaired than white children.

19         THE COURT:  But just, again, so I understand.  So the

20  actual data indicated that African Americans, the top of their

21  bell-shaped curve, so to speak, was at 85, whereas for the

22  population --

23         THE WITNESS:  -- at large everybody --

24         THE COURT:  -- at large is 100.

25         THE WITNESS:  -- is 100.  And that is still -- that

1    finding has continued to get significant scientific support, that

2    there is a difference in observed IQ scores based on whether or not

3    these are -- whether you are looking at African Americans as a

4    separate group or you're looking at the nation as a whole.

5         THE COURT:  Tell me what global intelligence means again,

6    how you're using that term and how it fits into these tests, if

7    it's appropriate.

8         THE WITNESS:  Yes, ma'am.  Global intelligence is the

9    combined -- is a reflection of the combined abilities.  In other

10   words, intelligence is made up of a number of different components

11   and subabilities that together represent the intellectual

12   capability that someone is able to bring to bear.

13        THE COURT:  So you're talking about individual persons'

14   global intelligence?

15        THE WITNESS:  Yes, the global intelligence of an

16   individual person, the sum -- the integration, the sum total of

17   their abilities.  And so an IQ score reflects that integration of

18   all of the abilities.  And often there are strengths and weaknesses

19   within those, relative strengths and weaknesses.

20        THE COURT:  Okay.  I want to go now to -- back in 1996.

21   When you were retained, do you remember what you were retained to

22   do?

23        THE WITNESS:  Yes, ma'am.  I was retained to do an

24   evaluation of mitigating factors and also a violence risk

25   assessment for prison.

1          THE COURT:  And you said you met with Mr. Hardy for a

2   total of 16 and a half hours?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Would you describe for me what your purpose

5   was when you were interviewing him, I mean, what kind of

6   information were you looking for and how did you question him?  I

7   mean, just describe to me the format and, I guess, if you would, to

8   the extent that it differed from an evaluation for adaptive

9   behavior, how it differed.

10          THE WITNESS:  Yes, ma'am.  And that would be facilitated

11   by my bringing up the binder that has those notes.

12          THE COURT:  By the way, if the government has

13   Dr. Cunningham's notes, I don't know that we have them as an

14   exhibit.

15          MR. MILLER:  I just have copies.  I'm sorry, your Honor,

16   I'll stand up.

17          THE COURT:  That's okay.

18          MR. MILLER:  I don't have great copies, but I think I can

19   get you a copy.

20          THE COURT:  Yeah, I would just like to have copies of

21   everything that's been referenced, articles and notes.

22          MR. MILLER:  Do you want a complete copy or just what

23   I've referenced?

24          THE COURT:  I think just a complete copy unless there's

25   some objection.

```
1          MR. LARSON:  No objection, your Honor, we'll be happy to

2    give you a copy of Dr. Cunningham's notes.

3          THE WITNESS:  I have these.

4          THE COURT:  I can't say I've memorized everything in the

5    exhibit book, so I don't know what's in the books completely and

6    what's not.

7          Okay, Dr. Cunningham, if you would go ahead and tell me

8    about your -- what was the purpose of it, what were you looking

9    for?

10         THE WITNESS:  The purpose of it was to take a detailed

11   psychosocial history of factors that would have been formative of

12   him.  In other words, I was looking at family history, quality of

13   parenting, abuse, neglect, within the family system, and also

14   information about the corruptive environment of the projects that

15   he was living in.  And so I made inquiry about his father and the

16   nature of the interaction that his father had with him and his

17   father's paternity of so many children.

18         I asked him a great deal of detail about Curtis, his

19   relationship with Curtis and the circumstances of Curtis's death.

20   I asked him about his other siblings and his involvement with them

21   and how they treated him and what their activities were and that

22   sort of thing.  I asked him a lot.

23         In addition to those family relationship kinds of issues,

24   I also asked him a great deal about his experiences in the project,

25   about what the other people there were like, about the nature of
```

1    crime that was occurring there, about violence that he'd observed,

2    and going through all of these issues I was asking him for

3    antidotal detail.  So it was kind of, tell me about this, tell me

4    about that.

5         So there are many pages of notes about things happening

6    in the projects and what he observed there.  And violent incidents

7    that he had observed.

8         So the focus of my interview was most heavily on

9    traumatic experiences, traumatic and corruptive exposures that he

10   had as he was interacting with family members and as was occurring

11   in the community that he was growing up in.

12        As part of the violence risk assessment, I was also

13   asking him about characteristics of psychopathy, which is a

14   variation or an extreme end of the antisocial personality disorder

15   continuum.  At that time the research, or really the field believed

16   that psychopathy was predictive of violence in prison.  And on the

17   basis of that, I utilized the PCLR with him, which is a structured

18   interview, for obtaining information about that.

19        I subsequently began to look much more critically at the

20   research that was available in that arena and ultimately wrote a

21   major literature review that was published in 1998 that identified

22   that, in fact, there was not research demonstrating that

23   psychopathy was predictive of violence in prison, though the field

24   had assumed it to be.  And that, then, gave rise to a whole line of

25   research that established more definitively that that

1    characteristic was not predictive of violence in prison.  That was

2    another example of how research understandings have evolved since

3    the time of Mr. Hardy's trial.

4         But I spent time asking about that, and I asked about

5    those kind of characteristics in my interviews with third parties

6    as well.

7         THE COURT:  Have you done one of these, the Vineland?

8    Did I say it right?

9         THE WITNESS:  The Vineland, yes, ma'am, I have.

10        THE COURT:  You've done one of those?

11        THE WITNESS:  Yes.

12        THE COURT:  Now, is that just done with the third parties

13   or is that supposed to be done with the defendant as well because I

14   know there's a concern about self-reports?

15        THE WITNESS:  Yes, ma'am.  It's most reliably done with

16   third parties.  To ask the person about what they can do or not do

17   is of limited validity.  And so it's conceivable that someone might

18   go over that information with an individual, but if you're looking

19   at what you're going to score, you would want to score that based

20   on observation, not based on self-report.

21        THE COURT:  If you were looking -- if you had been

22   looking for mental retardation with respect to Mr. Hardy back in

23   '96, would you have done your interview in a different way or would

24   you have incorporated other questions or would it have changed how

25   you did the evaluation?

1          THE WITNESS:  There would have been some augmentation of

2     the evaluation.  In other words, I still would have asked the

3     questions that I did here, except I would not have gone into

4     psychopathy because it's not in that case relevant, as I thought it

5     was.  But the social history part of this I would have done the

6     same.

7          In terms of what I would have done with him, I would have

8     asked him more questions about not what was coming at him but what

9     his functional adaptive experience was of his own world, what he

10    had trouble with, what he got assistance with, what he understood,

11    how people helped him, who he brought along with him, where he

12    went, those kinds of things.  The nature of my third-party

13    interviews would have been much, much different in terms of seeking

14    adaptive behavior information from them.

15         With them, again, I am doing the same thing, I am seeking

16    information, corroboration from them about the factors that are

17    impacting on Paul Hardy.  I'm asking them about dad and stepdads

18    and the morgue and the violence and that kind of thing, not about

19    what Paul Hardy could do or not do historically.

20         THE COURT:  Now, I think you also indicated that back

21    then you thought -- you concluded that he was mentally deficient,

22    and looking at your report, I think I saw a reference to impaired

23    intellectual development.

24         THE WITNESS:  Yes.

25         THE COURT:  How does that relate or not relate, if

1    there's a disconnect, with mental retardation?  Is that on a

2    continuum that you mentioned before?

3            THE WITNESS:  Yes, ma'am, that's on a continuum.  In

4    other words, even -- let's say that somebody is not -- does not

5    fall into the category of mild mental retardation, but they are

6    right next to that.  Then you would identify them as being mentally

7    deficient.  In other words, it's not a function of either you're

8    mentally retarded or you're good to go.  There is a continuum

9    there, and the intellectual capability and understandings that

10   somebody could bring to bear, let's say his IQ is 78, is going to

11   be well below that of somebody whose IQ score is 100 or 110 or so

12   on.  And so it's on a continuum.  This is a way of acknowledging

13   that also I think acknowledges the neuropsych findings that there's

14   something going on here.

15           THE COURT:  Would mentally deficient be comparable to

16   borderline?

17           THE WITNESS:  Yes, ma'am.  Now, again though, I mean, in

18   all candor, kind of clearly I've been -- I've got findings that are

19   somewhat inconsistent.  I've said he's mentally deficient and then

20   I've said, but his horsepower is about 15 points low, those two

21   ideas, he is mentally deficient by national norms, but once you

22   shift into this other idea, he is not mentally deficient, if you

23   simply compared him on African Americans norms.

24           THE COURT:  Right, I think I finally understand that

25   issue.

1            THE WITNESS:  Yes, ma'am.

2            THE COURT:  I think that's all I have.

3            Dianne, do you have anything that's on your mind?  That's

4    good to go?  Okay.  Let's take a 15-minute or 10-minute recess and

5    you're good to sit down.

6            THE WITNESS:  Thank you, ma'am, I appreciate it.

7            THE DEPUTY CLERK:  All rise.

8        (WHEREUPON, A RECESS WAS TAKEN.)

9        (OPEN COURT.)

10            THE DEPUTY CLERK:  All rise.  Please stand and raise your

11    right hand.

12        (WHEREUPON, LIONEL HARDY, WAS SWORN IN AND TESTIFIED AS

13        FOLLOWS:)

14            THE DEPUTY CLERK:  Please be seated.  State your name for

15    the record and spell it for us.

16            THE WITNESS:  Lionel Hardy, L-I-O-N-E-L H-A-R-D-Y.

17            MS. FOURNET:  Your Honor, before I begin examining

18    Mr. Hardy, for the record, if I may, Mr. Larson has some business

19    to do with a case elsewhere.  I have spoken to Mr. Hardy about

20    waiving Mr. Larson's presence for a short time.  He has agreed to

21    waive Mr. Larson's presence, and so I would simply state for the

22    record that Mr. Hardy does waive Mr. Larson's presence.

23            THE COURT:  Mr. Hardy, you're okay with Mr. Larson not

24    being here for the time being?

25            THE WITNESS:  Yes, ma'am.

```
 1            MS. FOURNET:  Thank you, your Honor.
 2                     DIRECT EXAMINATION
 3   BY MS. FOURNET:
 4   Q.  Mr. Hardy, state your name, please.
 5   A.  Lionel Hardy.
 6   Q.  And where are you living right now, Mr. Hardy?
 7   A.  Volunteers of America halfway house.
 8   Q.  And why are you living in a halfway house?
 9   A.  Complete my sentence of criminal charges.
10   Q.  And were those federal criminal charges or state criminal
11   charges?
12   A.  Federal.
13   Q.  What was your sentence, Mr. Hardy?
14   A.  Five years.
15   Q.  And you are currently completing that sentence in a halfway
16   house?
17   A.  Yes, I am.
18   Q.  When are you scheduled to be finished with the halfway house?
19   A.  18th of this month.
20   Q.  18th?
21   A.  Yes.
22   Q.  18th of this month?
23   A.  Yeah, Friday.
24   Q.  Friday.  And that five-year sentence was for what offense?
25   A.  Drug trafficking.
```

1    Q.  Prior to this offense for which you are now completing your

2    sentence, do you have any prior felony convictions?

3    A.  Yes.

4    Q.  And what, for what?

5    A.  Drug trafficking.

6    Q.  So you have one prior felony conviction.  Was it for drug

7    trafficking or was it for possession with intent to distribute?

8    A.  No, possession, possession to distribute.

9    Q.  And that was for cocaine as well?

10   A.  Yes.

11   Q.  Now, are you related to Paul Hardy?

12   A.  My little brother.

13   Q.  Your little brother.  Tell the judge, Lionel, the names of all

14   of your brothers and sisters in the order of their ages, if you

15   will.

16   A.  James -- James, Linda, Curtis, Terry, myself, Paul, and Wayne.

17   Q.  So Paul would be the second to the youngest --

18   A.  Yes.

19   Q.  -- in the birth order?  And of all your brothers and sisters

20   growing up, who was the closest brother or sister to Paul?

21   A.  Wayne.

22   Q.  And where is Wayne?

23   A.  Deceased.

24   Q.  What happened to Wayne?

25   A.  Killed, gunshot.

```
 1   Q.  Do you remember about when that was?

 2   A.  In '96.

 3   Q.  So that's something that's happened since your brother has been

 4   in jail on this charge?

 5   A.  Yes.

 6   Q.  After Wayne, who would have been the next closest brother to

 7   Paul?

 8   A.  Curtis.

 9   Q.  And where is Curtis now?

10   A.  Deceased.

11   Q.  What happened to Curtis?

12   A.  Killed.

13   Q.  And was he also murdered?

14   A.  Yes.

15   Q.  And that happened about when?

16   A.  In '84, '85.

17   Q.  So when that murder happened, your brother was still out on the

18   streets; is that correct?

19   A.  Yes.

20   Q.  Now, after Curtis, who was the next closest to your brother

21   Paul?

22   A.  Me.

23   Q.  And were you close to Paul growing up?

24   A.  Yes.

25   Q.  You mentioned your brother James, he's the oldest?
```

```
 1   A.   Yes.

 2   Q.   Where is James right now?

 3   A.   He is sleeping on the streets, he on drugs.

 4   Q.   So he is essentially homeless, is that what you're saying?

 5   A.   Yes.

 6   Q.   Your sister Linda, was she close to Paul growing up?

 7   A.   No, she wasn't.

 8   Q.   Do you have any idea of why not, why did she not develop a

 9   closer relationship with your brother like, say, you had?

10   A.   She -- I guess everybody -- I think she was -- I really

11   couldn't answer that.  I think she had her own problems.

12   Q.   Well, let me ask you this:  She was the only sister, right?

13   A.   Right.

14   Q.   When you and your brothers were outside playing or running the

15   streets or whatever you were doing, where generally would your

16   sister be?

17   A.   In the house in the room.

18   Q.   Did she stay inside a lot --

19   A.   Yes.

20   Q.   -- when you were growing up?  How did that make you feel that

21   she didn't spend time with, more time with you and Paul and your

22   other brothers?

23   A.   Kind of -- thought something was wrong, that's all, kind of

24   bad, felt bad.

25   Q.   Do you feel like Linda and Paul really knew each other very
```

1    well?

2    A.  No.

3    Q.  And was that because Linda pretty much kept to herself?

4    A.  Yes.

5    Q.  What about your brother Terry, was he close to Paul?

6    A.  No.

7    Q.  Tell the judge how much Terry mixed or spent time with you and

8    the other brothers.  Did he spend a lot of time with y'all?

9    A.  Not a lot, he was mostly to his self, too.

10   Q.  Did he spend a lot of time with the family or did he mostly

11   stay away from the family?

12   A.  He stayed away.

13   Q.  When did your sister Linda and your brother Terry leave home?

14   A.  When they graduated from high school.

15   Q.  So as soon as they were old enough they left home?

16   A.  Yes.

17   Q.  After they left home, did --

18          MR. McMAHON:  Object to the leading.  It started the

19   leading question, she has been leading a little bit.  He's not an

20   expert.

21          THE COURT:  Yeah, just watch it.  Go ahead.  Sustained.

22          MS. FOURNET:  Yes, your Honor.

23          THE COURT:  You said Terry and Linda graduated high

24   school and left home, that's where we were.

25   BY MS. FOURNET:

```
 1   Q.  After Terry and Linda left home, did they spend a lot of time

 2   with the family?

 3   A.  No.

 4   Q.  Do you recall how old Paul was when Linda left home, about?

 5   A.  Twelve, twelve.

 6   Q.  About twelve?

 7   A.  Yeah.

 8   Q.  And how old would Paul have been when Terry left home?

 9   A.  About 14.

10   Q.  Now, when did you get back to New Orleans to the halfway house

11   after getting out of prison this year?

12   A.  March 25th.

13   Q.  So that would -- six months ago, is that about right?

14   A.  Right.

15   Q.  And how long were you in prison before you came back to New

16   Orleans?

17   A.  Three years.

18   Q.  And you were in prison in what city?

19   A.  Yazoo, Mississippi.

20   Q.  Yazoo City, Mississippi?

21   A.  Yes.

22   Q.  About how long a drive is Yazoo City from here, Lionel?

23   A.  Three to -- three, three and a half hours.

24   Q.  During that three, approximately three years that you were in

25   Mississippi, how many times did Terry visit you?
```

```
 1   A.  None.

 2   Q.  How about your sister Linda?

 3   A.  None.

 4   Q.  Are you allowed visits at the halfway house where you are now?

 5   A.  Yes.

 6   Q.  During that time that you've been at the halfway house, how

 7   many times has your brother Terry been to see you?

 8   A.  None.

 9   Q.  Have you talked to him on the telephone?

10   A.  No.

11   Q.  Are there any feelings among the other brothers and sisters

12   about Linda and Terry and the distance they've had from the rest of

13   you?

14   A.  Yes.

15   Q.  What are those feelings, how do you feel about that?

16   A.  What -- what, that they wasn't around --

17   Q.  Yeah.

18   A.  -- or they cared?  Got used to it.

19            MR. McMAHON:  What was that?  I didn't hear it.

20            MS. FOURNET:  He said he got used to it.

21            THE WITNESS:  I got used to them not showing affection.

22            MR. McMAHON:  Couldn't understand.

23            THE WITNESS:  I got used to them not showing any

24   affection toward the family.

25            MR. McMAHON:  Thank you.
```

BY MS. FOURNET:

Q.  And your brother Terry works where now?

A.  I think he a fire captain.

Q.  In the fire department?

A.  Yes.

Q.  Have you had any contact at all with him recently?

A.  None.

Q.  What about Linda?

A.  Yes.

Q.  How much contact have you had with Linda?

A.  She came to see me about twice.

Q.  And was that here in the halfway house or was it in Yazoo City?

A.  Halfway house.

Q.  Now, how far ahead were you of Paul in school?

A.  One year.

Q.  And how far did you get in school?

A.  11th grade.

Q.  You dropped out in 11th?

A.  Well, I passed to the 12th, so I dropped out in the 12th.

Q.  How did Paul do in school?

A.  Not that good.

Q.  Was he -- was that because he was lazy --

          MR. McMAHON:  Leading, leading.

          THE COURT:  Sustained.

BY MS. FOURNET:

1  Q.  Why did he not do well in school?  As far as you could see.

2  A.  Couldn't understand.

3  Q.  Who was the worst student in your family of all of your

4  brothers and sisters?

5  A.  Paul.

6  Q.  And tell me the schools that -- did you and Paul go to all of

7  the same schools together, or did you occasionally go to different

8  schools?

9  A.  Same schools.

10  Q.  Tell me what schools the two of you went to.

11  A.  We went to Florence J. Chester Elementary, Sylvanie F. Williams

12  Elementary, James Derham Junior High and Booker T. Washington High

13  School.

14  Q.  And how many of those schools were in or near the Calliope?

15  A.  All of them surround the project.

16  Q.  Tell the judge what the schools were like that you and Paul

17  went to.

18  A.  As far as like -- what you mean, how were they?

19  Q.  Well, describe the schools.  Were they good schools, bad

20  schools?

21  A.  They was -- as far as teaching, I would say it was bad schools.

22  Q.  Why do you say that?

23  A.  You wasn't getting -- I felt you weren't getting proper

24  attention.

25  Q.  Do you think that your brother Paul got proper attention?

1    A.  No.

2    Q.  Now, your mother, what was your mother's name?

3    A.  Marie Hardy.

4    Q.  And how much education did your mother have?

5    A.  5th grade education.

6    Q.  To your knowledge, did your mother ever go to the school and

7    see what could be done to help your brother?

8    A.  No.

9    Q.  What was your mother like?  Describe your mother to the judge.

10   A.  She was a caring woman, a good woman, good mother as far as

11   like taking care of us.

12   Q.  How was her reading and her writing?

13   A.  She was kind of literate (SIC).

14   Q.  Did she -- how was her spelling?

15   A.  Bad.

16   Q.  Why do you say that?

17   A.  When she'd write, she couldn't like -- a lot of times she wrote

18   me when I was in jail, she always misspell my name and a lot of

19   other words.

20   Q.  Was she a good cook?

21   A.  Yes.

22   Q.  Did you ever see her using measuring spoons or cups or

23   anything?

24   A.  No.

25   Q.  Did you ever see her reading recipes?

1    A.   No.

2    Q.   Did your mother's children help her do some things around the

3    house?

4    A.   Yes.

5    Q.   And I mean besides making up your beds and that sort of thing.

6    Tell me how you and particularly your brother Terry would help your

7    mother.

8    A.   Figure out like, figure out how to do the bills, pay the bills,

9    and when letters came, read it to her and tell her what it is.

10            THE COURT:  Do what?

11            THE WITNESS:  Like when letters came to the house, she

12   couldn't read, so we would read it, and when the bills came, we

13   would help her figure it out.

14            THE COURT:  Okay.

15   BY MS. FOURNET:

16   Q.   If your mother had, say, a bottle of medicine and she was

17   trying to decide how much medicine to give one of her children,

18   what would she do?

19   A.   Get one of us to read the bottle.

20   Q.   Did your mother ever -- there were several male friends that

21   lived with your mother; is that correct?

22   A.   Yes.

23   Q.   Did she ever, as far as you know, have her own apartment where

24   she just lived by herself, managed her own bills, that sort of

25   thing?

A.  No.

Q.  Now, after you left school, where did you live?

A.  Got an apartment.

Q.  And did anyone live in that apartment with you?

A.  Lived alone.

Q.  And who managed the apartment, who paid the bills, who decided what groceries to get and so on?

A.  I did.

Q.  Knowing your mother as you did, do you think your mother could have ever done that?

A.  Not without help, not by herself.

Q.  Not by herself.

    What about Paul, when Paul left home, did he ever live by himself?

A.  No, he live with girls, women, women friends.

Q.  Now that you look back on -- and I know this is a tough topic, but I have to ask you this.  Now that you look back on your mother when you were growing up, do you look at her a little differently now than you did then?

A.  Yeah.

Q.  How differently?  Have you realized anything about her that maybe you didn't realize as a child?

A.  Capabilities.

Q.  And tell me what you mean by capability.

A.  What I knew was a good mother, when we came home, we had a hot

1    meal and she took care of the house.  But other than that, there

2    are other things she couldn't do as far as like -- and when I know

3    she couldn't read and write coming up there.

4    Q.  What about your brother Paul, when you look back on your

5    brother Paul now, growing up, is there anything that you think

6    differently about him now that maybe you didn't recognize as a

7    child?

8    A.  Yes.

9    Q.  And what would that be?

10   A.  Same thing, capabilities that he can't do things, couldn't do.

11   Q.  How old was Paul when your brother Curtis died?

12   A.  He was about 16 or 17.

13   Q.  And how did he react to Curtis' death?

14   A.  Took it hard.

15   Q.  Prior to Curtis' death, tell me what that relationship was

16   like.  How did Paul feel about Curtis or seem to feel about Curtis

17   before Curtis' murder?

18   A.  Well, he loved him, he looked up to him.  I mean, Curtis

19   watched over him.

20   Q.  And what did Paul do for Curtis, if anything?

21   A.  Helped him move drugs around.

22   Q.  And in what way did Paul help Curtis move drugs around?

23   Exactly what did he do for the most part?

24   A.  He had him drop it off, dropping off drugs; somebody come to

25   the house, give it to them.

1    Q.  And was that Paul's idea or was that your brother Curtis's

2    idea?

3    A.  Curtis.

4    Q.  Now, if Paul had gotten caught with those drugs that Curtis had

5    him deliver, who would have been the one that would have been

6    arrested?

7    A.  Paul.

8    Q.  And how old was Paul when Curtis had him delivering drugs for

9    him, approximately; when did that start?

10   A.  It was in -- I was in the 9th grade, so he had to be around 8th

11   grade.

12   Q.  Around the 8th grade?

13   A.  Yeah.

14   Q.  And after Curtis died and before Paul was arrested in 1994,

15   were there other people in the neighborhood who would use Paul like

16   that or in the drug business?

17   A.  Quite a few.

18   Q.  Tell me a little about that.

19   A.  When Curtis died, they had a dude named -- we just know him by

20   the name Lumber, he lived --

21   Q.  You're going to need to probably, I'm guessing, speak up just a

22   little bit, Lionel.  I know you're not used to this, but the judge

23   needs to hear you and these gentlemen need to hear you.

24   A.  Yeah.  A guy named Lumber, and he had a cocaine shop and he

25   used to have Paul bring the drugs over and watch over it.

1    Q.  Okay.

2    A.  And you have to understand, from when Curtis died -- Let's see.

3    When Curtis died he used to have -- I guess, like since the dude

4    was in the neighborhood, I guess they -- Paul thought they was his

5    friends, you know.  They really wasn't his friend, what I say

6    wasn't his friend, that they was using him.  If I tell him about

7    it, he'll tell me something like the dude is his friend and he is

8    looking out for him, even though I figure I was his brother, he

9    should have paid more attention to me looking out for him.

10   Q.  And did you feel that this guy Lumber and the other guys in the

11   neighborhood who were getting him to do these things were his

12   friends?

13   A.  No.

14   Q.  What did you think was the real relationship there?

15   A.  Manipulation, you know.

16   Q.  And did you try to talk to your brother about that?

17   A.  Yes.

18   Q.  And what was his response?

19   A.  He'll say the dude was his friend and the dude wouldn't do

20   nothing to hurt him, looking out for him.

21   Q.  Did you feel that he had good judgment about who was a friend

22   and who was just using him?

23   A.  No.

24   Q.  And did you and Paul talk about that from time to time?

25   A.  Yes.

1  Q.  Now, do you recall when -- when you're talking about this drug

2  shop and Lumber, are you talking about crack cocaine or are you

3  talking about powder cocaine?

4  A.  Powder cocaine.

5  Q.  At some point did crack cocaine come in to popularity?

6  A.  About '86.

7  Q.  And you recall that?

8  A.  Say it again.

9  Q.  You recall when there was -- when crack cocaine replaced powder

10  cocaine pretty much?

11  A.  Yes.

12  Q.  Did your brother Paul at some point become involved in crack

13  cocaine?

14  A.  Yes.

15  Q.  And was he involved in selling crack cocaine?

16  A.  Yes.

17  Q.  Tell me how Paul was about the details of crack cocaine; how

18  good was he at that?

19  A.  Selling it?

20  Q.  Selling it, cooking it, measuring it, any of that.  Tell me

21  about cooking it, how good was he at cooking it?

22  A.  He couldn't.  He come to me, the process was kind of simple,

23  but he kept messing it up.

24  Q.  This may be an odd place to do this in a court of law, but I

25  would like for you to explain to the judge, as simply as you can,

1   the process of cooking crack cocaine.  And then I want you to tell

2   the judge what Paul's efforts were like in that regard.

3   A.  Well, they had what they call an ounce tube, a long glass tube

4   and you have an ounce of cocaine, you put in the tube with baking

5   soda and water.  You put it over a heated fire until it liquifies,

6   and then you take it off the fire and you sprinkle water on it, you

7   cool it off, and you have to keep circling it around in the tube

8   until it get hard.

9   Q.  And were you supposed to stick it in the water right away?

10  A.  No.

11  Q.  Why not?

12  A.  The tube break.

13  Q.  Because it was still too hot?

14  A.  Yes.

15  Q.  And what would happen when Paul made attempts to make crack

16  cocaine?

17  A.  He kept shattering the glass putting it under water.

18  Q.  Did you or did anyone else try to tell him to quit doing that?

19  A.  We'll tell him because when the glass break, he'll lose all of

20  his product and the whole $1,000 has got glass all in the drugs.

21  So he did it about -- mostly every time he did it he kept messing

22  up.

23  Q.  Do you have any idea how much money he lost doing that?

24  A.  When the tube broke and they had glass in it, he doing it over

25  the sink, so when it hit the bottom of the sink, a lot of time a

1  lot of it go down the drain and he'll try to scrape up what's good

2  on the surface of the sink.

3  Q.  Did you try to talk to him about how much money he was losing

4  and try to teach him how to do it right, or did anyone try to teach

5  him how to do it right?

6  A.  Well, he seen us do it, but the first time he did it and he

7  broke it, I mean, we were laughing at him at first because we just

8  figured like, just an honest mistake.  But when he did it a couple

9  of time more, it start getting expensive, like saying, you're

10 losing -- you're losing all of your money, you know.

11 Q.  Did he ever catch on to how to cook crack cocaine?

12 A.  No.  He paid somebody to do it.

13 Q.  So he finally just decided to pay somebody else to do it?

14 A.  Yes.

15 Q.  And initially, who did he get to cook his cocaine for him?

16 A.  A guy named Dorsey.

17 Q.  And once he had Dorsey Jordan -- was it Dorsey Jordan?

18 A.  Yes.

19 Q.  Once he had Dorsey Jordan cooking his cocaine, how did Dorsey

20 Jordan treat him, as far as you could see?

21 A.  Well, he gave him -- the process, when you got coke, you

22 supposed to, I guess you got to follow the whole guideline where it

23 go, he give it to Dorsey to cook, and he'll let Dorsey tell him

24 what he made instead of knowing the whole process of it.  So Dorsey

25 told him this what came out, he'll believe him without really

1    knowing himself.

2    Q.  I know we all know because you were convicted of this, but you

3    yourself have dealt drugs; is that correct?

4    A.  Yes.

5    Q.  And would you trust somebody else to tell you how much profit

6    you had made?

7    A.  No.

8    Q.  Did you try to talk to Paul about that?

9    A.  Yes.

10   Q.  And what was the result of trying to talk to Paul about that?

11   A.  He'll say he understand, but he ain't demonstrate it that he

12   understood what I was talking about because every time you went

13   over there to drop off an ounce, he'll just give it to the dude and

14   the dude just tell him -- I guess the first time he told him how

15   much he made Paul thought they supposed to do that every time.  And

16   I told him sometimes drugs fluctuate, sometimes the drug you get

17   more, and if the drug bad, you might get less, but you can make it.

18          But if the dude told him he made 1400.  And every time he

19   told him the same thing he just believed him.  I would tell him,

20   man, go up there and watch him.  And he just figured -- I guess he

21   just figured he was making something.

22   Q.  So I think what, correct me if I'm wrong, what you're saying,

23   if somebody told him --

24          MR. McMAHON:  Objection, leading, leading.

25          THE COURT:  Yes.  Sustained.  If you want to circle

```
 1    around and ask him to explain it again, that's fine.
 2              MS. FOURNET:  It was a little garbled, Judge, I just
 3    wanted to make sure it was clear.
 4    BY MS. FOURNET:
 5    Q.  Explain again how Paul figured out his profit from each drug
 6    sale.
 7    A.  By what the guy told him.  If he told him this how much he
 8    made, Paul just believe him.
 9    Q.  Does a person who is an experienced drug dealer leave another
10    person alone with his drugs and go somewhere else?
11    A.  No.
12    Q.  What about Paul?
13    A.  Paul was trusting, he trusted a lot of people.
14    Q.  And what about Dorsey Jordan?
15    A.  He was -- it was his house where he was selling the drugs from,
16    and he know how it go because I think he was in -- he did drugs
17    before.
18    Q.  Now, you say -- let's make sure we know who you're talking
19    about.  You say "he" knew how it goes.
20    A.  Dorsey Jordan know.
21    Q.  Dorsey Jordan.  Okay.  Go ahead.
22    A.  Yes.  He know how the process work.  And I guess when he
23    talking to Paul, he kind of figured like Paul -- always in Paul ear
24    talking about how friendly they is, they friends and this and that,
25    so I guess Paul just -- his thing was that if a dude said he was
```

1    his friend, he'll take it for exactly what the dude said, you know.

2    And as far as on the business, he'll trust people.  I figure he

3    didn't know what he was doing so if somebody talk like they know

4    what he was doing it, he'll just figure they know what they're

5    doing.

6    Q.  Well, would he ever leave Dorsey Jordan alone with his drugs?

7    A.  Yes.

8    Q.  Did you worry about that?

9    A.  I worried about it and I told him about it.

10   Q.  And what exactly did you tell him, why should he not do that?

11   A.  Because he in it for the money, you're wasting money, he don't

12   know what he making.  You know, if you got caught on making a

13   certain amount, I say it could be more than that, you have to watch

14   your product.

15   Q.  To your knowledge, was your brother Paul ever a big-time drug

16   dealer?

17   A.  No.

18   Q.  How would you describe his -- the level of his drug dealing?

19   Well, let me ask you this:  Who was a bigger-time drug dealer, you

20   or your brother Paul?

21   A.  Me.

22   Q.  Did he have a crew?

23   A.  No.

24   Q.  What did he have?

25   A.  Guys who sold drugs with him.

1    Q.  And how many guys are we talking about at a time?

2    A.  Probably be about four or five.

3    Q.  Was he like the boss of these four or five guys?

4    A.  No.  Drugs came out with crack cocaine everybody was selling,

5    and if everybody was selling we know each other, we had a lot of

6    guys from different projects, and he just hung around with a whole

7    lot of dudes that sold drugs.

8    Q.  To your knowledge, did he ever make as much as $5,000 a month

9    selling drugs?

10   A.  No.

11   Q.  What would you estimate was the maximum he ever made a month

12   selling drugs?

13   A.  2,000.

14   Q.  Tell the judge about the safe that Paul bought for his money.

15   A.  He had -- at the house, I walked in the house and he had -- you

16   walk in the house, and as soon as you walk through the door you

17   seen something like a box, like a box like you buy a TV or

18   something.  And right there by the wall, like in the middle of this

19   here, right there in the middle.  And it's a cardboard box with

20   like a 19-inch TV on top.  So at first I thought something was in

21   the box as far as like they never opened it yet, but he was

22   talking, he said he had a safe.  I said, where your safe at?  He

23   said, by the box.

24          You know, I'm looking, in case somebody break in the

25   house, they wouldn't know where the safe was, and I'm telling him,

1    I said, Man, you telling me that if somebody walk in the house and

2    see a box in the middle of the living room with a TV on top, they

3    ain't going to think what's in the box?  So when I moved the TV and

4    I picked up the box, the safe was on the floor.  And he said --

5    Q.  What was your reaction to this initially?

6    A.  From --

7    Q.  I mean, when you first saw that he had a safe under a cardboard

8    box with a TV on top of it, how did you react to that?

9    A.  I was just used to him doing, kind of like I say, I ain't going

10   to say, I say stupid but ain't put too much thought in doing

11   anything.

12   Q.  And did you look at the safe?

13   A.  Yeah.  When I took the box off, I seen the safe.  It wasn't

14   that big.

15   Q.  How big -- how high do you reckon that safe was?

16   A.  About like this here (DEMONSTRATING).

17   Q.  So about, for the record, about maybe a foot and a half, two

18   feet?

19   A.  Yeah.

20   Q.  Was the safe bolted to the floor?

21   A.  No, it wasn't.

22   Q.  Did you try to talk to him about the safe?

23   A.  Yeah.  I told him, when I told him about the box, I said, Man,

24   what's wrong with you?  I said, Man, a box in the middle of the

25   living room, and he said, well, can't nobody move the safe.  And

1    I'm looking at the safe and I said, why they couldn't move it,

2    because it was kind of heavy.  So he figured if somebody do come in

3    the house they can't move it.

4         So I picked the safe up and walked to the door and walked

5    back.  The safe was kind of heavy, but it wasn't that heavy that a

6    person figured it couldn't be moved.

7    Q.  And did you try to talk to Paul about the safe business?  Did

8    you make any suggestions to him about maybe a better way to do it?

9    A.  You know, I told him, I said, most people that have a safe

10   they'll kind of like hide the safe, you know, in a closet or

11   something, not put a box over it, you know.

12   Q.  And did he ever do that?

13   A.  Well, after that episode, I really don't know because I never

14   go back.

15   Q.  When you think about Paul and your other brothers, and for that

16   matter, your sister Linda, how does he compare with the rest of the

17   brothers and Linda, was he like the rest of y'all or not?

18   A.  He was the most one needed help, put it like that.

19   Q.  Did you ever know him to pay his bills or manage his money by

20   himself?

21   A.  No.

22   Q.  What about profit, explain how Paul calculated -- let me just

23   give you a hypothet.  Paul buys drugs for $400 and he sells those

24   drugs for $800.  In your experience with Paul, how much profit is

25   he going to think he's made?

```
 1              MR. McMAHON:  Objection, he can't answer that.  That's

 2    highly speculative.  What is he, a mind reader?

 3              THE COURT:  Yeah.  If it's a specific situation that he

 4    can recall where --

 5              THE WITNESS:  Yes.

 6              THE COURT:  Do you have a specific example?

 7              THE WITNESS:  Yes.

 8              THE COURT:  Don't do the hypothetical, just tell us

 9    something specific.

10              THE WITNESS:  He'll go about it like this here because we

11    selling drugs.  We'll buy an ounce from a guy for $1,000, and we

12    cut off at 600 and the other worth 1,600, Paul will say, I made

13    1,600.  And I'll say, you ain't make 1,600.  He said, I did, when

14    the dude cut it up for them and they put them in little

15    whatchamacallits, and he said, I make 1,600.  You didn't make

16    1,600, so you got to take out what you paid for it.

17              But he'll do that a lot, every time he'll get drugs, and

18    whatever the dude cut up he'll say that's what he made.

19    BY MS. FOURNET:

20    Q.   What about a sense of direction, was he good at finding

21    places?

22    A.   Familiar places.

23    Q.   What about if he had to go find a place in, say, Metairie, and

24    you told him, you go down I-10, you get off at Causeway, you take

25    this left, you take this right, then you take another left, you go
```

```
 1    seven blocks and you take another right, could he do that?

 2            MR. McMAHON:  Objection, unless he can provide a specific

 3    example, again, that's speculative, and she is basically asking the

 4    witness to read Mr. Hardy's mind.

 5            MS. FOURNET:  I am asking the witness a hypothetical

 6    question based on his experience with his brother, your Honor.

 7            THE COURT:  Yeah, well, I'd like to stay away from

 8    hypotheticals because -- for the reasons -- well, sustained on the

 9    hypothetical.

10            Can you give us some examples of situations of your

11    brother getting directions; was he able to find a place?  Just tell

12    us a little bit about that.

13            THE WITNESS:  No.  If you switch it up more than twice,

14    he'll lose.  In other words, if you tell him to meet you somewhere,

15    you say like, say like in Carrollton, you got the name like

16    Claiborne and Carrollton, they got the end of the streetcar, you

17    know, so when you give him direction, you don't say go to Claiborne

18    and Carrollton and make a left.  You'll say go to Claiborne and

19    turn at the streetcar, certain things that he'll remember.

20            In other words, I know a lot of things that he didn't

21    get, so with me, I kind of like made it easy on him, as far as like

22    certain places he had to go, I'll tell him, well, you know, where

23    this place at, and if he say yes, I'll say, well, you go a couple

24    streets down, like that.  But as far as like going to an address,

25    give him an address, making it too difficult, changing it up three
```

```
 1   time, you'll lose him.
 2   BY MS. FOURNET:
 3   Q.  If you told him to drive to Baton Rouge, could he do that?
 4   A.  No.
 5           THE COURT:  Might, just to get clarity, Mr. Hardy.
 6   You're saying if directions involved, I think you said three
 7   things, like turn left and then turn right and then turn left, he
 8   could handle that; but if it was more than that, he wouldn't be
 9   able to do it?
10           THE WITNESS:  Yeah.
11           THE COURT:  Okay.
12   BY MS. FOURNET:
13   Q.  Did you ever see Paul reading anything growing up?
14   A.  No.
15   Q.  How were his communication skills, how well did he communicate?
16   A.  He was kind of quiet, but I think -- I took it from when people
17   are around he'll kind of like, when they talk and he'll kind of
18   like he'll join in then, you know.  But as far as like, if he in a
19   room, you wouldn't really notice him, you know.
20   Q.  Do you remember when he worked at Ernst Cafe?
21   A.  Yes.
22   Q.  How did he get that job?
23   A.  I got the job for him.
24   Q.  And what happened when he went to fill out the application for
25   Ernst Cafe?  Tell the judge that story.
```

1   A.  I was working there, so I got him the job.  And when he came

2   and the dude, the manager said, the owner said he was hired and

3   told him he had to fill out the application.  So when Paul sat down

4   and he gave him the application, I went back to work, I was like a

5   prep cook, and Paul kept calling me asking me what certain things

6   mean on the application.

7   Q.  Like what certain things?

8   A.  Like when they had SS, like the little thing with dashes, he

9   didn't know what it meant, I told him social security.  You know, I

10  thought from my things when he see the dashes, you know.  So . . .

11  Q.  What else was on that application that you had to tell him what

12  it was?

13  A.  Like they had previous address, he didn't know what previous

14  mean.

15  Q.  How old was Paul at this point?

16  A.  About 17.

17  Q.  And what ended up happening with that application?  Did Paul

18  fill it out?

19  A.  No, I sat by him and filled it out because he kept calling me,

20  so instead of keep walking back and forth I just tell him what to

21  put on the application.

22  Q.  By the way, is Ernst Cafe in the French Quarter?

23  A.  No.

24  Q.  Why would Paul tell someone it was in the French Quarter?

25          MR. McMAHON:  Objection.

```
 1              THE COURT:  Sustained.

 2   BY MS. FOURNET:

 3   Q.  What did Paul consider the French Quarter?

 4   A.  Canal Street, all, the whole area.

 5   Q.  And what -- at Ernst Cafe, what was Paul's job?

 6   A.  Sweeping, mopping.

 7   Q.  Did he do any cooking or anything like that?

 8   A.  No.

 9   Q.  In fact, as far as you know, could Paul cook?

10   A.  No.

11   Q.  Lionel, you know what this hearing is about?

12   A.  Yeah.

13   Q.  Tell us what the hearing is about, as you understand it.

14   A.  Learning capabilities.

15   Q.  Okay.  Has it been easy for you to come here and talk about

16   your brother being slow?

17   A.  No.

18   Q.  Why are you here; why did you agree to come testify?

19   A.  Because I know him.

20   Q.  Do you care about him?

21   A.  Yeah.

22   Q.  Does the fact that you care about him mean that you would come

23   in here and lie?

24              MR. McMAHON:  Objection, self-serving.

25              THE COURT:  Overruled.
```

BY MS. FOURNET:

Q.  Does the fact that you care about your brother mean that you would come here and lie under oath to the judge?

A.  No.

Q.  Is what you said today true?

A.  Yes.

        MS. FOURNET:  I tender.

        THE COURT:  All right.

                    CROSS-EXAMINATION

BY MR. McMAHON:

Q.  Mr. Hardy, how many times have you been convicted for drug offenses?

A.  Twice.

Q.  Once here and once in California, right?

A.  Yes.

Q.  And when you were arrested in California -- by the way, what was that charge out in California?

A.  Drug possession.

Q.  And you were -- what city in California was that?

A.  Los Angeles.

Q.  LA?

A.  LA.

Q.  You were distributing?

A.  I was buying.

Q.  You were buying?

1    A.   (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

2    Q.   But you did -- I thought you said selling drugs.

3    A.   I brought from California to sell in New Orleans.

4    Q.   When you were arrested, how much money did you have on you?

5    A.   In California?

6    Q.   The California arrest.

7    A.   I don't remember.

8    Q.   You don't remember?

9    A.   I don't remember.

10   Q.   Well, what about the Louisiana charge?  Now, you're still in

11   the halfway house?

12   A.   Yes.

13   Q.   You're still on supervised release?

14   A.   Yes.

15   Q.   How much money -- and that was for distribution, correct?

16   A.   Trafficking.

17   Q.   Yeah.  How much money did you have when you were arrested on

18   that charge?

19   A.   $200.

20   Q.   $200.  Well, would it surprise you to know that your brother

21   when he was arrested they found $4,000 in his safe?

22   A.   Would it surprise me?

23   Q.   Yes.

24   A.   No.

25   Q.   He was a pretty good drug dealer, wasn't he?

1    A.  $4,000, no.

2    Q.  My question was, your brother was a pretty good drug dealer,

3    wasn't he?

4    A.  No.

5    Q.  He had a lot more money than you did.

6    A.  No, he didn't.

7    Q.  Now, let me talk about, you grew up in the same house as your

8    brother obviously, right?

9    A.  Yeah.

10   Q.  And, now your mother, I understand your mother was a very good

11   cook, right?

12   A.  Right.

13   Q.  And she was kind of like an old-school cook, correct, like she

14   didn't use like measuring cups and things, you know, she probably

15   got the recipes from your grandmother who got them from her momma,

16   right?

17   A.  What, where she got a recipe from, I wouldn't know.

18   Q.  I mean, but she cooked by feel, like, she knew the amounts like

19   by heart, she didn't need a measuring cup or anything to cook,

20   right?

21   A.  She didn't use it.  I wouldn't say she didn't need it, she

22   didn't use it.

23   Q.  And she didn't even have them in the house I'll bet, true?

24   A.  Measuring cup?

25   Q.  Things like that.

```
 1  A.  Yeah.
 2             THE COURT:  Yes, she did or yes, she didn't?
 3             THE WITNESS:  Yes, she did.
 4             THE COURT:  She did, okay.
 5  BY MR. McMAHON:
 6  Q.  Now, you didn't have a microwave in that project apartment, did
 7  you, back in the '80s?
 8  A.  No.
 9  Q.  '70s, '80s?
10  A.  No.
11  Q.  Didn't have a computer either, right?
12  A.  No.
13  Q.  And when you were in prison, of course you would communicate
14  with your brother, you guys would write each other letters back and
15  forth, right?
16  A.  Yeah.
17  Q.  And about how many times, how many times a month would you get
18  a letter from your brother?
19  A.  About once I write and he write me back.
20  Q.  So about once a month you guys wrote each other back and forth?
21  A.  Yeah.
22  Q.  And you would send him money, would you send him money?
23  A.  In jail?  In jail?
24  Q.  Yeah, like when -- I mean, not when you were in jail, but you
25  would send him money for -- so he could put it on commissary
```

1   account, right?

2   A.  When I'm in jail or out of jail?

3   Q.  Out.

4   A.  Yeah.

5   Q.  Now, when your brother would write you letters, he would kind

6   of give you the news about what was going, I guess, with his kids,

7   right?

8   A.  Yeah.

9   Q.  And he would give you the news about what was going on with his

10  case?

11  A.  No, we didn't discuss the case on the phone.

12  Q.  And he would make himself understood in those letters, right,

13  you understood what he was saying, correct?

14  A.  He talked more about in the letters about the Bible.

15  Q.  And you would, you would write him back, too, and talk about

16  the Bible as well?

17  A.  Yeah.

18  Q.  And in those letters, wouldn't your brother explain to you that

19  he's really been listening to a lot of different ministers like, do

20  you know who Paul Morton is?

21  A.  Yeah.

22  Q.  Your brother would mention Paul Morton in these letters?

23  A.  No, he just talk about the Bible.

24  Q.  Would he ever mention the fact about how much inspiration he

25  got from looking at videos, videos, especially when he was in

1    Arkansas, looking at videos that kind of changed his spiritual

2    life, did he ever mention those to you in those letters?

3    A.  I don't recall, no.

4    Q.  Did your brother ever mention in the letters that he looked at

5    a lot of religious programming?

6    A.  Just said he read the Bible.

7    Q.  Are you aware that your brother looks at a lot of religious --

8    watches a lot of religious programing on television?

9    A.  No.

10   Q.  You're not aware of that?

11   A.  I am not aware of it.

12   Q.  Now, did you ever do any cooking when you were growing up with

13   your mom?

14   A.  Cooking with her or do I know how to cook?

15   Q.  No, my question is, did you ever do any of the cooking when you

16   were living in the same place as your mother?

17   A.  Yes.

18   Q.  Did you clean up?

19   A.  Yeah.

20   Q.  And your brother did, too, didn't he?

21   A.  Cleaned up?

22   Q.  Yeah.

23   A.  Cleaned up the house, yeah.

24   Q.  He would wash his dishes?

25   A.  Who are you talking about?

```
 1    Q.  Paul.

 2    A.  Wash dishes, no.

 3    Q.  He would clean up his room?

 4    A.  Yeah.

 5    Q.  Because, I guess you guys, you wanted to make life a little bit

 6    easier on your mother, right?

 7    A.  Right.

 8    Q.  Your mother was a real hard-working woman, wasn't she?

 9    A.  She didn't work.

10    Q.  She didn't work?

11    A.  I mean, hard working, she did part-time work back in the days,

12    but she got on welfare, she was on welfare.

13    Q.  She was on welfare?

14    A.  Yeah.

15    Q.  But she had it rough, I mean, you know, she was abused as a

16    girl, right?

17    A.  Yeah.

18    Q.  And Earl would beat her up, right?

19    A.  Yes.

20    Q.  Earl was very abusive to her, correct?

21    A.  Yes.

22    Q.  Earl Newman is not your daddy, is he?

23    A.  Yes, he is.

24    Q.  Oh, he is.  But you guys wanted to, you wanted to make your

25    life -- I mean, recognizing that your mother had a rough life, I'm
```

1   sure that you guys wanted to kind of pitch in and help out your

2   mom, right?

3   A.  Right.

4   Q.  You didn't want to make her life any harder, did you?

5   A.  No.

6   Q.  So Paul would pitch in and he would do his share of the chores,

7   too, correct?

8   A.  What, clean up a room?

9   Q.  Yeah, household chores.

10   A.  My mom really cleaned the whole house up, we ain't really had

11   no chores; but when she asked us to do something we done it.

12   Q.  But you did it, right?

13   A.  Yes.

14   Q.  Paul used to wet the bed?

15   A.  Yes.

16   Q.  And when did he stop wetting the bed?

17   A.  I don't know when he stopped, but I know him and Wayne would

18   wet the bed.

19   Q.  Wayne used to wet the bed, too?

20   A.  Yeah.

21   Q.  Now, Curtis had a nickname, Cool, right?

22   A.  Yeah.

23   Q.  And when Curtis was murdered, Paul tried to emulate him,

24   emulate his lifestyle, correct?

25   A.  Yeah.

1    Q.  And Cool was a very flashy dresser, Curtis was a very flashy

2    dresser, right?

3    A.  Yeah.

4    Q.  And Curtis was selling drugs, too, correct?

5    A.  Yeah.

6    Q.  And so Paul decided that he wanted to dress just like Curtis;

7    isn't that true?

8    A.  Yes.

9    Q.  And, in fact, Paul took on Curtis' nickname, Cool; isn't that

10   right?

11   A.  Yes.

12   Q.  And so part of being Cool, part of being like Curtis, would be

13   like to dress really nice and really flashy, correct?

14   A.  Yeah.

15   Q.  And Paul did that, didn't he?

16   A.  He wore Curtis' clothes.

17   Q.  But he knew how to put them together, right?

18   A.  From looking at Curtis, how Curtis dressed.

19   Q.  Do you know what kind of jeans Paul liked, Paul liked to wear?

20   A.  Jeans?

21   Q.  Brand, brand names.

22   A.  Calvin Klein.

23   Q.  Let me ask you something.  What's Paul's birthday?

24   A.  October the 14th.

25   Q.  What year?

```
 1   A.  '65.

 2   Q.  What was Curtis' birthday?

 3   A.  What's his birthday?

 4   Q.  What was his birthday?

 5   A.  I think July the 23rd, I think.

 6   Q.  What year?

 7   A.  I think Paul was born in '67, Curtis was born about '64.

 8   Q.  How about James?

 9   A.  The year he was born or his birthday?

10   Q.  Birthday.

11   A.  I don't know James' birthday.

12   Q.  Terry?

13   A.  February the 14th.

14   Q.  What year?

15   A.  February the 7th.  '65.

16   Q.  Linda?

17   A.  Don't know it.

18   Q.  Wayne?

19   A.  October the 21st, '67, '68.

20   Q.  So when Curtis gave -- you testified on direct that Curtis

21   would have Paul watch over his dope, correct, guard it; is that

22   what you said?

23   A.  Have him deliver it.

24   Q.  So Curtis would give Paul directions and Paul would go deliver

25   the dope, right?
```

1    A.  Give him directions to deliver the dope, yeah.

2    Q.  And Paul would do that?

3    A.  Yeah.

4    Q.  And he would do it when he had that little moped he would run

5    around in?

6    A.  No, that was in the project, over there in Calliope.

7    Q.  He never did it up by driving?

8    A.  No.

9    Q.  Just by foot?

10   A.  Yeah.

11   Q.  But this guy, what was his name, number; what was that guy's

12   name, numbers?

13   A.  Lumber.

14   Q.  Lumber.  He had Paul bring drugs over and watch over the drugs,

15   correct; isn't that what you testified to?

16   A.  Yes.

17   Q.  And this is when, this is when Paul was a juvenile, right?

18   A.  That's under 18?  I don't know if he was a juvenile or not.

19   Q.  Why did you say 18?  Did the defense attorneys tell you

20   anything about, anything special about age 18 before you testified

21   here today?

22   A.  I know Curtis died in '85 and I know -- I don't know if -- I

23   know I started selling drugs when Curtis died.  So it had to have

24   been after he died, so if I was selling drugs, I would deal with

25   Lumber, too, so that had to have been after Curtis died, so I'm

1  saying after '85, had to be '85 on up.

2  Q.  My question was, was before -- when Paul was watching over the

3  drugs and delivering the drugs for Lumber, that was before he was

4  18, right?  He was a juvenile, right?  Or you don't know?

5  A.  I'm trying to figure it out.  Yeah, '84 I was 18, so, yes, he

6  one year under me.

7  Q.  And he was doing that so, I guess, so that, to protect Lumber?

8  A.  To do it to protect him?  I wouldn't know.

9  Q.  Paul was never arrested, he was able to avoid arrest -- or he

10 was never arrested while doing that, was he?

11 A.  I don't think so, no.

12 Q.  So he was successful doing that; he avoided arrest, correct?

13 A.  Dropping off the drugs?

14 Q.  Yeah.

15 A.  Was he successful?  It wasn't his stuff.

16 Q.  He never got jacked, did he?

17 A.  No, not that I know of.

18 Q.  The cops never -- he never got arrested, did he, not that you

19 know of, correct?

20 A.  Not that I know of.

21 Q.  So he was pretty good at that, wasn't he?

22 A.  Pretty good at what?

23 Q.  I'll move on.  Now, before you testified, did the lawyers for

24 your brother tell you that if the judge were to find that he was

25 mentally retarded, he wouldn't get the death penalty; they told you

```
 1   that, right?
 2   A.  Right.
 3   Q.  And you knew that, right?
 4   A.  What?  Did I know that --
 5   Q.  I mean, you've been in federal prison, you know --
 6   A.  I know from knowing that they can't execute you if you mentally
 7   retarded.
 8   Q.  Right.  And you obviously, you don't want your brother to be
 9   executed, right?
10   A.  No.
11   Q.  Of course not.  You love your brother, don't you?
12   A.  Yes.
13   Q.  And you know that the slower, the more mentally impaired you
14   can make your brother appear, the better it is for him; you realize
15   that, correct?
16   A.  By the things he done bring it up, if it's mentally impaired,
17   it's mentally impaired.
18   Q.  But you're here today, right, to help your brother, correct?
19   A.  Tell the truth, yeah, about his life.
20   Q.  Uh-huh.  When Curtis died, you all went to the funeral, didn't
21   you?
22   A.  Yes.
23   Q.  And where was he buried?
24   A.  A place out there on Airline Highway, Providence.
25   Q.  And Paul was brought to the grave site, I take it, since he
```

1   idolized Curtis, correct?

2   A.  He'll do what?

3   Q.  Go out to the grave site.

4   A.  Yes, he'll visit.

5   Q.  You would go with him?

6   A.  Would I go with him?

7   Q.  Yeah.

8   A.  I go alone.  Sometime I went with him.

9   Q.  And I imagine like right after he died you guys went out there

10  probably quite a bit, didn't you?

11  A.  Yes.

12  Q.  And sometimes he would go alone, right?

13  A.  I wouldn't know.

14  Q.  You wouldn't know.  Because you weren't with him.

15  A.  When I was with him and I would go alone.  But if he ever went

16  alone I wouldn't know.

17  Q.  Now, your brother, you know, as part of this persona as Cool,

18  he dressed very well, he had various accounts at stores; you knew

19  that, didn't you?

20  A.  No.

21  Q.  You didn't know he had an account at Macy's?

22  A.  No.

23  Q.  You didn't know he had an account at Structure, remember that

24  store Structure?

25  A.  Yeah.

1    Q.   You didn't know he had an account there?

2    A.   No.

3    Q.   Did you know he had an account at Mervyn's?

4    A.   No.

5    Q.   Dillard's?

6    A.   Nope.

7    Q.   All of this would surprise you?

8    A.   That he had account?

9    Q.   Yeah.  All of those accounts?

10   A.   Why would it surprise me?

11   Q.   I don't know, I'm asking you, would it surprise you; yes or no?

12   A.   Yes.

13   Q.   Would it surprise you he had a bank account?

14   A.   No.

15   Q.   What about the fact that when he realized he had to pay tax on

16   the interest, he pulled his money out, would that surprise you?

17            MS. FOURNET:  Judge, I object to that question.  It

18   assumes a fact that is not in evidence in this, as far as I know,

19   and is nowhere to be found in this material.

20            THE COURT:  Yeah, why don't you back up and approach it.

21            MR. McMAHON:  I'll move on.

22   BY MR. McMAHON:

23   Q.   You know your brother had a number of guns, correct?

24   A.   I know he had guns, yeah.

25   Q.   And I'm sure you've been down to Chalmette Jewelry yourself on

```
 1   occasion.  Do you know what Chalmette Jewelry was?
 2   A.  Yes.
 3   Q.  It's a gun shop, right?
 4   A.  I bought a gun there.
 5   Q.  You bought a gun there, right?
 6   A.  Yeah.
 7   Q.  You know your brother bought several guns there as well,
 8   correct?
 9   A.  No.
10   Q.  He filled out gun forms at Chalmette; you're aware of that,
11   aren't you?
12   A.  No, I am not aware of that.
13   Q.  You're not aware of that.  And you're not aware that he filled
14   out gun applications at Elliot's in Metairie; were you aware of
15   that?
16   A.  Nope.
17   Q.  What you're saying is, it seems on direct examination that your
18   brother who writes you letters from prison was incapable of filling
19   out an application form.
20   A.  He couldn't.  The one I seen him fill out he couldn't.
21   Q.  What if we showed you gun application forms, would it surprise
22   you that your brother was able to fill them out?
23   A.  That he can fill them out?
24   Q.  Yes.
25   A.  Without help?
```

```
 1   Q.  Yeah.

 2   A.  Yeah, it would surprise me if he can fill it out without help.

 3   Q.  Because he is retarded?

 4   A.  Because he what?

 5   Q.  He's retarded.

 6   A.  Is he retarded?

 7   Q.  Because he is retarded he wouldn't be able to do that, that's

 8   what you're saying, right?

 9   A.  He can't figure certain things out.

10   Q.  Would he remember like telephone numbers like this off the top

11   of his head?  That would be hard for him to do, correct?

12   A.  I wouldn't know.

13   Q.  You wouldn't know.  I'm asking your opinion.

14            MS. FOURNET:  Well, Judge --

15            MR. McMAHON:  Wait.

16            THE COURT:  No, no, no, okay, sustained.  We didn't do

17   hypothets on direct, we're not going to do hypothets on cross.

18   BY MR. McMAHON:

19   Q.  You said he couldn't fill out an application.

20   A.  Because I was there.

21   Q.  Because you were there?

22   A.  Yeah.

23   Q.  Couldn't remember a multitude of telephone numbers right off

24   the top of his head?

25            MS. FOURNET:  Judge, again --
```

1       THE COURT:  Well, that's okay, that's asking specific.

2   BY MR. McMAHON:

3   Q.  Yes or no?

4   A.  It all depend on the number.  Like right now if you say, I know

5   the number of my daughter, my kids, yeah.  Other than that, other

6   numbers I can't say off the top of my head.

7   Q.  You're saying that your brother could not find his way from

8   here to Baton Rouge, that's what you testified to on direct,

9   correct?

10  A.  Yeah, I said he couldn't.

11  Q.  Mr. Hardy, all it takes to go to Baton Rouge is, you go on I-10

12  and you don't make a move until you see the sign Baton Rouge.

13      MS. FOURNET:  Judge, I object to the testifying by

14  opposing counsel.

15      THE COURT:  Sustained.

16      MR. McMAHON:  Let the record reflect I chuckled at that

17  one.

18  BY MR. McMAHON:

19  Q.  You're aware, too, that your brother Paul had various -- used

20  various apartments in the Florida project to store guns and dope,

21  that came out at the last trial, you're aware of that, aren't you?

22  A.  No, I wasn't.

23  Q.  You're not.  Are you aware that he gave the weapon he used to

24  kill Kim Groves to Damon Causey to keep?

25  A.  No.

```
 1   Q.  You're not aware of that?

 2   A.  No.

 3   Q.  Are you aware that your brother disassembled the weapon and

 4   threw the barrel in the Industrial Canal after he shot Kim Groves;

 5   are you aware of that?

 6   A.  That that's what they saying?

 7   Q.  Yeah.

 8   A.  From picking up on the trial, yeah.

 9   Q.  So you're aware of that?

10   A.  Yeah.

11   Q.  So he knew enough to swap out a barrel and throw it away,

12   correct?

13   A.  Did he know enough to say he done it?  I don't know if he done

14   it, they say he done it.

15   Q.  Oh, that's right, you weren't there.

16          Did you ever have to help your brother dress, assist him

17   in dressing in the morning?

18   A.  What do you mean dress?

19   Q.  When you were growing up, help him put his clothes on?

20   A.  Help him put his clothes on?  No.

21   Q.  He was able to do that himself, wasn't he?

22   A.  Yeah.

23   Q.  Were you ever in special ed when you were in school?

24   A.  Me?

25   Q.  Yeah.
```

A.  No.

Q.  You went to, what, Chester Elementary?

A.  Yeah.

Q.  They had special ed classes in there, didn't they?

A.  Yes.

Q.  And Sylvanie Williams, how do you say that, Sylvie or Sylvanie, what's the name of that?

A.  Sylvanie.

Q.  Sylvanie?

A.  Yeah.

Q.  You went to school there, too, right?

A.  Yeah.

Q.  They had special ed classes in Sylvanie Williams, correct?

A.  Guess so.

Q.  And some students, they had some students in special ed classes, right?

A.  Yeah.

Q.  You weren't in special ed, were you?

A.  No.

Q.  Your brother Paul was never in special ed at Chester, was he?

A.  No.

Q.  Your brother Paul was never in special ed at Williams, was he?

A.  No.

Q.  What was the other one, not Booker, but the one before Booker T.?

1    A.  James Derham.  Derham.

2    Q.  Your brother Paul was never identified as needing special ed at

3    Durham, either, was he?

4    A.  Say it again.

5    Q.  Your brother Paul was never put in special ed classes at

6    Durham, was he?

7    A.  No.

8    Q.  And he wasn't at Booker T. Washington High School, either, was

9    he?

10   A.  No.

11   Q.  Your brother Paul was never considered to be a disruptive

12   influence in any school, was he?

13   A.  No.

14   Q.  Your brother Paul never received supplemental security income,

15   SSI?

16   A.  No.

17   Q.  Did you realize your brother was slow at the time, or is your

18   memory kind of becoming a lot clearer now in retrospect?

19   A.  That I been know he was kind of slow?  I been know, he was

20   young.

21   Q.  But yet in the community out there -- by the way, your brother

22   kind of controlled an area of the Florida project known as the

23   White Side -- do you know what the White Side was?

24   A.  No.

25   Q.  I know you grew up in the Calliope, right?

1    A.  Yeah.

2    Q.  You didn't spend much time in the Florida, I take it, did you?

3    A.  Yeah.

4    Q.  Oh, you did, too?

5    A.  Yeah.

6    Q.  So how did y'all get from MLK out to the Florida, make that

7    your base of operations out there, what brought you out to the

8    Florida?

9    A.  Women.

10   Q.  Okay.  That's a good answer.

11          Now, your brother kind of, he kind of controlled the

12   White Side, like he was in this little war with Puny.  Do you know

13   who Puny was?

14   A.  Yep.

15   Q.  And he was considered to be a leader out there, wasn't he?

16   A.  Who that?

17   Q.  Paul.

18   A.  No.

19   Q.  I mean, he had like little guys come and like to run errands

20   for him?  People looked up to Paul Hardy, didn't they?

21   A.  Looked up to the Hardy Boys.

22   Q.  Paul and Wayne?

23   A.  Yeah.

24   Q.  But they looked up to them, right?

25   A.  Frankly, I don't know if they looked up to them, they --

```
 1   Q.  He was considered to be a leader, correct?

 2   A.  No.

 3             MS. FOURNET:  Judge, I would ask --

 4             THE COURT:  Asked and answered a couple of times now.

 5             MS. FOURNET:  -- that he allow the witness to finish the

 6   answer.

 7             MR. McMAHON:  Play audio 11 for me, please.  I want you

 8   to listen to this excerpt, it's not very long.  This is your

 9   brother talking to Len Davis about his status in the community.  Go

10   ahead.

11       (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

12   BY MR. McMAHON:

13   Q.  That was your brother?

14   A.  Yeah.

15   Q.  So others looked up to him out there, correct?

16   A.  From my knowledge?  I said they was just a whole lot of dudes

17   that we came up with that was just friend.  But they said they

18   looked up to him.

19   Q.  Your brother knew how to take a bus, didn't he?

20   A.  Take a bus, catch a bus, yeah.

21   Q.  In fact, he did it all the time when he was working at Ernst,

22   right?

23   A.  No, we walked.

24   Q.  Do you know Javetta Cooper?

25   A.  Yeah.
```

1    Q.  Well, your brother met Javetta Cooper when he was taking the

2    bus home from working at Ernst; did you realize that?

3    A.  No.

4    Q.  Your brother knew how to take a cab, right?

5    A.  He caught a cab, so I guess he know how to take one.

6    Q.  I mean, it's no big deal to take a bus, Mr. Hardy --

7    A.  Yeah.  No.

8    Q.  -- so your brother knew how to use these public modes of

9    transportation, right?

10   A.  Yeah.

11   Q.  Why do you keep looking over there?  Are you looking for --

12   A.  So I can figure out the answers you asking, like you're --

13   Q.  Are you looking for cues how to answer?

14   A.  No, no.  I'm looking at -- you asking questions like you

15   retarded, so.  You asking me a question like can he catch a bus, I

16   can catch a bus, I can catch a cab.  I mean, what the procedure for

17   catching the bus?  Put the money in the bus and at the bus stop.

18   Catching a cab, call a cab, get in the cab and tell the cab where

19   you want to go.

20         So maybe I'm thinking that maybe what you saying is, it

21   kind of getting at me, thinking that you asking me a lot of simple,

22   simple questions that I figure like, you know, I don't know what

23   you want.  Getting kind of hard for me answer because I'm figuring

24   like you asking me questions that should be self-explanatory.

25   Q.  You don't know a whole lot about your brother.  You didn't know

1   about the store accounts, right?  You don't know a whole lot about

2   him, correct?

3   A.  I don't know about store accounts.

4   Q.  And there are other things, a lot of other things you don't

5   know about your brother, too, correct?

6   A.  Yeah.

7   Q.  Now, Ernst Cafe isn't in the Quarter, but Ernst Cafe is located

8   where the World's Fair used to be, right?

9   A.  Yeah.

10          MR. McMAHON:  Just a couple more, your Honor.

11          THE COURT:  Sure.

12  BY MR. McMAHON:

13  Q.  To the best of your memory, no teacher ever suggested, because

14  we can't find any records, but no teacher ever suggested that your

15  brother Paul was retarded, correct?

16  A.  Suggested?

17  Q.  Yeah.

18  A.  To me?

19  Q.  That you're aware of.

20  A.  Well, my momma never went to school for us, but I saying in

21  elementary you wasn't -- you wasn't -- I kind of figured that if

22  you were slow, they'll put you in a special class.  I don't think

23  nobody would ever volunteer to go to a special ed class.

24  Q.  But nobody ever thought to put your brother in any of the

25  special ed classes, right?

1    A.  Thought to put him in?

2    Q.  Don't look over there.

3    A.  That's my brother, man.

4    Q.  Correct?

5    A.  That's my brother.  You tell me don't look at him.

6    Q.  Yeah, look at me when I'm asking you the question.

7              THE COURT:  Actually, Mr. McMahon, he can look where he

8    wants to.  You can note where he is looking in your question, but

9    you can't direct --

10             MS. FOURNET:  I would appreciate --

11             THE COURT:  Let me finish.  You can't direct him where he

12   is to look and not look.

13             Go ahead with the question about teachers.

14             MR. McMAHON:  I'll move on.

15             THE COURT:  All right.

16   BY MR. McMAHON:

17   Q.  Actually, Paul flew out to Sacramento to see you, didn't he?

18   A.  Say it again.

19   Q.  He flew out to California to see you, didn't he?  Didn't he fly

20   out to Sacramento to see you?

21   A.  Him, my mother, my father, his girlfriend, I think so, yeah,

22   they did.

23             MR. McMAHON:  That's all I have.

24             THE COURT:  Any redirect?

25             MS. FOURNET:  Just a little, your Honor.

                        REDIRECT EXAMINATION

BY MS. FOURNET:

Q.  Lionel, this trip to Sacramento that Paul took, other people

took it as well in your family?

A.  Yeah.

Q.  Did they -- who else came out to Sacramento to see you?

A.  That particular day with my family, with Paul and them or?

Q.  Yeah.  I mean, who else besides Paul?  Do you remember?

A.  You mean when they came to see me, my mom, my father, my daddy,

and his girlfriend, Paul girlfriend.

Q.  And did they come together?

A.  Yes.

Q.  Did you ever know Paul to get on a plane by himself and fly

somewhere?

A.  No.

Q.  With respect to special ed back when you were in school with

Paul, what is your recollection of how you got into special ed in

the schools that you and Paul attended?

        MR. McMAHON:  I am going to object to this.  This calls

for kind of an area of expertise.

        THE COURT:  Well, no, she is asking for his recollection,

he can go ahead.

        THE WITNESS:  I thought it was on the teacher's, that if

they seen you can't keep up, they put you in special ed.  But, you

know, like when you young, you don't want nobody to tease you, so

```
 1   you would just, you try to avoid special ed.
 2   BY MS. FOURNET:
 3   Q.  And why was that?
 4   A.  Because people tease you, think you was stupid.
 5   Q.  I'd like for you to explain clearly, Lionel, for the judge, if
 6   you can, exactly where is Ernst Cafe.  You probably don't -- do you
 7   remember the address?
 8   A.  By the convention.  Close to the convention center.
 9   Q.  Was it on the French Quarter side of Canal or on the other side
10   of Canal?
11   A.  The other side of Canal.
12   Q.  So was it in the French Quarter?
13   A.  No.
14            MS. FOURNET:  That's all, thank you.
15            THE COURT:  All right.  Mr. Hardy, you may step down.
16   Thank you, sir.
17            THE WITNESS:  Thank you.
18            MS. FOURNET:  Would you like me to call the next witness,
19   your Honor?
20            THE COURT:  Yes.
21            MS. FOURNET:  Your Honor, we would call Theresa Minor.
22            THE COURT:  You need to get somebody to get her.
23            MS. FOURNET:  And, your Honor, if I might, Ms. Minor has
24   some medical problems.  She is in a wheelchair.  She is capable of
25   getting up those steps, but it's a little hard for her.
```

```
 1            THE COURT:  I think, can we can probably -- Karen, would
 2    the jury mike work for you?  Okay.
 3            THE DEPUTY CLERK:  Raise your right hand.
 4        (WHEREUPON, OLEVIA THERESA MINOR, WAS SWORN IN AND TESTIFIED
 5        AS FOLLOWS:)
 6            THE DEPUTY CLERK:  Can you state your name for the record
 7    and spell it for us.
 8            THE WITNESS:  Olevia Minor, O-L-E-V-I-A, last name Minor,
 9    M-I-N-O-R.
10            MS. FOURNET:  Is that mike picking up well enough for
11    you, Judge, or do I need to tell her to pick it up a little bit?
12    She can walk, Judge, it's just --
13                        DIRECT EXAMINATION
14    BY MS. FOURNET:
15    Q.  Ms. Minor, would you -- you've already stated your name, I
16    believe, when you were sworn in.  Where do you live?
17    A.  In New Orleans.
18    Q.  And where in New Orleans?
19    A.  Uptown New Orleans.
20    Q.  And, Ms. Minor, how old are you?
21    A.  Sixty-four.
22    Q.  And do you have some medical problems?
23    A.  Not breathing well, I had open heart surgery.
24    Q.  And what seems to have caused the breathing problems?
25    A.  The formaldehyde in the trailers.
```

```
 1    Q.  And have you also had a stroke?

 2    A.  Nope.

 3    Q.  No, not a stroke, but you've had open heart surgery and you

 4    lived in a formaldehyde trailer?

 5    A.  For two years or better.

 6    Q.  And did you start using the oxygen tank after the trailer?

 7    A.  Yes.  I used it -- was presented it about '06.

 8    Q.  Now, are you related to Paul Hardy?

 9    A.  Yes, I am.

10    Q.  Explain to the judge how you're related to him.

11    A.  I am related to him through his mom.  His mom and I were first

12    cousins.  His grandfather and my mother were sister and brother.

13    So he is my second cousin.

14    Q.  So when you say Paul's grandfather, you're referring to Marie's

15    father?

16    A.  Father, yes.

17    Q.  And is Marie now deceased?

18    A.  She certainly is.

19    Q.  When did she pass away?

20    A.  January 24th, 19 -- 2002.

21    Q.  When you were a little girl, did you live somewhere other than

22    New Orleans for a while?

23    A.  Yes.

24    Q.  Where did you live?

25    A.  North Little Rock, Arkansas.
```

Q.  And how old were you when you moved to North Little Rock?

A.  In-between three or four.

Q.  And then did you come back to New Orleans at some point?

A.  Yes, when I was 10.

Q.  You were 10?

A.  Yes.

Q.  What was the age difference between you and your cousin Marie Hardy?

A.  She was six years older than I am.

Q.  And once you came back at 10 years old, how long did you stay in New Orleans before you left again?

A.  I don't remember leaving again, other than to visit my father because that's where my father lived, in Little Rock.

Q.  Were -- well, you went to California at some point much later.

A.  Oh, I was an adult then.

Q.  So from 10 until you were an adult you were here in New Orleans?

A.  Yes.

Q.  And during that time did you spend time with your cousin Marie?

A.  Yes, because we slept at my grandmother's house.

Q.  How well did you know her?  Describe what you remember about Marie as a little girl and as a teenager.

A.  She was, to me, somewhat depressed because her mom wasn't there for her.

Q.  Okay.

1   A.  And we slept together because my mom lived there a few months

2   until we moved out.  But I'd still see her every day because I

3   would come from school there.

4   Q.  And how did she compare, I know she was older than you were,

5   but how did she compare to other people her age when you were

6   growing up?

7   A.  She was different.

8   Q.  Tell me what you mean by different.

9   A.  I guess in the sense of saying normal, no.  Because we haven't

10  established what was normal.  But she was different in the sense of

11  saying it was hard to communicate effectively with her.

12  Q.  And after you got older, I think you said when you were an

13  adult you moved to California?

14  A.  I must have been about 22, 24.

15  Q.  Was there ever a time, Ms. Minor, when you -- after you moved

16  away from your family home that you lived alone?

17  A.  Uh-huh.

18  Q.  And where would that have been, was that here or in California?

19  A.  No, I got married in '67, and my ex-husband and I were together

20  up until about the '70s and then I moved to California.

21  Q.  And prior to 1967 when you married your mother -- excuse me,

22  when you married your husband.

23  A.  My ex-husband.

24  Q.  It's been a long day, Ms. Minor.

25  A.  I understand.

1    Q.  Prior to '67 when you married your husband, was there a time

2    when you lived by yourself?

3    A.  Unh-unh, I lived with my momma.

4    Q.  So you didn't have your own place?

5    A.  No, I did not.

6    Q.  What about Marie, did she ever live alone?

7    A.  She lived with us for a while.

8    Q.  But did she ever have her own apartment?

9    A.  I don't remember her having her own apartment.

10   Q.  Did you ever as an adult, whether before or after your

11   marriage, did you ever live on your own in an apartment?

12   A.  Unh-unh, I lived with my mom.  After that I moved and we lived,

13   you know, to myself in California.

14   Q.  Now, when you say to yourself, what do you mean?

15   A.  My son and I.

16   Q.  And your son was how old when you were in California?

17   A.  Five or six.

18   Q.  Five or six?

19   A.  Yes.

20   Q.  So you lived alone with your son, the only person living with

21   you was a five- or six-year-old boy, correct?

22   A.  Yes.

23   Q.  Did you ever know Marie to live either alone or alone with a

24   very small child like that?

25   A.  No.

```
 1   Q.  Do you have any idea why she wouldn't have done that?

 2   A.  I think she was more or less afraid to venture.

 3   Q.  And why would she be afraid to venture?

 4   A.  Because she lacked the funds, first off, and we tried to assist

 5   her as much as we could because she lived with us for a while when

 6   I was home with my mom.

 7   Q.  Was there any other reason that she would be afraid to venture

 8   and get her own place?

 9   A.  I guess lack of skills of -- she dropped out, that didn't help

10   very much.  But I just don't think she could handle living alone, I

11   really don't think so.

12   Q.  Now, did Marie also have a brother named Joe?

13   A.  Uh-huh.

14   Q.  And is Joe currently in the city?

15   A.  Yes, he is.

16   Q.  Tell us about Joe, what was Joe like?

17           MR. MILLER:  Judge, relevance?

18           THE COURT:  See what the answer is.  I'll let the

19   question, go ahead.  Tell us about Joe.

20           THE WITNESS:  Joe is easygoing, easily influenced.

21   BY MS. FOURNET:

22   Q.  What did Joe -- he is retired now, isn't he?

23   A.  Yes.  Yesterday was his birthday.

24   Q.  When he was working, what did he do?

25   A.  He drove trucks.
```

1    Q.  And where did he drive the trucks?

2    A.  From the company to wherever they sent him.

3    Q.  In New Orleans or outside of New Orleans?

4    A.  In New Orleans.

5    Q.  Was he able to drive outside of New Orleans, was he able to

6    find his way outside of New Orleans?

7    A.  I suspected so, I don't know.  Because I'd never be able to

8    ride with him.

9    Q.  Were Marie and Joe alike in any way?

10              MR. MILLER:  Again, relevance, Judge.

11              THE COURT:  It's okay.  Overruled.  You can answer the

12   question.

13   BY MS. FOURNET:

14   Q.  Were they alike in any way, Ms. Minor?

15   A.  Yes.  They wasn't very assertive.

16   Q.  What else?

17   A.  They -- I guess with him he just lacked, I guess, knowledge and

18   wanting to become I guess whatever he could have been.  They

19   dropped out of school early.

20   Q.  Do you know why he dropped out of school?

21   A.  Unh-unh.

22   Q.  Do you have any opinions about why that might have happened?

23              MR. MILLER:  Well, Judge, she said she doesn't know why,

24   so she would be speculating.

25              THE COURT:  Uh-huh.

BY MS. FOURNET:

Q.  Ms. Minor, did you see Paul when he was a little boy?

A.  Yes.

Q.  Tell us who were Marie's children.

A.  She had six boys and one girl.  Do you want me to name them?

Q.  Well, we've already had Lionel do that.

A.  Oh, okay.

Q.  So let's talk about Paul.  Paul was the second to the youngest?

A.  Yes.

Q.  And you said you had a son and still have a son.  How close in age was your son to Paul?

A.  Six months.

Q.  Now, Ms. Minor, how old -- how far did you go in school?

A.  Three years and three summers to college after graduation.

Q.  And do you know about how old Marie was when she stopped going to school?

A.  5th or 6th grade.

Q.  5th or 6th grade?

A.  Uh-huh.

Q.  And I asked you how far you went in school and you said three summers.

A.  Three years and three summer.

Q.  Three years and three summers of college is what you're referring to?

A.  Yes.

1   Q.  And in connection with college, did you take any courses in

2   child care?

3   A.  Early childhood development.

4   Q.  And where did you take that?

5   A.  The University of Berkeley.

6   Q.  And that was when you were living out in California in the

7   mid-'70s?

8   A.  Yes.

9   Q.  Have you worked with children before --

10  A.  Yes.

11  Q.  -- in different jobs?  Tell me the different jobs where you

12  have worked with children.  Starting with the first one, if you

13  can.

14  A.  Touro Infirmary and I worked on A2N, that was with children.

15  The next job was at LaFawn (PHONETIC) School and that was in the

16  1st grade.  From then --

17  Q.  And what time frame are we talking about, '60s, '70s, '80s?

18  A.  Yeah.  It must have been at least sixtyish because that was

19  prior to me getting married.  I worked at Touro, from Touro I had

20  gone to LaFawn.

21  Q.  Let me ask you about LaFawn a minute.  What was your job at

22  LaFawn?

23  A.  I was a teacher's aide.

24  Q.  And what age group were you a teacher aide with?

25  A.  1st grade.

1  Q.  1st grade?

2  A.  Yes.

3  Q.  And your next job that you had dealing with children was where?

4  A.  A daycare.

5  Q.  And which day -- which is the first daycare that you worked at?

6  Because I know you've worked at several.

7  A.  It was the one at 1326 Simon Bolivar.

8  Q.  And what age group did you work with there?

9  A.  We had the four to five year olds.

10  Q.  And about what years would that have been?

11  A.  Let's say seventyish to '72.

12  Q.  And then when did you move out to California?

13  A.  Around '74.

14  Q.  And while you were in California did you have any jobs working

15  with children?

16  A.  Uh-huh.  I had the three to four year olds then at the daycare

17  that I worked.

18  Q.  Go ahead.

19  A.  Oh, I worked at a daycare there.

20  Q.  And what was the age range in California?

21  A.  Three to four.

22  Q.  And you may have answered this, if you did I apologize for

23  asking you again.  The age range when you worked at the daycare

24  center on Simon Bolivar, what age kids was that?

25  A.  Four to five.

1    Q.  Now, in these different jobs that you had working with

2    children, were you just an observer or was it more hands-on, or

3    were you actually working directly with the children as opposed to

4    just watching?

5    A.  I worked with the children.

6    Q.  And tell me the kinds of things at any or all of those jobs

7    that you did with the children in terms of teaching them.

8    A.  We assisted in preparing lesson plans for them, and we had the

9    different instruments to like tie shoes, to make handprints with

10   them.  We actually worked with them.

11   Q.  And in your years of working with children, have you observed

12   the way children develop in those early years four to -- three to

13   six years old?

14   A.  Yes.

15   Q.  Now, at some point did you come back from California?

16   A.  Yes, in '78.

17   Q.  In '78.  And Paul would have been?

18   A.  Ten or eleven.

19   Q.  Ten or eleven years old.  And what year did you say you left

20   for California?

21   A.  At least, my son was six, so it must have been at least '74.

22   Q.  Prior to the time that you left for California, do you recall

23   taking one of those games or one of those teaching devices home to

24   your son and to Paul?

25   A.  Yes.

```
 1   Q.  What teaching object did you bring home for them to play with?

 2   A.  Well, I used to try the shoe, to tie the shoes.

 3   Q.  Well, tell the judge --

 4           THE COURT:  What age would your son and Paul be at this

 5   time?

 6           THE WITNESS:  My son is 41 now --

 7           THE COURT:  No, I mean at the time that you brought home

 8   this teaching tool.

 9           THE WITNESS:  Tony must have been at least five.

10   BY MS. FOURNET:

11   Q.  So Paul would have been what?

12   A.  Five and a half.

13   Q.  Five and a half.  Okay.

14           THE COURT:  What's your son's name?

15           THE WITNESS:  Shedrick, S-H-E-D-R-I-C-K.  We call him

16   Tony, though.

17           THE COURT:  Okay.  All right.  Go ahead.

18   BY MS. FOURNET:

19   Q.  He goes by Tony, doesn't he?

20   A.  Yes.

21   Q.  When you say to tie shoes, I mean, what kind of game are we

22   talking about, how did it work?

23   A.  Well, it was more difficult for my son because he was

24   left-handed and I said, well --

25   Q.  Tell me what the shoe looked like first before we tell the
```

1    story.

2    A.  Oh, it's just a shoe with a wooden tongue and you had to lace

3    it up, and they had the string in it, you'd give children the

4    string to see if they can do it.  And I just thought it was

5    different and interesting, and since they weren't going to use

6    those anymore they would pass them on to us.  If we didn't want

7    them, they would pass it to somebody else.  But a lot of the toys

8    and games and whatnots they had at school I could use with my

9    cousins and my son.

10   Q.  And was this basically a preschool toy?

11   A.  Yes.

12   Q.  And you brought it home and gave it to both your son and to

13   Paul.  Tell me how your son did first, how did Tony do, did you ask

14   Tony to tie the shoe?

15   A.  Yes.

16   Q.  And how did Tony do?

17   A.  He did okay.

18   Q.  Now, you said a minute ago that Tony was left-handed?

19   A.  He still is.

20   Q.  And was that a little bit of a challenge sometimes in teaching

21   him things, skills that involve motor skills?

22   A.  Yes.

23   Q.  But he did pretty okay anyway.

24   A.  Uh-huh.

25   Q.  What happened when you gave it to Paul?

```
 1    A.  He either shove it under the sofa or -- I just couldn't

 2    communicate effectively with him.

 3    Q.  Well, did he try to tie the shoe?

 4    A.  He tried, but he'd get flustered and I felt, you know, it's not

 5    that difficult, you know, but somehow he just couldn't or didn't

 6    communicate, he didn't know how to do it.

 7    Q.  And were you watching him when he tried to tie the shoe?

 8    A.  Yeah.  It wasn't like I was assigned to this, it was just

 9    something --

10    Q.  I understand.

11    A.  -- I made myself a committee of one to do.

12    Q.  Okay.

13    A.  Because I just thought it was -- since the children at school

14    would do it, let me try it with them.

15    Q.  When it became apparent that Paul could not tie the shoe, what

16    did he do?

17    A.  He would either walk away or not share with me he couldn't do

18    it.

19    Q.  When your son Tony couldn't do something, would he tell you?

20    A.  Or he would say -- tell me something that, you know, he was, he

21    just couldn't get it or something, he didn't know how.  But I

22    didn't know how to reach Paul, as to saying, to open him up, and I

23    just felt I just somehow lost him because it just wouldn't happen.

24    Q.  And when you say opening up, you mean opening up in what sense,

25    opening up and telling you what?
```

1    A.  I don't know how to do this.

2    Q.  Do you recall talking to this blonde-headed lady, Dr. Hayes?

3    A.  Unh-unh.

4    Q.  Do you remember going to the --

5    A.  The room to room to room?

6    Q.  Right.

7    A.  Yeah.

8    Q.  The room to room to room in the courthouse where you talked to

9    the lady for a while?

10   A.  That's the same lady?

11   Q.  Same lady.

12   A.  Okay.

13   Q.  Do you remember using the word defiant to describe Paul when he

14   couldn't do something?

15   A.  I probably said that.

16   Q.  What would you have meant by that?

17   A.  I meant that he, I guess I was flustered to the point of not

18   being able to communicate effectively with him and the sense of

19   saying defiant, he would walk away instead of saying something or

20   slide the shoe under the sofa or put it somewhere else where we

21   can't find it.

22   Q.  Was he a child that would sass you?

23   A.  Oh, no.  Unh-unh.

24   Q.  As your son grew older and Paul grew older, did you notice any

25   difference in the way they developed?

A.  Yes.

Q.  Explain what you noticed.

A.  I noticed he was slower.

Q.  When you say he, you mean who?

A.  I mean Paul was.  He was easily influenced, I noticed.

Q.  You noticed that he was easily influenced.  What about his, were his communication skills, for instance, on a par with your son's communication skills?

A.  They were different.

Q.  In what way?

A.  That I could somehow reach my son, I couldn't reach him, I couldn't reach Paul.

Q.  If you would try to talk to him about something, what kind of response would you sometimes get from him?

A.  I'd get a response that I didn't want to hear, that he -- I said, well, what seemed to be the problem, do you want to talk about it?  No.

Q.  When did you start to notice -- what age would Paul have been when you started to notice that he seemed to be developing more slowly than your son?

A.  Around, I guess he must have been in kindergarten, he must have been in 1st grade because my son was about to graduate from kindergarten and we didn't stay here long enough for him to.

Q.  How did Paul compare with other kids your son's age in terms of -- and his age, in terms of what you observed about his

```
 1   development and the way he came across to you?
 2              MR. MILLER:  Judge, I'm going to object to the form of
 3   the question.  Development meaning what?  She is not an expert in
 4   that particular area.
 5              THE COURT:  I think you can focus in on slowness or
 6   whatever.
 7              MS. FOURNET:  I can rephrase it, Judge.
 8              THE COURT:  Sure.
 9   BY MS. FOURNET:
10   Q.  How did Paul compare to kids his age?
11   A.  He was different.  He was slower.
12   Q.  Did you try to talk to Marie about that?  Were you concerned
13   about that?
14   A.  Yes.
15   Q.  Did you try to talk to Marie about it?
16   A.  I tried talking to her.
17   Q.  And what was the result of that?
18   A.  She said she couldn't afford it.
19              THE COURT:  If I may interrupt, what was it that you
20   talked to her about, what did you suggest to Marie?
21              THE WITNESS:  As to?
22              THE COURT:  Paul.
23              THE WITNESS:  Having him to be observed or sent to a
24   daycare because he didn't go to the daycare that I worked, but he
25   couldn't have gone anyway.
```

```
 1              THE COURT:  But you suggested he get an examination of

 2    some kind?

 3              THE WITNESS:  At school, whatever school he attended

 4    because there was somebody there, I felt.

 5    BY MS. FOURNET:

 6    Q.  Did you get the sense that his mother understood what you were

 7    talking about?

 8    A.  No.

 9    Q.  Were you able to help Paul?

10    A.  As much as I could when I was here.

11    Q.  Are you satisfied with the amount of help you were able to give

12    him?

13    A.  No.

14    Q.  How do you feel looking back on the problems you saw in him?

15    A.  That I somehow lost him.

16    Q.  Ms. Minor, do you know what this hearing is about, have the

17    lawyers explained that to you?

18    A.  Yes.

19    Q.  You're a church-going lady?

20    A.  Yes.

21    Q.  You read your Bible?

22    A.  Certainly do.

23    Q.  You love Paul?

24    A.  Yes.

25    Q.  Are you going to come to court and lie to help Paul?
```

1    A.  It wouldn't serve no purpose.

2           MS. FOURNET:  That's all.  I tender.

3           THE COURT:  Cross.

4                      CROSS-EXAMINATION

5    BY MR. MILLER:

6    Q.  Ms. Minor.

7    A.  Yes.

8    Q.  You indicated when you spoke with Dr. Hayes, the woman sitting

9    at the table --

10   A.  Uh-huh.

11   Q.  -- that you had only had limited involvement with the Hardy

12   family.  Is that a fair statement?

13   A.  No.

14   Q.  No?

15   A.  Unh-unh.

16   Q.  There was a question that was asked of you -- I guess we can do

17   the ELMO.

18          Ma'am, do you remember giving -- being asked this

19   question:  "What about Paul, as Paul got older, how well did you

20   know him?"  Your answer is, "Well, somewhat.  Somewhat, I knew him

21   somewhat but not as much as when -- as then because we would run

22   into each from time to time.  But as to me trying to share anything

23   with him, no, other than hi and bye."

24          So after you returned from California, would that be a

25   fair statement that you only really saw him other than to say hi

1  and bye?

2  A.  We would go to their house.

3  Q.  I am just asking you.

4  A.  Yeah, I understand what you're saying.  But I would see him,

5  not as much as I would have, but we would still visit them.

6  Q.  And then the question was:  "Did you know he was involved in --

7  did you know what he was involved in?"  Meaning the drug business,

8  you said, "No, ma'am, other than seeing -- I saw some caption or

9  something on TV.  Like a movie or something was being made and then

10  they mentioned -- but I kept to myself, I said, no, I just wasn't

11  involved, I wasn't, but I kind of knew what was going but as to,

12  um."

13      So would it be a fair statement that you really didn't

14  have any idea what Paul Hardy was doing for a substantial portion

15  of his life?

16  A.  When he got older I did.

17      THE COURT:  Mr. Miller, if I could just jump in to get

18  some clarity on timing of things.

19      You returned to New Orleans you say when Paul and your

20  son were about 10 or 11 years old.

21      THE WITNESS:  Uh-huh.

22      THE COURT:  Is that the period you're talking about after

23  he was 10 or 11 years old, is that that period that you're

24  referencing when you're talking about --

25      THE WITNESS:  When he was older than that because we were

```
 1   in the same town, you know, we were in New Orleans.  I had

 2   returned, what year did I return, '78 because my aunt died in '78,

 3   August.  And other than seeing them, you know, other than --

 4   because they lived right up the street from me.

 5              THE COURT:  Okay.

 6              MR. MILLER:  Thank you.

 7              THE COURT:  I just needed to get clarity.

 8   BY MR. MILLER:

 9   Q.  Do you remember giving this answer as to how much you knew Paul

10   Hardy:  "Okay.  Um, I guess from what age, how old was Paul when

11   you knew him well?  Well, let's see, under 10."  Dr. Hayes:

12   "Okay."  Your answer:  "At least because after that, well, that's

13   when we -- well, before that up until six or so because we left, we

14   moved to Vallejo --"

15              THE COURT:  Vallejo.

16              MR. MILLER:  Vallejo.  Thank you, your Honor.

17   BY MR. MILLER:

18   Q.  "California.  Uh-huh.  And what year was that?  '70-something."

19   Dr. Hayes:  "'70."

20              You followed, you said two, meaning '72.  And then you

21   say:  "Okay.  We left in 1972 and returned in '78, but we visit,

22   see them, and had hoped that maybe they would come to California

23   because it was, you know, and I didn't like it at first but I

24   adjusted."

25              And then we go down.  "So you all left Paul when he was
```

1    about five?"  And your answer was, "Correct.  Uh-huh."

2        Do you remember that?

3    A.  Yes.

4    Q.  So you would have stopped living in the same area of him for a

5    four- or five-year period starting at his age five; is that

6    correct?

7    A.  I left 'cause my son, we went to California, yeah.

8    Q.  Then you were asked later on again about how much contact you

9    had with Paul.

10   A.  Uh-huh.

11   Q.  And you said:  "Okay.  So prior to him being five and then

12   after five, how much contact did you have with him after that?"

13   Your answer:  "Not very much because I was -- we were

14   intermittent."  Dr. Hayes:  "Okay.  Because I didn't live here, you

15   know, we were gone.  No, I mean before five.  Before five, oh, and

16   after 10.  Other than seeing them where they come by, visit with

17   us, because Tony and I lived with my -- I don't know what that, um,

18   Tony and I didn't -- I was married and gone."  Dr. Hayes:  "Uh-huh.

19   But other than coming to visit my mom, you know, or going to the

20   house, that was, that was, you know, I would see them that way.  So

21   in a year's time, how many times do you think you would be around

22   Paul?  Maybe two or three times or more.  But if there was a

23   function with the family, I would see him because sometimes they

24   would have functions and parties and whatnot.  But other than that,

25   it was just casual something.

1          "What about when you all lived away, how often did you

2   see him?  Other than the summer see him, how many times would you

3   see him during the summers?  It was just like the time when we were

4   like going and coming.  Maybe if we would like, maybe they would

5   get the ride for us, whoever is picking us up from the airport or

6   sometimes we would drive in and visit them thataway."

7          And it continues.  "Okay.  But other than that, you know,

8   other than that, you know, we would see him.  How many times would

9   you see him?  Maybe once or twice."

10         So you're indicating to Dr. Hayes during your interview

11  with her, Ms. Minor, that you had very little contact with Paul

12  Hardy.

13  A.  Uh-huh.

14  Q.  Is that correct?

15  A.  I guess I indicated that.  But we would actually have games and

16  whatnot we play.

17  Q.  You weren't playing games after he was 10 years of age, were

18  you?

19  A.  No, we did not.  I didn't say we did, did I?

20  Q.  I'm just asking.

21  A.  Oh, okay.

22  Q.  You indicated also during the course of the interview that he

23  did not have any problems with his speech, correct?

24  A.  I don't remember.

25  Q.  Okay.  Let ma ask you.  "Did he have any problems with his

1   speech?  Unh-unh, I didn't imagine he did."  Correct?

2   A.  Maybe so.

3   Q.  So he didn't have any problems with his speech?

4   A.  I don't remember him having problems with his speech.  I shared

5   that I was uncomfortable in him not being able to function with the

6   games and not we played.  But his speech, I guess he spoke well, I

7   never zeroed in on that.

8   Q.  And then you were asked:  "How would you describe him growing

9   up?"  And you said:  "He was normal."

10  A.  Okay.

11  Q.  Do you remember that?

12  A.  No.

13  Q.  Here is your answer:  "Goodness.  Well, is there anything else

14  that you can remember about Paul's growing up and other things that

15  you can think of that I should know?  Uh-huh, no, other than that

16  he appeared to be normal."  Correct?

17  A.  Maybe so.

18  Q.  I just have a couple of other questions for you, Ms. Minor.  As

19  far as the shoe game was concerned, that's a game where you have

20  a -- it's not a shoe you actually put on, is it?

21  A.  No, it's not, it's a wooden shoe.  I shared with her it was a

22  shoe that they change every year, either they throw them away or

23  they pass them on.

24  Q.  So what you would have to do to do this shoe is you have to

25  sort of tie it without the shoe being on, correct?

1  A.  It's a wooden shoe.

2  Q.  I know.  Ma'am, I am not trying to be difficult.  But my

3  question is --

4  A.  Let me get my glasses.

5  Q.  -- is the shoe on when you tie it?

6  A.  It's not, no.  You hold it.

7  Q.  So if I was to take my shoe off, take my man shoe off, that's

8  what you do, you hand them a shoe and you ask them to tie it

9  without putting it on, correct?

10  A.  Right.

11  Q.  Which is somewhat more difficult than tying a shoe that's on

12  your foot.

13  A.  (NO RESPONSE.)

14  Q.  Because you have to do it all backwards.

15  A.  Okay.  But these are the games we played at the daycare.

16  Q.  I understand.  I am just asking.

17          MS. FOURNET:  Judge, I would ask that he allow the

18  witness to finish her answer.

19          THE COURT:  Yeah, let her finish her answers.

20          MR. MILLER:  I apologize, your Honor.  I apologize,

21  Ms. Minor.

22  BY MR. MILLER:

23  Q.  What I'm saying is, again, it's not a shoe that you put on,

24  it's a shoe you would have to tie not on somebody's foot, correct?

25  A.  Right.

1    Q.   Do you know if anybody ever taught Paul how to tie his shoe?

2    A.   No.  I guess his sister and brothers, they probably taught him

3    or he was at the daycare.

4    Q.   You never taught him, did you?

5    A.   I tried to, okay?

6    Q.   You tried to teach him after the game?

7    A.   It was little pegs you put in, I can't remember the game and I

8    guess maybe I am supposed to be, you know, taken out of here for

9    not remembering, but I just don't remember the name of the game, I

10   really don't.

11   Q.   No.  But my question is, ma'am, you tried to teach him how to

12   tie his shoe after he couldn't do it during the game, correct?

13   A.   Yeah, okay.

14   Q.   My question to you is, you don't know whether anybody in his

15   family ever taught him how to tie a shoe, correct?

16   A.   I never questioned them.  Maybe I should have but I didn't.

17   Q.   Did he even have shoes that you tied?

18   A.   Yes, all -- we weren't well off, we weren't a dysfunctional

19   family, but they had less than I had, and I just wanted to --

20   Q.   Help them.  And I understand.

21             MR. MILLER:  Thank you, your Honor.

22             THE COURT:  All right.  Any redirect?

23             MS. FOURNET:  Just a couple, your Honor.

24                      REDIRECT EXAMINATION

25   BY MS. FOURNET:

1    Q.   Ms. Minor.

2    A.   Yes.

3    Q.   Prior to when you left for California, how often did you see

4    Paul?

5    A.   Some days I would see Paul every day because they lived with

6    us.

7    Q.   And you left for California when Paul was five, six years old,

8    I think you said?

9    A.   He had to be five because my son had to be four and a half, but

10   we left right before my son was to graduate.

11   Q.   And you were there until Paul was 10 or 11?

12   A.   Yes.  My son was 10, so Paul had to be 10 and a half.

13   Q.   While you were in -- living in California, did you see Paul at

14   any time here in New Orleans during the year?

15   A.   When we would come home.

16   Q.   And when would you come home?

17   A.   In the summers.

18   Q.   And during those summers -- so you would be here, what, three

19   months?

20   A.   At least.

21   Q.   During those summers, about how many times a month would you

22   see Paul?

23   A.   We would see him if we'd go over, we'd see him if he come to

24   our house.

25   Q.   And how often would that be, approximately?  And I know you

```
 1    can't say exactly, but how often, how many times a month would you

 2    visit?

 3    A.  We would visit because when I finally come home, his mom had

 4    given me a party and we'd see him from time to time.

 5    Q.  Do you remember how many times a month, like if you went home

 6    in May --

 7    A.  Uh-huh.

 8    Q.  -- came here in May.

 9    A.  Maybe once or twice.

10    Q.  A month?

11    A.  You know why, because he live -- we live next door to his

12    grandfather and they would -- he would come by his grandfather.

13    And it wouldn't be like a case of having to go over at a designated

14    time.

15    Q.  I understand that.

16    A.  It would just be you'd run into him or he'd be next door, we

17    see him and talk to him.

18    Q.  And would that happen almost never or often or once in a while?

19    How often would that happen?

20    A.  At least twice a month.

21    Q.  Okay.  Now, do you remember when you -- I think you described

22    it as room to room when you came and you spoke to the lady at the

23    courthouse on tape?

24    A.  Okay.

25    Q.  Do you remember that?
```

```
 1   A.  I guess so.

 2   Q.  When this lady here, and you may not remember her from looking

 3   at her, but do you remember when a lady interviewed you?

 4   A.  Uh-huh.

 5   Q.  What happened to you the night before that interview?

 6   A.  My car was shot.

 7   Q.  And who did you have with you when your car was shot?

 8   A.  My grandson.

 9   Q.  And how old is your grandson?

10   A.  He's 12 now.

11   Q.  And how many times was your car shot into?

12   A.  Five times.

13   Q.  Were y'all hit?

14   A.  No.  Thank God we wasn't.

15   Q.  Thank God.  And how did you feel about that?  What was your

16   emotional reaction to having --

17   A.  I was a nervous wreck.

18   Q.  And how did you feel the next day when you had to go over to

19   the courthouse and talk to this lady?

20   A.  I didn't want to go.

21   Q.  Did you tell the lady when you sat down with her about what had

22   happened the night before?

23   A.  I don't remember.  I can show you the pictures if you want to

24   see the bullet holes.

25   Q.  No, that's okay.  I think we believe you.
```

1    A.  Oh, okay.

2    Q.  Let me ask you this question:  Were you still upset that

3    morning when you were interviewed?

4    A.  Yes, I was.

5    Q.  And did the lady ever say to you, you know, maybe this isn't

6    such a good time --

7             MR. MILLER:  Judge, she can ask her what she said as

8    opposed to putting the words in her mouth.  She is suggesting the

9    answer.

10            THE COURT:  Yes, sustained.

11   BY MS. FOURNET:

12   Q.  Was there ever a suggestion made to you that maybe another time

13   might be a better time for you?

14   A.  No.

15   Q.  Would another time have been a better time for you?

16   A.  It would have.

17            MS. FOURNET:  Okay.  That's all.  Thank you.

18            THE COURT:  All right.  Thank you very much.

19            THE WITNESS:  Thank you.

20            THE COURT:  Do you need any assistance getting down?

21            THE WITNESS:  No, I can manage.  Thank you so much.

22            THE COURT:  It's about 5:20, what's your pleasure?  I am

23   going to say brief witness, one time I said short witness and

24   somebody about four feet tall walked in and everybody fell out.

25   It's up to y'all.

1      MR. LARSON:  I think the next witness on direct and cross

2  will be about an hour, your Honor.

3      THE COURT:  We will start up tomorrow morning at nine

4  o'clock.

5      MR. MILLER:  Do you know what witness you're going to

6  start out with?

7      MR. LARSON:  We'll let it be a surprise, Judge.

8      THE COURT:  No, come on.

9      MR. LARSON:  Toni Van Buren.

10      THE COURT:  Recess until tomorrow morning.

11     (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

12

13                    *  *  *  *  *  *

14

15                    REPORTER'S CERTIFICATE

16

17   I, Karen A. Ibos, CCR, Official Court Reporter, United States

18  District Court, Eastern District of Louisiana, do hereby certify

19  that the foregoing is a true and correct transcript, to the best of

20  my ability and understanding, from the record of the proceedings in

21  the above-entitled and numbered matter.

22

23

24          Karen A. Ibos, CCR, RPR, CRR

25          Official Court Reporter