1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2    ************************************************************

     UNITED STATES OF AMERICA
3
                                 Docket No. 94-CR-381(C)
4    v.                          New Orleans, Louisiana
                                 Wednesday, September 16, 2009
5
     PAUL HARDY
6    ************************************************************

7
              TRANSCRIPT OF ATKINS HEARING PROCEEDINGS
8        HEARD BEFORE THE HONORABLE HELEN G. BERRIGAN
               UNITED STATES DISTRICT JUDGE
9                      VOLUME III

10

11   APPEARANCES:

12   FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                               BY:  MICHAEL E. McMAHON, ESQ.
13                                  MARK A. MILLER, ESQ.
                               500 Poydras Street, Room HB-210
14                             New Orleans, LA 70130

15
     FOR THE DEFENDANT:        HERBERT V. LARSON, JR., ESQ.
16                             650 Poydras St., Suite 2105
                               New Orleans, LA 70130
17

18                             MARILYN MICHELE FOURNET, ESQ.
                               715 St. Ferdinand
19                             Baton Rouge, LA 70802

20
     Official Court Reporter:  Karen A. Ibos, CCR, RPR, CRR
21                             500 Poydras Street, Room HB-406
                               New Orleans, Louisiana 70130
22                             (504) 589-7776

23

24
        Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

1                          I N D E X

2


3   WITNESSES FOR THE DEFENDANT:                    PAGE/LINE:

4   TONI VAN BUREN

5      Direct Examination by Mr. Larson            452/18

6      Cross-Examination by Mr. McMahon            474/18

7      Redirect Examination by Mr. Larson          510/13

8


9   JAVETTA COOPER FRANKLIN

10     Direct Examination by Ms. Fournet           514/6

11     Cross-Examination by Mr. McMahon            555/16

12     Redirect Examination by Ms. Fournet         570/15

13


14  VICTORIA SWANSON

15     Voir Dire Examination by Ms. Fournet        573/23

16     Traverse Examination by Mr. McMahon         598/14

17     Direct Examination by Ms. Fournet           599/3

18


19                      EXHIBIT INDEX

20


21                                                  PAGE/LINE:

22


23  Government Exhibit 2                            631/22

24


25

```
 1                    P R O C E E D I N G S

 2                (WEDNESDAY, SEPTEMBER 16, 2009)

 3                       (MORNING SESSION)

 4

 5       (OPEN COURT.)

 6              THE COURT:  Good morning, everybody, and have a seat.

 7    Who is next?

 8              MR. LARSON:  Good morning, your Honor.  We would call at

 9    this time Toni Van Buren.

10              THE DEPUTY CLERK:  Raise your right hand.

11       (WHEREUPON, TONI VAN BUREN, WAS SWORN IN AND TESTIFIED AS

12       FOLLOWS:)

13              THE DEPUTY CLERK:  Please be seated.  State your name for

14    the record and spell it for us.

15              THE WITNESS:  My name is Toni Van Buren.  That's T-O-N-I

16    V-A-N B-U-R-E-N.

17                       DIRECT EXAMINATION

18    BY MR. LARSON:

19    Q.  Ms. Van Buren, where do you live?

20    A.  I live across the river in Harvey.

21    Q.  And how old are you?

22    A.  Thirty-seven.

23    Q.  And what's your date of birth, Ms. Van Buren?

24    A.  12/25/71.

25    Q.  And what kind of work do you do?
```

1    A.   Management and restaurant business.

2    Q.   And where are you presently working?

3    A.   Holiday Inn.

4    Q.   And where did you work before that?

5    A.   O'Henry's.

6    Q.   And how much education do you have, Ms. Van Buren?

7    A.   I have my high school diploma.

8    Q.   And do you have any children?

9    A.   Yes, I have three daughters.

10   Q.   And is their father Paul Hardy?

11   A.   Yes.

12   Q.   And could you give the names and present ages of those

13   children?

14   A.   Paula is 20, Tonya is 18, and Paris is 15.

15   Q.   And you said Paula, P-A-U-L-A?

16   A.   Yes.

17   Q.   And Tonya and that's spelled --

18   A.   T-O-N-Y-A.

19   Q.   T-O-N-Y-A.  And then Paris, like Paris, France?

20   A.   Yes.

21   Q.   And how often do they talk to Paul Hardy, their father, on the

22   telephone?

23   A.   Every day, if not every other day.

24   Q.   And how often have they maintained that contact -- how long

25   have they been in that weekly telephone contact with Paul?

1    A.   Since he's been incarcerated.

2    Q.   And that would be in 1994?

3    A.   Yes.

4    Q.   Now, when did you meet Paul Hardy, first meet him?

5    A.   In '85.

6    Q.   '85?

7    A.   Yes.

8    Q.   Late -- early '85, late '85?

9    A.   I'm going to say early '85.

10   Q.   And how old were you when you first met Paul?

11   A.   Fourteen.

12   Q.   You said 14?

13   A.   Yes.

14   Q.   Did you tell him you were 14?

15   A.   No.  I lied and told him I was 16.

16   Q.   And at the time you first met Paul, how old was he?

17   A.   Eighteen.

18   Q.   The difference in your ages is about three and a half, four

19   years?

20   A.   Yes.

21   Q.   And Paul's birth date for the record is what?

22   A.   October 14th, '67.

23   Q.   And was he your first boyfriend?

24   A.   Yes.

25   Q.   And how long was it after you first met Paul that you started

1    spending time with him?

2    A.  About six months down the line.

3    Q.  Did Paul have any children already when you first met him?

4    A.  Yes.

5    Q.  And how many did he have?

6    A.  Two.

7    Q.  And do you recall what their names were and who their mothers

8    were?

9    A.  He have little Paul, which is Faith's son, and he have

10   Jaquetta, which is Javetta's daughter.

11   Q.  And when would those children have been born in relation to the

12   time when you first met Paul?

13   A.  I want to say they both had to be in-between six to eight

14   months old when me and him got together.

15   Q.  And do you know what their birth dates were, what months they

16   were born?

17   A.  Little Paul is August the 28th and Jaquetta is November the

18   20th or 21st.

19   Q.  Of what year?

20   A.  I want to say '85.

21   Q.  And where was Paul living when you first started going out with

22   him?

23   A.  In Calliope.

24   Q.  And was he living by himself or was he living with someone?

25   A.  No, with his mom and brothers.

1    Q.   And where did you live at that time?

2    A.   In the Florida.

3    Q.   And did you come to know Paul's mother, Marie Hardy?

4    A.   Yes, I did.

5    Q.   And can you describe what she was like to the court?

6    A.   She was a very sweet lady.   She talked to her sons as much as

7    she possibly can, she loved to cook, she went to church a lot.

8    Q.   As a result of your dealing with Marie Hardy, did you come to

9    have an opinion of what she was like intellectually?

10   A.   That she wasn't very intellectually.

11   Q.   Would you say she was average, less than average?

12   A.   Less than.

13   Q.   Less than average?

14   A.   Uh-huh.

15   Q.   To your knowledge, could she read and write?

16   A.   No.

17   Q.   Everybody has described her as having cooked a lot.   Did you

18   ever see her using a recipe book?

19   A.   She never used a recipe.   You could ask her to write stuff down

20   for you and she would tell you no.

21   Q.   Now, when you first started spending time with Paul, how did

22   the two of you get back and forth between the Calliope projects and

23   the Florida projects?

24   A.   We would catch rides with his friends or catch a cab or catch a

25   bus.

1    Q.  Did he ever, to your knowledge, take a bus down to the Florida

2    projects to see you?

3    A.  No.

4    Q.  Did you ever know Paul to take a bus by himself?

5    A.  No.

6    Q.  Did there come a time when he got a moped?

7    A.  Yes.

8    Q.  And was he able to come down to the Florida projects on his

9    moped?

10   A.  He's never come by himself.

11   Q.  He would bring somebody?

12   A.  From my knowledge, he always had somebody with him.

13   Q.  On the back of the moped?

14   A.  Yes.

15   Q.  What eventually happened to that moped?

16   A.  He wrecked it.

17   Q.  Now, at the time you first met him, did Paul know how to drive

18   a car?

19   A.  No.

20   Q.  Now, you're about three and a half years younger than Paul?

21   A.  Yes.

22   Q.  Did you learn to drive a car before Paul did?

23   A.  Yes, I did.

24   Q.  Were you in Paul's life when he learned to drive?

25   A.  Yes.

1   Q.  Can you describe for the court what that was like?

2   A.  In comparison, a turtle would beat us if he was driving, that's

3   just how slow he would go in the process of him learning how to

4   drive.

5   Q.  Did you ever know Paul to drive -- do you know what a stick

6   shift is?

7   A.  Yes.

8   Q.  Did you ever know Paul to drive a car with a clutch, a stick

9   shift?

10  A.  No.

11  Q.  Do you know how Paul got his driver's license?

12  A.  He paid for them.  He went to the DMV as if he was getting a

13  state ID and paid for them.

14  Q.  He bought his driver's license?

15  A.  Yes.

16  Q.  Do you know from whom he bought it?

17  A.  I just remember the guy's first name, I don't know his last

18  name.

19  Q.  What was his first name?

20  A.  Raymond.

21  Q.  And was it, to your knowledge, was it sort of common knowledge

22  that if you needed to buy a driver's license you could buy it from

23  Raymond?

24  A.  Yes.

25  Q.  Now, how long were you with Paul?

```
 1   A.  About nine, ten years.

 2   Q.  And how old were you when you started living together?

 3   A.  Well, on and off I lived with him by his mom house.  I want to

 4   say I was maybe 16, 17 years old.

 5   Q.  Who did most of the driving when you were with Paul?

 6   A.  I did.

 7   Q.  And why was that?

 8   A.  I never questioned him.  Most of the time he would, you know,

 9   tell me to drive, I just thought it was out of laziness, so, you

10   know, I drove and I just never questioned why he didn't want to

11   drive.

12   Q.  Did you ever come to question, looking back at the things that

13   Paul asked you to do for him, did you ever come to question why he

14   was telling you these things?

15   A.  Yes.  Now I have.  Being that I'm older and I look at a lot of

16   things different.  And being in the restaurant business I've worked

17   with a lot of functional illiterate guys, and they did a lot of

18   masking for things that they couldn't do.

19   Q.  Let me stop you right there.  You used the term masking.

20   A.  Yes.

21   Q.  Is that a term that you got from any of the lawyers in this

22   case?

23   A.  No.

24   Q.  Is that a term that you got from any of the psychologists or

25   psychiatrists in this case?
```

1  A.  No.

2  Q.  Where did you get --

3          MR. McMAHON:  I'm going to object, unless he can qualify

4  her as an expert in some kind of mental diagnosis.  She is not

5  qualified to make those kind of judgments.

6          THE COURT:  No, I am interested in knowing where she got

7  the terminology, which is all that the question asks.  Go ahead.

8  BY MR. LARSON:

9  Q.  Where did you get the term?

10 A.  Well, it was a term that I came up with working in the business

11 with a couple of guys that, it just seemed to me that they put a

12 mask on for the things that they didn't know.  They would find ways

13 to function and not show you actually that they didn't know what

14 they were doing and, you know, for the things that they did know

15 how to do, it was like they was pulling a mask off.

16          But, you know, I had become familiar with it when one of

17 the guys, he couldn't read the screen to understand exactly what it

18 was he had to do unless someone told it to him.  So, you know, I

19 did a method of explaining to him -- because the main cook would

20 always call back actually what he needed from each side to cook for

21 him.  And I would tell him if he hear the Tchoupitoulas, that's

22 this fish and you take -- you know, I showed him the procedure,

23 what he had to do.  So I just seen it as he was putting a mask on

24 to cover up, you know, so nobody would see.

25 Q.  And looking back at what Paul, when you thought Paul was just

1    being lazy back when he would tell you to go do things for him or

2    to drive, do you believe that that's what he was doing?

3    A.  He was covering up for a lot of things he couldn't do.

4    Q.  How was Paul with directions?

5    A.  Not good.

6    Q.  Does he have a real sense of direction?

7    A.  No.  I just think for the places he could go, it was places

8    that he was familiar with and used to going.  But to send him

9    somewhere by himself and he's never been, no.

10   Q.  Didn't at one time he have a job with Meals on Wheels?

11   A.  Yes.

12   Q.  How did he -- and that job calls for delivering meals to

13   different houses?

14   A.  Yes.

15   Q.  How did he do that job?

16   A.  I was with him.  I was with him, and I would show him from

17   street to street; because actually when he first started, they gave

18   him a map and the addresses of the houses that he had to go to.

19   So, you know, I would show him from street to street which

20   direction would be easier to take to get to the next house.

21   Q.  And you would go with him on that route?

22   A.  Yes.

23   Q.  To your knowledge, did Paul ever do that job by himself?

24   A.  I want to say maybe once or twice after he had done it for a

25   few months with me.

1    Q.   How long did he have that job total?

2    A.   I want to say about maybe six months.

3    Q.   Have you ever known Paul to have any other legitimate job?

4    A.   No.

5    Q.   Now, when you were with Paul -- and you lived with him a total

6    of how much time?

7    A.   Well, totally, I want to say I lived with Paul about six, seven

8    years totally.

9    Q.   During this time, did Paul buy things for himself?  And let me

10   give you some different examples.  Would he buy himself clothing?

11   A.   No.

12   Q.   Who bought his clothing for him?

13   A.   I did.

14   Q.   Would he buy things for around the house?

15   A.   No.

16   Q.   Would you send Paul out to buy groceries?

17   A.   No.

18   Q.   Would you send Paul out to buy anything like cosmetics for you

19   or anything?

20   A.   No.

21   Q.   Why not?

22   A.   I never questioned any of it back then, but, you know, I was

23   the one that always went and did everything.

24   Q.   And let's take these one at a time.  With regard to clothing,

25   did Paul have any idea about clothing sizes?

```
 1   A.  No, not at first, but down the line, you know, he was

 2   eventually able to go by himself, but, no.

 3   Q.  Now, over the years Paul had different cars, didn't he?

 4   A.  Yes.

 5   Q.  Who bought those cars?

 6   A.  He did but not by himself.

 7   Q.  When you say not by himself, would someone go with him?

 8   A.  Yes.

 9   Q.  Who paid the bills in the household when you were with Paul?

10   A.  I did.

11   Q.  And how would you handle that?

12   A.  He would give me the money and I would go pay off the bills.

13   Q.  Why did Paul -- I know you said you thought he was lazy, just

14   lazy at the time.

15   A.  Uh-huh.

16   Q.  Looking back at it, what is your present belief about why Paul

17   was having you do all of these things?

18   A.  Looking at it now, I just felt like he couldn't do it.

19   Q.  Did Paul have any credit cards, to your knowledge?

20   A.  Yes, he did.

21   Q.  Now, were you aware of a secured Visa that he had?

22   A.  Yes.

23   Q.  And do you know how he got that?

24   A.  I can't remember the guy name, but I know for a fact that this

25   guy took him to the bank and showed him everything to do, that he
```

1    just needed to deposit some money in the bank and he would be able

2    to get that card and to have that amount secured on that card.

3    Q.  How about -- were you aware of a Mervyn's card?

4    A.  Yes, I filled all of the paperwork out and had him sign it

5    because I used to do a lot of shopping for the kids at Mervyn's.

6    Q.  And why did you fill out the application for him?

7    A.  I never questioned it then.  I wanted the card and, you know, I

8    just never questioned it, I filled it out and just let him sign it.

9    Q.  Did Paul ever travel outside of town, to your knowledge?

10   A.  Yes.

11   Q.  And where did he go and why?

12   A.  I know he went to Atlanta for the Saints game and California,

13   out there with a female.

14   Q.  Now, let's take Atlanta.  Did he go to Atlanta by himself?

15   A.  No.

16   Q.  With whom did he go?

17   A.  A couple of his friends.

18   Q.  Did he drive?

19   A.  As far as I know, no.

20   Q.  And what about the trip to California?

21   A.  No, he took a plane, him and one of his friends went together.

22   Q.  Could Paul have gotten to either Atlanta or California by

23   himself?

24   A.  No, I don't think so.

25   Q.  Have you ever known Paul to leave New Orleans by himself?

```
 1    A.  No.

 2    Q.  How about, say, to Baton Rouge or Biloxi?

 3    A.  No.

 4    Q.  Why not?

 5    A.  I never questioned it.

 6    Q.  Now, you were interviewed in March of this year by Dr. Hayes

 7    right next door, were you not?

 8    A.  Yes.

 9    Q.  And was that interview, to your knowledge, videotaped?

10    A.  Yes.

11    Q.  And have you had a chance to view the videotape of that

12    interview?

13    A.  Yes.

14    Q.  Now, when you told Dr. Hayes that Paul never went anywhere by

15    himself, she asked you, and I quote, "If he was in the drug life,

16    having somebody with you would be a good thing, right?"  Do you

17    remember her saying that?

18    A.  Yes.

19    Q.  And in your opinion, is the reason Paul never went anywhere by

20    himself because he was in the drug life or is it because he needed

21    help?

22    A.  Because he needed help.

23               THE COURT:  Leading, sustained.

24               MR. LARSON:  Sorry.

25    BY MR. LARSON:
```

```
 1   Q.  Now, when you first met Paul back -- back when you first met
 2   him, to your knowledge, was he in the drug life then?
 3   A.  No, he wasn't.
 4   Q.  When you went places with him back when you first met him, were
 5   you with him to protect --
 6              MR. McMAHON:  Objection, leading.  I mean, that's where
 7   he is going.
 8              THE COURT:  Can you come around a different way?
 9   BY MR. LARSON:
10   Q.  When you went places with Paul, did you go to these places to
11   protect him?
12              MR. McMAHON:  Leading, objection.
13              MR. LARSON:  It's an open-ended question.
14              THE COURT:  No, it's not open-ended.
15   BY MR. LARSON:
16   Q.  Why did you go places with Paul?
17   A.  Because I wanted to go with him, to be with him.
18   Q.  Did Paul ever ask you to go with him to protect him?
19   A.  No.
20   Q.  When you went with him on Meals on Wheels, did you go with him
21   to protect him?
22              THE COURT:  That's leading.
23   BY MR. LARSON:
24   Q.  Now, you told Dr. Swanson a story about coming home once.
25              THE COURT:  Is this Dr. Swanson or Dr. Hayes?
```

```
 1              MR. LARSON:  I'm sorry, I think Dr. Swanson.
 2    BY MR. LARSON:
 3    Q.  A story about coming home while Paul was changing a diaper.
 4    A.  Uh-huh.
 5    Q.  Would you relate that story to Judge Berrigan, please?
 6    A.  Yes.  Me and my older daughter Paula, we went out walking in
 7    the mall, I would take her just walking in the mall to get out of
 8    the house a lot, and I decided to leave Paul home with my middle
 9    daughter Tonya for the first time.  And by the time we came back
10    home and I opened the door, Paul had newspaper sprawled all over
11    the floor, probably the whole canister of wipes and a T-shirt tied
12    around his face trying to change her diaper and asking me to help
13    him because he couldn't do it.
14    Q.  Did you ever know Paul to change a diaper to take care of the
15    children?
16    A.  No.
17    Q.  Did Paul routinely go out and buy things for the children to
18    take care of them?
19    A.  No, no.
20    Q.  And how many years did you stay with Paul, at his mother's
21    house I think you said?
22    A.  At his mom's house, I want to say about two years.
23    Q.  Did you eventually get a place of your own?
24    A.  Yes.
25    Q.  And where was that?
```

```
 1   A.   In Algiers.

 2   Q.   And did Paul handle getting that apartment?

 3   A.   No.

 4   Q.   Who got the apartment for him?

 5   A.   His sister did.

 6   Q.   I'm sorry?

 7   A.   His sister.

 8   Q.   And his sister, which sister, Linda?

 9   A.   Linda.

10   Q.   And in the time, the nine or ten years that you were with Paul,

11   did you ever see him read a book?

12   A.   No.

13   Q.   Did you ever see him read a magazine?

14   A.   No.

15   Q.   To your knowledge, does he read the Bible now?

16   A.   Now, now he reads, but --

17            MR. McMAHON:  I am going to object to this.  She doesn't

18   know what he does in prison.

19            THE COURT:  Well --

20   BY MR. LARSON:

21   Q.   To your knowledge.

22            THE COURT:  Yeah, it's okay, go ahead.

23            THE WITNESS:  To my knowledge, he reads the Bible, but

24   his interpretation and my interpretation of the Bible is totally

25   different, so . . .
```

1    BY MR. LARSON:

2    Q.  Are these different interpretations theological disputes, or do

3    you have the sense of whether Paul understands what he is reading?

4    A.  I don't think he is understanding.  He can possibly be

5    following and listening to other people, but we have conflicts

6    about parts of the Bible that he may write or talk to my daughters

7    about and I don't be in agreeance with, what he is explaining to

8    them.

9    Q.  During the time you were with Paul, how was he in terms of

10   keeping time, punctuality?

11   A.  Not good.

12   Q.  In the nine or ten years you were with Paul, did he have any

13   hobbies?

14   A.  Females and dogs, yeah, nothing else.

15   Q.  Sex and his dogs?

16   A.  Yeah.

17   Q.  Any other hobbies?

18   A.  Not that I know of.

19   Q.  During the first few years you were with Paul, did he ever have

20   any interests that he talked about?

21   A.  No.

22   Q.  Did you ever play cards with him?

23   A.  Yes.

24   Q.  And what card games did you play with him?

25   A.  We played Tonk and Pitty-Pat.

```
 1   Q.  Would you describe those as children's games?

 2   A.  Yes, children could play, yes.

 3   Q.  Did you ever see Paul play checkers or dominoes?

 4          MR. McMAHON:  Leading, leading, leading.

 5          THE COURT:  That's not leading.  Overruled.

 6          THE WITNESS:  No, I didn't.

 7   BY MR. LARSON:

 8   Q.  Did you ever see Paul play chess?

 9   A.  No.

10   Q.  Did Paul play any sports that you ever saw?

11   A.  No.

12   Q.  Ever see him play basketball?

13   A.  No.

14   Q.  Football?

15   A.  No.

16   Q.  Do you know Greg Williams?

17   A.  Yes.

18   Q.  And is he a friend of Paul's?

19   A.  Yes.

20   Q.  And did he and Paul ever make any trips to Atlanta?

21   A.  Yes.

22   Q.  And the purpose was to go to the --

23          MR. McMAHON:  Objection.

24          THE WITNESS:  Yes.

25          THE COURT:  Oh, come on, it's going to a Saints game, is
```

```
 1   there any problem with that?  I mean, objection, it's like --
 2           MR. McMAHON:  No, what I'm objecting to is the pattern of
 3   supplying answers to the witness, that's what I'm objecting to, he
 4   is leading.
 5           THE COURT:  Mr. Larson, try not to lead even on
 6   insignificant questions.
 7   BY MR. LARSON:
 8   Q.  Why would Paul go to Atlanta?
 9   A.  No other reason that I would know of.
10   Q.  When he was in New Orleans, did you ever see him watch a
11   football game on TV?
12   A.  No.
13   Q.  Did he ever comment on football games on TV?
14   A.  No.
15   Q.  When you were with Paul, did he ever talk to you about the
16   names of any football players?
17   A.  No.
18   Q.  Did you ever -- did you discuss with Dr. Hayes what Paul knew
19   about football?
20   A.  I think I did.
21   Q.  And do you recall what you said to her?
22   A.  It was probably the fact that he wouldn't know offense from
23   defense.
24   Q.  Now, we mentioned Greg.  Was Greg Paul's mechanic?
25   A.  Greg did body work to cars.
```

1   Q.  Did Paul have a mechanic for his cars?

2   A.  Yes.

3   Q.  And who was that?

4   A.  Jude, he work at Steve's Auto Shop.

5   Q.  Did you ever see Paul work on his own cars?

6   A.  No.

7   Q.  Did you ever experience Paul having confidence in his own

8   judgment?

9   A.  No --

10          MR. McMAHON:  Wait, objection.

11          THE COURT:  Sustained.

12          MR. McMAHON:  That's way beyond her expertise.

13          THE COURT:  Well, it's also leading.

14  BY MR. LARSON:

15  Q.  Did you ever see Paul rely upon opinions of others?

16          MR. McMAHON:  Objection --

17          THE WITNESS:  Yes.

18          THE COURT:  That's okay.

19  BY MR. LARSON:

20  Q.  And can you give a couple of examples?

21  A.  It would be something simple as his outfit that he had on, he

22  liked to go to other people and ask them what they felt about what

23  he had on, did they like it, did it look good, did it match.  He

24  never just went solely on what he thought of it.

25  Q.  How about with regard to other matters like cars or things?

1    A.  He always had someone with him.  When doing just about

2    everything, going places, purchasing stuff.  I've never known Paul

3    to just be to himself and by himself doing those types of things.

4    Q.  Did you ever know other people to take advantage of Paul?

5    A.  Yes.

6    Q.  Can you give some examples?

7    A.  I feel like a lot of people took Paul kindness for weakness

8    because he was one that always liked to help people and do things

9    for people.  So, you know, a lot of people came to him to do things

10   for him or to give them things.

11   Q.  Are you still in love with Paul?

12   A.  No.

13   Q.  Do you care whether he is executed?

14   A.  Yes.

15   Q.  Why?

16   A.  Because I have three daughters for him, and I would love for my

17   daughters to have their father in their life for as long as they

18   possibly can, so . . .

19   Q.  Would you lie to keep him from being executed?

20   A.  No.

21   Q.  Have you ever been convicted of a felony?

22   A.  Yes, I have.

23   Q.  And what was that and when was that?

24   A.  My conviction was in '96 actually, the day that I was here to

25   testify.  As I was about to leave, actually, this courtroom I was

1  arrested.  My charges were for attempt to possess drugs, and as far

2  as I know, my charges were never picked up the whole while I was

3  going through this case, because my lawyer came to me and told me

4  that he felt that if I didn't go forward with this case that my

5  charges would be picked up.  And I asked him could he guarantee me

6  that, and he told me no; but the last day of me coming here to

7  testify was the date that I was, as far as I know, I was indicted

8  and re-arrested on my charges again.

9  Q.  And those were state court charges?

10 A.  Yes.

11 Q.  And you entered a plea of guilty?

12 A.  Yes.

13 Q.  And what was your sentence?

14 A.  My sentence was ten years and I did five years.

15          MR. LARSON:  I tender the witness, your Honor.

16          THE COURT:  All right.

17                    CROSS-EXAMINATION

18 BY MR. McMAHON:

19 Q.  Ms. Van Buren, that conviction of yours is for heroin,

20 possession of heroin, correct?

21 A.  Yes.  Yes.

22 Q.  And you recall that when the FBI executed search warrants in

23 connection with this case, some crack was found in your apartment

24 on Mazant Street, correct?

25 A.  I don't remember everything that was found there, but.

1   Q.  Now, when you met with Dr. Swanson, the defendant's expert, you

2   were working, correct?

3   A.  Yes.

4   Q.  You were at the Holiday Inn?

5   A.  No, I was at O'Henry's.

6   Q.  And about how long did that interview take?

7   A.  I want to say a couple of hours.

8   Q.  People were coming in and out -- you were a supervisor -- you

9   were a manager at the time, correct?

10  A.  Yes.

11  Q.  So you were both working and interviewing with Dr. Swanson at

12  the same time?

13  A.  Yes.

14  Q.  Did Dr. Swanson tape your interview?

15  A.  I don't recall.

16  Q.  She may have taped it?

17  A.  I don't recall.

18  Q.  You don't remember?

19  A.  No.

20  Q.  When did that interview take place?

21  A.  I know it was this year that it took place, had to be in, what,

22  maybe May or so.

23  Q.  How many times did you interview with Dr. Swanson?

24  A.  Once.

25  Q.  And in preparation for your testimony today, you read your

```
 1  transcript of the interview with Dr. Hayes on March 22nd?

 2  A.  Did I read my transcript today?

 3  Q.  Right.

 4  A.  No.

 5  Q.  You watched the videotape of your interview with Dr. Hayes --

 6          THE COURT:  Wait a minute.  Wait.  She has to -- I think

 7  there may be a misunderstanding.  She said, did I read the

 8  transcript today.  Did you read the transcript prior to coming to

 9  testify?

10          THE WITNESS:  I want to say -- well, I seen the tapes.

11          THE COURT:  Okay.  Go ahead.

12  BY MR. McMAHON:

13  Q.  But you remember -- I switched -- actually I probably switched

14  gears a little too quickly.  You remember when you interviewed with

15  Dr. Hayes (INDICATING)?

16  A.  Of course.

17  Q.  It was on a Sunday, March 22nd, right?

18  A.  I don't remember exactly what day it was.

19  Q.  You looked at the interview -- or rather the videotape of that

20  interview, right?

21  A.  Yes.

22  Q.  How did you do that, who had you do that?  I mean, did the

23  defense attorneys, their investigators came and showed you the tape

24  or you had a copy of the tape?  How did that happen?

25  A.  They came and showed me the tape.
```

1    Q.  Where?

2    A.  At my home.

3    Q.  At your home.

4    A.  Uh-huh.

5    Q.  And did they bring a transcript of your interview as well, a

6    written transcript so you can read it?

7    A.  I recall seeing a tape.

8    Q.  Well, I mean, did you read a transcript?

9    A.  I don't recall.

10   Q.  When did you see the videotape?  About how long ago did you

11   view the videotape, Ms. Van Buren?

12   A.  Probably about a couple of weeks ago.

13   Q.  And you can't remember a couple of weeks ago whether you also

14   read a transcript?

15   A.  I don't recall.

16   Q.  Now, you've pretty much kept in contact with Paul Hardy for the

17   whole extent of this litigation, correct?

18   A.  Of course.

19   Q.  And you speak to him on the phone, correct?

20   A.  Not really.

21   Q.  Well, I've heard some of the calls, it's a little bit.  But

22   there's a lot of three ways when you're on the phone with him,

23   right?

24   A.  Yes.

25   Q.  And you care for him, don't you?

```
1   A.  Of course.

2   Q.  In fact, I think you said that you love him but you're not in

3   love with him; would that be a fair statement?

4   A.  Yes.  Yes, that would.

5   Q.  Huh?

6   A.  Yes, that would.

7   Q.  And he is the father of Paula, Tonya and Paris, right?

8   A.  Yes.

9   Q.  Does Tonya have a nickname Mighty Might or something like that?

10  A.  Yes, that's what her daddy called her.

11  Q.  And you don't want to see Paul Hardy executed, correct?

12  A.  No.

13  Q.  Now, you're an intelligent woman and you know that if the judge

14  decides that Mr. Hardy is mentally retarded, he is not going to

15  face the death penalty; you do realize that, correct?

16  A.  Yes.

17  Q.  And so it's in the best interest of your children to make Paul

18  Hardy look retarded; isn't that right?

19  A.  No.

20  Q.  Didn't you tell both Dr. Swanson and Dr. Hayes that you now

21  realize these deficiencies in Mr. Hardy looking back, correct?

22  A.  Yes.

23  Q.  You didn't realize them at the time, did you?

24  A.  No.

25  Q.  When you first met Mr. Hardy, he was driving around in the --
```

1   actually in the project on a little moped and kind of caught your

2   attention.  I think you were coming home from school, right?

3   A.  Yes.  That's not in the project.

4   Q.  And then you began to go out with him, right?

5   A.  Yes.

6   Q.  And you would go to the movies?

7   A.  Yes.

8   Q.  You would go out to eat?

9   A.  Not really, no.

10  Q.  You didn't?

11  A.  No.

12  Q.  Well, actually, when Dr. Hayes asked you why you began dating

13  seriously, you answered:  "He always just came, just came around

14  and called.  He took me out a lot.  He took me to the movies, out

15  to eat, to the French Quarter."  So that's -- now, what is it, did

16  he take you out to eat or did he not take you out to eat?

17  A.  Can I read that, what you're reading from?

18  Q.  It's page 11.  That paragraph right there (INDICATING).  You

19  read that transcript, do you remember it?

20  A.  I don't recall.

21  Q.  Well, read it.

22  A.  Okay.  (WITNESS READS DOCUMENT.)  I guess his persistence.

23  Q.  I can't hear you.

24  A.  I don't even recall saying, "I guess his persistence," but me

25  and Paul never really went out to eat.  I recall telling her that

1    we went to the French Quarters, but I also told her that his mom

2    cooked a lot.  So, you know, going out to eat a lot, that's not --

3    Q.  I'm talking about dates, Ms. Van Buren.

4    A.  That's exactly what I'm talking about.

5            THE COURT:  Whoa, whoa, whoa, one at a time, one at a

6    time.

7    BY MR. McMAHON:

8    Q.  So you now deny that you went out to eat with him?

9    A.  If me and Paul -- I don't ever recall me and Paul going out to

10   restaurants to sit down and eat.  I recall us going to the French

11   Quarters, I recall us going to the movies.

12   Q.  And you went to movies, correct?

13   A.  Yes.

14   Q.  And you would go alone, correct?

15   A.  Me and Paul.

16   Q.  Yes.

17   A.  Uh-huh.

18   Q.  Now, when you first met Mr. Hardy, he dressed neatly, didn't

19   he?

20   A.  Yes.

21   Q.  He didn't have any problems with personal hygiene; he took care

22   of himself, didn't he?

23   A.  Yes.

24   Q.  You didn't notice any rank odors emanating from his person, did

25   you?

1   A.  No, I didn't.

2   Q.  In fact, he had a nickname at the time, didn't he?

3   A.  Yes, he did.

4   Q.  What was that?

5   A.  Cool.

6   Q.  And so you thought he was a cool person, that's why you went

7   out with him, right?

8   A.  Well, when I went out with him, I really didn't know what type

9   of person he was until I took the time to get to know him.

10  Q.  And he showed you a lot of attention.

11  A.  Yes, he did.

12  Q.  And, in fact, you actually -- you told Dr. Hayes that Mr. Hardy

13  took you out a lot; isn't that true?

14  A.  Which would be to the movies and the French Quarters, we walked

15  the French Quarters a lot.

16  Q.  You didn't notice anything unusual about him at the time, did

17  you?

18  A.  No.

19  Q.  He seemed to be a perfectly normal guy, right?

20  A.  I guess, yeah.

21  Q.  Cool guy, right?

22  A.  Yeah.

23  Q.  And you were attracted to him?

24  A.  Yes.

25  Q.  You also -- did you ever have to -- strike that.  Well, I

```
 1    didn't start.
 2              You were very close to Hardy's mother, weren't you?
 3    A.  Well, for a while, no.
 4    Q.  Didn't you tell Dr. Hayes that you, quote, "you loved her to
 5    death"?
 6    A.  Yes.  I had come to really love his mom, yes.
 7    Q.  So that connotes you were very, very close to her?
 8    A.  Yeah, in the end we were.
 9    Q.  And you felt a great deal of affection for her, didn't you?
10    A.  Yes.
11    Q.  Now, you really didn't start to live with Mr. Hardy until about
12    a year and a half after you met, right?
13    A.  Yes, on and off, by his mom.
14    Q.  And you did meet him -- when you met him, he was already 18
15    years old, right?
16    A.  Yes.
17              THE COURT:  Can we hold up for a second.  I don't want
18    the technical stuff to distract you.  Okay.  Go ahead, Mike.
19    BY MR. McMAHON:
20    Q.  So you were a little coy at first in the relationship, right?
21    A.  Say that again.
22    Q.  You were a little coy, C-O-Y, coy?
23    A.  What you mean?
24    Q.  Well, it's like you were kind of playing a little bit hard to
25    get in the first part of the relationship, right?
```

```
 1    A.  Yes, I was, yes.
 2    Q.  And then after a time, you became intimate and it was about a
 3    year and a half, two years, that you began to sleep at Mr. Hardy's
 4    apartment in the Calliope with his mother there, right?
 5    A.  Yes.
 6    Q.  Because your parents wouldn't let him come over to your house
 7    at first, right?
 8    A.  My mom is just not that type of mom.
 9    Q.  I am having difficulty hearing you.
10    A.  My mom is just not that type of mom, so, no, she wouldn't.
11    Q.  So you really didn't get to live with him until he was 20,
12    about 20, right?
13    A.  No, I was there at his mom's apartment on and off.
14    Q.  And you never really knew what he -- what Mr. Hardy did out in
15    the street, did you?
16    A.  No.  If I am not with him, no.
17    Q.  And, in fact, you repeated that several times to Dr. Hayes that
18    you really didn't know what he did out on the street.
19    A.  No, if I am not with him, I have no idea.
20    Q.  Wouldn't you, for example, you would kind of play a little
21    game, I don't know if game is the right word, but kind of a -- when
22    you and Hardy would kind of have a race to see who would go pick up
23    Paula first at the daycare.  Do you remember you told that to
24    Dr. Hayes?
25    A.  Yeah, it was years down the line after I had Paula, after I had
```

1    my first daughter.

2    Q.  I didn't catch the first part of what you said.

3    A.  That was years down the line after I had my first daughter,

4    yes.

5    Q.  Right.  But it was kind of like a little playful competition,

6    right?  You would see who would get to the daycare first.

7    A.  It wasn't nothing that was did purposely, but, you know, we

8    just never made arrangements to see, okay, well, I'll go get her

9    today or you go get her today, it was just, you know, we knew what

10   time she got out of school.

11   Q.  No, I don't think you understand my question.  It was kind of

12   like -- it was like a playful, you and he would have like a playful

13   little competition?

14   A.  It wasn't nothing done purposely, is what I'm saying.

15   Q.  Well, you told Dr. Hayes, "When I had Paula, it was like a race

16   for me and him to go and pick her up from school so he can say, I

17   beat you first and I got her, you know, you know what I'm saying?"

18           MR. LARSON:  I would ask that the transcript be shown to

19   the witness.

20           THE COURT:  Okay.

21   BY MR. McMAHON:

22   Q.  Do you remember saying that?

23   A.  Yes.  But I'm saying the competition was nothing that we

24   planned out to do.

25   Q.  Right.  But you still did it?

A.  Yeah.

Q.  And, in addition, Mr. Hardy used to chaperone Paula's little field trips while she was in school, correct?

A.  Yeah, along with the rest of the school and teachers, he would go on some of her trips with her.

Q.  I can't hear you, you're going to have to speak a little clearer.

A.  Yes, he would go on some of her school trips with her.

Q.  He would chaperone the field trips, right?

A.  He would just go on a trip with her.  He would not be -- he would not be like, he wouldn't sign papers to say --

Q.  Well, he wouldn't be an official chaperone --

        THE COURT:  Whoa, whoa, whoa.

        MR. McMAHON:  I was trying to help her out.

        THE WITNESS:  Yeah, he would go on a trip with his daughter.

        THE COURT:  Stop.  Stop.  Okay.  Go ahead, Ms. Van Buren, please go ahead and explain.

        THE WITNESS:  He just would go on a trip with his daughter.

BY MR. McMAHON:

Q.  And he also went a lot of different places with his children and he did a lot of things with them, didn't he?

A.  Yes, he did.

Q.  And he did those alone, right?

1   A.  No.

2   Q.  I mean, not counting his children.

3   A.  No.

4   Q.  You went with him?

5   A.  Yes.

6   Q.  But at the time, looking back -- I mean, at the time, you

7   didn't go with him because you felt, oh, my God, he's slow, I don't

8   trust him with our kids so I better go along; you didn't think that

9   at all, did you?

10  A.  Back then, no.

11  Q.  No.  It was a natural thing to do, you went out with the kids

12  and you and he went out with your children, kind of made a little

13  family?

14  A.  Yes.

15  Q.  And you didn't think anything of it like you were doing that so

16  your kids would not be alone with him because you were afraid of

17  what might happen because he is a retard?

18  A.  No.

19          MS. FOURNET:  Judge, I have to object.

20          THE COURT:  Whoa, whoa, whoa, one attorney per --

21          MR. LARSON:  Judge, I will on behalf of Michele Fournet

22  and myself and Mr. Hardy, I would object to the use of the

23  terminology by Mr. McMahon.

24          THE COURT:  What, retard?

25          MS. FOURNET:  It's extremely offensive, your Honor.

1          MR. McMAHON:  I'll try to be more politically correct.

2    BY MR. McMAHON:

3    Q.  And you and Mr. Hardy would -- you went to church together,

4    right?

5    A.  Yes.

6    Q.  Greater St. Stephens?

7    A.  Yes.

8    Q.  And, in fact, you told Dr. Hayes that it was, it was his idea,

9    he was the one who actually got you to go to Greater St. Stephens,

10   correct?

11   A.  Yes.

12   Q.  On his initiative?

13   A.  Yes.

14   Q.  You lived with Mr. Hardy out at Barrington Court, right?

15   A.  Yes.

16   Q.  And you knew he was selling crack at the time, right?

17   A.  Yes, I knew he was selling drugs.

18   Q.  Do you have a problem saying crack?  He was selling crack.  I

19   mean, crack was found at your apartment on Mazant Street.

20   A.  Isn't it drugs?

21   Q.  Pardon me?

22   A.  Isn't it drugs?

23   Q.  Crack cocaine?

24   A.  Uh-huh.

25   Q.  Is it a drug?

1   A.  Uh-huh.

2   Q.  I don't know, why don't you tell me.

3          THE COURT:  Mr. McMahon.

4   BY MR. McMAHON:

5   Q.  There was a scale out at Barrington Court, correct?

6   A.  I don't know.

7   Q.  You don't know that?

8   A.  No, I don't know.

9   Q.  The FBI seized a scale at your home, you and Hardy's home out

10  on Barrington Court, correct?

11  A.  I don't know.

12  Q.  Do you deny a scale was there?

13  A.  I don't know.

14         MR. LARSON:  Your Honor, I just object --

15         THE COURT:  Asked and answered, move on.

16  BY MR. McMAHON:

17  Q.  Well, Dr. Hayes asked you, did he keep scales and other things

18  like that at the house at Barrington, page 22, you said no.  You

19  didn't say I don't recall, you said no.  Now you don't recall?

20  A.  You asked me did they seize a scale, I don't know.

21  Q.  But you knew the scale was there?

22  A.  I don't know.

23  Q.  But you denied there was a scale when Dr. Hayes asked you on

24  March 22nd?

25         THE COURT:  Asked and answered.

```
 1              MR. LARSON:  Thank you, your Honor.

 2              MR. McMAHON:  Right.

 3   BY MR. McMAHON:

 4   Q.  Now, Mr. Hardy, you would go actually, go shooting at the -- he

 5   had guns, right?

 6   A.  I know he did, yes.

 7   Q.  He had a lot of guns, correct?

 8   A.  I don't know how many he had, but I know he had a gun.

 9   Q.  He had more than one?

10   A.  I don't know how many he had.

11   Q.  And, in fact, you two would go shooting -- you went shooting

12   with him at the gun range once, right?

13   A.  Once, yes.

14   Q.  And I guess you were like shooting up in the ceiling and

15   everything --

16   A.  Yes.

17   Q.  -- and you were kind of like tearing the place apart, right?

18   A.  Uh-huh.

19   Q.  But he would do that on a regular basis, wouldn't he?

20   A.  I don't know, I just went with him once.

21   Q.  He wasn't shooting up the ceiling, was he?

22   A.  I don't know, I just went once.

23   Q.  You don't know that, either.

24              Mr. Hardy, he was never actually required to do any

25   domestic things, was he?
```

```
 1   A.  What you mean by required?

 2   Q.  Like cleaning up, washing the dishes, clearing the table,

 3   things like that?

 4   A.  He never did it, I never asked him to.

 5   Q.  Because you did it, right?

 6   A.  Yes.

 7   Q.  And when you were living with him with his mother, his mother

 8   did all of those things, didn't she?

 9   A.  Yes.

10   Q.  Well, I can relate to that because I had five brothers and

11   sisters and I never cooked a meal, my momma cooked the meals.

12          MR. LARSON:  Is there a question, Judge?

13          THE COURT:  Sustained.

14          MR. McMAHON:  Do you want me to make it into a question?

15          THE COURT:  Sustained.

16   BY MR. McMAHON:

17   Q.  Now, you did tell Dr. Hayes, however, that Hardy would vacuum,

18   would help you vacuum, right?

19   A.  Yes.

20   Q.  And he would also -- now, you didn't have to show him like how

21   to, like, Paul, push the vacuum cleaner on the floor, I mean, he

22   could do that himself, couldn't he?

23   A.  Yes.

24   Q.  And you didn't have to like -- he would wash a dish every once

25   in a while, I take it, correct?
```

```
 1   A.  No.

 2   Q.  Do you think you would have to tell him, teach him how to wash

 3   a dish?

 4   A.  No.

 5   Q.  Do you think Paul Hardy could find his way from here to Baton

 6   Rouge?

 7   A.  No.

 8   Q.  Anybody from the defense team talk to you about any testimony

 9   that's gone on in here up to this point?

10   A.  What you mean talked to me about it?

11   Q.  Did anybody tell you, ma'am, about what anybody else said on

12   the witness stand up to this point?

13   A.  No.

14   Q.  Well, what were you doing in the hall when I walked in?  You

15   were huddled with the investigator down there earlier this morning.

16   A.  It was not about no one's testimony.

17   Q.  You also told Dr. Hayes that Hardy would clean up the yard,

18   correct?

19   A.  Yes, uh-huh.

20   Q.  Like clean up after the dogs?

21   A.  Yes.

22   Q.  In fact, he was a neat guy, wasn't he, he was kind of very

23   fastidious?  Do you know what fastidious means?

24   A.  Well, no.

25   Q.  He was very, very, very neat, very, very tidy and made sure
```

```
 1    everything was nice and clean?

 2    A.  No.

 3    Q.  You wouldn't characterize him as that?

 4    A.  No.  He cleaned up after the dogs outside, though.  He would

 5    not let the yard go dirty and stinky with the dogs back there.

 6    Q.  Well, Javetta Cooper said he was kind of a neat freak.

 7              MR. LARSON:  Objection, your Honor.

 8              THE COURT:  Whoa, whoa, whoa, sustained.

 9    BY MR. McMAHON:

10    Q.  Do you remember you told Dr. Swanson that Mr. Hardy wrote only

11    in -- he only block printed; do you remember you told that to her?

12    A.  Can I see that?

13    Q.  That he couldn't write in script?

14    A.  He could write, he could write in cursive, he could write in

15    print.

16    Q.  He could write in cursive?

17    A.  Uh-huh.

18    Q.  And you told that to Dr. Swanson, that he could write cursive?

19    A.  I don't recall.  Can I read it?

20    Q.  Well, let me ask it to you this way:  Did you ever tell

21    Dr. Swanson, not Dr. Hayes, Dr. Swanson, the defendant's expert --

22    A.  Uh-huh.

23    Q.  -- that Mr. Hardy only wrote in like block print?

24    A.  He liked to write in print instead of in cursive.

25    Q.  That was like his natural way of writing?
```

1    A.  Yeah.

2    Q.  Mr. Hardy also would throw little parties for your daughters at

3    Chuck E. Cheese, correct?

4    A.  Uh-huh, I did.

5    Q.  He was there?

6    A.  Uh-huh.

7    Q.  Oh, he didn't help you at all?

8    A.  No.

9    Q.  He paid for it?

10   A.  Yeah.

11   Q.  And did Mr. Hardy drive people around, like he would drive

12   people around kind of like being helpful and friendly, right, like

13   the older people?

14   A.  I know -- I can't remember her name, this one older lady, if

15   she needed somewhere to go and she would call him.

16   Q.  And he would go drive her around?

17   A.  If he was able to, yes.

18   Q.  Right.

19   A.  Uh-huh.

20   Q.  Was her name Dorothy Robinson, does that ring a bell?

21   A.  I don't know if he rode Ms. Dot around, I don't know.

22   Q.  Because you denied to Dr. Hayes, page 34, that Mr. Hardy drove

23   anybody around; do you recall?

24   A.  I don't know, I really don't recall him driving Ms. Dorothy

25   around.

1    Q.  But you just -- well, Dr. Hayes asked you:  "Did he ever drive

2    people around or do favors for people or other stuff like that?"

3    You replied, "Not driving anybody around, but people came to Paul

4    more or less for money."  So you did --

5             MR. LARSON:  I would ask that the witness be shown the

6    transcript, your Honor.

7             THE COURT:  Do you need to see that?

8             THE WITNESS:  Yeah.

9             MR. McMAHON:  Right there and right there (INDICATING).

10            THE WITNESS:  (WITNESS READS DOCUMENT.)

11   BY MR. McMAHON:

12   Q.  Do you remember saying that now?

13   A.  Uh-huh.

14   Q.  And you said that he used to drive very, very slowly?

15   A.  Yes, when he first started driving.

16   Q.  When did he first start driving?

17   A.  I don't remember exactly when he started driving.

18   Q.  He first started driving after he was 18, when you met him?

19   A.  It was after, it was after 18.

20   Q.  Let me get this straight.  You're stating that Paul Hardy did

21   not start driving until --

22   A.  A car.

23   Q.  -- a car --

24   A.  Until after, yes.

25   Q.  -- until after you met, and you met him after he turned 18,

1    correct?

2    A.  Yes.

3    Q.  And what you're saying is that he drove really, really slowly?

4    A.  Uh-huh.

5    Q.  For how long, how long did that last?

6    A.  I don't recall how long it lasted for.

7    Q.  About a year and a half or so?

8    A.  I don't recall.

9    Q.  You don't know.

10   A.  I don't recall how long it lasted for.

11   Q.  Mr. Hardy, he used to keep his guns at different locations in

12   the Florida project, correct?

13   A.  I don't know.

14   Q.  You don't know that?

15   A.  No.

16   Q.  Because you weren't involved in that side of his life?

17   A.  I don't know.

18   Q.  You didn't know the crack was in your apartment?

19           MR. LARSON:  Your Honor, we've gone over this.

20           MR. McMAHON:  I want to know.

21   BY MR. McMAHON:

22   Q.  Did you know the crack was in your apartment on Mazant Street?

23   A.  I don't know everything that was found in the apartment.  I

24   don't know what was there at all times, I don't know.

25   Q.  Just like you didn't know the scale was out at Barrington?

```
 1    A.  I don't know.

 2              MR. LARSON:  Your Honor.

 3              THE COURT:  That's all right.  Overruled.

 4    BY MR. McMAHON:

 5    Q.  On the Meals and Wheels, you would accompany him because you

 6    enjoyed being with him; isn't that right?

 7    A.  Yes.

 8    Q.  You spent a lot of time together, didn't you?

 9    A.  Yes.

10    Q.  You were in love with him at the time, right?

11    A.  Yes.

12    Q.  And Dr. Hayes asked you about accompanying Mr. Hardy when he

13    worked for Meals on Wheels, right?

14    A.  Yes.

15    Q.  And you told Dr. Hayes that you did it because he asked you and

16    you just went with him a lot just because it was something to do

17    together, right?

18    A.  Yes.

19    Q.  At the time you didn't do this because you felt, well, Paul is

20    really slow, so I need to go with him because he can't figure

21    things out for himself.  You never told that to Dr. Hayes, right?

22    A.  No.  I told her from the beginning Paul asked me to come with

23    him.

24    Q.  Right.

25    A.  Uh-huh.
```

1    Q.  Because you all are really not familiar with uptown like the

2    St. Charles area, correct?

3    A.  Well, I knew about the St. Charles area, not a whole, whole

4    lot, but I was familiar with it.

5    Q.  But when you're given a list of addresses, which I take it

6    that's what happened with Meals on Wheels, I mean, you have to

7    figure out where the streets are and, you know, what the number

8    block is, right; anybody would do that, correct?

9    A.  Well, that's what we had to figure out, yes.

10   Q.  Right.  And that's a natural thing to do.  If you're not

11   familiar with a neighborhood, the streets in your neighborhood, you

12   have to familiarize yourself with the streets and the blocks,

13   correct, especially if you're delivering something there, right?

14   A.  Yes.

15   Q.  Natural thing to do, correct?

16   A.  Yes, yes.

17   Q.  He had that job for six months, did he not?

18   A.  I would say about six months.

19   Q.  And the reason he lost it was because he got arrested for

20   murder, correct?

21   A.  I don't remember why he lost the job, I don't remember.

22   Q.  Well, he didn't lose the job because the people at Meals on

23   Wheels thought, this guy is just too slow, he's a danger, we have

24   to get rid of him?

25   A.  I don't remember why.

1    Q.  You don't remember?

2    A.  No.

3    Q.  Do you remember in retrospect -- let me back up a little bit.

4    When Swanson interviewed you, didn't she suggest that you should

5    look back and try to put yourself, like pretend you're -- basically

6    put yourself, not pretend, but put yourself back when you were 14

7    years old, right?

8    A.  I can only remember what I can remember.

9    Q.  You were surprised that Paul Hardy had a bank account, weren't

10   you?

11   A.  Yes.

12   Q.  And, in fact, you were unaware that Mr. Hardy had more than one

13   credit card, weren't you?

14   A.  I knew about the secured Visa and the Mervyn's.  I remember

15   those, I should say.

16   Q.  Do you remember, page 41, when Dr. Hayes asked you, "Did he,

17   meaning Hardy, have any credit cards that you know of?"  Do you

18   remember what you answered?

19   A.  No.

20   Q.  You answered this.  What was your answer, read it out.

21   A.  "Just one card that I know of."

22   Q.  Just the one card, the secured Visa, right?

23   A.  Uh-huh.

24   Q.  You weren't aware that he had a Macy's card?

25   A.  I don't remember.  I remembered the secured Visa and the

1    Mervyn's card.

2    Q.  You remember no other cards, no other accounts?

3    A.  That's the two I remember.

4    Q.  So you don't deny he had multiple accounts at different stores,

5    you don't deny that, you just don't know, right?

6    A.  I remember the Mervyn's and the secured Visa.

7    Q.  But on March 22nd of this year you only remembered one,

8    correct?

9    A.  Yeah.  But then I remembered that I would always go shopping

10   for the kids at Mervyn's with the card.

11   Q.  Didn't you tell Dr. Hayes that he really didn't learn domestic

12   skills or things from his mother because simply his mother being as

13   slow as she was was just incapable of teaching him, correct?  Is

14   that a fair statement?

15   A.  No.  I just think she did what she can do and she showed what

16   she can show, which was tidying up around the house and doing what

17   she knew to do.

18   Q.  Well, you didn't quite answer my question.  The fact that

19   Mr. Hardy didn't know a lot of domestic things was because his

20   mother was simply -- because of her own reduced mental condition,

21   so to speak, she was just incapable of teaching him, right?

22   A.  Can you explain to me what you mean by domestic things?

23           THE COURT:  Do you have something that she said,

24   Mr. McMahon?

25           MR. McMAHON:  Yes.

```
 1           THE COURT:  Why don't you show her that.

 2           MR. McMAHON:  All right.

 3   BY MR. McMAHON:

 4   Q.  I want you to read this out loud.

 5   A.  Okay.

 6   Q.  Okay.  Read that starting right there (INDICATING).  Nice and

 7   clear.

 8   A.  Okay.  "I really, my assessment of it is that Paul honestly

 9   just didn't know how to do a lot because his mom didn't teach him

10   because she didn't know a lot.  His dad wasn't there, you know.

11   Your siblings really can't teach you much of what they don't know

12   either.  I guess that was just his way of getting things done what

13   he needed."

14           THE COURT:  Mike, what page number are you reading from?

15           MR. McMAHON:  For the record, that was page 44.  Right in

16   the middle of the page.  For the record, it was the transcript of

17   the collateral interview with Toni Van Buren by Dr. Hayes on March

18   22nd of this year.

19   BY MR. McMAHON:

20   Q.  You characterized Mr. Hardy as a very loving person, correct?

21   A.  Yes.

22   Q.  And, in fact, even to this day he counsels your children, does

23   he not?

24   A.  He talks to them.

25   Q.  He's aware of what's going on in their life, correct?
```

1    A.  As far as I know, yeah.

2    Q.  In fact, he got really upset when your daughters got earrings,

3    did he not?

4    A.  I don't know, I wasn't part of that conversation.

5    Q.  He also counsels them about their relationships with boys?

6    A.  Yes, he talks to them and tells them what he feels about them

7    dating.

8    Q.  And he advises them, too?

9    A.  Yes.

10   Q.  And he also showed you a lot of attention when you were going

11   out together, right?

12   A.  Yes.

13   Q.  I want you to explain to the court about how he became attached

14   to one of -- I think one of his friend's grandmothers.

15   A.  Yes.

16   Q.  Why don't you talk about that a little bit.

17   A.  Keith Mitchell's grandmother, he used to go over and sit --

18   Q.  Can't hear you.

19   A.  His friend Keith's grandmother, he used to go over and sit and

20   talk with her a lot.

21   Q.  And she used to like to drink beer, right?

22   A.  Yes.

23   Q.  And he would go over there and he would drink beer with her?

24   A.  No.

25   Q.  He would go buy her beer and go over?

```
 1   A.   Yes.

 2   Q.   Oh, okay.  He didn't drink beer?

 3   A.   No.

 4   Q.   But he would go -- what was this lady's name, do you know?

 5   A.   I can't remember her name.

 6   Q.   And what was his friend's name, Keith?

 7   A.   Keith.

 8   Q.   Keith who?

 9   A.   I can't remember Keith's last name.

10   Q.   So Mr. Hardy would go and he would buy beer and he would go

11   over and he would visit with Keith's grandmother?

12   A.   Yes.

13   Q.   And he would bring her the beer, right?

14   A.   Yes.

15   Q.   Because I take it he didn't drink?

16   A.   He didn't, not -- I've never known him to drink.

17   Q.   Did you know Dorothy Robinson who ran the little game room?

18   A.   Yes, I know her, that's Ms. Dot.

19   Q.   And you're aware, of course, that Hardy, he would do little odd

20   jobs for her around the shop, correct?

21   A.   I don't recall.

22   Q.   You don't recall or you don't know?

23   A.   I don't know.

24   Q.   He'd also cut grass for her and other people in the

25   neighborhood as well, correct?
```

1    A.  I don't know.

2    Q.  Wasn't there a time, Ms. Van Buren, when you lost a pair of, I

3    think, Jesus earrings and Mr. Hardy had them custom -- a new pair

4    custom-made for you?

5    A.  Yes.

6    Q.  And you told Dr. Hayes, did you not, that Mr. Hardy really

7    hasn't changed over the years you've known him, correct?

8    A.  Changed in what way?

9    Q.  I don't know, changed.  His mental condition changed?

10   A.  To me, no.

11   Q.  Didn't he encourage you to stay in school?

12   A.  Yeah, here and there while we were dating.  I was in school,

13   yeah, he would tell me to go to school.

14   Q.  Like, for example, like when you were eating lunch and he would

15   try to encourage you and say, well, okay, you know, go back to

16   school, I'll see you afterwards, right?

17   A.  Yes.

18   Q.  And you remember telling that to Dr. Hayes?

19   A.  Yes.

20   Q.  Remember when Dr. Hayes asked you if Hardy ever helped you with

21   any of your studies or even tried to?

22   A.  No, but I'm more than sure he didn't.

23   Q.  Well, you responded no.

24   A.  Yeah, I'm more than sure he didn't.

25   Q.  Can't hear you.

1   A.  I say I don't recall that question from her, but I'm more than

2   sure he didn't.

3   Q.  And you never asked him to help you with your studies, did you?

4   A.  No.

5   Q.  Mr. Hardy, he would extend kindnesses and courtesies to elderly

6   people, would he not?

7   A.  Well, I know of his friend's grandmother, I don't know --

8   Q.  I'm sorry, I didn't mean to --

9   A.  No, I'm saying that's the person I know he would go and sit and

10  chat with but, you know.

11  Q.  Let me phrase it this way:  He would like hold the door for

12  elderly people, right?

13  A.  Yes.

14  Q.  He wouldn't do it for you, though?

15  A.  Yes, he would.

16  Q.  Oh, he would?

17  A.  I mean, if we were going somewhere.  I mean, not to the point

18  of just --

19  Q.  But he was polite enough that he would hold the door?

20  A.  Yeah, uh-huh.

21  Q.  And he also played card games, didn't he?

22  A.  Yes.

23  Q.  What kind of games did he play?  Tonk?

24  A.  Pitty-Pat and Tonk.

25  Q.  What's Tonk?

```
 1   A.  It's a card game that you're mating up the pairs of the same,

 2   like the hearts.

 3   Q.  Did he play with you?

 4   A.  Yes.

 5   Q.  He knew how to play, right?

 6   A.  Yeah.  A kid could play that game.

 7   Q.  But he wasn't much of an athlete?

 8   A.  No.

 9   Q.  He would ask people opinions whom he felt knew more about a

10   certain thing than he did, right?

11   A.  Probably ask anyone's opinion who was right there pertaining,

12   say, if, like I said, if he is asking about his outfit and if you

13   were standing there, he would ask you, you know, what you felt

14   about what he had on.

15   Q.  I can barely hear that.

16   A.  I said, like if he had an outfit on him and if you were

17   standing there, he would ask you what you felt about what he had

18   on.

19   Q.  So he didn't go out of his way to ask the opinion of other

20   people on various things whom he felt knew more than he did, is

21   that a no?

22   A.  I mean, if it was pertaining to a car and he had to bring his

23   car to the shop, he would bring it to who knew about a car.

24   Q.  Well, do you remember when Dr. Hayes asked you on March 22nd,

25   how was he about making decisions, do you know how you responded,
```

1    do you remember?

2    A.   No.

3    Q.   Let me show you the transcript.

4    A.   Yeah.

5    Q.   How was he about making decisions, so I want you to read that

6    response right here if you would (INDICATING).

7    A.   "That's where I would say a lot of times he would ask people

8    who felt knew more than him their opinions."

9    Q.   Who he felt.

10   A.   Knew more than him, their opinions.

11   Q.   Right.  You didn't qualify it with only like clothes and cars.

12        Now -- and he would reject people's opinions on occasion as

13   well, correct?

14   A.   I mean, I could only speak for times that I know, like, he

15   would go to someone that knew about cars or, you know, opinions on

16   clothes or --

17   Q.   Well, the question is this, and you were asked this before,

18   that Mr. Hardy would on occasion, he would reject other people's

19   opinions as well, correct?

20   A.   I guess, depending on what the situation is, I guess.

21   Q.   Well, you told Dr. Hayes depending on who it was he would.  So

22   there would be occasions where he wouldn't blindly follow someone's

23   opinion, but he would assess it and on occasion he would reject it,

24   correct?

25             MR. LARSON:  I would ask that the witness be shown the

```
 1   transcript and we be given a page.
 2              THE COURT:  She hasn't contradicted.  I don't know that
 3   she's contradicted yet.  Did you follow his question?
 4              MR. McMAHON:  Before I was interrupted.
 5              THE WITNESS:  Yeah --
 6   BY MR. McMAHON:
 7   Q.  Did you recall the question?
 8   A.  I said I guess, depending on the situation.
 9   Q.  And Mr. Hardy, I guess you and he get into theological
10   discussions about the Bible?
11   A.  He would get into discussions with my daughters, he would tell
12   them things.  Like he wrote something in a letter and telling them
13   about the Bible, and I wasn't in agreeance with it.
14   Q.  You didn't agree with his --
15   A.  With his interpretation.
16   Q.  And he would write these little interpretations about the
17   Bible.  These were in letters, correct?
18   A.  Some of them, yeah.
19   Q.  And some over the phone?
20   A.  Yes.
21   Q.  But occasionally in letters.
22   A.  Yeah, sometimes.
23   Q.  And your daughters would show you the letters?
24   A.  Uh-huh.
25   Q.  And a lot of times you wouldn't agree with his particular
```

1  interpretation of the Bible, right?

2  A.  Yes.

3  Q.  And he paid the bills, didn't he, he made sure that the bills

4  were paid?

5  A.  Well, I would get the money from him to pay the bills.

6  Q.  Well, on page 54 of the transcript you told Dr. Hayes, quoting,

7  "I didn't pay the bills, he paid the bills."  Now --

8  A.  Can I read that?

9  Q.  -- he gave you the money to make sure the bills were paid.

10  A.  Yeah, so.

11  Q.  But you were the one who had to go down to the water company or

12  wherever, right?

13  A.  Yes, I would get --

14  Q.  He didn't physically go down and -- but he gave you the money?

15  A.  Yes, I would go to him for the money for the bills.

16  Q.  And he made sure the bills -- that you got the money so the

17  bills were paid, right?

18  A.  I would go to him for the money to pay the bills, I kept up

19  with that.

20  Q.  So you were the accountant --

21  A.  If he had the money --

22  Q.  -- of the family?

23  A.  He had the money and I would pay the bills.

24  Q.  That wasn't quite my question.  You were the one who kind of

25  like -- you were the accountant, you kind of took care of that,

```
 1    that was your little job, not his, right?

 2    A.  I paid the bills.

 3    Q.  Kind of evasive, but I'll go on.

 4              MR. LARSON:  Objection, your Honor.

 5    BY MR. McMAHON:

 6    Q.  Who is Girod?

 7    A.  Girod used to stay in the building with Paul and them in the

 8    Calliope.

 9    Q.  Is he still alive, is he around?

10    A.  I don't know.

11    Q.  I need to clear something up a little bit.  You said you didn't

12    go out to eat?

13    A.  If you say McDonald's, Wendy's, stuff like that, yeah.  But to

14    restaurants, no.

15    Q.  No restaurants?

16    A.  (WITNESS SHAKES HEAD IN THE NEGATIVE.)

17    Q.  Do you know where Anita's is on Tulane?

18    A.  Yes.

19    Q.  Page 47, 48.  Do you remember telling Dr. Hayes:  "One night we

20    went and sat in Anita's on Tulane"?

21    A.  Uh-huh, that was years down the line that we went there to eat.

22    Not when we -- your question was about when we first met and he had

23    shown me attention.

24    Q.  No, my question was, did you ever go out to restaurants?

25              THE COURT:  Stop, stop, stop.  Okay.  Go ahead and ask
```

1    the question, Mr. McMahon.

2    BY MR. McMAHON:

3    Q.  My question was, did you ever go out to eat in restaurants?

4    A.  Okay.  We went to Anita's once.

5    Q.  That was the only other -- apart from McDonald's, that's the

6    only restaurant you and he ever went to?

7    A.  The only one I can remember.

8    Q.  Anita's once, in all of the time you've known him?

9    A.  I went to Anita's with him once.

10              MR. McMAHON:  Thank you, Ms. Van Buren.

11              THE COURT:  Any redirect?

12                              REDIRECT EXAMINATION

13   BY MR. LARSON:

14   Q.  Ms. Van Buren, how old were you when you first met Paul Hardy?

15   A.  Fourteen.

16   Q.  Did the things that impressed you when you were 14 still

17   impress you now?

18   A.  No.

19   Q.  And when Dr. Swanson interviewed you at your workplace, how did

20   you end up that that was the place of the interview?

21   A.  Because I had to go to work, I was the manager that was on

22   duty, and she asked was it okay for her to come there and I told

23   her yes, that we would be able to get some time.

24   Q.  Did she originally ask to meet with you someplace else?

25   A.  Yes.

```
 1   Q.  And where was that?
 2   A.  My home.
 3   Q.  And so it was -- was it your request to be at the restaurant?
 4   A.  No.
 5   Q.  Now, did you routinely leave your children alone with Paul when
 6   the two of you were together?
 7   A.  No.  No.
 8   Q.  And why not?
 9   A.  I just never did.  It wasn't the fact that I felt like he was
10   going to harm them or anything, but I guess just being a mother I
11   just always had them with me.
12   Q.  Did it make you uncomfortable -- did the thought of leaving
13   them alone with Paul make you uncomfortable --
14              MR. McMAHON:  That's a leading question, objection.
15              THE WITNESS:  No.
16   BY MR. LARSON:
17   Q.  How did it make you feel, the thought of leaving them alone
18   with Paul?
19   A.  It wasn't a problem to me.  I mean, I know he's not going to
20   hurt his kids or do anything to harm them, so there was no problem
21   with me leaving them there with him.
22   Q.  Now, what was required for Paul to clean up after the dogs?
23   A.  He would put on a rain suit over his clothes and go out back
24   with the shovel and a hose pipe.
25   Q.  A shovel and a hose?
```

1    A.  Yeah.

2    Q.  Anymore complicated equipment involved in cleaning up after the

3    dogs?

4    A.  No.

5    Q.  Now, you described situations where you went to, I think,

6    Celebration Station --

7    A.  Uh-huh.

8    Q.  -- with Paul and the children?

9    A.  Yes.

10   Q.  And I think Chuck E. Cheese's?

11   A.  Chuck E. Cheese.

12   Q.  Was Paul involved in any of the planning for those?

13   A.  No.

14   Q.  Did he -- what was his role?

15   A.  He was there and invited his friends with their kids.

16   Q.  Now, with regard to the earrings, the custom earrings.  Do you

17   know if anyone was with Paul when he bought those earrings?

18   A.  I want to say I think his brother Wayne was with him.

19   Q.  And Mr. McMahon had asked you if you ever asked Paul to help

20   you with your studies with regard to school.  Why didn't you ever

21   ask Paul?

22   A.  I mean, no particular reason.  I never seen him into books or

23   anything, so . . .

24   Q.  Do you know whether he could have helped you?

25   A.  No, I don't know.

```
 1   Q.  Now, with regard to the letters that Paul sent to your

 2   daughters regarding his interpretation of the Bible.

 3   A.  Uh-huh.

 4   Q.  Why did you disagree with his interpretation?

 5   A.  His understandings of the Bible just seem totally off to me and

 6   the way he was explaining parts of the Bible to them, I just was

 7   not in agreeance with at all.

 8           MR. LARSON:  One moment, your Honor.  I have nothing

 9   further, your Honor.

10           THE COURT:  All right.  You may step down.  Thank you

11   very much.  Nice to see you again.

12           THE WITNESS:  Nice to see you.

13           THE COURT:  We've been at it about an hour and a half, so

14   we'll just go ahead and take our morning break.

15           THE DEPUTY CLERK:  All rise.

16      (WHEREUPON, A RECESS WAS TAKEN.)

17      (OPEN COURT.)

18           THE DEPUTY CLERK:  All rise.

19           THE COURT:  Have a seat, please.

20           THE DEPUTY CLERK:  Please stand and raise your right

21   hand.

22      (WHEREUPON, JAVETTA FRANKLIN, WAS SWORN IN AND TESTIFIED AS

23      FOLLOWS:)

24           THE DEPUTY CLERK:  Please be seated, state your name for

25   the record and spell it for us.
```

1              THE WITNESS:  My name is Javetta Franklin, J-A-V as in

2  Victor E-T-T-A F-R-A-N-K-L-I-N.

3              MS. FOURNET:  May I proceed, your Honor?

4              THE COURT:  Sure, uh-huh.

5                          DIRECT EXAMINATION

6  BY MS. FOURNET:

7  Q.  Ms. Franklin, where do you live?

8  A.  In Arlington, Texas.

9  Q.  And how long have you been living in Arlington?

10 A.  Since Hurricane Katrina.

11 Q.  Are you currently working in Texas?

12 A.  No, ma'am, but I do have a job that I should be starting as of

13 Monday.

14 Q.  And where is that job?

15 A.  It will be with the Grapevine Colleyville School Board.

16 Q.  Now, you stated for the record that your name is Franklin.  Did

17 you have a different last name at some point?

18 A.  Yes, I did, it was Cooper.

19 Q.  And where did the name Cooper come from?

20 A.  I was married for five years.

21 Q.  And about when did that marriage end?

22 A.  I want to say somewhere around the middle part of the '90s.

23 Q.  How long have you been going by Javetta Franklin instead of

24 Javetta Cooper?

25 A.  Since the divorce.

1    Q.  So ten, more than ten years?

2    A.  More than ten years.

3    Q.  Ms. Franklin, do you know Paul Hardy?

4    A.  Yes, I do.

5    Q.  When did you meet Paul Hardy, approximately?

6    A.  I want to say around, right after the Martin Luther King parade

7    in 1985.

8    Q.  And how are you sure it was 1985?

9    A.  Because it was, like I said, right after a Martin Luther King

10   parade celebration and it was going into the Mardi Gras season.

11   Q.  And did you have a child born that year as well?

12   A.  Yes, I did.

13   Q.  And what child would that be?

14   A.  Jacquetta Kristia Franklin.

15   Q.  And what was Jacquetta's date of birth?

16   A.  11/20/1985.

17   Q.  And who is Jacquetta's father?

18   A.  Paul Hardy.

19   Q.  Your date of birth, Ms. Franklin, is what?

20   A.  February the 29th, 1968.

21   Q.  And do you know Paul's date of birth?

22   A.  I want to say it's October of 1967.  The exact date, I do not

23   know.

24   Q.  But he would be about four months older than you, is that about

25   right?

1  A.  That's about correct.

2  Q.  And when you met Paul, how old were you?

3  A.  I was 16.

4  Q.  And how old would Paul have been?

5  A.  He was 17.

6  Q.  Now, was your daughter Jacquetta, was she born -- did she have

7  a nine-month period for her birth or was she born early or late?

8  A.  Jacquetta was actually born a premie at seven months.

9  Q.  And what is Jacquetta doing now?

10  A.  She is serving in the United States Air Force.

11  Q.  And is she stationed anywhere right now?

12  A.  Right now she is stationed in Tampa, Florida, and she will be

13  leaving out on Monday to go to Afghanistan.

14  Q.  You mentioned that you met Paul in 1985, and I would like you

15  to tell the judge the story, if you will, of exactly how you met

16  Paul, who you were with, who he was with, where this occurred, and

17  so on.  Let's tell the court exactly how that occurred.

18  A.  It was one day around, like I said, around the Mardi Gras

19  season that me and my family, which was my mother and my two

20  sisters and my brother, we were walking down Canal Street, towards

21  Canal and Rampart by the Popeye's, and Paul and one of his friends

22  or coworkers was walking behind us.  And he started whistling, you

23  know how guys whistle at a girl, and I turned around just slightly

24  and then I just kept on walking to the bus stop, and him and his

25  friend was behind me.

```
 1            We stopped at our bus stop that was on Canal and Rampart

 2    by Popeye's.  Paul and his friend stopped to talk to me and his bus

 3    stop was the next stop over, which is on Canal right by the Joy and

 4    the Lower State Theater (SIC).  And we exchanged numbers, we

 5    conversated for a little while, and him and his friend went to

 6    their bus stop and me and my family got on our bus to go home.

 7    Q.  That day did you see Paul alone waiting for a bus?

 8    A.  No, ma'am.

 9    Q.  Did you see Paul alone at all that day?

10    A.  No, ma'am.

11    Q.  Now, were you contacted several months ago in the summer by

12    this blonde-haired lady here (INDICATING)?

13            MR. McMAHON:  That's Dr. Hayes, not a blonde-haired lady.

14            MS. FOURNET:  Dr. Hayes.

15            THE COURT:  Well, we've had a little disparaging on both

16    sides of the experts, so . . .

17            MS. FOURNET:  I am not disparaging, Judge, she doesn't

18    know the lady's name.

19            THE COURT:  Well, I am just saying both sides need to

20    step it up a little bit.

21            MS. FOURNET:  Okay.

22    BY MS. FOURNET:

23    Q.  Do you recall meeting with this lady here, whose name by the

24    way is Dr. Hayes, do you recall meeting with her back in the

25    summer?
```

1    A.  Yes.

2    Q.  Prior to today and prior to meeting with the lawyers and

3    learning her name, did you know her name?

4    A.  I can't recall if, you know, I can remember her name or

5    anything like that.  I was basically trying to get ready for work

6    was what I was trying to do.

7    Q.  By the time she left that day -- and I am going to jump ahead,

8    we'll go back to the beginning of the meeting -- by the time she

9    left that day, after she had left, if somebody had been there and

10   said what was that lady's name, would you have known the answer to

11   that question?

12   A.  No.

13   Q.  Now, would this have been in about June or July that these

14   people came by your house?

15   A.  It would be somewhere up in that range, June or July.  The

16   exact month and date I cannot remember.

17   Q.  And were you working at that time?

18   A.  Yes, I was.

19   Q.  Where were you working at that time?

20   A.  I was working at Nova One, which is a call center in Ft. Worth,

21   Texas.

22   Q.  And was this date that we're talking about, the date that you

23   had the visit, was this a workday?

24   A.  Yes.

25   Q.  And what time were you supposed to be at work that day?

1    A.  Two o'clock.

2    Q.  Two o'clock.  You're going to need to speak up just a little

3    bit.

4    A.  Two o'clock.

5    Q.  Was this the kind of job that you could be late and expect to

6    have your job?

7    A.  No, ma'am.

8    Q.  Or miss a day?

9    A.  No.

10   Q.  What would have happened if you had been late or missed a day?

11   A.  I would have been fired.

12   Q.  Now, when you went to work at this job, how did you get to

13   work, did you drive yourself or did -- how were you to get to work

14   that day?

15   A.  One of my coworkers picks me up.

16   Q.  And what time on this particular day would you have expected

17   your coworker to pick you up?

18   A.  I mean, it depends, because if we have to drop off her baby at

19   the baby-sitter, she should get to me somewhere around one, 1:15;

20   if we don't have to drop her off at the baby-sitter, then sometimes

21   it will be somewhere around 1:15, 1:30 that she be there to pick me

22   up.

23   Q.  Do you recall if on this particular day she had to drop her

24   child off?

25   A.  No, she didn't.  When she came to pick me up, she was by

1    herself.

2    Q.  Now, what were you doing when you realized that somebody was at

3    your apartment?

4    A.  I was actually in the shower.

5    Q.  And is this a one-story or a two-story apartment?

6    A.  It's a two-story, it's a town home.

7    Q.  And at what time -- well, what happened to make you realize

8    that somebody was there to see you?

9    A.  When I heard a strange knock on the door, the first time I

10   heard it, I asked who, you know, I went to see who was it and I

11   didn't see anybody and nobody answered, so I went and got back in

12   the shower.

13   Q.  You said a strange knock.  What do you mean by strange?

14   A.  Like somebody's going to beat my door down.

15   Q.  You were up -- you were in the upstairs shower?

16   A.  Yes.

17   Q.  But you heard the knock?

18   A.  Correct.  It was loud enough where I can hear it, that's how

19   hard they were knocking.

20   Q.  And about -- and I know you probably don't know the exact time,

21   but about what time would you have heard this knock?

22   A.  It had to have been, I want to say somewhere around 12, 12:30,

23   something like that.  I am not quite sure.

24   Q.  And what did you do when you heard the knock?

25   A.  I mean --

1    Q.  I'm talking about the first time, when you heard the knock the

2    first time, tell me what you did.

3    A.  Okay.  The first time when I heard the knock, I looked out the

4    window to see who was it at my door and then I went to like the top

5    of the stairs to say who is it, and I said it three times, and

6    nobody answered.  So when nobody answered and I didn't see anybody,

7    I went and got back in the shower.

8    Q.  Did you look out the window at all?

9    A.  Yes, ma'am.

10   Q.  And what did you see when you looked out the window?

11   A.  The first time I didn't see anything when I looked out the

12   window.

13   Q.  So you went back upstairs to take your shower?

14   A.  That's correct.

15   Q.  And what happened when you went back upstairs?

16   A.  I got in the shower.  Like I said, I got in the shower and then

17   I heard the knock again.

18   Q.  And was it a loud knock, soft knock?

19   A.  Extremely loud.

20   Q.  And when you heard this knock a second time, what did you do?

21   A.  I actually got out the shower, put my same clothes on that I

22   had on before I got in the shower, and went to the top of the

23   stairs again to see who was it knocking at the door.  No one

24   answered.  And then I went to the side window to look out the

25   window to see if I seen anybody.  I saw either the SUV was either

1    white or silver, they were just sitting there.  The first time when

2    I looked out the window that vehicle wasn't sitting there.

3    Q.  And could you see whether anybody was in the vehicle?

4    A.  I couldn't tell if anybody was in the vehicle or not.

5    Q.  And the clothes that you put on, were these your work clothes?

6    A.  No, ma'am.

7    Q.  These were your dirty clothes that you had taken off before you

8    got in the shower?

9    A.  That's correct.

10   Q.  Did you have shoes on?

11   A.  No.

12   Q.  What happened next?

13   A.  I went down, all the way down the stairs at this time because

14   they still were knocking.  So I said, who is it?  They didn't say

15   anything.  I said who is it again.  They didn't say anything.  I

16   said who is it for the third time, and they didn't say anything;

17   and I said, well, you might get in, but you're not getting out.

18   And that was when he said the FBI.

19   Q.  Now, how did you feel when, after hearing these loud knocks on

20   two different occasions, a person outside your door announced

21   himself as this is the FBI?

22   A.  I felt like I did something wrong, but I know I didn't do

23   anything wrong, so it was more or less like an intimidation because

24   I didn't know why they were knocking on my door.

25   Q.  Well, let me ask you this, Ms. Franklin:  Did anybody call you

1  or let you know these people were coming?

2  A.  No, ma'am.

3  Q.  Were you expecting a visit from the FBI?

4  A.  No.

5  Q.  Were you expecting a visit from Dr. Hayes?

6  A.  No.

7  Q.  Have you met in the past with people like Ms. Rogers and

8  Mr. Lowman who work for me?

9  A.  Yes.

10  Q.  And how did you come to meet them, did they just show up at

11  your door?

12  A.  No, ma'am.

13  Q.  What happened when you opened -- did you open the door?

14  A.  Yes.

15  Q.  And what happened when you opened the door, what's the first

16  thing that happened?

17  A.  Well, before I opened the door I asked him to give me a minute

18  because I really wanted to put another pair of pants on because I

19  had on some short-shorts, and some shoes on my feet, so I went back

20  upstairs and put some pants on and some shoes, and then I opened

21  the door and he presented himself.  I cannot recall his name, but

22  he showed me his badge and he said he had a few people that wanted

23  to talk to me, and he waited for them to get out of the vehicle.

24  Q.  When you say them, so you're talking to one man, he showed you

25  a badge, and when you say he had some people that wanted to talk to

1    you, how many people are we talking about initially?

2    A.   Initially, two.

3    Q.   After he showed you his badge and told you he had people that

4    wanted to talk to you, did he tell you about what they wanted to

5    talk to you?

6    A.   No, he just said that they have two people that wanted to talk

7    to me.

8    Q.   And then what happened after he told you that?

9    A.   When -- after he told me that, he waited for them to get out

10   the vehicle.

11   Q.   Okay.

12   A.   And that was when the lady in the middle and a guy got out of

13   the vehicle and came over there.  And the young lady introduced

14   herself, I cannot recall her name, and then she introduced the

15   gentleman.  And I want to say, if I am not mistaken, but I really

16   can't recall what his name was, but, you know, she just introduced

17   her and him to me.

18   Q.   And at that point what did the first guy do, the guy that

19   showed you the badge?

20   A.   He went and got back into his vehicle.

21   Q.   And once the lady introduced herself, did the other guy stay,

22   the guy that had come up there with her?

23   A.   No, he also got back into the vehicle.

24   Q.   Now, I want you to tell me, as best you can, what this lady in

25   the middle here, Dr. Hayes, told you was the reason she was there?

1  A.  The reason, if I can recall, I mean, I'm not quite sure, you

2  know, I can't remember everything that she said, but if I am not

3  mistaken, I think she said that she was coming, you know, to talk

4  about Paul, she was like representing Paul.  So I am not quite sure

5  what her exact words were.  Like I said, I was trying to get ready

6  for work and I really didn't want to be bothered with nobody.

7  Q.  And did you tell her that?

8  A.  Yes.

9  Q.  Did you tell her that more than once?

10  A.  Yes.

11  Q.  Did you tell her what time you had to be to work?

12  A.  Yes.

13  Q.  Did you tell her you were waiting for a ride?

14  A.  I don't recall or remember if I told her I was waiting for a

15  ride.  Like I said, I just wanted to be left alone.

16  Q.  And did you communicate that to her one way or the other?

17  A.  Yes.

18  Q.  And did she at any time say, well, can I come back at a more

19  convenient time?

20  A.  She did and I said no.

21  Q.  And why was that?

22  A.  Because I didn't want to be bothered.

23  Q.  Did she ask to come into your house?

24  A.  Yes.

25  Q.  What did you say?

1    A.  No.

2    Q.  Why?

3    A.  Because I am not comfortable with strange people coming into my

4    house.

5    Q.  Do you think if you had had a call in advance and had known a

6    little bit more about --

7            MR. McMAHON:  Objection, that this is speculative and

8    irrelevant.

9            THE COURT:  Sustained.

10           MS. FOURNET:  Well, it's certainly not irrelevant, your

11   Honor.

12           THE COURT:  But it's speculative.  Sustained.

13   BY MS. FOURNET:

14   Q.  Ms. Franklin, did you want to talk to this lady?

15   A.  I mean, I really didn't want to talk to anyone, but by the FBI

16   knocking on my door, and like I said earlier, I felt intimidated

17   like I had to talk to them.

18   Q.  Did she ask you if she could tape the interview?

19   A.  Yes, she did.

20   Q.  And what did you say?

21   A.  No, because I was not comfortable with no one recording me.

22   Q.  And why were you not comfortable?

23   A.  Like I said earlier, I am just not comfortable being taped by

24   no one.

25   Q.  Have you ever dealt with the FBI before?

1  A.  No.

2  Q.  Was it made clear to you at any point, because you said earlier

3  that you thought that she was for Paul, was it made clear to you by

4  Dr. Hayes or by anybody else that she was actually there for the

5  government?

6  A.  No, I can't recall.  The only thing I remember her saying is

7  she was there, you know, to help Paul, that was all I remember.

8  Q.  Did she ask you any questions to make sure that you understood

9  exactly who she was and what she was doing there?

10  A.  I can't really recall, like, everything that she said.

11  Q.  Well, let me ask it to you this way:  Throughout this

12  interview, did you have a clear understanding of who she was or who

13  she was there for?

14  A.  No.

15  Q.  What was foremost in your mind during this interview, what were

16  you thinking about?

17  A.  I want to go to work, I want her to disappear.

18  Q.  Do you recall if Dr. Hayes said she was a psychologist?

19  A.  I really, really don't remember what she said she was.

20  Q.  Now, what -- did she then proceed to ask you some questions?

21  A.  Yes.

22  Q.  And where did that questioning take place?

23  A.  Sitting outside of my door on the little stoop.

24  Q.  On a stoop?

25  A.  Yes, which is concrete.

1  Q.  On the concrete step?

2  A.  Yes.

3  Q.  And what all did she have with her?

4  A.  I want to say she had her purse, a yellow legal pad and one

5  piece of white paper.

6  Q.  Did she have any kind of form, not later, I'm not talking about

7  later, but that day did you see anything like this with the lady

8  (INDICATING)?

9  A.  No.  What is that?

10 Q.  We'll talk about that in a minute.  Did you see this

11 (INDICATING)?

12 A.  No, no.

13 Q.  Did she tell you she was giving you a test?

14 A.  No.

15 Q.  Of any kind?

16 A.  No.

17 Q.  Did you see her writing things, notes?

18 A.  I seen her writing notes, but I've never seen that.

19 Q.  Did you see her making little circles on something like this

20 (INDICATING)?

21 A.  No.

22 Q.  Did she appear to have any information about you while she was

23 questioning you?

24 A.  Some.

25 Q.  What did she appear to know about you that you didn't tell her?

```
 1    A.  First of all, they called me Cooper, I don't go by Cooper.
 2    Second of all, if I am not mistaken, I think they had the telephone
 3    number, like my phone number.
 4    Q.  Your cell phone number?
 5    A.  Yes.
 6    Q.  And where did you get the idea she had your cell phone number?
 7    A.  Because if I can remember, I want to say she called it to me, I
 8    am not quite sure.
 9    Q.  And was it the correct telephone number that you had at that
10    time?
11    A.  Yes.
12    Q.  How did you feel when you found out she had your cell phone
13    number?
14    A.  I mean, I felt uncomfortable, but like I said, you know, I
15    don't -- I can't really quite, you know, remember.
16    Q.  How long do you think you talked to her, approximately?
17    A.  I want to say somewhere around 45 minutes to an hour at the
18    most.
19    Q.  And you said that you were sitting out on the stoop.  What
20    was --
21              MR. McMAHON:  Your Honor, I am going to object.  Can we
22    get to something relevant here?  What's the point?
23              THE COURT:  Well, I assume a point is going to appear.
24    So overruled.  Go ahead.
25              MS. FOURNET:  A great deal of the point will be in
```

1    Dr. Swanson's testimony.

2              THE COURT:  No, I understand.  I'm not troubled.

3              MS. FOURNET:  Okay, thank you.  I'm sorry, I lost my

4    place now.

5              THE COURT:  You're on the stoop.

6    BY MS. FOURNET:

7    Q.  You're on the stoop in June or July, what was the weather like?

8    A.  Hot.

9    Q.  Like how hot?

10   A.  About 106 degrees.

11   Q.  106 degrees.

12             And I want you to describe, if you can, how the

13   questioning went and how you responded to different questions.

14   A.  Sometimes it would be questions, sometimes it would be made

15   like statements, and like for some of them I would be like,

16   whatever you say or if you say so.  It never would be an

17   indirect -- direct question, answer like yes or no, all the time,

18   or I would give like an example.

19   Q.  Well, why would you just say to some of this stuff "if you say

20   so," what was behind that?  What was going on with you to say just

21   "if you say so"?

22   A.  I wanted to finish getting ready for work.

23   Q.  And how many times altogether do you think you told her you had

24   to go to work?

25   A.  I'm going to say maybe three or four times.

1   Q.  And, in fact, towards the end of the interview was it getting

2   close to the time for your ride to pick you up?

3   A.  By that time my ride showed up.

4   Q.  And when the ride showed up, what did you say to Dr. Hayes?

5   A.  I told her that I needed to finish getting ready for work.

6   Q.  And what did she say when you told her you needed to finish

7   getting ready for work?

8   A.  If I can recall, I want to say, and I am not sure, but I want

9   to say she said, "Give me at least five more minutes."

10  Q.  Now, after the interview was completed, did you ask Dr. Hayes

11  for anything?

12  A.  I asked her for her card.

13  Q.  And did she give you her card?

14  A.  No, she didn't have any.

15  Q.  Did she write her name and phone number down?

16  A.  No.

17  Q.  By the time the interview was over with and she left, how were

18  you feeling about what had just happened?

19          MR. McMAHON:  Objection.  It's irrelevant.

20          THE COURT:  Well, yeah -- okay.  Overruled.  I didn't

21  like the phraseology, but I don't know if you can get it any

22  better.

23          MS. FOURNET:  Well, I can ask it a different way.

24          THE COURT:  Yeah, okay, it's a little floaty.

25  BY MS. FOURNET:

1   Q.  After this interview was over, did you call somebody?

2   A.  Yes, I did.

3   Q.  Whom did you call?

4   A.  I called my daughter Jacquetta.

5   Q.  And what prompted you to call your daughter Jacquetta?

6   A.  Because Dr. Hayes asked me something that just threw me for a

7   loop and I had to call my daughter, you know, to ask her, you know,

8   who are these people.  And she asked me to describe them and I did,

9   and she was like, no, mom, that is not my dad's lawyers.

10  Q.  Did you understand prior to when your daughter told you that,

11  did you fully understand which side this lady was on?

12  A.  No.

13  Q.  Now, after that -- well, let me ask you something else.  Did

14  you tell Dr. Hayes -- and I'll show you --

15          MS. FOURNET:  May I approach the witness?

16          THE COURT:  Okay, what's --

17          MR. McMAHON:  No, objection, that's not the proper form.

18  And that she is beginning to lead.  "Did you tell Dr. Hayes,"

19  that's inherently a leading question.  And she is about to show the

20  witness a portion of Dr. Hayes's report.

21          THE COURT:  Well, I think --

22          MR. McMAHON:  We have to lay some kind of a predicate

23  here.

24          THE COURT:  Well, I think did you tell doctor -- well, be

25  a little more specific, I suppose, but did you tell Dr. Hayes seems

1    like a pretty fair question.

2            MS. FOURNET:  I don't know how else to ask it unless I

3    just ask her.

4            THE COURT:  Yeah, go ahead and ask the question.

5    Overruled.

6    BY MS. FOURNET:

7    Q.  Did you tell Dr. Hayes that Paul Hardy could fry chicken?

8    A.  If I am not mistaken, let me recall because cooking can mean

9    heating on top of the stove or in the microwave.  And food is

10   already done.  So when you're saying cooking, that is something out

11   of the can, that can be heated in the microwave or the stove.  It

12   depends on how you look at the cooking terminology.

13   Q.  Well, could Paul fry chicken?

14   A.  No.

15   Q.  Did you ever see Paul fry chicken?

16   A.  No.

17   Q.  What did you ever see Paul do that had to do with chicken and

18   cooking chicken?

19   A.  Heating it in a microwave?

20   Q.  Did you tell Dr. Hayes that in addition to frying chicken Paul

21   could cook meatballs and spaghetti?

22   A.  Are you talking about Chef Boyardee out the can?

23   Q.  No, I am talking about pasta, rolling the meatballs --

24   A.  No.

25   Q.  -- seasoning the meat.  Did you tell her he could do all of

1    that?

2    A.  I don't recall telling her that he can cook meatballs and

3    spaghetti from scratch.

4    Q.  What could Paul do with respect to meatballs and spaghetti?

5    A.  Open up the can and put it in a bowl and put it in the

6    microwave.

7    Q.  So you're talking about Chef Boyardee?

8            THE COURT:  Whoa, whoa, don't run over her.

9            MS. FOURNET:  I'm sorry.  I didn't ment to step on her

10   toes.

11   BY MS. FOURNET:

12   Q.  Go ahead, say that again.

13   A.  Opening up a can, putting it in a bowl and putting it in the

14   microwave.

15   Q.  Do you recall if you talked to Dr. Hayes about the Chef

16   Boyardee meatballs and spaghetti?

17   A.  I cannot remember, you know, quite exactly, but the cooking

18   term, it goes back to which cooking term you're referring to.

19   Q.  Have you ever seen Paul cook anything other than just heating

20   stuff up in the microwave?

21   A.  No.

22   Q.  When you and Paul were together, whose house would you be at?

23   A.  I mean, it depends because sometimes we would be at his house

24   and sometimes we would be at my mother's or my grandmother's house,

25   it just depends.

1   Q.   Did you ever see him clean his momma's house?

2   A.   No, his mother's house was always cleaned.

3   Q.   Did he ever go behind others and pick up?

4   A.   No.

5   Q.   Did you ever say that he did to Dr. Hayes?

6   A.   I can't recall if I said it or not.  Like I said, I was just

7   ready, basically just wanted to be left alone so I could get ready

8   for work.

9   Q.   When Dr. Hayes was asking you these questions, would she --

10  before she asked each question, would she say, now I want you to

11  talk about Paul, I want you to answer this question when Paul was a

12  certain age?  Like I only want to talk about when Paul was 17 now,

13  or I only want to talk about when Paul was 22 now?  Did she give

14  you any limitations like that?

15  A.   Are you referring to like age brackets?

16  Q.   Yes.

17  A.   No.

18  Q.   Have you ever seen Paul fix anything?

19  A.   What do you mean fix anything?

20  Q.   Well, like use a hammer and nails, screwdriver, pliers?

21  A.   No.

22  Q.   Put a TV, cable, stereo system together?

23  A.   No.

24  Q.   Would you ever send Paul to the grocery store?

25  A.   Are we talking about the supermarket or are we talking about

1    the corner store?

2    Q.   Okay.  If there's a difference, I want you to explain to the

3    judge what the difference is in terms of whether you would send

4    Paul to either one, the small corner store or the supermarket.

5    Let's talk about both.

6    A.   I would send Paul to the corner store because it's more simple

7    and it wouldn't be for anything major, something like a bag of

8    chips or a pack of cookies, something like that, from the corner

9    store.

10            THE COURT:  We need to stop for a second.  Hold up just

11   one second.  We haven't gotten much background on the relationship

12   past going out the first time they met at the Martin Luther King

13   parade.  We went from there, really, to Dr. Hayes's meeting, and

14   rather than, I mean, I am going to do it if you're not.

15            MS. FOURNET:  Yes, I understand, Judge, and that's a good

16   point.

17            THE COURT:  But we need to just establish something past

18   the Martin Luther King day to give a foundation for these

19   questions.

20            MS. FOURNET:  Sure, absolutely, Judge.

21   BY MS. FOURNET:

22   Q.   Let's go back to when you met Paul.  How long did y'all date?

23   A.   I want to say, I broke up with Paul maybe a week or two after

24   his brother was buried.

25   Q.   And that would have been?

A.  Curtis.

Q.  Curtis.  And would that be 1985 when Curtis was murdered?

A.  Yes.

Q.  So y'all were together until sometime in 1985, probably after, shortly before, shortly after May when Curtis was killed?

A.  Yes.  I really wanted to break up with him before that, but by Curtis being killed and the stress that they were going through, I just waited until after.

Q.  Were you pregnant when you broke up with Paul?

A.  I don't remember if I was pregnant or not because I didn't find out until August.

Q.  Did you tell him at first?

A.  No.

Q.  And your daughter, I think you said earlier, was born in November?

A.  That's correct.

Q.  Now, after your daughter was born in November, how much contact did you have with Paul?

A.  None, till about maybe when she was six months to a year, and I wasn't the one to contact Paul to tell him that I had Jacquetta.

Q.  Who contacted Paul?

A.  My grandmother.

Q.  And so when Paul was about -- when Jacquetta was about six months old, your grandmother contacted Paul and told him about the baby?

1   A.  That's correct.

2   Q.  After your grandmother told Paul about the baby, did you have

3   any contact with him?

4   A.  Yes.

5   Q.  When did that contact start and how often was it?

6   A.  I want to say the contact started a week after my grandmother

7   contacted Paul to let Paul know that Jacquetta was born, and it was

8   more or less like every weekend, if not every weekend, every other

9   weekend.

10  Q.  And until 2005 until Katrina hit, that would have been here in

11  the city?

12  A.  Yes, that's correct.

13  Q.  Now, the contact that you had with him during that time period,

14  was that mostly contact with you or is that mostly contact with

15  your little girl?

16  A.  It was mostly contact with my daughter.

17  Q.  And did he come and see Jacquetta?

18  A.  Yes.

19  Q.  And when he came, would anybody take him or would he come by

20  himself?

21  A.  I have never seen Paul by hisself, he's always had someone with

22  him at all times.

23  Q.  But this visitation continued along the lines you've described

24  until he was arrested in '94; is that fair to say?

25  A.  That's correct.

1   Q.  Now, you said you never saw Paul alone.  Let's talk about that

2   a little bit.  How did your relationship work in terms of seeing

3   somebody and spending alone time with him?  Tell the judge --

4           THE COURT:  Are we going back to January to May of '85,

5   is that the period we're talking about?

6           MS. FOURNET:  I'm talking about early in the relationship

7   and I think throughout it, Judge, is my understanding, throughout

8   the time they were seeing each other.

9           THE COURT:  Okay.  As I understand it, and correct me if

10  I'm wrong, from January until May of '85 was when you dated?

11          THE WITNESS:  That's correct.

12          THE COURT:  And then you had no contact with him for,

13  what, approximately six months or so?

14          THE WITNESS:  I want to say, you know, after they buried

15  his brother Curtis, I broke off the relationship with him, and I

16  had had no contact with him since then until my grandmother called

17  him and let him know about Jacquetta.

18          THE COURT:  And at that point he started coming around to

19  see your daughter?

20          THE WITNESS:  That's correct.

21          THE COURT:  Whatever way you want to direct it, but I

22  think those are two discrete periods.

23          MS. FOURNET:  You're right, Judge, and I'm sorry if I

24  haven't been as clear as I should have been.

25  BY MS. FOURNET:

```
 1   Q.  Javetta, you saw each other for a relatively short period of
 2   time is what it sounds like.
 3   A.  That's correct.
 4   Q.  Now, during that short period of time, how easy was it for you
 5   as a girlfriend to spend time with Paul alone?  And explain why it
 6   was easy or not easy to the court.
 7   A.  It wasn't easy because Paul was never by hisself, so it was
 8   like we never had no alone time.  And when someone was with him and
 9   I wanted to spend a little time with him, you know, by ourselves,
10   it was very hard to do that.  They would probably be in one room
11   and we'll be in the other room just conversating, but they never
12   left him by hisself.  So it was very uncomfortable.
13   Q.  And when you were finished spending the time with him, what
14   would happen?  If you spent some alone time with him, what happened
15   when y'all were finished visiting or doing whatever you were doing
16   together?
17   A.  Well, whoever was with him at the time they would leave.
18   Q.  Did you ever go to Paul's apartment?
19   A.  Do --
20   Q.  Did you ever go to his home to visit him when you were dating
21   him?
22   A.  You mean his mother's house?
23   Q.  Right.
24   A.  Yes.
25   Q.  How did you find out how to get to his mother's house?
```

1  A.  His brother Terry explained it to me over the telephone.

2  Q.  Tell the whole story about how you went to Paul's house the

3  first time.

4  A.  The first time I went to Paul's house I caught the bus, and I

5  caught the bus by myself.  And at the time I was staying in the

6  Lower Ninth Ward, and I had to go up to Martin Luther King in the

7  Calliope project.

8  Q.  But how did you find out what buses -- did you talk to Paul

9  before you came to visit?

10  A.  I talked to Paul before I came to visit, but Paul wasn't the

11  one to give me the directions, Terry gave me the directions; and if

12  I can recall, I knew from the Lower Ninth Ward I had to catch the

13  Galvez bus.

14  Q.  Okay.

15  A.  And I caught the Galvez bus to the Canal bus, and I cannot

16  remember the name of the bus that, you know, it was, but it was

17  right off of Claiborne and Martin Luther King was where the bus

18  would drop me off at and then I would walk maybe three or four

19  blocks down to the Calliope project.

20  Q.  How was this meeting set up?  In other words, you said Paul was

21  not one to get directions from.  Did you call Paul to get

22  directions?

23  A.  No.  We were just on the phone at that particular time, and I

24  just asked if I could come over and spend some time with him.

25  Q.  And how did Terry end up on the phone?

```
 1   A.  Because he needed to give me the directions, Paul couldn't give

 2   me the directions.

 3   Q.  Did you ever say that Paul gave you directions to get to his

 4   home to Dr. Hayes or to anybody else?

 5   A.  I don't recall saying that because Terry was the one to give me

 6   the directions.

 7   Q.  I mean, would you have said that?

 8           MR. McMAHON:  Objection, speculative.

 9           THE WITNESS:  I don't recall.

10   BY MS. FOURNET:

11   Q.  Did he have occasion to visit you at your home?  And let's talk

12   about the very first time he came to your home to visit you.

13   A.  Yes, he did, he came to visit me at my home.

14   Q.  And how did he get there?

15   A.  On the bus.

16   Q.  And do you know how he knew which buses to take?

17   A.  No.

18   Q.  Did your brother ever have to meet Paul anywhere?

19   A.  Yes, my brother had to actually meet Paul at his house to bring

20   him back to my house.

21   Q.  And was that the first time or was that some other time that --

22   A.  The first time and several times after that.

23   Q.  And then how would he get back?

24   A.  Either my step dad or my mom would bring him home, or his

25   brother or his sister would pick him up from the house.
```

```
 1   Q.  Did you go out to dinner with Paul ever?

 2   A.  If you're talking about McDonald's and Burger King, I guess you

 3   would call that dinner, but dinner to me is Houston's.

 4   Q.  Did he ever take you to Houston's?

 5   A.  No.

 6   Q.  Did he ever take you anywhere like Houston's --

 7   A.  No.

 8   Q.  -- where you had to sit down with a menu and actually order a

 9   meal in a restaurant?

10   A.  No.

11   Q.  By the way, why did you stop seeing Paul in 1985?

12   A.  It was a time when I was in school and I was on my way to the

13   office, and I just happened to see Paul in the school's office

14   picking up someone else.

15   Q.  To your knowledge, did Paul ever take anybody to an emergency

16   room?

17   A.  No.

18   Q.  Have you ever seen him in an emergency room in a hospital?

19   A.  No.

20   Q.  Have you ever seen Paul get instructions from a doctor?

21   A.  No.

22   Q.  When Jacquetta was a little girl, did you ever send Jacquetta

23   to the doctor with Paul?

24   A.  No, me and my mother would be the ones to take Jacquetta to the

25   doctor or to the emergency room.
```

```
1   Q.  If Jacquetta had hurt herself as a little girl and needed to go

2   to the emergency room, would you have sent Paul by himself to do

3   that?

4   A.  No.

5   Q.  Why not?

6   A.  Because he wouldn't understand, first of all, you know, what to

7   do in that situation; and when it came down to like the doctors or

8   nurses treating her, he wouldn't know what to do also.

9   Q.  Well, did you at any time tell Dr. Hayes that Paul could go to

10  the emergency room, listen to the doctor and make sure the

11  discharge instructions were followed?

12  A.  I don't recall saying that.  I don't really remember saying

13  that.  The thing would be, I mean, it would be hard for Paul to

14  even understand any terminologies that's coming out of the doctor's

15  mouth.

16  Q.  You've said you don't recall saying a lot of things.  What did

17  you say in answer to these questions, if anything, other than yes,

18  no, or if you say so?

19  A.  That would basically be it.  I just wanted to just finish

20  getting ready for work, I wanted to be left alone.

21  Q.  You mentioned Curtis' death.  Did you go to the funeral for

22  Curtis, did you go to the graveyard?

23  A.  Yes, I did.

24  Q.  And how did you get to the graveyard?

25  A.  My mother.
```

1    Q.   And did Paul go to the graveyard?

2    A.   Yes.

3    Q.   And how did he get to the graveyard?

4    A.   Paul was riding in a limousine with his mother and the rest of

5    his family.

6    Q.   Did you ever drive to the graveyard with Paul?

7    A.   No.

8    Q.   Did you tell Dr. Hayes that Paul drove to the graveyard?

9    A.   No.

10   Q.   In fact, have you ever seen Paul drive?

11   A.   No.

12   Q.   Did you ever buy clothes for Paul -- I'm sorry, did Paul ever

13   buy you clothes?

14   A.   No.

15   Q.   Did you tell Dr. Hayes that Paul bought you clothes at

16   Dillard's?

17   A.   I don't recall saying that, I don't remember.

18   Q.   I think there's a mention of a teddy bear.  Tell me the story

19   of the teddy bear.

20   A.   The teddy bear was a gift from the kids, and at the time the

21   teddy bear was given to me Paul was with the kids.

22   Q.   Did Paul go buy the teddy bear by himself?

23   A.   No, the kids were with him.

24   Q.   Did you and Paul, other than the teddy bear, did y'all ever

25   exchange gifts?

```
 1   A.  Never.
 2   Q.  Did you tell Dr. Hayes that you exchanged gifts?
 3   A.  I don't recall telling Dr. Hayes anything about exchanging
 4   gifts.
 5   Q.  Did you ever see Paul write anything?
 6   A.  Write, like what?
 7   Q.  A letter, card?
 8   A.  No.
 9   Q.  Did you ever see him read anything?
10   A.  Not to my knowledge.
11   Q.  Back when you were still in New Orleans and dating Paul, back
12   in '85, did you meet his mother Marie?
13   A.  Yes.
14   Q.  Tell me what Marie was like.
15   A.  Ms. Marie was a kind, sweet lady, but you can tell something
16   was wrong with her.
17   Q.  Tell me how you could tell something was wrong with her.
18   A.  I mean, to me she just looked like she had some type of mental
19   formality to her by her facial features, and it would be a time,
20   like if she would be trying to make pecan candy or a cake, you
21   know, me and her would be on the phone and I would try to guide her
22   through it as much as possible.
23   Q.  And when you tried to guide her through a recipe, how would you
24   do that, I mean, would you tell her a cup of this, a half a cup of
25   that?
```

1   A.  Yes.

2   Q.  And what would she do on the other end when you told her that?

3   A.  She didn't understand a cup or a half a cup or a quarter of a

4   teaspoon or a half a teaspoon.  So whichever kid, like Terry or

5   Linda or even her grandchild Alicia would be in the house, she

6   would call out to one of them to ask them what was a cup or a half

7   a cup or a teaspoon, and they would show her because, I mean, I'm

8   on the opposite line.

9   Q.  And you could hear that?

10  A.  Yes.

11  Q.  When you were dating Paul back in 1985, did he have a job?

12  A.  Yes.

13  Q.  And what did he tell you about that job, if anything?

14  A.  He didn't tell me anything about the job.  I didn't know what

15  he did on the job and where the job was and what was the name of

16  the place.

17  Q.  Well, did he tell you what part of the city the job was located

18  in?

19  A.  I can't recall.

20  Q.  Did he tell you he worked at Ernst Cafe?

21  A.  He didn't tell me the name of anything that he worked at, I

22  never knew the name of the place he worked.

23  Q.  So had you ever heard of Ernst Cafe --

24  A.  No.

25  Q.  -- before Dr. Hayes mentioned Ernst Cafe to you?

A.  No.

Q.  Do you know what he did at this place that you didn't know the name of?

A.  No.

Q.  And did you have a general sense of what he did, did he tell you what his little job was?

A.  No.

Q.  Did you tell Dr. Hayes that Paul had no difficulties in his job as a dishwasher at Ernst Cafe?

A.  I didn't even know what Paul did at whatever place he was at, so I don't recall telling her that.

Q.  And you didn't know the name of the place, either, I think you said?

A.  No, I did not know the name of the place.  I never knew the name of the place and I didn't know what he was doing.

Q.  Have you ever seen Paul drive a car?

A.  No.

Q.  What was it like trying to communicate with Paul, Ms. Franklin?

A.  It wasn't easy, you have to keep repeating yourself, over and over and over again.

Q.  And how would he react when he figured out that you were not getting your points across to each other?

A.  Are you asking me how he felt about it or how I felt about it?

Q.  Well, I know you probably can't say how he felt, but you can certainly describe how he reacted.  What would he do, what kind of

1   emotions would he show?

2   A.  He would be frustrated and just leave.

3   Q.  Did you tell Dr. Hayes you had no trouble communicating with

4   Paul?

5   A.  I mean, I don't recall telling Dr. Hayes that, I probably said

6   whatever you say or something like that.  Like I said, I just

7   wanted them to leave me alone so I could finish getting ready for

8   work because if I would have been late or not shown up, I would

9   have been fired, wouldn't have had no job to pay my bills and they

10  wasn't going to pay them for me.

11  Q.  How was Paul about being calm and still?  Was he good at that?

12  A.  Are you talking about like sitting or standing or --

13  Q.  Right.  And let's focus on when you were dating.  When you were

14  dating that four months or whatever it was, if you went to a movie

15  with him, how would he act?

16  A.  Paul can't keep still.

17  Q.  Elaborate on that.

18  A.  He's fidigetive, he always have to be moving around or doing

19  something, he would never sit still to watch a movie.

20  Q.  What would he do if he was at the movie?

21  A.  Get up, walk, use the bathroom, come sit back down for about

22  five or ten minutes, get back up.

23  Q.  And if you talk to him about the movie after the movie was

24  over, maybe talk to him about the story in the movie, what was that

25  like?

1    A.  If I can recall, I think I may have talked to him about one of

2    the movies that we went to see, but it just defeated the purpose of

3    even trying to explain it to him.

4    Q.  And why did it defeat the purpose?

5    A.  Because he wouldn't understand anything.

6    Q.  Now, sometime after this visit by Dr. Hayes, which you've

7    already described, did you receive contact from Ms. Rogers and/or

8    Mr. Lowman, who are sitting in the courtroom today?

9    A.  Yes.  I received contact from Ms. Rahcel and Jimmy.

10   Q.  Had you met them prior to when Dr. Hayes came to see you?

11   A.  You mean before she came to see me?

12   Q.  Yes.

13   A.  Yes, I met with Rahcel before Dr. Hayes came to see me.

14   Q.  And let's talk about this visit after Dr. Hayes came to see

15   you.  When Ms. Rogers contacted you after that visit, do you recall

16   how long after the visit it was?

17   A.  I really don't recall.

18   Q.  Long time, short time?

19   A.  I am not going to say it was a long time and I am not going to

20   say that it was really a short time.  I just really can't remember

21   how long it was after Dr. Hayes came to see me that Rahcel came in

22   contact with me.

23   Q.  And how did Rahcel get in contact with you?

24   A.  She called.

25   Q.  And did she ask your permission to do something?

A.  She asked my permission if she could come and see me.

Q.  And what did you say?

A.  I told her yes.

Q.  And who set the time and place and when you were going to meet

with Jimmy and/or Rahcel?

A.  I set the time and the place because it had to be convenient

for me.

Q.  And when she came, did she bring Mr. Lowman, Jimmy, with her or

did she come by herself?

A.  No, it was her and Jimmy.

Q.  And when they got there, did they explain to you the purpose of

their visit, what they wanted to talk to you about?

A.  Yes.

Q.  And what was the purpose of their visit as you understood it?

A.  If I am not mistaken, I want to say they, you know, came to

talk to me about the report that was taken by Dr. Hayes, which was

very confusing to me.

Q.  And were you at that time presented with that portion of the

report that contained comments attributed to you?

A.  Yes.

Q.  Now, what was your reaction when you saw that portion of the

report?

A.  I was shocked, felt like I had been tricked, and it was very

intimidating and stressful.

Q.  Did you recognize that portion of the report as being what you

1    know about Paul Hardy?

2    A.  No.

3    Q.  Now, when Rahcel and Jimmy came to see you, Ms. Franklin, did

4    they tell you that the answers that you had given were bad or good

5    for Paul?

6    A.  The only thing that Rahcel and Jimmy said when they came to see

7    me was, and asked me about the report was, just to let them know if

8    it was truthful.  They didn't tell me if it was bad or good, they

9    just wanted to know the truth about the report.

10   Q.  And in whole or in part, was that part of the report attributed

11   to you, was that accurate as to what you know about Paul Hardy or

12   what you said to Dr. Hayes?

13   A.  Not all of it.  I mean, I cannot recall because after that I

14   was just more confused and stressed out.  Like I said, I mean, it's

15   just unbelievable, it was just unbelievable to me.

16   Q.  Speaking of stress, let's go back to that interview back in

17   June.  Do you have any kind of medical problems, Ms. Franklin?

18   A.  Yes, I do.

19   Q.  What kind of medical problems do you have?

20   A.  I suffer with grand mal seizures, which is a form of epilepsy.

21   Q.  And are those types of seizure, in your experience, can stress

22   make those seizures more likely to happen?

23   A.  Yes.

24   Q.  After this visit occurred with Dr. Hayes, immediately after the

25   visit, how were you feeling?

```
 1   A.  I started getting headaches and --

 2   Q.  And what is that a sign of sometimes with you?

 3   A.  My seizures coming on, blurry vision.

 4   Q.  And within a few days after that, what happened?

 5   A.  I had the headaches first because I was getting the signs, I

 6   took the medicine, but by me being so stressed out the medicine

 7   just defeated the purpose of me taking the medicine because the

 8   headache was still there, and I want to say two to three days after

 9   I had the visit with Dr. Hayes I had a seizure and I lost my

10   eyesight for two days.

11   Q.  Now, I showed you this form.  You did not see this?

12   A.  No, never seen that in my life.

13   Q.  Well, do you recall coming to New Orleans a few weeks ago and

14   being told by the lawyers that you had been given a test?

15   A.  Yes, that's the only time that I knew I was given a test.

16   Q.  And who told you you had been given a test?

17   A.  The lawyer.

18   Q.  And up until the lawyer told you you had been given a test, did

19   you know you had been given a test?

20             THE COURT:  Can you clarify who the lawyer is?

21             MS. FOURNET:  It was me, Judge, it was me.

22             THE COURT:  Was it her?

23             THE WITNESS:  Yes, it was.

24             THE COURT:  Thank you.

25             THE WITNESS:  You're welcome.
```

```
 1   BY MS. FOURNET:

 2   Q.  What was your reaction when you found out that unbeknownst to

 3   you you had been administered a test?

 4             MR. McMAHON:  Objection, this is irrelevant, it really

 5   is.

 6             THE COURT:  Yeah, I do think it's irrelevant, sustained.

 7   BY MS. FOURNET:

 8   Q.  How much contact have you had with Paul since 1994 when he was

 9   arrested for this?

10   A.  None.  One letter and that was it.

11   Q.  That was it, one letter?

12   A.  Uh-huh.

13   Q.  Have you talked on the phone to him at all?

14   A.  No.

15   Q.  Has it been explained to you generally what this hearing is

16   about?

17   A.  Yes.

18   Q.  Do you care whether Paul is executed?

19   A.  Yes, I do.

20   Q.  Would you come in here and lie?

21             MR. McMAHON:  Objection, self-serving.

22             THE COURT:  Overruled.

23             MS. FOURNET:  Well, Judge, she is going to be attacked.

24             THE COURT:  Overruled, overruled.

25   BY MS. FOURNET:
```

```
 1   Q.  Would you come in here and lie to help Paul?

 2   A.  No, ma'am.

 3              MS. FOURNET:  Judge, sort of a housekeeping matter.  I do

 4   need to put in the record that the form I held up for Ms. Franklin

 5   is the Vineland-II Survey Interview Form.

 6              THE COURT:  Okay.  Any objection?

 7              MR. MILLER:  No, your Honor.

 8              MR. McMAHON:  No.

 9              MS. FOURNET:  And I tender, your Honor.

10              THE COURT:  Ms. Fournet, did you want to put it into the

11   record or just identify it for the record?

12              MS. FOURNET:  I just wanted to identify it, Judge.

13              THE COURT:  Then stated.  All right.

14              Mr. McMahon.

15                          CROSS-EXAMINATION

16   BY MR. McMAHON:

17   Q.  Ms. Franklin, let's go back to that unbelievably stressful day

18   there, okay?  Where were you living over there in Arlington, what

19   was the name of the complex?

20   A.  You're talking about Cedar Ridge Townhomes?

21   Q.  On June 1 of this year, where were you living?

22   A.  At Cedar Ridge Townhomes in Arlington, Texas.

23   Q.  Are you still living there?

24   A.  Yes.

25   Q.  And on June 1, you didn't hear the phone ring?  Several
```

```
1   attempts were made to contact you by phone.  You weren't aware of
2   that?
3   A.  No.
4   Q.  And you didn't see the lady who is the manager of that complex,
5   did you?
6   A.  What lady are you talking about?
7   Q.  Well, the lady who runs -- one of the managers of the Cedar
8   Ridge complex, you didn't see her that day, either, did you?
9   A.  No, I didn't.  Why should I see her?
10  Q.  In fact --
11        THE COURT:  Just hold up one second.  Rules of the game:
12  He asks questions, if you can answer the question, answer the
13  question; but the questions don't go back the other way.
14        THE WITNESS:  Okay.
15  BY MR. McMAHON:
16  Q.  You were in arrears for your rent on June 1, weren't you?
17  A.  Can you repeat that?
18  Q.  You owed rent on June the 1st of this year, didn't you?
19  A.  I mean, June the 1st is June the 1st, yes, I did owe rent.
20  Q.  And you didn't pick up the phone when people tried to contact
21  you because you were trying to dodge the manager because you owed
22  rent, right?
23  A.  Okay.  No.  I don't pick up the phone to dodge any type of
24  bills.  I pay my bills.  The 1st had just came and I have to the
25  3rd to pay my rent.  I was actually in the shower trying to get
```

```
 1   ready for work.  I don't dodge my landlords, period.

 2   Q.  Do you deny that the phone did not ring that day?

 3   A.  My phone did not ring at all.

 4   Q.  Now, you stated you had difficulty remembering Dr. Hayes.

 5   You're on a first-name basis with Rahcel and Jimmy there?

 6   A.  Sometimes I call her Rahcel, sometimes I call him Jimmy,

 7   sometimes I call them by their last name.

 8   Q.  How many times did you meet with them before Dr. Hayes came to

 9   interview you on June 1?

10   A.  I've only met with Ms. Rahcel one time before Ms. Hayes came to

11   see me, and that was a year ago before Ms. Hayes came to see me.

12   Q.  And you -- I'm sorry, go ahead.

13   A.  I haven't seen anyone or heard from anyone since.

14   Q.  And you willingly spoke with her then, didn't you?

15   A.  Which one are you talking about, Ms. Hayes or --

16   Q.  No, I am talking about Rahcel.

17   A.  I've only spoken to her, like I said, one time before Ms. Hayes

18   came to see me and that was a year ago.

19   Q.  The question was not when, the question was, you willingly

20   spoke with her, correct?

21   A.  That's correct.

22   Q.  And she identified herself as working for Hardy, did she not?

23   A.  If I can recall.

24   Q.  Can you recall?  I'm asking you.

25   A.  Yes.
```

1  Q.  You had no problem speaking with her, did you?

2  A.  No.

3  Q.  Do you know what the FBI is?

4  A.  Yes.

5  Q.  What is it?

6  A.  The Federal Bureau of Investigation.

7  Q.  So you thought an FBI agent was coming there with one of your

8  daughter's father's lawyers, that's what you thought?

9  A.  No.  I didn't know why the FBI agent was knocking on my door.

10  I've never had an FBI agent or a police officer knock on my door

11  ever.

12  Q.  That wasn't the question.  You thought that the FBI was there

13  with a representative of Hardy?

14  A.  I am not sure why the FBI agent was there.  He only represented

15  hisself as the FBI agent and said that he had some people that

16  wanted to talk to me.

17  Q.  Now, following the interview with Dr. Hayes, Jimmy and Rahcel

18  came and showed you Dr. Hayes's report?

19  A.  They came to ask me some questions about the report, yes, they

20  did.

21  Q.  And you read that report, right?

22  A.  Yes.

23  Q.  You realize, ma'am, that if the judge makes a finding that Paul

24  Hardy is mentally retarded, he would not be eligible for the death

25  penalty, he wouldn't face a possible death penalty; you understand

1  that, right?

2  A.  Yes.

3  Q.  And you read that report, you want to help out Hardy because he

4  is the father of your daughter, correct?

5  A.  Yes.

6  Q.  And after you willingly met with Rahcel and Jimmy after

7  Dr. Hayes -- you met with them willingly, you didn't have any

8  problems meeting with them when they showed you the report, did

9  you?

10  A.  They called and asked can they meet with me about the report

11  and I told them yes.

12  Q.  And when Dr. Hayes asked you on that day if you could pick an

13  alternate time you said no, that's what you testified to on direct,

14  correct?

15  A.  That is correct, because she asked me, you know, if she could

16  talk to me at any other time and I did tell her no.

17  Q.  Is your daughter known, people call her Quetta?

18  A.  Yes.

19  Q.  And she was in very frequent telephone contact -- let me

20  rephrase that.  Hardy speaks to your daughter quite often from

21  prison on the phone, does he not?

22  A.  Oh, I don't know.  I have no clue if he talks to my daughter or

23  not.

24  Q.  Do you know any other of his children who are called Quetta?

25  A.  No.  She is his only daughter that's called Quetta.

```
 1   Q.  Thank you.
 2           Why wouldn't you -- strike that.  Are you saying Paul
 3   Hardy couldn't drive?
 4   A.  I've never seen him drive.
 5   Q.  And you've met him when he was 16, 17?
 6   A.  I was 16, Paul was 17.
 7   Q.  Okay.  Are you saying he can't drive -- I am trying to get this
 8   straight -- or you don't know?
 9   A.  I don't know.  I have never seen him drive so I don't know.
10   Q.  On that date, June 1, you did speak to Dr. Hayes, did you not?
11   A.  I am not going to deny I didn't speak to her, yes, I did.
12   Q.  And you were crying at first, weren't you?
13   A.  I was crying because, I mean, like I said, I just didn't want
14   to be bothered, I wanted to get ready for work, and I am a very
15   sensitive person.
16   Q.  Do you recall saying, ma'am:  "I've known you were about to
17   come, I've been waiting for you to come."  Didn't you say that to
18   us?
19   A.  Oh, I don't recall saying that.
20   Q.  You don't recall?
21   A.  No, I don't remember saying that.
22   Q.  Do you deny saying that?
23   A.  I am not denying it, I am saying I do not remember saying that.
24   I am not denying that.
25   Q.  And when you spoke to Dr. Hayes, you told her the truth, didn't
```

1  you?

2  A.  What do you mean when I spoke to Dr. Hayes that I told her the

3  truth, I mean --

4  Q.  You were truthful?

5  A.  Truthful to whatever she was asking me as much as possible.

6  Q.  Right.  And did you not tell her that -- in fact, let me back

7  up a little bit.  Dr. Hayes never told you that Paul Hardy was a

8  dishwasher, you were the one who volunteered that information to

9  her, didn't you?

10  A.  That's incorrect because I did not know what Paul did on his

11  job.  As a matter of fact, I didn't even know the name of his place

12  of work.

13  Q.  You deny mentioning Ernst Cafe to her?

14  A.  I have never mentioned Ernst Cafe because I did not know the

15  name of the restaurant that Paul worked at.

16  Q.  Did you not tell Dr. Hayes that Hardy had no problems

17  communicating with you?

18  A.  I don't recall telling her that.  I probably did more or less

19  like examples, so I don't remember telling her that I had any

20  problems communicating with Paul.

21  Q.  Do you deny telling Dr. Hayes that Paul Hardy could prepare

22  chicken and spaghetti and meatballs?

23  A.  And if you're talking about warming it up in the microwave, I'm

24  not going to deny that because the food is always already cooked.

25  So like I said earlier, it depends on how you're looking at the

1    cooking term.

2    Q.  So he would heat it up in the microwave?

3    A.  That's correct.

4    Q.  Did you deny telling Dr. Hayes that Hardy participated in

5    chores around the home?

6    A.  I don't deny saying that.  I probably did, probably did not

7    say.  Our houses were already clean, so he really didn't have to do

8    anything.

9    Q.  Did you deny telling Dr. Hayes that Hardy was a very neat and

10   clean person?

11   A.  I am not going to deny that neither.  He is a neat and clean

12   person.  His persona about hisself is neat and clean, so I did say

13   he was neat and clean.

14   Q.  And did you also tell Dr. Hayes that he wanted his children and

15   the house to be neat and clean as well?

16   A.  If I am not mistaken, I don't recall that, but any human being

17   would want their house and their kids to be clean.

18   Q.  Isn't it true that you told Dr. Hayes that Paul Hardy would

19   often go around you and make sure that things were neat and tidy?

20   A.  Oh, I don't recall that.  My house is always clean, my

21   grandmother house is always clean.

22   Q.  Didn't you also tell Dr. Hayes that he would pick items up that

23   you needed from the store?

24   A.  If you're talking about the corner store, potato chips and

25   cookies, yes.  If you're talking about the supermarket where you

1   actually push a basket, no.

2   Q.  Didn't you tell Dr. Hayes that he brought, that Hardy brought

3   Jacquetta to the movies?

4   A.  I've never told Dr. Hayes that.  Paul brought Jacquetta to the

5   movies.  When they go to the movies, it's not just Jacquetta and

6   her dad.  It's Jacquetta, her dad and whoever is driving him and

7   the rest of her sisters and brothers.

8   Q.  Didn't you tell Dr. Hayes that Hardy would try to fix small

9   household items by himself?

10  A.  I don't recall saying that.  The project man fixed things like

11  that, they don't have to fix anything in the project.

12  Q.  Didn't you tell Dr. Hayes that Hardy always dressed

13  appropriately?

14  A.  What do you mean appropriately, like neat and clean or just

15  with clothes on?

16  Q.  Well, let's say neat and clean.

17  A.  He is always neat and clean.

18  Q.  And he was fashionable, too, correct, he dressed in current

19  fashion?

20  A.  What you mean by current fashion?

21  Q.  Well, whatever was current at the time.

22  A.  I have never seen him wear like fashion clothes, it always

23  would be simple jeans and a shirt.  It would never be nothing

24  flashy.

25  Q.  Didn't you tell Dr. Hayes that you two enjoyed going to the

1    movies, going out to eat and walking around?

2    A.   Okay.  Going out to eat, yes; walking around, if you're talking

3    about walking from the bus stop to our destination, that's the only

4    means of our transportation at the time was walking.

5    Q.   Didn't you tell Dr. Hayes that Hardy knew how to get medicine

6    for his children?

7    A.   I don't recall telling her that.  Paul wouldn't know how to get

8    medication for his children.

9    Q.   Do you deny telling Dr. Hayes that Hardy was instrumental in

10   bringing your children or your child to the emergency room?

11   A.   I don't recall telling her that because, like I said earlier,

12   me and my mother always bring my children to the hospital.  It

13   wasn't just Jacquetta, you know, that had to go to the hospital, I

14   had other two kids also.

15   Q.   Do you remember when Dr. Hayes asked you if it would surprise

16   you to hear that it was being alleged that Hardy may be mentally

17   retarded?

18   A.   I don't recall Dr. Hayes telling me that, I really don't.

19   Q.   So you don't recall telling her that that would surprise you,

20   do you?

21   A.   I don't recall that.

22   Q.   Do you remember Dr. Hayes asking you to rate Mr. Hardy with one

23   being the least intelligent, the dumbest person you ever met, and

24   ten being the smartest; and do you remember what number you

25   assigned?

1  A.  I don't remember that neither.  I don't even remember her

2  asking me anything about numbers, I really don't recall her asking

3  me that.

4  Q.  So you don't recall that you estimated that Mr. Hardy would be

5  a 7.5?

6  A.  I don't recall that.

7  Q.  Do you deny telling that to her?

8  A.  I don't deny anything, I just don't recall or remember.

9  Q.  You just don't want to say it today?

10  A.  No, I don't remember.

11  Q.  Do you recall telling Dr. Hayes in describing Hardy, and I am

12  quoting, "He is not a dummy, he real smart."  Do you deny saying

13  that?

14  A.  I don't deny saying anything.  I just don't remember the things

15  that I told her.  I don't deny it, I just don't remember.

16  Q.  Do you also recall telling Dr. Hayes that he would know what to

17  do in a situation?

18  A.  No.  Paul always had someone with him at all times.

19  Q.  You told Dr. Hayes, did you not, that he could read?

20  A.  No, I did not say that Paul can read.  I didn't even know Paul

21  can read because, as a matter of fact, he's never wrote me anything

22  but one letter, and I don't even know if he wrote that letter

23  because it didn't even look like something that he would write.

24  Q.  Well, if he only wrote the one, how would you know, how would

25  you know what his handwriting looked like?  What would you have to

1   compare it to, ma'am?

2   A.  What you mean what I have to compare it to, like?

3   Q.  I'm sorry.  Well, you expressed some skepticism that the letter

4   you got from him was written by him because you just made a comment

5   about his handwriting.  Well, if that's the only time he ever wrote

6   to you according to you, what do you have to compare it with?

7   A.  I didn't have anything to compare it with, it just didn't look

8   like his handwriting.

9   Q.  But that's the only time you've seen his handwriting, I take

10  it, correct?

11  A.  In 15 years or over ten years, that was the first time that

12  I've seen anything from him again.

13  Q.  Do you deny that he bought you an outfit from Dillard's one

14  Christmas because you liked it?

15  A.  First of all, I didn't say that he bought me an outfit from

16  Dillard's because he would not know what to pick out for me.  And

17  when I go shopping for my clothes, I have to try on all of my

18  clothes.

19  Q.  Let me try this again.  Did he buy you an outfit from

20  Dillard's --

21  A.  No.

22  Q.  Never did?

23  A.  No.

24  Q.  And you never told Dr. Hayes that Hardy bought you an outfit

25  from Dillard's one Christmas because you liked it?

1   A.  I do not recall telling Dr. Hayes that Paul bought me an outfit

2   from Dillard's, I cannot fit in anything from Dillard's.

3   Q.  Do you deny saying that to Dr. Hayes?

4   A.  I don't recall telling Dr. Hayes that Paul bought me an outfit

5   from Dillard's because I cannot fit nothing in Dillard's.  And when

6   I go shopping for my clothes, I have to try on every piece of

7   clothing.

8   Q.  Let's try this again.

9          THE COURT:  She answered the question, Mr. McMahon.

10         MR. McMAHON:  I asked her if she denied it, though.  I

11  guess she didn't -- all right.

12  BY MR. McMAHON:

13  Q.  You don't deny it?

14  A.  I said I don't recall.

15  Q.  Do you recall telling Dr. Hayes that Hardy was always on time

16  for work?

17  A.  I may have, I don't recall that.  I may have.  I don't deny it.

18  Q.  Do you deny telling Dr. Hayes that you went with Hardy to his

19  brother's grave site; do you deny that?

20  A.  I don't deny, we all went to the grave site.  He was in a

21  limousine and I was with my parents in a car.

22  Q.  Do you deny telling Dr. Hayes that you visited the grave site?

23  A.  If you're talking about visiting the grave site the day after

24  the funeral, I don't deny that.  But any time after that I've never

25  been to that grave site since the funeral.

1  Q.  You stated that you didn't want to be bothered with this

2  anymore, right?

3  A.  I don't want to be bothered.

4  Q.  Well, why are you here?

5  A.  I am here for the simple fact I was subpoenaed.  And by me

6  being subpoenaed, when Ms. Hayes came to see me and Ms. Rahcel and

7  Jimmy came, you know, to see me after that, this is why I am here.

8  Other than that, if no one wouldn't have bothered me, I would not

9  be here.

10 Q.  What were you talking to Rahcel and Jimmy out in the hall about

11 before you testified?

12 A.  Excuse me?

13       MS. FOURNET:  Judge, I object to that.  They are my

14 agents, it was a privileged conversation.  I can assure the court

15 that they were not talking about testimony of other witnesses,

16 which I suspect is being suggested.  I have asked Ms. Cooper if

17 that happened, I have asked Mr. Lowman if that happened, and I've

18 asked Ms. Rogers if that happened.  It absolutely did not happen.

19 And anything else is privileged and none of the government's

20 business, and I would object to the question.

21       MR. MILLER:  I understand, your Honor, but let's

22 understand, there are no privileges with what they talk to their

23 witnesses about.

24       MS. FOURNET:  Oh, I think --

25       THE COURT:  I don't want to get into a legal ruling about

```
 1   that.  I will sustain the objection.  Go ahead.
 2            MR. McMAHON:  Pardon?
 3            THE COURT:  Sustain the objection.
 4   BY MR. McMAHON:
 5   Q.  But you did speak before you testified to your friends Rachel
 6   and Jimmy, correct, out in the hall?
 7   A.  They are not my friends, they are Paul's, you know, legal
 8   assistants; and, yes, we did communicate in the hallway.
 9   Q.  When did you get to New Orleans, when did you get back here to
10   testify; last night?
11   A.  You mean when did I arrive?
12   Q.  Yeah.
13   A.  I arrived on Monday.
14   Q.  And between Monday and today, how many times have you spoken to
15   Rachel, Jimmy, or anybody else from Hardy's team?
16   A.  Maybe once.
17   Q.  Where?
18   A.  I don't recall, I don't know if it was at the hotel or not or
19   here, I mean, I spoke to them.
20   Q.  And they told you about the testimony that went on during this
21   court for the last couple of days, did they not?
22   A.  Oh, no, no.
23   Q.  And they told you what this hearing -- you know what this
24   hearing is about, don't you?
25   A.  I know what the hearing is about, but anything pertaining to
```

1    this hearing and anything, no, I do not know.  I know what it's

2    about.

3    Q.  So you remember everything that went on, every little gory

4    detail about when Dr. Hayes came to interview you, but you don't

5    remember, you can't recall anything about what she asked you or

6    what you said, correct?

7    A.  I don't recall half the stuff she saying or half the stuff

8    anybody else said.

9                    THE COURT:  Are you done?

10                   MR. McMAHON:  Yes.

11                   THE COURT:  Any redirect?

12                   MS. FOURNET:  Just a couple, Judge.  If I could have a

13   minute to confer.

14                          REDIRECT EXAMINATION

15   BY MS. FOURNET:

16   Q.  Ms. Franklin, just a general question.  At the time of this

17   interview, looking back on it --

18                   THE COURT:  Talking about Dr. Hayes?

19                   MS. FOURNET:  With Dr. Hayes, yes.

20   BY MS. FOURNET:

21   Q.  -- did you have a clear understanding of the significance of

22   that interview, who she was, who she was there for --

23                   MR. McMAHON:  Objection, asked and answered.  She went

24   over this in detail on direct.  It's repetitive.

25                   THE COURT:  It's the only question?

1          MS. FOURNET:  That's it, Judge --

2          THE COURT:  All right.  Go ahead.

3          MS. FOURNET:  -- so if you tell me not to ask it, I

4     won't.

5          THE COURT:  No, go ahead, go ahead.

6     BY MS. FOURNET:

7     Q.  Looking back on the interview with Dr. Hayes, throughout the

8     course of that interview, did you have a clear understanding of who

9     she was, why she was there or what side she was on?

10    A.  No.  Because like I said earlier, I did not have, you know, a

11    clear understanding of who she was.  I called my daughter.

12         MS. FOURNET:  Okay.  That's all.  Thank you.

13         THE COURT:  All right -- wait, one more.  Sorry.

14         MS. FOURNET:  One more, Judge, if I might?

15         THE COURT:  Okay.

16    BY MS. FOURNET:

17    Q.  When did you find out that mental retardation was an issue in

18    this case, Javetta?  Did you know before Dr. Hayes came to see you?

19    A.  No, I wasn't clear --

20         MR. McMAHON:  Objection.

21         THE WITNESS:  -- on why she came to see me.

22         MR. McMAHON:  Objection, irrelevant.

23         THE WITNESS:  I mean, I just don't know --

24         THE COURT:  Overruled.

25         THE WITNESS:  I just don't recall --

```
 1              MR. McMAHON:  Objection.

 2              THE COURT:  It's overruled.

 3              MR. McMAHON:  Oh, I'm sorry, I didn't hear you.

 4              THE COURT:  Okay.  I'm sorry, say again.

 5              MS. FOURNET:  Can she answer it again, Judge?

 6              THE COURT:  Yeah, please, one more time, I didn't hear

 7   you.

 8              THE WITNESS:  Can you ask that question --

 9              THE COURT:  When did you first learn that mental

10   retardation was an issue in this case?

11              THE WITNESS:  If I am not mistaken, a clear understanding

12   of the mental retardation was when I spoke to Ms. Rachel and Jimmy

13   about it when they came to ask me about the report that was taken

14   by Dr. Hayes.  I did not have a clear understanding of why they

15   were there.

16              THE COURT:  All right.

17              MS. FOURNET:  That's all, your Honor.

18              THE COURT:  Okay.  Ms. Franklin, you may step down.

19   Thank you very much.

20              It's ten after 12, do you want to take a lunch recess at

21   this point?  I don't know how you have your witnesses lined up,

22   whether you want to continue on or you want to take a break?

23              MS. FOURNET:  I think it's a good time to take a break,

24   Judge.

25              THE COURT:  I have ten after 12.  Is coming back at 1:15
```

```
 1    sufficient?

 2              MR. MILLER:  Judge, do they know who they're going to

 3    start off with?

 4              THE COURT:  Yes, who is next?

 5              MS. FOURNET:  Dr. Swanson, your Honor.

 6              THE COURT:  Dr. Swanson, okay.

 7         (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

 8

 9                        P R O C E E D I N G S

10

11         (OPEN COURT.)

12              THE COURT:  Have a seat, please.

13              THE DEPUTY CLERK:  Raise your right hand.

14         (WHEREUPON, DR. VICTORIA SWANSON, WAS SWORN IN AND TESTIFIED

15         AS FOLLOWS:)

16              THE DEPUTY CLERK:  Please be seated.  State your name for

17    the record and spell it for us.

18              THE WITNESS:  My name is Victoria Swanson.  That's

19    V-I-C-T-O-R-I-A, Swanson, S-W-A-N-S-O-N.

20              MS. FOURNET:  May I proceed, your Honor?

21              THE COURT:  Yes.

22                        VOIR DIRE EXAMINATION

23    BY MS. FOURNET:

24    Q.  Dr. Swanson, what is your profession?

25    A.  I am a licensed psychologist in the State of Louisiana.
```

1   Q.  And would you, for the benefit of the court, give us a summary

2   of your educational background -- let me ask you -- well, go ahead,

3   go ahead and give us your background.

4   A.  I earned a bachelor's degree in psychology from what was then

5   known as the University of Southwestern Louisiana in Lafayette,

6   Louisiana.  I then went on to earn a master's degree in clinical

7   psychology from Northwestern State University in Natchitoches,

8   Louisiana, and I earned that in 1991.  I earned the first one I

9   think in 1973.

10          I got a Ph.D., a doctorate in psychology, from Louisiana

11  State University in Baton Rouge, Louisiana, and the degree was

12  awarded in August of 1999.

13  Q.  And are you a licensed psychologist?

14  A.  Yes, I am.

15  Q.  What does it mean to be credentialed with the National Register

16  of Health Service Providers in Psychology?  I notice you have that

17  on your CV.

18  A.  This is more like a national credentialing agency, you do very

19  similar to what I did to get my license in Louisiana.  I had to

20  produce transcripts, I had to produce explanations of what I went

21  to school in, I had to have letters from different people that

22  supervised me at different levels of my academic career, and this

23  is offered to them and they review it and then they, if you

24  qualify, you're credentialed at a national level.

25          The difference being is states differ and what they

1    require of a psychologist, that's a state law.  And this

2    credentialing agency kind of has a national standard, so that meant

3    I met the national standard for that.

4    Q.  And what was the topic of your master's thesis and your

5    doctoral dissertation?

6    A.  My master's thesis was on the Vineland, and what I was looking

7    at was individuals with severe and profound mental retardation and

8    how well the Vineland correlated with intellectual measures in that

9    population.

10          My doctoral thesis was a study with methylphenidate,

11   which is a Ritalin, you know, a generic name for Ritalin, and it

12   was done with children who lived at St. Mary's Training School in

13   Alexandria, and it was trying to find the most effective dose of

14   medication as well as the treatment or intervention and then what

15   worked best.  For some of these kids the medication was best, with

16   some of these kids the behavior intervention was best, and with

17   some of these kids putting them together was the best treatment

18   combination.

19   Q.  And what is St. Mary's in Alexandria?

20   A.  St. Mary's Training School is a private developmental center.

21   It receives federal and state money but it's private.  It's ran by

22   the diocese, that diocese in the northern part of Louisiana.  It's

23   a developmental center for about 118 people, I think they

24   start taking -- well, they'll take children maybe as young as six

25   and they keep them to about the age of 25.

 1   Q.  And is this a residential facility or is it a day facility?

 2   A.  It's a residential facility for children with mental

 3   retardation developmental disabilities.  It also has group homes

 4   that are affiliated with that agency.  The people at the

 5   developmental center are also providing the oversight on the group

 6   homes.

 7        On campus is a special school district school so -- these

 8   are children so they're still in special education classes, and

 9   they attend it on campus.  And the services are provided by the

10   Rapides Parish People Appraisal.

11   Q.  And since your master's thesis and your doctoral dissertation,

12   have you had a focus in a particular area since you began your

13   vocational career?

14   A.  Yes.  My focus, really, when I went back to get my master's

15   degree was primarily in the area of developmental disabilities.  At

16   different times in your academic career you're given a choice on

17   where you can do your practicum, where you can do an internship, et

18   cetera, and I always sought to do mine in the field of mental

19   retardation and developmental disabilities because I knew this was

20   the area that I wanted to work.  I had already been in the field

21   for a while when I went back to get my master's, and I just wanted

22   to learn more about the people I was already serving.

23   Q.  Tell us about your vocational history, and I want you to

24   include internships or externships in connection with your degrees

25   beginning with your tenure at Central State Hospital in the early

1  '70s.

2  A.  Okay.  When I went to Central State Hospital in the early '70s,

3  Central State Hospital then was still a very large facility,

4  somewhere between 1,500 and 2,000 people were being served.  And

5  the psychology department was quite large and they had --

6  Q.  And what time period -- I may have to interrupt you

7  occasionally just to get us oriented.

8  A.  That's fine.

9  Q.  What time period are we talking about?

10  A.  I was at Central from June of 1973 and then moved on to

11  Pinecrest in November, I think, of 1976.

12  Q.  Okay.

13  A.  So I worked in -- at Central, they got special grants from the

14  federal government, so I worked in those research grants doing work

15  there.

16          And the particular area that I worked in was recidivism,

17  so we were kind of working on what could we -- many people who go

18  into mental institutions keep coming back chronically, so we were

19  looking at what could we do to change that situation so that they

20  wouldn't come back, what supports do we need to put in the

21  community, is it something we're not channelling back to the home

22  site, and that was the work I was doing there.  So I was not only

23  working with the people, but I was also working with the

24  psychologists who were working in this grant and gathering

25  information for the government.

1    Q.  And were some of the individuals that you were working with,

2    were they also people who suffered from developmental disabilities?

3    A.  Yes, many of the people that I worked with were dually

4    diagnosed.  By that I mean they had a diagnosis on Axis 1 that

5    would have qualified them for mental health treatment, but they

6    were also diagnosed with mental retardation.

7    Q.  And from there I think you mentioned Pinecrest?

8    A.  Yes.  We started doing some work in conjunction with Pinecrest

9    because the population that we were working with also had a

10   developmental disability, so I started going to Pinecrest, either

11   to pick up the research books or whatever, and became interested in

12   working at that facility; and so it was just a matter of getting a

13   lateral transfer in a government job to Pinecrest.  And that was in

14   November of 1976.

15   Q.  And how long were you at Pinecrest?

16   A.  I was at Pinecrest from 1976, and I left there in June of 1999

17   and went to Southwest Louisiana Developmental Center.  And that is

18   in Iota, Louisiana, maybe 40 miles outside of Lafayette.  And I

19   became the head of the psychology department there and stayed there

20   until I retired in June of 2003.

21   Q.  During the years of 1976 to the present, and I realize you were

22   at Pinecrest during some of those years, but did you also have

23   other work that involved the population with mental retardation?

24   A.  Yes.  As I said, while I was at Pinecrest, I got my master's

25   degree and I worked for licensed psychologists who worked in the

1    community.  They either worked at schools for school boards doing

2    people appraisal services, they worked for group home chains, they

3    did evaluations for the Office of Citizens with Developmental

4    Disabilities, which is the agency that makes people eligible for

5    services.

6            And so in that capacity, I went out and did the IQ

7    testing, I did the adaptive testing, I wrote the report, and it was

8    always under their oversight.  They had the contracts, but, and I

9    might have written the report, and it was under their supervision

10   at all times.  I started doing that work probably with them around

11   1990, I guess, and continued to do that probably, I would say

12   probably up to about 1999, '98, then I was working on my own

13   license at that point.

14   Q.  Once you went into private practice in '99, what has your

15   private -- what kind of work has your private practice consisted

16   of?

17   A.  Well, let me qualify that.  From 1999 August until the

18   following August I was in a post doc, which means I had to be

19   supervised at the doctoral level in certain areas, and then I was

20   able to sit for my license.  So I never did any work for myself

21   until after September of 2000, which is when I got my license.

22   Q.  Okay.

23   A.  And then since I've got my license I've continued to work at

24   Southwest Developmental Center as the head of their psychology

25   department and I started working --

1    Q.  Southwest Developmental Center is a facility for?

2    A.  It's a facility for individuals with developmental

3    disabilities.  At the time I was there, some of them were still in

4    school, they had a school on campus that, once again, was a special

5    school district.  They went up into adulthood.  Predominantly

6    profound severe, but there were some there that were moderate and

7    mild.

8         And they also had two group homes and they had a

9    supported independent living program, so we supported individuals

10   with mental retardation who lived in apartments.  And I would

11   provide the psychological services for all of them.

12        Also, while I was there, I headed up the community

13   support team, so I was over the teams that would actually go out in

14   the regions so that we were trying to keep people at home with

15   their families so they wouldn't have to be institutionalized.

16        And then I also had to be available to the two regional

17   offices there because they did not have a psychologist in either

18   office, so sometimes I had to go over there and -- maybe for

19   consultation on different issues.

20   Q.  You mentioned a minute ago about helping people stay in the

21   home rather than be institutionalized.  When someone has any degree

22   of retardation, is there an issue there of support that a

23   professional like yourself has to address?

24   A.  Yes.  In the State of Louisiana, I think in the country as a

25   whole, and even from the day I started working at Central, we've

1    been trying to move away from institutionalizing and warehousing

2    people and finding supports for them to stay in the community.  And

3    I felt kind of good by the end of my 30 years, we really do have

4    some programs there that we put out there to give supports.  A lot

5    of times what you don't have is the professional people to work

6    with those support teams, so that was kind of like what I was doing

7    toward the end of my career.

8    Q.  And currently, what are you doing?

9    A.  Currently, I am a licensed psychologist.  I provide

10   psychological services at several group home chains in Central

11   Louisiana and in Southwest Louisiana.  There are 27 community homes

12   that I provide services to directly.  So when I'm saying I provide

13   them directly, I am doing the testing, I am actually going to the

14   homes once a month, I am sitting in on meetings, I am writing

15   yearly reports.

16         I also supervise some master-level people who provide the

17   psychological services.  So I am kind of the psychological

18   oversight for Pecan Grove Training Center, which is a private

19   developmental center in Alexandria, Louisiana, it's 118 beds.  Most

20   of the people there are profoundly, severely, all the way up to

21   mild mental retardation.  I provide the psychological services, the

22   oversight at St. Mary's Training School in Alexandria.  And once

23   again, I said that's a 118-bed chain that also has group homes

24   affiliated with it.

25         I am the psychological supervision or oversight for the

1    Louisiana Special Ed Center, that's in Alexandria, and it is a

2    developmental center that receives ICFDD funds just like these

3    other facilities, but it primarily has people who also have -- are

4    there as a result of traumatic brain injury, cerebral palsy,

5    debilitating seizures.  Some of these people are only borderline

6    intellectual functioning or mildly mentally retarded because maybe

7    the car injury happened at 16 and these people functioned normally

8    before that.

9          Each of these sites that I've just mentioned, there are

10   master's-level people doing the work and I am providing the

11   oversight, I am reviewing all of the different records.  At one of

12   those facilities I do all of the intellectual testing, but at the

13   other two someone else is doing that, and I would be doing the same

14   kind of supervision that I was given when I was working with a

15   master's.

16         There are probably about 27 homes on Central or North

17   Louisiana that there's a master's-level person who provides the

18   work and I provide the psychological oversight for that person.

19   And I've been supervising him since 2000.

20         I am -- I work at a charter school in St. Mary's Parish,

21   it's called Glencoe Charter School, it's very near Cypremort Point,

22   you're almost in the Gulf, it's a very small school in a very,

23   very -- a rural area and is a very poor area, and I provide the

24   psychological services there.

25         I am the coordinator for the people appraisal services

1    there.  I am the one that, you know, I do all of the psychological

2    testing, but I am also the one that is the oversight of all of the

3    reports that have to be done for initial eligibility, as well as

4    triannual evaluations, as well as the person that has to look at

5    students who are coming in from other agents -- from other schools

6    who need special ed services.

7              I am a contract psychologist with the Office of Citizens

8    with Developmental Disabilities for region four and five --

9    Q.  Now, is that a state agency?

10   A.  That's a state agency.  The overall state agency of Office of

11   Citizens with Developmental Disabilities is the overall agency

12   under the Department of Health and Hospitals.  Then each region --

13   there are like nine regions or ten regions around the state.

14   Region four is the Lafayette region and surrounding parishes,

15   region five is the Lake Charles region and surrounding parishes.  I

16   have a contract with both of those agencies.

17             I do testing for them, I also am the psychologist that

18   sits on their eligibility review team.  So everybody who is asking

19   for services would go through that team.  We review the records to

20   see if they're eligible, we make decisions of who does or doesn't

21   need testing, not everybody needs testing because they come to us

22   with good testing.  And then if we deny services and there's an

23   appeal, then I am the psychologist who sits on that for those two

24   agencies.

25             I do the diagnostic psychological testing for the Lake

1    Charles Regional Mental Health Center, and I have done testing also

2    at some of their satellite facilities, say, in DeRidder, Allen

3    Parish.

4    Q.  And does that include evaluations to determine whether a person

5    has mental retardation?

6    A.  That's correct.  It's lot of differential diagnosis because

7    sometimes the mental retardation can be overshadowed by a mental

8    illness, so there's a question, are we looking at somebody who is

9    mentally ill.  Another one a lot of times that you see present

10   together is if there is a question, could it be bipolar, could it

11   be Asperger's, things like that.

12   Q.  Let me interrupt you in minute there.  You mentioned dual

13   diagnosis.  Does having, say, a diagnosis of posttraumatic stress

14   syndrome or some other personality disorder, mental health problem,

15   does that exclude the possibility of a concurrent issue of mental

16   retardation?

17   A.  No, it does not.

18   Q.  Okay.  Go ahead.

19   A.  Let's see.  I was naming off all of the different agencies that

20   I -- that's by and large what I do.  Most of my work is contractual

21   work.  I don't do individual clients.  I tell people, the people I

22   work with don't call me up on the phone and ask me to come over and

23   test them or whatever, so that's kind of how I have to go.

24          So I travel a lot between Lafayette, Lake Charles and

25   Alexandria serving through these different agencies that I talked

1  about.

2  Q.  I mean, do you have people that come in for counselling because

3  they're depressed or anything like that?

4  A.  No.  Sometimes I do counselling with the people that I work.  I

5  do a lot of work training, the case managers with the folks that I

6  work.

7  Q.  And case managers for whom now, for what population?

8  A.  Well, either the case managers for the particular group homes

9  that have people with developmental disabilities living there, and

10  are also case managers that do oversight with the people living in

11  supported independent living.

12         The counselling that I would do by nature would be more

13  likely to be anger management, social skills training, things like

14  this, because we're talking about people with developmental

15  disabilities.

16         Also, a lot of the work that I do is writing programs or

17  if you want to call them curriculums on how to train people.  For

18  example, if a team identifies that people -- this person needs to

19  learn how to write a check, well, I have a little expertise in

20  doing that.  And a lot of times the programs, you just can't take a

21  canned program and train a person.  So we'll do a little functional

22  assessment with that person and then figure out what's the best way

23  to do it, and then we need to be checking in on a regular basis

24  from month to month to see how it's progressing and what changes we

25  need to make.

1  Q.  Would it be fair to say, Dr. Swanson, that you have been

2  working almost exclusively, if not exclusively, in the field of

3  mental retardation in one capacity or the other now for about 35

4  years?

5  A.  That's correct.

6  Q.  And during that 35 years, have you worked with individuals at

7  every level of mental retardation; that is, severe, moderate, mild?

8  A.  Yes, I have.

9  Q.  And have you had occasions over those 35 years to perform

10  assessments to determine if an individual has mental retardation,

11  and if so, at what level he has mental retardation?

12  A.  Yes, I have.

13  Q.  Can you estimate how many of those assessments you have

14  personally done as opposed to overseeing somebody else or reviewing

15  somebody else's work?

16  A.  Since this has been asked of everybody else, I was trying to

17  come up with a number.  Now, I've only been licensed since 2000, so

18  figuring out what I've done, I would say directly I do somewhere

19  between 300 and 350 a year, and so that would come to about 3,000

20  plus that I do directly.

21       And I would say since I've been licensed in 2000,

22  indirectly I've supervised 3,000 more, which would be about 6,000.

23  Prior to that when I was doing these assessments, somebody else was

24  supervising me and my work.

25  Q.  Do most of these assessments -- and we'll discuss the

1  particulars of this instrument later -- but do most of those

2  assessments include the administration of an adaptive behavior

3  instrument such as the Vineland or an ABAS?

4  A.  That's correct.  Really, all of these assessments include an

5  adaptive assessment, because even when we've diagnosed somebody

6  with mental retardation and we place them in a treatment facility,

7  we redo a Vineland or an ABAS every year to see what progress we're

8  making.  So the best practice is once we've diagnosed somebody with

9  mental retardation, we retest their IQ every five years if they're

10  over the age of 22, recommended best practice is every three years

11  if they're under 22, and of course, more often if you have a

12  feeling to believe that there's been a regression or an increase in

13  skills.

14        But the adaptives are done on a yearly basis.  So those

15  are always done.  So when I am quoting these numbers, some of these

16  people get a Vineland every year no matter what.

17  Q.  Do you have any idea how many Vinelands you've administered

18  over that 35 years --

19  A.  Over my 35 years.

20  Q.  -- counting the follow-up year-by-year ones?

21  A.  The first one was a Vineland Social Maturity Scale, and when

22  that one went away in the mid-'80s, we got the first VABS, the

23  Vineland Adaptive Behavior Scales.  And then after that we went to

24  the VABS-II in 2005.

25        I would have to say it's in the 10,000s.  Because like I

1    said, we do them every year, and then you're mandated to do them

2    more often if there's suddenly a sudden change or loss of skills.

3            I'll give you an example of that.  We frequently see with

4    children who have Down syndrome or adults with Down syndrome, they

5    have an early onset dementia is what we're finding now, so that you

6    start seeing a loss of skills.  And it's been our experience you

7    might start to see this loss of skills as early as the age of 40.

8            And it's much more rapid with someone with Down syndrome

9    than is somebody who does not have the syndrome.  So on those folks

10   we do the Vineland much more often because we want a benchmark of

11   where they were and where they're going.  At this time our whole

12   treatment plan changes because we're trying to maintain skills.  We

13   don't want to teach new skills anymore, we're going to increase the

14   confusion.  So when I say at least once a year, there are some

15   folks we're going to do it on much more often.

16   Q.  How many IQ tests would you estimate, and I realize it's hard

17   to estimate --

18   A.  It's hard to estimate.

19   Q.  -- but about how many IQ tests would you estimate that you've

20   administered yourself as opposed to supervising someone else or

21   reading someone else's work?

22   A.  Okay, administered myself?

23   Q.  Yes.

24   A.  I would have to say, I would probably do about 300 of those a

25   year.  Because through these agencies that I've talked about that

1    are entry agencies, that's a mandatory requirement.  And then with

2    folks I've worked with before, every five years I have to redo them

3    if they're an adult; every three years, that's even in the ones

4    that I work in the school, we're revisiting them every three years,

5    so probably that number on IQ tests, yes.

6    Q.  Now, have you, with specific reference to Louisiana state

7    legislation, have you participated in drafting legislation around

8    the issue of mental retardation in death penalty cases in

9    Louisiana?  And if so, what and when?

10   A.  There was a particular panel that was formed in 2003, and it

11   was formed by the local chapters of the Association of Retarded

12   Citizens.  At that time we were known as also the American

13   Association of Mental Retardation, AAMR, that chapter, and then

14   there is another chapter called Cork, which are private providers

15   of people with developmental disabilities.

16        These three agencies came together after the Louisiana

17   Supreme Court decision was made in, that -- I think it was

18   Williams, Corey Williams Dunn, whatever case, and we drafted a

19   proposed legislation to go to the legislature so that we could have

20   a Louisiana law that would address this.  That later became, I

21   think, if I know my numbers right, 905.5 point something.

22   Q.  And is this the Louisiana statutory definition of mental

23   retardation for the purposes of the Atkins v. Virginia decision?

24   A.  What came out of the legislature is that, we had a draft, and

25   most of that was kept in there.  There were additions made by the

1  legislature as it went through various committees and houses.

2  Q.  And how many psychologists were on that panel?

3  A.  I was the only psychologist on that panel.

4  Q.  And were your recommendations in large part followed by the

5  legislature in the final enactment of that provision?

6  A.  Yes.  As far as for diagnosis and the three-prong criteria and

7  that, yes.

8  Q.  You mentioned the -- on your CV, the Human Rights Committee.

9  What are you referring to by that?

10  A.  The population I work with, we're always on guard to preserve

11  their rights, because these people naturally cannot stand up for

12  their own rights or really understand their rights.

13       And best practice in the field is that every facility

14  that I work with should have a human rights committee.  And this

15  human rights committee should meet once or twice a year, some of

16  our agencies meet four times a year, and review certain trends;

17  they should review the policies of that agency, the procedures they

18  use, they should be getting information about how many accidents

19  are happening there, how many injuries are occurring there, the

20  number of restraints that might be used, the amount of psychotropic

21  medications being used on these folks, if anybody is being doubly

22  medicated or triply medicated.

23       For example, some of our folks take two medicines or

24  three medicines and so you're kind of worried about maybe you're

25  overmedicating the person.  So I am a member of a bunch of those

1   committees.

2          But I think maybe what you're talking about in my vitae

3   is AAMR, three or four years ago, one of our missions when I was on

4   the state board was to increase the number of human right

5   committees in the State of Louisiana.  And so several of us were

6   asked to come together and to put on workshops so that providers

7   would know what best practice says about who should be on a

8   committee, the things they should review, how they should keep

9   minutes, et cetera, and so I made some presentations around the

10  state and then later I presented that, I think at least once at a

11  national convention.  I guess that's what you're referring to.

12  Q.  That's what I am referring to.

13         And you have organizations of which you are a member,

14  professional organizations listed on your CV.  You mentioned

15  American Association for the Mentally Retarded, AAMR.  You have

16  listed on your CV American Association on Intellectual and

17  Developmental Disabilities, which is AAIDD.  Is there a difference

18  between those two names?

19  A.  It's really the same organization.  There is a trend in the

20  field now to change the term mental retardation to intellectual

21  disability, that's already being done in Europe.  It might even

22  have already been done in the international code for health

23  disorders.

24         Many agencies are doing that in the United States because

25  the people who have this diagnosis finds that term offensive, and

1    AAMR voted on it and they decided to change their name to the

2    American Association for Individuals with Intellectual and

3    Developmental Disabilities, I think it is, so now it's AAIDD.  Some

4    of the books that we'll talk about today were written when the name

5    of that organization was AAMR and then some of them have been

6    written since it became AAIDD.  But for all practical purposes it's

7    the same organization.

8    Q.  And just so you'll understand, we will use the term mental

9    retardation frequently in this case, we're not trying to be

10   incorrect.  But that's the term that the Atkins decision --

11   A.  That's the legal term that is still used by many of the federal

12   agencies, people who award social security, et cetera.  It's the

13   private professional agencies that are trying to steer to another

14   name.

15   Q.  Back when it was still called AAMR, did you have any offices in

16   connection with that national --

17   A.  Yes.  I had been on the board of the state chapter of AAMR for

18   a number of years, either as head of their psychology division,

19   different ones, I was a vice-president, and I was nominated and won

20   a national board position as the head of the psychology division.

21          Let me explain what AAMR is.  AAMR really is all of the

22   professionals that work with people with developmental

23   disabilities, and there is a long, long list of them.  We're

24   talking social workers, nurses, doctors.

25   Q.  Not just psychologists?

1    A.  Not just psychologists.

2           And then within that each division has their own division

3    and so there was a division of psychology, and so I was elected the

4    national president of the psychology division.  And that's listed.

5           I think it ended up being three years but only because of

6    the way we shifted the way we did officers.  We now have an under

7    vice-president who kind of trains up to being president.

8    Q.  And you are still a member of that organization --

9    A.  I'm still a member of it.

10   Q.  -- and active in it?

11   A.  Yes.

12   Q.  Are you also a member of the National Association of Qualified

13   Mental Retardation Professionals?

14   A.  Okay.  Yes, I am.  And these are the folks I work with the

15   most, these are the people that I train in working with people with

16   developmental disabilities.  We call them qualified mental

17   retardation professionals, they're the case managers, the QMRPs,

18   you may hear that name.

19   Q.  So you do quite a bit of training people to work with and

20   evaluate and teach individuals with mental retardation?

21   A.  Yes, I do.

22   Q.  Have you published in the area of mental retardation?  I know

23   you have a list of publications, I certainly don't want you to go

24   through that whole list, but if you could just highlight a couple

25   of your publications in the area of mental retardation for the

1   judge.

2   A.  Well, most of my publications got started because I went to

3   LSU.  If you go to LSU, you do research and you publish or you

4   don't get out of LSU, that's kind of how it is.

5         The professors I worked under, we worked with applied

6   behavior analysis, if you know what that is, and it's the actual

7   treatment of people with developmental disabilities primarily was

8   what I was working with, who have behavior disorders, or we're

9   trying to teach them to learn proactive skills.  And most of the

10  publications that I did with that group were either under

11  Dr. Vollmer, who is who I started there, or Dr. Northup.

12        We primarily worked with behavior interventions with

13  folks that had severe behavior disorders, for example, hand biting,

14  head banging, things like that.  We also worked with students in

15  schools who may have required medication plus intervention to

16  figure out the best thing, because we would like to not

17  overmedicate children if a behavior intervention would be better.

18  So most of my publications were in that area.

19        We did some parent training, there is one on parent

20  training.  There's one I think on aggression, which was one of the

21  behavior disorders that we worked on.

22  Q.  And when you refer to parent training, are you talking about

23  training the parents of mentally retarded or training people with

24  mental retardation to be parents or both?

25  A.  Well, I've done both.

1    Q.   Okay.

2    A.   The particular article that I am talking about there was

3    working with -- it's one thing to work with the child and teach

4    them an intervention, but if you don't teach momma the intervention

5    well, then you haven't accomplished anything because the child is

6    not going to live in your office, the child is going to live in a

7    home.  So we actually would go in the home and work with momma to

8    try to get momma to do it the way we did it so we can see results,

9    or we would work at home and school and try to get both places

10   doing the same thing so that we have over time that child would

11   really improve if in every environment everybody was using the same

12   intervention.

13   Q.   Now, Dr. Swanson, you mentioned that you have done thousands, I

14   believe, over these 35 years of mental retardation evaluations.

15   A.   Yes, I have.

16   Q.   Can you estimate for me what percentage of those assessments

17   have been litigation related for Atkins hearings or for others?

18   A.   Oh, for Atkins or others, for sure for Atkins is less than one

19   percent.

20         I mentioned that I work at Lake Charles Mental Health

21   Center, I work at OCDD in Lafayette, OCDD in Lake Charles.  So as

22   the contract psychologist there for entry, I do court-ordered

23   testing.  So a judge could court order that agency to test and I

24   would do the testing.  So these folks are not capital offense

25   cases, these --

1    Q.  Are these cases where you go to court and testify?

2    A.  I could go to court and testify.  I've never had to go to court

3    and testify.  Generally they take my report and from then the judge

4    goes on and makes decisions about what they need to do.  So even

5    then, though, I would say that's probably one percent of overall of

6    everything I do.

7    Q.  So I think what I'm hearing you say is, taking Atkins hearings

8    in these various and assorted other assessments you might do that

9    are court ordered, adding those together they still come up to less

10   than one percent of the assessments that you've done over the

11   years?

12   A.  Oh, yeah, over all of the years for sure.

13   Q.  Dr. Swanson, have you been qualified as an expert in mental

14   retardation?

15   A.  Yes, I have.

16   Q.  And if you could list the cases for us where you have been

17   qualified by a judge as an expert in mental retardation?

18   A.  Okay.  And these are the ones that I've gone back through where

19   I actually went into court and was qualified in court.  And those

20   cases are the Corey Williams case, it was Corey Williams v. The

21   State of Louisiana, that was a post Atkins case.  That was the

22   first post Atkins case and that was in Caddo Parish.

23          Willie Tart v. The State of Louisiana and that was in

24   Ouachita Parish, that's another post Atkins.

25          Brian Nelson v. U.S., that was in U.S. District Court

1    here in New Orleans.

2         Justin Fontenot v. The State of Louisiana, that's the

3    16th Judicial District Court in St. Martin Parish.

4         Jimmy M. Turner v. The State of Louisiana, that was 11th

5    District Judicial Court in Sabine Parish.

6         Alexander Bohanan v. The U.S., and that was in Mobile,

7    Louisiana.  And that was a penalty hearing on a man who had already

8    been determined mentally retarded in an Atkins hearing, I wasn't

9    part of the Atkins on that.

10        Willie J. Pie v. The State of Georgia, and that is --

11   they call it a habeas case is what I understood that was.

12        Let's see.  I also did Christopher Lewis v. The State of

13   Georgia in a similar habeas case, I call those post Atkins cases.

14        William Riley v. The State of Mississippi.  And that I

15   think was also a habeas case, it was definitely post Atkins.

16        And I did the Michael Alexander (SIC) case a couple of

17   weeks ago here in New Orleans --

18   Q.  I think you meant -- do you mean Anderson?

19   A.  Oh, yeah, Michael L. Anderson, I'm sorry.  And here.  And

20   that's a total of ten times that I can remember that I actually

21   went into court in Atkins hearings.

22   Q.  What is your hourly fee, Dr. Swanson, for this case and the

23   others you've listed?

24   A.  Well, the first case I ever did was 70 bucks an hour.  I now

25   charge $150 an hour.

1  Q.  Have you ever charged more than $150 an hour?

2  A.  No, I haven't.  No, I haven't.

3  Q.  Have you ever been asked to testify for the prosecution in an

4  Atkins hearing?

5  A.  Not in an Atkins hearing, no.

6  Q.  Have you ever been approached by defense lawyers and asked to

7  review a particular case to determine if there is the possibility

8  of a viable Atkins claim and told them no?

9  A.  Yes, I have.

10        MS. FOURNET:  I tender Dr. Swanson as an expert in mental

11  retardation, your Honor.

12        MR. McMAHON:  I just have one question.

13                  TRAVERSE EXAMINATION

14  BY MR. McMAHON:

15  Q.  Judge, this -- Dr. Swanson, does that mean like you're only

16  half as good as Cunningham?

17        MR. McMAHON:  No, that was just a little levity.  Your

18  Honor, we have no doubt that Dr. Swanson may qualify as an expert,

19  but I just wanted to add a little levity into these tedious

20  proceedings.

21        THE COURT:  Okay.  I accept the qualification as well.

22  You can go forward.

23        MS. FOURNET:  And I certainly apologize for the tedium,

24  your Honor, if, in fact, it's tedious.

25        THE COURT:  No, it's not tedious.  At least not for the

1    fact finder.

2                        DIRECT EXAMINATION

3    BY MS. FOURNET:

4    Q.  Dr. Swanson, were you engaged by the lawyers for Paul Hardy to

5    determine whether Paul Hardy meets the American Association -- the

6    AAMR and the DSM-IV criteria for mental retardation?

7    A.  Yes, I was.

8    Q.  And in connection with that evaluation, did you review -- and I

9    am not going to go over it again -- but did you review the same

10   material Dr. Swanson -- Dr. Cunningham reviewed?

11   A.  Yes, I did.

12   Q.  Did you also review all of the information now constituting the

13   government exhibits, and by that I mean some 1,600 pages of

14   documents that were compiled by Dr. Hayes, as well as various

15   videos and discs and telephone conversations?

16   A.  Yes, I did.

17   Q.  And in connection with that evaluation, did you also perform

18   any interviews?

19   A.  Yes, I did.

20   Q.  If you will, Dr. Swanson, if you will list the names of the

21   individuals you interviewed in connection with your assessment of

22   Mr. Hardy?

23   A.  Okay.  I interviewed Toni Van Buren, I interviewed James Hardy,

24   I interviewed Tony Minor -- that's what he goes by, that's his

25   nickname -- that's Mrs. Minor's son.  I interviewed Mrs. Minor that

1    was here yesterday, I interviewed Greg Williams, I interviewed

2    Vance Ceaser, and all of those interviews were done in the fall of

3    2008.

4            And then, of course, I interviewed Mr. Hardy, I

5    interviewed -- there were people I couldn't get to interview

6    because my report was due in January.

7            I later went back and interviewed Lionel Hardy, I

8    interviewed Terry Hardy, I interviewed Linda Hardy, I interviewed a

9    lady named Terry Duncan who went to school with Mr. Hardy in middle

10   school.  And I interviewed Javetta Franklin, I interviewed her over

11   the telephone in early August, and I also interviewed her here in

12   New Orleans, you know, in late August, I guess.  I am not real

13   sure.  After I got back from Norway, I can tell you that much.

14   Q.  Were you also present when Dr. Hayes interviewed those

15   individuals on that list for whom videotaped interviews have been

16   provided by the government?

17   A.  Yes.  There was a special arrangement made and she interviewed

18   them in one room and I was in another room, so there was a wall

19   between me and them; but there was a doorway where I could watch

20   her the whole time and I could hear them well.  I mean, the door

21   was always left open.

22   Q.  Were you able to make eye contact with the particular witness

23   being interviewed or communicated with that witness?

24   A.  No.  I frequently made eye contact with Dr. Hayes or we talked

25   in-between interviewees, but I couldn't see the people being

1    interviewed, no.

2    Q.  And, of course, you had -- you also interviewed (SIC) all of

3    the previous reports and testing done on Paul Hardy, including the

4    reports and testing done back in 1996?

5    A.  Yes, I did.

6    Q.  Now, in terms of interviews, would you have liked to have had

7    non-family members such as teachers to interview?

8    A.  Yes.  Generally when I take these cases, I kind of like to

9    spell out to the lawyers who I think I need to see, and that's

10   always at the top of my list, any teachers, anybody that might have

11   known him well, a neighbor.  Maybe some managerial person in the

12   project would have been a good person here.  There weren't any

13   people really available because of Katrina.  There weren't even a

14   lot of school records available.

15          But I did kind of spell out what I would like to do, and

16   it's always my goal whenever possible to do a standardized

17   assessment, if I can find somebody that really knows the person

18   well enough to do that with.

19   Q.  Did you have -- explain the process.  When you're trying to

20   decide -- and let's use this case -- when you were trying to decide

21   in this case out of the universe of however limited that universe

22   of people available, how did you hone it down to people who were

23   worthy of your time in doing the interview who could really

24   contribute to your assessment of Mr. Hardy?

25   A.  Well, first thing I do is I talk to the lawyers.  I originally

1  talked to Denny LeBoeuf, who was the first lawyer I was working

2  with, and then you, and the mitigation specialist to explain what I

3  thought would make -- and what best practice says makes a good

4  respondent in these kind of interviews.  And the people that I want

5  to know.

6  Q.  Let me stop you right there.  If you could just explain

7  generally what those criteria are, what are you looking for in a

8  good respondent?

9  A.  Well, there's two things we're talking about here.  Anybody is

10  good to interview that knows something about Mr. Hardy, I wouldn't

11  turn down a chance to interview anybody that was, you know, was

12  willing to sit down with me.  But a respondent would have a higher

13  standard, the manuals specify what those are, but this person

14  should know him, see him every day, see him -- the manual even

15  points out seven to eight hours a day, like a teacher or a mother

16  or a sibling would have been good.  They have to have a clear

17  memory because we're talking about doing a retrospective diagnosis,

18  so they have to have a clear memory of those events.

19          And then they need to know all what we call the domains

20  of adaptive behavior.  So this person should be able to speak to

21  communication and how well they were doing in school, dressing,

22  self-care, healthcare, their leisure activities, how well they got

23  around in the community and what community resources they were able

24  to access.  What did they do in their leisure time, how were their

25  coping skills, what were their friendships like.  Because these are

1    all the different areas that we have to be able to interact with,

2    you know, in the environment.  And so I am looking for someone who

3    knows all of those areas and that's my first preference.

4    Q.  Now, are you describing a Vineland candidate or are you --

5    A.  Yes, that would be a candidate for a standardized measure of

6    adaptive behavior, that would be either the Vineland or the

7    ABAS-II, which are your two gold standards for that.  That's what

8    both sets of authors recommend that you look for.

9    Q.  So that's your first priority --

10   A.  That's my first priority.

11   Q.  -- is finding, if you can, a good candidate for the Vineland?

12   A.  And if I can't get someone who knows them globally like that,

13   then someone who knows a specific area.  For example, a work

14   supervisor a lot of times can tell you a whole bunch about just

15   work, and the ABAS-II has a subdomain, a subtest that addresses

16   just work skills.  So if I couldn't find anything else or even if I

17   got a global measure and I got a really good work supervisor, I

18   might sit down with him and do just that one measure with that

19   person.

20          But what you really like is the whole global picture

21   because that better meets the criteria or the definition of AAMR,

22   which I guess we're going to talk about in a little bit.  And if

23   not that, then I would try to find someone who knew one subdomain

24   really well.

25   Q.  In addition to the Vineland, which we will discuss in great

1   detail later on, are you looking for witnesses who can at least

2   give you some corroborating information?

3   A.  Yes.  And that's why I said, anybody that's comfortable with

4   sitting down and talking to me, I would love to sit down and talk

5   to them because they may not know enough that I could administer a

6   Vineland with them, but a lot of times they have rich details, and

7   I'll give you an example.  Someone like Vance Ceaser, who when I

8   interviewed him, he distinctly remembered certain periods of Paul's

9   life, but he knew a lot about the project and different activities

10  that were available to people that he accessed that Paul didn't

11  access.

12          He also had some direct information about Paul at two

13  different times of his academic life, when he was in kindergarten

14  and then they got tracked different, and then later on when Paul

15  came to him and asked him to tutor him so he could see if he could

16  get back in school.

17          So these were good ways to kind of check what other

18  people had told me against that.  So I thought that was good.

19          Linda Hardy really couldn't tell me a lot of different

20  things, but I could ask her stuff that Mrs. Minor had told me and

21  other people, and so she was able to corroborate that for me.  Oh,

22  yeah, I remember that, or, oh, yeah, that's right.  So it may not

23  have been new information, but I'm beginning to get more and more

24  people telling me the same thing and that's what I'm trying to

25  hear, I want to know what fits and goes together.

1  Q.  So what you're looking for is consistency across witnesses, is

2  that what you're saying?

3  A.  That's exactly right.

4  Q.  Now, did you interview Terry or -- let me ask you this first:

5  Are siblings always the best witnesses for this type of assessment?

6  A.  It varies.  I have done other assessments in Atkins cases, and

7  I've used siblings and done well with the siblings because they

8  knew them well.  Now, in the cases that I'm thinking of, those

9  siblings were care providers.  The person may have moved in with

10  them for three months and they took care of them during that three

11  months.

12      In another situation, at about 25, that sibling let him

13  live in the duplex, on the other side, and knew a lot about how he

14  lived.  And siblings remember things.  You know, I don't know if

15  any of y'all came from a large family, I do, and I can remember

16  different things about different ones, which, if nothing else,

17  gives me some good corroboration, so it kind of varies.  You have

18  to talk to the person to see how much they know and whether or not

19  they would make a good witness.

20      And then, of course, they would have to really want to

21  talk to you because you're not going to get very much out of an

22  uncooperative person.

23  Q.  Were there times prior to your report when Ms. Rogers, the

24  mitigation investigator, would come back to you and say, this

25  person doesn't really know enough?

1   A.  You know, because in a case like this, in trying -- I really

2   needed Vineland material, Vineland-quality respondents.  But

3   secondly, I wanted someone who was willing to talk to me, somebody

4   who is willing to sit down for enough time and relax because you're

5   having to think backwards in time.  And if these people really

6   don't have the time or the inclination, it's not -- they wouldn't

7   make a good witness.  And this family --

8   Q.  Let me stop you right there.  Is there really any sound

9   clinical benefit to be obtained in interviewing people who really,

10  really, really don't want to talk to you?

11  A.  I don't know of any reason to do it and then, you know, we

12  talked --

13  Q.  I mean, would you expect to get reliable --

14              THE COURT:  Don't interrupt.

15              MS. FOURNET:  I'm sorry, Judge, I apologize.

16              THE WITNESS:  There is an ethical standard in that, in my

17  opinion, and we have standards in our profession that we have to

18  follow and then each one of us has our own ethical standards, and I

19  think a psychologist has a certain role in people's eyes; and

20  before you step out there, some people are reluctant to talk to a

21  psychologist just because of the persona the word has for them.

22              Some people have things that go on in their lives, they

23  don't want to talk to a psychologist; and I think that's wrong for

24  me as a psychologist to impose that on another person if they don't

25  want it.  They may have some reason they're just not comfortable

1    sitting down with a psychologist, so I can't force that person to

2    sit down with me and participate in an interview like that.  I

3    don't see where that's therapeutic, and in my opinion it's

4    unethical.

5    BY MS. FOURNET:

6    Q.  In addition to the ethical considerations, which I gather are

7    substantial, how likely are you to get accurate or reliable

8    information from someone who is hostile about being interviewed or

9    unhappy about being interviewed?

10   A.  You're not very likely to get very good information if someone

11   is hostile or argumentative or just trying to get away from you.

12        In this particular case, I had another concern, and this

13   is a very unique family and these are children, these seven Hardy

14   children were exposed to a heck of a lot of trauma and stuff that I

15   was never exposed to in my life.  Some of Paul's siblings have

16   difficulties sitting down talking about these different things.

17        And I think for sure Linda Hardy, who I think everybody

18   was aware was raped in the project, has a hard time revisiting

19   project experiences.  And I can understand why she really -- she

20   doesn't remember stuff, she's blocked a lot of stuff off.  She kept

21   telling Ms. Rogers that she really couldn't remember anything.  And

22   so that was one of the reasons I was trying to hope that we could

23   get enough rapport to meet later.  And the second thing is --

24   Q.  Did that ever happen, by the way?

25   A.  We did meet, we did meet.

1  Q.  Okay.

2  A.  The second thing is with someone like Linda because I am a

3  psychologist, you open those doors and you let those little ghosts

4  out of the closets, it's your job as a psychologist to put them

5  back and put this person back together so they can go on into life.

6  And for Linda Hardy, that's a big thing you have to think about,

7  you know, is how much of this trauma are you going to drag out and

8  how useful is it to this case and is it going to really do anything

9  about that.

10         And I think that was a lot of Ms. Hardy's reluctance to

11  come forward in this case and talk.  There are some real reasons.

12  I kind of felt like when people were talking about it, maybe even

13  Lionel, that they didn't realize she had some real reasons for not

14  wanting to interview with me.

15  Q.  And what about Terry Hardy, did you interview him prior to your

16  report?

17  A.  I was never able to arrange an interview with him.  We tried

18  several times.  He did meet with Ms. Rogers.  He is a captain now,

19  I think, of this fire station.  I don't think he was a captain when

20  I started.  He was up for captain, I think.  There was some movie

21  being made that involved this fire department place, and so every

22  time I could schedule to come in we couldn't get anything together.

23         But at the same hand, when I talked to Ms. Rogers, Terry

24  shares some of the same issues that Linda shares, there was a lot

25  of bad experiences in the project that he put behind him when he

1    moved forward and made a better life for himself.  And when we did

2    talk, even then he has a lot of difficulty going back and reliving

3    some of these things that we talked about.

4    Q.  I think you did eventually talk to both of them after your

5    report; is that correct?

6    A.  That's right.  I was -- I mainly called you up, as I remember,

7    after I read Dr. Hayes's report because that was a criticism, and I

8    thought I had failed in my report to explain why this hadn't

9    happened and why I hadn't really determined that I didn't think

10   they were good witnesses and I felt I hadn't done a good job.  And

11   I asked could we try again, explain to them how it's important, I

12   will do it at their convenience, any time, night or day, wherever

13   they want to go.

14             And so we were able to arrange an interview with both of

15   them.  And I sent you a letter after I did the interview.

16   Q.  And that letter has been made part of the record, as far as you

17   know and given to the government?

18   A.  As far as I know, it has, yes.

19   Q.  Even now do you consider among these various informants, do you

20   consider Linda and Terry Hardy among your best informants?

21   A.  No, I don't.  Linda, like I said, could corroborate stuff.

22   She's six years older than Mr. Hardy, so she corroborated a lot of

23   stuff that Ms. Minor told me about early development, where they

24   lived, things like that, where they lived in the projects, which

25   schools.  There is such a difference in age, I gathered after --

they lived in a really bad part of the project where I think Linda had these problems, so pretty much the mother insisted she stay in the house, and she frequently just stayed in her bedroom.  So she wasn't interacting, she didn't know very much about what was going on with Paul.

Terry was more helpful in that he distinctly remembered where Paul was academically because Terry's about three years older than Paul, and there were times he tried to help him.  And so I think I put that in my letter about some of the academic issues with Paul.  And Terry saw him throughout the years.  Terry is somebody that Paul would call up and ask a question.  Terry helped Paul put Paul's kids' toys together at Christmas, things like this.  So, and then he gave me a lot of corroborative information.

There was a home invasion that he told me a lot about, he remembered that a lot, and so he could give me some information on that.  But as far as day-to-day activities with Paul, he really didn't know.

Linda and Terry went to a magnet school, they didn't go to the same schools as Lionel and Paul and Wayne.  And so pretty much early on they were going to this magnet school and staying with friends doing special projects and stuff.  So they were out of the house much, much more, and probably by the time Paul was like 12 or 11, Terry was more out of the house than in the house.

Q.  Who did Linda Hardy tell you knew -- who did Linda Hardy identify as the person who knew Paul the best as a little boy, who

1    was still living?

2    A.  Theresa Minor was the one that knew him the best, yes.

3    Q.  Now, I noticed that -- you mentioned that you had interviewed

4    James Hardy, but James Hardy, the interview was not covered in the

5    report.  Why is that?

6    A.  Well, Theresa Minor lives, as she describes, uptown, kind of a

7    little north of Claiborne, and James lives on the streets, best I

8    can tell in the median of Claiborne Avenue.  He's a severe

9    alcoholic, chronic alcoholic, possibly a drug abuser, I don't know.

10   And my opinion in talking to him, he might even be in the early

11   stages of alcohol dementia.  I couldn't even carry a good

12   conversation with him.

13         He comes to Ms. Minor's house quite often to get

14   something to eat, and so she had told me when we were going there

15   and we had set up for me to go that she would ask him to come by

16   that afternoon and I could see what I could get out of him.  And we

17   did talk, and he really wasn't that coherent.  He was still very

18   upset about having evacuated from Gustav and having broken his

19   foot, and all of his comments were very tangential, and I really

20   couldn't get him oriented or focused enough to have an interview

21   with him.

22   Q.  Was he of any use at all?

23   A.  He was no use at all.  I wish he had been, he is the oldest

24   sibling in the family, so hope -- it was hopeful that he might

25   remember something about Paul.  But he really had a difficult time

1  even identifying his siblings or the orders that they -- of birth.

2  Q.  What about Lionel Hardy who testified here yesterday, did you

3  interview Lionel Hardy prior to your report?

4  A.  No.  Lionel was in prison in Mississippi and he was scheduled

5  for release and I was very -- I kept holding off finalizing my

6  report hoping he would get back by Christmas because that's what

7  people thought was going to happen, but I was not able to see him

8  until after the report came in.

9  Q.  Now, in addition to hearing our lay witnesses testify

10  yesterday, did you hear -- and today, did you hear Dr. Cunningham's

11  testimony?

12  A.  Yes, I did.

13  Q.  And is there anything in Dr. Cunningham's testimony with which

14  you find yourself in disagreement?

15  A.  No, it's not.

16  Q.  When you do an evaluation, an assessment for an Atkins hearing,

17  are there, in your views and in the views of others, special

18  challenges that are posed in making this kind of evaluation?

19  A.  It is a much more challenging --

20       THE COURT:  Stop just for a second.  Is there some

21  difficulty?  It's okay for the gentleman to have his laptop if

22  that's what that was about.

23  BY MS. FOURNET:

24  Q.  Let me rephrase that a little bit and to break it down a little

25  better.  Most of these assessments you're talking about at these

1    various facilities and for the state, these are assessments that

2    are contemporaneous, in other words, you're assessing a person's

3    functioning at the time you give them a test; is that correct?

4    A.  Yes and no.  Most of them are.  The vast majority of them are.

5    But we still have in Louisiana people who don't believe in

6    institutionalizing their folks and they live at home with momma

7    until momma and daddy die, maybe at 56, and they knock on the door,

8    and so we're looking at somebody at 56 with no school records who

9    appears to be eligible for OCDD services, so then we're going to

10   have to do a retrospective diagnosis because we need to look back

11   and see what evidence do we have prior to the age of 18 that shows

12   this person is eligible for services.

13         And if someone has gotten a social security determination

14   30 years ago, a lot of times social security doesn't have those

15   records and psychologists have closed up their offices and their

16   practices.  So you see that out in the common field there, but even

17   then I am making someone eligible in Lafayette who lives right

18   around Lafayette so we kind of know something about the schools and

19   the teachers, so there are people that we can access and get some

20   statements from.

21         So nothing to the standard of an Atkins hearing, where

22   you're really looking backwards over time, and then you also have a

23   crime that's gone on between the -- probably the time from the age

24   of 18 and the time of the assessment.

25   Q.  And so by retrospective you mean trying to determine how a

1    person was functioning at sometime in the past --

2    A.  That's correct.

3    Q.  -- often significantly --

4    A.  And in either case, though, it would be the same.  We want to

5    know, did they meet the criteria prior to the age of 18 and would

6    they still be meeting the criteria in this case at the time of the

7    crime, in the case of the person in Lafayette, at the time they're

8    asking for services.  And so then we would be -- that's the similar

9    question there.

10   Q.  And in Atkins hearings, do you and others in your field

11   recognize that the population, the subpopulation of the population

12   with mental retardation, a certain subpopulation is the one that

13   you're going to run across most often, if not always, in capital

14   cases?

15   A.  That's correct.  People that have moderate mental retardation

16   or severe mental retardation are obvious probably to everybody.

17   People that have a medical syndrome that's closely, you know,

18   associated with mental retardation, anybody can pick that out.

19        People with mild mental retardation, really, once they

20   reach adulthood, and I think Dr. Cunningham addressed this, and get

21   out of a school or other agencies that clearly identify them, you

22   may not even notice the difference.  Not to the layperson, not to

23   the person who wouldn't sit down and really work with them.

24   Q.  I mean, having worked in this field for so many years, is it

25   your perception that many of us who are not psychologists and do

1  not work with individuals with developmental disabilities that

2  there are stereotypes out there?

3  A.  Oh, yes, there's definitely stereotypes out there.

4  Q.  And a person with a mild mental retardation, is he going to

5  have the -- necessarily going to have the mongoloid facial

6  features?

7  A.  No.

8  Q.  Is he going to drool or not be able to control his motor skills

9  or anything like that that's really obvious?

10  A.  Not typically, you know, I mean, he may also have cerebral

11  palsy or something that would cause a problem, but most people with

12  mild mental retardation can fit into their community fairly well,

13  and hopefully, I would think, during my 35 years we've worked very

14  hard in to getting them to blend into their communities.

15  Q.  So they're a lot harder to recognize than people with more

16  severe levels?

17  A.  That's correct.

18  Q.  In these capital cases where people come often from

19  dysfunctional backgrounds, from culturally-deprived backgrounds, do

20  you sometimes see what you referred to earlier as dual diagnosis?

21  A.  You frequently just see dual diagnosis, period.  There's

22  nothing to say that a mentally retarded person can't be depressed

23  and, you know, or can't have an adjustment disorder when their

24  mother dies or their grandmother dies.  If a person with mental

25  retardation is exposed to something traumatic, there's no reason

```
 1   they wouldn't get posttraumatic disorder just like anybody else
 2   could.  The problem for the professional is, is in the lower
 3   cognitive functioning people the disorders present different.
 4           So frequently what happens, if you don't have mental
 5   retardation experience, you don't recognize the person's depressed.
 6   Someone with an IQ of 100 can sit down and tell you they're
 7   depressed, why they're depressed, or you notice this or you notice
 8   that.  In people who function much lower, the symptoms, the
 9   characteristic symptoms, may present more behaviorally or in a
10   different way.  So you need someone who has had experience with
11   that population sometimes to recognize the dual diagnosis.
12   Q.  And is part of that dual diagnosis approach the job of the
13   professional to tease out what's attributable to the intellectual
14   impairments and what's attributable to other kinds of emotional
15   problems that may be going on?
16   A.  That's correct.  And then you should just have a good knowledge
17   of how that disorder primarily presents in a person with mental
18   retardation.
19   Q.  And if a person -- I asked you this earlier but I am going to
20   ask it again just for emphasis -- if a person has a diagnosis of,
21   say, posttraumatic stress syndrome, does that rule out mental
22   retardation?
23   A.  No.
24   Q.  And then also in an Atkins evaluation obviously takes place in
25   a legal context.
```

A.  That's correct.

Q.  So tell me what challenges that poses for the professional.

A.  Well, we've already discussed the challenge that the person is either, most likely, if they've reached this stage, mildly mental retarded or at least borderline intellectual functioning.  So you're having to differentially diagnose a very difficult area there.  And this is recognized in the field as one of most difficult areas to diagnose.

Frequently with this population you have dual diagnosis, and what happens with dual diagnosis in people who are mentally retarded is one overshadows the other.  So we tend to think, well, the person is mentally ill and not mentally retarded or mentally retarded and not mentally ill, and what we need to think is, well hey, what about the possibility there they're both.

There's legal constraints because if the person is living in Lafayette, Louisiana, or Alexandria, Louisiana, I could actually go and look at that person and watch how he does his job or go to his school or get the teacher to tell me how he's doing, there's lots of folks that probably know him well and then I have the opportunity to go and watch as well.

In a prison, it's a closed institution, it's not a community.  So our attitudes about what makes up adaptive behavior is based on a real community and not this closed situation.  So you're restrained and restricted in the areas that you can assess.

And then finally you're doing it at such a late period in

1    life.  Many, many, many school systems throw all of their school

2    records away five years after they graduate or exit the school.

3    There's other things, say in this case, Katrina, national disasters

4    that cause things to be lost.  Family members die, people that have

5    worked with them are no longer there or available or they retire,

6    so you don't have access to the folks you need to have to make the

7    traditional diagnosis.

8    Q.  And then, of course, in the legal context of an Atkins hearing,

9    you have the stakes, don't you?

10   A.  Have the what?

11   Q.  What's at stake with a person?

12   A.  Well, yeah, that's -- you have that stake.  And others you have

13   that as well, because you may be assessing this person to get

14   social security, and for that particular person getting it in their

15   father's name, that might be $1,000 a month.  Or you might be

16   assessing this person to see if they can move from a community home

17   to an SIR placement.  And there's a long waiting list on that, and

18   so there's a desire to get that service.  But nothing that's

19   equivalent, to me, of death, which is the highest stake of all,

20   yes.

21   Q.  And knowing that, would any responsible professional not at

22   least be mindful of the possibility of malingering or malingering,

23   I think what you call malingering by proxy?

24   A.  Yes, that's right.

25   Q.  And were you mindful of that possibility in Paul Hardy's case?

1   A.  I hope I am mindful of that possibility in any case, but I felt

2   I was mindful of that possibility in Paul Hardy's case, yes.

3   Q.  Now, do you recognize this book?

4   A.  Yes.

5   Q.  User's Guide, for the record, this is the User's Guide.

6           MR. McMAHON:  May I see it?

7   BY MS. FOURNET:

8   Q.  Again, for the record, this is *User's Guide:  Mental*

9   *Retardation:  Definition, Classification and System of Supports*,

10  published by the AAIDD, formerly AAMR.  Do you recognize that book?

11  A.  Yes, I do.

12  Q.  And do you have a copy of that book up there with you?

13  A.  Yes, I do.

14  Q.  Is this -- tell me about this book.

15  A.  Okay.  AAIDD, formerly AAMR, about every ten years, since I

16  think 1908, has published a classification book on mental

17  retardation.  It's a ten-year summary of where we are in the field

18  of mental retardation, what we know about mental retardation, what

19  we think is the best way to assess, it's kind of like an

20  accumulation of where we are.  It's very similar to the DSM that

21  comes out every so many years.

22           And the diagnostic committee of AAMR has been who most

23  people have turned to probably since the '40s for the diagnosis of

24  mental retardation.  It is the one that DSM has been using, I

25  think, since DSM-III for sure, for sure in DSM-IV and DSM-IV-TR.

1    Now, the Ninth Edition came out in '92 and that's the one that

2    DSM-IV-TR is based on, that's the one that's mentioned in Atkins.

3    The Tenth Edition came out in 2002.

4           And about the time, as many of you know, in 2002 is when

5    Atkins was, so they had already published their book when Atkins

6    came out, and there are other issues as well that came up, so the

7    User's Guide was put out in 2007 just as additional information for

8    folks to supplement their Tenth Edition.  I think AAMR or AAIDD now

9    is hopeful to maybe have their next edition out by 2012 if

10   everything goes -- I mean, it's every ten years they try to

11   summarize where we are and what their recommendations are.

12          So this would be like a guideline to what we call the

13   AAMR - Tenth Edition, some people refer to it as the red book

14   because it's in a book very similar to this that's red.

15   Q.  And that would be this book --

16   A.  That's correct.

17   Q.  Mental --

18   A.  "Definition, Classification and Systems of Support," that's the

19   Tenth Edition.

20   Q.  Why don't you read the title and I'll give Mr. Miller the book.

21   A.  I think it's right, this one right here, where it says, User's

22   Guide:  It's -- the title of that book is *Mental Retardation:*

23   *Definition, Classification and Systems of Supports*, Tenth Edition.

24   And that was the 2002 edition there.  And that came out with AAMR.

25   And it has the definition of what they recommend how to define

1    mental retardation, what are the gold standard tests that you use

2    intellectually, adaptively, how they recommend that you go about

3    it.  It also addresses treatment issues, policy issues, et cetera.

4    Q.  And would it be fair to say that these two books, these two red

5    books that I just held up for you, are some of the definitive texts

6    and guidelines for professionals in your field?

7    A.  Well, definitely.  As I mentioned, the Ninth Edition is what

8    DSM-IV-TR follows, and this is the definition that followed it.

9    The DSM has been kind of slow, they should have already come out

10   with their Fifth Edition, we're now hearing, I think, 2016 or

11   something for that.

12         But generally what DSM does is they take whatever the

13   current edition of AAMR has and they use that as their definition.

14   Q.  And, in fact, the court in Atkins I believe you mentioned

15   referred to this User's Guide?

16   A.  Yeah, they referred to this one because the Tenth was out.  The

17   DSM uses the Ninth, and I think Dr. Cunningham went into all of

18   that, how there's ten under the Ninth and now there's three under

19   this and they're the same thing.  So I don't want to go on forever

20   on that.

21   Q.  Well, in this edition, I think this is the latest edition that

22   I am holding up.

23   A.  That's right.

24   Q.  Is there not a special section on the use of clinical judgment,

25   particularly in the context of an Atkins hearing on page 24 here?

1    A.  Would you give me the page number, please?  Page 24.  Yes,

2    there is.  They've actually published a book on this, AAMR as well,

3    there's a book that they have published on this, and then they also

4    bring that up in this as well.

5            And in this section Ellis was someone who was kind of

6    instrumental in the Atkins case and they referenced him and some of

7    his recommendations of what makes a professional, an expert in the

8    field of mental retardation.

9    Q.  And according to the User's Guide, particularly in the context

10   of an Atkins hearing, is just any psychologist suited for this kind

11   of assessment?

12   A.  No.  As I understand this, you want someone who is not only

13   trained to diagnose mental retardation but also to treat mental

14   retardation and then also interpret those assessments and the

15   treatment and the progress.  And if I may, the reason that being

16   is, many of the assessment techniques we use, if you haven't ever

17   really had to train someone in that, you wouldn't realize exactly

18   how to do the probes for the adaptive.

19           For example, I used check writing a while ago.  If you've

20   never really had to oversee teaching someone with mild mental

21   retardation the steps that you had to go through to write a check,

22   you may not ask the right questions when you're asking somebody

23   about what are their money skills or what is their budget skills,

24   et cetera.

25   Q.  And I think the way it's worded in this User's Guide is:

1    "Anyone who is in a relevant field and engages in clinical

2    activities with individuals with mental retardation/intellectual

3    disabilities."  Is that what you're referring to?

4    A.  That's correct.

5    Q.  And it also recommends using this book, correct (INDICATING)?

6    The red book that you referred to?

7    A.  That's correct.

8    Q.  Why in your view is, as this User's Guide suggests, why is

9    experience actually working with the population, the population

10   with mental retardation, important in doing these assessments,

11   particularly retrospective evaluations in the context of an Atkins

12   hearing?

13   A.  Frequently in these evaluations what we're looking for is, we

14   need to have a good knowledge base of what would you commonly see

15   in the mildly mentally retarded as an adult and as a child, and I

16   think Dr. Cunningham brought that up, so that's one of the things

17   we're looking at, the whole developmental period.  And as we hear

18   these stories from different people, was that consistent with a 16

19   year old, is that consistent with a 12 year old.

20           Also, when someone who is trained in the field is working

21   with something, the fact that they have a strength, that's not

22   enough for me.  You know, the fact that they can do this one thing

23   well, I need to know, well, when did they learn that, did they

24   learn that when other children learned that.  What did it take to

25   teach them that, how many supports did you have to put in place.

624

1   If they go away for a while and the support's there, how quickly do

2   they forget.  Because these are all things you see with a person

3   with mental retardation.  So if you're an expert in the field, you

4   have a better knowledge of their developmental progress.

5          Not seeing a deficit at 26 doesn't mean maybe there

6   wasn't a deficit earlier developmentally, and then the fact that

7   the deficit was there, well, how did you -- how did that strength

8   come along, what did you do to do it.

9          And then I think we look a little closer at the natural

10  supports that other people may not see that are in an environment

11  that is helping that person function, and then what can we do to

12  strengthen those supports and make sure they stay out in the

13  community.

14  Q.  So basically, you're talking about the adaptive behavior prong,

15  the different definitions of --

16  A.  That's correct.  And then I think intellectually it's the way

17  they answer some of their questions possibly on intelligence tests.

18  Some of Paul's, as I remember off the top of my head, some of his

19  WAIS-R responses were truly unique and had the concreteness.  We

20  talked about some abstractions that people do, and that's more

21  common to see that in people with mental retardation.

22         I am sure we're going to talk about serial sevens.  When

23  I am working with someone with low cognitive ability, I know how

24  they're going to try to fake serial sevens, so I know how to

25  present it and what I will tolerate and not tolerate, so that would

```
 1    probably be a good example.

 2              With abstractions, for me, when I'm doing proverbs or

 3    something, I try to find the higher-level abstractions because a

 4    lot of times mentally retarded people can figure out blood is

 5    thicker than water, I want to know something more about why you

 6    can't see the forest through the trees, some higher abstraction.

 7    If I am working on similarities, I work higher up than that,

 8    because I kind of know and I've given enough tests to know where

 9    they're going to fall in that.  These are subtests that we give on

10    the Wechsler and the Stanford-Binet all the time, so I kind of know

11    where a mild person is going to start toppling off on those

12    questions, so I am going to differentially diagnose a little bit

13    higher than that to see where they are.

14    Q.  So these factors that you're describing that I am interpreting

15    to mean, this is how I know a person with mental retardation when I

16    see one, I've seen these characteristics in others over my 35

17    years?

18    A.  Yes, in those thousands that I read, yeah.

19    Q.  And I recognize them, I know them when I see them; is that

20    basically what you're saying?

21    A.  That's correct.  And when someone is telling me a story about

22    parenting or how they -- someone learned how to do something with

23    their child, I can think back on a lot of similar experiences and

24    well, what did I -- I knew another person with mental retardation

25    that could do the same thing and I know what I had to go through to
```

1    teach that person, so I am probably better able to say, well, you

2    know, I knew someone else who could do that, could you tell me how

3    you got that to happen for your person, and then we can go from

4    there.

5    Q.  Is this just a subjective judgment on your part or is this

6    science?

7    A.  Well, I think that section you just referred to there with

8    clinical judgment is, we're saying it's science, because if you

9    have expertise in that field and you use the gold standards for

10   that field and you're trained to use them and you use them in the

11   appropriate way, you are going to -- everybody who is trained in

12   that way is going to come to a similar conclusion.

13          So it's not rocket science.  And I think people need to

14   understand we've been doing this for years, we've been using IQ

15   tests to identify people with mental retardation since the early

16   1900s.  The Vineland started getting developed in the 1920s and

17   1930s.  It's been being done forever, I just think it suddenly got

18   so controversial after 2004 -- I mean 2002.  It's science, it's

19   just not rocket science.  If you know how to do it, you can do it

20   and you can do it well.

21   Q.  I think we have a poster up there that says just that, science

22   but not rocket science.

23   A.  That's correct.

24   Q.  And the fact that it is science means that obviously the person

25   has to have sufficient experience and training to make the

1   scientific, draw the scientific conclusions that these kinds of

2   evaluations require?

3   A.  That's correct.  But now within the field itself, there's been

4   recommendations come forth by different agencies that, you know,

5   Atkins is at a higher level, we discussed that, and within the

6   field there are guidelines and best practices and recommendations

7   of how you need to do these things in these specific cases.  And,

8   of course, we would all want to follow that in an Atkins hearing.

9   Q.  And are you familiar with those guidelines and try to follow

10  them in your own Atkins evaluations?

11  A.  Yes, I think maybe the first eight pages of my report I tried

12  to summarize them, and I give references of kind of where we were

13  in January when I wrote the report.  Actually, there's been a lot

14  of research done this year and even further along than that.  But

15  who you look to, where you go, where do you make your decisions.

16  Q.  Dr. Swanson, do you change, or is there any reason for changing

17  the scientific process for assessing a person for mental

18  retardation when the issue is a forensic one such as in an Atkins

19  hearing?

20  A.  It is retrospective.  I've given examples in regular

21  evaluations that are retrospective as well.  I think you kind of

22  have to do everything at a higher standard than you would, and you

23  do need to go and say, well, how do the experts say I need to do

24  this, you know, more than you would in other situations.

25  Q.  But you don't use different --

1    A.  Oh, no.

2    Q.  Do you use different standards, this is a forensic evaluation,

3    so I don't have to --

4    A.  No.  I pretty much use the same IQ tests and you use the same

5    standardized assessments.  And even in a normal, regular

6    assessment, I still want to talk to some other folks and I still

7    want school records and I still want social security records and

8    relevant information.

9    Q.  Once you have performed the testing and the interviews on the

10   person and you've done the Vineland, if you've done one, you've

11   interviewed the family, you've gone through school records, does

12   your job then consist of going through the results and trying to

13   ferret out any inconsistencies you see?

14   A.  Pretty much.  I think -- my training was every evaluation

15   starts like that.  You start at the big top of a funnel, just think

16   of that, and you look at everything you possibly can and then you

17   go down; and if you find something inconsistent, go back up again

18   and see if you missed something and then keep going and going and

19   going.

20          In these kind of evaluations, when I find something

21   inconsistent, I think we already discussed what I do, I go, okay,

22   well, there's a strength, you know, and I am supposed to be looking

23   for convergence of deficits, what's causing this strength.  And I

24   try to find more information about that, are there hidden enablers

25   there in the environment that's helping that happen for that

1   person, et cetera.  Is there some reason this record looks like

2   that and it's an outlier compared to all of these other records.

3           And then as I go down I converge down to where I finally

4   am able to make a diagnosis.

5   Q.  Well, in the overarching sense, are you looking for consistency

6   and convergence, or are you looking for -- picking through

7   information and trying to find where something looks different?

8   A.  No.  I mean, if I recognize something different or if something

9   flies out at me, I am going to make a note and say, hey, I need to

10  go back and look at this.

11          But in the field of mental retardation you're looking for

12  deficits.  I mean, that's what we're looking for is a picture of

13  somebody who is two standard deviations below in a lot of different

14  things, such as academics, leisure, cognitive ability, their

15  ability to work, et cetera.  So what I'm looking for is a

16  convergence of deficits.  And then, like I said, if I find

17  something that looks different, then I am going to look at it.  But

18  still, if the preponderance of the evidence is deficits, then I am

19  going to have to continue to go down with the deficits.

20  Q.  So you don't ignore the strengths but you focus on the

21  deficits, is what I think you're saying?

22  A.  I think that's correct.  That would be the way -- even if you

23  look at the definitions, you don't have to be 100 percent in every

24  area of adaptive behavior, it's 2 of 11 in DSM, it's 1 of 3 or the

25  overall in AAMR.

1   Q.  Can a person with mild mental retardation -- which is the type

2   we're talking about today, is it not?

3   A.  Yes.

4   Q.  Can a person with mild mental retardation have strengths?

5   A.  Yes.

6   Q.  Can he have quite a few strengths?

7   A.  Yes.

8   Q.  Dr. Swanson, do you have an opinion today to a high degree of

9   scientific certainty whether Mr. Hardy meets the first prong of the

10  AAMR and DSM-IV diagnostic criteria of mental retardation regarding

11  intellectual functioning?

12  A.  Yes, I do.

13  Q.  And what is that opinion?

14  A.  I think he meets it.

15  Q.  Do you have an opinion to a high degree of scientific certainty

16  whether Mr. Hardy meets the second prong of the AAMR and DSM-IV

17  diagnostic criteria of mental retardation involving the adaptive

18  behavior?

19  A.  Yes, I do.

20  Q.  And what is that opinion?

21  A.  I think he meets it.

22  Q.  How does the AAMR, the red book as you call it, recommend

23  establishing objectively -- and we're going to focus, as you know,

24  since Dr. Swanson talked mostly about cognitive --

25          THE COURT:  This is Dr. Swanson.

1          MS. FOURNET:  I mean, Dr. -- excuse me, Judge, I'm

2    getting tired.

3          THE COURT:  Well, actually, I was going to jump in

4    because we've been at it a little over an hour and a half, and it

5    might be a good time to take a break if it's a good time for you.

6          MS. FOURNET:  Yes, ma'am, that's perfectly fine.

7    Obviously I need it.

8          THE COURT:  I wasn't suggesting that.

9          Okay.  We'll take, 10 minutes, well, about 10, 15

10   minutes.

11         MS. FOURNET:  Thank you, Judge.

12         THE DEPUTY CLERK:  All rise.

13       (WHEREUPON, A RECESS WAS TAKEN.)

14       (OPEN COURT.)

15         THE COURT:  Please have a seat.

16         MR. MILLER:  Your Honor, before we begin, Ms. Fournet was

17   nice enough so I didn't forget to do this.  The court had asked

18   that we provide the court with the slides --

19         THE COURT:  Yes.

20         MR. MILLER:  -- from yesterday, and so the government has

21   marked its slide as Government's Exhibit 32G, correct?

22         THE DEPUTY CLERK:  Just 2, Government 2.

23         MR. MILLER:  I am going to do what Kim does and mark it

24   Government 2 and mark it during a break.

25         THE COURT:  She, who must be obeyed.

1          MR. MILLER:  Thank you.  Thank you, Ms. Fournet.

2          MS. FOURNET:  You're welcome.

3          THE COURT:  Michele.

4    BY MS. FOURNET:

5    Q.  Dr. Swanson, I meant to say Dr. Cunningham in my last question.

6    You heard Dr. Cunningham's question -- testimony largely addressing

7    the cognitive side of these criteria for mental retardation.

8    A.  Yes, I did.

9    Q.  And so, as you know, today we're going to function primarily on

10   adaptive functioning, okay?

11   A.  Yes.

12   Q.  What is the definition in the AAMR of adaptive functioning?

13   A.  Okay.  Are we talking about the AAMR Tenth?

14   Q.  Yes.

15   A.  Okay.  The AAMR Tenth, as Dr. Cunningham explained, collapsed

16   those ten or eleven areas down into three areas, and so they

17   recognize that the deficits would either be overall -- and they

18   also recognize, the Tenth, that there should be some kind of

19   standardized assessment.  So you're looking at two standard

20   deviations below, either in an overall global score or in one of

21   the three areas of conceptual, practical and social.  And as he

22   explained yesterday, those are really -- those 11 areas have now

23   been subgrouped down or brought back up into three large domains.

24   Q.  And are there really, as a practical matter, any significant

25   differences between the 11 criteria in the DSM and the -- or the 11

1   domains in the DSM and the three domains in the AAMR?

2   A.   They are exactly the same domains, it's just the way we look at

3   them now are -- we kind of took three or four and made them into

4   conceptual, three or four and made them into social, et cetera.

5   It's easier to get a standardized assessment on those than there is

6   to get in one of those very small areas, for example, like health.

7   Q.   And do you have an opinion to a high degree of scientific

8   certainty that Mr. Hardy met the third prong of the diagnostic

9   criteria of AAMR in DSM-IV, that is, onset prior to age 18?

10  A.   Yes.   I think the evidence, the preponderance of the evidence

11  is that he did meet these criteria prior to the age of 18.

12  Q.   And of the 11 areas in the DSM definition, does Mr. Hardy

13  presently have current limitations?

14  A.   And for the benefit of the court, if you look at my report on

15  page 24 under Summary and Analysis of Conclusions, Dr. Cunningham

16  mentioned that yesterday, we kind of have two thoughts, was it

17  there prior to the age of 18 and then what can we say about the

18  time of the crime and now.

19          And you're asking me what I said currently, and I felt

20  that currently he has -- I thought we could demonstrate substantial

21  limitations in the areas of functional academic skills, health,

22  self-direction, domestic skills and work.

23  Q.   And what about at the time of the crime of those 11 domains,

24  which ones did you find significant limitations?

25  A.   I really would say at the time of the crime you saw -- and if

1    you look a little higher up, I mention what areas I thought were

2    there prior to the age of 18, and I named more, I think seven:

3    communication, functional academic skills, self-care, home living

4    or domestic skills, social and interpersonal relationships, leisure

5    and self-direction.  So I think those were there prior to the age

6    of 18, and I think there's evidence they were there at the time of

7    the crime.

8         In the community, it's easier to demonstrate when someone

9    is in the community, and that's why, to me, I'm having a hard time

10   demonstrating the same number in an institutional setting as I did

11   when he was in the community.

12   Q.  Can a person actually learn some adaptive skills while

13   incarcerated?

14   A.  Yes.  You know, I firmly believe a person can learn no matter

15   where they are or what they are.  And if you look -- and I'll

16   equate that to what I am familiar with, people with mental

17   retardation who live in institutions that we now call developmental

18   centers, and they can learn a lot of skills there.  As a matter of

19   fact, you'll watch their adaptive skills go up.

20        And as I talked to you earlier, what we have to worry

21   about is, I can teach something in one setting, but I have to teach

22   them to generalize that to other settings.  So then that becomes,

23   if I teach them this in an institution, what can I put in place for

24   when they leave that those skills stay maintained.  People with

25   mental retardation have just as much trouble maintaining skills as

1    learning skills, so they need some supports in the community to

2    keep those going for a long enough period until they become natural

3    behaviors for them.

4    Q.  So does the fact that someone can perform a particular skill in

5    prison mean that he can without any additional support or help

6    perform that skill outside in the larger community?

7    A.  No.  Because in the community and even in institutions for the

8    mentally retarded, we tend to put in hidden supports.  People don't

9    independently decide when to bathe in institutions for the mentally

10   retarded or in prisons.  People don't decide pretty much when they

11   get to do certain things, these decisions are made for them, their

12   days are scheduled, their transportation is provided a certain way.

13        When you live in the community, suddenly it becomes your

14   responsibility to make these decisions for yourself, to put them in

15   the appropriate order, to make sure they get done in a timely way,

16   so there are many more demands on you in the community than there

17   would be in a restricted setting.

18   Q.  Was there in any of the three periods of Paul Hardy's life,

19   that is, pre-18, the time of the crime and currently, is there any

20   of those three time periods where he did not meet sufficient

21   criteria of severe limitations in enough of the adaptive behavior

22   domains to qualify as having mental retardation?

23   A.  No, he met them at all three times.

24   Q.  In connection with your evaluation of Paul Hardy, did you

25   perform or did you compile a developmental history of Mr. Hardy's

1  life?

2  A.  Yes.  You know, from the field of mental retardation that's

3  primarily how we do our evaluations and that's probably why my

4  report might look different than Dr. Hayes or Dr. Cunningham who

5  are more forensically trained than I am.  But what we really want

6  to do is to go back as far as possible in their developmental

7  history and watch how they develop.  And one of the things we're

8  looking for are the earmarks -- the benchmarks for what we know

9  should be there at two or three or six, are they there.

10       If they aren't there, why aren't they there.  And if they

11  later show up, do they show up at the time frame that's typical for

12  somebody with mild mental retardation, or are there other things

13  that help that skill emerge.

14       So that's what I did was primarily, as much as possible,

15  when I started at the top of my funnel, to start as far back in the

16  developmental period as I could.

17  Q.  And who would have been the witness you talked to who could

18  describe best Paul Hardy as a child?

19  A.  Well, the only -- at the initial trial it was the mother.  And

20  there is a lot of information available on the mother from the

21  initial trial and in different records.  But as far as living today

22  that I could sit down and speak with, Theresa Minor was the only

23  person that I could identify, the only person that Paul identified

24  and the only person that his other siblings identified that's still

25  living today that would have known Paul in his toddler years all

1    the way up.

2    Q.  And just generally, when you spoke with Ms. Minor, how did she

3    describe Paul as a child, say, up to about the age of ten?

4    A.  And I want to point out that, I don't think Ms. Minor did a

5    very good job explaining this yesterday, she has her son Tony.

6    Paul is six months older than Tony and Wayne is six months younger,

7    so you have three kids very close in age.  And this woman did work

8    with preschoolers, and that was her primary job most of her life.

9          So you have three children very close in age, and you can

10   watch how they develop and are they developing in a timely way.

11   And I think that's what triggered her to see Paul because she

12   watched her son and Wayne move past him.  She pretty much described

13   him when he was little when she first remembered him as being very

14   little, he's much smaller than his brothers.  Usually in poor

15   clothes, this was some of the poorest years this family had was

16   Paul's preschool years, his mother had not gotten public housing

17   yet, she frequently went homeless and was dependent on others.

18         The children, the boys pretty much wore each other's

19   clothes.  So it's a poor boy, barefoot and raggedy clothes.  And

20   she described him to me as a tongue-tied boy.  He had a hard time

21   speaking up.  Wayne, who was almost I think a little more than 12

22   months younger than he was, frequently answered for him.  And the

23   more you pressed him for an answer, the more confused he became.

24   She said he was an obedient boy, he did what you said.

25         Ms. Minor was used to being able to talk to children his

```
 1   age and get them to explain things to them and he couldn't do this,

 2   and so what she noticed immediately was not a speech deficit, not

 3   even what we call speech, but what's very important to me is

 4   language development.  His language was not developing at what

 5   would have been anticipated for his age.  He had a hard time coming

 6   up with the phrases and sentences that he needed to describe what

 7   he needed.  And if you pressed him, he tended to just walk away.

 8            The little shoe she was talking about, he would hide it

 9   so she wouldn't ask him to do it.  There were other things --

10   Q.  Let me stop you right there.  What was the walking away and

11   hiding the shoe about?

12   A.  Well, then, he avoided the task.

13   Q.  And why would he avoid the task?

14   A.  Because he couldn't do it.

15   Q.  And why would he not just tell her he couldn't do it?

16   A.  Well, he didn't have the speech, the language skills he needed

17   to communicate that.  And she had the same expectations for him at

18   that age that she had for all children, and I think initially, as I

19   understood my first conversations with Ms. Minor, she thought,

20   well, maybe it's just a speech impediment, a speech problem, let's

21   give him some speech therapy, things will get better, this is what

22   we do in our preschool.

23   Q.  She mentioned when she testified yesterday that her son would

24   tell her when he couldn't do something --

25   A.  That's right.
```

1    Q.  -- and Paul wouldn't.

2    A.  Her son would ask for help.  These are things Paul didn't do.

3         Wayne was closest in age to him and Lionel was a little

4    bit older, maybe a year and a half, so, you know, that's the age

5    frame there.  And Wayne early on kind of learned to stand up and

6    answer for him and do for him.  And that was a pattern that kind of

7    developed in Paul's family is people stepped up to do it for him

8    when they anticipated it was something that he couldn't do.

9    Q.  Let me ask you since you brought that up.  Let me ask you this

10   because much has been made implicitly or explicitly so far during

11   the course of this proceeding that Paul didn't do things at this

12   stage of life, as well as much later, because he didn't, quote,

13   "need" to do them, he didn't drive because he didn't "need" to

14   drive, he didn't cook because he didn't "need" to cook.  What do

15   you have to say about that?

16   A.  Well, there's two issues in this family.  You have a mother who

17   really didn't do well in school, was taken out of her family at an

18   early age -- by her family out of school early and was put to work

19   in domestic skills under her grandmother and learned them well.

20   And she did all of the housekeeping in the home and she was very

21   proud of it, and she didn't like to share her strengths with other

22   people, this is what she was known for.

23        So you have a mother who did all of the cooking, all of

24   the housekeeping.  Linda told me that she was never, I mean, she

25   was the only girl in the family, she was never required to cook,

1    she was never required to launder, she wasn't, you know, she kept

2    her own little area clean, her mother might ask her to do this or

3    that, but the housekeeping was done by her mother, and her mother

4    was very proud of her housekeeping.

5         So you have that going in the family so he didn't have

6    the opportunity in that way, and I think that's what people are

7    bringing up.

8         But within -- with Paul's siblings, there's just a

9    tendency among folks that it's harder to show them how to do it

10   over and over again than just to do it myself, and this is the

11   pattern that developed with Paul, people did for Paul rather than

12   make him do it.  And when you talk to people like Linda or Terry or

13   Lionel and I asked them --

14   Q.  Or Toni Van Buren.

15   A.  Or Toni Van Buren.  And I asked them, well, why didn't you just

16   get him to do it or show him how, they just laugh and say, it would

17   take forever, or you had to do it over and over again, it was just

18   easier to do it for him.

19         As far as the issue of what the mother did, and you heard

20   Lionel talk about he was a prep cook by the time he was 18.  The

21   folks in the family that had the capabilities, when they left the

22   home, quickly were able to pick up the skills they showed the

23   mother model, you know, they saw their mother model in the home.

24   Paul wasn't.  It's true he was never made to do those things, but

25   on the same hand, he couldn't learn them later.  There might have

1   been a chance if someone had made him do them over and over again

2   until he got them right, but they didn't.

3   Q.  Do people in families like this or for people around the person

4   with mental retardation, at the time -- and I know you -- I believe

5   you talked to Toni at length about this, and I am skipping a little

6   bit ahead in his life -- but at the time are they necessarily

7   conscious that, hey, I am doing this because he is slow or, hey,

8   I'm doing this because there's something wrong with him; is that

9   something that, for instance, Toni thought about at the time from

10  your conversations with her?

11  A.  No, I don't think so.  And I can give you a personal example.

12  I have only one child, a daughter, who has two college degrees, but

13  she is ADHD, and believe me, it was harder to show her how to clean

14  her room than for me to clean it myself -- I mean, it was easier

15  for me to clean it myself than to show her how.  You know, after a

16  while, it's like, don't fight those battles, let's do something

17  else.

18          And I think that's kind of like what went on -- and I

19  think all of us may have those things that we do with our kids.  We

20  know we should do a little bit more and we don't.  And I think

21  that's a lot of what went on with Paul, and I think I heard Toni

22  say that on the stand is, after a while, it was, we'll just do it,

23  because you knew he couldn't do it, why ask him, just do that.

24  Q.  When is the first time based on your conversations with Toni

25  that she became more conscious of, hey, this was not normal for me

1  to be having to drive him around Meals on Wheels or whatever?  When

2  did she first start to realize that maybe this was because Paul had

3  some type of impairment?

4        MR. McMAHON:  Your Honor, I hate to interrupt, but Toni

5  Van Buren didn't testify to any of this, and what Ms. Fournet is

6  really doing right now is, is she's basically asking Dr. Swanson

7  to, in effect, mind read Toni Van Buren.  Now, if Toni Van Buren

8  had this information, it didn't come out on the stand when she

9  testified.

10        So I am objecting on the grounds that it's speculative.

11        MS. FOURNET:  May I respond, your Honor?

12        THE COURT:  Sure.

13        MS. FOURNET:  This is not speculation on Dr. Swanson's

14  part, this is actual conversations that she had with Toni Van

15  Buren.  Whether Toni Van Buren testified to those conversations or

16  not, they are facts upon which Dr. Swanson's opinion is based.

17        THE COURT:  And I assume we're going to be doing quite a

18  bit of this with Dr. Hayes as well, so the objection is overruled.

19  Go ahead.

20        MS. FOURNET:  Thank you, your Honor.

21  BY MS. FOURNET:

22  Q.  When did Toni indicate to you she became aware looking back

23  that perhaps the reason she was without really thinking about it

24  doing these things for Paul may have been because he was impaired?

25  A.  I don't think she was ever aware of it prior to his arrest.  It

1    was my understanding, as she explained, she went on into the

2    restaurant management business and she took various classes on how

3    to manage other people or inservice training or whatever, and she

4    has to work with people who may have English as a second language

5    or not have had these skills, and people started explaining to her,

6    you just don't tell somebody something to do, you need to go back

7    and see how much they understood and the drill that goes with that.

8              And suddenly it started reminding her of what she had to

9    do with Paul.  And that there must have been some kind of problem

10   going on there with him that she didn't realize, and it was just

11   easier to do it herself and it would have been better to --

12   probably helped him learn how to do, nobody took the time to really

13   show him how.

14   Q.  Is that phenomenon that you just described with Toni Van Buren,

15   is that unusual in the families of people with mental retardation

16   or in their group of loved ones and friends, not to recognize at

17   the time that there was an impairment?

18   A.  No, it's not.  I mean, out of all of the people that I've

19   interviewed that I am diagnosing for the first time, a lot of times

20   you have to do a lot of education with family members for them to

21   understand what mild mental retardation is and what the goals are

22   for these people and what they need to do to better their lives.

23   Q.  And is it uncommon with these folks, the families and friends

24   and loved ones of people with mild mental retardation, to spend

25   years doing tasks that the person really should be able to do

1  himself without really thinking about the implications of that?

2  A.  That's very common.

3  Q.  Now, you talked about Ms. Minor's description of Paul as a

4  little boy.  What kind of resources, when he was a little boy and

5  for the entire time he was living at home, did the home provide for

6  him in terms of supports?

7  A.  Ms. Minor specifically addressed that.  And his mother was very

8  poor and she didn't want to live with the father, and there's been

9  reasons brought forth why she naturally wouldn't want to expose

10  herself, her daughter and her children to that.  So she had to

11  spend most of her income and what little that she did make working

12  on housing, and so there wasn't very much to spend on anything

13  else.

14       So once she got into the Calliope, ironically,

15  financially things got a little bit better for the family because

16  they weren't spending so much on finances, but by then they were

17  living in probably some of the most horrific living conditions

18  currently available in New Orleans.  And I think Paul moved in

19  there right about the time -- right before he started school.

20  There wasn't a lot of money, it's in the records from before and

21  Ms. Minor addressed that, and the children all talk about that.

22       She was a good mother.  To make sure they ate, she did

23  without; she might have ate something else or something smaller or

24  just a candy bar so there would be enough food on the table for the

25  kids.  Unfortunately, when she was doing this, she was rapidly

going through pregnancies.  I want to -- the last four boys would

have all -- and there was a time when all four of them would have

been under five years of age probably, and so she is rapidly going

through pregnancies, her nutrition is poor, there's not a lot of

resources available to these kids.

And what Ms. Minor found in her visits to the projects,

there wasn't a lot of things in the home to enrich the home.  It

was just the basic things you needed, furniture, two bedrooms, you

know, there was food there but there weren't any books, there

weren't any toys.  She mentions from the preschool, if there was

things at her preschool they were getting rid of, she was bringing

them over; and when Paul and Wayne would come to play with her son,

she would work with them with these different kinds of basic

preschool things.  And she told me she discussed this with Marie

and that, you know, maybe you ought to put him in a daycare when he

was in the preschool years.

And then once he entered school, she knew if Marie would

go to the school and request it, he would be evaluated.  But from

what she told me, Marie didn't seem to understand or maybe it was

because Marie never really went that far in school, she didn't

know, she didn't get anywhere with Marie.

Q.  Well, as a matter of fact, did several of the people you

interviewed describe Marie herself as slow, or as Greg Williams put

it, less than a full six pack?

A.  Several people described that.  As a matter of fact, Toni even

1    said that, in many ways, Paul and his mother were a lot alike.  And

2    as she got to know them both very well and when she was living in

3    the projects with both of them, they had similar learning

4    disabilities.  There seems to be this inability to measure, some of

5    their reading -- I don't think Marie really could read even as well

6    as Paul could.  And you heard Lionel say that he and Terry often

7    read things for her, had to read medication labels for her, things

8    of this nature.

9            I don't know that she always really understood the full

10   implications of the decisions she needed to make for her children,

11   and I don't think anybody was coming in to the back side of town in

12   the project where she lived to explain them to her or to educate

13   her.

14   Q.  If a person is mildly or has mild mental retardation, how

15   important are supports in the home, in the school, in the community

16   at large?

17   A.  If you can put the supports in the community and you can put

18   them in enough settings, that person will never be

19   institutionalized.  And hopefully, they will learn enough to where

20   they can move a little beyond those supports and become more

21   self-sufficient when they're older.  The trick is early

22   intervention, start recognizing these at-risk things early, early

23   on and put the interventions in, hopefully, sometime between birth

24   and three years of age.

25   Q.  Of course Paul was never institutionalized, as we all know.

1  A.  That's right.

2  Q.  But for a person with mild mental retardation, and let's assume

3  that person is never institutionalized, can the supports in the

4  home and the school and the larger community make a difference in

5  how well that person functions later in his life?

6  A.  That's right.  That makes all of the difference in the world

7  for that person.

8  Q.  You described the area where he lived as poor and violent.

9  Were they hungry sometimes?

10  A.  As I understood it, they always kind of lived in that general

11  area even when they didn't live in the Calliope, and I think when

12  they lived outside of the Calliope, they were much, much hungrier

13  than when they lived in the Calliope.  Like I said, ironically,

14  financially things got better when she finally got public housing.

15        If you look at the records, she was on the waiting list

16  for a long time, and eventually Theresa's mother brought her into

17  her home and let her live there the last year or so before she

18  moved into the housing project.

19        But there wasn't a lot of food.  There really wasn't

20  enough for all of the kids, there certainly wasn't enough for all

21  of the kids and Marie.

22  Q.  How was he treated as a child by other children?

23  A.  Other children picked on him.  He was the smallest one.  He, as

24  we heard lots of people talk about, when he was young, there wasn't

25  good language skills so he couldn't really speak up, kids made fun

1  of him, not only because he was slow or couldn't catch on but he

2  was in raggedy clothes.

3  Q.  Would that have been part of it?

4  A.  That would have been part of it, and then there's another

5  problem going on in this family that's going on.  Theresa Minor and

6  Marie's family was really a fairly well-educated group of black

7  people that lived in, as you heard her say, uptown.  Marie's father

8  worked for the railroad, and if you got a job at the railroad in

9  the '50s and '60s, that was a good job.  Ms. Minor's mother was a

10  nurse.

11        I mean, these people went to school, they had good jobs,

12  they did not live in the project, and then here is Marie, you know.

13  And even her own family shunned her.  And I think Ms. Minor tried

14  to say that, is her and her mother were the only ones that ever

15  felt sorry for her, ever went and checked on her, ever gave her a

16  place to stay.  And so as far as Paul and his siblings, they also

17  had that within their own family, people not wanting anything to do

18  with them.

19  Q.  And when Paul went to school, and let's talk about elementary

20  school, and I know the records are limited and not always

21  consistent, but as a general rule, how did he do in elementary

22  school?

23  A.  In elementary school, he did pretty good.  He wasn't a behavior

24  problem, and in New Orleans in the schools he went to, the behavior

25  problems get the most attention, so right there he is not going to

1    be the top ones that's going to be called to mind.

2         He tried.  Teachers took time with him, they either, as

3    he remembers it, he had teachers that would sit aside and work with

4    him one-on-one or let someone else work with him one-on-one.

5         And Paul's -- one of Paul's strengths that we're going to

6    talk about is, early on Paul learned to not let people know how

7    much he didn't know.  And so he turned into the class clown.  Vance

8    Ceaser talks about this.  Even in kindergarten Paul was beginning

9    to learn, well, if I don't know something and I make a joke, she is

10   going to move on to somebody else.  And this became more and more

11   as he went along.

12        In elementary school, he did okay.  He thinks he did very

13   well in elementary school.  He doesn't remember starting having

14   problems until middle school, which, in Orleans Parish where he

15   lived, would have been 6th grade.

16        Terry remembered 5th grade of having problems because he

17   tried to work with him because he couldn't get multiplication, he

18   couldn't get division, he was even having trouble what we call

19   carrying and borrowing, when you do two digits.  And so he tried to

20   work with him some and he just couldn't catch on, and Paul would

21   clown, and he just thought, well, Paul really wasn't trying.  But

22   what he really, I don't think, was realizing is, Paul was by then

23   was already two or three grades behind.

24   Q.  And did that surprise you that it was in middle school, around

25   the age of 8, 9, 10 that he started falling behind?

A.  No.  Most people with mild mental retardation, a lot of them in the school systems that I've worked in don't even become eligible for that classification until around 3rd or 4th grade.  In 3rd grade, you have to suddenly go from print to script.  You're struggling along with addition and subtraction, that's when they slam multiplication on you, and by the end of 3rd grade you should be dividing and you're getting remainders, and you're getting fractions, you're getting percentages into the 4th grade.

So that's what I'm saying, if you haven't mastered the basic first three grades, you quickly start falling off.  DSM, I think everything we've heard up this point, you pretty much start hitting that plateau somewhere around 5th or 6th grade and that's kind of like where their skills stay.  Now, they can still learn and some of those skills get better over time, but that's generally where you see that plateau, and that's not surprising at all and I think that's what you saw in Paul.

Q.  Did your witnesses who knew Paul in school, like Lionel and Vance, did they say anything to you to indicate to you that he was lazy, that he didn't try, that he didn't want to better himself?

A.  No.  And, I mean, ironically, I was amazed when Vance told me that he had already dropped -- Paul had already dropped out of school when he came and hunted up Vance and asked him to tutor him.  And what got to -- Vance just thought it was the clown thing again, you know, he couldn't stay serious.

And then at that time Vance was trying to make up some

1    grades himself, he was trying to get through three grades in one

2    year and he just didn't have the time to work with him and didn't

3    recognize the weaknesses, and the outstanding thing to Vance was,

4    here is this guy who's probably 16, and he's still struggling to

5    master something that's 4th grade level.  And, in his opinion,

6    wasn't trying -- wasn't getting as high as he thought he could as

7    fast as he could.

8          So, no, I don't think it was that, I think they

9    recognized that Paul still tried, I think the thing they saw was,

10   oh, well, he clowns too much.

11   Q.  And the clowning to a professional like yourself could indicate

12   what was going on with Paul.

13   A.  Well, generally in the field of mental retardation, I think

14   we've already talked about this already.  People who mildly -- who

15   are mildly mentally retarded realize the difference.  People who

16   are in the more moderate to severe range, they don't really realize

17   a lot of times that they're different or that they can't catch on.

18         So the people who have mild mental retardation are more

19   likely to mask their bad behaviors to try to cloak it in something.

20   And so instead of saying they can't do, they sit back and wait and

21   see how somebody else orders and say, oh, I'll have what he orders.

22         Or in these situations where it would let somebody know

23   they didn't know something, well, they kind of mask it by sitting

24   back, or they clown around and just make it like, I could tell you

25   if I wanted to, but I am better at making a joke.  And people kind

1    of go, oh, that's just Paul, he knows, we move on.  And that's one

2    of the things, Paul did both of those.  And he got pretty good -- I

3    think there was less clowning around and more masking as he got

4    older.

5    Q.  Now, Paul at some point dropped out of school and began getting

6    involved in selling drugs; is that correct, is that your

7    understanding?

8    A.  I kind of understood his brother used him to run drugs even

9    before he dropped out of school.

10   Q.  Okay.  That started while he was still in school?

11   A.  I gathered, in talking to everybody, somewhere around 13 or 14

12   for Paul, Curtis would have him run drugs to somebody who is

13   somewhere in the project, and Paul would drop them off, pick up the

14   money, bring it back to Curtis, and Curtis would give him a $10

15   bill or a $20 bill for running the drugs.

16   Q.  And that would have been at the age of about 13 or 14?

17   A.  Thirteen or 14.  Lionel yesterday said the end of the 8th grade

18   for Paul, which, you know, most of -- I don't -- you know, most of

19   us are in the end of 8th grade at about 13, so that's where I think

20   he was.

21           In talking to Lionel and Terry, Curtis tried to get them

22   to do it, and they had better sense and they wouldn't do it.  And

23   that's kind of like why they were so much aware of when Paul

24   started because he tried to get them to run the drugs as well.

25   Q.  And when, according to Lionel and Terry, when they were asked

1    to run drugs by Curtis, why did they refuse to do it?

2    A.  Because they knew the danger of getting caught.  They're taking

3    all of the risks when you run the drugs.

4    Q.  After Curtis was killed, in terms of selling drugs, what

5    happened to Paul next?

6    A.  It's -- apparently there were other people in the community

7    that were selling drugs and they -- Paul drifted under their kind

8    of supervision and started running drugs for them.

9    Q.  And was it your understanding from Lionel and other people that

10   you talked to about that stage in his life, that he made wise

11   decisions in dealing with these other drug dealers?

12   A.  No.  There's numerous stories that were told to me about things

13   that Paul did that just didn't make good sense as a drug dealer and

14   really caused -- called too much attention to himself or showed

15   poor understanding or -- I think Lionel gave examples yesterday of

16   him not knowing how to cook his drug, of him not knowing that you

17   should stay there in case someone is stealing some of it.

18            The other things they pointed out was, for example, Paul

19   repainted his car red, I think, and, you know, Lionel tried to

20   explain to him, you want to fit in, you don't want to stand out.

21   You know, wear clothes that don't make you stick out.  You need

22   to -- but Paul just couldn't catch on to what he was saying.  And

23   those kinds of things were described yesterday.

24   Q.  So was it ever your impression in talking not just to Paul but

25   in talking to the other witnesses, that Paul ran some kind of drug

1    organization?

2    A.  No.  The way I understood it -- I am going to tell you, I don't

3    know a lot about the drug industry.

4    Q.  I understand.

5    A.  But it started in the Calliope, he started as like a child

6    runner I think, brother dies, other people picked him up, this

7    other guy, he started working for him and slowly came to a higher

8    level.  But it was all like in the project, you know, that they

9    were running this, the Calliope project.

10         The home invasion came, I don't know if anybody's talked

11   about that yet.  After the home invasion, pretty much everybody had

12   to move because it wasn't safe for them in the Calliope anymore.

13   Because Toni lived in the Florida project, he was able to have a

14   place to stay in the Florida project, and he started selling drugs

15   in the Florida project, he was like a street, you know, to me, it

16   sounded like what I would consider a street pusher, someone who

17   went right there in the project, second line, and delivered drugs,

18   had some other guys he worked with.

19         As I remember Greg Williams talking about it, he pretty

20   much got his business done in a couple of hours and then he started

21   around, you know, whenever he was dealing, he dealt in a couple of

22   hours and then he went and visited Greg and then he was back, you

23   know, he had his little round and was back home at eight.  This is

24   in adulthood, you know, by the time -- close to the crime.

25   Q.  Right.  Now, did you have any impression in talking with Paul

1  or anybody else that he ever rose above the level of a street-level

2  drug dealer?

3  A.  No.  I didn't get that out of anybody I talked to.  And then I

4  asked Paul a lot of questions, too, and pretty much it was

5  consistent with what Lionel said about, you know, he really thinks

6  if he sold $800 worth of drugs, he made $800, even if he, you know,

7  had to pay $400 for it.  You know, he doesn't understand net and

8  gross very well.

9          He was a little too trusting in some of the dealings that

10 he did.

11 Q.  And what is the significance of being too trusting, how does

12 that figure in to the assessment for mental retardation?

13 A.  Well, you know, if you read what the experts say, and that's

14 our biggest weakness in adaptive behavior assessment right now is

15 the trademark signs of people with mild mental retardation is

16 they're very gullible.  And there's a naivete and just an easily

17 taken advantageness that you see with a mildly mentally retarded

18 person that you don't see with other people, and there's a lot of

19 criticism because our standardized measures don't test for that,

20 and so you pretty much have to rely on antidotal data to get that.

21         And I just think with Paul there were so many things he

22 didn't know right about the drug business that higher people who

23 were higher up and much smarter could have easily taken advantage

24 of him.

25         There was a lot of discussion about this scale, and

1    literally, Paul can't read a scale.  But he knows -- they put

2    little marks so he knows when it went this much, I need to charge

3    $25, and when it weighed this much, I need to charge that.  He

4    didn't know the weights, it was just Lionel or somebody marked the

5    scale for him to know.

6           So as far as making decisions out in the community

7    without these little backups that people had set up for him, he

8    really wouldn't have known if he was getting short -- I don't know

9    what you call it when you don't get enough dope or whatever, but

10   short changed or whatever.  So that was a lot of the things that

11   Lionel explained to me and Greg and different people about how you

12   deal with the drug business.

13   Q.  Did you hear over the course of interviewing all of these

14   witnesses, did you hear antidotal information about various people

15   using and manipulating Paul, either as part of the drug business or

16   out in the neighborhood at large?

17   A.  Yeah, there was a lot -- well, we all heard Lionel talk

18   yesterday about the guy who cooked his drugs and probably skimmed

19   some off every time cooked them.  Also, there was the guy he was

20   renting his car.  He was paying somebody to go rent him a car.

21   Q.  And he paid people to do a lot things for him.

22   A.  A lot of things.  And a lot of this is, he didn't know how to

23   do it so he would pay somebody to go do it rather than go tell

24   somebody.  Over time, people like Greg Williams or somebody would

25   recognize he is being taken advantage of, or Lionel, and say, hey,

1    look, here is an easier way to do this.

2            As I understood it, the reason he got the subsidized

3    credit card was to make it easier for him to rent the cars because

4    I think he was using someone else's credit card or whatever that he

5    needed to do these transactions.  And so people started, you know,

6    over time showing him easier ways to do those kinds of things.

7            Toni can give you a lot of examples where she was aware

8    that people took advantage of him.  Even when you pointed that out

9    to Paul, according to Lionel and according to Toni, they were his

10   friends and it was okay, you know, he didn't really hold a grudge

11   against it.  Lionel gave a lot of examples of that yesterday, I

12   don't think I need to go into that.

13   Q.  After he left the home with Marie, did he ever live on his own?

14   A.  No.  He pretty much always lived with Toni, and surprisingly,

15   even as he had relationships with and children by other women; but

16   if he wasn't living with Toni, he was living with one of these

17   other women.

18   Q.  And how did he get around in the world, how did he get places,

19   how did he put things together, how did he function reasonably well

20   in that community?

21   A.  Well, we've all been talking about his sense of direction, when

22   he drove, when he had the moped or whatever.  Paul moves around by

23   landmarks.  So if there's something that he knows, he goes to the

24   landmark and then from there he goes.

25           If you told him to go find Taylor Street, which I don't

1    even know where that is in New Orleans, but if you could say that's

2    where Joe Smith lives, you know Joe Smith, well, he knows where

3    that is, so he would go to Joe Smith's house and then you would

4    tell him where to go from there.  He would use the Superdome as a

5    landmark.

6            Canal Street, the bus he caught to go to the Calliope, he

7    knew where to go on Canal Street and do that.  He would go there

8    even though it was longer for him to walk there than it was to walk

9    home.  And when Lionel was talking about him and Paul walking home

10   from Ernst, it was easier just to walk home rather than walk all

11   the way up to Canal and then back up to catch that bus that would

12   take you to the Calliope.  But if Lionel wasn't with him, that's

13   what he did because he knew he could get home that way.

14           Pretty much Paul learned early on to have somebody with

15   him because he knew how to get familiar places, but if something

16   should happen where he suddenly had to go in an unfamiliar

17   direction, he needed somebody with him to help with that.

18           He initially walked or used the bus service.  He later

19   bought this moped, I guess they call it, it's some kind of

20   motorcycle but not as big as what I think a motorcycle is, and rode

21   that for a while.  Seemed to have a lot of wrecks on it, but

22   eventually from that he -- a friend of his who was really a good

23   friend in his earlier years, an older man named Girod, taught him

24   how to drive, and he went and bought him a driver's license.

25   Q.  What do you mean bought him a driver's license?

1    A.  Well, as I understand it, at that time in New Orleans there

2    were places you could go and if you couldn't pass the driver's

3    test, you could pay and you would get a driver's license.

4    Q.  And is that your understanding of how Paul got a driver's

5    license?

6    A.  Paul says that and that's what everybody else says.  Now, you

7    know, I only have that from interviews, but it was consistent and

8    it wasn't given at the same time with the same two people together.

9          He learned how to drive, like Toni, even in Dr. Hayes's,

10   if I can remember, sitting there, and, you know, if you look at

11   that interview, Toni gives a description of how long it took him to

12   drive places, and Toni was trying to explain to her how long it

13   took him to drive from one point to another point to Dr. Hayes.

14         And so he drove real slow, and his preference was

15   somebody else to drive.  He got better at it, you know, with age

16   and we would expect that.  He learned to drive late but, you know,

17   he picked up on the skill.  I think the reason Paul liked

18   Oldsmobile Cutlasses of the same year and continued to buy them

19   used ten years later is because he understood the dials and the

20   controls, so, you know, if you learn something one way, it's hard

21   when you get a new car to get adjusted to something else.  But he

22   did fairly well and towards the end, as far as driving, as long as

23   it was a familiar place, he had landmarks to go, and he might know

24   more than one way to get there.

25         But these were skills he was demonstrating possibly at

1   the time of the crime, closer to the time of the crime.  He wasn't

2   demonstrating them at all at 17 or 18.

3   Q.  Is getting by in the community with frequent support, as Paul

4   had, is that inconsistent with the diagnosis of mild mental

5   retardation?

6   A.  No, it's not.  And one of the things the experts tell you to

7   look at, because we do want to look at their natural community, you

8   know, how well they get along in their community, we're talking

9   about, say, the Calliope or the Florida project.  We have two other

10  questions we want to ask about that.

11          At let's just say 21, which is past a lot of the times

12  we've been talking about a lot, if I plucked Paul up and I dropped

13  him down in LA by himself at 21, or if I dropped him in Chicago or

14  even if I dropped him in Lafayette, how well would he have been

15  able to function without Greg Williams, without Girod, without

16  Toni, etc.?  This is one question that we asked.

17          The second question we want to ask is, in that community,

18  in that Calliope, was there still people even in that community

19  that said, well, you know, he was a little slower than the rest of

20  us, and is he evident even in his own community as having some

21  deficits at certain times?  And I think Paul meets both of those

22  requirements.

23  Q.  If you picked Paul up and dropped him in LA back when he was a

24  young man without all of these people, would he have been able to

25  function?

1  A.  No, he would be lost.

2  Q.  And the witnesses that you interviewed who were from his

3  community, like Ms. Minor, like Greg Williams, how did those people

4  describe Paul as coming across to them at the time?

5  A.  They all recognized there was a slowness there, he was slower

6  to catch on than other folks, he was a little bit different.  He

7  wasn't as -- he couldn't do it at the same level as other folks in

8  that community.  So he still, even though he was in his own natural

9  community and where he had supports, people recognized he was

10  different.

11  Q.  And is that consistent, are those descriptions consistent with

12  a person having mild mental retardation?

13  A.  Yes, they are.

14  Q.  Now, when you talk about norming, and we looked at

15  Dr. Cunningham's graph on IQs, but adaptive behavior scores are

16  also normed, are they not?

17  A.  Yes.  Adaptive scores are standardized.  The majority of the

18  scores on both the ABAS-II and the Vineland have a mean of 100,

19  just like an IQ, a standard deviation of 15.  When you see

20  performance falling two standard deviations below, which would be

21  about 70, then you're beginning to see deficits in the mild MR

22  range.  And they have -- on the Wechsler we talked about subtest

23  scores, they have subdomain scores on these, and they also have a

24  mean and a standard deviation.

25  Q.  And we're going to talk more about this when we talk about the

1    Vineland later.  But the Vineland, am I correct that the Vineland

2    is pretty much at least one of the gold standard instruments for

3    measuring adaptive behavior?

4    A.  Yes.  There are two, there's the Vineland and the ABAS-II.  The

5    Vineland's been around longer; the ABAS-II came out in 2003, so it

6    hasn't been there as long.  But both of them are well normed, well

7    standardized, and I use them both.

8    Q.  And when the Vineland was normed, is it normed on a discrete

9    subpopulation; in other words, is there one standard if you grow up

10   in the inner city and you norm that population separately and do

11   you norm it separately for Los Angeles, how does that work?

12   A.  No.  And I am going to be much briefer than Dr. Cunningham

13   because I think they can look at the record and see that same

14   principle, we want to get a demographic group representative of the

15   United States, we want to look at race, gender, ethnic, whatever,

16   and have the same proportions.

17        So if 38 percent of the people in the United States live

18   in the northeast, then 38 percent of the people in your sample,

19   normative sample, are going to be from the northeast.  You know,

20   they are going to have the same number of blacks, the same number

21   of females, et cetera.

22        And so, therefore, our normative sample is going to a

23   large normative sample, and that sample you're going to be able to

24   say, well, the same proportion of people that are in the United

25   States at the last census are here and we can make valid

1   conclusions about how this person, in this example, Mr. Hardy,

2   functions and compared to all of the people in the United States.

3   Q.  And if you are evaluating a particular task or a particular

4   function that a person can do or says that he can do in order to

5   determine his level of functioning -- and I'll just give you a

6   hypothetical example.

7              Let's say a person tells you, when I was 17 years old, I

8   could order something out of the Sears catalog.  What would you

9   want to know about that performance?

10  A.  Well, I would want to know how did they go about doing it, did

11  they do it at the store standing over the counter, did they do it

12  over the telephone, did somebody sit down first with them and show

13  them where it was in the book, did somebody have to read it to

14  them?  There's thousands of questions I would, you know, there's

15  lots and lots of questions I'd want to know about that.  How did

16  you learn how to do this, did you teach yourself, did you watch

17  somebody else and just pick it up like that, is this something you

18  learned in school, because this is certainly a skill that is taught

19  in special ed classes, that's just some of the questions I would

20  ask.

21  Q.  And independence, is that not a component of sufficient

22  adaptive functioning?  In other words, if you can perform a task

23  independently at the same age that others can perform the task

24  independently, is that a sign you look for for adequate --

25  A.  That's what we look for, we look for age-appropriate

1    independence.  I don't expect a seven year old to be able to do

2    what an 18 year old does, but I am clearly aware of when

3    independence should start emerging at certain ages.

4          So at 17 I would think somebody possibly could order

5    something out of the Sears catalog.  If someone six told me they

6    did it, I would go, wait a minute, I have to know more about this

7    because you wouldn't anticipate a six year old being able to do

8    that.

9    Q.  And if somebody age 17 had to have momma sitting by him helping

10   him find the item and fill in the forms and --

11   A.  And dialling the phone for him, or going down there and helping

12   him find the page number or having -- tell him what page in the

13   catalog to go when he gets to the counter.  Well, these are

14   supports, and that's what I'm looking for is what supports have to

15   be in place to make this happen for you.

16   Q.  If you don't know anything except a person saying, I can order

17   something out of the Sears catalog, can you do very much with that

18   information by itself without all of the additional information?

19   A.  No.  You really need much more to make a judgment on that.

20   Q.  Is adaptive behavior what a person does once in a while?  I'll

21   give you another example, a little boy that only makes up his bed

22   when he is told.

23   A.  This is all addressed in the manual.  Adaptive behavior is what

24   a person typically does on a day-to-day basis, when we're talking

25   about a skill that they should typically do on a day-to-day basis.

1    Now, some skills you only do once a month or once a season.  For

2    example, I only put up my winter clothes maybe -- go through my

3    closet and pull out my winter clothes once a year, but I always

4    pull out my winter clothes once a year.  So you could get maximum

5    credit for that even though it only occurs once a year because

6    every time you're supposed to do it, you do it.

7           But most of the skills that we look at, we're kind of

8    looking at them on a typical day-to-day basis, and how much

9    independence did they show when they do the skill and how many

10   supports do you have to give to make sure it happens.

11   Q.   Is adaptive behavior being able to describe reasonably

12   adequately how you perform a task?  And please explain your answer

13   for the court.

14   A.   No.  The thing that hops to my mind is classroom rules and kids

15   I work with in school.  I have kids that can tell me all of the

16   classroom rules, they can tell me how many flags they're going to

17   lose if they do this and what's going to happen after that and what

18   kind of sticky is going to be sent home to momma, but, darn,

19   they're going to still break the rule.  So what I'd be looking for

20   good behavior is, well, what supports do we have to do to get that

21   to happen, or are they typically able to do this with more

22   independence.

23          So it's one thing to describe what's the appropriate

24   thing to do when getting in line to go to lunch and it's another

25   thing to say, does he do it all the time or do you always have to

1  put him at the front of line, or do you have to have the aide by

2  him or does he have to have a peer holding his hand, these are the

3  other things that I would be asking.  He may always get to lunch on

4  time, but how many supports needed to be in place to do it.

5  Q.  And a person, as I understand it, correct me if I am wrong, a

6  person who is mildly mentally retarded functions at somewhere

7  between the 8- and 11-year-old age range?  And I know y'all don't

8  like to but we're lay people here.

9  A.  And we say this from lay people, okay?

10 Q.  Yes.

11 A.  Because lay people have a hard time wrapping their hands around

12 this.  But, you know, cognitively that's kind of where they are,

13 and we as professionals hope we can put some interventions in there

14 in place so they can do things that are much more age appropriate.

15        But, yeah, we are starting off at 8-11 and then we're

16 trying to put enough supports in there to make sure that maybe in

17 some of these skills they can function at a higher level with

18 supports.

19 Q.  Just to give you an example of what you just described as

20 verbally describing a task.  If -- are there 9 year olds -- and I

21 know you have children yourself -- are there 9 year olds who can

22 describe in detail how to drive a car?

23 A.  Oh, well, yeah, because, I mean, you know, they can -- honest

24 to God, I have had a gifted grandson.  At 20 months he knows to go

25 get his play keys, sit in his little car, put it in the slot, plug

1    it, hit that little thing and pretend to drive, but I wouldn't let

2    him drive a car.

3              I mean, describing things and how to do them is not the

4    same as being able to take those skills and put them in place.

5    Q.  Can a person's adaptive skills improve?

6    A.  Oh, I firmly believe they can improve.  If we put the proper

7    interventions in place and work with the person and we fade those

8    supports over time and they do those tasks repetitively enough,

9    those skills will go up.

10   Q.  Did Paul have, as far as you could see, the kind of supports

11   that would allow him to have more than a minimal improvement in his

12   adaptive skills?

13   A.  No, he didn't.  Those supports weren't in place for Paul.

14   Q.  Now, there are some publications, are there not, that define

15   the best practices in the field of mental retardation?

16   A.  That's correct.

17   Q.  And I think you've already identified two of those, this User's

18   Guide and what you called the red book, the 2002 --

19   A.  And the organization being AAIDD, and these are their current

20   publications that are in place where you can go to to get some

21   guidelines.

22   Q.  Tell us or tell the court about Division 33 of the APA, what it

23   is and what it's done recently in terms of these Atkins hearings.

24   A.  The American Psychological Association has multi divisions, and

25   one of those divisions is 33 and that addresses persons who have

1    intellectual disabilities.  It used to be the division on mental

2    retardation, now it's the intellectual and developmental abilities,

3    they too have changed their name.  This is a resource group anybody

4    can go to.

5           If you're a member of APA, you can go to them.  If you're

6    not a member of APA, you can still go to that group, you can go to

7    their newsletter, it's free on the Internet.  You can get the

8    latest things that they're recommending that you do.

9           They created a task force after Atkins in 2005 -- I think

10    it was, I think I put that in my report -- and this task force was

11    specifically addressing the best practices, it was an ad hoc

12    committee to gather information on what should be the best

13    practices in evaluating people in Atkins-related cases.

14           And so they over a period of time have a lot -- this task

15    force met, gathered their information, traded information, and kind

16    of published different ideas and are trying to work towards a

17    consensus.

18           Dr. Cunningham mentioned Gil MacVaugh, and Gil MacVaugh

19    and myself were invited to Boston in August of 2008, where that ad

20    hoc committee met with people who have been trying to do these

21    cases to say:  What are you doing?  Where should we go?  Do you use

22    the Flynn Effect?  Do we use, you know, just the different ideas

23    that we're talking about.

24           So you can go to these newsletters and see the different

25    things that they've been recommending, and then you can also go and

1  start following the people that were on that committee, the

2  original ad hoc committee, and their publications are now coming

3  out because that's one of the things they called for, publish

4  things, put them out there.

5          And in the ones that I would talk about would be

6  Greenspan, Greg Olley, Mark Tasse' has published that, and the

7  author of the Oakland and Harris who are the authors of the ABAS-II

8  have come out with a book in 2008, which has a whole chapter now on

9  how to use their instrument in Atkins-related hearings.

10          Dr. Sparrow has been the lead author on the Vineland, or

11  the VABS.  And this book -- by the way, the ABAS-II was coming out

12  in 2003, so they didn't manage to make Atkins, that was one of the

13  reasons they generated this.  This survey form that I used and

14  Dr. Hayes used came out in 2005, and that was when this committee

15  was working.  So she put out in late 2008, I didn't get it until

16  early this spring, her latest manual, which is the expanded manual.

17  She addresses in there how to do a retrospective diagnosis with

18  this -- with using this, as I did with Paul.

19          And then the other ones, like I said, Mark Tasse' has

20  recently published an article that everybody in the field is

21  probably very much aware of.

22  Q.  Do you happen to know who is chairman of that ad hoc committee?

23  A.  Greenspan and Greg Olley are the cochairs of that committee.

24  They're the ones who invited us to Boston.  And Greg -- those are

25  the two you see publishing a lot.  Mark Tasse' heads up the

```
1   diagnostic committee that generates these (INDICATING).  And so he

2   is also kind of become a leader as well because AAMR is now working

3   on their 11th Edition.

4   Q.  And has Division 33 generated since that committee was formed a

5   number of scholarly articles addressing Atkins-related issues

6   involving mental retardation assessments?

7   A.  Yes.  And the best set that has come out, really has come out

8   since I wrote my report, was in the Neuropsych Journal, and I think

9   I've given you some copies if you want to share them with the

10  court.  And it's a series that Greenspan heads up and he does the

11  over chapter.  Greg Olley does the summary and Frank Gresham from

12  LSU, Mark Tasse', Daniel Ritchie, several people, Flynn, Karen

13  Salekin from the University of Alabama addresses malingering, so

14  there's a different article on each one of these, these are kind of

15  like the leaders, they were all participants in the original ad hoc

16  committee, and they publish where we are in 2009 kind of in those

17  different areas, and I gave you some copies and I am free to share

18  those with anybody.  That's kind of like the latest thing that has

19  come out.

20  Q.  And do you keep up on a regular basis with the latest research

21  and literature in the area of --

22  A.  Well, I keep up, I hope I keep up with everything I need to

23  keep up to work in this field.  But I am definitely keeping up with

24  the Atkins stuff almost as soon -- the articles I gave you were

25  articles -- the copies you have were the ones that were submitted
```

1  to the publisher to publish.  I mean, I've asked anybody and

2  everybody please give me as soon as it's hot off the presses.

3  There's all kinds of conferences and workshops on this and when you

4  go, you can always go up and say, hey, can I have a copy of that as

5  soon as it comes out.

6          Because we weren't doing this prior to 2002, and so we're

7  all struggling to come up with the best science.

8  Q.  In addition to keeping up with the letter and keeping up with

9  the work generated by this ad hoc committee on mental retardation

10  and the death penalty in that division, do you from time to time

11  consult with, personally, with experts like Dr. Greg Olley, like

12  Dr. Greenspan?

13  A.  Well, yeah.  I actually called Dr. Sparrow before, you know,

14  when I was -- first started doing these because I was using the

15  Vineland in an atypical way, I didn't know how else to do it, you

16  know, as far as in these Atkins hearings.  So I've had telephone

17  conversations with her, with Dr. Oakland, who is one of the

18  authors, and he is also on that ad hoc committee.  Greg Olley,

19  every so often I shoot him an e-mail and say, can we have a

20  telephone call.  He is a very nice guy and he'll talk to anybody.

21          I've talked to Dr. Greenspan, Gil MacVaugh who has

22  published with Dr. Cunningham is just next door in Mississippi, so

23  he is easy to access.  I've talked on the phone with Karen Salekin.

24  Just when different questions come up about where do you think we

25  ought to go with this or do you have an idea.

1  Q.  And I gather from what you just said that when these Atkins

2  hearings first started taking place that you've made some calls and

3  did some consultations to make sure that if you were going to

4  administer a Vineland in the context of an Atkins hearing, you were

5  going to do it consistently with the principles underlying that

6  test.

7  A.  That's right.

8  Q.  Has Dr. Olley expressed an opinion in his capacity as the

9  chairman of the ad hoc committee about, and this evidently comes up

10  at a lot of Atkins hearings, whether motivation should be a

11  consideration in determining whether a person has mental

12  retardation?

13  A.  He points that it's often something that comes up, and he looks

14  at it, and I think that's in the chapter of this book that anybody

15  can have a copy of as well, that it's a performance and an ability

16  thing.  I think we just kind of talked about that some.  It's one

17  thing to demonstrate an ability.

18       If I am working with people with mental retardation and I

19  am teaching them how to write a check, I can write up a 26-step

20  task where we teach that person how to write a check and I have a

21  little book that they can copy from as far as writing it over and

22  everything.  But then I have to get those skills good enough for

23  when they're standing at Wal-Mart they can write a check, and then

24  I have to teach them how to budget a book.  So them to be able to

25  demonstrate the ability in a training session is totally different

1    than them being able to demonstrate that ability when they're

2    paying for their rent or they're writing a check to somebody who

3    might be giving them the wrong amount to write.

4            So that's how he looks about it on the lines of

5    motivation and that some people possibly -- you need to look at it

6    as an ability/performance thing to see, in this population that's

7    generally what it is, and that you're misinterpreting that as them

8    not wanting them to do when possibly they either don't know how to

9    do it or they haven't had enough trials in learning how to do it.

10   Q.  In fact, does Dr. Olley take the position that what appears to

11   be poor motivation may be better used as an argument for the

12   diagnosis of mental retardation --

13   A.  Exactly, because you should be seeing those kinds of behavior.

14   I should be hearing incidents of, you know, it suddenly hit me he

15   just didn't catch on, he didn't know.  Because if he knew how to do

16   these things and he learned them at the same time as everybody

17   else, then he wouldn't be mentally retarded.

18   Q.  And apparently another area that Division 33 has addressed that

19   has come up in these cases is that experts sometimes claim that the

20   family or the cultural life didn't provide adequate opportunities

21   to develop the customary adaptive skills.  And what is Dr. Olley's

22   and your position on that argument?

23   A.  I think we kind of addressed this as well, because what you're

24   saying is because his momma always did it, he didn't ever -- he

25   never had to do it and that's why he couldn't do it, or Paul

1  frequently uses this as his excuse:  Because I grew up in the

2  Calliope, I never noticed that.  Or I never learned that because of

3  the Calliope.

4        But what you have to look at is, like I said before, are

5  those skills really -- once he had the opportunity, was he able to

6  remediate those skills, was he able to learn them at a regular

7  pace, was he able to catch up?  And the second thing was, even then

8  within that culture were there people going, you know, he's a

9  little bit different.

10 Q.  Would that account for why, for instance, Terry Hardy succeeded

11 and Paul didn't?  I mean, Terry Hardy came out of the same

12 environment, did he not?

13 A.  That's right.

14 Q.  What is the difference, as you perceive it knowing about these

15 two brothers, what is the difference between Paul Hardy and Terry

16 Hardy in terms of Terry Hardy being able to rise above the

17 limitations of the Calliope project and Paul not being able to do

18 so?

19 A.  Well, he obviously had better capabilities.  He alone, along

20 with Vance, got the higher track; even though that was illegal, New

21 Orleans was still doing it, tracking the higher-functioning kids

22 one way and tracking the Pauls in another direction.  And because

23 of that, he was able to go to a magnet high school, he didn't have

24 to go to Booker T., which is where Paul went.  So he had better

25 educational opportunities.

```
 1              The capabilities were a little higher.  But when you talk
 2    about some of the things with Terry, the choices he made, he had
 3    enough sense not to run that bag of dope across the Calliope, Paul
 4    didn't.  You know, there were decisions he was making showing good
 5    self-direction, recognizing a risk.
 6              And Terry also says he wasn't -- I mean, he helped his
 7    mom when his mom asked, but she did the housekeeping, he didn't
 8    know how to do those things when he lived at home.  When he got
 9    out, he had seen her do them.  When he got on his own, he was able
10    to pick them up and was able to pick them up quickly.  So those are
11    the differences you see between Paul and Terry, Terry had better
12    capability.
13    Q.  So it's a matter of capacity?
14    A.  That's exactly right.
15    Q.  It's a matter of one person having the capacity despite those
16    limitations to actually learn these skills and another person
17    because of his cognitive deficits not being able to learn the
18    skills even after he -- if he has an opportunity to leave that
19    environment.
20    A.  That's correct.
21    Q.  Now, do you recognize -- we're going to talk a little bit about
22    some general principles of adaptive behavior.  I don't know what
23    that writing is.
24              Does this, what you call the red book, the 2002 AAMR book
25    on mental retardation, does that book contain operational
```

1   definitions regarding mental retardation?

2   A.  Yes, yes.

3   Q.  And I assume you have a screen there as well?

4   A.  Yeah.

5   Q.  Do you recognize those five assumptions on the screen?

6   A.  That's correct.  What AAMR kind of preaches is, this is their

7   definition at the top that we talked about, but you need these

8   basic assumptions to go with that definition.  And I guess we're

9   going to talk about No. 3, which you have highlighted.

10  Q.  Good guess.

11  A.  So that assumption says, within an individual limitations often

12  coexist with strengths.  So if you're looking at this convergence

13  of deficits over time that I discussed, just because you find a

14  strength you're not going to throw it out, you know, the baby out

15  with the bath water; you're going to say, okay, we know strengths

16  can exist.  Let's go to step 2, let's see, where did this strength

17  come from, what made it possible for him to have these strengths,

18  what supports were in place, and how long did it take him to

19  develop this strength compared to others.

20  Q.  And again, that is why, as you said earlier, and I think we

21  have it on that poster which I can't see from here, that you focus

22  on deficits rather than strengths when you do one of these

23  evaluations?

24  A.  That's right.  I mean, it's a deficit-driven diagnosis.  *Rain*

25  *Man* comes to mind here, if I can hop in with that.  I mean, if you

1    saw the movie, the man has autism.  There is no doubt he has

2    deficits.  I mean, they're obvious just watching him on the screen,

3    but this man has unbelievable strengths, numerical strengths, as

4    well as kind of visual/spatial strengths.  But those you still

5    would never say, hey let's take him out of the institution and let

6    him walk on his own because he had these strengths.  He can't even

7    buy his underwear anywhere but the K-Mart, for example.

8              And so, therefore, it's all of those deficits that make

9    *Rain Man* autistic; that one strength that you saw didn't make him

10   not qualify for the diagnosis.

11   Q.  Well, and if a person, and let's talk specifically about a

12   person with mild mental retardation.  I mean, is there some cut-off

13   point, okay, you have these nine strengths and when you get to

14   strength number ten, now we know you're not -- you do not have

15   mental retardation?

16   A.  No.  It's really a deficit-driven diagnosis.  I mean, we're

17   looking for consistent evidence.  If you remember that normal curve

18   that Dr. Cunningham had, how much evidence piles up under that

19   lower end, that lower tail, you know?  And one little outlier over

20   there isn't going to make everything go away from under that tail.

21   Q.  And in reviewing all of the material that you reviewed,

22   including what Dr. Hayes did, do you have any question but that

23   Paul Hardy has some strengths?

24   A.  Oh, Paul has some strengths, yes.

25   Q.  And what are some of those strengths?

1   A.  Well, I actually think it's a strength that he can hide his

2   deficits.  I mean, that's been a strength for Paul because people

3   will help him and people don't mind helping him.  Where language

4   was an extreme problem for him when he was young and Dr. Cunningham

5   talked about that, as we would anticipate, when he got into his

6   teenage years, his expressive language is good enough to where he

7   can carry on a good conversation with people.

8         His loyalty really stands out to me because he's very

9   loyal and beyond loyal for some of the things that have been done

10  with him with some people.

11        Let's see, another strength for Paul.

12  Q.  Could he drive a car; could he get behind the wheel of a car

13  and drive?

14  A.  He could drive.  It took him a long time to learn, it took him

15  awhile to do it over and over again, and I think he was kind of

16  dependent on always having a familiar car.  But he got to where he

17  could drive petty good.

18  Q.  Can he tell time?

19  A.  He can tell time.  He has a problem with the concept of time,

20  but he can look at an analog watch like this and tell you to the

21  minute what time it is (INDICATING).

22  Q.  What about his language skills, and I want you to talk a little

23  bit for our purposes today about the difference between expressive

24  and receptive language and how that applies to Paul in terms of

25  strengths and deficits.

A.  Okay.  Traditionally when we look at language, there's your receptive language skills, how well can you listen to something, process it, make a decision what to do about it and act on it, so this is someone's receptive language.

We heard yesterday Lionel talked about you could give Paul three things, three directions, and he can get that.  But when you started adding on the fourth and the fifth, he couldn't get it.

Most adults could process five or six or seven steps. You wouldn't have any problem sending someone to the store for more than three things.  What they're telling us, three is kind of a magic number for Paul, he can't go over that.  So these are receptive problems he has.

Frequently within a person with mild mental retardation you also see a lot of hyperactivity and inattentiveness.  That's different from plain old ADHD, it's related to cognitive impairment.  And Paul, particularly when he was younger, showed some classic signs of that.

And there's this inability to sit still long enough to tend to remember, and you see a lot of that.  I heard Javetta talking about that today, I heard Toni talking about that today.  I think that's a lot of the frustration that Terry was feeling and Vance was feeling when they were trying to teach him.

And so these are your receptive skills.  And receptive skills are traditionally, to me, the thing I see more common in adult persons with mild mental retardation.

1          Expressively, we all can talk pretty good.  Paul and I

2    can have a good conversation on a basic level talking about

3    day-to-day things.  Expressively for Paul, the problems come in

4    when they get into levels of abstractions because he's much more

5    concrete.

6    Q.  Is a person with mild mental retardation just totally helpless?

7    A.  No.

8    Q.  And does the fact that a person like Paul, and you've described

9    some of his strengths, does the fact that he can drive, the fact

10   that he can tell time, the fact that he can read his Bible, the

11   fact that he can fill out commissary requests, is any of that

12   inconsistent with mild mental retardation?

13   A.  No, I mean, other than a commissary request, those are all

14   things that I've written programs for to teach people with mild

15   mental retardation, even as teenagers or as adults, and they can

16   learn and they do learn these things.

17   Q.  Is the assessment of this impairment a matter of just ticking

18   off a person's strengths in order to determine whether --

19   A.  No.  And like I said, I would never ignore the strengths.

20   Q.  I understand that.

21   A.  Because I want to -- the strengths are valuable information to

22   me.  I think Cunningham brought that up yesterday about we really

23   need to dig into these strengths and see, well, how did those come

24   about.

25          But it's a diagnosis of deficits.  And like I said, we

1    keep piling things up under the tail.  I mean, if there's a lot of

2    things under that tail and less things outside of the tail, then

3    we're looking at someone who has mild mental retardation.

4    Q.  Are you familiar with, it's sort of a vernacular term, but are

5    you familiar with the term of cherry picking in making these

6    assessments?

7    A.  Yes.

8    Q.  And what does it mean in your field when someone describes an

9    assessment as engaging in cherry picking?

10   A.  Well, it's -- you go find something -- what I always hear said

11   is, well, he couldn't be mentally retarded because he can drive a

12   car.  So like you're cherry picking on one little strength and

13   you're ignoring all of these deficits.  *Rain Man* couldn't be that

14   bad if he could have gone and done these things that he had

15   strengths in.  *Rain Man* body rocked, he banged his head up against

16   the wall, he probably IQ wise would have tested in the MR range.

17           But because he had these strengths, we can't ignore the

18   deficits.  So you don't go pick a few strengths and say, hey, we

19   can't give this guy social security; hey, this guy is not eligible

20   for special ed.  What you do is look and see, well, where are the

21   deficits, how many deficits he has, and is this consistent with an

22   MR profile.

23   Q.  Now, I've heard it described also as looking through the wrong

24   end of the telescope.

25   A.  Well, that's true.

1   Q.  Is that what you're doing when you do that?

2   A.  Well, the other thing is, if you cherry pick, you're at risk

3   for looking in through the wrong end.  Because you get so centered

4   on that as not a behavior typical of MR that you are just way off

5   base.  And any skill you mention to me, other than a commissary

6   because nobody ever asked me to go to a prison and teach anybody

7   how to do anything, understand, I have written programs to teach

8   all of those things to people with mental retardation and been very

9   successful.

10          And I can give you even better examples of people with

11  mental retardation who can drive tractors, they operate weed

12  eaters, they push lawn mowers, they ride riding lawn mowers.

13  Easily I can teach people how to check the oil and do those kinds

14  of things.  There's programs like that, with enough time and enough

15  drill and enough support they can learn to do these things and be

16  more and more self-sufficient.

17          Now, at no time would I say this person is not mentally

18  retarded because I taught them these skills.

19  Q.  Or because he knew those skills?

20  A.  Or because he knew those skills, that's correct.

21  Q.  Does this same book on pages 74 to 75 also include 11

22  assumptions about adaptive behavior?

23  A.  Yes.

24  Q.  There are 11, we're not going to talk about all of them, but

25  I've picked out some that seem most appropriate for this case.

1    A.  And it's kind of like a sideboard here.  When I say AAMR like

2    every ten years tries to collect, this is kind of like what they

3    did in 2002, this is what we know about adaptive behavior in 2002,

4    and so they're trying to put these things there as, these are the

5    basic theoretical assumptions underlying our understanding of

6    mental retardation in 2002.  Now hopefully in 2012, we'll know even

7    more than we know today.

8    Q.  And this one has to do, Dr. Swanson, with gullibility and

9    vulnerability, which we've already discussed briefly, does it not?

10   A.  That's right.

11   Q.  And is this one of the features of mental retardation and mild

12   mental retardation in particular?

13   A.  That's correct.  And pretty much this gullibility, this ability

14   to be taken advantage of, it's all recognized in the field, and we

15   are at this point in our time very self-critical of ourselves for

16   not coming up with a good standardized measure for this.  The

17   leading names that hop to my mind in this are Greenspan and Tasse',

18   who are both hoping to develop some kind of scale that would better

19   measure this.

20         We know it's there, we know there are a class of people

21   who are easily taken advantage of, this is an earmark of our

22   definition, but it's not in any of our standardized measures at

23   this point.

24         So I think right now and in 2002, AAMR is acknowledging

25   it's there and it's acknowledging we're not doing a very good job

1   of testing for it, other than gathering antidotal data at this

2   time.

3   Q.  And it says that these characteristics, gullibility and

4   vulnerability, should still be considered in the overall diagnostic

5   decision process and evaluated by other means.  Because you don't

6   have any standardized instruments developed yet to measure this,

7   how do you determine if these factors are present when you do one

8   of these assessments?

9   A.  Well, pretty much you have to gather antidotal data and then,

10  once again, you do just like you do with any other example of

11  adaptive behavior, you compare it to, was that age appropriate, do

12  most people 18 years old realize they were being taken advantage of

13  at that time?  Is this typical for somebody of that culture living

14  in that place at that age at that time?  And that's the best we can

15  do at this point until we come up with a more standardized measure.

16          The caution here and the caution in all of the articles

17  that I have talked about that are being addressing this today is,

18  they're calling on experts in cases, not only like this but just in

19  every day assessments, to be aware of it, to be -- where it's there

20  and make sure you've addressed it and not ignored it.

21  Q.  And we've given some specific examples, so I won't do that

22  again.

23  A.  Okay.

24  Q.  But just to sum up, in your interviews with these various

25  witnesses, did you find multiple examples of where other people

1  used, manipulated or took advantage of Paul Hardy's gullibility?

2  A.  Yes, I did.  As a matter of fact, what flashes in my mind, and

3  the judge can go look at it later, there's a section of the Hardy

4  interview where Paul Hardy's explaining to Dr. Hayes, he'd do his

5  life over now, thinking back, because he realizes now sitting in

6  prison, and the things he gave away for free to people that he now

7  realizes they were manipulating, he would do -- his nature is to

8  give, but he would go give it to a stranger sitting on the median

9  of a street because he realizes -- is beginning to realize thinking

10  back now that, you know, I was really stupid to do that.  I was

11  taken advantage of.

12        Now, I don't think he quite gets it because he is going

13  to give it away to a stranger, but that kind of explains.  And

14  there is a long conversation between him and Dr. Hayes in there on

15  that.

16  Q.  In that passage, does he not say that he now, it's his --

17  people that he thought were his friends that he doesn't trust?  In

18  other words, he trusts a hobo on the street rather than somebody

19  who is pretending to be his friend?

20  A.  That's true.  Now, I will say this, to be honest, and I hope

21  Paul's listening, he has that ability level, the capacity level.

22  Remember, he has got to be able to perform that, and he's reached

23  that level because I was in there asking him a bunch of questions

24  and a lot of other professionals have asked him enough questions to

25  where now he's had his little "aha" moment.  Now, the proof of the

1  pudding would be, if he ever got out, would he be able to take that

2  knowledge and implement it on a day-to-day basis.

3  Q.  So when you say "aha moment," you mean at some point he's been

4  able to look back and recognize --

5  A.  And a lot of that came up from different questions different

6  ones of us have asked him because we did our job and we explored

7  that assumption.

8  Q.  Now, this is another of the assumptions, and this one is about

9  problem behavior.  What does the AAMR, what position does the AAMR

10  take regarding the role of problem or maladaptive behavior in an

11  assessment for mental retardation?

12  A.  Okay.  I guess because the word adaptive is in maladaptive,

13  people have the misconception that adaptive behavior is here and

14  maladaptive behavior is here, and it's not the same continuum, it's

15  two different continuums.

16        So you have adaptive behavior here, you have good

17  adaptive skills, you have poor adaptive skills.  Down here you have

18  maladaptive behaviors.  There are typical maladaptive behaviors we

19  see in people with mental retardation, particularly in the severe

20  and profound ranges; for example, head banging or hand biting.

21  There are also conduct disorders.

22        Now, it's not to assume that because you have an adaptive

23  behavior deficit that you cannot also have coexisting with that a

24  maladaptive behavior, a conduct disorder or whatever.

25        And what they're cautioning you is, don't take

1    maladaptive behavior and put it at the other end of adaptive

2    behavior, consider it as a second dimension.  We are

3    multi-dimensional people and when we diagnose with the DSM, we are

4    diagnosing across a lot of different continuums, mood, depression,

5    not depressed, conduct disorder, adaptive behavior, cognition,

6    learning disorder, all of these are separate, different continuums

7    we should be looking at.

8    Q.  Is crime considered a species of adaptive behavior --

9    A.  Yeah, I would put --

10   Q.  -- or maladaptive behavior?  I'm sorry.

11            MR. McMAHON:  What?  I didn't hear that.

12            MS. FOURNET:  Crime, C-R-I-M-E.

13            THE WITNESS:  I would consider crime a species of

14   maladaptive behavior.  Now, not everybody's behavior qualifies for

15   a diagnosis in DSM, I hope.  And there are some things -- some of

16   us here could probably walk out without a DSM diagnosis, so I am

17   not saying that one particular behavior, please don't misinterpret

18   me there, qualifies for me.  But if you look at criminal behavior,

19   I would put it on the maladaptive spectrum, the conduct disorders,

20   the way we look at it as -- in childhood.

21   BY MS. FOURNET:

22   Q.  What does that last sentence mean, "The presence of problem

23   behavior is not considered to be a limitation, although it may be

24   important in the interpretation of adaptive behavior scores," what

25   does that mean?

A.   Okay.   Now, I'll tell you how that means most specifically to
me, and I don't know if it applies in this case.   For example, if I
have a person who is a chronic hand mouther and he's scoring only
in the severe deficit range and he always is mouthing his hands to
the point they have fissures and cracks on them, and that's a
maladaptive behavior and he has severe adaptive deficits, you know,
et cetera.

        If I can get rid of the hand mouthing, find other ways to
redirect his hands, where he can start using his hands to learn a
skill, my adaptive behavior is going to go up because I reduced the
maladaptive behavior.   And so, therefore, don't assume that someone
who has severe deficits couldn't learn better behaviors if you
eliminated the maladaptive behavior.

        That's actually the area I think my specialty is in
because I primarily train to work with maladaptive behaviors and
eliminating those.

        You know, with criminal behavior, that applies in this
assumption as well, but I do think the primary thing they're
getting there and this is, is the maladaptive behavior keeping that
adaptive behavior from emerging.   If we got rid of the maladaptive
behavior, would it be there.

Q.   And here is another assumption about adaptive behavior.   This
has to do with the person's culture, opportunities, motivation and
performance.   Now, we just discussed how Dr. Olley does not think
the lack of motivation excludes mental retardation, and, in fact,

1   may indicate, may be an indicator of mental retardation.  What does

2   this particular assumption --

3   A.  Well, it means a lot of different things.  For example, if I am

4   scoring someone who is of Asian descent and uses chopsticks, I am

5   not going to score them off because they don't use a fork, if they

6   within their culture haven't been trained to use a fork.  So a lot

7   of it applies to more simplistic things like that.

8           Broadly and more globally and in relation to Paul, I

9   think we've discussed that.  You have to closely examine the

10  Calliope and its uniqueness and how his behaviors may be a function

11  of his culture and something that grew up in his culture and how it

12  could be a deficit, that even in any culture he would have had

13  trouble.

14  Q.  And I think you mentioned earlier, and tell me if I am wrong

15  about this, that part of this type of analysis is that a person who

16  has mental retardation will be perceived in his community as being

17  slow or being different.

18  A.  That's true.  That's kind of like your earmark.  And I think

19  that's what Olley is saying is, go back and ask that question, you

20  know, did he really function that well or did y'all recognize he

21  was a little bit different but you just made an allowance for it.

22  Q.  Now, Paul managed to function in a minimally-adequate level

23  with supports in the poor neighborhoods of New Orleans, in the

24  Calliope.  I think you would put it he didn't thrive, but he did

25  okay with supports; is that an accurate description?

1    A.  Yes, he did okay with supports.

2    Q.  How do the poverty, according to the literature, things like

3    poverty and homelessness fit into the equation in evaluating

4    someone for mental retardation?  In other words, do you try to

5    explain all of the deficits in terms of the poverty and the lack of

6    supports in the community?

7    A.  No.  The at-risk features are what ticks you off.  There may be

8    a problem, and hopefully, if you catch it early enough, there's

9    going to be a problem coming if we can handle these.

10            There were all kinds of Catchment studies done years ago,

11   longitudinal studies, where we started identifying communities

12   where there were higher teenage pregnancies, less prenatal care, et

13   cetera, all of these things are highly correlated with learning

14   disabilities and mental retardation.  So if we can find these

15   at-risk behaviors and correct them, they're less likely to happen.

16   But if they're not corrected, you can look pretty much to see,

17   there might be some learning disabilities, there might be some

18   mental retardation.

19            You know, the IQ of the mother, the -- her nutrition,

20   which we talked about, the number of babies coming so closely also

21   caused problems, the largeness of the family, which meant the

22   mother had less time to show with the other children.  The

23   community that they lived in and how easy it was to access school

24   resources, et cetera.

25            Ms. Minor mentioned where she went, Marie would have had

1    to pay to send Paul where she taught, and so you would have had to

2    go find a Head Start place to put him or somewhere.  I don't think

3    there were a lot of those in that particular neighborhood because

4    it was an at-risk neighborhood.

5           So you can't say, well, he is the way he is because he's

6    at risk.  A lot of times I look back at -- I think that's looking

7    through the wrong end of the telescope, you ought to be looking

8    backwards and say, hey, all of those at-risk factors were there,

9    you know, maybe it didn't impact Terry but it did impact Paul

10   because there was a lower capacity.

11          MR. McMAHON:  Judge, I need five.

12          THE COURT:  Yeah, and I actually was looking for a place

13   to break, too, we've been at it for about an hour and a half.  I

14   would like to go to like six o'clock today if it's okay, and I'd

15   like us to start at 8:30 tomorrow morning just to keep moving.  Is

16   everybody okay with going until six today?

17          MR. MILLER:  Yes, your Honor.

18          MS. FOURNET:  That's fine.

19          THE COURT:  Okay.  We will take a break right now.

20          THE DEPUTY CLERK:  All rise.

21      (WHEREUPON, A RECESS WAS TAKEN.)

22      (OPEN COURT.)

23          THE DEPUTY CLERK:  All rise.

24          THE COURT:  Is there a category of special ed where

25   people are educable?

```
 1              THE WITNESS:  That's an old label that we used to have,
 2    and the mild is considered educable and you can look at old records
 3    and see educable.
 4              THE COURT:  I'm hoping to stay educable.  That is lot of
 5    stuff.
 6              MS. FOURNET:  You may be squinting, I certainly am, and I
 7    was wondering if it would help you to have hard copies of our
 8    exhibits?
 9              THE COURT:  Yeah, I can read that up there, I think it --
10    can you make it a little bit larger?  Adaptive behavior scores must
11    be --
12              MS. FOURNET:  May I proceed, your Honor?
13              THE COURT:  Sure.
14    BY MS. FOURNET:
15    Q.  I think what -- you were discussing the difference between risk
16    factors and explanations for behavior when we quit.
17    A.  As I understand risk factors, they are the things that we are
18    looking for, and hopefully, once we identify them, we put
19    interventions in place and prevent something from happening.  But
20    if nothing is done to get rid of them or intervene on them, pretty
21    much there's a highly -- a more likely likelihood that you're going
22    to be getting one of these disorders.
23    Q.  And I think, if I am not mistaken, that this red book, as you
24    call it -- and I am going to keep calling it the red book as the
25    shorthand version, the Mental Retardation Tenth Edition, AAMR --
```

1    actually addresses and lists risk factors for mental retardation.

2    A.  That's correct.

3    Q.  And poverty is one of those risk factors?

4    A.  That's correct.

5    Q.  And so poverty is a risk factor for mental retardation, but

6    it's not a cause of the significant adaptive functioning

7    limitations that you find in what appears to be a mildly -- a

8    person with mild mental retardation?

9    A.  That's correct.  I mean, look at Abraham Lincoln.  You know,

10   where he came from and the isolation in which he lived and what he

11   became.  Sonia Sotomayor is another one I think of who grew up in a

12   project and, you know, is now Supreme Court Justice.  So the fact

13   that she lived in poverty or even lived in a project would not

14   necessarily mean that you would have mental retardation.

15   Q.  Now, I think you mentioned earlier, Dr. Swanson, that the kinds

16   of assessments that you do in the context of an Atkins hearing is a

17   retrospective assessment; that is, you're trying to figure out how

18   someone was functioning at a previous time in the past, not --

19   A.  And it's unique because you're previous twice.  You're probably

20   looking at how they were prior to the age of 18 and how they were

21   prior to the time of incarceration.

22   Q.  And does this User's Guide, this other red book, include some

23   guidelines, eight in number, for retrospective diagnosis?

24   A.  Yes.  And since I --

25   Q.  I think they start on page 19 or 20.  And we're not going to

1    talk about all of them, but we're going to talk about some.

2    A.  Okay.

3    Q.  And we're going to start with No. 3, which appears on page 20

4    of the User's Guide.

5    A.  Okay.

6    Q.  Now let's look at (a), "Use multiple informants and multiple

7    contexts --"

8    A.  That's right.

9    Q.  "-- in assessing adaptive behavior in a retrospective

10   evaluation."  What does that mean and why is it important?

11   A.  Well, if you can get -- a person is not mentally retarded just

12   in one setting.  So they're not mentally retarded just in their

13   home and functioning like an average person in school and an

14   average person maybe with their girlfriend, so we are looking at

15   multiple settings and we would like multiple informants.  It's best

16   if we can have teachers and parents and siblings and friends and

17   girlfriends, as many people as we can find.

18          They don't all have to be standardized assessments, but

19   as many of those as we can get, and we want to look at multiple

20   context; because like I said, we need to look at the places where

21   that person is supposed to be functioning at that age, their work

22   setting or their school setting or their home setting or how they

23   interact in the community.

24   Q.  And once you have this universe of information from these

25   different informants in these different contexts, what is it that

1   you look for in the overarching sense?

2   A.  Well, you're looking for that convergence again or is there a

3   convergence of deficits across the informants, across the settings.

4   Are there any strengths; if there are strengths, is there -- you

5   know, what do you know about these strengths and how they

6   developed.  It's pretty much the same thing we've been talking

7   about all afternoon.

8   Q.  And as you find that consistency and as you find that

9   convergence, does that also give you a comfort level that the

10  reports you're getting are reliable that you would not have if only

11  one person made a --

12  A.  I guess that would be as I explained before.  You start off

13  with a big funnel and you're working your way down.  If the

14  convergence suddenly stops, work your way back up and see where the

15  problem is and see if you can go back down again.

16  Q.  (B) says:  "Recognize that limitations in present functioning

17  must be considered within the context of community environments

18  typical of the individual's peers and culture."  What does that

19  mean?

20  A.  Well, I think we've talked about that a lot already.  So we

21  need to look at where Paul's living, be it the Calliope, be it the

22  Florida project, be it where he was living in New Orleans East; and

23  how is he functioning in that setting, is he doing what we would

24  expect somebody to be doing in that setting, is he doing it age

25  appropriate, did he learn it at an age-appropriate time, how many

1  supports need to be there -- the same questions -- and are there

2  still people saying, hey, he's not quite like everybody else.

3  Q.  And again, (c) I think we have talked about, is that correct,

4  this again --

5  A.  Oh, that's the -- yes, I think we've discussed that one.

6  Q.  Now, (d) says:  "Use an adaptive behavior scale that assesses

7  behaviors that are currently viewed as developmentally and socially

8  relevant."  What does that mean?

9  A.  There are a lot of scales out there, and the gold standard is

10  the Vineland and the ABAS-II.  There are certain scales that

11  experts just recommend you don't use with the prison population

12  because it's not generalizable.  There are certain scales that

13  really aren't -- don't have a good normative base.  So you want to

14  look -- I think they're just telling you to get a good scale and

15  then be aware of what you can do with the scale.

16          You want to try to get a global score, you may only be

17  able to get a score in one domain.  It may be better to use the

18  ABAS-II with this person than the Vineland.  Know your scales well

19  enough to know which one to pick.

20  Q.  And as a matter of fact, just to digress a little bit, you

21  actually picked a Vineland in this case?

22  A.  I did.

23  Q.  (E) I believe we've talked about and that has to do with

24  adaptive -- with maladaptive behavior.

25  A.  That's correct.

```
 1   Q.  What about (f):  "Realize that adaptive behavior refers to
 2   typical and actual functioning and not to capacity or maximum
 3   functioning."  What does that mean?
 4   A.  Okay.  If the person is able to describe how to do something
 5   and he doesn't do it, then it's not something he's doing on a
 6   typical basis.  I gave an example of that of the preschooler that
 7   can tell you the rule, but every time he has to apply the rule he
 8   doesn't apply it.  So he really hasn't absorbed that adaptive
 9   behavior and incorporated it into his day-to-day routine.
10        So it's not the capability or the ability to describe it,
11   it's actually the ability to do it on a daily basis or when it's
12   needed to be done with as little supports as possible that are
13   expected for that age range.
14   Q.  And would the car example I gave you earlier of having the 10
15   year old describe how to drive a car but not being able to actually
16   drive a car, is that another example of that?
17   A.  That would be another example of that, yes.
18   Q.  And with respect to Paul, were there instances in the
19   information you reviewed where he appeared to be able to describe
20   tasks that, in fact, he might not be able to do?
21   A.  Yes.  I saw a lot of examples of that, really, when Dr. Hayes
22   was talking to him for that long five-hour period.  He described
23   things that he didn't do on a daily basis or that people in the
24   community said he didn't do them when he needed to do them.
25        When I worked with Paul, I not only did a standardized
```

1    assessment and I did a standardized academic assessment with him,

2    but when I work with people with mental retardation and I am

3    assessing them, I bring some things along and I just see what can

4    they do with those things.  And if I wanted to teach them how to

5    use them, how long would it take me to teach him that.

6              And so I brought some things along with Paul and tried to

7    see what was his knowledge about setting a laundry dial or setting

8    a dryer dial or looking at a ruler and figuring it out, figuring

9    out fractions, counting money, looking at a check and then

10   identifying different parts of a check.  Just things like that.

11             And some of that Paul can do and he can show you the

12   ability.  The unfortunate part of it is, when he is in the

13   community where there's multiple choice situations going on, he

14   can't do it reliably.

15   Q.  Now, this is also an assumption, I believe, or a guideline, I

16   believe Dr. Cunningham alluded to that.  This book, which is the

17   premiere or one of a very few premiere publications on the issue of

18   mental retardation.  And specifically on the issue of retrospective

19   diagnosis, which is what we're talking about here today, they

20   recommend that you recognize the Flynn Effect?

21   A.  That's correct.  Now, Division 33 also recommends that, and the

22   leading authors in this field that I mentioned earlier --

23   Greenspan, Olley, Tasse', Frank Gresham -- they're also

24   recommending that you use the Flynn Effect.

25   Q.  So whatever the controversy, if there is indeed a lot of

1    controversy around this Flynn Effect in the larger community of

2    psychologists, in the community of psychologists that deal with

3    retrospective diagnosis in the context of -- especially in the

4    context of Atkins hearings, is there a recognition by this

5    organization, AAIDD, that the Flynn Effect is something that should

6    be recognized and applied in retrospective diagnosis?

7    A.  Yes, it is.

8    Q.  And do you agree with that?

9    A.  I do.

10   Q.  Practice effect, this is something else that Dr. Cunningham

11   discussed.  Again, do you agree with this guideline and with

12   Dr. Cunningham?

13   A.  Yes, I do.  And it's more important in the field of mental

14   retardation because this population is so over tested because

15   you're mandated to keep testing them and testing them if they're

16   receiving services.  So you're going to get practice effects.

17          You don't know how many times I pull out my little red

18   and white blocks and they say, oh, I remember that from the last

19   time.  I mean, I'm getting practice effects just from that.  So you

20   have to be very much aware of.  Most of us never take an

21   individually-administered IQ test, and here is Paul who's had two

22   of them within a month's time.

23          So you have to be aware that that's a danger.  Once

24   you're exposed to a test, your performance may go up.  We build

25   these tests deliberately for novel tasks because we're doing two

1    things, I am trying to teach them a task that hopefully they've

2    never seen before and then I'm asking them to demonstrate it with

3    only a brief instruction.

4         So if I give them the same, you know, so the red and

5    white blocks are fine the first time I give it because he's never

6    had to do anything like that before.  But the next time I give it

7    to him, and even if it's a year later, two years later, he

8    automatically knows, oh, that's right, I have to do something with

9    those blocks and there's going to be a picture.  So he's already at

10   an advantage is what I'm getting at.

11        So you have to be weary of practice effects.  And, you

12   know, my regular evaluations, you know, I'm going to note that if I

13   think that possibly it was a little high because he's been

14   administered the Wechsler four times over the last 20 years.

15   Q.  And I'd like to talk next about the sixth AAIDD guideline for

16   retrospective diagnosis having to do with self-ratings.

17   A.  Okay.  Self-ratings, self-report, it's pretty much the same

18   thing, and you need to be really cautious with that.  And

19   Dr. Cunningham went into this at great length.

20        There is an acquiescent bias that's there for people who

21   have more cognitive functioning, where you tend to want to say what

22   they think the authority wanted them to say.  And so that's a

23   problem with self-report.

24        There's the masking problem going on, particularly if the

25   person is in the -- possibly in the mild range, they're going to

1    try to fake good.  I mean, they don't want to look any dumber than

2    anybody else, so there's a tendency to mask the problem or say they

3    can do something that they can't do.

4            And then when you're dealing with people with lower

5    cognitive functioning, you're asking -- particularly in a prison

6    setting years with where they've been incarcerated a long time,

7    you're asking someone who may have limited memory to think back and

8    put them in a situation when they had to use the skills.  So that's

9    the third problem you have with that.

10           Pretty much in Atkins hearings all of the experts

11   recommend that you don't use self-report, that you don't use

12   self-ratings.

13   Q.  Well, I mean, you talked to Paul, did you take down any --

14   A.  Yeah, I mean, a good interview where you can flush those things

15   out, and if he says he can do something, then give him some

16   examples and let him go from there and then ask him more questions

17   beyond that.

18   Q.  I notice in (a) where the AAIDD in this guideline is discussing

19   what we're calling for our purposes today masking, that is,

20   appearing to try to look more competent and normal, there seems to

21   be a concern there in that guideline that that can be interpreted

22   by someone with less experience than perhaps you have as faking.

23   Do you agree with that?

24   A.  That's correct.

25   Q.  Did you see in the various interviews conducted by you and

1    Dr. Hayes, did you see -- and you don't need to list them right

2    now -- but did you see multiple instances of faking or masking?

3    A.   Yes, I did.

4    Q.   Not faking.  Masking or --

5    A.   Faking good.

6    Q.   -- pretending to be -- faking good.

7    A.   That's what we call it, faking good, yeah.  You can fake bad,

8    fake good.

9    Q.   Now, (b) says that people with MR/ID have a strong acquiescence

10   bias or inclination to say yes or agree with authority figures.

11   And Dr. Cunningham in his testimony discussed why yes or --

12   discussed the fact that yes or no questions are not the best way to

13   approach a person who might have mild mental retardation?

14   A.   That's correct.  There's just a massive amount of research done

15   with people with mild mental retardation who tend to want to

16   acquiesce, they want to say what's going to please you.  So that's

17   a problem in dealing with that, and it's just better to start with

18   more open-ended questions and just let them talk before you start

19   giving them suggestions.  There's a high suggestibility, that might

20   be a way to put it.

21   Q.   And I guess (c) perhaps may be tied to the masking.  I mean, is

22   there a sort of a stigma attached to having mental retardation?

23   A.   And like I said, you see that more in the mild range because

24   when you get in the lower cognitive ranges, they're not as aware of

25   the difference.  But mild, people in the mild range do become aware

1   that they're not catching on as fast as other people and they don't

2   want to look bad, they don't want to put themselves up to being

3   kidded and/or teased.

4   Q.  And is there some level of shame or embarrassment about having

5   a sense that you're different from other people?

6   A.  That's right.  And when you look at the age range where this

7   starts going, I mean, there is all kinds of literature about people

8   in special ed not wanting to be on the short bus.  There's millions

9   of ways that they identify -- that other kids figure out the kid is

10  not as high as they are.  And there's a tendency among the kids to

11  pick on people, and who wants to look like that, you know.

12  Q.  When you interviewed Paul, how did you try to minimize the

13  problems with this acquiescence bias and the masking?

14  A.  Paul is very hard to interview on that because, let me tell

15  you, he is really good and you really have to stick with him on

16  topic and go a long way with it and then let it go and go on to

17  something else, and then when you see the inconsistency go back to

18  that.  The one that got --

19  Q.  When you say he's good, he's good at what?

20  A.  Masking.

21  Q.  Masking.

22  A.  And not admitting that he can't do.  And I can give you an

23  example.

24  Q.  Please.

25  A.  But when I had to get him to read the newspaper and, you know,

1    rather than admit -- I mean, because what I do is I just -- first

2    of all, I just put the newspaper out, and I say, you know what this

3    is?  It's a newspaper.  Well, I'd like for you to read it for me.

4    And so he said, well, what do you want me to do?  And I said, well,

5    find the sports page.  Well, I immediately expected him to flip it

6    over, go to the index, find the sports page and go to the sports

7    section.

8            Well, Paul immediately takes the paper and he opens it

9    all up and he acts like he knows exactly what he is doing, and he

10   looks down every page like, you know, that's how you look for the

11   sports section.  He actually passes up somehow the first page of

12   the sports section, goes past it, then he comes back and then

13   finally he comes on the sports section.

14           So then you take the paper back and I fold it back up

15   again.  And I say, Now I want you to find the weather.  He still

16   doesn't know to go to the index, and it's the same process of going

17   over and over.  And if you ask Paul, well, do you know how to read

18   the newspaper?  Yeah, I know how to read the newspaper, I know how

19   to find things in the newspaper.  You know, he really doesn't know

20   how to read a newspaper.

21           So then when I get to asking him more and more things, I

22   say, well, what do you do, can't you find it without turning it

23   page by page?  Well, he finally admits he doesn't know how.  So I

24   show him how to do it.  You know, which, like I said, I like to do

25   it to see if they can do it and then if I show you how, can you

1    learn how to do it.

2            And, you know, we looked at the index and I showed him,

3    and then after that, you know, he flipped the pages and we worked

4    on that a while and I give him different examples.  But even then,

5    there was a lot of prompting and reminding him to go back to the

6    index.

7            I think it's something Paul could learn how to do.  I

8    think if you worked with him enough on it, he would learn how to do

9    it.  Most people kind of picked that up just watching somebody else

10   read the newspaper.  You know, over time if you watch somebody you

11   would know how to do that.  So that's -- rather than admit he

12   didn't know how to find the sports pages, we went through a long,

13   long process before I got him to admit that.

14           I tried to get him to find numbers in a phone book, and we

15   went through a long process of him not having trouble with that.

16   And then I would give him addresses, and Paul has a really hard

17   time finding a street, if it's not a street that he doesn't know.

18           And we went the longest time with me giving him different

19   requirements of tasks to do, and I said, Paul, can you do this?

20   And he couldn't, he finally admitted he couldn't.  But it took me

21   15 minutes of challenging him to get him to admit it.

22           And we talked about how he does find directions and things

23   like that.

24           Paul, very quickly he could have told me, no, I don't

25   know how to do that, Vicky, and we would have moved on from there.

1   But he didn't do that, he had to make me think he could, which once

2   again is why he would want to do that.  I think it's just a

3   function of his mental retardation.

4   Q.  And, in fact, when you asked him to read the newspaper, did you

5   get the impression, any impression as to whether he had seen people

6   maybe sitting on the corner reading the newspaper in terms of --

7   A.  That's what I said, that he flipped it out and he'd turn the

8   page and he would go down the line.  But, I mean, you don't turn to

9   the first inside page and start looking for the sports section.

10  But, I mean, he didn't know how to do it.

11  Q.  But he flapped the pages and he did the fold?

12  A.  And he fluffed it out, uh-huh.

13  Q.  And if somebody saw Paul --

14  A.  They would think he could read the paper, yes.

15  Q.  Now, this one is potentially important in this case.  This one

16  is about past criminal behavior and verbal behavior.

17          Let's talk about the issue of past criminal behavior and

18  the fact that AAIDD does not recommend using past criminal behavior

19  in mental retardation assessment.  Do you agree with that advice?

20  A.  And there's really two concepts in here.  One of them is

21  maladaptive behavior, criminal behavior is not the other end of

22  adaptive behavior.  It's really on a separate continuum.  The

23  second thing is, there's a tendency in these Atkins hearings to go

24  to the crime itself and say this one event in this man's life tells

25  you what his adaptive behavior is, it's this one example of

1   planning is an example of all of his planning skills.  For none of

2   us, one event in our whole life is not the best example necessarily

3   of our whole being.

4           And then secondly, I don't think it's saying here you

5   can't consider the fact that if someone has had a criminal life

6   that you wouldn't look at all of the different criminal behaviors

7   he's been involved in, and we certainly looked at them in this

8   case.

9           But what I think what they're specifically addressing

10  here is:  Don't go cherry pick this one thing up and hold it up and

11  say, once again, this is an example of this so, therefore, you

12  can't say he has this deficit.

13  Q.  And I guess that's one thing I wanted to ask you.  I mean, is

14  this some sort of exclusion of mental retardation; in other words,

15  if you can commit a crime, you must not be mildly mentally

16  retarded?

17  A.  No, that would not be an exclusion to being mentally retarded.

18  Q.  I mean, if you're Pablo Escobar -- I don't know if you know who

19  he is.

20  A.  Who is Pablo Escobar, tell me again.

21  Q.  Well, the Medellin cartel mentioned yesterday.

22  A.  Oh, he is a drug dealer?

23  Q.  He was an international drug dealer that ran the Medellin

24  cartel that was mentioned yesterday, a very complex multi-national

25  drug organization.  He's dead now but at the time --

1    A.  Well now, that criminal behavior, like the Ponzi scheme we're

2    looking at, I mean, if this is the crimes, if it takes a lot of

3    complicated, triple-level planning to do this, you know, if you're

4    ripping off security stocks, you know, or something like this, and

5    going through the Internet and ripping off millions through some

6    kind of intricate scheme, you know, that would be something that

7    you would want to look like.

8              I am not saying that you wouldn't want to look at all

9    behavior.  The government first gave me this much stuff to look at,

10   and I looked at all of it.  And I think what they're saying here

11   is, don't pick up this one thing and say, well, all of these other

12   deficits don't count because he did this one thing one day that

13   day.

14   Q.  And is it also a measure -- a function of the complexity of the

15   crime?  In other words, I believe I read, it may have been Tasse'

16   that said, you know, if you commit a murder in the course of

17   committing securities fraud, it may exclude or certainly call into

18   question the mental retardation diagnosis, but it's the security

19   fraud that's problematic, not the murder.  Would you agree with

20   that?

21   A.  That's right, I would agree with that.

22   Q.  I mean, a mildly mentally retarded person, could that person

23   take a gun and shoot somebody?

24   A.  Yes.

25   Q.  Could a mildly mentally retarded person go on the street and

1   sell some crack, rocks of crack cocaine?

2   A.  Yes.

3   Q.  In much the same way that an eight year old could sell Girl

4   Scout cookies?  I am not saying that's a legitimate analogy, but

5   we're talking about the same type of skill?

6   A.  Yeah, someone could send an 8- or 11-year-old child to sell

7   cookies in the same way you could send them to sell or deliver a

8   bag of crack.

9   Q.  Are you familiar with the term street smarts?  I think that

10  came up in Dr. Hayes's interview of Paul, and, in fact, it comes

11  up, I believe, frequently in these Atkins hearings.

12  A.  That's correct.  That's an assumption that if someone's smart

13  enough to live out on the street and not get picked up, not thrown

14  in an institution, survive from day to day, they can't be mentally

15  retarded because they have street smarts, and there is not a good

16  measure of street smarts.  But experts don't recommend that you use

17  that as a preclusion to a diagnosis of mild mental retardation.

18  Q.  In fact, would you disagree that Paul probably had some minimum

19  level of street smarts there in the Calliope project, he knew his

20  way around, he knew how --

21  A.  When he was in a familiar neighborhood with familiar landmarks,

22  Paul's direction problem was not a problem, you know, it was well

23  contained --

24  Q.  Well, I'm not just talking about direction, I'm talking

25  about --

1   A.  But he had friends, he had people that knew him, he had old

2   ladies that didn't mind him taking them to the doctor.  I mean, he

3   had a group of people and he was respected, and he did well within

4   that community, yes.

5   Q.  And he had supports within that community, too, did he not?

6   A.  That's right.

7   Q.  Let's don't even take Paul out of New Orleans, let's put Paul

8   in -- let's keep all of those support people away from him and put

9   him in an apartment in uptown New Orleans by himself.  How much

10  good are those street smarts going to do him in that situation?

11  A.  Not in that situation because, you know, he's -- I guess what's

12  hopping into my mind is the Kennedy sister.  You know, I mean, you

13  could have said she had street smarts, her father was an ambassador

14  to England, she went to court with the queen, you could say she had

15  street smarts because she fit in very well went there when her

16  other siblings would interact or whatever.  You know, if you took

17  her and you dropped her in the Calliope, she wouldn't last a minute

18  probably; and not just because of the dangerousness of it, she had

19  those supports within that setting.

20          On the same hand, you take Paul and you put him in with

21  the Kennedys, and he wouldn't last very long because that's not

22  with his street smarts world.  When you're talking about street

23  smarts, you're talking about those capacities within a small,

24  little niche where a person does well, but that isn't going to help

25  you because all of us have to go every once in a while somewhere

1    else.

2    Q.  And adaptive behavior is not about your ability to function in

3    a discrete environment like a project or an inner city neighbor --

4    A.  Or the queen's court.

5    Q.  -- or the queen's court.

6    A.  That's right.

7    Q.  It's about your ability to function in the world as a whole?

8    A.  That's correct.

9    Q.  Now, people with, I think you've said before, mild mental

10   retardation have some areas of competency; is that correct?

11   A.  That's correct.

12   Q.  Did it surprise you that Paul could read?

13   A.  No.  I mean, the DSM predicts that most people with mild mental

14   retardation can read at about the 6th grade level.  What you see is

15   a difference between comprehension and word recognition, which you

16   clearly see in Paul.

17   Q.  But he can basically, I think, as I've understood it from you,

18   he can basically sight read; in other words, he can look at a word

19   and if it's not a hard word, he can tell you what the word is.

20   A.  He's learned -- he cannot phonetically read, but that amazed me

21   when I watched him read, and I think that's why he is so good at

22   word recognition.  We have sight words, there's 220 words that we

23   all learn just by sight, see, come, go.  Paul's learned to look for

24   sight words within a bigger word and does a pretty darn good job of

25   coming up with the word even if he doesn't know what it means.

1        And if you watch him with his fingers, he even breaks

2   it -- because Paul does a lot of things with his hands -- into

3   little sight words.  So if it's a hard word, it was amazing to me

4   how he got it.  He may not have been able to tell me what it meant,

5   he may not have been able to tell me what the sentence meant, but

6   he guessed the word by figuring out the "com" or the "ent" or the

7   "plete" or whatever.  You know, he's seen enough of the pieces to

8   put it together.

9        And it's unique almost in the way which I think other

10  people who are in neuropsychology or maybe Dr. Woods could better

11  explain why with his brain that's what happens, but it's unique in

12  the way that he does that and I think that's why his word

13  recognition is so good.

14  Q.  In your working with the population with mental retardation and

15  working in the larger community, have you perceived that there are

16  many stereotypes out there, particularly when you're talking about

17  people at the mild range of mental retardation?

18  A.  Yes, there's a lot of stereotypes out there.

19  Q.  I mean, typically, do people with mild mental retardation who

20  don't have something else physically going on, do they drool all

21  over themselves?

22  A.  No, they wouldn't drool all over themselves.

23  Q.  Do they emanate rank odors from their bodily persons?

24  A.  No, I wouldn't think so.

25  Q.  I mean, do mildly mentally retarded people stink?

1  A.  No.  I mean, particularly by adult age, late teen years, they

2  know how -- personal hygiene.  The problem we look for is how late

3  do they learn that and how much supports did momma or somebody have

4  to put in place before they put that regularly in their schedule.

5  But by the time they reach early adulthood, they have pretty good

6  hygiene skills.  I mean, they know to take a bath every day, they

7  know how to use soap, they know how to soap the rag, they know how

8  to hit all of the body parts.

9  Q.  Does the fact that some of Paul's women friends describe him as

10  neat and clean, does that tell you that he cannot be mildly

11  mentally retarded?

12  A.  No.  I would anticipate that somebody with mild mental

13  retardation would have mastered those skills by late teen years.

14  Q.  So the fact that he is not disheveled, smelly and raggedy

15  looking does not mean that he is not mentally retarded.

16  A.  That's correct.

17  Q.  Is a person with mild mental retardation capable of being nice

18  to old people?

19  A.  Yes.

20  Q.  Is a person with mild mental retardation capable of bringing a

21  six pack of beer to an old lady who likes to drink beer?

22  A.  Yes.

23  Q.  In fact, could an eight- or nine- or ten-year-old child perform

24  those functions?

25  A.  We hope they couldn't go buy it, but they could pack it to her.

1  Q.  Well, I realize they probably couldn't buy it, but they could

2  certainly recognize that she needed this and bring it to her?

3  A.  That's correct.

4  Q.  Is the fact that a person can do basic math problems, is that

5  inconsistent with a diagnosis of mild mental retardation?

6  A.  No.  Most people with mild mental retardation can do basic

7  numerical computations.  The problem comes in when you start having

8  to do it more abstracting with borrowing or carrying.  That becomes

9  harder for them.

10  Q.  And did you do some of that with Paul?

11  A.  Yes, I did.

12  Q.  Tell us how that went.

13  A.  Paul does pretty good even with double digits.  You know, he's

14  learned how to do that.  A lot of times he relies on his fingers.

15  Paul's problems start about where I would have anticipated them to

16  come in, fractions, percentages, which, like I said, that's 4th,

17  5th.  He even knows his addition and subtraction tables pretty

18  good; higher up, there's a little more finger counting.  He knows

19  some multiplication tables.  I think he can do basic division,

20  remainders are harder for him, but he can get those if you give him

21  enough time on a piece of paper.

22          Some of the tasks he can do on a piece of paper he can't

23  do in his head, which is why you start seeing the finger thing

24  coming in.

25          Money is something Paul does fairly well, and I mentioned

1    that in my reports.  I mean, when he counts money, you know, he

2    counts by fives, tens, twos, whatever.  He couldn't do serial

3    sevens backwards for me, but he had no problem doing twos, fives,

4    tens forwards.

5    Q.  Let me stop you a minute on the money.  He could count money?

6    A.  He could count dollar bills, and all of that is absolutely no

7    problem.  He could sit and he counts money -- what I look for first

8    is, a lot of times they're like little kids, they put them in rows

9    and then it's like four quarters, et cetera.  He doesn't do that, I

10   mean, he's scooping them into his hand as he goes.

11          The problem comes up with Paul and money when you give

12   him scenarios of shopping.  For example, you know, you give him

13   this little scene about going to the store and buying this and you

14   have this much money.  Most of us know if I am going to pay $15.62

15   for something, well, you know, hopefully, I'll get $4 and some

16   change.  You know, you have a ballpark figure in your head.  Paul

17   can't in his head say, okay.  If I don't have four ones, I'm in

18   trouble.  Do you see what I'm getting at?

19   Q.  Yes.

20   A.  Or be computing in advance how much the money is.  And I don't

21   think in a purchase situation he sits down and counts them up

22   because it's going to make him look bad.  This is what the people I

23   talked to in interviews said with Paul, whether or not he could do

24   it or not, he pretty much got the bills, forgot the change, you

25   know, because he didn't want to look bad like he couldn't do, which

 1   is one of the things I think Toni mentioned in my interview.

 2          But as far as counting money, he did pretty well.  As far

 3   as budgeting money, managing money, making a good purchase, making

 4   a qualitative comparison, these are the things, the more abstract

 5   things with money he has problems with.  And that's more typical of

 6   a person with mild mental retardation.

 7   Q.  Well, is the fact that he could count it, whether it was bills

 8   or whether it was change, is that inconsistent with a diagnosis of

 9   mild mental retardation?

10   A.  It's not inconsistent.  You asked for strengths for mild

11   people, I think that ability is a strength.  Either he sat and

12   counted a lot of change until he got it right.  I think, if I

13   remember correctly, Paul told me that was something his momma made

14   him do was -- so that they wouldn't get shortchanged, but he does

15   know how to count and he counts as fast as I would count, you know.

16   I can take two nickels and go, 10, 20, or whatever, he does that

17   fairly well.  The problem I think for him would come up during an

18   exchange.

19   Q.  So he did have some strengths.  And because people with mental

20   retardation do have some competencies, professionals like yourself

21   actually would expect to find some; is that correct?

22   A.  I hope to find some because we build on competencies.  If we

23   can increase those competencies, then we can overcome the gaps.

24   Q.  I mean, have you ever met anyone with mild mental retardation

25   who had no competencies in any area at all?

1    A.  Not unless they were physically challenged.  You know, when

2    you're dealing with someone who is cerebral palsy and, therefore,

3    have a lot of fine motor and gross motor deficits, that's going to

4    be some more limitations.  But, no, I mean, physical limitations

5    are in the average range, then, you know.  If there are no physical

6    limitations, there's something always I can latch on to build from.

7    Q.  So there are going to be some competencies as long as there's

8    not this -- the physical limitations you're talking about.  You're

9    going to expect to find --

10   A.  That's correct.

11   Q.  And so when you see those strengths surfacing, as they

12   apparently almost inevitably do, do you immediately turn away from

13   the possibility of a mental retardation diagnosis?

14   A.  No.  I mean, like when I saw how fast he could count money, I

15   thought, Lord, that's good, so let's go up further.  So I just

16   probed further to see, well, how is his money management skills,

17   how could he do a purchase, does he understand how to buy meat by

18   the pound or why you would want to buy this cut of meat instead of

19   that cut of meat.  I went as high as I could go with him to see

20   where he was on that.

21   Q.  And again, when you do an evaluation, given these principles,

22   does it make sense to go through the whole range of behavior and

23   select out the task that a person could do instead of focusing on

24   the deficits?

25   A.  Like I said earlier, you're looking for a convergence of

1  deficits.  But I never ignore the strengths either, I like to

2  explore those as well.

3  Q.  Is it something as simple as a weighing process; do you take a

4  scale and put the strengths here and you put the deficits here and

5  then you see which side wins and that's how you make your

6  diagnosis, is it something that simple?

7  A.  I don't conceive it that way.

8  Q.  Now, you mentioned that you administered a Vineland, is that

9  correct, in this case?

10  A.  In this case I administered one Vineland, yes.

11  Q.  And you administered that Vineland to whom?

12  A.  To Toni Van Buren.

13  Q.  Explain to the judge, if you can, what is a Vineland, generally

14  how does it work, how long has it been around.

15  A.  The Vineland, the whole name comes from a school, there is a

16  Vineland School that was a school for people with mental deficits.

17  And the administrators there started coming up with checklists to

18  go and measure how well a person was doing in their programs.  And

19  from that came out -- the first one that was standardized was the

20  Vineland Social Maturity Scale.  That one, when I first started

21  practicing in the early '70s, that one was already out and that's

22  the first one I used, called the VSMS.  And it was a way of giving

23  you a rough estimate of how efficient that person was within their

24  community.

25          At that time it didn't require adaptive measure to

1    diagnose, but we already recognized that that was something that we

2    needed to do and it was kind of like best practice to do it.

3         The next one that Vineland came out with was the Vineland

4    Adaptive Behavior Scale, it came out in the mid-'80s, and that one

5    was in effect until 2005 when the Vineland-II came out.  I've

6    probably given more of it than any other one.

7         And what a Vineland does -- the ABAS-II, as I mentioned

8    earlier, came out in 2003.  The major difference between the two is

9    the ABAS-II looks at those 10, 11 areas, and so it gives you a

10   score for each one of those and then collapses those down into

11   conceptual, practical, and social.  The Vineland has four domains,

12   only three of which will count after the age of seven.  And it's

13   communication, daily living skills and social.  And then those are

14   broken down into different subdomains that apply to the different

15   areas of adaptive behavior.

16        The other major difference between the two and why

17   sometimes I tend to prefer to go with the Vineland is the

18   adaptive -- the ABAS-II is meant to be, you can just hand it to the

19   person and they mark it.  Now, if the person doesn't have a reading

20   ability, there are different procedures in the manual that you can

21   go through and read it to them and different things like that.  Or

22   you can use it as a semi-structured interview, it allows all of

23   that.  But you're kind of getting away from how it's normed.

24        The other thing about the ABAS-II is, you can't get a

25   score below 40 on it, so it's kind of a weakness in it that it

1    doesn't have a low enough floor sometimes when I'm looking for

2    things, and I like low floors and high ceilings because that does a

3    better pinpointing of where the ceilings are.

4           The Vineland survey form is made to be done in a

5    semi-structured interview.  It allows you to go -- you go through

6    it as the domains go.  But at any point when things start sounding

7    funny or questionable, it allows you to go back and double check

8    those.  Either one beyond that is about the same procedure.

9  Q.  And has the what we call the red book, the AAMR 2002 book, does

10   it recognize that regardless of the purpose of the evaluation that

11   adaptive behavior should be measured with the standardized

12   instrument, if possible?

13 A.  If possible.  And, you know, in regular, normal evaluations,

14   that's hardly ever a problem.  In retrospective ones, it does

15   become more difficult.

16 Q.  And you identified Toni Van Buren as an appropriate respondent

17   for the Vineland on Paul Hardy.

18 A.  Well, you know, honestly, you know, I had hoped to get more

19   than one, and anybody I interviewed -- when you start off giving a

20   Vineland, the first thing you do is you talk to the person and you

21   have to determine whether or not they would be a good respondent

22   for that measure.  And find out how much they know them, did they

23   see them on a day-to-day basis, how long of the day, there's

24   certain --

25          The Vineland lists what -- the manual lists who makes a

good respondent. And in that first 20 minutes you've got a good

feel of, well, can I use the whole measure, can I use part of the

measure.

        And then retrospectively, you've got another problem.

Now, the Vineland -- this particular survey form came out in 2005.

In 2008, it wasn't available to us until 2009. The expanded form

of the manual came out, and Dr. Sparrow specifically addressed in

that manual how to do a retrospective diagnosis, and so you have to

go to that manual to make certain that you meet the requirements

there. And I think you have a copy of the whole manual, I just

have a some copies --

Q. You know what, let me hold those up for you, Dr. Swanson. I am

holding up the Vineland II Survey Interview Form and

Parent/Caregiver Rating Form, Second Edition, by Sara Sparrow,

Domenic Cicchetti and David A. Balla. When you refer to the

Vineland Manual, is that what you're referring to?

A. That's correct. And that was the one that came out in 2005.

Q. And then I think you refer to an expanded Vineland manual, and

this is titled *The Expanded Interview Form Manual Vineland-II*,

Second Edition, same authors. A revision of the Vineland Social

Maturity Scale by Edgar A. Doll is at the bottom. Is this what

you're referring to when you say the expanded?

A. That's the expanded form. And more importantly, it gives the

authors a chance to address, since Atkins, how to use their survey

form -- how to use any of their forms retrospectively. Dr. Sparrow

1    had presented, since Atkins, on different ways of doing it, and

2    there was a lot of pressure put on her to formalize that, so she

3    formalized it in her last manual.

4         And there's a section on page 28 through 30, where she

5    describes the retrospective interviews and how you would qualify a

6    respondent and how you go about norming it, et cetera.  So like I

7    said, you have to go to the expanded form for that.  And the

8    ABAS-II, you would go to this book that came out in 2008, where

9    they address how to use that retrospectively.

10        So to do this in a retrospective diagnosis, you would

11   have to use the ABAS-II manual plus this book.  You would have to

12   use the Vineland manual plus the expanded form or have gone to one

13   of her workshops where she explained how to do it.

14   Q.  This first book that I've held up, is there much, if anything,

15   in this first manual about retrospective use of the Vineland?

16   A.  There's really not anything in that about that.  That was an

17   issue that's kind of come forward in the literature much more

18   prevalent since Atkins because we want to all be doing it in a

19   standardized way.

20   Q.  And when you administered the Vineland to Ms. Van Buren, did

21   you consult both of these books?

22   A.  Well, now, to be honest, that manual wasn't out.  But I had

23   been to in-service where she spoke about it, I had talked to her

24   and tossed -- there's been articles by Tasse', Greenspan, Olley and

25   other folks on how to do it retrospectively, so I used that.

1          But I had talked to Dr. Sparrow back in early 2008,

2     that's when she told me the manual was coming out this year, so I

3     was waiting for it to come.  And it did come, I just -- I wasn't

4     able to get it until 2009.

5     Q.  So this expanded version was not out, but you actually

6     consulted with one of the authors of the expanded version prior to

7     the time --

8     A.  Yeah, I consulted with her -- well, you know, she had been

9     in-servicing it, but in early 2008 I called and spoke with her

10    about it and explained how I was doing it and confirmed this is

11    what she meant to do, and it was in relation to another case that I

12    was fixing to do.

13    Q.  And since this book has come out, have you gone back and

14    reviewed the expanded version?

15    A.  Yes, I have.

16    Q.  And is there anything in this expanded version that was

17    inconsistent with the way you administered the Vineland to Ms. Van

18    Buren or with the way Dr. Sparrow advised you to administer it?

19    A.  No.

20    Q.  Now, Dr. Swanson, have you had training over the years in

21    administering the Vineland?

22    A.  Well, yes.  Like I said, you know, when you've given an earlier

23    version, it helps facilitate using a second version.  So like I

24    said, I am on my third version of the Vineland.

25          At Pinecrest when we give them, if you went to Pinecrest,

1  the head of psychology at that time for any kind of testing, if you

2  were going to do testing for him, you had to do an observation

3  where he sat and watched you through an observation room and made

4  sure you could do it to his standards and then checked your

5  protocols, etc., or have one of his senior assistants do that, so I

6  went through all of that.

7          As the new versions came out, like I went to the Vineland

8  II -- the publishers put out workshops where you can go right away.

9  So as soon as the new Vineland came out, I went and did that.  At

10  any conference that I go to, say APA, AAMR, whatever, even the

11  local ones, if there's anything being offered on Vineland or

12  retrospective diagnosis, naturally I tend to go to the classes that

13  are more suited for the specialty that I work in, which is mental

14  retardation, developmental disabilities and educational problems.

15  Q.  Other than Atkins-related Vinelands, over the course of your

16  35-year career in the field of mental retardation, about how many

17  of these instruments would you estimate -- and I know it's hard

18  again, how many --

19  A.  On Vinelands I would say, I mean, you know, from the time I was

20  first giving them, I am in the tens of thousands of Vinelands

21  because you give them every year, you give them when you suspect

22  regression, you give them when you want them -- if I have them at

23  Pinecrest and we wanted to move them to an SIL slot or a group home

24  slot, we had to give the Vineland before they left.  So some people

25  get Vinelands more than once a year.

1       So, you know, at one time my case load at Pinecrest was

2   500 people, so I know I was doing 500-plus a year just on the ones

3   I was doing at Pinecrest and not the ones that I was doing for

4   private providers through supervisions of other people.

5   Q.  And does the manual itself -- and I am not speaking of the

6   expanded version, I am speaking of the survey forms manual -- does

7   that manual emphasize the necessity of having appropriate training

8   and interview techniques and experience in the administration of

9   the test?

10  A.  Yes, it does.  I mean, you have to be a licensed professional.

11  You don't have to be a psychologist, you can be a licensed social

12  worker.  You'd have to produce a license to even get the book from

13  the publisher and the protocols from the publisher.  And then they

14  recommend that you be -- have training in semi-structured

15  interviews, which aren't that easy to do and particularly when

16  you're dealing with people that might have a hard time

17  communicating.  And they had also recommend that you have

18  experience, some kind of training in actually administering this

19  one.

20      When I did my thesis, for example, that professor was so

21  strict, even though I had given Vinelands before, I had to do ten,

22  have my protocols done, have one videotaped, and then she had to

23  watch them all and certify that, in her opinion, I could give a

24  good Vineland before she would let me do a thesis about comparing

25  the Vineland to something else.

1  Q.  How do you go about determining, when you are considering

2  giving the Vineland to a respondent, how do you determine if the

3  person is a good candidate, what do you look for?

4  A.  And whenever I can, just for the benefit of the court, I am

5  going to try to point some things out.  And I think I should have

6  already done that if she's supplied a copy of the manual.

7        The semi-structured interview format we talked about is

8  on page 9 of the manual.  Then as far as selecting the method of

9  administration that you're going to give and how you're going to

10  give it, that is on page 11.  Then you would need in selecting the

11  respondent itself, that's actually listed on page 12, and I'll kind

12  of go through some of that.

13        THE COURT:  Actually, I think probably even though

14  it's -- my little rule was six o'clock, it's ten to six, I think

15  we're getting into an area that's going to take longer than

16  probably ten minutes to explain.

17        MS. FOURNET:  No question, your Honor.

18        THE COURT:  So it's probably a good breaking point.  Is

19  everybody okay with cranking up at 8:30 in the morning instead of

20  nine?  Okay.  All right.  See you at 8:30.

21        THE DEPUTY CLERK:  All rise.

22      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

23

24                    *  *  *  *  *  *

25

1

2

3                        REPORTER'S CERTIFICATE

4

5      I, Karen A. Ibos, CCR, Official Court Reporter, United States

6   District Court, Eastern District of Louisiana, do hereby certify

7   that the foregoing is a true and correct transcript, to the best of

8   my ability and understanding, from the record of the proceedings in

9   the above-entitled and numbered matter.

10

11

12

13                        Karen A. Ibos, CCR, RPR, CRR

14                        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25