```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   *********************************************************************
     UNITED STATES OF AMERICA
 3
                                       Docket No. 94-CR-381(C)
 4   v.                                New Orleans, Louisiana
                                       Thursday, September 17, 2009
 5
     PAUL HARDY
 6   *********************************************************************

 7
                     TRANSCRIPT OF ATKINS HEARING PROCEEDINGS
 8            HEARD BEFORE THE HONORABLE HELEN G. BERRIGAN
                      UNITED STATES DISTRICT JUDGE
 9                            VOLUME IV

10

11   APPEARANCES:

12   FOR THE PLAINTIFF:            UNITED STATES ATTORNEY'S OFFICE
                                   BY:  MICHAEL E. McMAHON, ESQ.
13                                      MARK A. MILLER, ESQ.
                                   500 Poydras Street, Room HB-210
14                                 New Orleans, LA 70130

15
     FOR THE DEFENDANT:            HERBERT V. LARSON, JR., ESQ.
16                                 650 Poydras St., Suite 2105
                                   New Orleans, LA 70130
17

18                                 MARILYN MICHELE FOURNET, ESQ.
                                   715 St. Ferdinand
19                                 Baton Rouge, LA 70802

20
     Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR
21                                 500 Poydras Street, Room HB-406
                                   New Orleans, Louisiana 70130
22                                 (504) 589-7776

23


24
        Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

I N D E X

WITNESSES FOR THE DEFENDANT:                          PAGE/LINE:

VICTORIA SWANSON

  Continued Direct Examination by Ms. Fournet      730/11

  Cross-Examination by Mr. McMahon                 866/20

  Redirect Examination by Ms. Fournet             923/1


WITNESSES FOR THE GOVERNMENT:

JILL HAYES

  Voir Dire Examination by Mr. McMahon            928/8

  Traverse Examination by Ms. Fournet             969/8

```
1                    P R O C E E D I N G S

2                 (THURSDAY, SEPTEMBER 17, 2009)

3                        (MORNING SESSION)

4

5        (OPEN COURT.)

6              THE COURT:  And, Dr. Swanson, you're still under oath.

7              THE WITNESS:  Okay.

8              MS. FOURNET:  May I proceed, your Honor?

9              THE COURT:  With all deliberate speed.

10                   CONTINUED DIRECT EXAMINATION

11   BY MS. FOURNET:

12   Q.  I believe when we stopped yesterday, Dr. Swanson, we were

13   discussing what factors or characteristics you look for in

14   determining whether a particular person is a good candidate to take

15   the Vineland.

16   A.  Yes, I think that's what we were discussing.

17   Q.  Can you summarize those for the judge?

18   A.  Primarily what you're looking for is someone who knew him well

19   during a specific period of time of their life, and the manual

20   addresses this specifically on page 11 as an example.  And what

21   you're looking for is someone who knew him on a day-to-day basis,

22   who knew him for a long period of each day, so a teacher is good

23   because she is with him seven or eight hours a day.  Of course a

24   parent would be good, a sibling that lived in the home.

25              So you're looking at someone who knew him on a day-to-day
```

 1    basis.  A spouse is somebody they mention, a care provider.  A lot

 2    of times I do these with people who work in community homes and

 3    they're providing care for the person.  You're looking for someone

 4    who can identify -- who knows them well at that period of time with

 5    those guidelines.

 6              Now, with retrospective you need to go to the expanded

 7    manual, and somehow Dr. Sparrow says to do that, but you have to

 8    pay attention to some other things as well.  You need to meet the

 9    qualifications, as I already said, but they need to be able to

10    identify a specific point in time when they knew them well.

11              So I'll give you some examples maybe in another case.  I

12    did a grandmother once -- the grandparents had raised this man and

13    the grandfather had a stroke and fell off the tractor when he was

14    15 -- when the man was 15, the grandson.  So this is a clear time

15    in her life that this grandmother remembered what that grandson

16    could do because then he had to start helping her on the farm.  So

17    she remembered very distinctly.  So we could pinpoint a day grandpa

18    died, we could pinpoint what was going on at that time.

19              And so when I started asking her the questions

20    retrospectively, if she started talking I could always go back,

21    well, remember, we're talking about when your husband died,

22    remember he was 15 years and about two months old.  Tell me, could

23    he do it then.  So we keep going back to a time that's kind of

24    clear in their mind, or a period or a year, whatever it takes.

25              And the reason that's important in retrospective

1    diagnoses is, you have to use -- they recommend that you try to

2    norm it to normative table.  And the Vineland is normed from a very

3    young age to probably maybe less, all the way up to about 89 years

4    of age.  And so if we're dealing with someone who was 15:2, I can

5    go to the normative table and compare those answers to what's

6    typical for someone who is 15 years and two months.  I could also

7    compare the answers to someone who is 25 or 26.

8          So it's very important addition on the retrospective one

9    that you find somebody who is able to understand that.

10   Q.  Now, you mentioned norming and you've mentioned age, and let's

11   talk about that with respect to the Vineland.  Is age a component

12   of a properly administered Vineland?  And when I refer to age, I

13   refer to the age range of the person who is being evaluated, not

14   the person who is being interviewed for the Vineland.

15   A.  The person, the person that we're talking about?

16   Q.  Right.

17   A.  Okay.  Yes, that's important.  Because let's say we're talking

18   about bathing and hygiene.  I wouldn't expect the same level of

19   independence of a three year old or a five year old that I would

20   expect of a 15 year old or 22 year old.  So if I go to the

21   normative table, the same answer given on a three year old might be

22   a pretty high score because if a three year old even extends an arm

23   and lets you bathe it, that's a pretty good score.  If I got that

24   same response from a 25 year old, I would be looking at somebody

25   who is probably in a severe level of caring for their own hygiene.

1              So it's graded on the age and what's expected for that

2     age developmentally and it -- how much supports you're expected to

3     give at that age.  So that's how the normative table works.

4     Q.  And so when it's normed, if I'm understanding you correctly,

5     it's like the IQ test, it's normed on a particular age range of the

6     person being examined, that age range being the time during which

7     the interviewee knew that person, and that's normed with the entire

8     population of that age range?

9     A.  That's correct.

10    Q.  Is that an accurate description of how it works?

11    A.  And a little bit more.  And I think if you look back at

12    Dr. Cunningham's explanation of IQ, he did a very good job of this.

13    You give the subtest and those are normed on the age range, you add

14    those together and you go to another normative table and you get

15    that overall comparison to everybody in the United States for that

16    score.

17             So first you compare it to the age norm and then you

18    compare it and you get an overall global score for all of adaptive

19    behavior and then in each of the domains.

20    Q.  So the age range of the person, in this case Paul Hardy being

21    examined, is an inextricable component of the Vineland because

22    that's the number you feed in to get your scores?

23    A.  That's the number you feed in to get your first subscale

24    scores, yes.

25    Q.  Now, in this case in determining a candidate, I believe you

```
1   said yesterday that you had Ms. Rogers to an extent prescreen

2   people and come to you and you would determine on the basis of that

3   information whether there was an appropriate candidate in the

4   group.

5   A.  That's correct.  And I specifically was hoping to get

6   standardized measures, so I explained what would be the

7   qualifications of a good respondent and asked her as she talked to

8   people to see if she could gather some knowledge about when they

9   knew him and how well they knew him.  But I wanted to talk to

10  anybody that was willing to talk to me.  And quite frankly, some of

11  them, Ms. Rogers didn't know if they were a good respondent or not,

12  it was going to be my call when I talked to them.

13          And the best example of that was Theresa Minor because

14  she really didn't know if she would be good or not or knew enough

15  domains to be a good respondent.

16  Q.  What about Javetta Franklin, did Ms. Rogers bring you

17  information regarding her initial contact with --

18  A.  Yes.  She had interviewed Javetta Franklin in Dallas, and what

19  she initially reported to me was Javetta had only known him well

20  for four months of his life about, it was a good age, it was the

21  age we were aiming for.  The manual says you should go prior to age

22  18 or as close to 18 as possible, and it should be a respondent, of

23  course, who knows him well.

24          So we had the age right with her, but from what she had

25  told Ms. Rogers, she really had only known him four months, they
```

1    had never lived in the same house.  She sometimes visited his home,

2    most of the visits were in her own home.  And then after that in

3    subsequent years it was only to see him when he picked up her child

4    or came in to visit her child.  And as I understood it, her

5    grandmother was the primary care provider for this child until

6    Ms. Cooper finished her education and then I think Ms. Cooper went

7    on to get -- excuse me, Ms. Franklin went on to get some additional

8    degrees.  They're mentioned in Dr. Hayes's report, I think.

9          So although they lived in the same home -- what I'm

10    saying is, the grandmother was kind of -- a lot of times when

11    Mr. Hardy came in to visit his child, she wasn't there, is what I

12    understood from Ms. Rogers initially.

13          There was also the considerable expense of flying her in

14    to Louisiana to speak with me.  So, you know, I just didn't see

15    where that was going to go and, you know, I thought, well, I want

16    to concentrate on people that really know him well that have a

17    possibility of being a good respondent.

18    Q.  Now, since your first report, you have talked to Ms. Franklin

19    on a couple of occasions, have you not?

20    A.  Yes.

21    Q.  Once over the phone and once here in New Orleans?

22    A.  That's correct.

23    Q.  Have you changed your mind about whether she would have been an

24    appropriate candidate for the Vineland after talking to her on

25    those two occasions?

```
 1   A.  I don't think she is a good respondent for the Vineland.  No, I
 2   haven't changed my mind about that.  I don't think she has -- she
 3   meets those requirements as outlined in the manual because she kind
 4   of has to know all of the domains, and I think we'll get into that,
 5   or she has to know one domain at least extremely well.  We didn't
 6   get into that very much, but for me to do a Vineland, I have to
 7   have a good rapport and the person has to be willing to talk to me,
 8   and you kind of have to go through some things that you set up or
 9   you kind of spoil -- find it's worthless.
10   Q.  Yes, and we're going to talk about that.
11   A.  And so that would be the other reason, I would think, she
12   really didn't want to do it.
13   Q.  You mentioned a minute ago you'd want to have somebody, if you
14   can, who knew the person being assessed when that person was
15   younger than 18 years old.  Is that essential?  What if you can't
16   find somebody?
17   A.  What the manual states, and that's in the expanded manual, I
18   can give you the page number if you want.  Hold on just a minute,
19   please.
20         MS. FOURNET:  And, your Honor, when this entire hearing
21   is over, if the court would like, I would be happy to at least lend
22   you for whatever period of time you need these books and these two
23   manuals.
24         THE COURT:  I want all articles mentioned, all manuals,
25   all books.
```

```
 1            MS. FOURNET:  Okay.

 2            THE WITNESS:  So it needs to be a person who knows them

 3   well in all domains, and at the time you talk to them that person

 4   needs to be an adult, and it's what you hope to find is someone who

 5   knows them at the age -- prior to the age of 18 or as close to the

 6   age of 18 as possible because sometimes that's hard to find.

 7            And that's the expanded manual, is pages 28 through 30,

 8   and there's a specific section that's titled Retrospective

 9   Interviews.

10            THE COURT:  Which book is that?

11            THE WITNESS:  She can show it to you.  This is the survey

12   form, there is another one that is the expanded manual which came

13   out this year, which has the additional instructions from

14   Dr. Sparrow on how to do this survey retrospectively.

15            THE COURT:  Is that the one you're saying page 28 to 30?

16            THE WITNESS:  That's the one I'm talking about.

17   BY MS. FOURNET:

18   Q.  You mentioned in one of your earlier answers that the best case

19   scenario in terms of scoring is a global scoring.  Explain to the

20   court what you mean by global.

21   A.  And I am going to be brief at this point because I am sure

22   you're going to take me more complicated later.  The Vineland

23   yields a global score, it's called an adaptive behavior composite.

24   Let's just say it's like an IQ, it has, you know, a mean of 100,

25   standard deviation of 15, and when you start seeing scores around
```

1    70, alarm bells go off.

2            It also has several domains kind of like a verbal IQ and

3    a performance IQ.  And these are in communication, socialization,

4    daily living skills, which kind of like your big areas of adaptive

5    behavior, and those also give you a score that's a mean of 100,

6    standard deviation of 15, seeing scores around 70 sends off alarm

7    bells.

8            And if you remember, in the AAMR definition, the Tenth

9    Edition, their definition is try to use a standardized measure, try

10   to get a global score, standard score, that's significantly below,

11   two standard deviations below, or get it below in one of those

12   three areas:  conceptual, social or practical.  So if you can give

13   a standardized measure, it's better to get one of those.

14           Now, in a retrospective diagnosis, I am not saying that

15   everything hinges on a standard score, it's one of the things we

16   want to gather together in this big funnel of things to look at.

17   When you put some standard scores in there, then you can start

18   saying okay, well, that's consistent with what we're seeing in the

19   tail of this normal curve.

20   Q.  And with Ms. Van Buren, were you able to do a global Vineland

21   assessment as you've described?

22   A.  Yes, I was.

23   Q.  Now, there have been, I'm sure you noticed, in Dr. Hayes's

24   report, there seems to be some dispute about the age that Paul

25   Hardy was at the time that she met him.  Can you try to sort that

1    out as best you can --

2    A.  Yes, I certainly can.

3    Q.  -- how you did your calculations, what was said to you, why you

4    arrived at -- well, let's start off at with what age range did you

5    use on the Vineland and then you can explain why.

6    A.  Let me flip to my Vineland.  And I'll give you the numbers on

7    this in a minute here.  This is my testing that's in the -- let me

8    see if I can figure out the numbers.  This will be JH000822, it

9    looks like is where my Vineland starts, and this is just all of my

10   testing, and it runs through JH000864.  So when we're talking,

11   we're talking -- my Vineland is in those sections.

12           And the age that I arrived at when I discussed this with

13   Ms. Van Buren was 17 years, 6 months.

14   Q.  And how did you arrive at that age range?

15   A.  Well, when I typically do these, I start off my interview with

16   a long discussion about trying to determine if they know enough

17   about the person in all areas or what areas they know.  Then I go

18   to the next question about can we identify an age because you're

19   looking backwards in time and that's a very long time to look back.

20   And I usually try to do this by pinpointing significant events in

21   someone's life.  For example, I give the example of when the

22   grandfather died and everybody remembered when the grandfather

23   died, so it helped focus attention on a point.

24           So I started this long process with Ms. Van Buren, and it

25   didn't have to be when she met him, if she could meet a clear time

when she could say, and we had a long discussion, and if we picked a time like 21, I needed to be certain that she remembered that was a 21-year-old behavior and not when she first met him and not sometime later.

So we had a very long discussion, so we got to, well, when do you think you met him?  And she knew it was in May.  Our problems were further complicated because both Mr. Hardy and Toni Van Buren have fall birthdays, hers is December.  So when she's starting the 8th grade, she is really 12, and she ends the 8th grade at 13.  When she starts high school, she's really 13 and she ends at 14.

So we had to keep going back and forth of what is the age, what is the age.  She was certain with me that it was in late May, school was fixing to be out, she remembered walking with her schoolmates.  I even asked her, can you remember what you were wearing, were y'all wearing uniforms, was it 8th grade clothes, was it 9th grade clothes.  I was trying to pinpoint what year it was.

We talked about her courtship because she met him and then he kind of courted her over the summer.  She talked about Girod bringing him over there.  They got to know each other really well in the fall and started seeing each other some.  She said by the following summer she was spending lots of nights at his house, so we were trying to pinpoint -- well, it got down to was it 13 or was it 14.  And after about 40 minutes of discussion, I thought it was 13, which would have put him at 17,6.

```
 1   Q.  Did she give you a year that she met him when you --
 2   A.  When we were talking, and we talked about different things, and
 3   this family's significant event is the death of Curtis, which was
 4   around May 10th, 1985.  And she knew it was after Curtis and she
 5   thought it was shortly after the birth of Curtis --
 6   Q.  You mean the death.
 7   A.  She remembered -- I mean the death of Curtis.  She remembered
 8   that he was already dressing like Curtis, she remembered that, and
 9   she learned later when that occurred.  So, in her mind, that's, you
10   know, that's where we identified the time.
11          Now, every question that I asked her was, okay, we've
12   identified when you met Paul, so I had a clear reference point of
13   every question I asked her.  So if we started talking about her
14   children and things he did with her children, it was, well, wait,
15   wasn't Paula born three or four years later?  Yeah, that's right.
16   No, no, no, I want to know, did he do that when y'all met.  So we
17   pinpointed everything to that time.
18          Now, you got the contrary problem of do you go with 17:6
19   or do you go with 18:6, and we're talking about what she knew about
20   him when she first met.  If I go with the 18:6 tables, I get a
21   lower score; if I go with the 17:6 tables, I get the highest
22   possible score he could get.  Needless to say, it's like I was
23   saying, if I take what someone knows and I plug it in at a
24   chronological age and they don't learn more, the standard score
25   just goes down.  Do you understand?  So I went with the most
```

1    conservative one.

2    Q.  Okay.  Correct me if I'm wrong, but the dispute centers around

3    whether Paul and Toni met in the spring or early summer of 1985 or

4    whether that actually occurred in the spring or summer of 1986.  Is

5    that basically the crux of the dispute?

6    A.  That's the crux of the dispute, yes.

7    Q.  And it's my understanding that, at least in the discussion with

8    Dr. Hayes, there was some mention of the babies, little Paul and

9    Jacquetta having been born when they met, and this is how Dr. Hayes

10   came up with 1986.  Is that your understanding of the --

11   A.  Yeah, you know, I was sitting -- I mean, I heard the whole

12   interchange between Dr. Hayes and Toni Van Buren when they were

13   trying to figure out the age.  And I think Dr. Hayes had as much

14   trouble as I did trying to, you know, that's a hard thing to do, to

15   think back that many years.

16   Q.  And what year did Toni give us yesterday when she testified,

17   '85 or '86?

18   A.  If I remember correctly, she said 14 and she said '85, which

19   would have meant she would have been 13.  But she did say 14, I

20   think I heard the other day when Dr. Cunningham did him.  But, you

21   know, as far as me remembering when I met the first guy I ever

22   dated, you know, I can give you the general year but pinpointing

23   maybe is hard.  So, you know, I think we're looking at she first

24   met him, she knows what he was like when she first met him, and it

25   was either when she was 13, in May of 13 when she was 13, or May

1    when she was 14.  So we can at least pinpoint a year and possibly

2    give two sets of scores.

3    Q.  And if you run the numbers twice, if you run the numbers on the

4    Vineland, as you did, on the age of 17 years and 6 months, and then

5    you run the numbers on the age Dr. Hayes determined, which would be

6    about a year later, is there a significant difference?

7    A.  No.  If you run the numbers on 17:6, his overall adaptive

8    composite is a 65, which I put is greater than two standard

9    deviations below the mean.  The only -- if you run it on 18:6, the

10   scores are going to go down because he should have learned

11   something in a year, and so I think it's a 64, if you run it -- it

12   goes down at 18:6, not up.

13           Also, the difference is, where he is greater than two

14   standard deviations below the mean in everything but community at

15   17:6, at 18:6 he would be greater than two standard deviations

16   below the mean in every single subdomain.  And I think the standard

17   score for daily living skills might drop another point, too.

18   Q.  So to the extent there is a difference between using the

19   younger age and the older age, the score is going to go down as the

20   age goes up because as the person ages slightly he should have

21   slightly more skills, is what you're saying?

22   A.  That's correct.  And what's important here is, how was he

23   functioning at the time she first met him, which was kind of the

24   point range that we both used to describe him.

25   Q.  And so would it be fair to say that that's very close to being

1   a distinction without a difference in terms of this 17:6 as opposed

2   to 18:6 in terms of the Vineland scores?

3   A.  I wouldn't think there was that much significant difference

4   between a 63 and a 64.

5   Q.  Now, you mentioned rapport a minute ago.  What does the manual

6   suggest about establishing rapport with a person -- once you've

7   determined that this person, for instance, Toni Van Buren, is a

8   good candidate for the Vineland, why is rapport important and what

9   do you do to establish it?

10  A.  Well, the rapport is important because this is a semi-

11  structured interview, it basically is a conversation that you're

12  having with someone.  It's semi-structured in that you're trying to

13  keep them on your track of adaptive behavior.  You may let them

14  reel out, but you're trying to reel them back in on focus of the

15  conversation.

16          But you want the person to be comfortable, you want the

17  person to be willing to be there and you want the person to have

18  enough time to have the discussion.

19          The manual addresses this on pages 12 for establishing

20  rapport and then on pages 13, rolling over to page 14, in the

21  testing environment and rapport.

22          So, like I said, you want the person to want to be there.

23  I always -- if I am doing this for an agency, the person wants to

24  be there because they've sought the services so they come in.  So I

25  don't have that problem.  But in a retrospective one, it's even

1    more important that they be comfortable and have the time because

2    it's going to take so much longer.

3             I can do a Vineland with, say, a mother of a small child

4    probably in 45 minutes because there's not that many skills.  The

5    mother of someone who is maybe 25 years old and handicapped, it's

6    going to take a little longer because we are going to go through a

7    longer range, but it's still going to probably be an hour, or a

8    little under an hour.

9             A retrospective interview is going to take probably two

10   hours to do it right because, you know, you have to give them

11   enough time to remember and then if they give you information that

12   can't be scored, that's useful information, you want to talk about

13   it, I want to know what Paul is like at 25 or things he did at 25,

14   but I can't score those.

15            So we have to separate those out, write them down on the

16   tablet, and then reel them back in and say, what about that when

17   you first met him, tell me how he used that microwave when you

18   first met him, why do you think he could use a microwave if his

19   momma didn't have one in the house, and so then we have to kind of

20   pinpoint that.

21   Q.  I am going to read you the first sentence in the Establishing

22   Rapport portion on page 12 in the Vineland manual.  And it says as

23   follows:  "Establishing a relationship that encourages the

24   respondent to provide accurate, unbiased information about the

25   individual's typical level of functioning is one of the most

1   important preconditions for obtaining valid results on the survey

2   interview form."

3          Do you see where it says that, Dr. Swanson?

4   A.  Yes, that's the first sentence on page 12 under Establishing

5   Rapport.

6   Q.  Is there a relationship between establishing that rapport and

7   the accuracy of the results you're going to get?

8   A.  That's the whole idea behind a semi-structured interview, if

9   you do a good rapport.  Now, if you read on down the column, maybe

10  you intend to -- or do you intend to read any more in that column?

11  Q.  If you think there is something --

12  A.  Well, it goes on, the next thing about that is, you kind of

13  have to do a little education.  So the next step is, you sit down

14  with the person and you -- I do it in lay terms, I am not going to

15  sit there and say, you know, there is a socialization domain and

16  we're going to have an adaptive behavior composite score.  So I

17  just say, you know, we're going to be talking about the things of

18  how well he did for himself in his daily life.

19         And the manual mandates that you go through each domain

20  in advance so they kind of have an idea of what you're going

21  through, and the reason is, is you need some face validity here.

22  This person is going to hear you talking about bed making and

23  they're going to go, well, what does bed making have to do with

24  this.  And so you're kind of telling them, you know, we are going

25  to be talking about how well he did on a day-to-day basis, what he

1  could do for himself, what y'all had to do to make sure he got

2  things done.

3          And we're going to be talking about communication, and I

4  talk about communication; and I go on and explain the areas that

5  we'll be talking about briefly in lay terms like that so the person

6  isn't surprised when, out of the blue, I suddenly start asking her

7  questions about, well, what about money, tell me how he does with

8  money.

9  Q.  Well, in the case of Ms. -- on the subject of rapport, in the

10  case of Ms. Van Buren, how did you set up the initial -- the

11  administration of the Vineland?  Tell me the steps you went through

12  in order to build a relationship of confidence and trust and

13  rapport with her before you even sat down and administered the

14  instrument to her.

15  A.  Well, we -- first I used Ms. Rogers because I am dealing with a

16  woman who is estranged from Mr. Hardy, and in the later years of

17  their relationship, Mr. Hardy didn't -- wasn't -- had a lot of

18  other relationships, so, you know, I don't know how this woman is

19  going to respond to answering my questions.  I wanted to be sure

20  she wanted to talk to me.

21          And she was, she had a good motivation, she has three

22  children who are very close to him, and she wants to make sure that

23  her children don't feel she failed their father.

24  Q.  Can I stop you a minute?  What if she had said -- told

25  Ms. Rogers and Ms. Rogers had come back and said, tell that lady I

1    don't want to talk to her, what would your reaction have been?

2    A.  Well, there were witnesses who said that and my reaction was, I

3    really don't want to talk to them unless they want to talk to me.

4    Q.  So when you determined that a witness, whether it be for a

5    Vineland or just for an interview, when a witness doesn't want to

6    talk to you, you respect that, is what you're saying?

7    A.  Well, for what I have to do, I have to respect that because I

8    am not a lawyer, I am not an FBI agent and I am not a policeman, I

9    am just a psychologist, so I can only talk to them within my own

10   therapeutic training.

11   Q.  If you force yourself on them and you talk to them when they

12   don't want to talk to you, what is the likelihood of getting

13   accurate or reliable information from that type of interview?

14   A.  Well, you're not going to be able to have a conversation.  I

15   mean, I'll just be firing questions at them and that's not going to

16   meet any of the requirements of a Vineland or an interview or

17   anything else.

18   Q.  Does that meet any of the requirements of the manual --

19   A.  Oh, no.

20   Q.  -- is that how this manual contemplates that these things are

21   to be conducted?

22   A.  No.

23   Q.  And I didn't mean to get you off track, but get back to

24   Ms. Rogers and how this interview with Ms. Van Buren was set up.

25   A.  So, you know, once I explained to her, because when I came on

1    the case people had already been working on the case for 16 years,

2    I guess.  So I explained what I needed, and so she went about doing

3    that and she talked to her several times and she talked to some

4    other people, and I came down one weekend about three days and

5    there were some people scheduled for me to interview.

6            With Ms. Van Buren they set it up in advance.  My rules

7    are, I want to meet where they want to meet.  Some people are more

8    comfortable meeting in an office, some people are more comfortable

9    meeting at home, some people want to meet at work.  If you want to

10   meet in the park and that's where you're more comfortable, I don't

11   mind meeting there.

12   Q.  Is this just about, Dr. Swanson, being nice or is this about

13   making sure that you get results that you're going to like?

14   A.  No, I want to make sure they're comfortable and it's somewhere

15   where we can talk and they don't feel like they have to jump up and

16   run.

17           Now, initially, we set up and where she wanted to meet

18   was at her house, if I remember correctly, I think it's in

19   Terrytown, or in that way is best, I know that side of New Orleans.

20   That's where we went, but there had been a problem that morning,

21   and everything had been set up in advance and they cleared it the

22   night before when I came in and double checked that morning.

23           But what had happened was another person was supposed to

24   be working Saturday managing, I think it's O'Harry's (SIC), maybe,

25   was the restaurant she was at, and that manager just didn't show

1   up.  So the owner of the restaurant had to go there and unlock the

2   place, and she didn't have a key so she had to call Ms. Van Buren

3   to come in; and Ms. Van Buren didn't have to work so much, but she

4   had to stay there because she was going to have to lock up when it

5   closed up that evening.  So she ended up having to work all day, or

6   be at the place all day.

7        So when we set up again, I offered to change, we offered

8   several things, and she said if I didn't mind she would like to do

9   that there, she had an office, all she had to do was be on the

10  premises, you know, and make sure that at the end of the day it got

11  locked up and it wouldn't be a problem for us to meet in her

12  office, so that's where we met.  We met in the manager's office of

13  O'Harry's in Terrytown.  And that's where she was and that's where

14  she wanted to be and that's where she was comfortable.

15       I do remember one interruption during the interview.  The

16  interview was somewhere between two and two and a half hours

17  probably, and there was a lady that English was her second

18  language, I think possibly she was Hispanic, and was having a

19  problem understanding something, and Toni asked could she have a

20  break to go take care of that and she did.  And then we came back,

21  and that's the only break I remember during that.

22  Q.  And I think what you've described is that the time, the place

23  and the circumstances of this interview were a time, a place and

24  circumstances of Ms. Van Buren's choosing?

25  A.  That's correct.

1   Q.  And, in fact, you rearranged your schedule to accommodate her

2   comfort level?

3   A.  And that rearranged every interview from that day, but we did

4   get her interview done.

5   Q.  Now, Dr. Swanson, is it consistent with the appropriate

6   administration of the Vineland as described in this manual, in your

7   opinion, to show up unannounced with an FBI agent to conduct the

8   administration of a Vineland instrument?

9   A.  No, it's not.

10  Q.  And why not?

11  A.  Well, it undermines everything we've been talking about because

12  you're not going to be able to establish rapport.  I don't see how

13  you can have a conversation.  I don't know, if the FBI knocked at

14  my door and then somebody wanted to have a conversation with me, I

15  think I would be in FBI mode of, you know, yes, no, yes, no.  We

16  don't want that, we want it to be a conversation, and we're going

17  to be talking about how it needs to be open-ended and you really

18  want a lot of time.  There's no way in 45 minutes can you do a

19  regular Vineland, you would be pushing that because you haven't

20  allowed time for rapport building.

21          In a retrospective one, to ask somebody to look back on

22  that many years, you really need probably closer to two hours.

23  Q.  And does it contribute in any way or cure the problem of

24  establishing rapport when you do it that way?  For you to show up

25  with an FBI agent banging on the door, showing his badge, and then

 1    say, is there a more convenient time, could you reasonably expect a

 2    person in that kind of situation to be willing to cooperate and

 3    accommodate --

 4              MR. McMAHON:  I'm going to object to this, this is

 5    speculation.

 6              THE COURT:  Sustained.  Sustained.

 7    BY MS. FOURNET:

 8    Q.  How much time did you spend with Ms. Van Buren?

 9    A.  Somewhere between two and two and a half hours.  At the end of

10    the Vineland, you're supposed to let them ask questions.  And so I

11    would say the last 20 minutes Ms. Van Buren and I primarily just

12    discussed her children, and she naturally had a lot of questions

13    after the interview, and she was aware, she's talked about Marie

14    Hardy and just what were the implications for her children and

15    future grandchildren, she needed to know more about it.

16              And you're kind of required, the manual requires that,

17    that you have to kind of resolve all issues before you leave.  So I

18    really think the last 20 minutes I was there I was really

19    discussing and reassuring Ms. Van Buren that her children were

20    fine, they made good grades, they're bright daughters, they're

21    going to do fine.  There's every anticipation her grandchildren

22    will do fine as well.

23    Q.  She was concerned that perhaps there may be something genetic?

24    A.  That's correct.

25    Q.  Of that two hours and some, how much of that time did you spend

1    before actually administering the Vineland; how much of that time

2    did you spend first confirming that she was, in fact, a good

3    candidate as Ms. Rogers had indicated she might be and also just

4    generally establishing rapport, and tell me how you did establish

5    rapport?

6    A.  Like I said, for sure, the first 45 minutes to an hour was

7    working out the age and describing the Vineland, and I tried to

8    just get an overview, let's just talk about what you know and when

9    you met him, and just a very -- conversation, similar to what I had

10    with Theresa Minor, much more vague, not as specific, because it

11    gives me an idea of where can I go with this Vineland, can I give

12    the whole thing or should I just concentrate on the communication

13    domain or does she only know about socialization skills.

14          And so when I kind of do a broad conversation like that,

15    then I move into the Vineland administration itself.  And the way I

16    do it, and everybody I'm sure has a style that's comfortable to

17    them.  When I am not giving the Vineland, it's usually like this

18    and I usually have -- it's in my thing and we're talking, et

19    cetera.  When I move to the Vineland, I pull it out and it's clear

20    to her that I am giving a test or that I am marking something.

21          And we talk about it and what it means, you know, you

22    have to flip as you go through the domains, and she knows what I am

23    doing and I want her to know that because if I suddenly pull it out

24    in the middle of a question and mark a two, they're going to say,

25    well, what are you doing.  So that's, you know, I always have to

1    make sure they know that.

2            Say, for example, with Ms. Minor it stayed right here

3    because she really couldn't give me enough answers to do any

4    particular domain, it was more of a corroboration of what other

5    people had said.

6    Q.  So when you confirm that, in fact, Ms. Van Buren was a

7    candidate for the Vineland, did you show her that form that you

8    just --

9    A.  Well, yeah, I showed her this (INDICATING).  I mean, I raised

10   it up and I explained it to her and that I would be marking this

11   and flipping pages, and to bear with me and things like that, just

12   so that that wouldn't throw her.

13           People have a fear of psychologists sometimes, and they

14   associate psychologists with school or whatever, and when we start

15   pulling out their things, they always wonder, golly, what is that,

16   so I just always try to make them feel at ease and understand, this

17   is just to help me and this is what I'll be marking and that kind

18   of thing.

19   Q.  Were you present when Ms. Franklin learned from me that she had

20   been given a Vineland?

21   A.  Yes, I was.

22   Q.  What was her reaction?

23           MR. McMAHON:  Objection.  Objection.  How is this

24   relevant to anything?  I mean, what it is, it's just they're

25   attacking Dr. Hayes now.  Ms. Franklin testified yesterday, and I

```
 1   don't think Dr. Swanson is competent enough to go into

 2   Ms. Franklin's psyche and answer that question.

 3            MS. FOURNET:  May I respond, your Honor?

 4            THE COURT:  Yeah, I think she can answer the question in

 5   terms of what the reaction was, to describe her reaction.  Go

 6   ahead.

 7            THE WITNESS:  Do you want to ask that question again?

 8   BY MS. FOURNET:

 9   Q.  When you observed me show Ms. Franklin the Vineland form and

10   tell her she had actually been given a test by Dr. Hayes, what was

11   her reaction; how did she respond, what did she say?

12   A.  She was very shocked and she said, I was given a test?  And her

13   first reaction to that was, there's nothing wrong with me, why did

14   she give me a test, does she think there's something wrong with me,

15   and I think she was thinking she was given -- initially, she was

16   given a test because she knew Paul.  And she got pretty upset.

17            And I had already talked to Ms. Franklin and I knew she

18   had partial complex seizures, and so I just intervened at that

19   point and said, you know, we need to calm down and I explained to

20   her what -- I did my explanation of the Vineland, it wasn't a test

21   with her, it was really a conversation, and blah, blah, blah, blah,

22   blah.  And she calmed down.  But I was kind of concerned there for

23   a little while when she got a little upset.

24   Q.  Are there, Dr. Swanson, ethical considerations as well as

25   considerations under this manual for the Vineland about whether it
```

1   is important to let a person know, at least the parameters of the

2   testing that you're giving them?

3   A.   There are written standards that we have to know and have to

4   follow when we give tests, and then each person has their own

5   personal ethical standards that they go by.  People should know

6   they're being tested and they should be consent and willing to be

7   tested.   In other words, we call this informed consent.

8         Some people waive that consent when they do certain legal

9   actions.  For example, Mr. Hardy has waived a lot of issues because

10  he's raised this, so he can be tested and he has to agree to be

11  tested.  I am not aware that Javetta Franklin had waived any of her

12  rights in this.  So, in my opinion, she should have known that she

13  was being given a test, and the manual requires that you explain to

14  her what the test is.

15  Q.   Now, you mentioned earlier also that there is a particular type

16  of questioning that the administrator of this Vineland is supposed

17  to use, and the term you used was semi-structured interview.   Could

18  you explain to the court what we mean by that?

19  A.   And just so she knows what page that's specifically on in the

20  manual, it's listed on page 9 of the manual.  There's a long

21  explanation of what a semi-structured interview is.  And then if

22  you turn to page 27 in the manual, they talk again about the

23  semi-structured interview, and then if you flip the page on page

24  28, they actually give an example of a semi-structured interview

25  and how somebody should do an interview if they were getting the

1       responses to six questions.

2              And essentially a semi-structured interview, as much as

3       possible, you need to know the Vineland really well so you know

4       what you're talking about so it can be a conversation.

5              And depending on the age of the person you talk about,

6       you kind of know where you need to go in and then you know how you

7       need to word the questions.  So if I was talking about someone who

8       was young, I know we need to talk about, say, if we're talking

9       about personal care and bathing, I know these are issues we need to

10      be addressing in any child ten or younger.  So I don't want to put

11      the word in there, I don't want to use the word like hygiene which

12      pinpoints them thinking hygiene, I don't want to use a word about

13      bath in my first question that pinpoints them thinking, oh, well,

14      you know, because it narrows the person, and I want the first thing

15      that comes out is all of their thoughts they have about this person

16      in this area.

17             So depending on who I'm talking about I'll say something

18      like, well, let's talk about how they take care of themselves, and

19      let them pick which topic, they may immediately jump to bathing,

20      they may immediately jump to hygiene.  I mean, the way the Vineland

21      is set up, it's kind of closely related on a page, and so I let

22      them go in where they are and we start talking about what they can

23      do.  And then we move on to whatever areas they want.  As I

24      mentioned, they reel out, I reel them back in, we stay that way.

25             The Vineland is built, we try to go domain by domain, so

1    we start with the communication, we move next into socialization

2    and daily living skills.  But if they jump ahead, I don't stop them

3    and say, we don't want to talk about movies now, it's on page 26, I

4    let them talk about movies, make a little note, and when I get to

5    movies later, I'll say, you remember a while ago when we were

6    talking about movies and I remember you said such and such.  So you

7    don't want to start restricting them where they go because it's a

8    conversation, you know.

9            There is also within the manual you should be asking

10   questions because you're going to have to score them a two, a one

11   or a zero, or that they don't know, or that there is no opportunity

12   for that to occur.  So at some point or another, you're going to

13   have to ask them, well, you know, you talked about they could dress

14   themselves.  Well, tell me a little bit more about that, and so you

15   see what you can get with that.

16           I mean, you know, after you get enough information, you

17   would say, well, you know, you're saying they're completely

18   independent in their dressing, sounds like there's no problem

19   there.  Well, is there anything you have to do to make sure that it

20   works, that he is dressed nice?  And then they, you know, whatever.

21   And then I say, well, do you hang their clothes a certain way in

22   the closet?  Oh, well, yeah, I always put their pants and shirt

23   together so they're always matched.

24           Well, that's not quite independent if I am presetting

25   that.  Yeah, I put their pants, their shirt, their underwear and

1    their socks so they'll know exactly what order to put them on, well

2    then you've kind of preset it, so that's a little bit of

3    assistance.  So then it's like, well, why do you do that, you know,

4    he can't find his own socks, and then we get into a conversion like

5    that.

6              So it's a way of asking all of these questions but in a

7    way where they don't have to give yes and no answers, they get to

8    talk about the person.

9    Q.   So, and we heard Dr. Cunningham talk about open-ended versus

10   leading or yes or no questions in interviewing Paul, and it sounds

11   like what you're saying is the same principles apply on the

12   Vineland.  And what the manual recommends is open-ended questions,

13   not yes and no questions?

14   A.   That's right.  Now, sometimes as you get down --

15   Q.   Narrow it down?

16   A.   Narrow it down, I need in the Vineland the highest two -- four

17   two scores, which are your highest scores is a two is my basal, you

18   know, we know they can do that, and when I hit four zeros I can

19   stop.  So sometimes I've got -- I'm thinking I've got my four twos,

20   but I want to be sure, and that's where I go to my yes/no

21   questions.

22             Once I've kind of explored that subdomain as much as I

23   can go, I'll say, well, you know, you said a while ago, and I'll

24   use the microwave again, you said a while ago, you know, that you

25   thought he could use the microwave.  Well, you know, did his momma

1  have a microwave or where did you see him use a microwave or did he

2  use it at your house?  And they have to say, well, yes, I know he

3  can use a microwave, you know, he used it at the Stop-N-Shop, or

4  whatever they said, and then I know that's a two.  I need to make

5  sure my four twos are four twos and my four zeros are four zeros

6  before I move on.

7  Q.  And we'll get to the scoring in a minute, this might be Greek

8  to the judge at this point with the twos and the zeros, but we'll

9  get to the scoring.

10         But in any event, you want to keep it open until you need

11  to narrow it down, is what you're saying?

12  A.  Uh-huh, uh-huh.

13  Q.  You heard Javetta Franklin testify the other day?

14  A.  Yes, I did.

15  Q.  And you have talked to her before, have you not?

16  A.  Yes, I have.

17  Q.  If the description of how she was questioned and how she

18  responded to those questions is accurate, was this type of

19  open-ended questioning done of Javetta Franklin?

20  A.  No, it was not done.

21  Q.  Now, Dr. Swanson, do you ever question anyone, and I know

22  you've given thousands of these, but do you ever question anyone

23  and then go home and fill out the form later?

24  A.  No.  Now, if you want to get into the scoring, there are times

25  you go home and double check your protocol against the manual.

1    But, no, you need to have it there because before you leave you

2    need to know that you've gotten your basal and your ceiling, which

3    we're going to talk about later.  And if you have too many

4    don't-know items, you've spoiled the test.

5            So if you look down and they didn't know a lot of things,

6    then you really need to go back and really probe those because once

7    you hit three don't knows, you have to throw out that subdomain.

8    Q.  Well, and we are going to talk about that part of the scoring,

9    but just basically, there's a built-in on the Vineland, there are

10   built-in triggers that tell you at some point once you start

11   administering the test that tell you, hey, stop, this person

12   doesn't know enough about the person you're evaluating?

13   A.  Or it tells you, hey, you didn't do -- you haven't done your

14   job yet, you need to ask some more questions.

15   Q.  Go back and ask some more questions.

16   A.  Now, I may not circle everything there and I may be writing

17   some on the tablet at the same time, or I might be writing

18   somewhere on the protocol, but I am watching that because I'm

19   having to see if I have my twos, if I've got my zeros or if I have

20   my don't knows.  So while I am there I am flipping pages to make

21   sure, and usually I can flip and know about where I want to start,

22   so I am looking at a page where I'm at.

23   Q.  I am going to show you, and there is a cover sheet, is there

24   not, on these Vineland interview forms?

25   A.  Yes, there is a cover sheet.

Q.  Now, what you're looking at, Dr. Swanson, is side-by-side

images of the cover sheet of your Vineland and the cover sheet of

Dr. Hayes's Vineland of, she says Javetta Cooper but we know she

doesn't go by that name anymore, Javetta Franklin.

A.  That's correct.

Q.  Now, let's talk about yours first.  And, in particular, let's

talk about where you have retrospective diagnosis and where you

have these calculations.  And if you will, explain that to the

judge.

A.  Okay.  The experts, Dr. Sparrow in her manual, as well as the

people in this article, are clear that you have to identify that

it's retrospective, it's not the same thing as doing it with

someone who is currently 17:6.  So you have to clearly identify

that it's retrospective, and you have to use the age that you

calculated it on.

        And that's my calculations of where I came up with the

17:6 under the age there.  So it's clear to anybody who looks at

the protocol that I normed it on a 17:6, I didn't norm it on a 22

or a 25.  I didn't norm it at the time of the crime, which would

have given me a lower score.  I normed it on that age there and how

he functioned as a 17 and a half year old man.

Q.  Now, was the expanded Vineland manual out when you administered

the Vineland to Ms. Van Buren?

A.  No.  The manual itself had not come out.  I wasn't able to buy

it until early January, its publish date is 2008, but it wasn't

1    available to be bought before then.  But -- go ahead.

2    Q.  But the expanded manual -- or does the original manual also

3    instruct you to put the age on the cover?

4    A.  Oh, well, the original manual instructs you to put the age,

5    it's just the expanded version says put retrospective, but I knew

6    to put retrospective because it's been recommended in -- by other

7    experts.

8    Q.  And once again, why is that age important?

9    A.  Well, people need to know what's the first normative table you

10   went to to get the standard score you used for the subdomains,

11   because those subdomains add up to make those standard scores that

12   make the overall scores for socialization, communication, daily

13   living skills and the adaptive behavior composite.

14           So those same raw scores for someone 60 is going to

15   generate a different score than someone two or someone 17:6, so we

16   need to know, okay, you got this information, what normative table

17   did you go to get a standard score.

18   Q.  I mean, would you give an IQ test to a 15 year old and then

19   norm his score on a group of 50 year olds?

20   A.  No, I would norm it on 15.

21   Q.  And this works the same way, doesn't it; in other words, these

22   scores are age driven, the scores are a function of however old

23   Paul Hardy was at the time the person knew him?

24   A.  That's correct.

25   Q.  Now, look at Dr. Hayes's cover sheet.  And she has across that

same section N/A, which presumably stands for not applicable.  Is
there any conceivable rationale under which Paul Hardy's age or age
range covered by this Vineland would be considered not applicable?
A.  I don't -- it is applicable.  I just don't think Dr. Hayes has
as much experience doing retrospective diagnosis as I do, and
that's the way she marked the front.  It is very applicable, we do
need to know the age, we do need to know that.  I am just kind of
uncomfortable saying that -- I think she did it out of ignorance or
lack of experience, not because she thought it was not applicable.
Q.  Well, I understand that and I understand you're trying to be
very circumspect and I think we all appreciate that.
A.  I mean, I wouldn't have known to do it ten years ago, the
information wasn't out there to me.
Q.  Well, you need that age to score --
A.  I am --
Q.  Wait, wait.  Let me finish the question.  You need the age to
score the thing, don't you?
A.  You have to have the age to score it, and the age is
applicable, yes.
Q.  And is it not true that throughout the expanded interview
manual, and if you look at page 28 and 29 --
          MR. McMAHON:  Judge, I am going to interject at this
point.  Why doesn't Ms. Fournet put up the second page with that
same information on it.
          MS. FOURNET:  Because I think I get to pick --

1        THE COURT:  Because we're on direct examination,

2    Mr. McMahon, you can do whatever you want on cross.

3        MR. MILLER:  The problem, Judge, is, it gets lost, and

4    we're going to start doing that sort of game playing.  If we are

5    going to put in documents, we should put them all in.  And they're

6    sort of cherry picking what we're doing.  It makes it very

7    difficult --

8        THE COURT:  No, I don't have a problem with it, I am

9    taking good notes and I am following it.

10   BY MS. FOURNET:

11   Q.  Is it not correct, and I am referring to pages 28 and 29 of the

12   expanded manual where they talk about retrospective diagnosis, that

13   the manual refers repeatedly to the fact that the respondent should

14   be an adult, this is 28 to 29, "The respondent should be an adult

15   with -- who is very familiar with the every day behavior of the

16   individual being evaluated," and I want to emphasize this, "when

17   that individual was at the specified younger age"?

18   A.  That's correct.

19   Q.  And this right here is the specified younger age that you

20   specified; is that correct (INDICATING)?

21   A.  That's the specified age I scored the whole Vineland on, yes.

22   Q.  The expanded manual also says, does it not, that the examiner

23   should emphasize that all interview questions are in reference to

24   the individual, again, functioning at the designated earlier age,

25   correct?

1    A.  That's correct.  You keep needing to remind them we're talking

2    about 17:6, we're not talking about what he did at 22, can you tell

3    me that in relation to 17:6.

4    Q.  So once you designate this age as the designated earlier age,

5    you focus your -- the person you're questioning on that age range

6    because that's the age range that you want to know about,

7    otherwise, your results are going to be skewed; is that fair to

8    say?

9    A.  That's correct.

10   Q.  Now, is there anything in either of these manuals, Dr. Swanson,

11   that allows, encourages or tolerates the person administering the

12   test to mix and match ages?

13   A.  No.

14   Q.  Can you score a test, a Vineland, when you're talking about

15   different age ranges in the same test?

16   A.  No.

17   Q.  So if you do that, you're off manual; is that correct?

18   A.  That's correct.

19   Q.  In your over 35 years of practicing in the field of mental

20   retardation, have you ever encountered any professional who

21   considered the age range of the person you're evaluating not

22   applicable to the Vineland?

23   A.  No.

24   Q.  In your over 35 years of working in the field of mental

25   retardation, have you ever seen anyone who used two different age

1  ranges and then purported to compute a score on a Vineland?

2  A.  No.

3  Q.  In all of the trainings you have attended and in all of the

4  trainings you have conducted on administering the Vineland, has

5  there ever been any suggestion by you or by anyone else that it is

6  appropriate to mix and match ages on this test?

7  A.  No.

8          THE COURT:  I think we can move on.

9  BY MS. FOURNET:

10  Q.  Now, this is, and I can't see, this is page five and it's a

11  little hard to read, but it's page five, side by side of your

12  Vineland and Dr. Hayes's Vineland.

13          Now, how do you know, and this is on, the left-hand side

14  is Toni Van Buren, the right-hand side is Ms. Franklin.  As simply

15  as you can, Dr. Swanson, how do you know where to put -- start

16  putting numbers here?  First of all, what domain is this?

17  A.  This is the receptive subdomain of the communication, it's the

18  receptive subdomain of the communication domain so it's -- there

19  are three subdomains:  receptive, expressive and written, we're at

20  the beginning of the test of the receptive subdomain.

21          THE COURT:  Ms. Fournet, is this in any of the exhibit

22  books?

23          MS. FOURNET:  Yes, ma'am.

24          Dr. Swanson, if you could, because you have my exhibit

25  book up there, if you could give the judge the exhibit numbers for

```
 1    your Vineland and Dr. Hayes's Vineland.
 2              THE COURT:  Okay, I think it's three and four.
 3              MS. FOURNET:  I know it's near the beginning, Judge.
 4              THE WITNESS:  Under Exhibit 4 is Hayes' Vineland and --
 5              MS. FOURNET:  I think 3 might be yours, Dr. Swanson.
 6              THE COURT:  I got it.
 7              THE WITNESS:  That's JH000867 about is the first page of
 8    that, I think.
 9              MS. FOURNET:  She doesn't have those numbers --
10              THE COURT:  I've got it, I've got it.
11              MS. FOURNET:  She has it, Doctor.
12              THE WITNESS:  And then mine is three, okay.
13              Now, would you repeat the question, please?
14              MS. FOURNET:  Yes.
15    BY MS. FOURNET:
16    Q.  I think you said this is one of the subdomains of
17    communication, which is one of the three domains on the test,
18    correct?
19    A.  Uh-huh.
20    Q.  Now, how do you know, and we may have to go back and forth with
21    this exhibit, but how do you know where to start putting your
22    numbers?
23    A.  Well, you know --
24    Q.  You don't fill in those first?
25    A.  No, you don't start at the first one and give them every one,
```

1   so you're kind of going in about where you think they do it

2   independently, and you start talking and that's how you score.

3   This particular subdomain is only one page, so you're not having

4   the problem of going back and forth.  If you look in the four left

5   column going down where you see the 1, 1, 2, 3 plus, these are the

6   estimated ages at which you think these communication receptive

7   skills are mastered.  So about three years they should be getting

8   number 11 all the time.

9           And if you're looking at someone around 17, you really

10  are probably more at the bottom of the page, there might be some

11  zeros, some ones, whatever, but you're really more centering that

12  away.

13          And I just let the person start.  You know, I usually

14  start off with something about, well, you know, how does -- and I

15  don't like to use the word communicate or anything like that, and I

16  just say, well, how does -- I usually start off something along the

17  lines of, well, you know, how does Paul express his needs, how did

18  you remember at that time he told you what he needed?  And it's

19  because I want to leave it broad -- I don't want to use the word

20  talk or directions or instructions, I want to start off broad

21  enough and see what I get.

22          And then we start talking more about this and that or the

23  other, and they talk about what he says, how he says, how he

24  listens.  And we start scoring from there.  And so that's how I

25  figure out where to start putting twos, ones and zeros.

1   Q.  I am going to ask my paralegal to momentarily remove this

2   exhibit and hold onto it because we're going to go back to it, and

3   I would like to talk about what those numbers mean.

4           Now, I saw a lot of twos on your sheet for that, and does

5   this represent how a person gets a two, what you look for in

6   getting a two?

7   A.  Well, if I may.

8   Q.  Sure.

9   A.  The court will know everything because I am very big on that.

10  If you actually looked at the protocol, the third page of the

11  protocol gives the examiner some instructions, so the examiner has

12  that right there in their hand.  The top of each page has some ways

13  about which you give a two and a one for.  The examiner also should

14  know the pages we're fixing to talk about, as well as some pages at

15  the back of the book, because all of those should need to be

16  considered when you award a two, a one, or a zero.

17          But, yes, this right here gives a more complete example

18  of the page you're looking at, and we're looking at page -- it

19  really starts on page 32 and runs all the way through 35, and it

20  gives you some complete examples of when you could give a two, when

21  you could give a one, when you could give a zero, when you

22  could give -- when you might want to give an N/O, no opportunity or

23  don't know, when a zero might overrule one of those other ones.

24  Q.  And the two signifies, as this document reflects or this

25  portion of the manual, actual independent performance, correct?

1    A.  That's correct.  And they give some specific examples.  There's

2    some questions that have "and" in it, there are some questions that

3    have "or," so for the or ones, they can do one of those two things,

4    they get the two points; for the ands, they have to do both, things

5    like that.  So it gives you some pretty clear directions on when

6    they earn a two.

7    Q.  And I don't want to get too detailed about this, but just

8    generally, a two is for tasks that the person can actually perform

9    and can perform independently, that is, without assistance; is that

10   pretty much a summary of what a two means?

11   A.  That's pretty much a summary of a two.  You would have to check

12   another place before you could be certain you could give a two

13   sometimes.

14   Q.  Yeah, and we'll talk about that other place in a minute.

15          Let's talk about a one.

16   A.  A one is at the top of page 33 in the manual is what you have

17   up now, and if you look also at the top of the protocol, we're

18   really looking at something someone does sometimes or partially.

19   And this gives a lot clearer example of that.  You know, a lot of

20   times it's something they're just beginning to perform, so they may

21   not be as consistent in it, but it's an emerging skill.  Sometimes

22   they do it well, but they don't do it habitually, so that's going

23   to be a one.  So it just gives some examples of -- more concise

24   examples than is given on the protocol of when to give a one.  Once

25   again, there is another place you need to check and be familiar

1    with before you award it.

2    Q.  Now, what does a score of zero mean?

3    A.  A zero means they never or very seldom perform this, and that's

4    when they get a zero.  And right now, at the bottom of page 33 and

5    it goes on to page 34, and they give some specific examples of when

6    you give a zero.  You need to read these carefully because in some

7    of these cases where you might want to give a one or a don't know

8    or a no opportunity, you really have to give a zero instead.

9    Q.  And let me point a couple of these out to you.  One of these

10   is, another person always performs the activity for the individual.

11   So, for instance, if you're talking about cooking and the person

12   always has somebody else cooking for him, what do you score for

13   that?

14   A.  You score it a zero.

15   Q.  The third one, the individual can perform the activity but

16   seldom does, is that also a zero?

17   A.  Oh, on that same page.  Yes, yes, that's right.

18   Q.  Now, there's a score called N/O for no opportunity; is that

19   correct?

20   A.  That's correct.

21   Q.  And when do you score an N/O?

22   A.  Well, for no opportunity, you can only score it where the

23   protocol clearly marks that you may score a no opportunity, you

24   know; in other words, you can't just put no opportunity on

25   everything.  You can only use it when the protocol states beside it

1    N/O may be used.  It doesn't mean you have to give an N/O, it may

2    be some other score that you'll give, and we can discuss that

3    later, but you're giving it because the person has never had an

4    opportunity.

5              The best example, you know, an example of that would be a

6    telephone, you know, maybe a pay phone.  They're kind of hard to

7    find now, and I don't even think the pay phone one is in the new

8    Vineland anymore.  But, you know, that would be an example.  Some

9    people -- kids don't even know how to use a pay phone, they're kind

10   of hard to find now.  Or maybe nobody makes coffee in the home,

11   there's not a coffee maker, something like that.  So literally it's

12   not there, and you don't think the person would have a clue of how

13   to do it if it was.

14   Q.  Let's look at the second to last sentence up there.  "A score

15   of no opportunity signifies that no opportunity is the only reason

16   the person cannot perform the activity."

17   A.  That's correct.

18   Q.  Now, let's say that you're talking to an informant about a

19   computer and there was no computer in the home.  Do you just

20   automatically score no opportunity?

21   A.  No.  Now, if I'm doing a current one, that's a lot easier

22   because there are computers available in libraries, there's

23   computers available in schools, so we can address it that way, as

24   to the person do they think they can use it or can't use it.

25              When I am doing them retrospectively, there's a lot of

1    items.  I've done items on people who are in prison who are 60

2    years old and, needless to say, a lot of the things we're talking

3    about aren't there.  So when I'm asking a person, I have to ask

4    them, I am mandated by the manual to say, well, is that a skill you

5    think -- do you know anything about computers, have you used them.

6              In Toni Van Buren's case, we talked about, do you know

7    how to use a computer, do your kids know how to use a computer, you

8    know about computers today.  In your opinion, if Paul had had

9    access to a computer, is this something he could learn, is this

10   something he could do.  And she has to tell me.  Now, if she is, in

11   her firm opinion, that he was not capable of learning that skill,

12   the zero overrides the no opportunity.

13   Q.  Because that says it has to be the only reason he didn't

14   perform it, and if he really didn't perform it because he couldn't

15   perform it even if he'd had a computer, the score would be zero, is

16   what you're saying?

17   A.  That's correct.  And then that's also outlined on the previous

18   page under zeros.

19   Q.  And that's how the manual requires you to do it?

20   A.  That's correct.

21   Q.  Now, I am going to go back to these two pages side by side, and

22   let's focus, Dr. Swanson, for the purposes of this discussion, on

23   No. 20, the last question on that page.

24   A.  That's correct.

25   Q.  Now, you gave a zero on that question.  Explain to the court

1    exactly what you referred to and how you came to the conclusion

2    that that should be a zero.

3    A.  As I mentioned, there's another place in the manual you have to

4    go to for clarification on some questions.  And in the back of the

5    manual there are pages that go item by item and further clarify

6    different ones.  So there is a clarification on that particular

7    item No. 20, and that clarification is on page 302 in the manual.

8    Q.  Okay.  And what does that clarification --

9    A.  Well, for example, on No. 20, which is listens to an

10   informational talk for at least 30 minutes, the person would have

11   actually had to have been there and observed, because you have to

12   score one if the individual listens for more than 15 minutes but

13   fewer than 30 minutes; if the individual attends only to

14   information of particular interest to him or her for 30 minutes,

15   score one.

16          So it has to do with -- when I score that, when I ask

17   that question, I usually ask for the examples of where have you

18   seen that, you know, we get into, are we talking about church, are

19   we talking about a movie.  An informational talk is more than a

20   leisure talk.  It's a little harder to listen to a sermon than it

21   is to maybe listen to something else.

22          And then I always say, well, you know, what does he come

23   out of it with it, how does he sit there, does he pay attention,

24   how long does he sit.  And those are how I probe those to get some

25   of the answers to answer not only 20 but also 19, and then No. 14

1    and 15 on there is a similar one, but it's easier, it's more like

2    listening to a story or leisure-type thing, going to a movie would

3    be a good example of that.  So those are scored pretty much the

4    same way.  There's time limits on it.  If the individual listens to

5    a story for more than five minutes but fewer than 15 minutes, they

6    get a one; you score a zero if the individual listens fewer than

7    five minutes.  And I am now talking about No. 14.

8              So in scoring these things you would assign twos, ones

9    and zeros, but some of them have additional clarification at other

10   places in the manual.  Not everybody has all of that in their head

11   at once, but I always know when I get to these items, double check

12   here or there before you make certain that you did it.  And that's

13   why I said, a lot of times I always stop when I get to the basals

14   and the ceilings and we kind of re-go over those so I make sure I

15   didn't mis-score something.

16   Q.  Now, the sort of clarification of the scoring criteria that you

17   just described on page 302, would that be in Appendix E to the

18   manual titled Scoring Criteria, which begins on page 301?

19   A.  Yes, that's Appendix E, Scoring Criteria, starting on page 301,

20   and it runs all the way through 325.  And not on every item but

21   almost every item they have additional clarification, so that the

22   examiner has a clearer opinion.  It's less subjective that way.

23   It's a more objective standard that you're following.

24   Q.  Now, let's look on the right-hand side, and let's look at

25   Dr. Hayes's No. 20; now what did she score?

A.  She scored No. 20 a two.

Q.  And what in that block as part of that number two, what has she written?

A.  She's written "attended church, so I guess so.  He did this when he needed to."

Q.  Now, Dr. Hayes --

A.  Dr. Swanson.

Q.  Dr. Swanson, if you are following the manual, is there anything in the manual that suggests that what an interviewee guesses that Paul Hardy can do merits a two?

A.  No.

Q.  Anything in the manual or in Appendix E to the manual?

A.  No.

Q.  Do you want these people to guess what somebody can do?

A.  No.  I mean, really, on that one you would have had to have had more time to really give an example or give a better example of something she knew something about.  To me, church is good because, like I said, sermons are kind of hard to listen to and you have to walk out of church and remember what the preacher said.  And not everybody does that.

        And that's a good question, I just think you need to probe it more and were you ever actually there, because you're going to have to score it on the number of minutes of attention that the person allotted it.  So the fact that -- it sounds like she didn't go with him, she just knew he went to church is a guess.

1  And so with the amount of information she had, it sounds like it's

2  a don't know.

3  Q.  I mean, if you were going to talk about church as with regard

4  to No. 20, would you want the interviewee to have said, I actually

5  attended church with him?

6  A.  Well, yeah.  I could give you another example of someone that I

7  interviewed retrospectively.  And his grandmother raised all of

8  them, and he and his cousins, many cousins, all went to church

9  every day, and he was notorious for sitting there twirling with his

10  tie.  There were clear examples of, yeah, he went to church and he

11  stayed the whole time, but he never paid attention, and when he

12  walked out, he couldn't tell you anything that was going on in

13  there.  So that informant could give me a lot of good quality

14  information about when he went to church and what he retained.

15         This is receptive language.  What we want to know is, did

16  someone go somewhere and absorb it and were they able to sit still

17  long enough.  A five-year-old child doesn't sit still long enough

18  in church to score high on this.  That's not going to really reduce

19  his score much.  A 17-, 18-year-old individual should be able to

20  sit still long enough to come out of a situation like this and give

21  you a good synopsis of what he heard.

22  Q.  And, in fact, you've talked to Ms. Franklin a couple of times

23  and you've also heard her testify.  Was there anything in any of

24  those discussions that would suggest she actually went to church

25  with him and was able to --

```
 1   A.  No.  She was -- I am going to be -- if I can explain this, one

 2   more thing we haven't talked about this page and I don't know how

 3   it's scored, but there's a note here that this is cumulative.

 4   Q.  We're going to get to that.  Don't worry, we're getting to it.

 5   A.  She knew he went to church with Toni and that was a different

 6   church, I think, then when he was 17, because I think at 17 and 18

 7   he was going to Zion Baptist Church where his mother went.  So in

 8   her mind, she knew he and Toni went every Sunday and she knew

 9   sometimes Jacquetta went with him, so she knew he went to church,

10   but we're talking about, in her case for sure, 17 -- they were

11   similar in age, we knew, at that time, I really think she was

12   answering that question in relation to 22, not to that time.

13   Q.  Now, we're really going to get to the confusing part of this,

14   and let's go to the note you mentioned a minute ago where it says

15   note.  And read that note for us.

16   A.  That note states that:  "Since Ms. Cooper and Mr. Hardy had a

17   limited relationship, the ratings are based upon her cumulative

18   knowledge of him in some areas and in her knowledge of him until

19   17:6 to 17:11 in others.  She said that she did not tell him she

20   was pregnant."  That's the end of that, and then she has an arrow

21   drawn to the side that says 22 to 29:11.  On the far right corner

22   it says 17:6 to 17:11.  So I think what she's trying to say there

23   is Javetta knew him at two different times.

24        MR. McMAHON:  I am going to object, this is speculative,

25   it really is, that she is trying to explain what Dr. Hayes meant.
```

```
 1              THE COURT:  All right.  You going to back up, Ms.
 2    Fournet?
 3              MS. FOURNET:  Yes, yes, ma'am, I can do that.
 4              THE COURT:  Go ahead.
 5    BY MS. FOURNET:
 6    Q.  There are how many different ages mentioned here?
 7    A.  Well, there's 17:6, 17:11, 22:0, and 29:11, but I think she's
 8    talking about the normative table --
 9              MS. FOURNET:  Whoa, whoa, whoa.  That's what we don't
10    want you to do, Dr. Swanson, that's what we don't want you to do.
11              THE WITNESS:  I'm sorry.
12    BY MS. FOURNET:
13    Q.  She is mentioning several different ages here, correct?
14    A.  That's right.  Yes, she's mentioned four ages.
15    Q.  And she's talking about -- she has a note about cumulative
16    knowledge.  Is this a test that can be given based on somebody's
17    cumulative knowledge of a person over a number of different age
18    ranges?
19    A.  No, no.  I mean, specifically, those twos and ones and zeros
20    need to be on a specific age because that score at the bottom,
21    which is a 40, has to go -- she put that in, I know this because I
22    can look it up in the manual, she computed that 40 into a standard
23    score for 17:6 to 17:11.  So every one of those scores up there
24    have to be related to how he performed at 17:11.  And that's what
25    I'm assuming they are because when you take a 40 and go to the
```

normative table, that 40 gets the same standard score she got at

17:11, it doesn't give the same score at 22.

So I need to be comfortable that all of those items, one

through 20, were Ms. Franklin's opinion of where he was at 17:6 to

17:11. Now, if some of them were her opinion at 22, at 29 and 17,

then it's -- it can't be used as a normative score.

Q. Now, she's got, out on the right-hand margin, 17:6 to 17:11; is

that correct?

A. That's correct.

Q. And under the manual, assuming she was going to use one age

range, which we know she didn't, it would have been incumbent on

her when she questioned Ms. Franklin because Ms. Franklin knew Paul

at different periods; is that correct?

A. That's correct.

Q. It would have been appropriate and, indeed, it would have been

required for her to be very clear with Ms. Franklin, I want you to

stay within the age range of 17 years, 6 months and 17 years, 11

months?

A. When she was scoring.

Q. Right.

A. I mean, it's perfectly okay to ask information for all of his

ages, but, you know, she needs to be certain that when she puts

that two, it's a two based on a behavior at 17:6 or 11 or whatever

she was using.

Q. I would like to show you another side-by-side comparison, and

1    we will go to page -- I'm sorry, this is just Dr. Hayes's page.

2    Dr. Hayes's page 12 -- okay, they are side by side, I apologize.

3    But I want to focus this time on Dr. Hayes's page 12.

4    A.  All right, I'm there.

5    Q.  Now, let's focus on No. 22 on page 12.  And that question says:

6    "Washes clothes as needed."  And Dr. Hayes gave a two on that; is

7    that correct?

8    A.  That's correct.

9    Q.  Now, there's also a note by No. 22, what does that note say?

10   A.  That note says, "His momma mostly did it."

11   Q.  What does the manual say about whether a two is appropriate

12   when somebody else performs the task usually or always?

13   A.  Just a minute, you're moving much quicker than me.  Hold on.

14   Q.  I thought you had all of this stuff in your head.

15   A.  No.  That's why I said, I always go back and I check my manual.

16            The washing clothes as needed is No. 22, so what you do

17   is, you're looking at, does that get her answer earning a two, a

18   one or a zero, you have those other pages we talked about that

19   clarified a two, the last step is go to page 310.

20   Q.  Before we do that, before we do that, let's go to the pages in

21   the manual that tell you when you can give a two and when you

22   cannot give a two.

23   A.  It looks like 30-something.  Okay, that's page 33.  A score two

24   signifies any of the following, remember that a score of two is

25   based on an individual's actual independent performance of an

1    activity, not whether he or she is capable of performing it.  And

2    then you would go through each one of those bullets to see if they

3    qualified under one of those.  And then you would look to see what

4    one says and what zero says.

5    Q.  Look at the zeros, look at how you score a zero.  What does it

6    say about when a person is not asked to perform the activity or

7    another person always performs the activity?

8    A.  Those are the third to last and second to last bullets in that

9    column on page 33.  The first one says, this is -- you would award

10   a zero, "The individual is not asked to perform the activity such

11   as clearing the table," is the example they give.  "Another person

12   always performs the activity for the individual, for example,

13   taking his or her temperature, putting away clean laundry."

14   Q.  Now, I want to take you to page 310 in the Appendix E that

15   expands a little on what this question means.

16   A.  On page 22, I mean, item No. 22, page 310 states:  "The

17   individual must wash and dry clothes and put them away

18   appropriately to score a two."

19   Q.  Now, does "momma mostly did it" meet those criteria for a two?

20   A.  No.

21   Q.  Now, if you notice in the margin there, we have a different age

22   from the last page we looked at, we have ages some five years

23   older; is that correct?

24   A.  That's correct.

25   Q.  Now, you would, assuming that that 22 to 29 in the margin

1  represents the focus of this particular subdomain, you would have

2  to assume, or you would have to, if you were to follow the manual,

3  you would have to limit your questions to Paul at the ages of 22 to

4  29; am I correct?

5  A.  That's correct.

6  Q.  And you would have to make sure that your respondent was clear

7  that that respondent was only to talk about behaviors that occurred

8  when Paul was 22 to 29 years old; is that correct?

9  A.  That's correct.

10  Q.  Was Paul even living with momma when he was 22 years old?

11  A.  It was my understanding by then Toni was living there.  It's

12  possible Toni and he were living, either with mother in the

13  Calliope or they had moved over -- I think the first place they

14  moved to was Algiers.  I am not sure, I would have to go pull out

15  all of my chronology.  But for sure Toni was, I feel pretty

16  certain, living with him by the time he was 22.

17  Q.  And again, we have now introduced, and I can't recall if this

18  is the first page in the protocol where it was introduced.  We've

19  introduced a totally different age range in the same test.  Is that

20  on manual or off manual?

21  A.  That's off manual.

22  Q.  Is that the correct way to give a Vineland, to use two

23  different age ranges?

24  A.  Not with the same respond -- it's incorrect to do it with the

25  same respondent, I mean.

```
 1   Q.  That's what I mean.
 2   A.  Yeah.
 3            THE COURT:  Mr. Fournet, we've been at it an hour and a
 4   half.  Is this a logical time to take a morning break?
 5            MS. FOURNET:  I think it's a very logical time, Judge.
 6            THE COURT:  Okay.  Let's take a break.
 7            THE DEPUTY CLERK:  All rise.
 8         (WHEREUPON, A RECESS WAS TAKEN.)
 9         (OPEN COURT.)
10            THE DEPUTY CLERK:  All rise.
11            THE COURT:  Please have a seat.  Go ahead.
12   BY MS. FOURNET:
13   Q.  Dr. Swanson, what you have before you now is a side by side of
14   your score summary and Dr. Hayes's score summary.
15   A.  Yes.
16   Q.  Let's talk about your score summary first.  Now, the words in
17   black there, communication, daily living skills, and socialization,
18   what do those represent?  And this is page 27, I think, your Honor,
19   of the Vineland protocol on both.
20   A.  And just describing it briefly, on your left-hand column are
21   the domains:  communication, daily living skills, socialization and
22   motor skills.  Motor skills is given, but it doesn't enter into the
23   score after the age of seven.
24   Q.  So we don't need to worry about motor skills for our purposes
25   today?
```

```
 1   A.  That's correct.
 2   Q.  And in the black, the socialization, daily living skills and
 3   communication, those are the actual domains?
 4   A.  Those are correct.
 5   Q.  And above the communication you have three words, you have
 6   receptive, expressive and written, what are those?
 7           THE COURT:  Ms. Fournet, I forgot one thing, I just need
 8   you to waive Mr. Larson's presence.
 9           MS. FOURNET:  I meant to do that, Judge, I forgot.
10           THE COURT:  My apology, too.
11           MS. FOURNET:  I do waive Mr. Larson's presence for a few
12   moments.
13           THE COURT:  Mr. Hardy, are you all right with that?
14           THE DEFENDANT:  Yes, Judge.
15           THE COURT:  And is the prosecution all right with
16   Dr. Hayes not being present for a few moments?
17           MR. MILLER:  Yes.  Actually, she is rescheduling a few
18   things, but she'll be right back in.  But thank you.
19           THE COURT:  Okay, all right.  Go ahead, Ms. Fournet.
20   BY MS. FOURNET:
21   Q.  Again, Dr. Swanson, above the word communication in black
22   there, those are the three subdomains of communication?
23   A.  Yes, receptive, expressive and written.
24   Q.  And it's a little hard to see on the left-hand side, the daily
25   living skills, but those subdomains are above daily living skills
```

1    being personal, domestic and community; is that correct?

2    A.  That's correct.

3    Q.  And then you have the socialization domain, and it has three

4    subdomains:  interpersonal relationships, play and leisure time and

5    coping skills.  Is that correct?

6    A.  That's correct.

7    Q.  And then you score each of those subdomains separately based on

8    all of those twos and ones; is that correct?

9    A.  That's correct.

10   Q.  And you use -- we're not going to get into the arcane issue of

11   the formulas you use and how do you get to the numbers, but on

12   Ms. Van Buren's score, on the right-hand side you have adaptive

13   levels and then next to that you have age equivalence.  And what

14   does that column represent, those two columns?

15   A.  Okay.  Those two columns give you the adaptive level, which

16   would be equivalent to -- we've talked about number standard

17   deviations below the mean.

18   Q.  And how many standard deviations below the mean does a person

19   need to be to qualify under the definitions for adaptive behavior?

20   A.  About two standard deviations below the mean.

21   Q.  So let's look at -- is that -- that confidence level, that's

22   not the same as standard deviations or is it?

23   A.  No.  It would be under the adaptive level, they just put low,

24   and I think in my report I actually give the standard deviations,

25   if I can have just a minute to check.  Yes, I did.  On my report,

1    if the court wants to look later on pages 18 through 19, I give the

2    number of standard deviations below the mean for each subdomain,

3    each domain and for the total score the way I scored it.

4    Q.  And for the total score, was he two or more -- and that would

5    be the adaptive behavior composite?

6    A.  That's right.  And on here it's listed as an ABC and that's

7    towards the very bottom, it says 65, 7, then 1 and then mild.  And

8    so it's 65, and that is 2.33 standard deviations below the mean,

9    the actual standard deviations being on my report in -- on page 19.

10   Q.  I am going to pull this, and I apologize for pulling and

11   putting back exhibits.  This is Dr. Cunningham's exhibit.  And, of

12   course, we're not talking about an IQ here, but would Mr. Hardy on

13   your scoring of the Vineland, would he fall within the two standard

14   deviations below the mean as reflected on this graph?

15   A.  Yes.  All of his domain scores fall greater, I think, than two

16   standard deviations below the mean.  So less than 70, in the 60

17   range, and his subdomain scores also scored below the mean in every

18   area except for community.

19   Q.  And let's put the --

20          Now, he has adequate motor skills, but that is not part

21   of your assessment for mental retardation.

22   A.  No.  They leave that to be used with adults because many people

23   with developmental disabilities have cerebral palsy or other

24   problems, maybe a brain injury, so you would want to get some kind

25   of an age equivalent on that and how it impacts an overall

1    adaptive; but I scored it because I just didn't want to leave

2    anything blank, but it's not relevant to this issue at all.

3          And it never enters the overall score after the age of

4    seven.

5    Q.  And I think you have a chart on page 18 of your report that

6    indicates that except for age equivalency on community, at which he

7    scores just below age 12, these subdomains put him anywhere between

8    an age equivalency of about six years to six years, ten months old?

9    A.  That's correct -- according to the manual.

10   Q.  And of the 11 criteria under the DSM, according to this

11   Vineland, where does he show substantial deficits?

12   A.  Of the 11 criteria?

13   Q.  Yes.

14   A.  And I summarized that also on the last page of my report, which

15   is 24.  I clearly think communication -- just going by the

16   Vineland, you know, and not all of the other things that we've

17   looked at, in communication, I think he scores low, and you can see

18   he is at a 66, which is below, and he's also below -- two standard

19   deviations below for each subdomain in communication.

20         Functional academics is addressed in the Vineland under

21   the written subdomain, and so according to this Vineland, he would

22   be greater than two standard deviations below the mean in

23   academics.  I used other things as well to score him low there.

24         His self-care is what they have listed on the Vineland

25   under personal, and those are the questions that address, you know,

1    how much help he needed at different things like that.

2           Home living and domestic is primarily listed under

3    domestic on the subdomain.  Social interpersonal relationships, of

4    course, is listed under interpersonal relationships, which is

5    greater than two standard deviations; leisure is under play and

6    leisure.  Self-direction would be under coping skills, that's where

7    those questions are directed, but some of those are also in the

8    community domain on the Vineland.  So that would be where I use the

9    Vineland to support my decisions.

10          But as I've said before, the Vineland is just one of the

11   things that I looked at in reaching my decision.

12   Q.  And the DSM has 11 areas, and he only needs to be two standard

13   deviations below the mean in two of them, but he actually is seven;

14   does that sound right?

15   A.  That's correct.  He needs to be below in two of the 11 to meet

16   the DSM-IV-TR criteria, the adaptive prong.

17   Q.  Now, you mentioned that you didn't just rely on this Vineland

18   in identifying which of the 11 criteria on the DSM he fell below

19   the level required for, to meet the criteria for the diagnosis of

20   mental retardation.  Did you rely on just the Vineland or you

21   relied on other material as well?

22   A.  I relied on other material as well.

23   Q.  Such as?

24   A.  Well, I actually did standardized academic testing myself,

25   there were other academic testing, and academic testing, to me, the

1    gold standard is something that's done individually by a

2    professional under standardized measures that we all accept, and I

3    felt I gave a good test and it was consistent with the previous

4    test done by other psychologists.

5            I also did all of the interviews that I did with other

6    folks, and as much as possible I tried to hit on these things.  I

7    felt I got, that in my collateral interviews, I felt that I got

8    similar information on academics from Terry Duncan, a woman who had

9    helped him pass his junior high years; from his brother Terry

10   Hardy, and from Vance, as well as the school records that we had

11   also looked at.

12           The only -- in academics or functional living skills, I

13   also probed him.  I did a lot of things with him that I talked

14   about in getting him to compute various things so I could see what

15   was his functional reading ability, how fast could he read, what

16   was his comprehension, I got him to do basic numerical things for

17   me.

18           So that was other things that I used; say, for example,

19   in functional academic living skills and self-care, I talked to

20   other people as well, but I also just wanted to probe myself what

21   he could do.  So I used different things to get him to identify

22   things.  I don't want to go on forever and ever, so at any point

23   you want me to quit just say hush, Vicki.

24   Q.  It was a lot of material, I think we get the message.

25   A.  I know.  It's tons of stuff to look at.

1    Q.  In that adaptive behavior composite, you've written mild, what

2    does that mild represent?

3    A.  The lows and milds are what the manual tell you the level that

4    they are.  In my report, I actually used standard deviations

5    because I think that's what the court needs to know.  But mild

6    means mild deficit range of adaptive skills, so that would mean he

7    would have met the criteria in that domain for communication

8    because it was greater than two standard deviations below.  So

9    that's what the mild means.

10           In the subdomains, low means two standard deviations or

11   greater; moderately low is a ten, probably a 10, 11, 12.  The mean

12   for the V scale, and I sure don't want to get into the technical

13   stuff --

14   Q.  No, we don't want to do that, we'll get lost.

15   A.  Just trust me to mean --

16   Q.  We'll get lost in the thicket, trust me.

17   A.  We get concerned at a nine because that means he's two standard

18   deviations below.  So at nine get worried, ten there is a problem,

19   but he is not there yet.  How about that?

20   Q.  Okay.  That sounds good.

21           Now, where you have the adaptive composite, you also have

22   mild there.  Now, is that synonymous with mild mental retardation?

23   A.  Well, that means that he scored in the mild deficit range of

24   adaptive behavior, so for this test would say that he met -- would

25   be evidence that he met the mild, I mean the adaptive criteria on

1  both the DSM-IV-TR and the AAMR Tenth, and he met that at

2  approximately the age of 17:6, when this respondent knew him.

3  Q.  And is mild, in this context, is that synonymous with mild

4  mental retardation?

5  A.  Well, it's synonymous if you also get the cognitive and that

6  and there's proof that it existed prior to the age of 18, yes,

7  you've met the criteria.  Somebody could be functioning in the mild

8  range and have a brain injury or cerebral palsy or whatever.  There

9  are other reasons you can be functioning in that range and not

10 qualify for mental retardation.

11 Q.  In your opinion, were the results of this Vineland consistent

12 with the IQ scores in 1996?

13 A.  Yes, they were.

14 Q.  And is this score consistent with information that you gleaned

15 in your interviews with various adaptive behavior witnesses?

16 A.  Yes.

17 Q.  Now, let's look at Dr. Hayes's score sheet.  And we had

18 discussed earlier that the manual has trigger -- built-in trigger

19 devices to tell you when the person you're interviewing does not

20 have enough information to provide a valid score.  Is that correct?

21 A.  That's correct.

22 Q.  And that is addressed, I believe, on page 45, not of the

23 expanded manual but of the original manual; is that correct?

24 A.  That's addressed really two places in the manual:  how to give

25 a don't know is addressed on page 35 of the manual and then on page

1  45 is how to compute the number of don't knows and/or missing

2  items, and that's on page 45, and they give examples of it on

3  subsequent pages.

4  Q.  Now, how does the manual instruct you in terms of each

5  individual subdomain, how does the manual tell you that you have

6  too many don't knows to obtain a valid score on the subdomain, what

7  is the rule on that?

8  A.  And you want what the manual states?

9  Q.  I would like what the manual states.

10  A.  That's on page 45, in computing the number of don't knows

11  and/or missing items, and it goes down.  In the middle of the

12  paragraph, it says:  "If the total for a subdomain is greater than

13  two, then that subdomain cannot be scored.  When a subdomain cannot

14  be scored because the total of items scored don't know or not

15  scored is greater than two, you must follow up with the respondent

16  to obtain the information needed to rescore don't-know items or

17  score those not scored, or prorate the subdomain.  Prorating is

18  discussed later in this chapter."

19  Q.  So let's break that down a little bit.  And correct me if I'm

20  stating this wrong.  If you have more than two don't knows in a

21  particular subdomain, then you first have to go back and see if you

22  can clarify that maybe this person knew a little more than they

23  initially thought they did or that you understood that they did; is

24  that correct?

25  A.  That's correct.

1    Q.  And if you find out after some additional probing that they

2    really don't have the information and you have a score in that

3    subdomain that contains more than two don't knows, you cannot score

4    that subdomain; is that correct?

5    A.  That's correct.

6    Q.  And that's the trigger device that tells you you can't score

7    it?

8    A.  That's correct.

9    Q.  Now, on Dr. Hayes's score sheet, in the communication domain,

10   she acknowledged or appears to have acknowledged because she has

11   N/A by written, that she could not score that subdomain, is that

12   correct, and she did not score it?

13   A.  To be fair, I think she noted on there in a note that she

14   didn't administer it or that Ms. Franklin really didn't know it.  I

15   mean, I'd have to look back on that page.  I don't think she

16   administered it because Ms. Franklin said something to the effect

17   they weren't in school together, they didn't know.  I would have to

18   look back at those pages, but I don't think she scored those pages.

19   Q.  On -- I'm having trouble reading that.

20   A.  Community.

21   Q.  She also acknowledged on community and coping skills that for

22   one reason or another she could not or did not think it was

23   appropriate to score those subdomains?

24   A.  Yeah.  She actually administered community subdomain and -- let

25   me check and make sure before I say -- she actually administered

1    coping skills, but she notes there that they're not applicable

2    because she couldn't score them.

3    Q.  Now, community, which is on page 14 of the protocol, according

4    to what I have here, I am showing -- and you can confirm this or

5    correct me if I'm wrong -- that in the community subdomain, and I

6    don't have an exhibit of this, but on page 14 there are eight don't

7    knows on that subdomain.

8    A.  Yes, there are eight domains on that page.  And that's

9    JH000877.

10   Q.  And, appropriately, she did not score that, and certainly the

11   manual would tell her not to score it because eight don't knows is

12   way too many; is that correct?

13   A.  That's right, and she underlined that instruction at the bottom

14   of the protocol page.

15   Q.  So does it appear from that underlining, I think she

16   underlined, there's some little lettering at the bottom that kind

17   of reminds the examiner not to score if you have more than two

18   don't knows?

19   A.  I'll read that.  Is says:  "If the total of don't know and/or

20   missing is greater than two, do not score the subdomain."  And she

21   kind of has underlined that, and she entered her answers, but she

22   didn't put any totalling.

23   Q.  And then coping skills also she has N/A.  I believe coping

24   skills is page 19 of the protocol, and for that subdomain, I have

25   here she had five don't knows.  Is that correct?

1    A.  One, two, three, four, five.  Yes, she has five don't knows.

2    Q.  So we have at this point, we have three subdomains that

3    Dr. Hayes has implicitly acknowledged are not scorable and she has

4    not scored them; is that correct?

5    A.  That's correct.

6    Q.  Now, there is a process called prorating, is there not?

7    A.  Yes.

8    Q.  And that involves a formula where you can extrapolate a score

9    for a particular domain?

10   A.  That's correct.

11   Q.  When are you allowed to prorate for a particular domain, and we

12   don't need to get into the formula, but let's just --

13   A.  All the instructions, should the court want to read them, are

14   on page 62 of the manual and there is a section on prorating.  And

15   an unscorable subdomain, when there are, like I say, in

16   communication, two subdomains that are scorable and one that isn't,

17   you can prorate one domain on the whole test.

18          So, for example, when she did communication, she had two

19   subdomains there, it would be possible to get a prorated score

20   there.

21   Q.  Let me stop you for a minute.  Let's make sure we're clear

22   about this.  The manual says on a particular domain, if you have

23   two subdomains that are scorable of the three, then you can prorate

24   and you can get a score for that domain.

25   A.  That's correct.

1   Q.  So if you start with communication and you have two -- and

2   putting aside the age problem, which is a different problem -- but

3   if you have two scorable subdomains, you can actually prorate

4   communication, the manual would allow you to do that?

5   A.  Yes.

6   Q.  Dr. Hayes, for whatever reason, did not do that.  Is that

7   correct?

8   A.  She didn't do it on this protocol, I would really have to look

9   at the report.  She might have done it -- the report is very long,

10  and to be honest, I would have to look at that page on the report.

11  If you want me to take the time -- she didn't do it on this

12  protocol, and I think that's all you're asking me.

13  Q.  That's all I'm asking.

14          Now, when do you lose your right to prorate?

15  A.  If I could read from the manual on page 62:  "Prorating is not

16  permitted if the entire form contains more than one unscorable

17  subdomain.  Also, prorating is not permitted for the motor skills

18  domain or any other domain of ages where only two subdomains are

19  administered."  And they're talking about little kids there because

20  some of these subdomains aren't administered, say, to a

21  two-year-old child, etc.  So in the case of Mr. Hardy, prorating is

22  not permitted if the entire form contains more than one unscorable

23  subdomain.

24  Q.  So she would have essentially lost her right to prorate after

25  the communication domain?

1    A.  That's correct.

2    Q.  Now, let's talk about the unscorable subdomains, and she's

3    acknowledged that she has three unscorable subdomains.  Under the

4    manual is that the only unscorable subdomains that she should have

5    written N/A by and not computed a score for?

6    A.  There are other subdomains that has too many don't knows in it

7    that she should not have scored and given a standard score for.

8    Q.  Let's look at the personal subdomain, which is on page 11 of

9    her protocol, I do not have an exhibit of that.  How many don't

10   knows are on page 11 for personal?

11   A.  Okay.  For personal, there are three don't knows, and she notes

12   that in the bottom right-hand corner of the domain -- of the

13   scoring where it says, like the total number of don't knows.

14   Q.  I am confused here because, if you look at page 11, she's got

15   this underlined several times, where it says that the total don't

16   know and/or missing is greater than two, do not score subdomains.

17   She has two circled and then she has an arrow drawn, but then she

18   scores the subdomain, does she not?  Because if you look up there

19   at personal she scored it.  Should she have scored that subdomain?

20   A.  According to the manual, she should not have scored the

21   subdomain.

22   Q.  So we've got -- and I am going to circle it here -- we have a

23   score on personal that should not have been scored.

24   A.  According to the manual, that's correct.

25   Q.  Domestic is on page 12.  And how many don't knows do we have on

1   domestic?

2   A.  She has three don't knows circled and then she entered three in

3   the bottom right-hand corner for the number of don't knows.

4   Q.  So she acknowledges that she has more than the allowed numbers

5   of don't knows, she's indicated that she's -- certainly suggested

6   that she's aware that two is the limit, but she scores the

7   subdomain anyway, does she not, because if we look up there at the

8   domestic she's actually scored it?

9   A.  That's correct.

10  Q.  So domestic is another subdomain that should not have been

11  scored?

12  A.  That's correct.

13  Q.  Now, play and leisure, let's look at that one.

14  A.  That's page 17 of the protocol.  And starts on 17 -- this is

15  out of sync, there's a missing page, let me see if I can see what

16  happened here.

17  Q.  We may have another --

18  A.  Okay.  For everybody to understand, page 18 is ahead of page

19  17.  So page 17 is JH000881 and page 18 is JH000880, if I got my

20  zeros right.  And so leisure starts on page 17 and then runs

21  through the top of page 18, so that's what we're looking at.

22  Q.  And how many don't knows does she have for play and leisure?

23  A.  So if you look on page 18, she has two don't knows.

24  Q.  And is that, according to the manual, should that be

25  unscorable?

1    A.  No.  If she has two don't knows, she can score it.

2    Q.  She can still score it?

3    A.  That's correct.

4    Q.  Okay.  So she has personal and domestic, she's got two

5    subdomains that she should not have scored according to the manual

6    and she did.

7    A.  That's correct.

8    Q.  Is that correct?

9         Now, with respect to personal, you may recall, and if you

10   don't, I can certainly give you Dr. Hayes's report, she says on,

11   and this is one of the ones she shouldn't have scored, correct,

12   personal?

13   A.  That's correct.

14   Q.  On page -- in footnote 66 of page 87 of her report, Dr. Hayes

15   notes that she scored this for informational purposes only.

16   A.  That's correct.

17   Q.  Have you ever heard of scoring an unscorable subdomain for

18   informational purposes only?

19   A.  It's my understanding of the manual and experts in the field,

20   you could use the Vineland as a background for your structured

21   interview.  When you start adding standard scores, you leave room

22   for misinterpretation, and as my understanding, you know, ethically

23   in my own personal ethics is, you don't want to put something there

24   that confuses somebody.

25        So once I put a standard score for something that's

1    unscorable and I've introduced it, I just feel I've put a bias.  So

2    it's always been my understanding that when you report standard

3    scores, they have to be good standard scores.  If you want to

4    report it for illustrative purposes, you could say, I attempted to

5    give the report and it was my blah, blah, blah in giving the

6    report.  I mean, I think that's how I would have done it.

7    Q.  Well, if I were a lay person and I didn't know anything about

8    the Vineland and I looked at these score sheets, which contains two

9    scores that shouldn't even be on there under the manual, is there

10   any notation or any information on that score sheet or anywhere

11   else that would tell me that these subdomains were off manual, that

12   they should not have been -- the scores should not have been

13   computed?

14   A.  No, there's no instructions.

15   Q.  And, in fact, does the manual also say that once you have more

16   than one unscorable subdomain you can no longer prorate?

17   A.  That's correct.

18   Q.  So here we have -- she's acknowledged she's got written as

19   unscorable.  When she gets into personal, she has lost her right

20   even to prorate, correct?

21   A.  That's correct.  She could report her opinion of what the

22   prorated score was on the first domain, which is communication.

23   Q.  Correct.

24   A.  But that's all she can report as a standardized score.  The

25   rest of it should, in my opinion, be a narrative of everything that

1    she learned from this lady because she did have the protocol in

2    front of her, and ask questions.

3    Q.  So she could have, if I am hearing you correctly, and should

4    have prorated that first domain, when she lost the right to prorate

5    after that, abandon the scoring, abandon the score sheet and simply

6    written a narrative, which may very well have been useful --

7    A.  That's right.

8    Q.  -- of what information she gleaned when she was discussing

9    subdomains that were on a standardized test that this manual says

10   were unscorable?

11   A.  That's correct.  And it would be perfectly acceptable for her

12   to offer her standards -- prorated standard score in communication

13   as her estimate of where he was in that area of adaptive ability.

14   Q.  But that's not what she chose to do, is it?

15   A.  No.

16   Q.  What she did instead was she failed to identify two other

17   subdomains as unscorable; is that correct?

18   A.  That's correct.

19   Q.  She should have stopped when she had two unscorable subdomains

20   on the whole test but kept going instead and kept scoring

21   unscorable subdomains; is that correct?

22   A.  That's correct.

23   Q.  And on top of that, she has acknowledged, at least implicitly

24   throughout this test, that she is using two different age ranges

25   for Mr. Hardy, which is also neither required or allowed by the

```
1    manual; is that correct?

2    A.  That's correct.

3    Q.  Dr. Swanson, I know that you have thoroughly reviewed

4    Dr. Hayes's report, including her -- that section of the report,

5    which covers some 20 pages, from pages 86 to 106, including a

6    chart, which we're going to discuss in a minute --

7    A.  Can I have just a second?  Are we going to be talking about

8    that report?

9    Q.  Yes.

10   A.  If you'll give me a second.

11   Q.  Sure.

12              MS. FOURNET:  Would it help if Ms. Clark --

13              THE WITNESS:  I have it.  There are so many, so many

14   reports.

15              MS. FOURNET:  I know, I know.

16              THE WITNESS:  I can't remember what book they're in

17   anymore.

18              MS. FOURNET:  I think she might have one handy for you,

19   though.

20              THE WITNESS:  I have this one right here.  So what pages

21   are we looking at?

22              MS. FOURNET:  We're looking at beginning on page 86.

23              THE WITNESS:  Okay.

24   BY MS. FOURNET:

25   Q.  Now, there are about 20 pages, are there not, including a
```

1    three-column chart, which we'll talk about in a minute, that

2    incorporates a discussion about the Vineland; is that correct?

3    A.  That's correct.

4    Q.  Now, on page 86 Dr. Hayes gives a little laudatory description

5    in quotes about the value of the Vineland instrument, does she not,

6    there at the top of page 86?  She talks about how well-suited it is

7    for evaluation and diagnosis of mental retardation; she talks about

8    the norm reference data provides reliable and valid estimates of an

9    individual's adaptive behavior and ranking in comparison with the

10   national normative group.

11          So we're acknowledging, are we not, the importance and

12   the value, and I think you would agree, of this particular

13   instrument in assessing adaptive behavior?

14   A.  That's correct.

15   Q.  Now, is there any caveat other than that for "informational

16   purposes only" business we discussed a minute ago, did you see any

17   caveat in all of these pages, where this expert notified the court

18   who would be making this decision, that in a number of multiple

19   major respects, the administration and scoring of this Vineland was

20   completely inconsistent with the principles that are outlined and

21   required by the manual?

22   A.  I don't remember seeing anything on those pages.

23   Q.  Now, now, this is not a report that's being submitted to

24   another psychologist, is it?

25   A.  No, it's not.

1  Q.  Is there anything to you as a professional, an experienced

2  professional in this field, that troubles you about the way this

3  Vineland was administered and, in particular, about its inclusion

4  in a report where a judge has to rely on the information to decide

5  whether this man is eligible for execution, in the manner its

6  presented in this report?

7  A.  In my opinion, when you use a standard score, you need to give

8  the full explanation of the score and the relevance or the

9  importance of it.  And I just don't -- if you only abled -- well,

10 example, if I could just give my own personal example.  I've given

11 one domain, I mean, one subtest of an ABAS one time to someone who

12 was a work supervisor that could tell me some things about

13 communication and work, but I clearly clarified that I was only

14 doing some subdomains and it wasn't all of them.  So they got the

15 clear opinion and understanding that I was only reporting on one

16 subdomain or one domain of something.

17        When giving the V scale scores, which are the subdomain

18 scores, without giving the overall domain could also be misleading

19 because they're not always clearly correlated with adaptive areas

20 if you don't explain them.

21        For example, in personal, there's the health issues are

22 listed under personal, as well as the self-care issues, so you're

23 implying in that that he is in a normal range of both.  You see

24 what I'm getting at?  So if you're going to be reporting his

25 abilities by subdomain, I think you need to start parsing out,

1    well, is he good at both or is he good in one or what did your

2    score show?

3            So I just think it's misleading and maybe it's -- maybe

4    you could do that with a subtest of the Wechsler in some kind of

5    way that made sense to people, but you need to be a little bit more

6    careful when you're talking about these domains because of the way

7    the subdomains overlap.

8    Q.  Well, and I know it may be hard to put yourself in the shoes of

9    somebody like most of us in this room, that is, somebody that knows

10   nothing about this test, but if you look at this score sheet and

11   you see these scores for personal and domestic, they certainly have

12   every appearance of being legitimate scores to a lay person, don't

13   they?

14   A.  That's correct.

15   Q.  Is there anywhere in her report that she acknowledges that

16   these scores are not scores that the manual would allow her to

17   compute?

18   A.  I don't remember her acknowledging that anywhere in her report.

19   Q.  Is there anything in her report that acknowledges that after

20   she got that first unscorable subdomain, she should have quit

21   giving the test or at least notified the court that these scores

22   are essentially under the manual meaningless for another reason,

23   that is, that she's also lost her right to prorate?

24   A.  I didn't see anything in the report alluding to that.

25   Q.  Now, she did include a chart, this is on page 87 of her report.

```
1   A.  That's correct.
2   Q.  And she did note with asterisks that she used different age
3   ranges in different domains, does she not?
4   A.  That's correct.
5   Q.  Putting aside for a minute the question, the issue that
6   certainly the form suggests that she didn't stay within those age
7   ranges --
8          MR. McMAHON:  I am going to object, this is repetitive.
9   I think we've gone over the age ranges in detail previously.  So I
10  am going to object on the grounds --
11         THE COURT:  Are you talking about the presentation now?
12         MS. FOURNET:  I am talking about the presentation, your
13  Honor.
14         THE COURT:  Okay.  Overruled.
15         MS. FOURNET:  Thank you.
16  BY MS. FOURNET:
17  Q.  She does acknowledge with these asterisks, does she not, that
18  she is using these two different age ranges?
19  A.  She does acknowledge that in a footnote.
20  Q.  Is there any caveat to this chart to tell Judge Berrigan, oh,
21  by the way, this is completely off manual and you're not supposed
22  to do it this way because the data has to be normed on one age
23  range, does she tell the judge that anywhere that you saw?
24  A.  I didn't see where she -- wait, let me -- I mean, she has a
25  pretty lengthy footnote on -- footnote 64 and 65, where she
```

```
 1  mentions there that his adaptive functioning was either 17:6 or --

 2  I don't think it's clear.  She does have footnotes where she goes

 3  into that and the court can read them, but it's not clear to me.

 4           My concern with that chart, if I may?

 5  Q.  Sure.

 6  A.  Is, looking at the chart, it needs to be clear that we're

 7  saying he is moderately low, say, in expressive language when he's

 8  17, but somewhere between 22 and 29 he's hopped up to a higher

 9  level in personals.  So we're comparing his personal ability at 22

10  with his communication at 17, and there is a footnote, but it's

11  like comparing me when I came out of high school as when I came out

12  of college, and I was a different overall person.  And, I mean,

13  that might be of interest, it just needed to be a little clearer

14  because a lay person looking at the chart thinks you're talking

15  about his total skills at one time, I think.

16  Q.  And, Dr. Swanson, I mean, isn't the whole point of the test to

17  norm this data on one specific designated earlier age, isn't that

18  what the manual says?

19  A.  You want the age, as close as possible, to the age of 18 as

20  possible, but really, you use one age with one respondent.  If you

21  need to know about 22 to 29, you go find another respondent.

22  Q.  So regardless of what else this may represent, this represents

23  that she has gone totally off manual on this standardized test

24  because she's used two different age ranges on the same test with

25  the same respondent; isn't that correct?
```

1   A.  That's correct.

2   Q.  And where in the report --

3        THE COURT:  Okay, I think we can move on, I think you've

4   made your point.

5   BY MS. FOURNET:

6   Q.  Dr. Swanson, what would you conclude in light of all of the

7   don't knows that were obtained in this test, multiple times in

8   multiple subdomains, what would you have concluded about whether

9   Javetta Franklin was even a candidate for this test with the

10  possible exception of the communication domain?

11  A.  I think all of the don't knows confirm my opinion that she is

12  not a good Vineland candidate, she is a good source, you heard her

13  yesterday, she knows things and it's worth talking to her and you

14  can certainly add those to your report.  But she isn't a good

15  candidate.  I didn't think she was, and I think this confirms that

16  she wasn't, the number of don't knows, and the number of subdomains

17  shows that she really isn't a good candidate for a Vineland

18  administration.

19  Q.  You are aware from talking to Javetta and from seeing her

20  testify yesterday that there are also significant conflicts between

21  what is in this report and what she says she said to Dr. Hayes; is

22  that correct?

23  A.  That's correct.

24  Q.  Given what you know about having reviewed this protocol and

25  also having heard Javetta testify, does it surprise you to learn

```
 1    that there are conflicts between what she says she said --

 2              MR. McMAHON:  Objection.

 3              THE COURT:  Sustained.

 4    BY MS. FOURNET:

 5    Q.  As part of this discussion of the Vineland, Dr. Swanson, did

 6    Dr. Hayes also prepare an almost 20-page chart from pages 88 to 105

 7    in which the scores of Ms. Van Buren and the scores of Ms. Franklin

 8    were compared; do you recall that chart?

 9    A.  Yes.

10    Q.  I am going to display one page of that chart, which would be

11    page 101, and I guess we should have written up at the top because

12    I think it's at the beginning.

13              THE COURT:  It's under play and leisure time?

14              MS. FOURNET:  I'm sorry, your Honor?

15              THE COURT:  It's under play and leisure time, is that

16    what you're --

17              MS. FOURNET:  Well, I was identifying the columns because

18    it's not clear from the exhibit.

19              The second column, for the benefit of the court, and this

20    is on page 88 where she identifies the column.  The first column is

21    the Van Buren score, the second column is what she calls the JC

22    score, which is the Franklin score in that subdomain; and then the

23    third column is information from records and interviews with

24    Dr. Hayes.  So that's what those three columns represent.

25    BY MS. FOURNET:
```

1    Q.  This column here is Toni, this column here is Javetta, this

2    column here is various and assorted pieces of information from

3    various and assorted sources.

4         What is the problem with this chart in terms of making

5    the coherent presentation about Mr. Hardy's adaptive behavior

6    skills, aside from the fact that, as we've already established,

7    there are problems with the Franklin administration?

8         MR. McMAHON:  Your Honor, I am going to object to that

9    question, it's extremely general, problems with the chart.

10        THE COURT:  Can you answer it?

11        THE WITNESS:  Yes.

12        THE COURT:  All right, go ahead.

13        THE WITNESS:  I had more problems with this chart than

14   any other chart, and I really didn't -- I got the report and then I

15   later got the protocols and all 1,600 pages of things to go

16   against.  So I didn't make -- I couldn't make sense of this chart

17   until I got everything to go with it, so I really do think since I

18   was misled by the chart, other people would be misled.

19        The first column are the scores that I gave Toni Van

20   Buren, and when I first looked at it because I knew she had talked

21   to Ms. Van Buren, and I was sitting in another room and heard her

22   responses, I first thought, well, that's how she scored Ms. Van

23   Buren, so I kind of figured that out a little bit from the report.

24        The second columns were, Ms. Franklin and I didn't have

25   those, and then when I hit -- so I am looking, okay, here's one age

1  and here's another age; but then the third column is just anything,

2  it could have been her opinion of him at 42, it could have been

3  something that was in an FBI file at 26, it could have been

4  something she extracted from a transcript.

5          So, to me, the column equates his -- where he is, but

6  you're really not getting that, you're getting different opinions

7  of overall ages.  So I just didn't quite -- I had a hard time

8  understanding the whole thing until I went through 1,600 pages,

9  just about, and I do think this chart is very misleading.  I

10  understand now what it is, but I didn't understand it when I first

11  saw it.

12  BY MS. FOURNET:

13  Q.  Well, and the second column with the Franklin scores, I mean,

14  unless you go back and look at the protocol, because we know she

15  used two different ages, right?

16  A.  That's correct.

17  Q.  So when we look at the Franklin column we don't know if that

18  score represents the 17 to whatever age or the 22 to 29 age?

19          MR. McMAHON:  Object.  This is basically -- it's another

20  way -- she's just gone over this, this is repetition.

21          THE COURT:  Yeah, I mean -- yes, I agree, sustained as to

22  that particular point, we've been over that.

23  BY MS. FOURNET:

24  Q.  Is there any way in which this chart paints an accurate,

25  coherent picture of Paul Hardy's adaptive functioning at an

```
1    identified period of time as opposed to a mishmash of all kinds of

2    different theories?

3              MR. McMAHON:  Objection, that's for the court to decide.

4              THE COURT:  I think you're right.  Sustained.

5    BY MS. FOURNET:

6    Q.  Does this chart also include observations made of Mr. Hardy in

7    jail?

8    A.  That's correct.

9    Q.  And are there independent problems with observations made by a

10   person in jail in terms of a mental retardation assessment?

11             MR. McMAHON:  I don't understand independence problems, I

12   don't understand that.

13             THE COURT:  I did, you can answer the question.

14             THE WITNESS:  I think this has been discussed a lot by

15   both Dr. Cunningham and I and all of the experts that we've alluded

16   to, and prison is a restricted setting and it's not a good drop of

17   what someone does in a restricted setting, where there's scheduled

18   leisure times or recreation times or bathing times, it's not a good

19   judge of how that person would do in the community where they're

20   under their own self-responsibility to perform these.

21             And I do have a problem with the ages when you talk about

22   these because someone could not be able to play ball at 17 --

23   basketball at 17 and could play it at 42, and it's significant that

24   they hadn't mastered it at 17 and it took them a much later age

25   before they mastered it.
```

1        So I think you're leaving out in this chart the

2    developmental importance of when a skill emerged.

3        MS. FOURNET:  Judge, I am moving into another area on

4    interviews of corroborating adaptive behavior witnesses, I don't

5    know if you want me to go right on into that.

6        THE COURT:  Yeah, I mean, we'll break at noon when it's

7    around time to get something to eat.  That's about 40 minutes from

8    now or whatever is logical.

9    BY MS. FOURNET:

10   Q.  Dr. Swanson, in addition to giving the Vineland to Ms. Van

11   Buren, did you also interview -- and you don't need to list them

12   because you've done that before, but you also interviewed other

13   witnesses?

14   A.  Yes, I did.

15   Q.  And did those witnesses also provide at least information of a

16   corroborating nature to you?

17   A.  Yes.

18   Q.  And would any of those witnesses in your view have been good

19   candidates for a Vineland?

20   A.  No, none of the witnesses I interviewed were good candidates

21   for a Vineland, but they gave me good information in some areas or

22   they corroborated something someone else said.

23   Q.  And does the fact that adaptive witnesses who are family

24   members and friends, is that going to raise your antenna a little

25   bit about possible bias?

1    A.  That always raises your antenna because frequently when you're

2    doing these things, you're doing them even in the regular world

3    because people want services, people want a social security check,

4    people want special education for their children.  So you always

5    kind of have your antenna up, and I think in Atkins a little bit

6    more.

7    Q.  And when you interviewed these witnesses, as well as when you

8    interviewed Paul, were you mindful of that always being a

9    possibility in the legal context?

10   A.  I was mindful.

11   Q.  Was it your impression or is it your opinion today that, I

12   think in your business you call it malingering by proxy, that is,

13   people, loved ones exaggerating or lying to help the person on

14   trial.  Was it your opinion that malingering by proxy was a factor

15   with these folks?

16   A.  Yes, it was.

17   Q.  Do you think people exaggerated his symptoms?

18   A.  No, I don't think they did.  A lot in part because I knew how

19   to interview them, so I kept going forwards and backwards and

20   asking things in different ways, so I feel I got a good assessment.

21   Q.  When you're trying to decide if folks -- you're interviewing

22   multiple sources, when you're trying to decide if those multiple

23   sources are giving you accurate and reliable information, what are

24   some of the things you look for across witnesses?

25   A.  I look for little bitty corroborating details.  If they know

1    them well, they know the brothers, they know the sisters, they

2    know -- two of the most important, three of the important events in

3    this family was when they moved to the Calliope, when Curtis died,

4    when the home invasion occurred, which was very traumatic for

5    everybody, how much did you know about that.  Just different

6    stories.

7         When I started hearing Vance repeating stories about

8    academics, I mean, Vance gave me stories that I later heard Terry

9    say, that I later heard Terry Duncan say, then I started hearing

10   this, people may be less knowledgeable about academics, about other

11   things as well.  Other things that hit me right off the top of my

12   head is this sense of direction, he can get places by landmarks, he

13   might be able to go more than one way in a familiar area, but when

14   you get out of a familiar area, problems start.  His inability to

15   explain how to get somewhere, these stories were told over and over

16   again.

17        Everybody admitted he had pretty good money-counting

18   skills.  The problems happened with money management.  And we heard

19   similar stories of vulnerability and things like that.  So when I

20   am starting to hear the same trends and I know to ask for them,

21   then I kind of go, okay, we all know the same person, we all maybe

22   can't fine tune it enough to win, but they all knew the same person

23   and the things that he did.

24   Q.  So essentially what you're looking for is consistency across

25   witnesses?

1    A.  That's correct.

2    Q.  And when you interviewed these witnesses, did you use -- what

3    kind of interviewing style did you use with them and compare it to

4    the semi-structured interview that you did with Ms. Van Buren on

5    the Vineland?

6    A.  I still used a semi-structured interview, and I still would

7    introduce things in general terms first and then see where I could

8    go with that.  Depending on the ages when people knew them, it went

9    a different way because Greg knew him later in life, for example,

10   and Terry could remember, Terry remembers him better earlier in

11   life other than times he would see him occasionally as an adult.

12          So, you know, I looked for those things.  I looked -- I

13   mean, everybody knew Marie Hardy, even Greg Williams, so I was

14   asking questions about her cooking --

15   Q.  Let me stop you right there with Marie Hardy.  Were the

16   descriptions of Marie Hardy reasonably consistent?

17   A.  Oh, those were consistent across people, some a little crueller

18   than others in their assessments.  The cooking descriptions were

19   the same.  Greg Williams even mentioned that she made extra money

20   selling things that she made, she was considered one of the best

21   cooks in the Calliope and people would buy her pies and things for

22   Christmas or whatever --

23   Q.  And Greg Williams -- I am sorry for interrupting you, but Greg

24   Williams also said that she was a little short of a six pack,

25   didn't he?

1    A.  That's correct.

2    Q.  Okay.  Go ahead.

3    A.  So, you know, if people knew Paul, people knew his mom, mom was

4    very important in his life.  When I was talking to the different

5    siblings, I wanted to see did they have the same picture of their

6    mother.

7            Another recurrent theme is, nobody did anything in the

8    house, mother did it all pretty much with very little help.  But

9    some people learned afterwards to do things, some people didn't.

10   So like I said, I kind of had some threads to go there and just

11   say, well, am I hearing the same thing everywhere I go.

12   Q.  Now, I know you spent some time with Toni, and one of the more

13   vivid stories she told you was the story about the diaper changing,

14   which I believe she discussed when she testified.  Did you see that

15   portion of the Hayes interview of Paul and his discussion of how to

16   change a diaper?

17   A.  Yes, I did.

18   Q.  And certainly on the video, he gives a reasonably good

19   description of how to change a diaper?

20   A.  He modelled pretty good how you would -- the actual steps of

21   doing it, yes.

22   Q.  How do you account -- and if there's more than one way to

23   account for it, more than one reason, please list them -- but how

24   do you account for the fact that he was able to describe how to

25   change a diaper to Dr. Hayes and the very different description by

1    Toni Van Buren of her experience with his efforts to change a
2    diaper on her child?
3    A.  I would describe that in two ways:  First one, I think we've
4    already hit on and so I am not going to go too much into that.
5    There's a difference in a person's ability to describe something
6    and the ability to do it.  And you can watch somebody do something
7    and give a fairly good description of how to do it, but actually
8    when you have to encounter, if any of you have ever changed a
9    baby's diaper, it's not quit as simple as described on there, where
10   you do this, put this and do this and this.

11          My second description of that is, I mentioned a long time
12   ago it seems like, I do parent training, I do parent training with
13   parents and I also do parent training with people who are mentally
14   retarded and have their children and are at risk for losing them.
15   And one of the things we write up is we, before the baby is born we
16   teach these folks, and we use dolls and whatever to model how to do
17   bathing, the different things they have to do.

18          And then we also work with them in more settings because
19   someone's going to have to make a decision, is this handicap person
20   going to be able to take this child or do we need to put them in
21   care providers, it's going to be a judge's decision, so we do a lot
22   of training.  And it's very, very easy to start with a book and
23   train it and start with the steps and train it, and then go to the
24   doll and train it.  But, believe me, when you get the baby, it gets
25   much harder to do because, as we all know, it doesn't happen.

1          So I think Paul is at that modeling stage where he saw it

2    enough and he could describe how to do it.  I don't think in my

3    opinion from what I heard from people he was able to do it.  The

4    two mothers that I talked to, mothers of his children, said those

5    were not the things they let him do with their child.

6    Q.  Did different of your informants such as Theresa Minor and Greg

7    Williams and others describe Paul, either in retrospect or even

8    recognizing it at the time, as slow or not very bright?

9    A.  As I remember the terminology used was:  Slow, slow in some

10   things, not very bright, just couldn't catch on.

11   Q.  Were there consistent descriptions in your interviews of these

12   adaptive behavior witnesses with specific antidotes that described

13   essentially masking behavior by Paul, that is, behavior where he

14   pretended to know how to do something that the witness knew that he

15   really didn't know how to do?

16   A.  Yes, there were.

17   Q.  And did you see instances of that also in the interview with

18   Dr. Hayes?

19   A.  Yes, I did.

20   Q.  And did Theresa Duncan also describe him as a class clown?

21   A.  Yes, she did.

22   Q.  And what else did Theresa Duncan tell you about him, about

23   Mr. Hardy?  Because we haven't talked much about her.

24   A.  Theresa Duncan also lived in the Calliope, as a matter of fact,

25   she was still living in the Calliope when she evacuated from

1    Hurricane Katrina and she now lives in, I think College Town,

2    Texas, right north of Houston.

3            And I talked to her over the telephone because she was

4    identified as somebody who had tutored Paul and worked with him

5    from the 6th grade through the 8th grade.  And we couldn't find her

6    initially, and I did put -- my comments on her are in the letter

7    that I wrote you when I talked to Terry, Linda, and Lionel and her

8    and Javetta.

9            And what she told me was, she lived in the side of town

10   and she went to the elementary school that served -- the Calliope

11   is front of town, back of town, side of town, that's how they refer

12   to stuff.  So she went to the elementary school in the back of town

13   and he went to the elementary school more up on Martin Luther King,

14   they went to two different elementary schools and they came

15   together the 6th grade for middle school, 6th, 7th and 8th.

16           And when he got there, he was in her classes, that's the

17   first time she really got to know him because, as it's explained to

18   me, the people of the side of town didn't go in the front of town,

19   didn't go in the back of town, so she really didn't know him until

20   she met him in the 6th grade.  But he was easily, she said, way,

21   way behind, and she did fairly good in school.  So she started

22   trying to tutor him.  And she felt he was easily three grades

23   behind or something like that and she couldn't teach him.  I mean,

24   when he mastered one thing, it seemed like the next day he had lost

25   it.

1          She finally just would give him her homework to copy and

2     he would give it back to her the next morning, and she would check

3     his homework.

4          The other thing mentioned was, if she had A work and he

5     was a D-F student at the time she started helping him, she actually

6     had to tell him, Paul, you can't give them A work, you're going to

7     have to get some of these wrong or they're going to catch you.  So

8     she would have to tell Paul to miss some and he would miss some.

9          And then when they took tests, they had a special code,

10    any time they had a multiple choice test, where she'd cue him

11    whether to put an A, B, C or D if it was a multiple choice, or true

12    or false.

13         Sometimes he would copy off her papers, and this was

14    throughout the 6th and 7th grade.  And in the 9th grade -- her

15    scores were better than Paul's, and in the 9th grade I think she

16    originally went to Booker T. Washington but was able to transfer to

17    one of the better schools like Terry, Linda, and Linda did, and he

18    no longer had her to help him when he got to high school.

19    Q.  When you spoke with her about his struggles in school, did she

20    indicate to you whether she thought he was really trying or whether

21    he was just too lazy to learn?

22    A.  She thought he tried as hard as he could try, but there were

23    just some things he just couldn't catch on.  And he was so far

24    behind, by then they were working on much more complicated math,

25    and he didn't have a good grasp for basic multiplication and

1    division even.  So here they were moving into other things and she

2    couldn't catch him up enough years to do.

3         And then, like she said, things she drilled him on one

4    night the next morning he wouldn't know them.  So she said, I just

5    finally -- I liked him, he was a nice guy, you know, I just gave

6    him my work.

7    Q.  So her experience was comparable to Vance Ceaser's experience,

8    only earlier; is that fair to say?

9    A.  It was comparable.  Vance didn't cheat.

10   Q.  No, I know that.  But, I mean, Vance did try to tutor him and

11   help him.

12   A.  Vance and Terry Hardy also tried to tutor him, so the three of

13   them had a similar story on the tutoring, yes.

14   Q.  Now, did you also interview Paul Hardy?

15   A.  Paul Hardy, yes.  Several times.

16   Q.  And you are, of course, aware, and we showed some exhibits

17   yesterday about the dangers of self-report, are you not?

18   A.  Yes, I am.

19   Q.  Does that mean that an interview with the person being examined

20   has no use at all?

21   A.  No.  I mean, you want to interview the person just like you

22   would interview anybody else.  What I think it specifically means

23   are, there are adaptive measures that you can give directly to the

24   person and get a standard score, and you're told not to do that

25   because that standard score is misleading in a prison setting on a

1    self-report.  So that's kind of forbidden.

2          There are other skills you can give them that they do

3    different things and that'll generate a standard score, and you're

4    told not to do that because those aren't acceptable in that

5    setting, but pretty much anything you want to do to kind of probe

6    and test what you gathered in your -- your starting here and

7    working down here I think are appropriate.  Whatever you know what

8    your skills are, you should utilize them with that person and see

9    where you think they are.

10    Q.  And did you uncover anything in your interview with Paul Hardy

11    that was inconsistent with information you had gathered elsewhere,

12    such as IQ tests, test scores, grades, information from other

13    adaptive behavior witnesses?

14    A.  No.  Things that people told me he could do well, I could get

15    him to do them well, like counting money; things that people told

16    me he couldn't do well, like directions or whatever, he couldn't do

17    those things for me.

18          And so that was kind of like what I was doing.  And like

19    I said, that's just one little component of a lot of things you

20    have to do.  I don't think you should just take that one thing and

21    hold it up as a standard.

22    Q.  Did you give Paul a malingering instrument?

23    A.  No.

24    Q.  Why not?

25    A.  Well, there really isn't anything out there that is -- that's

```
 1   considered appropriate at this time to be using with people with

 2   mental retardation.  There's some articles we're prepared to give

 3   the judge that say that.  I think, if I understood Dr. Hayes's

 4   report, she said that.  I think Dr. Cunningham has said that.

 5           Dr. Hayes is, I think, much more qualified in malingering

 6   than I am and so is Dr. Cunningham, and they may know something

 7   that works, so I would have left it to those experts.  I didn't

 8   give him an IQ, which is kind of like where most people give the

 9   malingering instrument.

10   Q.  I was going there next.

11   A.  And I did do an academic test, but I felt as long as I could

12   compare that with any other test that a qualified professional had

13   given him in an individual administration, as well as things that I

14   learned and things I proved, I think I tested for malingering

15   there, because Paul didn't hold back on what he knew and some

16   things he did well on.

17   Q.  And you mentioned IQ tests.  When you do one of these

18   assessments, do you always give an IQ test?

19   A.  No.  I don't.

20   Q.  And did you give one in this case?  And if not, why not?

21   A.  I did not give one in this case.  What we're interested in in

22   these cases are, is he -- is there -- do we think he was mentally

23   retarded prior to the age of 18, does he meet Criteria 1 for

24   cognitive, did he meet it close to the crime?  Now, where he is now

25   I don't think is what we're looking at on an Atkins test.
```

1       And by the time I tested him in that spring, we were at

2    the WAIS-III, and it was at the same place in his psychometric life

3    as the WAIS-R, it was fixing to go off.  I could have given him a

4    five, that would have introduced new information, you know, the

5    WAIS-IV wasn't out yet.  And even then that's not the question.

6    The question is, and I think Dr. Cunningham mentioned this, is,

7    where was he prior to the age of 18, where was he close to the age

8    of the crime, and that information was already there.

9       What the court needs to know is his adaptives, where were

10   they prior to the age of 18, where were they after the age of 18,

11   and was there evidence that they were there at that level prior to

12   the age of 18.

13   Q.  Were the 1996 IQ scores, especially taking into account

14   practice effect, reasonably consistent, as far as you were

15   concerned?

16   A.  Yes, I thought they were.

17   Q.  And were they closer to the age of 18 and also closer to the

18   time of the crime than anything you could have given him much

19   later?

20   A.  That's correct.

21   Q.  And did you have any reason to question the validity of those

22   1996 IQ scores?

23   A.  No, I did not.

24   Q.  Now, you've testified in a number of Atkins hearings, have you

25   not?

1    A.   That's correct.

2    Q.   And one of these in this very courthouse, Brian Nelson; is that

3    correct?

4    A.   That's correct.

5    Q.   And did you give an IQ score in that test, in that case?

6    A.   Yes, I did.

7    Q.   Tell me what was different about that case from this case.

8    A.   Brian Nelson was, for one thing, closer to the age of 18, and I

9    am going way back now, but I think he was about 21 when I tested

10   him.  He had two existing IQ scores, one, guessing again, about the

11   age of 11, the second one about 14.  The one at 11 was done by a

12   licensed professional in a mental health center, so it was, you

13   know, and it seemed to be a very good score.

14         The one that was done at 14 was done by, as I recall, a

15   school professional, a master's level, and there was a discrepancy

16   in the scores.  The first one was clearly within the side of the

17   mental retardation range, the second one was much higher.  So you

18   had an outlier situation, are we outlying in this direction or this

19   direction.  So an IQ test, a third test was needed to determine

20   what is he closer to, what is the true test.  So I did administer

21   an IQ test with Brian Nelson and that was the reason why.

22         If both of those scores had clearly shown prior to the

23   age of 18, I don't know that she would have needed to do it, I

24   would have had to have considered the time of the crime for that

25   too, I guess, and see where we go; but clearly, he had to have a

1    second one because the two scores were very inconsistent.

2    Q.  And let's go to another case, a more recent case -- and I

3    certainly don't intend to go exhaustively through all of your

4    cases -- but a recent case in state court was the Michael Anderson

5    case.

6    A.  That's correct.

7    Q.  Did you give an IQ test in that case?

8    A.  Yes.  At the time Michael Anderson was referred to me, we had

9    verbal reports from his mother.  And once again, we're looking at a

10   man who I think today even is only 22, so I probably looked at him

11   somewhere around 20, 21.  Because of Katrina we had verbal reports

12   from the mother that his IQ had tested in the mental retardation

13   range prior to the age of 18, and she also said because he had been

14   incarcerated in various juvenile facilities in New Orleans that his

15   IQ had tested in the mental retardation range at those facilities,

16   but there were no records because of Katrina.

17            So the problem is, we had verbal reports from a mother

18   and nothing to corroborate this.  So I tested him probably November

19   or October of -- no, I would say November of 2008 with the WAIS-IV.

20   And at the time I tested him, and then I also did the Vineland with

21   the mother, I learned he had been at -- where he had been.  So I

22   knew he had been tested because I was familiar with Jetson

23   Correctional, and they are now mandated under court order to test

24   anybody who is in special ed.

25            So I asked for the records, and I later got those records

1    before I finalized the report, but at the time I tested him, we

2    didn't know there was an IQ, when I got those reports from social

3    security and from -- all of the correctional reports that were

4    still existing at Jetson, which also had a lot of school reports,

5    by the way, that we couldn't get here.  And so I had a more

6    complete report by the time I did it, but at the time I tested him,

7    there was nothing on record to substantiate what the mother said.

8    Q.  Is there any hard and fast rule in Atkins proceedings that you

9    always do give an IQ test or you always don't give an IQ test, or

10   is it something you use your judgment about on a case-by-case

11   basis?

12   A.  In Atkins hearings you use your judgment.  Like I've said, I've

13   gone to court and testified ten times, and half of those cases I

14   didn't test and the other five I tested.

15          Even when I am sitting on the eligibility committees for

16   OCDD, that's one of the things we're looking at, do we need to have

17   this person tested, and we may not have to.  There might be really

18   good scores two years old in their school records that we can

19   accept, and we know they're clearly eligible for services.  So you

20   don't always test somebody unless it's either a requirement of

21   where they're getting a service or there's a true need.

22   Q.  And let's talk about some of the information you gleaned from

23   your interview with Mr. Hardy.  And, in particular, I am referring

24   to an interview you did on March 18, '09.  What are the

25   competencies and the limitations he has in math?

1   A.  Are we looking at my notes or my report right now?

2   Q.  We're looking at your notes of March 18, '09.

3   A.  And I want to be exact on that because I am actually talking

4   there about where he scored, grade equivalencies, which sight words

5   he can see, so that's why I am looking for the actual document on

6   that.  If I remember correctly --

7           MR. McMAHON:  Judge, is that March 18th of '09, the

8   report was submitted January 17th of '09.

9           THE WITNESS:  March 18th of '08.

10          MS. FOURNET:  '08, I'm sorry, I misspoke.

11          THE COURT:  Thanks for the clarification.

12          MS. FOURNET:  I have a typo in my outline here.

13          THE WITNESS:  So what I am looking at is my typed notes

14  from March 18th, '08, and my kind-of-hard-to-read March 18th notes

15  that are written.

16  BY MS. FOURNET:

17  Q.  I believe there should be a section in there on math.

18  A.  Basic math ability, there's a paragraph towards the end of

19  those notes, yes.

20  Q.  I mean, could he do word problems?

21  A.  Word problems was harder for him, particularly if you give them

22  to him verbally.  If you have a problem and you put them in front

23  of him and you read it to him, so he has it still in his visual

24  memory while he is working on it would probably be a little better.

25  But to verbally give him a problem to subtract or whatever that he

1    has to keep in his mind while he is doing it, that's a much harder

2    function for Mr. Hardy.

3    Q.  And what about rulers and tape measures and those sorts?

4    A.  Well, these things he'd have a lot -- he doesn't put the ruler

5    where he should put it.  So like he starts on the one instead of

6    the end of the ruler, and he doesn't have a good understanding.  He

7    might be able to find the half mark but the quarter or the eighth

8    or whatever.  So if he goes to measure something, he's always an

9    inch off to begin with and then he's probably a little more if it

10   has to be -- if I asked him to measure something and it was 7 and

11   3/8, he is going to automatically make it 8 and maybe call it a

12   fourth or a half.

13   Q.  Well, how did you check that, I mean, did you actually bring a

14   ruler with you?

15   A.  I had a measuring tape, I have a little ruler that I use.  I

16   just give them different things to measure.  A lot of the stuff

17   that I use because I train people because I kind of have to know

18   where they are before I write the next program to teach them to do

19   things, so I have little things and I just get them to show me,

20   there's a picture of a screw and how do you measure the screw and,

21   you know, from here to here, those kinds of things, and I just give

22   them examples of it.

23   Q.  We talked a little about profits.  Did he understand the

24   concept of a profit?

25   A.  No.  He counts surprisingly well with money when he is not

1    under pressure, but he doesn't understand the concepts of money as

2    well.  There's no way you can explain, you know, do one of these

3    scenarios where you paid so much for this and then you sold it for

4    that and what was your profit because he always goes back to, this

5    is how much money I have in my hands, so I made that amount of

6    money, that was a profit.

7    Q.  How about his language skills, what were you able to discern

8    about his language skills?  And particularly let's talk about the

9    expressive and receptive because we've talked about both aspects of

10   language skills here.

11   A.  And on this particular form I typed it wrong because I said

12   receptive language greater than expressive, but it's really the

13   other way, that's my shorthand.  It should be receptive language is

14   less than expressive language.  And that's just kind of like

15   something you note professionally when you're looking at something.

16         Paul has a response delay sometimes.  If it's something

17   he's familiar with, you don't see it; but if you give him something

18   novel or different, there's a pause, where he is trying to

19   recompute this new information that he's got.  And so it becomes

20   more evident in receptive than expressive.  And as long as he is

21   talking every day language, you really don't particularly see the

22   expressive problems that he had.

23         You know, the visual spatial thing, where it has to be

24   kept in memory, is where I saw it the most.  If you even give him

25   an example of a little diagram where there's two people here and

there's a little scene and you can even have the little compass,

north, south, east and west, and you just say, here are these two

people and they want to go to the park, and there's these little

streets, tell me how to get to the park, he has -- and use any of

these words you want to, north, south, east, west, left or right or

whatever, Paul can't tell you that even when he's looking at it.

It's the same problem we heard on that video when he's trying to

tell you how to go down the street, turn right on Third and there's

the church.

          For some reason, he can't keep that visual spacial memory

in his head, and that became really evident to me.  And when you're

testing somebody, the little oddities, as they start adding up, you

just kind of note those down because it's like, well, okay, that's

probably where a lot of his problems are, let's go back to that.

Q.  What about his ability, his concept of time?  I mean, can he

tell time?

A.  He tells time very well and he tells time on an analog.  A lot

of people with mild mental retardation can only do it digitally.

He can tell it to the minute.  He has no problem with that.  He has

a hard time conceptualizing time and scheduling time.  And this

would be consistent with mild mental retardation.

          And you can show him pictures of clock faces, and say,

okay, you finished painting here and your instructions are to come

back in an hour and 45 minutes.  What time should the second clock

say or even if you get --

1  Q.  What time should it be when you come back for the second coat?

2  A.  When you come back, that's right.  And if you just give it to

3  him, he is not going to get it.  If you give him a multiple choice,

4  well, here's four examples, which one of these clocks are right?

5  He would probably only get it right 50 percent of the time.

6         And please remember, in life we don't have four choices,

7  we have to make our own decisions.  So I think there's a problem

8  with him conceptualating the concept of time, you know, that would

9  be what I kind of got with him.  He can tell time, but he has a

10 hard time scheduling time, he has a hard time estimating how long

11 it takes him to get somewhere, when he ought to do things.  If you

12 give him a bunch of tasks to do and say, okay, you have a doctor's

13 appointment at such and such a time and it's at such and such a

14 place, and I need you to get all of these things done and be ready

15 and be at the doctor's office on time, what time should you start?

16 He has no concept of that.

17 Q.  Well, if you tell him you finished painting at 2:30 and you

18 have to let the paint dry for an hour and 15 minutes and then do

19 your second coat, and you give him one clock with movable hands, is

20 he going to be able to figure out --

21 A.  No.

22 Q.  -- what time --

23         MR. McMAHON:  I am going to object to this unless he

24 actually did it.

25         MS. FOURNET:  Well, I think she did, Judge.

1    THE WITNESS:  I did.  I came with little -- that's kind

2   of how I do it.

3   BY MS. FOURNET:

4   Q.  Let's describe what you did.

5   A.  Okay.  You have a -- what I use is a cardboard clock, y'all

6   might have remembered them from a long time ago, and it's kind of

7   small and it has little hands and you can move it around.  So some

8   people who are very concrete move it, okay, there's an hour,

9   there's 45 minutes.  He had trouble with that.  And if you give it

10  to him verbally where he had to make up his own mind, he couldn't

11  do that.

12    Now, when you give him options, that's what I'm saying, I

13  go up to 50 percent, because, okay, can't be this one, it can't be

14  this when I'm down to these two, and he was pretty good at guessing

15  which of the two.  So that's good, I mean, that's trainable, and

16  that's kind of like what I'm doing.  This is how I work with

17  someone who needs to know more about telling time, we get a

18  complaint he never goes to work, so I now know this is where I need

19  to train.  So that's what I was using was the same thing I used to

20  functionally assess where I start training with this person.

21  Q.  And I think in your notes of March 18th you also indicated

22  that, in terms of selling drugs, Mr. Hardy appears to have been, at

23  most, a second-line pusher; is that what those notes reflect?

24  A.  That's, you know, that's the way I understood it in talking to

25  him.  I think he -- I will admit he has a higher opinion of

1    himself, but the way I understood and what he was saying and where

2    he was selling to, I kind of just got the idea that he did it in

3    the Calliope or he did it in the Florida project, there was some

4    regular people, it was a very small area.  You know, I am not

5    familiar with all of the drug vernacular, but that seemed like kind

6    of a second-line street pusher to me.  And that's -- these are my

7    own notes, you know, when I'm trying to figure things out, so

8    that's how I rated him in his description.

9    Q.  And is that characterization of his role in selling drugs also

10   consistent with what you heard from others and what you heard in

11   this courtroom?

12   A.  That's correct.

13              THE COURT:  Ms. Fournet, are the notes part of an

14   exhibit?

15              MS. FOURNET:  They should be.

16              THE WITNESS:  I had to furnish all of my notes --

17              MS. FOURNET:  They were all furnished to the government.

18   Your Honor, I don't think they're in our bench book, but they

19   should be in the government's benchmark.

20              THE COURT:  Mr. Miller, Mr. McMahon, do you know if they

21   are?

22              MR. McMAHON:  Pardon me?

23              THE COURT:  Do you know if Dr. Swanson's notes are part

24   of one of your exhibits?

25              MR. McMAHON:  I don't think they're part of any of our

1    exhibits.

2              MR. MILLER:  I do not believe so.

3              MS. FOURNET:  Well, they certainly were furnished to the

4    government.

5              MR. McMAHON:  I know we got them.

6              THE COURT:  I know, I'm not -- I'm talking about

7    furnished to me.

8              MR. MILLER:  Oh, we're not talking about discovery.  I

9    don't believe we included them, your Honor.

10             THE WITNESS:  I don't mind giving them to her and letting

11   her copy them.

12             THE COURT:  Okay.  Well, when we supplement afterwards

13   with all of the different articles that are referenced, I'd like to

14   have those, too.  Thank you.

15   BY MS. FOURNET:

16   Q.  In your opinion, Dr. Swanson, and based on your experience in

17   this field, did you perceive that Mr. Hardy was malingering when

18   you interviewed him?

19   A.  I didn't get that perception at all when I was interviewing

20   him, no.

21   Q.  Except maybe faking good, did he do any faking good with you?

22             MR. McMAHON:  Objection.

23             THE COURT:  On what basis?

24             MR. McMAHON:  How does she know if he's faking?  I mean,

25   if you did not administer a malingering test, then how does she

1    know whether he is faking good or faking bad?  This is speculation.

2           THE COURT:  Dr. Swanson, in your examination or interview

3    with Mr. Hardy, were you able to make any kind of assessment as to

4    whether he was faking good at times?

5           THE WITNESS:  I felt he was faking good, and I think I

6    gave some examples of rather than telling me he didn't know

7    something he tied to pretend he knew it.  And I became even more

8    aware of it after I watched Dr. Hayes's interview with him because

9    he told her things he never told me.  I never heard of Ernst Cafe

10   till I heard that, and I'm sitting there going, Paul, you could

11   have told me about Ernst Cafe.  It's like he didn't -- it was to

12   his advantage to have told me about Ernst, you know, and to his

13   disadvantage to tell her, and that's why I said, I just think he

14   tries to present the best as possible.

15          The other thing that he did that I remember is every time

16   I asked him something, for example, he knew the current president.

17   Now, we administered at different times, so I am still Bush and

18   maybe even Blanco, and when she went, she's Obama and definitely

19   Jindal, so there was kind of some differences.

20          So he knew Bush and he knew a couple of the previous

21   presidents and he wanted to know more, and I said, Paul, I can't

22   tell you, other people are going to test you, I can't tell you

23   that.  And he said, that's okay, I'm going to go to the back and

24   I'm going to find out and I'll know the answer the next time.  And

25   that's not to your advantage, that's to your disadvantage in a case

1   like that.

2           Frequently when I was doing the academic testing and he

3   didn't know something, he would want me to tell him the answer.

4   And I'd always say, Paul, I can't tell you if it's right or wrong,

5   it's not fair, somebody else may need to test you with the same

6   test.  And he always wanted to know and his answer would always be,

7   I know, you're not going to tell me, but I'm going to go find out

8   this answer.

9           So I just feel like I couldn't tell him he couldn't do

10  that, but that was more to his disadvantage and not typical of a

11  person who was trying to malinger, it was more likely a person who

12  wanted to look even better the next time he was tested.

13  BY MS. FOURNET:

14  Q.  Did you notice in the Hayes interview that often when Dr. Hayes

15  would ask him a question he would answer with a question; that is,

16  he would say, well, here's the answer and then he would say, right,

17  huh?  Did you notice that he did that?

18  A.  Uh-huh.  See, he did that to me all the time.

19  Q.  That sounds like the same thing, I mean, what's going on when

20  he does that?

21  A.  Well, he wants you to say if it's right or wrong because he is

22  guessing.  And then if you confirm that it's right, he says, okay,

23  the next time I'll know that.  And I'd always say, Paul, we went

24  over this, I can't tell you the answer, you know, blah, blah, blah,

25  and he'd always say, that's okay, I'm going to go look it up, I'll

1    know it the next time.  So . . .

2    Q.  Did you have an opinion regarding the Hayes interview of Paul

3    about whether he was malingering in the sense of faking bad?

4    A.  I thought he, you know, he tried very hard and he did some good

5    things.  Actually, I learned things from watching her -- I mean, I

6    watched the whole thing and I went back and looked at other things,

7    and I learned more about Paul by watching her.  So I don't think he

8    held anything back in that interview, no.

9    Q.  Dr. Swanson, did you give Paul any tests that involved his

10   ability to read credit card receipts?

11   A.  Yes.

12   Q.  Tell me how you did that.

13   A.  Okay.  I do all kinds of receipts.  And like I said, this is

14   something that we train in the field, so I am using different kinds

15   and different measures because people with mental retardation are

16   frequently shortchanged, they need to understand the difference of

17   taxes.

18           And one of the things we want to move on to is, well, if

19   you see a receipt, can you anticipate the change, and I think we've

20   talked about this some.  Paul could read some receipts, he couldn't

21   read other receipts.  When they start getting complicated or

22   there's more than one type of tax on them, for example, if you go

23   somewhere where there's one tax for drugs, one tax for groceries

24   and things, you really lose him.

25           But what really was remarkable to me about Paul because

1    he counts money so well is if you give him -- and then the next

2    step for me is, okay, here's a receipt.  I want you to go buy such

3    and such and how much are you going to buy, here is your receipt

4    and we kind of play role -- you know, rehearse the purchasing

5    thing.  He can't anticipate the amount of change.  Where most of us

6    are going to go, and, I mean, none of us are -- I am not good

7    enough to say it's $14.13 I'm going to get back, but I kind of

8    know, okay.  I'm either going to get a ten and four ones and some

9    change or I'm going to get a ten and a five or whatever.

10             Paul can't anticipate that and that's what he masks.  He

11   pretty much -- well, then we got into a discussion, well, nobody

12   keeps change anyway, I know nobody keeps pennies, I don't worry

13   about the change, I worry about the bills, I usually always get the

14   bills right.

15   Q.  Do you recall on the Hayes interview videotape her questions

16   regarding a receipt of him?

17   A.  I think so.

18   Q.  And if I'm recalling correctly, what she did was give him a

19   single receipt and ask him questions about that receipt; for

20   instance, what store is it, what credit card is it, what's the

21   total cost, those sorts of things.

22   A.  As I remember it, that's what she did.

23   Q.  That's very different from the way you did it.  Did you just

24   give him one receipt or did you give him --

25   A.  No.  I do a lot of them in, and it's in a series of an activity

1    that I do.  Also within that, I give examples of prices on things.

2    I pull something out of a catalog or the Sunday paper and we look

3    at that.  I like to see, can you compute so much per pound and

4    then, you know, are you sure you got the right amount on a receipt

5    compared to that?  Because it's more than one thing --

6             That's going back to the ability and the ability to use

7    that ability in the community.  I can't really assess that in

8    prison, but I am trying to get a feel for it because if this person

9    told me that, I want to know if it's true.

10   Q.  Well, does giving a person a single receipt and asking very

11   focused questions, where's the store, how much did it cost, how

12   useful is that a measure of his ability to function in the larger

13   society?

14   A.  It shows he knows how to read that one receipt.

15            THE COURT:  Ms. Fournet, we're at noon, we can continue

16   on.

17            MS. FOURNET:  Judge, I am reasonably near the end, I will

18   have a video, I am not quite to the video yet.  If you want to

19   break for lunch, I am thinking I might have an hour and a half

20   more, two hours.

21            THE COURT:  Okay.

22            MS. FOURNET:  And I think it would work if that's what

23   you choose to do.

24            THE COURT:  Okay.  We'll break now, it's noon.  Is 1:15

25   okay?

1          MR. MILLER:  Yes, thank you, your Honor.

2          THE COURT:  1:15, okie dokie.

3          THE DEPUTY CLERK:  All rise.

4      (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

5

6                  P R O C E E D I N G S

7               (AFTERNOON SESSION)

8

9      (OPEN COURT.)

10          THE DEPUTY CLERK:  All rise.

11          THE COURT:  Have a seat.

12          MS. FOURNET:  May I proceed, your Honor?

13          THE COURT:  Sure.

14  BY MS. FOURNET:

15  Q.  Dr. Swanson, I want to ask you this before I forget.  Did you

16  get Paul Hardy in any of your interviews with him to do the

17  backward sevens that we have discussed?

18  A.  Yes, I did.

19  Q.  Explain to the judge how that went, what you did, what his

20  response was and so on.

21  A.  Traditionally when I am doing a mental status exam, I am doing

22  it with people who are at least low cognitive functioning if not

23  mental retardation, so you kind of go a little beyond maybe what a

24  regular clinician would do in explaining what I want out of a task.

25          And when I started with Paul, I explained to him, you

1    know, I want you to count back from 100 by sevens, he immediately

2    said, can I use paper?  And I said, no, Paul, listen to me.  I want

3    you to count backwards by sevens, you have to do it in your head,

4    you can't write on a piece of paper, you can't use your fingers, I

5    just want to hear you say it.  And he said, I can't do it.  I said,

6    well, at least try.

7            And he went, a hundred, and then he went six backwards

8    and then he said, I can't do it.  And I said, okay.  Well, you

9    tried and that's all I asked you.  And then I went on to say,

10   anything that I ask you to do today, as long as you try, I'll be

11   happy with that.

12           So I restricted the task beforehand because, really, it's

13   a task to see can they carry a mental sequence in their heads as

14   they work backwards, and so a lot of folks with mental retardation

15   want to use a crutch or whatever, but that's not the purpose of

16   that test.

17   Q.  Did he appear to you to be trying to be making real effort?

18   A.  He seemed to be making a real effort and he really wanted to

19   use his fingers and he really wanted to use pencil and paper, but I

20   didn't allow that.

21   Q.  Do you agree with Dr. Cunningham that allowing the person being

22   evaluated to use his fingers is an inappropriate way to administer

23   that test?

24   A.  It's not the appropriate way to administer the test.  But as I

25   remember his testimony, and like I said, I learned things from the

1    videos, it is a good way to learn more about Paul, and it actually

2    illustrated his dependence on tactile cues to process.

3    Q.   I mentioned malingering earlier right before lunch, and if you

4    will, what is the current literature in your field about whether it

5    is appropriate to administer any kind of standardized malingering

6    test to someone who might have mental retardation?

7    A.   And we're talking about the field of mental retardation --

8    Q.   Correct.

9    A.   -- which is the field that I maintain having a little expertise

10   in.  And currently within the field, it is the position that the

11   current tests for malingering have not been normed on this

12   population.  You can find some studies that have included people

13   with mental retardation, but there's nothing definitive out there

14   that makes experts believe they can base their whole opinion on

15   that malingering test.

16          Now, what is recommended by the experts is that you look

17   for internal consistency, and Dr. Cunningham addressed this, it's

18   in the article that he mentioned, in the Cunningham/MacVaugh

19   article.

20          The other one, and we will be giving the judge a copy of

21   this, is the *Applied Neuropsychology* this year, Volume 16, Issue 2,

22   2009, has a series of articles that they've published by the people

23   I consider current experts in the field of mental retardation and

24   Atkins hearings, and it was directed, the whole series is at,

25   what's our current opinion, best opinion, and we will be giving

1    copies of this and they are published.

2            And Karen Salekin, who is at the University of Alabama,

3    did the article on "Malingering Intellectual Disability, It's More

4    Than Just Effort," and she kind of summarized what everybody's

5    tried, what's out there, what her best recommendations are.  And so

6    I base it also on that.

7            And I think what everybody is saying is, for now, what

8    you really need to do is to look at similarities across time and

9    look for internal consistency.

10           So we talked about that amongst the WAIS subtests, we

11   talked about that amongst the adaptive tests, we can talk about the

12   consistency we got across interviewers, the consistency we got when

13   we asked him to do something.  And so that's -- at this point in

14   time is your best measure of malingering is to look for internal

15   consistency across the measures --

16   Q.  And did you find --

17   A.  -- in that population.

18   Q.  I'm sorry.  Did you find that sort of consistency in Paul's

19   case once you get there?

20   A.  I think we have.  I think I did, and I think that's what we

21   were talking about this morning, across the different measures and

22   the different things that I did and looked at.

23   Q.  Now, Dr. Swanson, you said early in your testimony that you had

24   reviewed all material, including material supplied by the

25   government; is that correct?

1    A.   That's correct.

2    Q.   And I am going to ask you about some factors that seem to

3    underlie some of this material on both sides, and I am going to ask

4    you with regard to each factor whether that factor would counter

5    the notion that Mr. Hardy suffers from significant impairment in

6    adaptive functioning.

7    A.   Okay.

8    Q.   Number one, the fact that he came from a deprived environment,

9    a poor home and inadequate schools.

10   A.   Would that counter or --

11   Q.   Does that in any way undermine your evaluation of him being

12   mentally retarded?

13   A.   No, it does not.

14   Q.   What are those things, in effect?

15   A.   We talked about those already.  Those are some at-risk things

16   that you need to be on the lookout for, that you would hopefully

17   intervene on, but they don't necessarily cause mental retardation.

18   Q.   Street-level drug dealing.

19   A.   No, that didn't undermine my decision or change it.

20   Q.   Maintaining multiple relationships with women.

21   A.   No, that didn't undermine my decision.

22   Q.   Is a person with mild mental retardation capable of lying in

23   attempting to conceal relationships?

24   A.   I think so.

25   Q.   As a matter of fact, was Paul very successful in concealing all

```
 1   of these women from each other?
 2   A.  They all -- at least the ones I talked to all maintain they
 3   pretty much figured out what he did with each one of them.
 4   Q.  Purchase and ownership of multiple weapons.
 5   A.  No, I don't think that rules it out.
 6   Q.  Successful siblings who came from the same environment.
 7   A.  No.
 8   Q.  And I think you used the Abe Lincoln analogy for that one, it's
 9   a matter of --
10   A.  And, of course, the John Kennedy, Ted Kennedy, all the
11   Kennedys, and them having a sister with mental retardation.
12   Q.  The ability to fill out commissary requests, ask for medical
13   treatment or bounce a basketball around in the prison.
14   A.  No.  That wouldn't change my decision.
15   Q.  The apparent ability to articulate his language.
16   A.  No.  I think Dr. Cunningham addressed that fairly well,
17   expressive language by adulthood, it's hard to distinguish the
18   difference unless you really get down and go for the abstract.
19   Q.  And the ability to read or sound out words.
20   A.  No.  That's fairly typical in someone with mild mental
21   retardation.
22   Q.  Now, in the materials you received from the government, there
23   was a section, I think, said FBI records.  Is that correct?
24   A.  That's correct.
25   Q.  And within those records were some references to some other
```

1    offenses, and there seems to be some suggestion, although there's

2    very little evidence, that he may have been implicated in some of

3    those other offenses; is that correct?

4    A.  That's correct.

5    Q.  And was there anything in that material that would undermine or

6    change your opinion that Paul Hardy has mental retardation?

7    A.  No.

8    Q.  To the extent that there were facts in there or alleged facts

9    about those other offenses, was there anything in the descriptions

10   of those other offenses, to the extent there was a description,

11   that would suggest that the offenses were in any way complex?

12   A.  No.  I think we discussed that earlier, and I know

13   Dr. Cunningham discussed that about the level of complexity would

14   have made a change, but these seem to be fairly simple to carry out

15   kinds of things.

16   Q.  And did you also listen to the tapes surrounding the murder of

17   Ms. Groves, that is, C1 through C27 and X1 through X16, and read

18   the transcripts that went along with those tapes?

19   A.  Yes, I did.

20   Q.  And was there anything on those tapes that would cause you to

21   question your diagnosis of mental retardation in Mr. Hardy?

22   A.  No.

23   Q.  Was there anything in those tapes to -- that tended to give

24   some corroboration to the fact that Mr. Hardy has mental

25   retardation?

1    A.  Yes.

2    Q.  And what would that be?

3    A.  There is a fairly long exchange, as I remember, early on, where

4    Len Davis is explaining to Mr. Hardy how to talk on the phone and

5    not to use names and not give identifying information, and

6    Mr. Hardy kind of denies having done this; and so they go back and

7    forth and he's educating him, you know, you've got to talk, you've

8    got to talk this way.  And he seems to catch on.  There's some

9    subsequent tapes where he doesn't seem to catch on real quick, but

10   I think he gets better at it.

11        There's another long section where he is explaining to

12   him, as I understand the tapes, the phone that Mr. Hardy is using

13   belongs to Mr. Davis, and Mr. Davis gave it to him to use for these

14   phone calls.  And, obviously, Mr. Hardy has not mastered the use of

15   it, he is leaving it on, the battery's going down, and there's the

16   phone call where he is explaining to him to find the button, do you

17   know what it means, do you know how to push it, these kinds of

18   things, which is consistent with it takes Paul a while to catch on

19   to these kinds of things.  So that's two things that hop to mind on

20   the tapes.

21   Q.  And I know you weren't at the 1996 trial, but you know

22   generally the facts of the murder, that is, that after a series of

23   phone calls between Mr. Davis and Mr. Hardy over a few hours,

24   wherein Mr. Davis requests that Mr. Hardy take care of Ms. Groves.

25   He then goes to the scene and he shoots Ms. Groves, is that

1    basically what you understand?

2    A.  I understand that, yes.

3    Q.  Is there anything about that course of conduct that a person

4    with mild mental retardation could not do?

5    A.  We're talking about getting the directions of where to go, how

6    she looks, what to do, yes.

7    Q.  All of that.

8    A.  I would say that's -- there's nothing about that that I would

9    think a person with mild mental retardation couldn't do.

10   Q.  And did you further understand that there were people with him

11   even on this occasion?

12   A.  It was my understanding there were two people with him and

13   somewhere maybe even a change in cars or something so these two

14   people could add-on or something like that, if I am recalling the

15   tapes correctly.

16   Q.  I think you may be wrong about the cars, but you're right about

17   the people.

18   A.  The people, okay.

19   Q.  Now, have I explained to you or have you learned from some

20   other source that the government's evidence indicates that on the

21   way back from the scene Mr. Hardy removed the barrel from the gun

22   that he had, threw it in the canal, replaced that barrel with

23   another barrel, and then gave the gun to another man, Damon Causey.

24   Are you familiar with those allegations?

25   A.  Yes, I am.

```
 1    Q.  Is there anything about that course of conduct that is

 2    inconsistent with your diagnosis of mental retardation?  And please

 3    explain your answer for the judge.

 4    A.  I don't think it's inconsistent for a person with mild mental

 5    retardation, and I had some questions about it, too, because where

 6    it showed some planning, I didn't think it showed good planing from

 7    my point of view.

 8    Q.  And why is that?

 9    A.  Well, you know, criminal --

10            MR. McMAHON:  I am going to object to that, why that

11    didn't show good criminal planning.

12            MS. FOURNET:  I think she said good planning.

13            THE COURT:  Yeah, well, let's go with good planning so it

14    will take the objection out of it.

15            THE WITNESS:  Okay, good planning.  I was going on to say

16    I am not a criminal expert, I think that's where he heard the

17    criminal.

18            THE COURT:  Okay.

19            THE WITNESS:  But I think it's curious that he went and

20    got witnesses for the crime, that he throws away the barrel but he

21    keeps the gun, puts a new barrel in and then gives it to a witness

22    to hold because that literally is what traces him.  The best thing

23    to do would have been to throw away the whole gun, I think.  I

24    mean, he got part of it but he didn't get it all right.  So he

25    showed some planning, but in my opinion, I think I could have
```

1    figured out a better way to do it, you know, but I am not a

2    criminal expert.

3              And so all I'm interested in is how much planning did it

4    show, did it show the complex level that needed to be done to be

5    successful, and in my opinion it wasn't there.

6    BY MS. FOURNET:

7    Q.  And we talked very early, much earlier today about the Sears

8    catalog and about the kinds of information you would want to know

9    about a person who says, I can order something out of a Sears

10   catalog.  What more information would you want to know about that

11   gun barrel?

12   A.  About the gun barrel that he replaced or -- I want to know who

13   told him about the gun barrel.

14   Q.  Okay.

15   A.  You know, that's the whole thing we've been talking about is,

16   does he think these things up on his own or did somebody else tell

17   him to do them.  Did Davis tell him, is this something one of his

18   friends told him, is this something he learned a long time ago and

19   he's retained this back for a very long time?  As I remember all

20   these documents, there is proof of when he purchased the gun

21   barrel, I think, because there's documents of a gun barrel being

22   bought, and I remember seeing all of that in there.

23              But in other words, I would like to know a lot more

24   questions about those kinds of things and that would help you have

25   more information about the complexity.

1    Q.  Is there any indications in any of the documents on either side

2    that you saw that would answer that question, that is, would tell

3    you whether this was his idea, whether his brother suggested he do

4    it, whether somebody in the neighborhood suggested he do this --

5    A.  There's no other -- the only information I saw about it was

6    the, you know, information that was listed on, when it was

7    purchased, I think, and then there's a separate table, I think,

8    that they took a lot of this information and made it into a table

9    so it's also mentioned in the table, but those particular questions

10   weren't answered.

11   Q.  Now, I want to talk to you a little bit about the tapes you

12   watched of the Hayes interview, and we're not going to show the

13   tape quite yet, I want to talk to you just about some -- one or two

14   excerpts.

15        And this is Dr. Cunningham's exhibit expressing some of

16   his concerns about the types of interview techniques that Dr. Hayes

17   used in interviewing Paul Hardy.  Do you subscribe to those same

18   criticisms?

19   A.  Yes, I do.  I agree with -- I remember this slide and I agree

20   with that.  I think we've talked about some of these, if not all of

21   them, today.

22   Q.  And I am going to refer to you, and I am not going to play this

23   one, I am going to refer to you -- you to the interview Dr. Hayes

24   did with Theresa Minor, and specifically to page six of that

25   interview, where Ms. Minor is discussing Paul getting flustered and

1    her having been with children ages two, three and four years old.

2    A.  Okay.  I think I've got that open.  This is on page six of 30,

3    that transcript?

4    Q.  Yes.  I need to find mine so I can look at it, too.

5         Look at the statement by Ms. Minor beginning "but, no,

6    the little games and whatnot."  Read that entire comment by

7    Ms. Minor.

8    A.  Ms. Minor is saying, "but, no, the little games and whatnot, I

9    know this with Paul, he would get flustered.  And I guess he didn't

10   want to open up and say, well, look, Theresa or Toni, I don't know

11   how to do this.  And we know these little games because I used to

12   be with children two to three or three to four years, and these

13   little games I knew he should have known but --"

14   Q.  And then what does Dr. Hayes do there?

15   A.  She says "like checkers."

16   Q.  Well, actually she -- it appears because there is a dash there,

17   does it not appear that she interrupts Ms. Minor?

18   A.  Well, as you remember, I was there.

19   Q.  I was going to ask you that.

20   A.  I was there in the other room.  Ms. Minor has an oxygen

21   problem, so to say that many words kind of leaves her almost

22   gasping for breath if she's particularly talking kind of fast, and

23   so I think she was kind of gasping for air at that point before she

24   went on.  And Dr. Hayes said "like checkers."

25        Do you want me to go on?

1    Q.  Knowing what you know and knew even before this hearing about

2    Ms. Minor and the games, why is this interjection of checkers in

3    the middle of this narrative by Ms. Minor not a good thing?

4    A.  Well, I knew the answer having done the interview already and

5    she was, in my opinion, offering a game that's above what a two,

6    three or four year old could do.  When we talked about the games,

7    we were talking about the basic preschool games of memory matching

8    cards, matching colors, matching shapes.  The things that you

9    really do do with children who are two, three, and four.

10           So, as I mentioned earlier, it's a good idea not to

11   introduce that word like hygiene that points somebody in a certain

12   direction.  You know, a lot of times it's just a good idea to

13   restate the question, if one is needed at that point, and say,

14   you're talking about games for two, three and four year olds.

15   Because you want her to tell you what the games are, you don't want

16   to point her mind in the wrong direction.

17   Q.  Now, we have a tape that we're going to play for you and that

18   is -- has to do with Mr. Hardy's discussion of a fish fry or his

19   purported ability to fry fish.  I believe that's on page 162, am I

20   correct about that?  It starts on 161, it should start right at the

21   very top of page 161 for the benefit of the court and opposing

22   counsel and Dr. Swanson.  And if you could please play that for us.

23           (WHEREUPON, A VIDEO WAS PLAYED.)

24   BY MS. FOURNET:

25   Q.  Dr. Swanson, does this passage tell you that Paul Hardy knows

1  how to fry fish?

2  A.  It doesn't tell me that he knows how to fry fish.

3  Q.  What does it tell you he knows how to do?

4  A.  Well, it tells me he remembers watching his mother do some

5  things.  I am not even sure that he remembers all of them because I

6  think he's interrupted too often.  If we had let him go more, you

7  know, by interrupting or supplying a question, sometimes he gives

8  her more information.  For example, he's talking about putting the

9  stuff on the fish and he's already flipping it over, I guess, you

10  know, and it's like, well, what kind of batter and what are you

11  doing, so this is reminding him to go back, you know, to come up

12  with the answers and things like that.  So we don't get quite as

13  much.

14       But petty much what he is doing here is he's just

15  describing his memory of something he remembered his mother to do,

16  and he leaves out some really important steps that I try to teach

17  people, you know, we would like to get the grease hot before we

18  throw the fish in because, otherwise, it's not going to be too

19  nice.  And there's a lot of different things here that are left out

20  in the preparation, and I just -- I don't feel like he knows how to

21  fry fish, but I think he is trying to remember how his mother fried

22  fish in that passage.

23  Q.  Is he even giving a particularly good description, for

24  instance, cornmeal or whatever it was, water or something?

25  A.  Yeah.

1   Q.  Does he appear to be comfortable with his description such as

2   it is?

3   A.  That's right.  And then even then he offers the water or

4   something when she asked him, well, what do you do to make it

5   stick, he didn't remember that on his own.

6   Q.  And was "what do you do to make it stick" a question that would

7   be consistent with a semi-structured interview-type exchange?

8   A.  No.  I mean, I would have given him more time just to talk on

9   his own and go through the process and then come back with the

10  queries because then you would know what exactly he remembers, and

11  then the rest of it might be good information just to query, but I

12  would have waited a little while before I threw the queries in.

13  Q.  Well, he says at the beginning he knows how to fry fish, what's

14  that about?

15  A.  Well, that's Paul masking.  Paul says he knows how to do a lot

16  of things.  When you interview Paul, it gets kind of tedious,

17  because he always says he does and you need to challenge him and

18  you need to go through the process, and somewhere down the line he

19  lets you know what he knows and he doesn't know.

20  Q.  Is he able even to maintain the masking because does he not

21  later in that same exchange basically say he couldn't cook anything

22  except pork and beans in the can and SpaghettiO's, which is what

23  everybody else says he can cook?

24  A.  That is consistent with what I think everybody else -- what I

25  remember, too, when I talk to people is, he's right about the

1  cereal, he loves cereal, and that was his favorite thing to go fix

2  himself was cereal.

3  Q.  And at some point she, Dr. Hayes gets him to say -- he tells

4  her flat out, does he not, at line 13 on page 162, "Why didn't you

5  cook more?  I didn't know how."?

6  A.  Yes, that's right.

7  Q.  Then she gets him to agree, well, you didn't know how to cook.

8  Was that a good way to approach that area, and is that meaningful

9  at all in terms of an evaluation for mental retardation?

10  A.  I think I would have worded the question, you know, well, you

11  would have liked to learn how to cook.  What would I need to do, if

12  that had been me back there, what could I have done to help you

13  learn how to cook.  And then we'd start talking and I'd try to get

14  him to identify what's necessary to do and where were the problems.

15        My next step would go there is, well, what are some

16  things we can put in place to do this because maybe it's the

17  process of not remembering to turn something on.  I can tell you

18  now he can't read a dial because that's one of the things I probed

19  with him, so I definitely would start --

20  Q.  Wouldn't you think he would have to know how to read a dial on

21  a stove to fry fish?

22  A.  Well, I would think because he couldn't read that for me in the

23  probes I did, but anyway, I'm really just trying to go through the

24  process of how we'd teach somebody how to cook.  So we would kind

25  of go through some of these functional assessments, some of those

1    things that I did with him, and we would start working out a

2    strategy of, well, where do you need the supports and what can you

3    do on your own.

4         When I teach people to do things like this, I want to

5    fade the support system as much as possible because I haven't done

6    very much if I have to be there all the time.  So then we might be

7    working on some kind of cue sheet that I can put up that reminds

8    him to do step three and four and five on his own or whatever.

9         But anyway, that's how I would have approached the

10   cooking thing is, well, what do you know how to do and what do I

11   need to help you to learn how to do it.

12   Q.  And in your own words, and even to some extent in this

13   interview with Dr. Hayes, did you see some recurring themes about

14   deficits; for instance, did you see a recurring theme about his

15   inability to cook, except for simple things like a can of pork and

16   beans, as we just observed?

17   A.  That's correct.  And, I mean, he says several times, well, he

18   is not going to go hungry because when there weren't people to cook

19   for him he went to a restaurant, he went to fast food.  You know,

20   if his kids needed something, he could run out to fast food and

21   bring some fast food home and they would eat.  So as far as he was

22   concerned, not learning to cook was not a problem for him.

23   Q.  And is that also consistent with the limitations of his cooking

24   skills as described by other witnesses, including Javetta Franklin

25   who testified yesterday?

1    A.  That's correct.

2    Q.  Is there a recurring theme that he could not find his way

3    around in unfamiliar areas?

4    A.  There's definitely a recurring theme.  Now, landmarks, with

5    landmarks and when he's done it routinely it gets better, but

6    there's a problem there.

7    Q.  Is there a recurring theme that he was gullible and often used

8    by people?

9    A.  That's frequently mentioned and there are examples given, but I

10   think we've talked about those this week.

11   Q.  Is there a recurring theme that he could not play complicated

12   games that required scoring, although he could play simpler games?

13   A.  He liked to play simpler games, yes.

14   Q.  Is there a recurring theme of masking behavior by Paul Hardy?

15   A.  There is a recurrent theme.  You see it on the videos, you see

16   it reported, I saw it in my own observations.

17   Q.  Is there a recurring theme that he could not put together

18   things like stereo systems or furniture?

19   A.  He reports that in the videos.  All the witnesses I think

20   addressed it, except maybe Ms. Minor, you know, that's just a

21   recurrent theme with him.

22   Q.  Is it a recurring theme that he learned to drive late, and for

23   the most part, did not drive well?

24   A.  I think that's -- he was getting better with age but it took --

25   he was definitely going at a very slow progress with that one.

1  Q.  Is there a recurring theme that he could read but not really

2  comprehend what he was reading?

3  A.  That's correct.

4  Q.  Is there a recurring theme that he did poorly in school and

5  dropped out?

6  A.  Yes.

7  Q.  Is there a recurring theme that he had jobs that were menial in

8  nature, such as Ernst Cafe, and also such as selling drugs on the

9  street?

10  A.  That's correct.

11  Q.  And did you see some of this, even in the interview by

12  Dr. Hayes?

13  A.  Yes, I did.

14  Q.  So despite the multiple problems with the Hayes interview, did

15  her interviews actually uncover information that was consistent

16  with your diagnosis of mental retardation or at least corroborate

17  that information?

18  A.  Yes, they did.  Like I said, I learned a lot from watching her

19  videos.

20  Q.  Dr. Hayes at page 175 states that neither you nor

21  Dr. Cunningham had comprehensive information about Mr. Hardy's

22  adaptive strengths and weaknesses during the developmental period.

23  Do you agree with that or do you disagree?

24  A.  That's on page --

25           THE COURT:  You're talking about the report?

1          MS. FOURNET:  The report, yes, I'm sorry, 175 of the

2   report.

3          THE WITNESS:  I'd like to look at that one.

4          MS. FOURNET:  Sure.  And that's in my notes, so I hope I

5   got the page right.

6          THE WITNESS:  Yes, it is page 175.  Okay.  I've read that

7   passage.

8   BY MS. FOURNET:

9   Q.  Do you agree that you did not have comprehensive information

10  about Mr. Hardy's adaptive strengths and weaknesses during the

11  developmental period?

12  A.  I thought I did have comprehensive information during that

13  period, the developmental period.

14  Q.  She also says that you did not conduct a standardized

15  assessment of Mr. Hardy's adaptive behavior at the time of the

16  commission of the crime.  I am not sure I even understand this

17  statement, but maybe you can explain it.  Despite the norms for the

18  Vineland II extending until 90 years of age.

19  A.  Well, the Vineland II you can give it to a person who is -- you

20  can get information on a person 90, 89, 79, so I guess what she's

21  saying is, it's at the time of the crime when he's 29 or -- I am

22  not sure what age I could have given it.  Well, I would point out

23  she didn't do it either.  There's two.

24          And secondly, once you do it with one at one age it's

25  going to be very confusing to isolate it at another.

1          I only found one person I could do it on and that was

2    Toni.  So to do Toni at one age and then turn around and do it at

3    another age is not very helpful, and that's really in my opinion

4    what's wrong with the Javetta Vineland, it's done on two different

5    age groups, so you have to stay with one age.  And I never could

6    find somebody else that could give me a complete Vineland at a

7    later age.

8          I was supplied all kinds of information, though, about

9    what he could do later in life, and even when I was talking to

10   Toni, she talked about things he could do at 22, 23, 24 and things

11   that he improved in.  So I do think I addressed behavior after the

12   age of 18 and as close to the age of 18 or before the age of 18 as

13   possible.

14   Q.  How likely is it that a person's adaptive functioning would

15   increase so dramatically over that period of time that he would no

16   longer be two standard deviations below the mean?

17   A.  With intervention, an intensive intervention, it's possible

18   because even the DSM recognizes that eventually someone could test

19   higher.  Without intervention in place, it's highly unlikely.

20   Q.  And did Paul Hardy have intervention?

21   A.  No, he did not.

22   Q.  In fact, as Paul Hardy currently -- subsequent to these

23   murders, is he not still -- functions below two standard deviations

24   below the mean in more than the required number of areas?

25   A.  In my opinion, he does.

1  Q.  Now, is information, the comprehensiveness of information a

2  function of how high a stack of documents you gather up or the

3  quality of those documents?

4  A.  To me, I guess for me I want a lot of information, but I want a

5  lot of consistent information and I want to go broad across areas,

6  so I am looking for more quality information, I think.  You know, I

7  certainly had comprehensive information because, believe me, my

8  front hallway stayed stacked with forms for a long time before I

9  could get through all of them.  So I think I had comprehensive

10  information when I made my -- on my decision.  But, yes, I would

11  much rather have consistent, high-quality information.

12  Q.  Is there anything that we've discussed today or anything in any

13  of the material you've reviewed, including the material supplied by

14  the government, that would cause you to question your assessment

15  that Paul Hardy qualifies and meets the criteria for a diagnosis of

16  mental retardation under both the DSM and the AAMR definitions?

17  A.  I am not aware of anything that changes my mind.

18          MS. FOURNET:  That's all, and I tender, your Honor.

19                    CROSS-EXAMINATION

20  BY MR. McMAHON:

21  Q.  Dr. Swanson, when did you get involved with this case, when did

22  you first get involved with this case?

23  A.  I'm thinking it was March of 2008.  Maybe late February is what

24  I am thinking, would be when I got involved.

25  Q.  By that, I mean you were first contacted about it.

1    A.  That's correct.

2    Q.  So you've had -- and you submitted your report on January 17th

3    of this year, correct?

4    A.  I think that's when I finalized it.  I don't know when the

5    court got it, but that's when I sent it this way.

6    Q.  So you had ten months to do the report?

7    A.  That's correct.

8    Q.  And --

9    A.  Well, let me qualify something about that.  There was a change

10   of lawyers in the middle, so I did a lot of work at first, I want

11   to say through April because that's the last time I billed.  And

12   then Ms. Leoeuf stood down from the case so, you know, I didn't

13   hear anything for a while, I knew there was other lawyers coming on

14   and they were going to reformulate the team, and of course, I took

15   one of my summer vacations.  So I'm thinking maybe late August is

16   when I met with the new lawyer and Mr. -- the whole team again and

17   probably started working again.  So I probably didn't do any work

18   in February, March -- I mean, excuse me, April, May, June or July

19   and early August.

20   Q.  But you began to work on it ten months before it was submitted?

21   A.  I did the initial work, yes.

22   Q.  And you knew the report was going to the court, correct?

23   A.  Yes.

24   Q.  And the issue in the report was whether or not Paul Hardy met

25   the requisite criteria for mental retardation, correct?

```
 1   A.   That's what I understood, yes.

 2   Q.   And you wanted to be as complete -- this report submitted to

 3   the court was supposed to be as complete as possible, right?

 4   A.   I would have hoped my report did give the court all of the

 5   information that it needs to make a decision, or as much as I was

 6   able to give them.

 7   Q.   And it was imperative for you to gather as much information as

 8   possible in order to make an -- an opinion upon which the court

 9   could rely, correct?

10   A.   It was imperative that I get my hands on as much information as

11   I could, yes.

12   Q.   And, in fact, you testified to that same effect in State of

13   Louisiana v. Michael Anderson a few weeks ago, correct?

14   A.   And that's a similar case where I had to wait a long time for

15   some records, yes.

16   Q.   That wasn't my question.

17   A.   Well, okay, I asked for records and I eventually got them, yes.

18   In this case.

19   Q.   And in this case, it's really not the typical case, in the

20   sense that Paul Hardy's been incarcerated since December of 1974;

21   you're aware of that, right?

22            THE COURT:  '94.

23            MR. McMAHON:  '94.

24   BY MR. McMAHON:

25   Q.   '94.
```

1    A.  Yes, that's listed on one of the tables that Dr. Hayes, the

2    date he was arrested, yes.

3    Q.  So I guess in the more, for lack of a better term, the more

4    normal case, you're going to have a defendant who hasn't been

5    incarcerated that long, you pretty much have a crime and then the

6    prosecution commences, you've never done a -- let me put it this

7    way:  You've never done an Atkins case where the defendant's been

8    locked down for 15 years, right?

9    A.  The longest I've done he's been locked down since 1982 and I

10   did it in May.

11   Q.  '82?

12   A.  '82.

13   Q.  You've done ten other Atkins cases, correct?

14   A.  That's correct.

15   Q.  None of which you were on the government's side?

16   A.  I've never been asked to be on the government's side in any

17   Atkins cases.

18   Q.  Well, that really wasn't my question, okay, but you were never

19   on --

20   A.  I've never -- the ten cases I did have all been for the

21   defense.

22   Q.  In all of those cases you found the defendant to be mentally

23   retarded, correct?

24   A.  Not in one.

25   Q.  Which one was that?

1   A.  Willie Tart.

2   Q.  Out of what district?

3   A.  Post-Atkins, he's in Ouachita Parishes where we go for the

4   hearings.  I might have the district number.

5   Q.  Up in Monroe?

6   A.  Yeah, it's in Monroe, but I think it might have happened in

7   Bastrop, but we always meet in Monroe because that was the change

8   of venue.  And I somewhere have a list of that and I probably have

9   the -- let's see if I have that on here.  Willie Tart v. The State

10  of Louisiana, 4th Judicial District, Ouachita Parish.

11  Q.  That wasn't the case where the defendant was incarcerated since

12  '82?

13  A.  No.  I want to say Willie Tart's somewhere around '89, maybe,

14  something like that.  Off the top of my head.

15  Q.  Now, according to your report, you interviewed Toni Van Buren,

16  right?

17  A.  That's correct.

18  Q.  And I'm actually -- I'm actually referring to the report that

19  the court got in January before Dr. Hayes began her work, okay?

20  A.  That's correct.

21  Q.  So you mention in there Tony Minor, right?

22  A.  That's correct.

23  Q.  Theresa Minor?

24  A.  Correct.

25  Q.  Greg Williams?

1   A.  Correct.

2   Q.  And Vance Ceaser?

3   A.  Correct.

4   Q.  That's it.

5   A.  That's it.

6   Q.  Correct?

7   A.  That's correct.

8   Q.  Now, I am going to ask you this:  Because this was a

9   retrospective analysis and because it's imperative to, as you

10  testified actually earlier, that anybody, anybody was good, that's

11  a quote, who knew the defendant, and in light of how you testified

12  over in Michael Anderson, why was there no mention whatsoever made,

13  or actually you didn't mention at all Lionel Hardy, correct?

14  A.  Well, I didn't interview --

15  Q.  I know you have an excuse, but I just want you to please answer

16  my question.

17  A.  Okay.

18  Q.  And these are again in relation to the report submitted to the

19  court in January.  There was no mention of Lionel Hardy, correct?

20  A.  There was no mention of Lionel Hardy I don't think in that

21  report, other than to maybe identify him as a sibling, I think.

22  Without looking through the whole report.

23  Q.  No substantive mention.

24  A.  I don't remember anything.

25  Q.  No mention of Terry Hardy, Sr.?

1    A.  No, I don't remember that.

2    Q.  No mention of Linda Hardy?

3    A.  No.

4    Q.  No mention of Terry Duncan?

5    A.  No.

6    Q.  No mention of Javetta Cooper Franklin?

7    A.  No.

8    Q.  You did not consult social security records, did you?

9    A.  I don't remember seeing any social security records.

10   Q.  They're not cited in your report, either?

11   A.  I don't remember seeing them, no.

12   Q.  While on that, you did allege in your report that the only job,

13   the only employment that Paul Hardy had was a brief period of time

14   with Meals on Wheels, correct?

15   A.  That's -- at the time I wrote that report, that was the only

16   job I knew that he had.

17   Q.  But had you consulted with social security, social security

18   records, you would have learned, and, in fact, you would have

19   learned from Hardy himself that he worked for a time at Ernst Cafe

20   earning approximately $2,700, if not more, and also for a brief

21   period of time for Aramark, who at one point ran the concession at

22   the Superdome.  You weren't aware of those employments, were you?

23   A.  I was not aware of those employments.

24   Q.  This person Girod that I think you did, I think Toni Van Buren

25   mentioned, did you make any efforts to locate and interview Girod,

1    this Girod person?

2    A.  I specifically asked that they make an effort because his name

3    was mentioned by Mr. Hardy and it was mentioned by Ms. Van Buren,

4    and the investigators assured me they weren't able to locate him

5    anywhere.

6    Q.  Since Mr. Hardy's been locked down for so long, didn't you

7    think it was important to at least interview prison personnel?

8    A.  My understanding from experts in the field that we don't -- I

9    don't generally do that.  But if somebody had been identified to me

10   by Paul or someone else that this is a really good person, he knows

11   him well and there's something distinctive about him.

12          I can recall one time I did interview a guard at Angola

13   on Corey Williams --

14   Q.  I am talking about Paul Hardy.

15   A.  I had no guard identified to me by Paul or anybody else that

16   had a significant impact on this.

17   Q.  But again, because we're -- he's been incarcerated for so long,

18   so you're saying and my question is, so you made no effort to

19   interview the personnel at the St. Bernard Parish Prison, did you?

20   A.  I made no effort to interview the prisoners at St. Bernard --

21   I mean, the prison guard s at St. Bernard.

22   Q.  But since, I'm quoting you, "anybody is good," I mean,

23   not being maybe -- don't you think it would have at least been

24   worth your while to talk to them because they see Hardy, they've

25   seen him on a daily basis for the last three years, but you ignored

1  that source, didn't you?

2  A.  I go by what's considered best practice in the field and what

3  is recommended in Atkins hearings, and prison guards are not

4  recommended as a good interview source.  But if somebody would

5  point out somebody that they thought was good, I would have asked

6  to talk to that person.

7  Q.  Give me a citation that you're not supposed -- that you should

8  not interview prison personnel.

9  A.  Give me a minute.

10  Q.  Go right ahead.

11  A.  Let me find it.  I am now quoting from page 386 of Olley and

12  Cox, "Assessment of adaptive behavior in adult forensic cases:  The

13  use of the Adaptive Behavior Assessment System-II."  It's the

14  ABAS-II clinical use and interpretation.  And I think we've talked

15  about this one all the time.

16        It ends, it's a paragraph about this, last word on the

17  paragraph.  I am quoting from page 386:  "Thus, reports from

18  corrections officers or other observations of current functioning

19  in prison are not valid indicators of levels of adaptive behavior."

20  Q.  Well, actually, there's literature that suggests the contrary,

21  that at least they are useful as a source.

22        MS. FOURNET:  Judge, I object to the testifying by

23  Mr. McMahon.  I'll get into that --

24        THE COURT:  Overruled.  Why don't you ask her if she is

25  familiar with that literature, that might be the way to get to it.

1   BY MR. McMAHON:

2   Q.  Are you familiar with that?

3   A.  I am not familiar with that literature.

4         MR. McMAHON:  Judge, bear with me.  I think later in the

5   examination we can produce articles that do endorse, at least

6   consulting them as a source.

7         THE WITNESS:  Okay.

8   BY MR. McMAHON:

9   Q.  Let me ask my question.  You completely rejected even

10  discussing Mr. Hardy with any prison personnel; yes or no?

11  A.  I did not give that as a suggestion to the investigators of

12  somebody I wanted to talk to, no, I did not.

13  Q.  Why didn't you interview any of his former teachers, or did you

14  try?

15  A.  That was somebody I really wanted to talk to, and the

16  investigators assured me they tried very hard to find teachers.  It

17  was my understanding a lot of teachers have moved away from New

18  Orleans, it's hard to find them.

19        There's a problem among school districts now because you

20  have the original school system, you have the new charter school

21  system, there's been a loss of records, it's a lot harder to trace

22  people.

23        I specifically wanted to talk to teachers, and the

24  investigators on my team had a hard -- were not able to find any --

25  I didn't notice that in any of your records that y'all had located

1    any.

2    Q.  My question is:  You did not speak to any of his teachers; yes

3    or no?

4    A.  I was unable to find any teachers to speak to.

5    Q.  On page four of your report, you do mention that you should

6    conduct an examination of adaptive behavior in two or more

7    environments.  Now, really, and again, don't you think in this case

8    with Mr. Hardy being locked down for 15 years it would have been

9    beneficial to talk to prison personnel because that was another

10    environment in which he lived?

11            MS. FOURNET:  Your Honor, asked and answered several

12    times, I object.

13            THE COURT:  Well, I'll let it go one more time.  Do you

14    want to answer it one more time?

15            THE WITNESS:  Would you restate the question so I can

16    refocus there, please.

17    BY MR. McMAHON:

18    Q.  Referring to your report at page four.  You do note -- and

19    again, bearing in mind the circumstances of this case with

20    Mr. Hardy being locked down for the last 15 years, almost 15 years,

21    you state that you should -- one should conduct an examination of

22    adaptive behavior in two or more environments.  That would have

23    given you another environment, correct?

24    A.  Uh-huh.

25            MR. McMAHON:  I'll move on, Judge.

1          THE WITNESS:  Wait -- okay.

2          MR. McMAHON:  I've finished my question.

3          THE WITNESS:  Okay.

4          MR. McMAHON:  You're not on direct anymore, you're on --

5          MS. FOURNET:  Judge, I don't know if she's finished her

6     answer.

7          THE WITNESS:  I don't know that I got a question, I think

8     is my question.  Did I ever get questioned?

9          THE COURT:  Move on.

10    BY MR. McMAHON:

11    Q.  You never listened to any recorded phone calls from either the

12    Orleans Parish Prison or St. Bernard Parish jail in which Hardy was

13    a participant, did you?

14    A.  I heard that one there -- if I didn't hear it, I read it, so I

15    am not sure because, believe me, I had disks like this to look at

16    (INDICATING).

17    Q.  No, I know, I meant in preparation of your report to the judge.

18    A.  Oh, not before -- I had none of that before my report.  No,

19    I -- there was a lot of this stuff that was supplied to me by

20    government that I didn't have prior to the report.

21    Q.  Well, you could have -- I mean, are you saying that you

22    couldn't have gone -- you could have gone to the Orleans Parish

23    Prison or the St. Bernard Parish Prison and obtained that

24    information.  But you never did, did you?

25          My question is this:  And I don't want any -- I would

1  just like an answer, please.  You did not listen to any recorded

2  telephone calls of Paul Hardy from either the Orleans Parish Prison

3  or the St. Bernard Parish Prison, did you?

4  A.  I listened to some, but I did not listen to them prior to

5  writing my report.  I either listened to them or I read some

6  transcripts or something but not prior to writing my report, no.

7            MR. McMAHON:  Judge, bear with me one second.

8  BY MR. McMAHON:

9  Q.  Did you attempt to interview any of the personnel from the

10  Bureau of Prisons regarding Mr. Hardy; yes or no?

11  A.  I did not.

12  Q.  Did you review any -- or did you contact any law enforcement

13  person such as an FBI agent or a police official to discuss Hardy's

14  drug-dealing activities?

15  A.  No, I did not.

16  Q.  Did you listen any, and again, prior to the preparation or

17  prior to the submission of your report to the court in January, did

18  you listen to any of the wire tap conversations intercepted in

19  connection with this case?

20  A.  And I know I'm kind of dense.  Are we talking about the phone

21  calls between Lenny Davis and Mr. Hardy prior to the crime?

22  Q.  Right.

23  A.  I listened to those, yes.

24  Q.  Did you read the transcript of the testimonies of Albertine

25  Arceneaux?

```
 1    A.  I read a lot of transcripts.

 2    Q.  Do you remember that one?

 3    A.  That name doesn't ring a bell.  Can I see the transcript?

 4    Q.  Well, this would be the transcript of the mitigation phase in

 5    the trial in April and May of 1996.

 6    A.  Is that the penalty phase?

 7    Q.  Right.

 8    A.  Would that say penalty phase testimony on the top?

 9    Q.  Back in 1996, did you read that?

10          MS. FOURNET:  Your Honor, she's asked to see the

11    transcript.

12          THE COURT:  Well, no, I think -- did you read the penalty

13    phase transcripts?

14          THE WITNESS:  There was a large kind of document with

15    penalty phase on it and it was a transcript, and I remember looking

16    at that.

17    BY MR. McMAHON:

18    Q.  Okay.  So you would have read, I have --

19    A.  I might have that.

20          MR. McMAHON:  May I approach, your Honor?

21          THE COURT:  Sure.

22    BY MR. McMAHON:

23    Q.  This is the transcript.  Now, does that look familiar?

24    A.  Can I see the -- mine had a big thing, it said penalty phase.

25    Yes, that's what I remember, then, yeah, I looked through that.
```

```
 1   Okay.

 2   Q.  So that means you would have read the penalty phase testimony

 3   of Marie Hardy, right?

 4   A.  I remember reading Marie Hardy's testimony.

 5   Q.  I'll just go right down the page.

 6   A.  Okay.

 7   Q.  Linda Hardy also testified.

 8   A.  I remember that.

 9   Q.  Terry Hardy, Sr.?

10   A.  I feel certain I read that.

11   Q.  Toni Van Buren?

12   A.  Yes.

13   Q.  Albertine Arceneaux?

14   A.  I must have.

15   Q.  Keith Mitchell?

16   A.  Yes.

17   Q.  Javetta Cooper?

18   A.  Yes.

19   Q.  Jacquetta Franklin?

20   A.  Yes.

21   Q.  Your report to the court does not mention Albertine Arceneaux.

22   Did you speak to her?

23   A.  No.

24   Q.  Dorothy Robinson, did you speak to her?

25   A.  No.
```

1    Q.  Did you speak to Keith Mitchell?

2    A.  No.

3    Q.  These are all people who knew Paul Hardy during the

4    developmental period, you are aware of that?

5    A.  I think I'm aware of that.  I'd have to -- I remember

6    Ms. Robinson for sure and Keith Mitchell I would have to look up to

7    remember when he knew him, but I do remember some of those people

8    definitely knowing him during the developmental period, yes.

9    Q.  All these people -- now, let me back up.  It would have been

10   the best practice, would it not, to interview a person who was

11   familiar with Paul Hardy and his adaptive abilities during the

12   developmental period, that is, the time before he was 18 years old,

13   correct?

14   A.  The literature says, what we have available at the time you

15   start out, during the developmental period or as close to the age

16   of 18 as possible.  And the best witness would have been his

17   mother, who is dead.

18   Q.  But brothers and sisters, as well; for example, Terry and

19   Linda, correct?

20   A.  Brothers and sisters would be good:  (a), if they want to talk

21   to you; and (b), if they know something about -- you know, just to

22   talk to them, fine, if they're willing to interview.  But as far as

23   making a standardized assessment, they would have to meet the

24   requirements of the manual.

25   Q.  But they would have known -- they are, and I can give you your

1    testimony in the Anderson case if you want me to, but in the

2    Anderson case you testified that the best possible -- among the

3    best people to interview would be brothers and sisters, right?

4    A.   That's correct.

5    Q.   Did you personally, before the report was submitted to the

6    judge in January of this year, did you speak to Terry Hardy, Sr.?

7    A.   No.

8    Q.   Linda Hardy?

9    A.   No.

10   Q.   Would you concede now hearing the testimony of both, and

11   actually from the transcript of the interview or the video which

12   you've seen of Dr. Hayes's interview with Paul Hardy in the

13   St. Bernard Parish Prison and Toni Van Buren's own testimony, would

14   you concede now that Toni Van Buren did not meet Paul Hardy until

15   he was after 18?

16   A.   I think there's confusion on when she met him.  I think we're

17   looking at either May of '85 or May of '86, and I think that's what

18   I testified to, and which would have put him 17:6 or 18:6.

19   Q.   According to Paul Hardy on page 148 of the transcript, he met

20   Toni Van Buren in 1986.  And according to Toni Van Buren, she met

21   Paul Hardy when he was, she testified to that yesterday, when he

22   was 18.

23   A.   Uh-huh.

24   Q.   So you did not interview -- let me put it to you this way:

25   Toni Van Buren did not know Paul Hardy prior -- during the

1    developmental period, that is, prior -- and I know it's close, but

2    prior to when he was 18 years old, correct?

3    A.   It does not appear she knew him prior to the age of 18.

4    Q.   So when you put in your report that the information provided by

5    Toni Van Buren was to apply to Mr. Hardy at age 17 and a half, that

6    was not correct, right?

7    A.   That was not correct.   I probably should have used 18:6 norms.

8    Q.   Michael Anderson was mildly mentally retarded, wasn't he?

9    A.   Yes, he was -- or he is, he is, I guess I should say.

10   Q.   In fact, you testified on direct that the only information you

11   got about his IQ was from his mother, right?

12   A.   No.   His legal team, when they contacted me, said they strongly

13   suspected mental retardation based on verbal reports of what the

14   mother said and that's when they wanted me to agree to evaluate

15   him.   I didn't talk to his mother until the day after I tested him.

16   Q.   But actually you testified, and perhaps this information came

17   to light to you later, but, in fact, in 2001 he was given --

18   actually, it started in 1997 -- let me back up.

19          So Michael Anderson, he is a mild, he wasn't profound or

20   severe, he is a mild, he was a case of mild mental retardation,

21   right?

22   A.   That's correct.

23   Q.   But he was tested before, right?

24   A.   He was tested before, yes.

25   Q.   And, in fact, just as a means of comparison, in 1997, they

1    attempted to give him the WISC-III and he couldn't even finish it,

2    he didn't even -- they had to stop because he couldn't even finish

3    it, is that --

4    A.  That's correct.

5    Q.  And you testified to that effect a couple of weeks ago?

6    A.  That's correct.

7    Q.  Then in 2001 -- by the way, what is that acronym, just for the

8    record, the WISC-III, what is that acronym?

9    A.  That's the Wechsler Intelligence Scale, Third Edition, which

10   was the previous edition to the one that's out now, which is the

11   WISC-IV.

12   Q.  But the WISC is the Wechsler Intelligence Scale for Children,

13   right?

14   A.  For children, Third Edition.

15   Q.  Right, that's the C.  But then again, in 2001, he was given the

16   WASI, now, that's the Wechsler Adult Intelligence Scale --

17   A.  No, no.

18   Q.  No?

19   A.  No.  I'm interrupting and I apologize for that.  You've asked

20   me not to do that, so go ahead.

21   Q.  Well, what does WASI mean?

22   A.  It means the Wechsler Abbreviated Scale for Intelligence.

23   Q.  Abbreviated, I'm sorry.  And he scored about a 67 on that, so

24   you testified; you wouldn't dispute that, right?

25   A.  I mean, I hope you're giving me the right dates because then

1    there's another WAIS right after that, right?

2    Q.  Well, then, you're familiar with a person named Kristin

3    Williams?

4    A.  Yes.

5    Q.  And she gave him a test as well, right?

6    A.  Well, her subordinate gave him the test and she signed off on

7    the test as I recall, yes.

8    Q.  And then there's in 2003 Dr. Fontanelle?

9    A.  Wait.  The first WASI was given by Dr. Gillespie, as I

10    remember; the second WASI was given by Kristin Williams's

11    subordinate and signed off on Kristin Williams.

12          Gillespie was given here in New Orleans while he was

13    possibly at Bridge City or somewhere, and Kristin Williams tested

14    him at Jetson Correctional when he entered there at some process of

15    this.  So there's a little interval between those two --

16    Q.  And then Fontanelle, there's a Dr. Fontanelle in the mix, too,

17    correct?

18    A.  Dr. Fontanelle, Dr. Fontanelle here in New Orleans tested him

19    the next time, as I remember.  With a full scale.

20    Q.  And after all of these various -- after all of these different

21    tests, you chose to get -- you gave him, you gave him I think the

22    WAIS-IV, didn't you?

23    A.  By the -- the WAIS-IV came out in the fall, and I want to say I

24    tested him in November.  Now, I had finished my --

25    Q.  Well, you didn't quite answer my -- I didn't mean to interrupt,

1    but you didn't quite answer my question.

2    A.  I tested him with the WAIS-IV --

3    Q.  With the WAIS-IV.

4    A.  -- in November, I think.

5    Q.  Now, Mr. Hardy, you could have given Mr. Hardy the WAIS-IV.

6    The WAIS-IV came out in 2008, you could have given him the WAIS-IV,

7    correct?

8    A.  The WAIS-IV came out like in early September and before I give

9    it I had to inservice, so I could have given it to him about the

10   time I gave it to -- my rule is, I don't give a test in a

11   higher-stakes case like this until I've given the test at least ten

12   times, and I have to go through some CEUs to make sure that I can

13   say that I know how to give the test.  It's a brand-new test.

14          You give it a little different than you do the WAIS-III,

15   and I didn't mind giving the test in November.  I don't know that I

16   was ready to give it in October.  The inservice I was supposed to

17   have gone to got canceled by a hurricane, so I don't think I would

18   have given it before November of 2008.

19   Q.  My question was, you could have given him the WAIS-IV, correct?

20   A.  In 2008 or on I could, yes.

21   Q.  And you didn't.

22   A.  I did not.

23   Q.  By giving him the WAIS-IV, by administering the WAIS-IV, all of

24   this talk about practice effect and the Flynn Effect would have

25   been obviated because the WAIS-IV has just been normed, correct?

1   A.  I saw no need to give the WAIS-IV, and then that would have

2   denied Dr. Hayes the right to give the WAIS-IV.

3   Q.  With all due respect you're really not answering my question.

4   A.  Oh, I'm sorry.

5   Q.  The question was, had you administered the WAIS-IV, we wouldn't

6   be talking about the Flynn Effect today because the WAIS-IV has

7   just been normed, it's a new test, correct?

8   A.  Well, if you look at Michael Anderson's, there was a one point

9   Flynn Effect on Michael Anderson's because --

10  Q.  One point or .3?

11  A.  I don't remember, but there was a Flynn Effect on his.  The

12  norms for that -- 2008 is when it's published, it was actually

13  normed prior to that.  I want to say it was one point.  I mean, I

14  would have to look at his report, you've got it in front of you and

15  you can show it to me.

16  Q.  You still didn't answer my question.  We wouldn't be having to

17  worry about the Flynn Effect had you administered the WAIS-IV?

18  A.  I would have still reported the Flynn Effect to the WAIS-IV,

19  yes, I would have.

20  Q.  Let me go back to -- let me talk about the process a little

21  bit.  When you -- the real flag for you here was the full scale IQ

22  score of 73 administered by Dr. Tetlow in 1996, correct?

23  A.  The real flag --

24  Q.  Let me rephrase that.  That was not artful.  If you see a 73, a

25  full scale IQ of 73, that suggests mild mental retardation possibly

1   because it's kind of down on that left side of that bell curve that

2   Cunningham flashed up, correct?

3   A.   What I look for within a confidence interval is a score around

4   70, which would be plus or minus approximately five points.  So if

5   I see a score anywhere between 65 and 75, I want more information.

6   Q.   Right.  But wouldn't that also prompt, Dr. Swanson, that once

7   you see that 73 you're going to want to, as a professional, you're

8   going to want to go into the adaptive area to see if, in fact, this

9   person, especially in the forensic context, is retarded, right?

10  A.   If I feel Criteria 1 is being met, then I am going to move on

11  to Criteria 2, yes.

12  Q.   Right.  And 73 would move you, again, taking into account your

13  Flynn Effect and margin of error, you're going to want to go on to

14  Criteria B, Criteria 2, right?

15  A.   Correct.  After I've looked at the scores and analyzed the

16  scores, yes.

17  Q.   Because they don't give -- you don't give IQ tests to

18  defendants to see if they're going to get into a medical school, I

19  mean, that's the reason you give an IQ test, right, to see if

20  they're possibly retarded?

21  A.   To see if they meet the first criteria, yes.

22  Q.   Right, exactly.  Have you read the federal Death Penalty Act?

23  A.   I don't think so.  I mean, I've read things about Atkins, but I

24  doubt if I'd read the official federal Death Penalty Act.

25  Q.   Just maybe for some light reading tonight, Title 18, Section

```
 1   3596(c) states that "the sentence of death shall not be carried out

 2   on a person who is mentally retarded."  That law predates --

 3              MS. FOURNET:  Judge, I would object to any questioning.

 4   That is clearly outside of Dr. Swanson's area of expertise.

 5              THE COURT:  Let's see where the question is going.  Keep

 6   going with the question.

 7   BY MR. McMAHON:

 8   Q.  Are you aware that law was in effect before and during the

 9   first trial of Mr. Hardy, the original trial of Mr. Hardy back in

10   1996?

11   A.  I am not familiar with that federal regulation.

12              MR. McMAHON:  You can take judicial notice, I'm sure.

13   BY MR. McMAHON:

14   Q.  And Atkins actually applied what was already written into the

15   federal law to the state --

16              MS. FOURNET:  Judge, I would object to the legal

17   dissertation to the witness, who is not a lawyer --

18              THE COURT:  That's all right.  She indicated she wasn't

19   aware of it, that's fine.  Go on to something else.

20   BY MR. McMAHON:

21   Q.  Dr. Swanson, in light of that, Cunningham in 1996 did not even

22   consider whether or not Mr. Hardy was mentally retarded.  You're

23   aware of that?

24              MS. FOURNET:  I object, I would object to asking

25   Dr. Swanson what Dr. Hardy --
```

```
 1              THE COURT:  What Dr. Cunningham.

 2              MS. FOURNET:  What Dr. Cunningham considered in 1996.

 3              THE COURT:  Well, you asked her about how she felt about

 4    Dr. Cunningham's evaluation, so I think it's fair game.  Go ahead.

 5    BY MR. McMAHON:

 6    Q.  He never pursued, he never went down that road to Axis 2 to see

 7    if Mr. Hardy was mentally retarded in 1996, did he?

 8    A.  As I remember his -- what I read previously and his testimony,

 9    I don't think he went that direction, no.

10    Q.  Neither did Dr. Tetlow, did he?

11    A.  No.

12    Q.  Neither did Dr. Bianchini, did he?

13    A.  No.

14    Q.  Neither did any Bureau of Prison person, did he?

15    A.  Not that I'm aware of.

16    Q.  Or did they?

17    A.  I haven't -- I don't think I've seen all of the prison records,

18    but the ones I've seen I don't see where that was looked at.

19    Q.  And in reading the transcripts from the original trial in 1996,

20    nobody -- and the list, I mean, I don't want to read it back out,

21    but Marie Hardy never suggested her son was mentally retarded, did

22    she, from the testimony?

23    A.  I don't remember her ever saying he was mentally retarded.

24    Q.  Terry Hardy never suggested, hey, I think my brother may be

25    mentally retarded, did he?
```

1    A.  I don't remember that language anywhere in his testimony.

2    Q.  Linda Hardy didn't?

3    A.  I don't remember that in her testimony.

4    Q.  Albertine Arceneaux didn't?

5    A.  I don't remember that in that testimony anywhere.

6    Q.  Dorothy Robinson didn't?

7    A.  No, I don't remember that in that testimony.

8    Q.  Toni Van Buren didn't?

9    A.  I don't remember that in that testimony.

10   Q.  Keith Mitchell didn't either, did he?

11   A.  I don't remember that.

12   Q.  In fact, Keith Mitchell, I don't know if you remember this, he

13   described Mr. Hardy as being a real leader of men, a real leader;

14   do you remember that?

15   A.  I think I kind of remember that.  If you want to hand it back,

16   I can kind of go back and find it.  I think I do remember that

17   part.

18   Q.  That's fine.

19           All of these professionals, and, in fact, you re-read

20   that transcript, you look at those reports, there's never even a

21   hint that Mr. Hardy was mentally retarded in 1996.  I guess they

22   all missed it, right?

23   A.  I think they did.

24   Q.  But yet you relied here on IQ tests administered in 1996 as a

25   reason for not administering a new test to Mr. Hardy, right?

1    A.  That's correct.

2    Q.  But yet you did not rely on the judgments of those experts in

3    1996 who didn't see fit or didn't see the need to explore whether

4    or not Paul Hardy was mentally retarded.  Why didn't you rely on

5    that?

6    A.  Rely on their -- can you rephrase the middle part of the

7    question?

8    Q.  The question was, since you relied on those tests taken in

9    1996 --

10    A.  Okay.

11    Q.  -- and Cunningham testified to the same effect as a reason not

12    to give Hardy the WAIS-IV, yet you did not rely on all of those

13    experts' findings back then that, well, they didn't even pursue

14    mental retardation back then?

15    A.  I mean, I relied on the testing they did for Criteria A, they

16    didn't do any testing for Criteria B.  They didn't pursue it, yes.

17    Q.  They all missed it, right?

18    A.  They all missed it, yes.

19    Q.  And I won't get into Cunningham, but -- never mind -- actually,

20    and Cunningham stating that, well, that back in 1996 he's

21    underestimating Hardy's intellectual horsepower by 15 points.

22         Let me ask you this, ma'am.

23         MS. FOURNET:  Judge, again, I would ask that we ask

24    questions and not make statements.

25         MR. McMAHON:  I am going to ask.

1          THE COURT:  He's getting to it.  It's cross-examination,

2    you have more leeway.

3    BY MR. McMAHON:

4    Q.  Do you feel, then, that Cunningham's testimony here over the

5    last few days, in contrast to how he testified in 1996, was

6    intellectually dishonest?

7    A.  No.  I think he has just grown as a scientist.  I would hope

8    I've grown, too, in the last 15 years.

9    Q.  Now, you relied on Toni Van Buren as being your Vineland

10   respondent, right?

11   A.  Yes, I did.

12   Q.  And Toni Van Buren is the mother of three of Hardy's daughters?

13   A.  That's correct.

14   Q.  This is a woman who loves Hardy, although she is not in love

15   with him, but she loves, as she testified?

16   A.  That's correct, she still has love for him is what I kind of

17   remember her saying.

18   Q.  And really, Toni -- you took what Toni Van Buren said to you at

19   face value, right?

20   A.  I applied whatever techniques in my skill to ask the questions

21   the right way, not to lead her, to get as accurate information as

22   possible that I could.

23   Q.  But you told her what was at stake here, she understood what

24   was at stake, correct?

25   A.  I'm sure she knew by the end of the conversation.  I don't know

1  that I had any conversation about that at the beginning.  At the

2  beginning, we just talked about what the Vineland was and what was

3  going on.

4        I think I mentioned earlier, the last 20 minutes of the

5  interview was specifically addressing a mother's concerns about

6  mental retardation, the genetic propensity, what effects that might

7  have on grandchildren.  I think she had some misinformation and

8  some good information.  So I know she knew mental retardation was

9  in the ballpark because of the end of our conversation, the end

10 when she asked me a lot of questions.

11 Q.  And she willingly spoke with you, obviously.

12 A.  Yes.

13 Q.  And, in fact, I think you mentioned that Toni Van Buren did not

14 want her daughters to think that she let their daddy down, right?

15 That's what you testified to earlier.

16 A.  I don't know if those are my exact words.  But I do remember

17 talking about that and she had -- that's the father of her children

18 is what I remember, and she owed it to them I think is what she was

19 telling me.

20 Q.  So if Toni Van Buren was not truthful, that would skew her

21 answer or your evaluation -- your filling out, your administering

22 the Vineland, right?

23 A.  If she had told me untruths --

24 Q.  Correct.

25 A.  -- and the statements she gave me were not in fact true?

1  Q.  Correct.

2  A.  That would skew my Vineland, yes.

3  Q.  You did no independent investigation to corroborate what she

4  told you, did you?

5  A.  I thought I did, by talking with others and looking at records.

6  Q.  And as far as the drug dealing goes, you spoke to Greg

7  Williams?

8  A.  To Greg Williams and to Lionel.  I didn't speak to Lionel prior

9  to the report, but by today I had spoke to Lionel in August.

10  Q.  Did you know that -- did you examine or did you have access to

11  Greg Williams' criminal history?

12  A.  I don't think I had access to his criminal history prior to my

13  report.  I know I had access to his criminal history and Toni Van

14  Buren's criminal history after my report.

15  Q.  Greg Williams was in the dope game as well, were you aware of

16  that?

17  A.  That's what I understood in the records I was supplied after my

18  report, yes.

19  Q.  And had you spoken to, for example, an FBI agent or some other

20  law enforcement person, they could have explained Greg Williams'

21  involvement with Paul Hardy and the drug game?

22  A.  That's correct.

23  Q.  And you didn't do that, did you?

24  A.  I did not do that.

25  Q.  In fact, Greg Williams used to cook up the crack for Paul

```
 1   Hardy; are you aware of that?
 2   A.  I saw in something.  I don't think that's in his criminal
 3   records, possibly that's in some witness, confidential witness
 4   maybe, CW, CW report.
 5   Q.  And your other source of information regarding Paul Hardy's
 6   drug involvement was his brother Lionel, right?
 7   A.  Would you say that, ask that question about Lionel again,
 8   please?
 9   Q.  The other source of information upon whom you relied to give
10   you -- regarding Mr. Hardy's drug involvement was his brother
11   Lionel, right?
12   A.  That's correct.
13   Q.  You didn't consider the fact -- and he knows, he knows what's
14   at stake here; he testified to that effect, right?
15   A.  That's right.
16   Q.  Greg Williams clearly knows what's at stake here, correct?
17   A.  That's correct.
18   Q.  Didn't you consider the possibility that those two certainly
19   would have downplayed Mr. Hardy's, you know, role in the drug trade
20   to akin to running a lemonade stand, didn't that possibility occur
21   to you, these people are downplaying this?
22   A.  I mean, that was a possibility, but they pretty much talked
23   about daily drug activity.
24   Q.  But didn't you think at that point, saying, well, you know
25   something, these guys, you know, maybe they're friends of Hardy,
```

```
 1   one's his brother, let me get some outside information on this, but
 2   you never did that?
 3   A.  I had -- by the time I talked to Lionel I had all of the
 4   criminal records that your office had supplied.
 5   Q.  But, of course, by the time you spoke to Lionel you had already
 6   received and read Dr. Hayes's report, so you were kind of rebutting
 7   Dr. Hayes at that point, weren't you?
 8   A.  Well, I am going to be honest with you, at the time I spoke to
 9   Lionel --
10   Q.  Oh, please.
11   A.  -- I am not sure I had read all of those 174 pages, that was a
12   very long report, and I went to Hawaii and Norway in that span.  So
13   I had started reading the report, and I am not sure I had finished
14   all of it by the time I talked to Lionel.  But I had started
15   looking at a lot of records which I think came about that time.
16   Q.  I notice in your report that throughout, and if you want me to,
17   we can go through it line by line, and I think Ms. Van Buren
18   actually testified to this effect, but she stated that she later
19   realized, for example, there was a deficit.  She is now more aware
20   of Hardy's deficits.  She is more aware now of Hardy's deficits.
21   She now realizes, this is all throughout your report.
22           And as she testified, at the time she knew Mr. Hardy, she
23   didn't know, she didn't realize or she didn't recognize any
24   deficiencies, did she; that's only now in retrospect, right?
25   A.  That's correct.
```

Q.  Did you look at -- are you familiar with a woman named Dawn

Dedeaux?

A.  The lady that did the videos, the drive, the drive-by stuff.

Q.  Yeah, she's -- right.

A.  Yeah, I looked at the videos and there's a web page in your

information you sent, I think I looked at that, maybe something

else.  I think there's some mentions of it in some of the tables

that possibly Dr. Hayes supplied.

Q.  And you've gone to Dawn Dedeaux's web site, I take it?

A.  When y'all gave me a picture of her web site, I mean the page,

and then y'all have given me videos to look at.

Q.  But my question was, did you go to Dawn Dedeaux's web site?

A.  No.

Q.  So you didn't realize, then, that back in -- according to her

filmography, which is on her web site, she filmed Paul Hardy and

his brother Wayne in preparation for an exhibit on, for lack of a

better term, the thug life, which ran at the CAC, the Contemporary

Arts Center, up the street, are you aware of that?

A.  I didn't know about the CAC part, but I feel certain his legal

team told me that what I was looking at was maybe not the finished

documentary, but these were scenes that she was putting together

for a documentary on juvenile crime in New Orleans was what I, you

know, that's about the same thing, I guess.

Q.  Do you remember viewing a video entitled "Drive-By Shooting"?

A.  I am pretty sure -- there's several videos and some of them are

1    repeats, but, yes, I remember seeing that.

2    Q.  And how old -- Mr. Hardy would have been 21 years old in 1988,

3    correct?

4    A.  In the end of '88, he would have been 21 because he was born in

5    '67 October, so he would have been 20 in the early part, 21 in the

6    end.

7    Q.  And you recall that that video shows Mr. Hardy behind the wheel

8    of a car with his brother Wayne with him driving around New

9    Orleans, and Dawn Dedeaux is filming things and interviewing he and

10    his brother as he drove?

11    A.  I remember talking -- yeah, there's a video and he is driving,

12    and you can see the scenes flashing and Wayne is in the back seat.

13    Q.  But you didn't view that in preparation for your report before

14    the court?

15    A.  I didn't have that information prior to January, no.

16    Q.  And, in fact, in that video, Mr. Hardy is really shown to be

17    very expertly driving around New Orleans; he had no trouble

18    driving, do you recall that?

19    A.  I saw him driving.  I thought he was a tad slow, but he was

20    driving and waving at the neighbors.

21    Q.  And did you see another video entitled "The Hardy Boys and

22    Nancy Drew," with assumably Ms. Dedeaux being Nancy Drew, did you

23    see that one?

24    A.  Yes.

25    Q.  And in that one, she is interviewing Paul Hardy, Wayne Hardy

```
 1   and some other guy in City Park; do you remember that?
 2   A.  Yes.
 3   Q.  You state in your report at page eight that, using -- citing
 4   Toni Van Buren, that Hardy printed rather than wrote in script;
 5   that was incorrect, isn't it?
 6   A.  As I remember her speaking, and I thought she said that
 7   yesterday because, you know, we were talking about that period of
 8   time, you know, and he could write in script but what she noticed
 9   was he often printed.  So he was more comfortable with the print
10   than the script was what she was noticing at that point in time.
11   Q.  Did you examine Mr. Hardy's prison request for medical
12   assistance, a/k/a sick calls, from the St. Bernard Parish Prison?
13   A.  Yes, I did.
14   Q.  Before you submitted your report to Judge Berrigan?
15   A.  I don't think I had that information before I submitted the
16   report.  I had Mr. Hardy write for me.
17   Q.  Well, I am talking about the sick calls.
18   A.  No, I don't think I saw the sick calls until after I wrote my
19   report.
20   Q.  Those sick calls really reflect -- I mean, he was very -- they
21   were multi-sentence, very detailed, the penmanship was good, the
22   grammar was good, he cited drugs by name that I couldn't even
23   spell; do you recall that?
24          THE COURT:  Okay.  Get to a question.
25   BY MR. McMAHON:
```

1    Q.  Do you recall that?

2    A.  I recall the medical request, yes, I do.

3    Q.  Well, doesn't that indicate a very facile use of the language?

4    A.  Before you snap my head off, I want to answer that question.

5    There's also other information in the records you supplied that

6    sometimes he got other inmates to write his stuff and sometimes he

7    asked other inmates how to do or how to write.  So I look at that

8    that way.

9    Q.  Who told you that?

10   A.  It's in information that I have, do you want me to --

11   Q.  Yes.  Who told you that Hardy requested other prisoner

12   assistance to fill out his sick calls?

13   A.  Hold on.  I didn't say sick calls, now, by the way, I said in

14   writing.  He asked for assistance when he wrote things.

15   Q.  I was talking about the sick calls.

16   A.  Well, that's why I said, I used that knowledge in some of my

17   judgment, the quality of his writing of his sick calls.

18   Q.  I would like to know who told you that.

19   A.  Hold on just a minute.  This book here, I think this is --

20   yeah, it's prepared by Jill Hayes, Ph.D., hold on a minute, I guess

21   the judge has a copy of this, I don't see any numbers, it came from

22   the government.

23        It is a table, a chronological summary of records

24   supplied by Dr. Hayes, and it starts, hold on a minute, 12/1/86

25   when he's 19:1 years of age and goes on up to past the time of the

1    crime.  And if you look on page 20 of 77, this is where I saw, on

2    7/28/95 FBI records, FBI FD-302 Kathleen Adams, Paul Hardy wrote a

3    letter to Judge Berrigan and assistant.  The agent received a copy

4    of the letter.  Apparently, Paul Hardy writes letters and has

5    others copy them so they're more legible.  So -- and it will take

6    me awhile to find it.  But if I cross reference that, there is

7    something with some brothers --

8    Q.  I'll move on.

9    A.  Okay.

10   Q.  Why didn't you administer the Vineland II to Theresa Minor?

11   A.  She wasn't a good respondent.  I have to come up with a date

12   when she knows him well, she needs to know him in more than one

13   domain, and there wasn't any way you could use a Vineland on her

14   and get it scored for all of the reasons that we discussed with

15   Javetta Franklin.  But I did use the Vineland and information on

16   the adaptive scales as a background in trying to get some

17   information from her.

18   Q.  Why didn't you administer the Vineland with either Terry or

19   Linda Hardy?

20   A.  Linda Hardy denied any specific knowledge of any developmental

21   history, other than she knew what schools he went to, they went to

22   different elementary schools.  She knew -- she remembered him

23   having a head injury as a young child and having passed out.  She

24   didn't go in his circles and go outside, so she assured me she knew

25   nothing.  Her mother didn't leave her in charge of the other

1   children.  There wasn't anything I could get on a Vineland out of

2   her.

3   Q.  Ma'am, she is his sister, she lived with him.

4           MS. FOURNET:  Judge, I am going to request --

5           THE COURT:  Is that a question?  Just phrase it as a

6   question, yes.

7           MS. FOURNET:  -- that he ask a question.

8           MR. McMAHON:  Well, I guess it would be exclamation point

9   question mark.

10           THE COURT:  Is she his sister?

11           THE WITNESS:  She is his sister.  She is six years older

12   than he is, I think, or about.

13   BY MR. McMAHON:

14   Q.  The same thing with Terry Hardy, ma'am, Terry Hardy -- is not

15   Terry Hardy Paul's brother --

16   A.  That's right.

17   Q.  -- who lived with him in the Calliope?

18   A.  That's correct.

19           THE COURT:  Mike, we've been at it about an hour and a

20   half, do you want to break?  We can keep rolling if you want.

21           MR. McMAHON:  No, a break would be good.

22           THE COURT:  Okay.  Take ten minutes.

23           THE DEPUTY CLERK:  All rise.

24       (WHEREUPON, A RECESS WAS TAKEN.)

25       (OPEN COURT.)

```
 1              THE DEPUTY CLERK:  All rise.

 2              THE COURT:  Have a seat, please.

 3   BY MR. McMAHON:

 4   Q.  Dr. Swanson, I am going to refer you -- your Honor, I don't

 5   know about the ELMO -- but there is an article -- are you familiar,

 6   Dr. Swanson, with an article entitled "Four practical and

 7   conceptual assessment issues that evaluators should address in

 8   capital case mental retardation evaluations"?  It was written by

 9   Bethany Young, Marcus T. Boccaccini, Mary Alice Conroy and Kristy

10   Lawson, and it was published in the -- I think it's a book.

11              MR. McMAHON:  May I approach, your Honor?

12              THE COURT:  Uh-huh.

13              THE WITNESS:  I am familiar with the article.  Can I have

14   it in my hands while we talk about it?

15              MR. McMAHON:  You sure can, there it is.

16              THE WITNESS:  Thank you very much.  I don't have it with

17   me, but I have seen it before.

18   BY MR. McMAHON:

19   Q.  You're familiar with it?

20   A.  Yes.

21              THE COURT:  Who is the first author, Mike?

22              THE WITNESS:  Bethany Young.  2007, Young, et al.  2007.

23   Young, et al., 2007.

24              THE COURT:  Okay.  Thank you.

25   BY MR. McMAHON:
```

 1    Q.  Now, this article discusses actually, among other topics,

 2    should correctional officers serve as informants regarding adaptive

 3    behavior.  And do you mind if I just read it?

 4    A.  Can I look at it just one more minute before you walk away so I

 5    can -- I have an idea, it seems like this was kind of like a survey

 6    thing and they're checking with all --

 7    Q.  It's a survey.

 8    A.  Yeah.  And they're checking with experienced evaluators on

 9    what's currently being used in the field and they go through

10    different things.

11    Q.  Correct.

12    A.  And that's one of the areas they looked at.

13            THE COURT:  So let Mr. McMahon ask questions, though.

14            THE WITNESS:  Okay.  I just kind of wanted to make sure

15    in my mind I remember this article because, boy, he asks good

16    questions.

17            THE COURT:  No problem.

18    BY MR. McMAHON:

19    Q.  And, Dr. Swanson, according to this, and again, I think without

20    the benefit of a question, the authors surveyed various experienced

21    evaluators to see if any used correctional officers in adaptive

22    functioning assessments, correct?

23    A.  As I remember it, I don't know about the experience of the

24    evaluators, but they surveyed evaluators who were doing these

25    evaluations to see, what are you using.

1  Q.  And one of the findings was:  "However, when evaluators were

2  asked directly" -- and this is, your Honor, in the article, pages

3  174 to 175 -- "evaluators were asked directly about whether they

4  interview correctional officers to gain insight into the prisoner's

5  adaptive functioning, 90 percent said they did."

6  A.  That's correct.

7  Q.  And at the bottom of the first column on page 175, the last

8  sentence reads:  "Nevertheless, there does not seem to be a clear

9  reason why correctional officers cannot be interviewed given that

10 it is up to the evaluator to decide how much weight to place on the

11 information."

12 A.  That was the opinion of those authors, yes.

13 Q.  And that is an opinion to which you do not subscribe?

14 A.  I don't hold those authors with the same esteem as I do the

15 other authors I've mentioned in my testimony, yes.

16 Q.  Now, you testified, I believe, I guess to sum up a little bit,

17 everybody who knew Paul Hardy when he was young recognized,

18 excepting Toni Van Buren, but the family members recognized him as

19 being slow; is that your proposition?

20 A.  Family members recognized there are things he couldn't do and

21 they kind of stepped forward and did it for him, yes, that's what I

22 remember saying.

23 Q.  Let's explore that.  I am going to hand you the transcript from

24 the penalty phase hearing.

25 A.  Okay.

1    Q.  You can have that.  Not forever but just for present purposes.

2            Now, if you'll turn, if you would, Marie Hardy, Paul

3    Hardy's mother, on page 28.  Are you there?

4    A.  I'm on page 28, yes.

5    Q.  Marie Hardy testified that Hardy was walking and talking at age

6    four.

7    A.  That's correct.

8    Q.  Do you see any other hint, any hint whatsoever that he was

9    delayed or in any way there was any problem with that on that page?

10    A.  I don't see anywhere where she's noting, let me be honest here,

11    I don't see any other instance of delays, is that what you asked

12    me?

13    Q.  Right.

14    A.  No, not on that page.

15    Q.  Now, I am going to turn to the testimony at the initial penalty

16    phase of Terry Hardy, Sr., Hardy's brother.  Page 84, if you could

17    turn to that.

18            THE COURT:  We're in April of '96?

19            MR. McMAHON:  Yes, in fact --

20            THE COURT:  That's okay, I just want a ballpark.

21            MR. McMAHON:  Specifically, your Honor, actually, for the

22    record, it's Penalty Phase, Hardy Volume 1, and it's Monday, April

23    29, 1996, 9 A.M., I guess the morning session.

24            THE COURT:  Okay.  Thank you.

25    BY MR. McMAHON:

1   Q.  Page 84, do you see where Mr. Hardy testifies, we, meaning he

2   and his brother, used to play football in the courtyard.  Do you

3   see that?

4           THE COURT:  Is this Terry?

5           MR. McMAHON:  Terry Hardy, Sr.

6           THE COURT:  Page 48 you said?

7           MR. McMAHON:  Eighty-four.

8           THE COURT:  Eighty-four, I'm sorry.

9           THE WITNESS:  (WITNESS READS DOCUMENT.)

10          THE COURT:  Do you see that?

11          THE WITNESS:  I see it, yes.

12  BY MR. McMAHON:

13  Q.  All right.  Any indication there that -- well, he didn't say

14  that Paul never played football, did he?

15  A.  I am not sure he said Paul was playing football right there.

16  Q.  Well, let's go to 87.  And the question was, did he say Paul

17  didn't play?  Page 87, we'd go out and play football in the other

18  projects.  Do you see that?

19  A.  Top or bottom -- oh, wait, I see it.  (WITNESS READS DOCUMENT.)

20  Is Paul part of the we?

21  Q.  I'm asking you if you see anything there that indicates Hardy

22  did not play; yes or no?

23  A.  I don't see anything there that indicates he did not play.

24  Q.  Let's go to 96, still with Terry Hardy, Sr.  And on that page,

25  Terry is describing how Curtis taught Hardy how to play, to do card

```
 1   tricks for money and, he quotes, I am quoting, "so it was a lot of
 2   those tricks that Curtis taught Paul," and he also goes on to say
 3   that Paul Hardy learned those card tricks to get over on others.
 4   Do you see that there?
 5   A.  Uh-huh.
 6         MS. FOURNET:  Judge, is there a question that goes with
 7   that or is this just a way to read transcript portions?
 8         MR. McMAHON:  Well, certainly I'll ask a question.
 9         THE COURT:  Well, I don't mind you just giving -- if you
10   want to ask a question, go ahead, but --
11         MR. McMAHON:  Thank you, your Honor.
12   BY MR. McMAHON:
13   Q.  If you would, ma'am, could you turn to page 121, this is the
14   testimony of Albertine Arceneaux.  Do you see that?
15   A.  Yes.
16   Q.  And do you see where Mrs. Arceneaux states, or testifies that:
17   "Paul took care of my mom, bought medicine, she had to have pills
18   that were $85 and the medical card couldn't take it, so Paul bought
19   it for us for her."  Do you see that?
20   A.  Yes, I do.
21   Q.  Please turn to page 123.
22         THE COURT:  Is there going to be a question at the end of
23   all of this?
24         MR. McMAHON:  There is at the end.
25         THE COURT:  All right.
```

1    BY MR. McMAHON:

2    Q.  Do you see where Hardy bought shoes for her son, Harold

3    Arceneaux, who actually at that time was a pretty good college

4    basketball player?

5    A.  Top or bottom of the page -- wait, shoes, I just saw that.

6              THE COURT:  What page number is that?

7              MR. McMAHON:  123, your Honor.

8              THE WITNESS:  Top of the page.  Yes, I do.

9    BY MR. McMAHON:

10   Q.  And both on pages 125 and 127 she testified that Hardy gave her

11   money for rent on many occasions.

12   A.  Yes, I do.

13   Q.  On page 126, Hardy once paid her bond after an arrest, do you

14   see that?

15   A.  Top or bottom or middle, so I can go faster?

16   Q.  Well, you have me at a bit of a disadvantage because you have

17   the transcript.

18   A.  Oh, I've got your paper, I'm sorry, okay.  I'll find it.  Give

19   me a minute here.  Yes, at the bottom of the page.

20   Q.  And that, on page 130, do you see where Mrs. Arceneaux

21   testifies that after the Meals on Wheels job Hardy had, "little odd

22   jobs."  Can you see that?

23   A.  Yes, I do.

24   Q.  And finally, I want to talk about Keith Mitchell.

25             THE COURT:  What page?

```
 1            MR. McMAHON:  Page 134, ma'am.

 2            THE WITNESS:  Okay.

 3   BY MR. McMAHON:

 4   Q.  Do you see where Keith testifies, talking about Hardy, "He was

 5   a great kid, you know, play around the neighborhood"?

 6   A.  Yes.

 7   Q.  Next page, he worked for Meals on Wheels to, "help the old

 8   people."

 9   A.  Yes.

10   Q.  Please turn to page 138.  Same page, Keith Mitchell testifies,

11   "He's not stupid with me."

12   A.  Yes -- well -- yeah, I see those two lines, yes.

13   Q.  And Hardy was a leader, "In so many ways, you know, that's why

14   his nickname was Cool, he was cool with everybody," close quote.

15   A.  I don't read it exactly that way.  Can I read what I'm seeing?

16   Q.  Go ahead.

17   A.  The question is, "Was he a leader?"  And the answer is, "In so

18   many ways, you know, that's why his nickname was Cool, he was cool

19   with everybody."

20   Q.  Right.

21   A.  Okay.

22   Q.  And finally on page 140, Mr. Mitchell, who was actually Harold

23   Arceneaux's brother, testified that Hardy helped to keep Harold

24   Arceneaux on the straight and narrow, advised him to avoid drugs

25   and stay in school, do you see that?
```

```
 1   A.  Yes.

 2              MR. McMAHON:  Thank you, Dr. Swanson.

 3   BY MR. McMAHON:

 4   Q.  Now, my question is, somebody -- all of these various pieces of

 5   information from people who knew him during the developmental

 6   period do not suggest mental retardation, do they?

 7   A.  I don't think they rule out mental retardation, and there was

 8   some of them I'm not sure related to Mr. Hardy.

 9   Q.  You just won't concede the point, would you?

10   A.  Well, I formed my opinion.

11   Q.  I realize that's argumentative --

12              MS. FOURNET:  Judge, and it's also interrupting and I

13   object.

14              THE COURT:  Sustained.

15   BY MR. McMAHON:

16   Q.  I would like to show the witness a document that we received

17   actually from you all.  Were you aware, Dr. Swanson, that Paul

18   Hardy was his mother's designee to get his food stamps, food stamp

19   money?

20   A.  I know I've read that.  I cannot remember if I heard it on the

21   Hayes tapes or read it somewhere else, but I definitely remember

22   the food stamp conversation that Paul going on --

23              MR. McMAHON:  And, your Honor, these are documents that

24   we received from the defense, and I want to put this up.

25              THE WITNESS:  Yeah, I've seen that before.
```

```
 1   BY MR. McMAHON:
 2   Q.  If you could read line -- or box 29.  "Do you want to authorize
 3   someone other than the head of your household to get your food
 4   stamps for you?"  And do you see what box is checked, yes or no?
 5   A.  Yes.
 6   Q.  "If yes, who?"  Who?
 7   A.  Paul Hardy.
 8   Q.  And again, if you could read right here (INDICATING).  Can you
 9   read that?
10   A.  Yeah.  It says no, and then underneath that, says Paul Hardy,
11   son, authorize representation.
12   Q.  Ma'am, is it consistent with -- if everybody thought, or so you
13   allege, if it were so obviously apparent that Hardy was mentally
14   disturbed, don't you think a little bit incongruous that his mother
15   would designate him as the representative to get her food stamps
16   when Terry was there, Lionel was there, Wayne was there?
17   A.  What was the date on that?  Just to be sure.  I want to make
18   sure Terry was there and Lionel was there.  That's the only reason
19   I'm asking.  Just tell me the date of the form, I'm fine with that.
20   Q.  The question is, is it incongruous?
21   A.  I don't think it's incongruous at all that she designated Paul.
22             MS. FOURNET:  Judge, she did ask to know the date.
23             MR. McMAHON:  Well, I am going to move on.
24             MS. FOURNET:  Well, the witness has asked --
25             MR. McMAHON:  Well, I'm going to move on, it's my
```

1    examination.

2            THE COURT:  Well, why don't you tell us the date just to

3    put clarity on it because you asked about Terry specifically and I

4    think she needed -- wanted to know the date, the date of the

5    document.

6            MS. FOURNET:  And if the witness has a comment on the

7    date, how that affects her answer, I would request, your Honor,

8    that she be able to --

9            MR. McMAHON:  I am handing the documents to the

10   witness --

11           THE COURT:  Let's not talk at the same time.  Is there a

12   date on it?

13           THE WITNESS:  There is no date.

14           THE COURT:  All right.  Give that back to him.

15   BY MR. McMAHON:

16   Q.  Any reason why you didn't tape record any of your interactions

17   with any of your witnesses, Toni Van Buren, Javetta Cooper?

18   A.  I don't tape record my interactions with people.  I've been

19   tape recorded but at the request of other people or to verify that

20   I have the skills.  But I don't tape record.

21   Q.  And, of course, by not tape recording you don't open yourself

22   up to the kind of critiques suffered by Dr. Hayes in this

23   courtroom, do you?

24   A.  I don't tape record any of my evaluations.

25   Q.  Let me ask you.  Do you feel comfortable excoriating another

1  professional and listening to Dr. Cunningham excoriate another

2  professional that's gone on in this room for the last three days?

3             MS. FOURNET:  Your Honor, objection to the relevance.

4             THE COURT:  Yeah, I don't know that that's relevant.

5  Sustained.

6  BY MR. McMAHON:

7  Q.  Did you read the transcript of the guilt phase from the trial

8  in 1996?

9  A.  You're going to have to come put it in my hands and let me look

10 at it.  I've read so many transcripts.  I've read transcripts from

11 psychologists, I know I remember the penalty one because of

12 testimony.  If you'll show it to me I could probably tell you, I

13 think they gave me every transcript they could give me.

14 Q.  Let me ask you this:  Do you remember reading the testimony of

15 Steve Jackson?

16 A.  I read the testimony of Steve Jackson, okay.

17 Q.  And you'll recall that Steve Jackson testified that Paul

18 Hardy -- Steve Jackson, just to refresh your memory, Doctor, he

19 drove the Maxima, he drove the car in which Paul Hardy and Damon

20 Causey were when Kim Groves was murdered on October 13th, 1994.

21 A.  I am remembering that's who he was, yes.

22 Q.  And you're aware, of course, reading that testimony that it was

23 Hardy who directed Steve Jackson to Kim Groves' location because it

24 was Hardy alone, not Damon Causey, who knew where Kim was located

25 because Len Davis, the cop, told him?

```
1    A.  As I remember the testimony, it's not sitting in front of me

2    here --

3    Q.  Right.

4    A.  -- I remember Paul Hardy giving directions -- that he testified

5    Paul Hardy gave the directions, yes.

6    Q.  And you're not familiar with the Lower Ninth Ward, are you?

7    A.  When I worked in New Orleans for the school system in '98, '99,

8    I frequently went down there, but that's been ten years, but I am

9    familiar with some of it.

10   Q.  Let me ask you, then, you're familiar that the quickest way to

11   get back to the Upper Ninth Ward from the lower would be to go over

12   the Claiborne Avenue bridge, right?

13   A.  I've gone over the Claiborne Avenue bridge coming back or going

14   down that way.

15   Q.  That's a high -- do you remember, that's a high bridge?

16   A.  Yeah.  Is that the old one, the old-looking bridge that's going

17   down that way?  I mean, I may not remember.

18   Q.  Well, there are three bridges, you have the St. Claude

19   bridge --

20   A.  Okay.

21   Q.  You have the Claiborne, which is a high bridge.

22   A.  Okay.

23   Q.  And the Florida, which is a ground-level bridge or drawbridge.

24   A.  You might be beyond me remembering which -- the names of each

25   bridge, but I remember there's more than one way to go.
```

1    Q.  But yet Hardy directed Causey to go over the Florida so he

2    could toss -- which is kind of remote.  It's by Southern Scrap, are

3    you familiar with Southern Scrap?

4    A.  No.

5    Q.  -- so he could disassemble the barrel and chuck the barrel in

6    the canal.

7    A.  I am remembering that from the testimony.

8    Q.  You remember that.  I believe in direct you were talking about

9    the barrel.  Do you realize or not -- well, why do you think Hardy

10   took the barrel off the gun and threw it in the canal?

11        MS. FOURNET:  Objection, your Honor, calls for

12   speculation.

13        MR. McMAHON:  I am asking her expert opinion, like the

14   rationale behind it.

15   BY MR. McMAHON:

16   Q.  Do you see a rationale behind that, ma'am?

17        THE COURT:  That, you can ask.

18        THE WITNESS:  You know, we're building on my TV-watching

19   skills and movie-watching skills, that's all the expertise I can

20   bring to that.  I mean, I think everybody tries to get rid of the

21   gun after a crime, so I'm sure he was trying to get rid of anything

22   that would lead it back to the crime.

23   BY MR. McMAHON:

24   Q.  Exactly.

25   A.  Yes.

1    Q.  And in examining the records, you examine the FBI records and

2    you'll note that Paul Hardy would buy replacement barrels from

3    various gun shops; you saw those records, too, did you not?

4    A.  I saw those records, yes, I did.

5    Q.  But I guess that doesn't indicate mild mental retardation

6    either, does it?

7    A.  I would need to know more information about who gave him the

8    idea, things like -- I think I already testified to that.

9    Q.  Well, do you have any information whatsoever that anybody did

10   give him the idea?

11   A.  No.  I don't think I do.

12   Q.  You accept the propositions in the DSM-IV-TR, correct?

13   A.  You mean the criteria?

14   Q.  Yes.

15   A.  The three criteria?

16   Q.  Yes.

17   A.  Yes.  Yes, I do.

18   Q.  And you would also accept the proposition that the individual's

19   deficits or impairments in present adaptive functioning must be

20   significant and also must be currently exhibited, that is, and I'm

21   quoting, "A deficit that an individual no longer manifests cannot

22   supply the basis for a finding that Criteria B is satisfied."  Do

23   you agree with that proposition?

24   A.  Can I see the DSM just to be sure?  I mean, there are three

25   criteria in here and then there are several pages that elaborate.

```
 1              MR. McMAHON:  Actually, your Honor, I am quoting from --
 2              THE COURT:  Just show it to her.
 3              MR. McMAHON:  This is actually from the opinion in
 4    Shannon Shields, up in Tennessee, okay?
 5              THE WITNESS:  Yeah, I understood -- I heard y'all talk
 6    about that earlier, yes.
 7              MR. McMAHON:  That's what I just read (INDICATING).
 8              THE WITNESS:  (WITNESS READS DOCUMENT).
 9    BY MR. McMAHON:
10    Q.  I just want you -- either you agree or you disagree with that
11    proposition.
12    A.  You know, I haven't read all of this, and, you know, this is
13    Shields, but I think I testified earlier to the fact that I trained
14    someone out of one of those.
15              Criterias wouldn't make me say that they wouldn't again
16    meet it, do you know what I'm saying?  So I don't know, you're just
17    giving me one little context there and I don't know in what context
18    they're speaking to.
19              I generally agree, but I would like to qualify it along
20    those lines.
21    Q.  I would like to ask you and -- wouldn't you agree with the
22    proposition that it's actually harder to describe orally how to
23    change a diaper than actually to change a diaper?
24    A.  The way I train, we train from model and description first and
25    then once we master that and we get the steps down, then we model
```

```
 1   it and then we do it with the doll and then we do it later.  So I
 2   kind of train it the other way, you know.
 3   Q.  That wasn't my question.
 4   A.  I think it's easier to train them how to say it and put that in
 5   their head and then get them to work on actually doing it.  And I
 6   wouldn't consider that they had mastered it until they were able to
 7   do it.
 8   Q.  You testified in direct that you had comprehensive,
 9   comprehensive information regarding the developmental period, and
10   by Criteria A, the developmental period is the period before the
11   age of 18.  Since Toni Van Buren did not know Paul Hardy before the
12   age of 18 and your other informants -- and again, I'm speaking in
13   reference to your report -- Keith Williams; Tony Minor; Theresa
14   Minor; Greg Williams, the mechanic; and Vance Ceaser.
15         Does that information to you, with all of the records
16   that you did not consult and the people you did not interview, what
17   is the comprehensive information regarding the developmental period
18   you had?
19   A.  As I remember my testimony in relation to comprehensive, there
20   was a discussion on, did I think comprehensive was better than
21   consistent, and I thought I had comprehensive because I had
22   1,600-plus page s and 24 videos, et cetera.  But what was more
23   important was that I would rather have high-quality consistent, and
24   that's all I remember that I testified to comprehensive.  But I may
25   be wrong on that because I sure have been testifying a long time.
```

1    Q.  Of those ten Atkins cases in which you've been involved, you

2    said like nine you were involved on the side of the defendant,

3    correct, and there was one I think --

4    A.  No, all ten were with the defendant.

5    Q.  All ten?

6    A.  Yes.

7    Q.  I thought -- and in nine of those ten you found the defendant

8    mentally retarded?

9    A.  I found them mentally retarded, yes.

10   Q.  And I thought the one, it was a court appointed --

11   A.  No, no, that one is --

12   Q.  The one where you did not find mental retardation.

13   A.  No, that's a post-Atkins case I am still working on, Willie

14   Tart.

15          MR. McMAHON:  With leave of the court, your Honor.  I

16   think I'm almost done.

17          THE COURT:  All right.

18   BY MR. McMAHON:

19   Q.  You saw no documentary, no evidence whatsoever, none, did you,

20   to suggest that Paul Hardy was referred or placed in special ed

21   classes as a youth, did you?

22   A.  I saw no evidence of that, no.

23   Q.  You mentioned the Cutlass.  Were you aware as well that Hardy

24   had a Maxima, drove a Jeep, an Audi at one point and also a

25   Peugeot?

1    A.  The Peugeot I am not as familiar with, but I do remember the

2    Audi, I remember the Cutlasses, I remember a Cherokee Jeep, I

3    think, because I remember Dr. Hayes talking about that one, and I

4    remember the Audi.

5    Q.  And there was testimony, I believe, from Ms. Cooper who said

6    that Paul Hardy never went anywhere alone.  Did you see the FBI

7    video logs which show Hardy alone going all over the place, do you

8    remember reading them?

9    A.  Oh, that's where, like the survey logs, yes, I mean

10   surveillance logs, I saw those, yes.

11   Q.  Correct.  Remember those?

12   A.  Yes, I do.

13           MR. McMAHON:  With leave of the court.

14           THE COURT:  Okay.

15   BY MR. McMAHON:

16   Q.  You classify Toni Van Buren as a biased informant?

17   A.  When -- yeah, I wouldn't classify her as a biased informant

18   with me, no.

19   Q.  You would not?

20   A.  No.  There's a potential for bias there, you asked me about

21   that and did I evaluate that, but I didn't -- I wouldn't classify

22   her as a biased informant.

23           MR. McMAHON:  Thank you, Dr. Swanson.

24           THE COURT:  All right.  Any redirect?

25                         REDIRECT EXAMINATION

```
 1   BY MS. FOURNET:
 2   Q.  Dr. Swanson, I think you mentioned in direct and then again on
 3   cross, because of the intervention of Hurricane Katrina in 2005,
 4   were there problems in locating different witnesses?
 5   A.  Yes, there were.
 6   Q.  And were there discussions, either with you or when you were
 7   present, about difficulties locating witnesses, including those
 8   listed in the penalty phase portion of a 1996 trial?
 9   A.  Yes, it was.
10   Q.  Would you have liked to have talked to Mr. Mitchell,
11   Ms. Arceneaux, and Ms. Robinson, if our investigators had been able
12   to locate them?
13   A.  If your investigators had been able to locate them and they
14   were willing to talk to me, I would have liked to talk to them,
15   yes.
16   Q.  Now, Mr. McMahon went through that penalty phase transcript and
17   he read you a series of one-line quotes from that transcript; is
18   that correct?
19   A.  That's correct.
20   Q.  And you stated that you had previously reviewed that
21   transcript.
22   A.  Yes, I had.
23   Q.  Was there anything in those one-line quotes, or in that
24   transcript as a whole, that, in your opinion, would undermine or
25   cause you to question your conclusion that Mr. Hardy has mild
```

1  mental retardation?

2  A.  No.

3  Q.  There were several references in there to football in Terry

4  Hardy's testimony.  Did you hear in any of those quotes or did you

5  see in any of Terry Hardy's testimony any indication that Paul

6  Hardy played football?

7  A.  No.  And I talked to both Vance and him about the football that

8  was played in the project, which is the Brown Eyes football team

9  that they had, the project had.

10  Q.  And according to your investigation, was Paul Hardy at any time

11  of which you are aware capable of doing much more than throwing the

12  football back and forth?

13  A.  No, the Brown Eyes was an organized -- what they're talking

14  about there is, they competed in the project and other places, and

15  Paul was not on that team.  Vance was on the team and so was Terry.

16  And they both described him as pretty much sitting on the sidelines

17  watching.  Any other football was just kids lobbing balls back and

18  forth or, as he said, pitching them back and forth.

19  Q.  In fact, did Toni Van Buren tell you at some point that he

20  really didn't even have it clear, the difference between offense

21  and defense in football?

22  A.  That's correct.

23  Q.  Now, did anybody ever tell you or did you ever suggest that

24  Paul Hardy was not capable of driving a car alone?

25  A.  No.  I think we've talked a lot about how he got his license,

1    when he learned to drive, how long it took him to drive.

2    Q.  So the fact that he was able to drive a car alone or that some

3    of the government materials indicated that he drove a car alone,

4    was that a surprise to you in view of information you got from the

5    various adaptive behavior witnesses you interviewed?

6    A.  No, it was not.

7    Q.  Is there anything about the fact that Paul Hardy was able to

8    drive alone, albeit perhaps in the somewhat limited area, is there

9    anything inconsistent with that in your diagnosis that he has mild

10   mental retardation?

11   A.  No, there's not.

12   Q.  The food stamp documents that were shown to you, is it possible

13   to tell whether Terry Hardy was still in the home at that time?

14   A.  No, no, it's not.

15   Q.  And in any event, if Marie Hardy had made a judgment, whether

16   Terry Hardy was in the home or not, to designate Paul Hardy, based

17   on what you know about Marie Hardy, was she a person who was

18   capable of making particularly sound, informed decisions about such

19   matters herself?

20   A.  She seems to have had some limitations.

21            MS. FOURNET:  Could I have just a minute, your Honor?

22            THE COURT:  Yes.

23   BY MS. FOURNET:

24   Q.  There was discussion of the issue of Mr. Hardy's drug sales.

25   You received quite a package in the government materials in a

1   section labeled FBI records, did you not?

2   A.  Yes, I did.

3   Q.  Did you see -- have any -- since that collection of documents,

4   that 1,600 pages, and the FBI records in particular, did you have

5   any reason to suspect that the government would have provided less

6   than a complete accounting of Mr. Hardy's involvement in other

7   crimes, such as drug dealing?

8   A.  No, I didn't.

9   Q.  Did you see anything at all in any of those FBI records or

10  anywhere else in the government materials to contradict your

11  conclusion that Mr. Hardy was involved in only basic small-time,

12  street-level drug dealing?

13  A.  No, I did not.

14  Q.  And, in fact, is that what Mr. Hardy himself told you as well

15  as other witnesses?

16  A.  That's right.

17  Q.  And you saw no information to contradict that?

18  A.  No, I did not.

19  Q.  Do you feel that as a professional doing an evaluation of this

20  magnitude that you have a right to assume in the absence of

21  evidence that someone is a major drug dealer and base your

22  conclusions on that assumption?

23  A.  No, I don't.

24  Q.  Do you think you have a right as a professional who is as

25  careful as you have evidenced yourself to be over the past few days

 1   to assume, for instance, that when Terry Hardy says the generic we

 2   played football in the projects that Paul Hardy is about to be

 3   signed up for the Saints and knows all about football?

 4   A.  No.  I wouldn't draw that conclusion.

 5           MS. FOURNET:  That's all I have, your Honor.

 6           THE COURT:  All right.  Dr. Swanson, you may step down.

 7           Michele, Herb, why don't you give a hand to unloading and

 8   clearing the decks up here.

 9           MS. FOURNET:  Sure.

10           THE COURT:  Will the defense call your next witness.

11           MS. FOURNET:  Your Honor, the defense rests.

12           THE COURT:  I know one witness of yours for sure.  Do you

13   have others?

14           MR. McMAHON:  Could we have ten minutes?

15           THE COURT:  Take a break?

16           MR. McMAHON:  Yes.

17           THE COURT:  Sure.  I would like to get started because

18   it's only four o'clock.

19           THE DEPUTY CLERK:  All rise.

20       (WHEREUPON, A RECESS WAS TAKEN.)

21       (OPEN COURT.)

22           THE DEPUTY CLERK:  All rise.

23           THE COURT:  Have a seat, please.

24           THE DEPUTY CLERK:  Dr. Hayes, will you stand and raise

25   your right hand.

1          THE WITNESS:  Yes, sorry.

2        (WHEREUPON, JILL HAYES, WAS SWORN IN AND TESTIFIED AS

3        FOLLOWS:)

4          THE DEPUTY CLERK:  Please be seated.  State your name for

5    the record and spell it for us.

6          THE WITNESS:  My name is Jill Hayes, H-A-Y-E-S.

7                    VOIR DIRE EXAMINATION

8    BY MR. McMAHON:

9    Q.  What is your occupation?

10   A.  I am a clinical psychologist/neuropsychologist with a specialty

11   in forensics.

12          MR. McMAHON:  Your Honor, I am about to attempt to lay a

13   predicate to qualify Dr. Hayes as an expert clinical psychologist/

14   neuropsychologist with an expertise in mental retardation.

15          THE COURT:  All right.  Go at it.

16   BY MR. McMAHON:

17   Q.  Let's go over your education first.  Where did you get your

18   undergraduate degree?

19   A.  I got my undergraduate degree from Armstrong State College,

20   which is now called Armstrong State Atlantic University.

21   Q.  Where is that located?

22   A.  That's in Savannah, Georgia.

23   Q.  What was your major?

24   A.  It was psychology.

25   Q.  Did you graduate with honors?

1   A.  I did.  In fact, I was the outstanding psychology student that

2   year that I graduated.

3   Q.  What kind of honors?

4   A.  Magna cum laude, I think I had a 3.7, 3.8, 3.9.

5   Q.  Where did you go on to get your master's?

6   A.  I initially went to Augusta State College, which is now Augusta

7   State University.

8   Q.  Where is that located?

9   A.  In Augusta, Georgia.

10  Q.  What master's degrees did you obtain?

11  A.  I got a master's of science degree in applied psychology.

12  Q.  Did you graduate with distinction?

13  A.  I did.

14  Q.  And did you intern in connection with that degree?

15  A.  I did.

16  Q.  Where?

17  A.  It was at the Medical College of Georgia.

18  Q.  When was that?

19  A.  That was in June of -- well, the degree started before then,

20  but I completed the degree in June of 1992.

21  Q.  Let's jump up to 1998.  Did you obtain any other degrees?

22  A.  Can we jump back?

23  Q.  Go ahead.

24  A.  Let's jump back to 1995, that's when I got a master's of arts

25  degree in clinical psychology from Louisiana State University.

```
 1   Q.  Did you get your Ph.D. at LSU?

 2   A.  I did.

 3   Q.  When?

 4   A.  I got my Ph.D. in 1998.  I believe it was August.

 5   Q.  In what?

 6   A.  In psychology, in clinical psychology.  I had a minor in

 7   behavioral neuroscience.

 8   Q.  And did you specialize in neuropsychology?

 9   A.  I did.

10   Q.  So just to sum up, two masters --

11              THE COURT:  Hold on a second.  What was the minor in?

12              THE WITNESS:  Behavioral neuroscience.

13              THE COURT:  Okay.  Go ahead.  All right.  Go ahead.

14   BY MR. McMAHON:

15   Q.  So to sum up, you have two master's degrees and one doctoral

16   degree, correct?

17   A.  I do.

18   Q.  Now, did you spend time at the Medical University of South

19   Carolina?

20   A.  I did.

21   Q.  Where is that located?

22   A.  That's in Charleston, South Carolina.

23   Q.  When was that?

24   A.  That was -- in clinical psychology when you're finishing

25   your --
```

```
 1   Q.  No, I said when was that?

 2   A.  Oh, I'm sorry.  It was from July of 1997 to July of 1998.

 3   Q.  Can you explain to the court what that involved?

 4   A.  Sure.  When you're finishing your degree in psychology or

 5   neuropsychology, you have to do a one-year internship, and as part

 6   of the one-year internship I went to the Medical University of

 7   South Carolina, where I worked in pretty much three different

 8   places:  one was at the National Crime Victims Research and

 9   Treatment Center, another was on the neuropsychology service there

10   at the hospital at MUSC, and then the third place was at the Ralph

11   H. Johnson Medical Center, which is a V.A. Medical Center in

12   Charleston.

13           And can I clarify one thing?

14   Q.  Sure.

15   A.  I can't remember, Judge, if it was behavioral neurology or

16   neuroscience.

17           THE COURT:  Okay.  I assume it's on the résumé, I just

18   don't have it right in front of me.  Go ahead.

19   BY MR. McMAHON:

20   Q.  Let's go on.  The next month, August of 1998 until August of

21   1999, what did your professional education involve?

22   A.  I was fortunate enough to get a fellowship at the Louisiana

23   State University Health Sciences Center.

24   Q.  Where?

25   A.  In New Orleans.
```

1  Q.  What did that entail?

2  A.  That entailed a year of me doing forensic evaluations, both

3  civil and criminal, as well as neuropsychological evaluations

4  within both the department of psychiatry at LSU Health Sciences

5  Center, as well as within the division of law and psychiatry.

6  Q.  I want to back up a little bit and go back to your

7  undergraduate degree.  Did you study mental retardation?

8  A.  Yes.

9  Q.  Explain.

10  A.  Not unlike most people who take your intro to psych class,

11  you're going to get a smidge of mental retardation there, and then

12  when one takes abnormal psychology, then you usually have about

13  probably 1/10 to 1/15 of the time that you're in that class in

14  study related to mental retardation, and then I also took a class

15  on assessment, and that included a great part on mental

16  retardation.

17  Q.  Regarding your master's degree in applied psychology, did that

18  involve the study of mental retardation?

19  A.  Yes.

20  Q.  Could you explain that, please?

21  A.  Sure.  Part of my first master's degree at Augusta, or in

22  Augusta, excuse me, it involved like individual assessment classes,

23  and that's where we had to do multiple IQ assessments with

24  individuals of all different ages, shapes, sizes, in order to be, I

25  guess, qualified to give these intelligence tests.

1    Q.  How many of these intelligence -- could you explain -- I mean,

2    the court has heard a lot about various IQ tests.  What specific --

3    did you administer IQ tests regarding your work for the master's at

4    Augusta State?

5    A.  Yes.

6    Q.  What kind?

7    A.  I think back then that was actually I think before the WAIS-III

8    came out, the WAIS-R was still the one that was being taught when I

9    was at Augusta, and so back then I was doing the WAIS-R.  I was

10   also giving a version of the Stanford-Binet.  They really didn't go

11   into any of the other ones other than those two, so the only ones

12   that I recall that I was taught back then was the WAIS-R and the

13   Stanford-Binet.

14           Though I think the WAIS-III was just coming -- I'm sorry,

15   I don't want to misspeak.  I'm trying to remember.  It had to be

16   the WAIS-R.

17   Q.  About how many of those did you -- IQ tests did you administer?

18   A.  As part of Augusta?

19   Q.  We're still in Augusta.

20   A.  Okay.  Probably about 40 or so.

21   Q.  During your work for your master's, did you have the occasion

22   to administer adaptive behavior scales such as the Vineland?

23   A.  I think only on a few occasions then.  That was at the Medical

24   University of South Carolina, I was on their inpatient psychiatry

25   unit, and adaptive functioning only came up on a few occasions and

1    it was related to when people were having shock therapy and things

2    like that, they wanted to get a measure of their adaptive

3    functioning before and after, and I wasn't involved in too many

4    shock therapy cases.

5    Q.  I want to turn your attention to your time at LSU, when you

6    obtained the master's and the doctorate in neuropsychology.

7    A.  Okay.

8    Q.  Relate to the court your work with mental retardation at LSU.

9    A.  Okay.  While at LSU, I took several classes.  One of the

10   classes would have been on individual achievement tests, where you

11   would have learned about the different scales.  Another one would

12   be on child intelligence tests, where you would learn the various

13   scales.  You would also take adult and child psychopathology to

14   learn about the disorders themselves, and then you would also do

15   practicums, which are, I guess, practical placements almost like

16   externships and practicum.

17   Q.  Now, we're concentrating on mental retardation here.

18   A.  Right.

19   Q.  Did you work with anyone in that field while up at LSU?

20   A.  I did.  Most specifically, I worked with a man, well, a

21   psychologist named Johnny Matson.

22   Q.  And who is he?

23   A.  Dr. Matson, he is actually a preeminent researcher in mental

24   retardation that actually wrote the handbook on mental retardation,

25   and I was his student for a year.

1   Q.  Was that in the class or was that in some kind of a clinical

2   setting or what?

3   A.  I had Dr. Matson for a class, which was the child

4   psychopathology class but also he was my supervisor in clinical

5   work as well.

6   Q.  And did you administer any kind of test in relation -- in your

7   work with Dr. Matson?

8   A.  Oh, definitely.

9   Q.  Explain.

10  A.  We would do assessments of children and adults with mental

11  retardation or without mental retardation, depending on the

12  referral question.  We would do social skills evaluations of the

13  children, we would do applied behavioral analysis with the

14  children --

15  Q.  Let me stop you there.  Explain, what do you mean by

16  assessment?

17  A.  Well, first off, we weren't doing forensic assessments like in

18  this situation, we were doing assessments to try to dictate what

19  the best treatment would be for the children.  And I say children

20  because, as best as I recall, most of the people that I saw when I

21  worked with Dr. Matson were children.  I think a couple may have

22  been teenagers, but the majority of the people that I saw were

23  probably in the 13 and under range when I was working with him.

24  Q.  You mentioned, I believe, social skills assessments as well,

25  what does that mean?

1  A.  Right.  One of Dr. Matson's major areas of research was, he

2  named his scale the MESSY, which stood for the Matson Evaluation of

3  Social Skills for either Youth or Youngsters.  And then he did the

4  MESSIER, which was the Matson Evaluation of Social Skills

5  Revised -- or for Youth Revised or something to that effect.  And

6  so we would do a lot of those types of assessment measures and

7  evaluations, I think, so that he could get more data for research.

8  And that was one of his major areas.

9        His other major area was -- Dr. Swanson referred to this

10 in her testimony -- was dual diagnosis of individuals who were

11 mentally retarded but who also had comorbid psychiatric

12 difficulties.  He developed something as well for that called the

13 PIMRA.

14       And then the third thing that he was big into, meaning he

15 would train us on, was related to, it was the QABF, it was a

16 qualitative measure to determine a person's functioning.

17 Q.  Did this work with Dr. Matson involve mental retardation

18 evaluations?

19 A.  Absolutely.  That's pretty much all he does.

20 Q.  And would that involve the administration of IQ tests?

21 A.  Yes.

22 Q.  Adaptive scales?

23 A.  Yes.

24 Q.  How many of those have you done while working with Dr. Matson?

25 A.  Probably, I'm trying to think, 10 or 15 max.

```
1   Q.  When did you work for -- or with Dr. Matson?

2   A.  I think that was my third year in graduate school and I started

3   in 1993, and so around 1996.

4   Q.  None of those, I take it, were in the forensic context?

5   A.  None.

6   Q.  Did you do any forensic work during your fellowship in forensic

7   psychology/neuropsychology at -- in New Orleans at LSU?

8   A.  I did.

9   Q.  To be more specific, the LSU Health Sciences Center here?

10  A.  I did.

11  Q.  Did that involve forensic work?

12  A.  It did.

13  Q.  And could you explain to the court, let's break it -- I am

14  going to break it down first, first into clinical work.  Did you do

15  any clinical work?

16  A.  At that point I don't believe I did.

17  Q.  How about research?

18  A.  Yes.

19  Q.  What did that research entail?  And again, we're focussing on

20  mental retardation.

21  A.  Okay.  At that time one of the things that we were very

22  interested in were children's comprehension of Miranda rights

23  because we were concerned that children -- the Miranda rights,

24  depending on which version you were looking at, were normed at

25  around, not normed but the reading level was around a 6th to 8th
```

1    grade reading level, and we were concerned about children's rights

2    being denied because of actually not being able to understand the

3    various Miranda rights forms that were available.

4              So we undertook a project to look at that and evaluated

5    children related to that, specifically concentrating on the younger

6    age ranges and developmental issues that may involve their -- in

7    terms of developmental incompetence.

8    Q.  By children and Miranda, are you talking about juvenile

9    offenders?

10   A.  Yes.

11   Q.  And what age ranges are you referring to here?

12   A.  We were looking at around, anywhere from probably 11 to 15 at

13   that point.

14   Q.  Did you do any MR evaluations in that context?

15   A.  Not for the -- not research.  Do you mind if I look?  Because I

16   did other research on MR while I was there.

17   Q.  Sure.

18   A.  And I did other research on MR when I was at LSU and other work

19   on MR, just not with Matson when I was at LSU.

20   Q.  Well, okay.  Well, let's go back to the research, the topic is

21   research.  So why don't you go ahead and explain to the court, and

22   again focussing on MR.

23   A.  Okay.  One of the things that --

24              THE COURT:  Back in Baton Rouge now?

25              THE WITNESS:  Yes, ma'am.

1          MR. McMAHON:  I thought I was going chronologically,

2    Judge, but I guess I jumped ahead.

3          THE COURT:  That's fine.

4          THE WITNESS:  It jumps around in my mind all the time,

5    too.  That's why I'm like, let me check and see when I published

6    this.

7          THE COURT:  No problem.

8          THE WITNESS:  One of the things that I got interested in

9    when I was in graduate school was whether or not the available

10   malingering tests actually worked with people with MR.  The reason

11   I was concerned about that was because there was some estimates

12   that came out that said that, if I can recall right now, that, you

13   know, possibly around 20 percent of offenders were either -- had

14   borderline or MR in some various facilities.  Again, I am thinking

15   from 10 or 12 years ago, so you have to excuse me if I get some of

16   my numbers wrong.

17         My concern was that -- well, my concern came out of a

18   situation where I evaluated a gentleman in Mississippi with my boss

19   at the time when I was working at Feleciana Forensic Facility in

20   Jackson, where a gentleman with a 36 IQ was labeled as a

21   malingerer.  His malingering strategy was ridiculous, because it

22   would be like if you asked him what color my jacket was, he would

23   say white instead of black.  It was just ridiculous.

24         But he was labeled as a malingerer because he was trying

25   to malinger and, therefore, they assumed he was competent to stand

1    trial because he was malingering, and they're not mutually

2    exclusive.  You know, a person can malinger, but they can still

3    have either mental illness or mental retardation, so that's what

4    kind of spawned my interest in that area.

5            So when I went back to Forensic or Feleciana Forensic --

6    we would just call it Forensic.  When I went back to Feleciana, I

7    undertook what's called at LSU, and I'm sure Dr. Swanson had to do

8    the same thing and will probably grimace, but a middle project to

9    where not only did you have to do a thesis and a dissertation, but

10   you had to do what was called a middle project.

11           And the middle project was almost like another major

12   research project on the way to getting your dissertation.  And I

13   did that related to, if I am correct, that was my study that I did

14   for my middle project was looking at what available tests at that

15   time actually were discriminative of people with mental

16   retardation.

17           THE COURT:  On malingering?

18           THE WITNESS:  On malingering, yes, ma'am.

19   BY MR. McMAHON:

20   Q.  You mentioned Feleciana.  Could you go into a little bit

21   more -- are you finished -- did you pretty much entail all that you

22   did at Feleciana?

23   A.  That was some of the research that I did at Feleciana, there

24   was other MR research that I did elsewhere.

25   Q.  And just to clarify.  Your work with Dr. Matson and the work,

1   was that when you were working at Feleciana as well or was that

2   separate?

3   A.   I worked a lot when I was in graduate school, and so, actually,

4   your practicum, you had a practicum that you had to do as part of

5   school.   You know, there was no way around that, you did that, it

6   was unpaid and you smiled and were happy about doing it.   And then

7   oftentimes you would have a part-time job.

8         When I was working with Dr. Matson at that time, I must

9   have done -- it had to be my third year because then Dr. Matson and

10  I actually kind of went into business together and started doing

11  evaluations.   And so I think that happened for like a year and a

12  half or two years that we were doing that.

13  Q.   And then you went over to South Carolina?

14  A.   Right.   But at the same time I was at Feleciana Forensic, I

15  worked at a place called Educator, I worked for my major professor.

16  I look back now and wonder when I slept.

17  Q.   And I think we covered your work at the Ralph Johnson V.A.

18  Medical Center at the University of South Carolina, correct?

19  A.   Well --

20  Q.   Anything you want to add relative to MR with that stint?

21  A.   Mental retardation with children and adults -- well, with

22  children, actually.   I mean, obviously, prior to the age of 18 this

23  has to occur.   But head injuries could occur prior to the age of

24  18, which would then cause an individual to possibly have a

25  diagnosis of mental retardation, if that occurred, prior to the age

1   of 18.  That would be an acquired mental retardation.

2           So while I was at the Ralph H. Johnson Medical Center I

3   would have to do neuropsychological evaluations but they were of

4   individuals who were older than 18, so it wasn't specifically

5   mental retardation there.

6           I did work with some children at the National Crime

7   Victims Research and Treatment Center who were mentally retarded,

8   one family who had a particularly horrific event occur in their

9   lives, and then as part of a clinic at the V.A. I also did some

10  therapy, and the primary focus was not the child with mental

11  retardation but that came up in the therapy.

12  Q.  Now let's jump over to -- back to LSU but this time New

13  Orleans, correct?

14  A.  Okay.

15  Q.  Am I correct?

16  A.  Do you want to go back to graduate school?

17  Q.  I want to go back to your fellowship.

18  A.  Okay.

19  Q.  And what kind of research, again focussing on MR, did you

20  conduct during the fellowship in forensic psychology and

21  neuropsychology?  I'm on your CV page two regarding LSU.

22  A.  My publications are listed further, so that's why I moved down.

23  Q.  I'm talking about the research now.

24  A.  Say again.

25  Q.  Research.

1    A.   Yeah.   Like my publications start on page --

2    Q.   Well, I don't think I asked about publications.   I mean, does

3    that entail MR research?

4    A.   Yes.

5    Q.   We'll get to publications in a minute, okay.

6    A.   Okay.

7    Q.   Let's talk about -- I thought you worked -- didn't you work in

8    the clinical setting with HIV people there?

9    A.   That was after my fellowship.

10   Q.   Well, let's go there and talk about your research.

11   A.   Okay.   After I finished my fellowship, I started doing a number

12   of different research projects.   I was actually --

13   Q.   Now, who were you working for at this point?

14   A.   I was working in the department of psychiatry, the division of

15   law and psychiatry, as well as the --

16   Q.   Where?

17   A.   At LSU Health Sciences Center.

18   Q.   That's where I was trying to get, okay.

19   A.   Right.   Just to try to explain and be as clear as I can.   LSU

20   during this period of time you wore a lot of hats, and so at one

21   point or another I was director of research for the division of law

22   and psychiatry, I was director of mental health for the HIV clinic,

23   I was director of the clinical psychology internship training

24   program at LSU, did forensics, and then you have to do

25   administrative work and research on top of that.

1    Q.  Did you do supervisory work?

2    A.  Yes.

3    Q.  And, again, as it relates to MR, can you explain that to the

4    court?

5    A.  Sure.  I would supervise research as it was related to mental

6    retardation if any of the forensic fellows were interested in that

7    area.  One of the forensic fellows, a wonderful woman named Judy

8    Holloway, was interested in mental retardation, she had been

9    working at Southeast Louisiana State Hospital in their MR and DD

10   wards.

11          And we started noticing a trend of how people were being

12   portrayed in the media, this is around the time of the movie called

13   *The Other Sister* came out, if you remember that, and so we wrote an

14   article based upon how people with mental retardation are portrayed

15   in the media.

16   Q.  Did you supervise anyone who did testing?

17   A.  Oh, of course.

18   Q.  Let's talk about that.

19   A.  I was director of the internship program, and the interns would

20   have inpatient responsibilities and outpatient responsibilities

21   with adults and with children.  They would have to do a number of

22   assessments and have a number of cases and then do their inpatient

23   and outpatient training.

24          As part of that, they were at Charity Hospital and they

25   were at New Orleans Adolescent Hospital.  And then we also took

```
1    referrals from the violence intervention program for children and

2    families at LSU.  As part of that --

3    Q.  Did that work, your supervisory work, did that involve

4    assessing people with MR?

5    A.  Yes.

6    Q.  About how many?

7    A.  I honestly would have no idea.

8    Q.  Give me a ballpark.

9    A.  Maybe 15.

10   Q.  All right.  How about clinical work?

11   A.  Okay.

12   Q.  Let's go into that.

13            THE COURT:  About 15?

14            THE WITNESS:  Evaluations that I would have supervised.

15   BY MR. McMAHON:

16   Q.  I mean, that involved IQ testing and also adaptive scales?

17   A.  Yes, of course.

18   Q.  Let's get into the clinical work during that time, please.

19   A.  Okay.  While at LSU I would take referrals from the Violence

20   Intervention Program For Children and Families, and some of the

21   people that I saw had children who were mentally retarded, as well

22   as some of the adults that I saw who were victims of crime would

23   have been limited.  In that setting, you're not, though, giving

24   them IQ tests and adaptive behavior scales, they just had something

25   happen to them that's bad and so you don't say, sit down and let me
```

1    give you an IQ test or an adaptive functioning scale.  What you're

2    trying to do is to try to help them and help their family and put

3    them back on track.

4            So in as much as down the line when the initial crisis

5    was over you could try to get them hooked up with social security

6    or in some other type of social assistance, then we would try to do

7    that.  But that was not the focus of that at all.

8    Q.  And you did research, but we'll I guess address that when we

9    talk about your publications, correct?

10   A.  Okay.

11   Q.  How about teaching?  During your time -- describe any

12   teaching --

13   A.  Do you want me to finish?

14   Q.  I'm sorry.

15   A.  That was one place.

16   Q.  I'm sorry, go ahead.

17   A.  That's okay.  As part of the HIV clinic, there was a program

18   for children and adults who would have difficulties, and pretty

19   often I would get referred, like the basic referral question is,

20   something's wrong, can you evaluate this person.  And a lot of

21   times the children, young adults would have that referral, and then

22   after you did the IQ testing, you saw that they were low

23   functioning, and so then you would get on to the adaptive and

24   sometimes that would then help get them different services.

25   Q.  In that context, did you administer, for example, the Vineland?

1    A.  Yes.  Or the Adaptive Behavior Assessment Scale, the Second

2    Edition.

3    Q.  Also known as I guess the acronym ABAS?

4    A.  Yes.

5    Q.  How many -- in that context, how many IQ tests did you

6    administer and then how many adaptive scales did you also

7    administer?

8    A.  Some version of an IQ test, probably two times a week for three

9    years or so.  Adaptive behavior scales, not as much.  Maybe three

10   or four a year because it wasn't always applicable.

11   Q.  Can we go on to teaching?

12   A.  Yes.

13   Q.  Are you sure?

14   A.  Let me think.  I think so.

15   Q.  Let's talk about that.  Your teaching experience, and again,

16   try to focus it for the court on the subject of mental retardation.

17   A.  Sure.  I was director of a class that we would always teach

18   mental retardation for the psychology interns.

19   Q.  Where?  Kind of specify where, please.

20   A.  Oh, this is all at LSU Health Sciences Center.  I apologize.

21        I would always teach a class for the medical students on

22   interviewing, and part of that would be interviewing people who are

23   low functioning or who are -- were thought to have some kind of

24   limitations, so that it would obviously include people with mental

25   retardation.

1  Q.  Any -- I'm sorry, go ahead.

2  A.  I would also teach psychiatric residents about mental

3  retardation.  So residents, interns --

4  Q.  Let me ask you this:  Did any of your teaching involve

5  undergraduate psychology students?

6  A.  Yes.

7  Q.  MR?

8  A.  I taught an intro class after I finished my first master's at

9  where I graduated from, but it was just an intro to psychology

10  class.  And that has what I talked about before, just a smidgen on

11  mental retardation, but then I also taught abnormal psychology when

12  I was at LSU when I was a graduate student, and I taught, I think,

13  two abnormal classes when I was at LSU, and that's where it had

14  like the one, I think it was two, it may have been one or two, I

15  can't recall.

16  Q.  How about with graduate psychology students -- were you

17  finished with the undergrads?

18  A.  No.

19  Q.  I'm sorry, go ahead.

20  A.  I also taught at Arizona State University two sections of

21  abnormal psychology, which is where there was like the 1/12 to 1/15

22  mental retardation and developmental disabilities.

23  Q.  That's at ASU in Tempe, Arizona?

24  A.  Yes.

25  Q.  Have you done any teaching of graduate psychology students?

1    A.  I did.  I taught the forensic psychology class at the

2    University of New Orleans to their Ph.D. developmental psychology

3    program, and part of that, probably 1/10 involved doing

4    mitigation -- well, probably more than that -- mitigation

5    evaluations or -- which would include mental retardation issues.

6    Q.  What do you mean by -- what does that mean, mitigation?  Is

7    that a term of art?

8    A.  No.  It's --

9    Q.  What?

10   A.  It's when a psychologist is hired to work on a death penalty --

11   Q.  In the forensic context?

12   A.  In the forensic context, yes.

13   Q.  How about have you ever taught medical students?

14   A.  Yes.

15   Q.  Psych residents?

16   A.  Yes.

17   Q.  Forensic psych fellows?

18   A.  Yes.

19   Q.  Can you go into those, please.

20   A.  Sure.  Like I said, every year you would -- I would, well, not

21   you, I would teach medical students about interviewing people who

22   are low functioning, what kind of questions to ask.  I would also

23   teach psychiatric residents the same thing and also give them kind

24   of the primer on what are the IQ tests and what are the adaptive

25   functioning tests, as well as what are other tests that they would

```
 1   see or what they may want to request a psychologist to help them

 2   out with.  And the forensic psychiatric fellows we would go into

 3   mitigation issues as well.  We would work together on many cases

 4   that involved issues related to mental retardation.

 5   Q.  Did that involve, I guess, teaching them -- did you do any

 6   testing in that context?

 7   A.  Yes.

 8   Q.  About how many?

 9   A.  Probably about -- this was two years, maybe 15.

10   Q.  And when were those years, when?

11   A.  That would have been around 1998 to 1999ish.

12   Q.  Have you also taught your peers?

13   A.  I have.

14   Q.  In what context?

15   A.  I taught at -- I know I taught at --

16   Q.  And, again, we're talking about MR here.

17   A.  Right.  At a local, at a Louisiana AAMR conference about

18   working or about issues related to mental retardation, and as best

19   as I can recall, issues related to mental retardation and the

20   criminal justice system.

21   Q.  Have you taught police officers?

22   A.  I have.

23   Q.  Can you explain that to the court?  And, again, talking about

24   MR.

25   A.  I taught the child abuse unit at NOPD about issues related to
```

1    defendants with MR and DD, how to try to best work with them, how

2    to try to recognize when a defendant may need special precautions

3    or help when that comes up, as well as with them related to the

4    people who are standing around or the -- when you're interviewing

5    parents and children, how you would better interview people with MR

6    and DD.

7    Q.  And have you taught attorneys?

8    A.  I have.

9    Q.  And again --

10             MS. FOURNET:  I'm sorry, I didn't hear the last question.

11             THE COURT:  Attorneys.

12             MR. McMAHON:  Attorneys.

13   BY MR. McMAHON:

14   Q.  And again, talking with the focus on mental retardation here,

15   can you explain to the court any teaching you've done to lawyers?

16   A.  I don't -- well, I did a defense workshop here and only part of

17   it involved mental retardation issue, but we went over like a case

18   of an individual who had been charged with aggravated rape and

19   how -- this was identified during the competency evaluation that he

20   was mentally retarded and the benefit of videotaping and things

21   like that, especially in these situations.

22   Q.  Total, in your career -- well, actually up to this, up to that

23   point, let's go on from there.  What did you do from that point to

24   when Hurricane Katrina hit, what were you doing?

25   A.  When Hurricane Katrina hit, I was the director of mental health

1  for the HIV clinic, I was the director of psychology internship

2  training, and I did forensic work.

3  Q.  On the side?

4  A.  Not -- when you're at LSU, everything goes to LSU.  So it was

5  on the side, but it was still under the auspices of LSU.

6            And then there was your administrative duties, your

7  teaching responsibilities, as well as your research.

8  Q.  What did that forensic work, I mean, were you court appointed

9  or were you privately retained?  How did that work if you're still

10  at LSU?

11  A.  When I was initially at LSU, we had the contract to do all of

12  the competency evaluations in Jefferson Parish, and so the vast

13  majority of testimony I had is in that vein, being court appointed

14  to do these evaluations.

15  Q.  Did any of that involve administering IQ tests and adaptive

16  scales, adaptive behavior scales?

17  A.  It did.

18  Q.  And about how many of those did you do?

19  A.  Those were the ones I was talking about earlier, where I would

20  be with the forensic fellows and it was probably around 10 or 15.

21  Q.  How about, what happened after the storm, what did you do, what

22  happened?

23  A.  After the storm, anybody who had all senior faculty in my

24  division were let go from LSU.  The euphemism was, you were

25  furloughed.  And so with 18 hours notice, even if you had been

1    there since 1968, you were let go or furloughed.

2            So with that, that's when I moved to Arizona and began

3    teaching at ASU that January.  I had also done some forensic work

4    out in Arizona prior to that, and so some of the attorneys that I'd

5    worked with -- had worked with put out the mass e-mail that said,

6    this person is here displaced from Hurricane Katrina, if you have

7    any cases, send her.  And so that's how I got out there.

8    Q.  Did you do any MR assessments out there?

9    A.  Yes.

10   Q.  About how many?

11   A.  Specific to MR?

12   Q.  Uh-huh.

13   A.  There was one ADA case, but some of the other cases that I had

14   involved an element of -- almost like Dr. Cunningham said, when

15   you're hired on these cases and you start an evaluation, you start

16   it with, like what Dr. Swanson had said, with your big funnel.  You

17   don't know when you go and you first interview somebody necessarily

18   what's going to be their issue.  And so you usually would do like

19   an IQ test, you would do other -- since I am a neuropsychologist, I

20   would do other neuropsych measures.  And if the individual scored

21   like a 75 or below on the testing, then you would go on to do

22   adaptive behavior testing.  So the initial evaluations are just, go

23   see this person and see if -- what you think.

24           And then from there, if you needed to, then you would do

25   adaptive functioning testing.  And I think there's probably only

1    one where that was really called for.

2    Q.  I take it -- you also work in Arizona now or are you back

3    here -- I mean, I want to go chronologically.  After you relocated

4    to Phoenix, what happened?  We're done with that, pick it up from

5    there.

6    A.  When I was in Phoenix, I always wanted to get back to New

7    Orleans because I love it here.  And Phoenix is nice but it's not

8    here.  And so as things began to rebuild in New Orleans, I was able

9    to start transitioning back to being in New Orleans.  One of the

10   problems was that when I was furloughed from LSU, what do you do

11   with all of your patients, sorry, you know, bye.  That would not

12   work, you can't just tell your patients, because I'm furloughed you

13   can't see me anymore.

14            So I would still come back and see all of my patients

15   that I had before but for free because most of them were on public

16   assistance and other things.  So I continued to do that up until

17   now.  And so as things got more and more up to speed in New

18   Orleans, I've been able to transition more and more to living in

19   New Orleans, so that now I only have to go back to Arizona maybe

20   eight times a year.

21   Q.  And your practice now in New Orleans, you do -- do you do

22   mental retardation assessments?

23   A.  I do.  But now they're in the forensic context.

24   Q.  And how many have you done in the forensic context?

25   A.  In the forensic context since I've been back, I think only --

1    well, no that's not true.  Maybe five.

2    Q.  And in your career total, about how many mental retardation

3    assessments have you done?

4    A.  Probably about 80.

5    Q.  And again, that is including IQ testing and adaptive behavior

6    scale administration?

7    A.  Right.

8    Q.  Let's talk about your licensures.

9    A.  Sure.

10   Q.  Go ahead.

11   A.  I am licensed in Louisiana as a neuropsychologist and clinical

12   psychologist.  I am also licensed in Arizona as a clinical

13   psychologist, they don't have a neuropsychology licensure.

14   Q.  Are you board certified?

15   A.  No.

16   Q.  Why not?

17   A.  It hasn't been necessary.

18   Q.  Could you explain?

19   A.  Well, a few people get board certified.  In fact, in

20   neuropsychology, of the people who are on like the National Academy

21   of Neuropsychology Board, last I looked, it was about half and half

22   were board certified or not board certified.  In forensics

23   psychology, I haven't looked at their boards to try to figure out

24   who is boarded, who is not in that.

25              But it's not like in medicine, where you almost have to

```
 1   get your board certification in order to practice.  In psychology,

 2   you actually do go through a process where you have to go and take

 3   an oral examination, they question you about ethics and about some

 4   of the state laws, and then they show that you're qualified via

 5   your training and your experiences.  And so they do give you an

 6   oral examination, so I was given that in both clinical psychology

 7   and neuropsychology.  So because of that I haven't seen the need to

 8   get board certified and it's never been an issue.

 9   Q.  Have you been recognized by your peers or by relevant

10   associations and received any type of awards?

11   A.  I have.  Three out of the five years I was in graduate school I

12   won the student research award at the National Academy of

13   Neuropsychology, or for the National Academy of Neuropsychology,

14   for best student research that year.  I also won the Louisiana Best

15   Young Psychologist Award one year.

16   Q.  Now, real quick, I just want you to -- I think we may have

17   covered it, but could you just summarize and just quickly go down

18   page three of your CV and relate to the court your academic,

19   professional, and research appointments?

20   A.  Sure.

21   Q.  Just real quick, I just want you to name them.  Go ahead.

22   A.  I am still an adjunct associate professor of psychiatry at LSU

23   Health Sciences Center, I'm adjunct faculty the best that I know

24   still at Arizona State University.

25   Q.  And please enumerate the years, too.
```

1    A.  Oh, sorry.  From December 2007 to present -- I guess that

2    should say December 2005 -- or no, it should be '07.  December 2007

3    to the present I was an adjunct associate professor of psychiatry

4    at LSU Health Sciences Center from the storm -- well, from December

5    from the storm until then I was still considered faculty on

6    furlough.  So that's when I became an adjunct associate professor.

7          I think I'm still adjunct faculty at Tempe, that's

8    January 2006 to present, and I am still a consultant for the

9    Southeast Louisiana Criminal Justice Task Force for rebuilding

10   following Hurricane Katrina.  I was working with the New Orleans

11   Police Foundation on that from December 2005 to present, but I

12   don't have to really do that much for that anymore.

13         And I still have a graduate faculty appointment when --

14   Applied Developmental Psychopathology at the University of New

15   Orleans from January 2004 to present.

16         In the past, I was an associate professor of clinical

17   psychiatry at LSU Health Sciences Center, I was director of

18   training for the clinical psychology internship program from '01 to

19   '06, I was director of research for law and psychiatry from '98 to

20   2000.  I was a lecturer, I guess, at Armstrong Atlantic State

21   University when I taught there.  But I think that's about it.

22   Q.  Are you a member of any professional organizations?

23   A.  I am.  I am a member of the National Academy of

24   Neuropsychology, the American Psychological Association.  I am not

25   sure if I am a member still of the Louisiana Psychological

1    Association, I am not sure if I've paid my dues this year.

2              Similarly, I think this isn't updated right now, I think

3    the New Orleans Neuropsychological Society disbanded and I should

4    have taken that off of my vitae, and I am still involved with the

5    New Orleans FBI Citizen's Academy Alumni Association.

6    Q.  Are you a member of Division 33?

7    A.  No, I am not.

8    Q.  And again, what is that?

9    A.  Division 33 is the division of the American Psychological

10   Association that is dedicated to issues related to mental

11   retardation.

12   Q.  Do you read their publications, do you keep up with them, with

13   the work, with the latest publications in mental retardation?

14   A.  I try.  I know there's things that I haven't seen.  But I do

15   read their newsletters and other things like that.

16   Q.  Are you a member of any editorial boards?

17   A.  I am.

18   Q.  Which ones?

19   A.  I am on the editorial board of the *Archives of Clinical*

20   *Neuropsychology*.

21   Q.  Do you peer review?

22   A.  Yes.

23   Q.  How many articles have you peer reviewed?

24   A.  Probably 20.

25   Q.  Are they listed in your CV?

 1   A.  Oh, no, you don't do that because you don't know who they are.

 2   That's one of the good things about peer reviewing is they're blind

 3   so that you're not going to have any undue influence based upon who

 4   they are when you get them.

 5   Q.  Now, let's go to your -- have you published?

 6   A.  Yes.

 7   Q.  Have you published in the field of mental retardation?

 8   A.  Yes.

 9   Q.  Could you please enumerate those articles for the court?

10   A.  Sure.  In one of the book chapters, I wrote with Deprado and

11   Hammer.

12   Q.  No, we're not on books, I'm on -- well, actually, let's go

13   to -- let's break it down.

14   A.  Okay.

15   Q.  Start with books, books that you've authored or coauthored or

16   collaborated on.

17   A.  Okay.

18   Q.  Enumerate those for the judge, please.

19   A.  I have two books that I've written, with other individuals, and

20   this is an older CV because this book is out now, it says in press

21   on my CV, it's a 2009 book.  Again, both were published by Johns

22   Hopkins, this one is *Planning Parenthood Strategies for Success in*

23   *Fertility Assistance, Adoption and Surrogacies*.  I was a coauthor

24   with Rebecca Clark and some other colleagues on that.

25           The second one, again, Rebecca Clark and I and another

```
 1   gentleman, a physician, wrote A Woman's Guide to Living with HIV
 2   Infection.
 3   Q.  And have you written or collaborated on chapters in books?
 4   A.  Yes.
 5   Q.  And could you go through those quickly, please.
 6   A.  I would just like to point out on my CV, it says Hammer, that
 7   was another name ago, and so if you pull any of the publications,
 8   it's still me, just a name ago.
 9           I have seven book chapters.  The first one -- and again,
10   all of the book chapters are with myself and others, and so rather
11   than read out everybody's names --
12   Q.  You listed seven in your CV.
13   A.  I do.  Do you want me to go through them?
14           THE COURT:  If there's one involved with mental
15   retardation.
16   BY MR. McMAHON:
17   Q.  Yes, any involving MR, if you would.
18   A.  "Assessment and Treatment of Juvenile Offenders," I think that
19   had an itty-bitty area related to mental retardation.  It was --
20   the focus was on juvenile offenders as a whole.
21   Q.  I note rather that others address the topic of malingering in
22   some fashion?
23   A.  Many do.
24   Q.  How about journal publications?
25   A.  Yes.
```

1  Q.  Now, you list actually 21, but could you direct the court to

2  any of those that relate to mental retardation, please.

3  A.  A lot of them have -- you can apply to people with mental

4  retardation, but the only ones that specifically are related to

5  mental retardation are, there's a 2000 publication titled

6  "Individuals with Mental Retardation Transitioning from Adolescence

7  to Independence," "The Other Sister," which was published in the

8  *Journal of the American Academy of Law and Psychiatry*.

9         I have in *Applied Neuropsychology* in '98, "Malingering

10  Detection in a Mentally Retarded Forensic Population."  And in

11  1997, I have "Do Common Tests Predict Malingering in Defendants Who

12  Are Mentally Retarded," and that was in the *Journal of Psychology*.

13  Q.  I think we've covered -- go back to page four of your -- yes.

14  A.  I think there's another one.

15  Q.  Okay.

16  A.  These were book reviews that were published in the *Journal of*

17  *Developmental Disabilities*.  One was a review of the book entitled

18  *Sex Errors of the Body and Related Syndromes*, I believe that was by

19  Money, that was in '95; and also for the *Journal of Developmental*

20  *Disabilities*, I reviewed "Neuropsychology Of Mental Disorders," so

21  both of those were published in that journal.

22  Q.  If you can go back to pages four and five, actually

23  extending -- pages four and five, you do list your teaching

24  experience, responsibilities.  Have we covered all of those, or are

25  there any in there that you want to bring to the attention of the

1  court?  I think we've covered everything.

2  A.  In the forensic nursing certificate program, we would touch on

3  issues related to mitigation, but again, that would be a small part

4  in that.

5  Q.  Okay.  Are you on any thesis, theses, I guess, and dissertation

6  committees?

7  A.  Yes.

8  Q.  Where?

9  A.  I have been at the University of New Orleans, Biola University.

10  Q.  Where is that?

11  A.  Biola I think is in, as far as I can remember, this was a long

12  time ago, it was like in the LA'ish area.  I didn't have to go

13  there.  It was able to be done over the phone.

14  Q.  Anyplace else, how about Tulane?

15  A.  Tulane as well.

16  Q.  And you list on pages six and seven, you have -- we won't

17  enumerate those, you have received various grants and contracts?

18  A.  Yes.

19  Q.  And how about non-funded applications, what does that mean,

20  non-funded applications?

21  A.  That means ones that I tried to get, grants that I tried to get

22  but were denied.

23  Q.  You note on page 10 of your CV videos and multimedia.  What's

24  that about?  And again, let's focus on MR, okay?

25  A.  Okay.  That's video or audio tapes that were made and

1    disseminated to other professionals.

2    Q.  Any of those relate to mental retardation?  If not, we can skip

3    over them.

4    A.  No.

5    Q.  But you do list -- they did concern neuropsychology certainly,

6    correct?

7    A.  Yes.

8    Q.  And what does that mean, scientific exhibits, you have a lot

9    of, you enumerate 11 of those, what is that about or what are they

10   about?

11   A.  Those are usually just poster sessions, if you go to a

12   conference or some sort, they would have a poster session, and what

13   it serves to do is to get research out quicker than if it was

14   published in a journal because it takes awhile to get through the

15   journal process.

16          This is somewhat peer reviewed but not nearly to the

17   level that a journal or an article would be.

18   Q.  You also have a heading of papers, presentations and abstracts,

19   listing 13 items.  Did any of those concern mental retardation?

20   A.  I believe so.  "The Efficacy of the Structured Interview of

21   Reported Symptoms to Correctly Classify Mentally Retarded,

22   Pretrial, Not Guilty by Reason of Insanity, and Malingering

23   Defendants," that's published in the *Archives of Clinical*

24   *Neuropsychology*.

25          Another one on "The Utility of Several Common Malingering

1  Measures to Identify Mentally Retarded, Pretrial, Not Guilty By

2  Reason of Insanity and Malingering Defendants," that was published

3  in the *Journal of the International Neuropsychological Society*.

4  And that's it.

5  Q.  Okay.  I don't think you listed these, but you do have

6  editorial activities.  This is at the bottom of page 14 of your CV.

7  A.  Okay.

8  Q.  Can you just quickly list those?

9  A.  Sure.  Like I said, I'm on the editorial board of the *Archives*

10  *of Clinical Neuropsychology*, I'm an ad hoc reviewer for *Applied*

11  *Neuropsychology*, for the *Journal of Developmental Disabilities*, for

12  *Psychiatric Services*, for the *Journal of Behavioral Education*, and

13  for *Professional Psychology:  Research and Practice*.

14  Q.  Let's talk about, finally, your forensic involvement testimony.

15  Have you summarized your testimony in criminal cases?

16  A.  Yes.

17  Q.  And could you break that down to the court, and I especially

18  would like you to pay special attention to those cases in which

19  you've been involved, whether retained by one side or the other or

20  court appointed, involving especially mental retardation, but I

21  want you to go through the entire -- read the entire panoply there.

22  A.  You want civil, too?

23  Q.  Yes.

24  A.  In criminal cases, the best as I can tell from my data, which

25  only lists from 2001 to now, I've testified as, in criminal cases,

1    36 times.

2              THE COURT:  Can you tell us in what areas those were?

3              THE WITNESS:  Yes, ma'am.  When I testified as the

4    court's expert, it was generally related to competence to stand

5    trial.  And to tell you the truth, I wouldn't be able to tell you

6    what all of the different diagnoses and variables would be on that.

7              THE COURT:  But it was as a forensic psychologist?  Do

8    you remember what you were qualified as?

9              THE WITNESS:  I think I was qualified as a clinical

10   psychologist, you know, a forensic psychologist and somebody

11   qualified me a forensic psychiatrist once, completely in error.

12             THE COURT:  Okay.

13             THE WITNESS:  And a neuropsychologist.

14             THE COURT:  All right.

15             THE WITNESS:  I did -- 14 times I've testified for the

16   defense, though it was ten different cases.  And of those ten

17   different cases, seven of them involved murder, one carjacking, one

18   felon in possession of a firearm, and one I don't remember.

19             THE COURT:  And these were competency assessments?

20             THE WITNESS:  No, these are different.  With the seven

21   murders, one was initially competence to confess and then I

22   testified related to intellectual functioning and how it impacted

23   the crime.

24             THE COURT:  All right.

25   BY MR. McMAHON:

1    Q.  Now, you've testified, you've actually testified in federal

2    court for -- well, for the defendant in two competency assessments,

3    correct?

4    A.  That was the carjacking and I think the felon in possession of

5    a firearm.

6    Q.  Do you remember the name of the defendant in the carjacking?

7    A.  In carjacking, I think it was Glenn Cole in front of Judge

8    Feldman.

9    Q.  And what was the issue there?

10   A.  The issue was mental retardation, actually.

11   Q.  Did you administer an IQ test in that situation?

12   A.  As best as I can recall.

13   Q.  How about an adaptive behavior scale?

14   A.  Yes.

15   Q.  And -- okay.  How did -- what did you find in that case?

16   A.  I found that the individual was mentally retarded.

17   Q.  And how about the other one you mentioned?

18   A.  The other one, I believe his name was Anthony Scott.

19   Q.  Do you remember which court, which judge?

20   A.  I think that was in front of Judge Moore, I think.

21   Q.  Magistrate Judge Moore?

22   A.  Yes.

23   Q.  What was the issue there?

24   A.  The issue was, again, it's competence to stand trial, but it

25   was, I initially felt the defendant was not competent to stand

1   trial.  He was sent to Texas, I think, though sometimes the more

2   defendants are involved in the criminal justice system, whether

3   they get training or not, they get more up to speed on legal

4   issues.

5             And so after the month or two or three or six that he was

6   in Texas he came back, I re-evaluated him, and at that point I

7   thought he was competent; but he was still an individual with

8   mental retardation, but he was competent to stand trial at that

9   time, in my opinion.

10  Q.  You were also involved in another capital case before this

11  court as well?

12  A.  Yes.

13  Q.  But that has not reached -- have you testified in that yet?

14  A.  No.

15  Q.  Back up.  Anything we missed there, did you cover everything?

16  A.  In terms of murder, another one was mitigation for the death

17  penalty.  Obviously, anytime you're hired on a mitigation for the

18  death penalty issue, one of the things is going to be is the person

19  low functioning, retarded, learning disability, so that was

20  evaluated.  The charge was reduced, and I testified related to

21  competence to stand trial on that.

22  Q.  For the defendant or for the prosecution?

23  A.  These are all the defendant.

24  Q.  All defendant?

25  A.  Yeah.

1          Another mitigation for the death penalty on one educating

2     the court regarding false confession.  Two mental state at the time

3     of the offenses and one just a neuropsychological evaluation.  The

4     carjacking and the felon in possession of a firearm were competence

5     to stand trial.

6          And then in terms of the prosecution, there was one rape,

7     one shoplifting and one murder.  And they all three were mental

8     state at the time of the offense.

9     Q.  Could you break down the number of cases in which you've been

10    on the defense side -- I know that's -- you're associated with the

11    defense --

12          THE COURT:  Called by the defense.

13          MR. McMAHON:  Pardon me?

14          THE COURT:  Called by the defense.

15    BY MR. McMAHON:

16    Q.  I have to break this down, like, okay, defense, prosecution,

17    court appointed, but about how many, could you just in total break

18    down your involvement with the defense, with the prosecution and

19    then court appointed, if you would?

20    A.  Sure.  Nineteen times I have testified as the court expert, 14

21    times I was hired by the defense.

22          THE COURT:  Called by the defense.

23          THE WITNESS:  Called by the defense.  And three times I

24    was called by the prosecution.  And that's just the testimony.

25    Certainly there are many, many more cases where you don't actually

1    get to trial.  So that's the criminal summary.

2               MR. McMAHON:  Okay.  At this time, your Honor, I would

3    offer Dr. Hayes as an expert in the fields of neuropsychology,

4    clinical psychology, with an expertise in mental retardation.

5               THE COURT:  Okay.  Any cross?

6               MS. FOURNET:  Yes, your Honor.

7                        TRAVERSE EXAMINATION

8    BY MS. FOURNET:

9    Q.  Dr. Hayes, you began your recitation of your expertise in

10   mental retardation with your undergraduate basic courses, and you

11   indicated to Mr. McMahon that in these undergraduate courses you

12   had a smidge of mental retardation.  Is that accurate, an accurate

13   account of what you said?

14   A.  Not exactly.

15   Q.  Are you denying that you used the word smidge?

16   A.  I used the word smidge but as it related to introduction to

17   psychology.  You have a smidge in your introduction to psychology

18   and then in abnormal psychology you would have a bit more.  Like I

19   said, between like one and ten, twelve or fifteen would be related

20   to mental retardation, and then I also took, and actually, at my

21   college they allowed you to do an individual intelligence test

22   class.  And that was the whole class.

23   Q.  Let me make sure I understand the smidge terminology here.  Did

24   you get a smidge all the way through your undergraduate career or

25   was the smidge related to one particular course?  Where did the

1    smidge come in?

2    A.   The smidge is introduction to psychology, just the one course.

3    Q.   So your basic, I guess we would call it where I went to

4    college, Psychology 101?

5    A.   Exactly.

6    Q.   And in that basic introductory course, mental retardation was

7    one of a number of topics that were addressed by the professor; is

8    that correct?

9    A.   Exactly.

10   Q.   And that is a course, is it not, that not only do all

11   psychology majors take but others who are undergraduates and are

12   interested in learning a little about psychology take that

13   Psychology 101 introductory course; is that correct?

14   A.   Absolutely.

15   Q.   And certainly the focus on that -- in that course is not on

16   mental retardation whatsoever, is it?

17   A.   No, it's an overview of psychology.

18   Q.   Now, you also mentioned abnormal psychology.  Now, this is

19   another basic course for psychology majors, is it not?

20   A.   It's an advanced-level course.  If you refer to Psychology 101,

21   this would be like Psychology 400 or 404.

22   Q.   And you said that 1/10 to 1/15 of that, I believe, if I took

23   notes correctly, 1/10 to 1/15 of that course was devoted to

24   abnormal psychology, I mean, to, excuse me, mental retardation; is

25   that accurate?

1   A.  Mental retardation and developmental disabilities.

2   Q.  Okay.  And again, abnormal psychology is a course that -- was

3   that a required course for all psychology undergraduates?

4   A.  I believe it was.  It's been a long time but I would think so.

5   Q.  And, in fact, isn't that another course that non-psychology

6   majors take?

7   A.  Of course.

8   Q.  And I need to be clear.  You said you took an assessment course

9   in undergraduate school, and maybe I couldn't write fast enough,

10  but could you tell me, elaborate on that a little bit?

11  A.  The best that I can recall, it involved intelligence testing,

12  as well as possibly a few other things.  But the focus was

13  intelligence testing.  As I look back, I am actually surprised that

14  they were allowed to do that because you're not supposed to in

15  undergraduate.

16  Q.  What were the possibly other things, do you remember what the

17  other things were?

18  A.  I think he went over like House Tree Person or something like

19  that back then.  That's the only thing that comes to my mind.

20  Q.  Now, isn't it a fact, Dr. Hayes, that IQ tests have

21  applications in many contexts other than in mental retardation

22  assessments?

23  A.  What do you mean?

24  Q.  Well, I mean, is an assessment for mental retardation the only

25  context in which you give somebody an IQ test?

1  A.  Oh, no, of course not.

2  Q.  So merely getting instruction on generally IQ tests generally

3  is not mental retardation focused, is it?

4  A.  No.  But I recall this one, we actually had to do the tests

5  itself.

6  Q.  So you actually had to do some IQ tests?

7  A.  We did.

8  Q.  Did you actually have to do any mental retardation assessments?

9  A.  No, we did not.

10  Q.  Was the man who taught that course, as far as you knew, an

11  expert on not just IQ testing but mental retardation specifically?

12  A.  To tell you the truth, I don't recall what his background was.

13  I know he was a clinical psychologist, I know he had an active

14  private practice, but I don't know what percentage of time he would

15  spend with people with MR.

16  Q.  And what percentage of time did he spend teaching that course

17  on the specific focused topic of mental retardation, if any?

18  A.  You're asking me to think back to 1989, and so I am trying to

19  do the best I can.  Probably -- I mean, any time you're teaching an

20  IQ test, that's going to be one of the issues that you're covering

21  and that was the majority of the course.  Would every class be

22  devoted to mental retardation, no.  But probably, I would say

23  conservative, 50 percent of the class would involve some element

24  that would apply to mental retardation, if that makes sense.

25  Q.  Well, frankly, not entirely.  I mean, when you say some

1    element, are you referring again to IQ tests?

2    A.  Well, if you're learning an IQ test, that does apply to mental

3    retardation.

4    Q.  I understand that.  But the mere fact that you were learning

5    about how to administer an IQ test is not a focus on mental

6    retardation, is it?

7    A.  I think that you have to have a basis in understanding how to

8    give an IQ test in order to be able to do an evaluation on mental

9    retardation.  So we'll have to disagree on that one.

10   Q.  Undeniably true, but IQ tests are not used exclusively to

11   diagnose mental retardation, are they?

12   A.  No, they are not.

13   Q.  Tell me how much of this course was focused specifically on

14   assessment for mental retardation as distinguished from simply

15   talking about IQ tests.

16   A.  It's been 20 years ago.

17   Q.  Well, do you know if any of it was?

18   A.  I'm sure it was, but to tell you the truth, that was 20 years

19   ago, I can't recall what percentage of the course.  The reason I

20   was able to give you somewhat of the percentages on the other ones

21   is because I taught since then, 101 and abnormal.  I haven't taught

22   this course.  And so, I'm sorry, I can't with any degree of

23   accuracy tell you exactly what percentage of that course was

24   dedicated specifically and solely to mental retardation.

25   Q.  I can't ask you to remember something that you can't remember,

1  Dr. Hayes, and that's perfectly fine.

2        Now, when you went to graduate school, you testified to

3  Mr. McMahon that with your first master's you did some individual

4  IQ assessments; is that correct?

5  A.  That's correct.

6  Q.  And who were those assessments of?

7  A.  We had to assess, as far as I can remember, we had to do a

8  couple of gifted assessments, a couple of mental retardation

9  assessments, a couple of assessments with the elderly, I think it

10  was -- an assessment of another population -- I can't recall if it

11  was like hearing impaired or other types of issues as part of that

12  class.

13  Q.  So the class was not exclusively assessments of mental

14  retardation, there were some mental retardation assessments done?

15  A.  Of course.

16  Q.  And how many?  You said a couple a minute ago.

17  A.  I think it was two or three.

18  Q.  Two or three.  And were those that you did independently, that

19  you did under supervision, or that somebody else did and let you

20  observe?

21  A.  We had to observe some, so I didn't include those.

22  Q.  Okay.

23  A.  All of the ones when you're in graduate school are under

24  someone's supervision certainly because you're not a licensed

25  professional at that point.  So you have to be under someone else's

1    supervision.

2    Q.  And so how many did you do, you personally, under the

3    supervision of what -- whoever was teaching that course, for the

4    purposes of mental retardation?

5    A.  I think it was around two to three.

6    Q.  So two to three.  And these were simply IQ tests, these were

7    not adaptive functioning measures?

8    A.  We would -- in those situations, we would go ahead and do the

9    adaptive functioning measures as well.

10   Q.  In what situations?

11   A.  When you were doing IQ testing on people who you thought might

12   be mentally retarded, they would have us go ahead and do adaptive

13   functioning testing.

14   Q.  So does that mean you did two to three IQ and adaptive

15   functioning measures in this individual assessment program for your

16   master's?

17   A.  Yes.

18   Q.  And what adaptive functioning measures did you use?

19   A.  As best as I can recall, it was the Vineland.

20   Q.  And then did you tell Mr. McMahon that you gave an adaptive, a

21   Vineland instrument on only a few occasions?

22   A.  When?

23   Q.  Or am I misreading my notes?  As a graduate student.

24   A.  Where?

25   Q.  Well, I'm sorry.  I'll have to withdraw the question because I

```
 1   can't read what I've written down here.
 2             There was some discussion of a Vineland given in
 3   connection with shock therapy?
 4   A.   That was while I was at the Medical University of Georgia.
 5   Q.   And is that --
 6   A.   The Medical College of Georgia then.
 7   Q.   Is that when you gave the Vineland on a few occasions?
 8   A.   I think I gave it then no more than I would think six times.
 9   Q.   Six times.  Now, these shock therapy Vinelands obviously were
10   not in connection with a mental retardation assessment?
11   A.   No, they were not.
12   Q.   When you were at LSU in the master's and doctorate program, you
13   indicated that you took several classes, one was on individual
14   achievement tests.
15   A.   Not on individual achievement, if I said that I misspoke.
16   Q.   Okay.  Well, explain it.  I might have written it down wrong,
17   it's entirely possible.
18   A.   One would just be individual testing, or individual IQ testing.
19   Q.   Individual IQ testing?
20   A.   One would be for adults, one would be for children, and then
21   you would take specific classes for neuropsychology as well.
22   Q.   Now, this was not mental retardation focused either, was it?
23   A.   These classes are more teaching you about how to administer the
24   tests and how to administer them properly.
25   Q.   So the answer is, no, this was not mental retardation focused?
```

```
 1    A.  No.  I wouldn't say that because there are different caveats.
 2    I mean, you have to understand how to give these tests to people
 3    who are mentally retarded, so part of the classes would involve
 4    teaching you how to give the test to different populations.
 5    Q.  What part of the class, what percentage of the class was
 6    devoted not just to these achievement assessments, but to mental
 7    retardation assessments specifically?
 8    A.  Probably 10 percent, I would think.
 9    Q.  Okay --
10    A.  Honestly, I am doing the best I can with the percentages.
11    Q.  I don't think anybody is going to criticize you for not being
12    able to give us precise figures, and I include myself in that.  I
13    just want you to give me an estimate.
14              So you took these classes on achievement tests --
15    A.  No.
16    Q.  Achievement -- I'm sorry if I'm misstating it, correct me.
17    A.  Okay.  It's not achievement.  I mean, achievement, you learn
18    how to give achievement tests, but this one is, when you're -- one
19    would be teaching you how to do adult testing, one would be
20    teaching you how to do child testing, and then others would be
21    neuropsychological issues.
22    Q.  So if I wrote down achievement, that doesn't belong in there?
23    A.  Achievement is a subtype of testing.
24    Q.  Okay.  But this was not mental retardation focused course work,
25    this was course work where there were some incidental mental
```

1  retardation issues involved to the extent of about 10 percent; is

2  that correct?

3  A.  I think so.  The best that I can recall.

4  Q.  And then you took a course in psychopathology, correct?

5  A.  Yes.

6  Q.  Now, psychopathology is a different construct for mental

7  retardation, is it not?

8  A.  It is, but that's where we would get the training on mental

9  retardation as well.

10  Q.  So again, you were studying psychopathology, and did you study

11  subjects or were you just reading books?  I mean, what did this

12  psychopathology course involve?

13  A.  Usually, the best that I can recall, and again, it has been

14  awhile so forgive me if I misspeak, the best that I can recall, it

15  would take the DSM, it would break it down into its various

16  components, and then you would get taught about all of the

17  different areas involved in the DSM.

18  Q.  When you say the DSM, do you mean the entire DSM, do you mean

19  the DSM criteria for antisocial personality disorder, do you mean

20  the DSM for mental retardation; what part of the DSM did this

21  course involve study of?

22  A.  It involved the whole thing.

23  Q.  And so this was not mental retardation focused, was it?

24  A.  It was one of the focuses, but it was not -- the whole class

25  was not on mental retardation, no.

1   Q.  And would among the parts of the DSM that you study --

2   A.  You know -- I'm trying to think.  I think we took adult

3   psychopathology and child psychopathology, and they both went over

4   some mental retardation for adults and for children.  So I think

5   there was another class that I forgot.

6   Q.  Okay.  So you took two psychopathology courses, one for adults

7   and one for children?

8   A.  Yes.

9   Q.  And, obviously, there's going to be some overlap between

10  psychopathology and mental retardation because sometimes you have a

11  dual diagnosis; is that correct?

12  A.  Certainly.

13  Q.  And so you learned, among other things, you learned the

14  diagnostic criteria for mental retardation?

15  A.  Of course.

16  Q.  And what percentage of that course work would have involved the

17  mental retardation aspect of the course, approximately?

18  A.  With adults, probably 10 percent, I would think, and with

19  children, probably -- I mean, with mental retardation and

20  developmental disabilities, maybe 50 to 60 percent.

21  Q.  Now, in that course work, were you taught simply the criteria

22  or were you taught how to do an assessment?

23  A.  In adult and child psychopathology, I think you were just

24  taught the criteria.  I think there were -- I'm sorry, I can't

25  remember all of the classes I took in grad school, but I think

1   there were others that actually taught you how to do the testing.

2   I think there was like an adult testing class, a child testing

3   class and then neuropsych testing classes, the best as I can

4   recall.

5   Q.  But, obviously, in neither one of these classes did you work

6   with real people, you were simply studying the concepts?

7   A.  I was simply studying the concepts there, no people.

8   Q.  You mentioned practicums, tell me what a practicum is and what

9   your practicum involved.

10  A.  My -- a practicum is a year-long, 20-hour-a-week basically

11  unpaid position, where you're under supervision and are learning

12  how to work with these populations.  My first practicum was doing

13  evaluations of individuals in a day treatment program, who had

14  dementia or other neurological difficulties.

15  Q.  Let me stop you right there.

16          MR. MILLER:  Judge, I know it's six o'clock, but at this

17  point, I think this has gone beyond the scope of voir dire that's

18  envisioned about testing the qualifications.  This really is more

19  in the area of cross-examination.

20          We've offered her, I don't think there's anything other

21  than this sort of nitpicking that she wants to do, that's something

22  to be done in cross-examination.  We've offered her as an expert, I

23  think it's gone beyond the opportunity the court provided to

24  counsel.  We would ask that these sort of questions be left for

25  more appropriate cross-examination.

```
 1              THE COURT:  Michael, do you concur in your cocounsel's

 2    objection on your behalf?  It's your witness.

 3              MR. McMAHON:  Of course.

 4              MR. MILLER:  Yes, he does.  I won't do it again, Judge,

 5    but it's six o'clock.

 6              MS. FOURNET:  I did it so I can't complain.

 7              MR. MILLER:  I've tried not to take the liberty.

 8              MS. FOURNET:  Can I respond, your Honor?

 9              THE COURT:  Yeah, but let's -- if you have anything else

10    to proffer, go ahead and let's do it very quickly.

11              MS. FOURNET:  I don't know how to do cross-examination

12    quickly, I'll do the best I can.

13    BY MS. FOURNET:

14    Q.  The practicums, none of your practicums were mental retardation

15    focused, were they --

16    A.  Of course.

17    Q.  -- including the one you just described, correct?

18    A.  The one I just described was my first year.  Actually, I recall

19    now because when you're breaking it down like this, my second year

20    was with Dr. Matson, and that practicum was a year-long practicum

21    working with and assessing people with developmental disabilities

22    and mental retardation.

23              THE COURT:  I am going to step in and cut to the chase.

24    I do think that Dr. Hayes is qualified to testify as an expert in

25    the area of mental retardation based on publications, education,
```

1    teaching experience, and court experience as well.  All of the

2    concerns that you have from the defense side go to the weight of

3    her testimony, which I'll certainly take into consideration when I

4    evaluate the weight of her testimony.  And I note the defendant's

5    objections to my curtailing the cross-examination.

6              MS. FOURNET:  Thank you, your Honor, please do so.

7              THE COURT:  Let's recess.  I see the marshals are here

8    and are vigilantly wanting me to recess, and can we start up at

9    8:30 or nine tomorrow morning, how are we doing time wise?

10             MR. MILLER:  I'll leave it up to --

11             MS. FOURNET:  It's up to --

12             MR. McMAHON:  Nine.

13             THE COURT:  Nine.  All right.  We'll start at nine

14   o'clock tomorrow morning and recess until then.

15             THE DEPUTY CLERK:  All rise.

16        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

17                        * * * * * *

18                    REPORTER'S CERTIFICATE

19

20     I, Karen A. Ibos, CCR, Official Court Reporter, United States
     District Court, Eastern District of Louisiana, do hereby certify
21   that the foregoing is a true and correct transcript, to the best of
     my ability and understanding, from the record of the proceedings in
22   the above-entitled and numbered matter.

23

24   _____
     Karen A. Ibos, CCR, RPR, CRR
25   Official Court Reporter