1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

2  *************************************************************

UNITED STATES OF AMERICA

3
                            Docket No. 94-CR-381(C)

4  v.                     New Orleans, Louisiana
                            Friday, September 18, 2009

5
PAUL HARDY

6  *************************************************************

7

8         TRANSCRIPT OF ATKINS HEARING PROCEEDINGS
       HEARD BEFORE THE HONORABLE HELEN G. BERRIGAN
             UNITED STATES DISTRICT JUDGE

9                   VOLUME V

10

11  APPEARANCES:

12  FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                     BY:  MICHAEL E. McMAHON, ESQ.

13                      MARK A. MILLER, ESQ.
                     500 Poydras Street, Room HB-210

14                     New Orleans, LA 70130

15

16  FOR THE DEFENDANT:        HERBERT V. LARSON, JR., ESQ.
                     650 Poydras St., Suite 2105

17                     New Orleans, LA 70130

18                     MARILYN MICHELE FOURNET, ESQ.
                     715 St. Ferdinand

19                     Baton Rouge, LA 70802

20

21  Official Court Reporter:   Karen A. Ibos, CCR, RPR, CRR
                     500 Poydras Street, Room HB-406

22                     New Orleans, Louisiana 70130
                     (504) 589-7776

23

24

25    Proceedings recorded by mechanical stenography, transcript
produced by computer.

1            I N D E X

2

3    WITNESS FOR THE GOVERNMENT:                    PAGE/LINE:

4

5    DR. JILL HAYES

6

7      Direct Examination by Mr. McMahon          1052/22

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2              (FRIDAY, SEPTEMBER 18, 2009)

3           (MORNING SESSION - AFTER MORNING BREAK)

4

5       (OPEN COURT.)

6           MR. McMAHON:  Judge, I think I neglected, here is a copy

7   of the slides for the court.  Do you have one?

8           THE COURT:  No.

9           MR. McMAHON:  I'm sorry.

10          THE COURT:  Okay.  Great.  If you would, Dianne mentioned

11  something to me during the break that I think was a good point.  I

12  don't know, we may have, I don't know that we've had testimony

13  regarding the practice effect with respect to neuropsychological

14  testing.  It's logical to me that it would exist, but I think we

15  only had testimony regarding the practice effect with respect to IQ

16  testing; and so I think we need to get into the record that

17  presumably that if there is, in fact, statistically shown a

18  practice effect, I don't think we have.  So obviously you're

19  qualified to tell us that, but I think we need to have it in the

20  record.

21              CONTINUED DIRECT EXAMINATION

22  BY MR. McMAHON:

23  Q.  Dr. Hayes, I think what the court is inquiring is what -- what

24  is the significance of the test results, the neuropsych test

25  results from Dr. Martell vis-a-vis Dr. Bianchini, and how does that

1  dovetail into the discussion of the practice effect relative to the

2  IQ testing or the suggestion of a practice effect?

3          THE COURT:  Maybe I am not being clear enough.  I just

4  need to know from Dr. Hayes if, in fact, in general there is shown

5  to be a practice effect that applies in neuropsychological testing,

6  that's all I really need to know.

7          THE WITNESS:  Yes, there is, definitely.

8          THE COURT:  Can you just elaborate on it a little bit?

9          THE WITNESS:  Certainly.  Neuropsychological tests are

10  not that dissimilar from the IQ tests in terms of you would expect

11  a practice effect going from one test to another in such a short

12  period of time.  Some of the tests have more practice effect than

13  others, but all of them you would expect practice effect.

14          THE COURT:  Okay.  That's enough.  Thank you.

15  BY MR. McMAHON:

16  Q.  Dr. Hayes, let's go to your report on page 26 and following,

17  your Honor.  And there was some discussion in the defendant's case

18  regarding some of the other indicators that again taken in

19  combination certainly cause concern to you, correct?

20  A.  Correct.  And I believe you're referring to page 24.

21  Q.  What did I say?

22  A.  Twenty-six.

23  Q.  I misspoke, I meant 24.  And thank you for correcting me.

24          So let's go on, I think it's going to be, there was some

25  talk by the defendant's experts regarding the MMPI and how you

1    don't use it or something to that effect, and it's never given in

2    the context of an IQ test with someone who is mentally retarded.

3    Can you address that criticism of your report, that portion of your

4    report?

5    A.    Certainly.    I would agree with Dr. Cunningham that you don't

6    give an MMPI-2 or an MCMI-II to an individual who is mentally

7    retarded, I wholeheartedly agree.    I think that's why the MMPI-2

8    and MCMI-II were given to Mr. Hardy is because the four evaluators

9    who initially saw him did not think he was mentally retarded so

10   they felt like those measures were appropriate for Mr. Hardy given

11   that they did not believe that he was mentally retarded.

12   Q.    And referring to the second bullet point on page 24, there's a

13   quote that Mr. Hardy, "was inconsistent in answering questions and

14   over reported his level of psychopathology in an effort to appear

15   more disturbed than he really is."    Who said that?

16   A.    I believe that was going to be in one of the Tetlow printouts,

17   I believe, don't quote me on that one.    I trust the quote more than

18   my memory.

19   Q.    And so what's the significance of having that in your report?

20   A.    The significance of that is that the MMPI-2 is a

21   well-standardized, well-used measure in the area of forensics and

22   in psychology in general, and that is just again another one of the

23   check boxes for this doesn't make sense.    He was inconsistent in

24   answering the questions and appeared to overstate his level of

25   psychopathology.    It is what it is.    Again, that was what was

1    reported.

2    Q.  Let's go to the third bullet point on 24.  The Millon Clinical

3    Multiaxial Inventory-II.  What did that indicate and why did you

4    find it at least to be of some significance?

5    A.  It also indicated that he had a tendency to magnify his

6    psychological difficulties was one of the hypotheses for why he had

7    the score structure that he had.  And so again, that was another

8    point that I felt needed to be brought out.

9           Again, I agree, you don't give these tests to people with

10   MR, but that assumes that you believe that he had MR.

11   Q.  Again, touching the point that you made, like the MMPI, if

12   you -- you don't give them to people who are mentally retarded, but

13   nobody in 1996 thought that Hardy was mentally retarded, correct?

14   A.  Correct.

15   Q.  And so it's almost -- I'll stop it at that.  So they were

16   administered?

17   A.  Yes.

18          THE COURT:  Let me just step in again, if I could, it's

19   just because I want to keep my train of thought.  Is your reason --

20   what reason do you have that why these two tests should not be

21   given to someone who is mentally retarded?

22          THE WITNESS:  There is not a lot of data, if almost any,

23   I think there's one article using the old MMPI with people with

24   mental retardation in combination with another couple of tests who

25   look at malingering.  But there's not a lot of data because the

```
 1    MMPI is written, depending on who you look at, between a 6 to 8th
 2    grade reading level.  And you also have to have the requisite
 3    comprehension in that area as well.
 4               THE COURT:  Okay.
 5               THE WITNESS:  And so that's why you just don't give those
 6    to people with MR.  A better measure would be something like the --
 7    if you thought a person was MR and you're still trying to
 8    understand their psychopathology, you would give them something
 9    called the PIMRA, which stands for the Psychopathology Inventory
10    for Mentally Retarded Adults, and that was not given.
11               THE COURT:  And you're saying the same thing with respect
12    to the Millon Clinical is because the person needs to have a 6th to
13    8th grade reading level and a certain level of cognitive
14    functioning just to understand the test?
15               THE WITNESS:  Certainly.
16               THE COURT:  All right.  Go ahead, Mike, I apologize.
17    BY MR. McMAHON:
18    Q.  We're on page 25 now, the first bullet point.  This indicator
19    was kind of dismissed by the defendant and I want -- this is in
20    regarding to reporting, self-reporting head trauma.  And why was
21    that indicator, why was that contained in your report, part of your
22    report?
23    A.  I thought this was significant because you have to look and see
24    is the defendant or are the defendant's statements consistent, does
25    what he tell one evaluator or in one situation match up with what
```

1    he tells another evaluator in another situation.  This is certainly

2    in 1994 after he had been incarcerated for the murder of Kim

3    Groves, and he only mentioned having lost consciousness once at age

4    16.  That to me is significant because he had told Dr. Bianchini

5    that he had a moderate head injury when he was in jail previously,

6    and there was no documentation that I could turn up or that was

7    furnished to me that indicated that that was true.

8              And so again, it's another inconsistency in what

9    Mr. Hardy is saying between evaluators.  And of course that's

10   important.

11   Q.  What about the self-report to Dr. Bianchini regarding a

12   truancy?

13   A.  Mr. Hardy had said that he was not, did not miss school much.

14   And when you look at that and when you look at his school records,

15   his school records suggest otherwise.

16   Q.  And we've spoken a lot, or we didn't, but there was a lot of

17   talk about the serial sevens.  Would you care to elaborate on that

18   at all or can we move on?

19   A.  Just that when you look at the serial sevens they are

20   inconsistent.  Doing serial sevens in 36 seconds, while it may not

21   be as fast as Dr. Cunningham or as fast as Dr. Swanson can do it,

22   is not that bad.  And then you move to my evaluation, Dr. Swanson's

23   evaluation, it was not undertaken with Dr. Swanson based upon the

24   reasons that she outlined.  I decided to go ahead and try to get

25   him to do it, and it took him a minute and 15 seconds.  And

```
 1   Dr. Cunningham also had indicated in his report that there was no

 2   difficulty with serial sevens.

 3             So again, you're looking at inconsistencies in what

 4   Mr. Hardy can do and how well he can do it at different time points

 5   to try to give you an understanding of how reliable the testing

 6   that you're looking at is.

 7   Q.  The next point regarding Hardy's being queried about political

 8   figures.  Who was the governor, who was governor when Hardy was

 9   first asked about that, can you recall?

10   A.  I'm taking Dr. Swanson's word for it because I don't follow

11   politics that much, but I believe it was Blanco.

12   Q.  Did you elaborate, did you ask about more or different

13   political figures than did Dr. Swanson to the best that you could

14   determine?

15   A.  I believe I asked about the current president, which

16   Dr. Swanson did.  I asked about --

17   Q.  I'm sorry -- okay.  Go ahead.  Actually who was -- who was the

18   president when Dr. Swanson interviewed Hardy first?

19   A.  I do know that one, it was Bush.

20   Q.  And who was the president when you interviewed him?

21   A.  It was our current president Barack Obama.

22   Q.  And what other political figures did you ask Mr. Hardy about

23   and did he know them?

24   A.  I asked him about the governor, and he did; I asked him about

25   any Senators, and he said that he knew David Vitter was a Senator.
```

1    Q.  And according to the transcript he actually said Vitter,

2    mentioned Vitter by name, David Vitter, correct?

3    A.  Yes.  And I asked him if he knew why David Vitter was in

4    trouble and he said, yeah, messing with a prostitute.

5    Q.  You were criticized for your use of idioms and labelling them

6    proverbs.  Do you care to comment on that, please?

7    A.  Sure.  Idiom, proverb, proverb, idiom, I am referring to

8    figures of speech.  I am asking him there to explain the figurative

9    concept in literal terms, and so I apologize if I mislabeled an

10   idiom as a proverb.

11   Q.  And the last bullet point on page 25 and extending to 26,

12   talking about variably on memory measures and Dr. Bianchini's

13   evaluation.  Have we already discussed those or do you care to add

14   more to that?

15   A.  Well, one of the things that the defense had brought up is that

16   the Neurobehavioral Cognitive Status exam is a brief measure, and

17   it is.  But on that measure I think you have like four words that a

18   person's asked to remember.  If we can recall back to the

19   California Verbal Learning Test, Mr. Hardy at his first, on his

20   first go round with the 16 words was able to recall 10 out of the

21   16.  I believe with the four, it was either four or five, I believe

22   it's four, he was able to recall two.

23   Q.  What conclusion could you draw from what or what conclusion may

24   be drawn from that?

25   A.  Again, you're looking at does the data make sense and that just

1   does not make sense that he could recall on his first go round with

2   the Wechsler or with the -- excuse me, the California Verbal

3   Learning Test that he could recall 10 out of 16 words and then on

4   the Neurobehavioral Cognitive Status Exam he was able to recall two

5   out of four.  Especially when he was also able to recall more

6   digits than that forward.  For example, if I said, 4, 7, 2, 3,

7   those are words as well and he could do that, but he wasn't able to

8   recall four words immediately forward.

9   Q.  When you're doing such a retrospective evaluation, records are

10  important, are they not?

11  A.  Absolutely.

12  Q.  And in the school records, we did -- you were able to examine

13  the results of various achievement tests taken by Mr. Hardy, right?

14  A.  Yes, I was.

15  Q.  And talk about them in comparison to testing that Dr. Tetlow

16  did.

17       MR. McMAHON:  And I am referring, your Honor, page 26,

18  the first full bullet point.

19       THE WITNESS:  Certainly.  Mr. Hardy was given two

20  achievement tests when he was in high school with regard to math.

21  Again, these were the California Test of Basic Skills and this was

22  in the 9th grade and the 10th grade.  And again we're comparing

23  this to national norms -- not national norms, excuse me, to large

24  city norms such as like LA or Chicago, New York and New Orleans.

25  And when his performance was compared to large city norms, he was

1  functioning with regard to math based upon his peers at the 60th

2  percentile rank and one year at the 87th percentile rank on other

3  years.  Again, this is his 9th and 10th grade years.

4          So even if you did a gross adjustment to switch this into

5  or attempt to switch this into national norms, he would still

6  likely be functioning in the average range.  And so, therefore, he

7  would be average equal to his peers in the 9th and 10th grade on a

8  national level.

9          But then when he's tested by Dr. Tetlow, his math skills

10  were measured to be at the 9th percentile at the 6th grade level,

11  and with Dr. Swanson at the 16th percentile at the 6th grade level,

12  despite him being average in the 9th grade and 10th grade.

13  Q.  This is yet another inconsistency that you thought bore further

14  scrutiny?

15  A.  Certainly.

16  Q.  And finally, did you do a comparison to Mr. Hardy's ABLE score,

17  the Adult Basic Learning --

18  A.  Examination.

19  Q.  -- Examination.  With the Kaufman Test of Educational

20  Achievement-II, the KTEA-II administered by Dr. Swanson, and I

21  think you did -- I'd like you -- you did a comparison or a contrast

22  and comparison with a chart on the top of page 27 of your report,

23  did you not?

24  A.  Yes, I did.

25  Q.  And could you discuss that very briefly?

1    A.   Certainly.   Obviously they're not the same test and so you are

2    comparing like a Granny Smith apple to a Red Delicious, they're

3    kind of getting to the same thing but they're not exactly the same

4    thing.   And so on the ABLE with regard to language, writing and

5    spelling he was at the 4th and 8th grade and a certain number of

6    numbers.   And on the KTEA, the second edition, which Dr. Swanson

7    gave you, he was at the third grade, seventh month.

8             With regard to his math skills on the ABLE, he was at the

9    6th grade, 8th month in the 8th grade, and on the same with

10   Dr. Swanson who was at the 6th grade.

11            The biggest discrepancy obviously was in reading

12   comprehension and reading, where on the ABLE he was at the 13th

13   grade level and the KTEA he was at the 6th grade level.

14   Q.   Based upon the foregoing, what did you conclude?

15   A.   Well, you've got to look at the cumulative effect of all of the

16   indicators.   And again that was not an exhaustive list.   The

17   cumulative effect of the indicators indicates -- that doesn't make

18   much sense grammatically -- but the cumulative effect of the

19   indicators suggest that Mr. Hardy had inconsistent results,

20   inconsistent findings such that it raises serious questions about

21   the reliability of the various cognitive assessment measures.

22   Q.   What about those malinger tests he passed?

23   A.   The malinger tests he passed, he did.   Those tests there are

24   some problems with them.   They don't have good -- actually

25   sensitivity.   And what I mean by that is -- is there chalk?

1    Q.  Dr. Hayes, for the record, can you just describe for the record

2    what exactly you're doing?

3    A.  I am writing on a black board just a diagram indicating an

4    explanation of why those malingering tests are not the best in the

5    world.

6    Q.  So you have a square divided into four squares:  The top left,

7    true positive; top right, false positive; bottom left, false

8    negative; bottom right, true negative; correct?

9    A.  Correct.

10   Q.  So go ahead and continue.

11   A.  On the top I have test and on the left-hand side I have real

12   world.  Let me just put this in an every day example.  Say you go

13   to your doctor and you want to find out if you have cancer.  You

14   want a test that is going to be as accurate as you possibly can.

15   You want to make sure that you maximize that when you take that

16   test that you actually have cancer or you don't.  So you want to

17   have as many true positives and as many true negatives as you can.

18   So that if you have cancer, the test shows that you have cancer.

19   If you don't have cancer, you want to be darn sure that the test is

20   right.  Okay?

21          And then the other things you want to eliminate would be

22   false positives.  A false positive would be when yours said that

23   you have cancer when you really don't; and what would be worse in

24   that situation would be a false negative is when you're told that

25   you don't have cancer when you actually do.

1           This is referring to the sensitivity and specificity of a

2   test or how accurate the test is.  And the tests that were given to

3   Mr. Hardy back in 1996 have high specificity, that is if an

4   individual pops on that malingering test and you get a finding of

5   malingering, you can be pretty darn sure that they are malingering;

6   but it has low sensitivity such that you're not going to pick up as

7   many people who are responding in a bias fashion as you possibly

8   could.  So you're going to have on the test that he was given in

9   1996 too many in the false negative category.

10  Q.  Now that you have an accumulation of all of this data about

11  which you've testified, do you think that these, a malingering test

12  should have been administered to Hardy?

13  A.  Absolutely.

14  Q.  Is there one current that you would suggest should have been

15  done?

16  A.  There is a little bit of discrepancy in the field, but I think

17  out of an abundance of caution you should do it.  There is the Test

18  of Memory Malingering is one, another one would be the Word Memory

19  Test, there are some other ones that there is data on.  But again,

20  you know, these are tests that like the Word Memory Test that 3rd

21  grade children do fine on, people with Alzheimer's dementia do fine

22  on, there is a sample with children with mild mental retardation.

23          And so these tests are normed on various groups that do

24  have cognitive difficulties and such that if Mr. Hardy came up in

25  the range that was indicative of poor effort, then it would let you

1    have another window into whether or not he was actually putting

2    forth maximum effort or if the testing was inconsistent.

3    Q.  Why didn't you give him one?

4    A.  Again, I would have to be videotaped.

5    Q.  What's your conclusion up to this point?

6    A.  My conclusion up to this point is that, I mean, there was just

7    too many inconsistencies in the testing.  I mean some things were

8    consistent, but you had way too many inconsistencies from which you

9    could actually rely on this data to say that this is a real good

10   set of tests upon which to rely upon to determine this gentleman's

11   true IQ score.

12   Q.  Did you look to other available records?

13   A.  Of course.

14   Q.  Like what?

15   A.  I looked at school records, I looked at Bureau of Prisons

16   records, I looked at a number of different records.  But what I was

17   trying to do was to determine are there any other things that may

18   help inform the issue of IQ because I now knew that the IQ testing

19   was not reliable.

20   Q.  Would it be fair to say that the results obtained in 1996 were

21   reflective of Hardy's minimum, minimum at best?

22   A.  They would suggest that that was his minimum level of

23   performance.  Because if you know that someone is either not trying

24   their best or not putting forth enough effort, had fluctuating

25   attention, the room was too cold, they hadn't eaten, whatever the

```
1   reason is, then you know that at least they can do that at the very
2   least.
3   Q.  Did Dr. Bianchini and Dr. Martell both indicate that Hardy had
4   cognitive strengths?
5   A.  They both did.
6   Q.  And I believe you discuss those at pages 36 and 37 of your
7   report.
8   A.  Okay.
9   Q.  Go ahead.
10  A.  Dr. Bianchini had indicated that Mr. Hardy continued to have
11  significant cognitive strengths such that he did not evidence any
12  emotional or organic lability or impulsivity that sometimes
13  accompanies brain injury.  In addition, he continued to show
14  evidence of considerable cognitive adaptability including good
15  problem solving, reasoning, mental flexibility, and set shifting
16  abilities.
17  Q.  You noted as well something interesting between --
18  A.  Wait.
19  Q.  I'm sorry.
20  A.  I think you were referring to both Dr. Bianchini and
21  Dr. Martell.
22  Q.  Right.
23  A.  That was Bianchini.  Martell had indicated that his strengths
24  were in memory, new learning, verbal fluency, visual organization,
25  sensory perceptual function, motor function and control, executive
```

1    control function, such as higher order planning, organization and

2    direction of behavior, and attention and concentration.  So there

3    was a little bit of difficulty in their opinion regarding

4    Mr. Hardy's attention and concentration.

5    Q.  I want you to point out to the court an observation you made

6    between the Category Test and the Wisconsin Card Sorting Test.

7    A.  Sure.  Remember we were talking about T scores that had an

8    average of 15 and standard deviation of 10.  I had indicated on the

9    Category Test, that one that we flashed up and everybody got to

10   look at and figure out what was the number between one and four,

11   that Mr. Hardy was at a T score of 38.  That is still mildly

12   impaired, but it is definitely not two standard deviations below

13   the mean, as that would be less than 30.

14           On the Wisconsin Card Sorting Test, which is another test

15   that is one of the classic neuropsychological test where a person

16   is trying to sort various cards based upon, again, a series that

17   you're trying to figure out.  On that test Mr. Hardy had a T score

18   of 77, which if you recall the T scores have an average of 50,

19   standard deviation of 10, so 77 minus 50 is 27.  So he is 2.7

20   standard deviations above the mean, so that would indicate that he

21   was functioning on that test, which is not an easy test either, at

22   greater than the 99th percentile, meaning that he was equal to or

23   better than in this abstract reasoning task 99 percent of the

24   population.

25   Q.  Even taking into account the practice effect?

1  A.  Yes.  Because he did have it when -- he was given it with

2  Dr. Bianchini, so again I do need to qualify that that was with a

3  practice effect.

4  Q.  But still --

5  A.  That's good.

6  Q.  So the cognitive testing indicates that Hardy actually was

7  operating at a higher level, correct?

8  A.  I would agree with that.  If you look at his memory test -- I

9  mean, remember the California Verbal Learning Test, the one that

10  had all of the 16 words on it.  I mean, after a 30-minute delay I

11  think he was still able to recall 14 or 15, I don't have that in

12  front of me right now -- or actually, let me look so I can be

13  clear.  He was able to recall 15 out of 16 words after a 30-minute

14  delay.

15       His Wechsler Memory Scale Revised initially when it was

16  given by Dr. Martell was in the low average range and -- it was in

17  low average to average range with Dr. Martell, and I do think we

18  should look at that one because of the practice effect.

19       But those both are memory measures and he's functioning

20  in the low average to average, whereas now if you look at his IQ, a

21  73 is in the borderline range.

22  Q.  There's been a lot of talk about the Flynn Effect.  Now, can

23  you -- what --

24       THE COURT:  Can I jump in before you switch over to the

25  Flynn Effect?  I meant to ask you a question and I frankly forgot

1  to ask you.  I assume these various -- this is going back to the

2  neuropsychological testing, which I failed at the third level.

3          Is there statistics or scores that indicate what pure

4  guesswork comes out at?

5          THE WITNESS:  Pure guesswork would be anywhere from like

6  25.  You know, like if you have a scale of 50, you would expect

7  that if you gave the test to any person that they would get around

8  a 25.  If you go down below around 12 based upon the binomial

9  distribution, if you have below 12 there would be indicators that a

10 person was consciously feigning.  If it's a -- and this is in yes,

11 no, types of tests.

12         So on this test given that there are four choices, you

13 would expect if a person was purely guessing that his or her score

14 would be about a quarter of the total score.  So if there were 100

15 items, it was pure guessing, and the person by chance would get

16 about 25 right.

17         THE COURT:  Okay.  Go ahead.  Flynn Effect.

18 BY MR. McMAHON:

19 Q.  I'm going to go to the DSM diagnostic criteria in a minute, but

20 let's talk about the Flynn Effect first.

21 A.  Okay.

22 Q.  There's been a lot -- it's been suggested by the defendant that

23 the Flynn Effect should have been applied to Hardy's IQ scores.

24 You don't agree with that proposition, you don't embrace it

25 entirely, do you?

1    A.  No, I don't.

2    Q.  And what got you thinking about this?  And kind of like explain

3    your opinion regarding this to the court.

4    A.  I've also been interested in mental retardation obviously.  You

5    know, I had done the practicum with Dr. Matson, we actually went

6    into business together where I traveled around Louisiana and did

7    evaluations of various group homes and treatment there.  I did my

8    research on malingering and mental retardation which meant that I

9    had to evaluate a number of people at Feliciana Forensic Facility

10   with regard to mental retardation.  So I've always been interested

11   in the topic.

12          And so when I started getting hired on more of the cases

13   where mental retardation was an issue, I felt like, similar to

14   Dr. Swanson, like you need to be a good professional, you need to

15   know everything that's out there in the field.  And the more I

16   started reading the research, the more I started becoming unsure

17   about the veracity of the Flynn Effect with regard to people who

18   are in the borderline and below range.  The reason being is because

19   almost all of the studies, all of them, are done with people who

20   are in the normal range.  Normal, low average, high average.

21          In fact, I was so curious that I tried to contact

22   numerous people about the issue.

23   Q.  Including Flynn?

24   A.  Including Flynn, yeah.

25   Q.  I know you did cite articles in your report that Dr. Cunningham

1    actually went over.  Let's talk about those contacts that you made

2    to try to -- what was -- so go ahead.  So like you really noticed a

3    paucity of research in the Flynn Effect on those with MR or mild

4    MR, correct?

5    A.  Not only MR but I am looking at borderline and down, because if

6    you look at Mr. Hardy's obtained IQ score, even if you think that

7    his IQ score at 73 is valid, which I do not, then you've got to

8    look and see what effect the Flynn Effect would have on Mr. Hardy's

9    IQ score.  And so you need to make sure that there's been research

10   done to prove the Flynn Effect on people who are low functioning.

11        The only really good study was one that Dr. Cunningham

12   flashed up that I saw which was the Kanaya study that was done in I

13   believe 2003.  And Kanaya is K-A-N-A-Y-A.  And in that study the

14   only population that they looked at was children.  And Flynn Effect

15   held, and so I don't disagree with that.  I don't disagree that

16   Kanaya said the things that Dr. Cunningham had indicated in the

17   article.  My problem was still this is with children, this isn't

18   with adults.  You know, how do we know.  It's a situation where you

19   don't just say trust me, I am a doctor.  It's a situation where I

20   felt like you needed to have the data.

21        And so I started looking for the data and started asking

22   people, is there data on this.  I asked Flynn, Olley, Greenspan,

23   Whiteman.  Honestly, I can't remember all of the people that I

24   contacted.

25   Q.  Olley is Greg Olley?

1    A.  Yes.

2    Q.  Greenspan, his name has come up all week.

3    A.  Stephen Greenspan, I think it's with a P-H.

4    Q.  When you contacted Flynn, how was this, by telephone, e-mail,

5    what?

6    A.  I contacted Flynn, Flynn lives in Australia, so I contacted him

7    by e-mail.

8    Q.  So what did you ask him?

9    A.  Can you point me to any research that's been done that will

10   corroborate or that has any data, hard data, on whether the Flynn

11   Effect applies to individuals in the borderline or mild range

12   basically.

13   Q.  Did he respond?

14   A.  He did.

15   Q.  What did he say?

16   A.  Read my book.

17   Q.  Did you read his book?

18   A.  I did.

19   Q.  Did you find that information?

20   A.  No.

21   Q.  How about, let's go to Greenspan --

22   A.  Again, not in adults.

23   Q.  I'm sorry?

24   A.  Not in adults, there is data based on children.

25   Q.  Let's go to Greenspan.  How did you contact him?

1  A.  Actually somebody else put me in contact with him, I can't

2  recall who, and he was going to be in town for the AAMR conference.

3  So he came over and we had drinks over the topic.

4  Q.  What did you ask him?

5  A.  The same question.

6  Q.  What did he say?

7  A.  He said he felt like the Flynn Effect would hold water in the

8  borderline and mentally retarded population, that was his opinion.

9  But that, you know, certainly that that was his opinion but still I

10  believe the data that he had indicated was look to Kanaya and again

11  Kanaya is with children.

12  Q.  And what about your contacts with Olley, can you describe them?

13  A.  Sure.  Dr. Olley and I have been in contact many times.  He

14  actually felt like it would be a good topic for the next American

15  Psychological Association meeting and suggested that I try to put

16  in a panel discussion related to that.

17  Q.  Now, recognizing your concern --

18  A.  Let me go back, too.  Another thing that he said was thank you

19  for asking all of these different people so that hopefully we can

20  talk about this between colleagues and not try to fight it out in

21  court.

22  Q.  So Olley thought that further inquiry would be warranted?

23  A.  It was suggested to me when he said why don't you put together

24  a panel presentation, the deadline is December 1st for the next

25  American Psychological Association meeting.

1  Q.  Now, you testified to this effect recognizing that in at least

2  one case a federal appeals court kicked back an Atkins issue to the

3  district court level because the Flynn Effect was not applied and

4  they said apply it.  So with that caveat, does that -- at least

5  what does that say about your conclusion?

6  A.  I think that's legal issues that is really outside my area of

7  expertise.  I was simply looking for is there data, good data, hard

8  data, using appropriate sample sizes, using appropriate tests to

9  see does the Flynn Effect hold water in people with borderline

10  intellectual functioning and mild mental retardation.  And as you

11  go up the IQ curve, you can see the that the Flynn Effect is

12  definitely there, it's definitely real, and I agree with it 100

13  percent.

14      What I am still unclear on is does the Flynn Effect apply

15  in people as you go down the range, for the reason being is one of

16  the things that's been pointed out is the standard error of

17  measurement.  So if Mr. Hardy has plus or minus five and if you

18  consider 73 to be his accurate IQ score, then he could be in the 68

19  range of IQ, right?  Which would be in the mild mental retardation

20  range, which there have been studies that suggested that either the

21  Flynn Effect was not there or there were reverse Flynn Effects or,

22  you know, there were Flynn Effects.

23      So I think the data is just -- to me the question is

24  still out.  I agree that the best researchers in this area all say

25  that, yes, the Flynn Effect holds water in people with mental

1    retardation, but they couldn't answer the hard question of show me

2    the data.

3    Q.   Who is Tulsky?

4    A.   Tulsky was the developer of the Wechsler Adult Intelligence

5    Scale, Third Edition, or he was one of the developers, he was one

6    of the two main guys.

7    Q.   So he is a heavyweight, correct?

8    A.   He is.

9    Q.   And do you accept the regression to mean phenomenon described

10   by Tulsky?

11   A.   I do.

12   Q.   Even taking into account the Flynn Effect, what does that tell

13   you?

14   A.   It suggests that you when you look at the plus or minus five

15   that it's more likely going to be toward the plus side than the

16   minus side, that's what it is simply.

17   Q.   Would the examination of school records assist in the

18   consideration of Criterion A IQ?

19   A.   Certainly.

20   Q.   Why?

21   A.   Obviously it's not a perfect correlation, I don't think

22   anything is most of the time.  But certainly school performance is

23   indicative of IQ, it is correlated.

24   Q.   And based upon Dr. Swanson herself it appears that from

25   kindergarten to the 6th grade Hardy was fine, correct?

1   A.  As far as I could tell he had all S's and G's.

2   Q.  His attendance was good?

3   A.  I don't recall what his attendance was in elementary school.  I

4   would have to refresh my memory if you want me to testify to that.

5   Q.  Is this when you contacted Stacy Stewart?

6   A.  Yes.

7   Q.  Who is she?

8   A.  She was just a person who worked at the New Orleans Public

9   School System office who I contacted, I asked to speak to somebody

10  who knew definitively what an S was and what a G was because their

11  legend was not indicated on the school records, and she had

12  indicated that, yes, an S is satisfactory and a G is good.

13  Q.  And in the 8th grade he had about a C average?

14  A.  As best as I could calculate, he had anywhere from A's to D's,

15  but I think it was maybe a little bit above a 2.0.

16  Q.  Now, was there any evidence to indicate that Hardy was in Title

17  I -- what's Title I for the record?

18  A.  Title I was a -- is a -- again, I can't testify to what the law

19  actually is, but it's basically similar to "no child left behind"

20  meaning that you would like to make sure that children who need

21  special education get special education.  And so I can't say it's

22  the same thing as "no child left behind" I am just trying to use a

23  current example.  But the issue is that you wanted to identify

24  children with special needs and get children with special needs

25  assistance while they're in school.

```
 1   Q.  You saw that form from Booker T. Washington that we did

 2   actually display, I think we can actually -- if you could bring

 3   this up.

 4             THE COURT:  I see a number down at the bottom.  Can you

 5   read that?  Just trying to find it, this is in the packet?

 6             MR. McMAHON:  Yes, it is, your Honor.

 7             MR. NGUYEN:  Page 39.

 8             MR. McMAHON:  It should be in there.

 9             THE COURT:  Page 39.  Thank you.  Okay.  Got it.  Thank

10   you.

11   BY MR. McMAHON:

12   Q.  That's a release form from Booker T. Washington High School,

13   correct?

14   A.  That's right.

15   Q.  And right at the bottom, the bottom left -- and this is --

16   we're not talking about "no child left behind" that the

17   president -- legislation from the former president?

18   A.  Of course not.

19   Q.  This goes back many years, correct?

20   A.  Correct.

21   Q.  And that is noted on that form Title I, correct?

22   A.  Correct.

23   Q.  Did you do further research or attempt to verify about --

24   because Dr. Cunningham really denigrated or really was quite

25   dismissive of special education in the Orleans Parish schools.  Did
```

1    you do some further digging in that area?

2    A.  I did.  I was able to get some information from Special Agent

3    Steve Nom (PHONETIC) of the FBI to look into the issue, and he had

4    contacted and I have a 302 --

5            MS. FOURNET:  Your Honor, this is, if I may -- and pardon

6    me for interrupting you, Dr. Hayes -- but this is one of the 302s

7    that I objected to earlier that I was handed this morning.

8            THE COURT:  Okay.  And do you have a copy of it I can see

9    also?

10           MR. McMAHON:  I don't have them right up here at the

11   podium, Judge.

12           MS. FOURNET:  I'll be happy to lend you mine, your Honor,

13   as long as I can have it back.

14           THE COURT:  I just need to -- tell me who it is again,

15   who is being interviewed?

16           MS. FOURNET:  According to what I have here, your Honor,

17   it's Stanislas D. Rachal, R-A-C-H-A-L, a primary education teacher

18   in the New Orleans Public School System.

19           THE COURT:  And what was the date?

20           MS. FOURNET:  September 15th, 2009.

21           THE COURT:  Okay.  All right.

22           MS. FOURNET:  And I would note that certainly we could

23   have at least been given it earlier.

24           MR. McMAHON:  Judge, I can hold off on this until after

25   the lunch break.

```
 1              THE COURT:  No, no, we can -- I'm fine.  I am just noting

 2    there is an objection to it, and I'll decide later on whether it's

 3    admissible.  I just want to keep going.  So go ahead.

 4              MS. FOURNET:  Sure.

 5    BY MR. McMAHON:

 6    Q.  What did you find out about special ed in the New Orleans

 7    school system?

 8    A.  That there were special education services that were available

 9    within the New Orleans school system.

10    Q.  Let's talk about when.

11              MS. FOURNET:  Your Honor, again, and now I don't have the

12    302, but if this is information that was obtained from this

13    recently provided 302, I don't know that we cure the problem by

14    simply having her testify to what's in the 302.  I am not sure

15    that's what's happening.

16              THE COURT:  Look, if the 302 goes out, if it's not in,

17    then any testimony about it is out as well.

18              MS. FOURNET:  Yes, ma'am.

19              MR. McMAHON:  I'm going to move on.

20              THE COURT:  Okay.  Go ahead.  Move on then.

21    BY MR. McMAHON:

22    Q.  Was 302 -- Freudian slip.  Was special education available in

23    Orleans Parish schools in the '70s?

24    A.  Yes.

25    Q.  In the '80s?
```

A.  Yes.

     THE COURT:  Is your knowledge of that based on independent knowledge or is it based on this 302?

     THE WITNESS:  It was not just based on that.  The one form that he had put up right before, the one that is handwritten, that was the release, official release form from Booker T. Washington that had the C's on it and the Title I.  It also had at the bottom left a part that said special ed and no was checked.

     THE COURT:  That's in reference to Title I?

     THE WITNESS:  No, below, go down to the very bottom.

     THE COURT:  Special ed, okay.

     THE WITNESS:  And that indicated to me you wouldn't have had a check box if it wasn't available.

     MS. FOURNET:  And, your Honor, if I might.  In looking at the other 302s, both dated September 17th, 2009, one 302 of someone named Joan Eymard, E-Y-M-A-R-D, and one of a Dr. Roslyn Dennis, both dated September 17th, 2009.  They both also address whether there was a special education program in the time period being discussed.

     So I would again object to any testimony based or the admission or consideration of any testimony based on that time period.  And again, I understand the court's intentions in this regard.

     THE COURT:  Okay.  I tell you what, are you about to get into a new topic because there's something in the back I need to

```
 1   take care of if we could take lunch a little early, that would be
 2   great, if not --
 3           MR. McMAHON:  Actually, this would be a good time to
 4   break because I was going to go into a new area but if I have only
 5   a little bit here so we could do that after lunch.  So this would
 6   be fine.
 7           THE COURT:  Okay.  So let's recess until, let's say one
 8   o'clock.
 9           THE DEPUTY CLERK:  All rise.
10       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)
11
12                   P R O C E E D I N G S
13                   (AFTERNOON SESSION)
14
15       (OPEN COURT.)
16           THE DEPUTY CLERK:  All rise.
17           THE COURT:  Have a seat, please.  Yes, sir.
18   BY MR. McMAHON:
19   Q.  Dr. Swanson, I think we picked up on the Flynn Effect, and is
20   there literature --
21   A.  Dr. Hayes.
22   Q.  That was a Freudian slip if I ever saw one.  Dr. Hayes -- well,
23   you keep calling me Mark, so.
24   A.  I know.  Quid pro quo.
25   Q.  I guess we're even.
```

```
 1          MR. MILLER:  That will end their friendship.

 2          THE COURT:  I don't want to get involved in this

 3   discussion.

 4   BY MR. McMAHON:

 5   Q.  Let's go back to the Flynn Effect.  There is literature, is

 6   there not, to suggest that the Flynn Effect has only been applied

 7   in the context of capital litigation, are you aware of any of that?

 8   A.  I am aware that that's where it's been applied at this point.

 9   Q.  And can you elaborate and do you have the article for the

10   court?

11   A.  I don't have it with me as I sit up here.

12   Q.  I thought we did.  I guess we'll revisit that a little later.

13   But are you aware of that proposition?

14   A.  Yes.

15          THE COURT:  That it's only been applied in capital

16   litigation?

17          THE WITNESS:  It has, it's only been applied in capital

18   litigation.  There's been one article that I know of that just came

19   out in Applied Neuropsychology like within the last couple of

20   months that said we should consider using this in

21   neuropsychological evaluation as well.  But that's been the only

22   article that I've seen that has indicated that it's been used in

23   other areas other than capital litigation.  Based upon my review of

24   the literature.

25          THE COURT:  Let me just jump in.  Are you saying it's
```

```
 1   only in the literature it's only been discussed?  I mean, you say I
 2   know it's been applied in capital litigation, but are you saying
 3   the only discussions of the Flynn Effect in the literature has been
 4   in connection with capital litigation?
 5           THE WITNESS:  Not that the Flynn Effect in the literature
 6   only regards to capital litigation.  That the only place, some
 7   authors Hagan, et al, I think was 2007 maybe, did a survey of
 8   practitioners to try to figure out where they were applying the
 9   Flynn Effect and it was only in the context of capital litigation.
10           THE COURT:  Okay.
11           MR. McMAHON:  What I would like to do, your Honor, is
12   once we produce that article --
13           THE COURT:  I am familiar with that particular article as
14   I think it was mentioned before.  Go ahead.  I'm sorry, I apologize
15   for the interruption.  I didn't mean to throw you off.
16           THE WITNESS:  Your Honor, just to clarify a little bit.
17   I don't know what individual practitioners do, and so I can't say
18   that individual practitioners don't use the Flynn Effect from time
19   to time.  But based upon my review of the literature that was the
20   article that addressed did practitioners use it and it was in the
21   context of capital litigation only.
22           THE COURT:  Okay.
23   BY MR. McMAHON:
24   Q.  Now, I think before the lunch break we started, we spoke about
25   special ed and Title I, but I want to go on to school records.
```

1           In your assessment of Criterion A, did you also look at

2  school records or various academic records of Paul Hardy?

3  A.  Yes.

4  Q.  Were you able to get a summary of Hardy's high school

5  performance?

6  A.  I was.

7  Q.  And that is an exhibit, and can you just discuss this for the

8  record and for the benefit of the court?

9           THE COURT:  What number is this?

10          MR. NGUYEN:  Thirty-two, your Honor.

11          THE COURT:  Thirty-two, thank you.  What's your name,

12  sir?

13          MR. NGUYEN:  Arthur.

14          THE COURT:  Arthur.  Thank you, Arthur.

15          THE WITNESS:  This table reflects a part of my report, it

16  was in my report on page 46 and 47.  It's a summary of Mr. Hardy's

17  high school performance in the 9th grade and the 10th grade and a

18  portion of the 11th grade which he attended, which was around 45ish

19  days, 45-46 with three absences.  And then John C. Fremont is

20  reported but I believe he only attended there briefly, so the JCF

21  at the top is referring to John C. Fremont in California.

22  BY MR. McMAHON:

23  Q.  Let's look at the class ranks, the bottom line.  At the end of

24  the 1981 school year, which would have been the end of his freshman

25  year of high school or 9th grade, what was his class rank?

1    A.  160 out of 353.

2    Q.  At the end of the 10th grade?

3    A.  269 out of 500.

4    Q.  And at the end of the 11th grade?

5    A.  254 out of 412.

6    Q.  There's a couple of asterisks before the 254.  Why?

7    A.  Both Dr. Swanson and myself noticed some irregularities in that

8    he had only attended school, for like I said, for 45 days-ish, and

9    it appeared as if his grades were entered into the calculation of

10   his final average.  I believe he was given like two C's into his

11   final average and three F's.  Certainly if an individual does not

12   complete a grade, they should be given an incomplete.  But I

13   believe they were calculated into his final average.

14   Q.  And were you able to get some of Hardy's standardized testing

15   scores, specifically those from the California Test of Basic

16   Skills?

17   A.  I was.

18   Q.  For the record, what is the California Test of Basic Skills?

19   A.  It's a group administered standardized assessment that was

20   administered to Mr. Hardy in the 80s.  It has reading and math and

21   things like that.

22   Q.  In April of 1980, what grade was he in?

23   A.  In April of 1980 Mr. Hardy was in the 7th grade.

24   Q.  And '82 he would have been in the 9th?

25   A.  That's correct.

1  Q.  And April of '83 he would have been in the 10th?

2  A.  That's correct.

3  Q.  Okay.  Discuss this chart relative to Hardy's CTBS tests in

4  those three years.

5  A.  First off I agree with Dr. Swanson that large city norms do

6  underestimate a persons actual achievement and that you're based

7  upon large city kids, which tends to underestimate a person's

8  functioning.  So we agree on that area.

9          With regard to reading and math, Mr. Hardy was given the

10  reading portion of the CTBS in 1980, 1982, and 1983.  In terms of

11  math, he was given the CTBS in 1982 and 1983.

12  Q.  And in the reading in 1980 he scored in the 25th percentile?

13  A.  That's correct.

14  Q.  And that means that he was, that out of 100, 75 other people

15  would have done better?

16  A.  75 other children that were his same age in large cities.

17  Q.  And in April of '82 in reading he was in the 10th percentile?

18  A.  That's correct.

19  Q.  Math the 87th percentile?

20  A.  That's correct.

21  Q.  Now, that means he was in the top -- there were only 13 percent

22  better than him, correct?

23  A.  That's correct.

24  Q.  And in April of '83 he was in the 20th percentile in reading

25  and the 60th percentile in math?

1    A.   That's correct.

2    Q.   And let's go on.  You also obtained Terry's standardized

3    testing scores in the CTBS as well?

4    A.   Yes.

5    Q.   Let's go over those.

6    A.   Okay.  Terry Hardy's records were more voluminous than his

7    brothers.  Captain Hardy's CTBS scores were reported for his 7th

8    grade year, 8th grade year, 9th grade year, 10th grade year, 11th

9    grade year, and 12th grade year.

10   Q.   I just noticed on this chart we have two norms, large city and

11   national.  Why didn't we have it on the previous graph?

12   A.   Mr. Hardy, the defendant Mr. Hardy, only had his large city

13   norms reported.

14   Q.   Now let's go to the next display, which is a comparison of Paul

15   Hardy's and Terry Hardy's California Test of Basic Skills scores.

16   And I want you to start from the top, let's talk about the 7th

17   grade reading, Paul Hardy vis-a-vis his brother.

18   A.   Paul Hardy was -- and again, this is as compared to national

19   norms -- I mean, not national, excuse me, compared to large city

20   norms.

21   Q.   Large city.

22   A.   I apologize.  The CTBS reading test was given in 7th grade to

23   both brothers, again there is an age difference.  But when Paul

24   Hardy took it compared to his brother, he was at the 25th

25   percentile and Terry Hardy was at the 47th.

1        With regard to 9th grade reading abilities, Paul Hardy

2   was at the 10th percentile and Terry Hardy was at the 36th.

3        In 9th grade Paul Hardy was at the 87th percentile

4   whereas Terry was at the 59th percentile.

5        And in the 10th grade with regard to reading, Paul Hardy

6   was at the 20th percentile, as was his brother.

7        And in the 10th grade, as well, using national norms,

8   Paul Hardy was at the -- not national, large city.  With regard to

9   the math in the 10th grade, Paul Hardy was at the 60th percentile

10  whereas Terry Hardy was at the 66th.

11  Q.  And did you attempt to calculate Hardy's CTBS scores normed to

12  the national as opposed to the large city by applying some kind of

13  formula?

14  A.  Well, first off, what I did is I contacted the test publishers

15  to find out if given the percentile rank that Paul Hardy had, could

16  they then back down from the large city norms and then obviously

17  then use the -- because you would be able to back down from a

18  percentile to a raw score and then use the same raw score to go to

19  the national level.  So I contacted them and they also did a

20  diligent search and said that they didn't have the information back

21  from that long ago.

22       So what I did is I contacted some statisticians to find

23  out if it would be okay to use just a simple proportional formula

24  to determine what Paul Hardy, about what Paul Hardy's score was

25  compared to his brother.  Because with Terry we had both national

1    and large city norms, but with Paul Hardy we just had the large

2    city norms.  So if you think back to like Algebra I, X divided

3    by -- Paul Hardy's large city percentile equals Terry Hardy's

4    national percentile divided by Terry Hardy's large city percentile

5    to get to these numbers.

6            So from a statistical standpoint, the two statisticians

7    that I spoke to, the jury was out.  But out of an abundance of

8    caution, I would say this is just an estimate based upon a

9    proportional formula.

10   Q.  Summarize that chart for us.

11   A.  Certainly.  In 7th grade Paul Hardy, using the proportional

12   formula, compared to national norms would be at the 17th

13   percentile.  In April of 1982 while in the 9th grade, he would have

14   been at the 7th percentile with regard to reading and at the 69th

15   with regard to math.  And in April of 1983 when he was in the 10th

16   grade, he would be at the 13th percentile with regard to reading

17   and at the 53rd percentile with regard to math.

18   Q.  What is the Adult Basic Learning Examination?

19   A.  That is another achievement test, it is often used in prisons

20   and other settings like that in adult education areas.  It can be

21   group administered, it can be individually administered, but it has

22   the various achievement domains that one would expect.

23   Q.  And it was administered to Paul Hardy at Terre Haute on

24   February 15, 2000, correct?

25   A.  That's correct.

1   Q.  And let's go to this chart.  We'll go to the subtest and the

2   ABLE, which is the acronym, rating or score.  And let's go over

3   this chart.

4   A.  Certainly.  Mr. Hardy in language and writing was rated to be

5   at the 4th grade, 9th month; with spelling, 8th grade, 6th month;

6   number operation, 6th grade, 8th month; problem solving, 8th grade;

7   and reading comprehension and reading at the 13th grade.

8   Q.  And the next demonstrative it's just simply I believe the

9   printout from the prison in Terre Haute which the previous display

10  summarized, correct?

11  A.  Correct.  Just I'll point it out because you can't see it as

12  well on the bottom where it says test ABLE and then it says subtest

13  and then language --

14  Q.  Do you have a pointer up there, Doctor?

15  A.  Sorry.  That doesn't work as well as actually using this with

16  the red dot.  There would be the subtest.  And I contacted a woman

17  at Terre Haute who works in their educational services department

18  and she verified that those were grade scores.

19  Q.  Did you also solicit the opinions of people who knew Paul Hardy

20  just to get their opinion on his intelligence?

21  A.  Yes, I did.

22  Q.  How do you do that, what happened with that?

23  A.  This is definitely not standardized in any way.  It's just

24  because you're asking lay people what is your opinion of this

25  individual.  It is informative in that you do find out what other

1    people think about the person when they compare that individual to

2    others.

3              And so when I talked to various individuals, they pretty

4    much all indicated that he would be average or average for this

5    population.  I asked two of the correctional officers at

6    St. Bernard to rate Mr. Hardy from like 1 to 100, with one being

7    the most limited individual that they had come into contact with in

8    their role as correctional officers, which means compared to an

9    inmate population; and one of those individuals rated Mr. Hardy as

10   being in the high 80s or lower 90s, and the other one rated the

11   defendant as 100.

12   Q.  Were you able to estimate IQ -- did you do any kind of a

13   demographic, try to estimate the IQ according to demographics?

14   A.  Let me back up for just a second.

15   Q.  Go ahead.

16   A.  I also asked Faith Price, who was one of Mr. Hardy's paramours

17   and the mother of his son.

18   Q.  Right.

19   A.  And she indicated he was average, right at average.  She said

20   that he would be a five, he was just a normal guy.  And I asked

21   Javetta Cooper the same thing and she said it would be a 7.5.

22              And those are on one to ten scales with one being a very

23   limited individual, like the least intelligent and adaptively-able

24   person that they knew, and ten being the most.

25   Q.  You talk in your report about configuring Hardy's IQ based upon

1   demographics.  Can you explain that concept, please.

2   A.  Yes.  I thought that Dr. Cunningham did a fairly nice job on

3   this.  What this is doing is basically trying to estimate what a

4   person's IQ is when you don't have any IQ tests from the past to do

5   that.  The Barona regression equation was initially used, and

6   that's the one that Dr. Cunningham talked about, and it typically

7   is used in the field of head injury or early civil litigation when

8   you're trying to figure out what a person's IQ was prior to the age

9   or prior to when the individual actually had whatever occurred to

10  them.  It doesn't have to be used exclusively in head injury

11  litigation or anything like that, it is just simply a regression

12  equation that uses demographic variables to try to estimate an

13  individual's IQ.

14  Q.  How does this apply to the defendant?

15  A.  He came up as being in the low average range.

16  Q.  Where in your report does that reflect that in fairness to the

17  judge?

18  A.  That is on pages 54 and 55.  And then the second demographic

19  equation that I used, it's not an equation as much as there is

20  actually a test that's available now called the Wechsler Test of

21  Adult Reading, published by the same authors as all of the WAIS's

22  that we've been talking about, that also has a demographic, simply

23  demographics to try to estimate an individual's IQ.  And that one

24  was also in the low average range.

25  Q.  Can you summarize the conclusions you reached in regard to

```
 1   Criterion A?
 2   A.  Certainly.  Number one would be that there were multiple
 3   inconsistencies in Mr. Hardy's cognitive testing data, such that
 4   they are not, in my opinion, reliable measures of his level of
 5   intellectual abilities and/or cognitive functioning.
 6           Number 2 would be because of that, one cannot assume that
 7   these are actually accurate reflections of his current level of
 8   intellectual and cognitive functioning.
 9   Q.  What were not?  Define that.
10   A.  That IQ testing as well as the neuropsychological testing.
11   Q.  Okay.
12   A.  Number 3 would be the Flynn Effect.  That while I hold --
13           THE COURT:  What was No. 2 again?
14           THE WITNESS:  Two was that the intellectual and the
15   cognitive testing was not an accurate reflection of his level of
16   functioning at the time that the evaluations were given to him.
17           THE COURT:  Okay.  Go ahead.
18           THE WITNESS:  No. 3 would be with regard to the Flynn
19   Effect.  I have to respectfully disagree with some people that I
20   feel are incredibly good researchers and that I have a lot of
21   respect for, but I disagree with them with regard not to the Flynn
22   Effect as a whole but to the Flynn Effect as it applies to people
23   with borderline intellectual functioning and into the mental
24   retardation range; because I am not saying that the Flynn Effect
25   won't be there, but I am saying that we need more data.  It's just
```

1    not enough data, the sample sizes are too small, there's not enough

2    that's been done in adults.  The Kanaya article is great with

3    children but it doesn't address adults.

4         The fourth thing would be given these factors that are

5    real, that are there and that have been pointed out even in the '96

6    testing, additional testing should have been done and that testing

7    should have included malingering testing.  But no psychological

8    testing was -- or no intellectual testing was redone in the 2008

9    and certainly no malingering testing.

10        The reason that would have been necessary is because it

11   would have negated the issue of the Flynn Effect and negated the

12   issue of any practice effects.  And we wouldn't have been here as

13   long as we've been here if Flynn was gone, you could have tested

14   using more recent measures that have better sensitivity and

15   specificity for malingering, and it just would have been the

16   proper, in my opinion, thing to have done.

17   BY MR. McMAHON:

18   Q.  Five.

19   A.  Five would be taking together -- when you look at all of these

20   different factors in combination and based upon everything that I

21   have reviewed, there is -- that Mr. Hardy does not meet Criterion A

22   of the DSM definition of mental retardation.

23   Q.  And do you recognize that page or the portion of that page now

24   being displayed?

25   A.  I do.

1  Q.  Where is that from?

2  A.  This is from the *Diagnostic and Statistical Manual of Mental*

3  *Disorders*, Fourth Edition.  This is not the text revision, but this

4  was the one that was in effect at the time that Mr. Hardy was

5  initially evaluated in 1996.

6  Q.  And let's talk about the numbers.  Now, with the 73 from

7  Dr. Tetlow's test, the 76 from Dr. Martell's test, what do you do

8  now?  With that number, where do you go from here?

9  A.  If you do an IQ test, one of the things that you're doing it

10  for is to determine what the individual's intelligence is, right?

11  It's not -- I don't want to say rocket science because otherwise I

12  would denigrate my Ph.D. -- but if you're doing an IQ test and

13  you're getting a number, what is the purpose of that number?  And

14  that number is to determine what that individual's level of

15  functioning is.

16          If you get a 73, a 73 is automatically going to cue you

17  to the possibility that the individual could be mildly mentally

18  retarded.  As you can see it says --

19  Q.  Let me stop you right there.  According to the DSM, he is above

20  70 so he wouldn't even fit that.

21  A.  It says approximately 70.

22  Q.  Okay.  So what do you do from now, from this point?

23  A.  What I did from there is I moved on to try to find out more

24  information about his adaptive functioning so that I could

25  determine more about the second prong of mental retardation, the

```
 1   adaptive prong.
 2           MR. McMAHON:  Your Honor, at this point we're going to go
 3   on to Criterion B, which is going to be the adaptive functioning.
 4           THE COURT:  That part I've picked up.  Go ahead, I'm
 5   sorry, just teasing you.
 6           MR. McMAHON:  I'm trying to think of a clever reply, but
 7   I'm too beat.  Are you kidding me?
 8           THE COURT:  You'll adapt.
 9   BY MR. McMAHON:
10   Q.  How did you address this area initially, Dr. Hayes?
11   A.  What I initially did was got as many records as I possibly
12   could.
13   Q.  I think we've already been through that.  Let's -- there's been
14   a lot of talk about Toni Van Buren, and did you see problems with
15   Toni Van Buren's Vineland protocol, or just using her, let's put it
16   this way, as the Vineland respondent?
17   A.  I did.  The first thing was is that Toni Van Buren did not, I
18   think it's clear that she did not know Mr. Hardy when he was 17
19   years, 5 months old.  I think that's clear to everyone.
20           That said, Dr. Swanson had indicated that 17:5, 18:5, you
21   know, they're almost equivalent.  But still, there is no
22   information about him during the developmental period on a
23   standardized test.
24   Q.  And the Criterion A, they don't say 18:5, they say before 18 --
25   onset before the age of 18, correct?
```

1    A.  That's correct.

2           The second problem that I saw with that is the issue of

3    memory degradation.  Again, you're trying to do the best that you

4    can in these evaluations, so Dr. Swanson is asking a 14 year old to

5    think back over 20 years -- or whatever age she was at the time of

6    the evaluation, I think she was either 38 or 39, maybe a little

7    less than that, I can't recall her age then -- but to think back

8    over 20 or 25 years to what Paul Hardy was like when he was 17:5 or

9    18:5 years old.  That's going to insert a high degree of

10   unreliability into the standardized testing, into the protocol.  I

11   think that's also clear.

12          Dr. Swanson did make some mistakes in her protocol.

13   Q.  Like what?

14   A.  Well, like when she asked about computers being in the home.

15   Clearly Mr. Hardy had no computers in the home.

16   Q.  Well, Lionel testified to that.

17   A.  Right.  And so that should have been scored as no opportunity

18   instead of as a zero.  She had indicated that she had spoken with

19   Toni Van Buren and Toni said, or it's my understanding this is what

20   she testified to, that if computers had been in the home that he

21   would not have been able to do it.  But again, that's asking Toni

22   Van Buren to possibly consider if he could.  And so --

23   Q.  Would that be off manual?

24   A.  That would be off manual.  And to tell you the truth, any of

25   this stuff related to using standardized testing for measurement of

1    cognitive functioning -- or excuse me, not cognitive functioning,

2    but adaptive behavior is going to be fraught with error, it just

3    is.

4    Q.  And according to Toni Van Buren's Vineland interview, under the

5    communication domain, what age level did Dr. Swanson apply to the

6    receptive communication domain, her subdomain?

7    A.  I believe it was six years, six months.

8    Q.  How about the expressive communication -- is that a domain or a

9    subdomain, expressive?

10   A.  Those are subdomains.

11   Q.  Expressive communication.

12   A.  Six years, seven months.

13   Q.  Written communication?

14   A.  Eight years, one month.

15   Q.  In the daily living skills subdomains, personal subdomain?

16   A.  That was eight years and six months.

17   Q.  Domestic?

18   A.  Ten years even.

19   Q.  In the community subdomain?

20   A.  Eleven years and nine months.

21   Q.  And in the socialization domain with the subdomain

22   interpersonal relationships.

23   A.  Six years, seven months.

24   Q.  Do we mean to say that by these numbers that what she's saying

25   is that Paul Hardy was like a six year old kid?

1    A.  Dr. Swanson's not saying that, she's saying that based upon

2    Toni Van Buren's ratings and responses to her semi-structured

3    interview that Toni Van Buren rated him as if he were those ages;

4    that is, that based upon her responses, his behavior would be equal

5    to an individual at those ages, around age equivalence such as

6    those.

7    Q.  And how about the play and leisure time?

8    A.  Play and leisure was at six years, six months.

9    Q.  Now, were there discrepancies vis-a-vis Toni Van Buren,

10   available documents you examined and your interview, the

11   information you gleaned from Javetta Cooper?

12   A.  There were.  But would you mind if I back up because I think

13   there is one more point that I would like to make --

14   Q.  Go ahead.

15   A.  -- that escaped me.  In terms of the problems I saw with Toni

16   Van Buren, whether Mr. Hardy was 17:5 when she met him or 18:5 when

17   she met him, and again I contend that it was 18:5, that we were

18   asking or Dr. Swanson was asking a 14 year old girl to rate

19   Mr. Hardy as if he was that age.  How is she going to be able to

20   rate him based upon that one age the day that she met him?  She had

21   no knowledge of his behavior on all of these behaviors on the day

22   that she met him.

23   Q.  Well, what about the concept of having a 37 year old woman go

24   back to when she was 14 years old and give a rating on Hardy at the

25   time who was, well, ostensibly 17 and a half but actually he was

```
 1    over 18?
 2    A.  It's going to involve significant error.  The research
 3    hasn't -- the research hasn't caught up in terms of how much error
 4    is involved in doing retrospective interviews, especially as
 5    regards to memory degradation and forgetting.  All of us have had
 6    situations where you think back to, try to think back to when you
 7    were 14 years old and think back clearly about what a person that
 8    you know could do or couldn't do to the amount of detail that is
 9    included in the Vineland.  I think everybody would be able to see
10    that that is going to be fraught with error.
11    Q.  Now, let's turn to Javetta Cooper.  You've been characterized
12    in the defendant's case as really as almost Torquemada during the
13    Spanish Inquisition here.  So let's go back first and let's --
14              In Arlington, Texas that day June 1, was it 106 degrees?
15    And let's go to information available on the net that records the
16    weather in Arlington on that faithful afternoon.  Now, about what
17    time did you first met Javetta Cooper?
18    A.  I think it was around 12 o'clockish, I remember being a little
19    hungry.
20    Q.  Arthur, can you go actually to the third page which reflects
21    the temperatures.  And let's just err on the side of caution, at
22    around let's say about one o'clock, let's say one o'clock, I think
23    she had to go to work, what's the temperature in Arlington, Texas?
24    A.  Approximately 85 degrees Fahrenheit.
25    Q.  Thank you.  Now, much has been made, of course, that you
```

1    butchered her name and can we go to the next.  And why call her

2    Franklin?

3    A.  Because the FBI agent that was with me at the time had pulled a

4    copy of her driver's license and it indicated on her driver's

5    license that her name was Javetta Franklin-Cooper.  And also she,

6    when I met her I said, hi, I'm Jill Hayes, and she said, I'm

7    Javetta Cooper.

8    Q.  I know it's a small point but I just wanted to clarify.

9            Now, talk about the attempts to -- actually, the events

10   that occurred up to the point where Ms. Cooper answered the door.

11   Kind of briefly, just kind of be concise with that.

12   A.  Okay.  What occurred was that --

13   Q.  Well, actually, let me stop you there.  Why not call her

14   remotely from here, why go over to Texas on June 1 and then try to,

15   you know, basically do a cold visit, so to speak?

16   A.  The first reason was she is the mother of one of Paul Hardy's

17   daughters.  I was concerned that if I had called her that she would

18   just blow me off.

19   Q.  Why?

20   A.  Well . . .

21   Q.  We'll go on.  And so what happened once you arrived, once we

22   arrived at the complex and attempted to locate Ms. Cooper?

23   A.  The FBI agent knocked on the door, there was no answer, so we

24   returned to the apartment complex manager's office.  The manager

25   had indicated that Ms. Cooper had not paid her rent and was in

```
 1   arrears --
 2              MS. FOURNET:  Your Honor, I object to the hearsay.
 3              THE COURT:  It's okay.  This is not a hearsay purpose.
 4   Go ahead, it's all right, go ahead.
 5              THE WITNESS:  But contacted the apartment manager and the
 6   apartment manager came back and she and the FBI agent went to the
 7   door.  They knocked, they came back to the car, and subsequently
 8   Ms. Cooper opened the door.
 9   BY MR. McMAHON:
10   Q.  Were telephone calls made to the apartment by either the
11   special agent or the manager?
12   A.  I wasn't in the office when the special agent and the manager
13   were together.  But my understanding is that phone calls were made
14   to Ms. Cooper's residence or her cell phone or whatever number was
15   listed.
16   Q.  Let's pick it up when you actually met Ms. Cooper.
17   A.  Okay.  When I actually met Ms. Cooper it was like with any
18   other interview that I do, which is my standard practice, which is,
19   Hi.  I'm Dr. Jill Hayes.  I am a clinical psychologist or forensic
20   psychologist who has been hired by the government to do an
21   evaluation of Paul Hardy's abilities, that is what he can do, what
22   he can't do.
23   Q.  What did she say?
24   A.  She said, "I knew you were coming."
25   Q.  And did she agree to speak to you?
```

1    A.  She did.  She was upset at first because she said that thinking

2    back about Paul is hurtful.  So actually we sat down on the steps

3    and I talked with her awhile and then she stopped crying.  I

4    offered to do the evaluation -- or not the evaluation, the

5    interview at another time.  And she declined, she said, no, she

6    wanted to go ahead and do it.

7    Q.  And did you actually ask to go inside the premise and she would

8    not let you in, correct?

9    A.  She said she would prefer to stay outside.

10   Q.  That was her choice?

11   A.  Yes.  It was a nice day and we were sitting under a tree in the

12   shade on her stoop, so.

13   Q.  So she willingly spoke to you, you didn't force her to speak to

14   you?

15   A.  No, not at all.

16   Q.  You didn't threaten her at all?

17   A.  Not in the least.  In fact, other than the FBI agent

18   introducing himself, knocking on the door, telling who he is and

19   then saying that he had some people with him that wanted to talk to

20   her.

21   Q.  And he retreated, didn't he?

22   A.  He went back to his vehicle and stayed in there the entire time

23   that I was sitting with Ms. --

24   Q.  And I was there as well?

25   A.  Yes.

1  Q.  And we were probably about 100 yards up the street, correct?

2  A.  That's correct.

3  Q.  It wasn't right in front like looking at you, correct?

4  A.  No, that's correct.

5  Q.  So she did agree to give you an interview?

6  A.  Yes.

7  Q.  This is from the Vineland manual regarding -- and this was --

8  what does it mean a semi-structured interview, what does that mean?

9  A.  That means that you have areas that you need to cover but that

10  it doesn't say exactly say the exact thing.  Like on the WAIS-R, if

11  I remember one of the subtests right because I gave it to so many

12  times that I can say this in my sleep.

13        One of the little subtests is called the block design

14  subtest and it's the one that has red and white blocks and you have

15  to put them together to make little designs.  Every single time you

16  ever give the subtest you have to say:  "See these blocks.  They're

17  all alike.  On some sets they're all red, on some they're all

18  white, and on some they are half red and half white.  I am going to

19  put the blocks together to make a design, so watch me."  Every

20  single time you have to say that and then you begin the block

21  design subtest.

22        A semi-structured interview is not like that, it's got

23  domains and content areas that you need to cover.  But the purpose

24  of it is is to be more of a conversation such that you can in a

25  conversational format go through all of the different areas but you

1  want to find where the person's level of functioning is without

2  asking specific questions.

3  Q.  Did you tell her, hey, look, I am going to give you a test?

4  Did you do that?

5  A.  No.  I was -- asked her to rate Mr. Hardy's functioning, you

6  know.  Actually, I had the same bag with me that I have here every

7  day in court, and I had the Vineland protocol with me, I had copies

8  of the Vineland scoring criteria, a legal pad, white paper and

9  different colored pens.

10  Q.  Because you're not really giving her a test in the classic

11  sense, are you?

12  A.  Not a test, I am not testing her abilities or testing her.

13  Q.  That's how you were attacked on the defendant's case --

14          MS. FOURNET:  I object to the testifying by counsel, your

15  Honor.

16          THE COURT:  Sustained.

17          MS. FOURNET:  Thank you.

18          THE WITNESS:  Not in the classic sense -- oh, wait, I am

19  not supposed to say anything, right?

20          MR. McMAHON:  Go ahead.

21          THE COURT:  There's no question but go ahead.

22  Mr. McMahon interrupted you, so you can continue.

23          THE WITNESS:  Okay.  So you're not giving a person a test

24  in a classic sense that you're trying to estimate what that

25  person's level of functioning is, but it's more of a conversation,

1    it's an interview.  So it is a psychological assessment measure but

2    it's not as related to Ms. Cooper-Franklin, Franklin-Cooper, Cooper

3    or Franklin, but it is as it relates to Paul Hardy.

4    BY MR. McMAHON:

5    Q.  And you told her what the purpose of talking to her was, right?

6    A.  Of course.  And I most certainly told her that the government

7    had called me to be an expert with regard to his level of

8    functioning.

9    Q.  By the way, did you have your business cards that day?

10   A.  Yes, I had just gotten them printed.

11   Q.  Did you give her one?

12   A.  I certainly did.

13   Q.  How do you remember that?

14   A.  I had just gotten them printed.  I designed the cards myself

15   because I like to do graphic design on the side, and I was really

16   proud of the business cards that I designed and gave her one.  And

17   she talked about it and then her friend came up, they were asking

18   me some fashion advice about what the friend should wear that day

19   when we were on the way out.

20   Q.  That was the person who was picking her up for work?

21   A.  Yeah.  Because one of her straps had broke on her dress and she

22   was asking me to put a safety pin in it to help her with that.

23   Q.  So you helped her?

24   A.  Yes.

25   Q.  It was a cordial encounter?

1  A.  Like I said, initially she was upset, Ms. Cooper-Franklin was

2  crying.

3  Q.  But from that point on, that's the question, was it a cordial

4  encounter?

5  A.  Yes, yes, very much so.

6  Q.  There's another excerpt from the Vineland manual up, can you

7  discuss that, please, for the record?

8  A.  Certainly.  This is indicating that the Vineland takes

9  approximately 20 to 60 minutes to conduct.  In

10 Ms. Cooper-Franklin's case it took around probably between talking

11 and getting to know a little bit about Paul, probably around 30

12 minutes, because many of the subdomains weren't applicable.  So

13 once they weren't applicable, we didn't have to keep talking about

14 them.

15         And when I say weren't applicable, she didn't have enough

16 information to be able to rate Mr. Hardy with regard to that

17 subdomain and so we could move on.

18 Q.  What were the criticisms you heard earlier in this proceeding

19 regarding Cooper's Vineland protocol?

20 A.  Well, I think there were about three.  One was related to me

21 making some errors in the testing.  And, if you let me get my

22 testing real quick.

23 Q.  And actually, if you need to put anything on the ELMO, just let

24 me know, we can do that, I cleared the screen.  We're on errors on

25 the protocol.

1    A.  Okay.  Probably everybody remembers the first pages.  The

2    reason I put not applicable under the ages is because on that other

3    page I tried to explain in narrative form what ages I was using at

4    the time.  And so it wasn't that the age is not applicable, it's

5    that I wasn't putting it in that section and did a narrative format

6    to try to indicate with more specificity what I was actually doing

7    to be as transparent as possible in the assessment process.

8    Q.  Okay.

9    A.  And that is on page 5.

10           Another error that was mentioned was on -- which one?

11   Q.  Off manual?

12   A.  Not these not yet, these are just plain old errors.

13   Q.  Oh, I'm sorry, go ahead.

14   A.  On page 12, and if you want to put this one on the ELMO, you

15   could.

16           This was a situation where I wasn't quite sure how to

17   score Mr. Hardy.  You can see question No. 10 about using a

18   microwave oven for heating.  She --

19   Q.  If you want to use your pointer, feel free.

20   A.  Sure.  My pointer may be -- there it goes.  She had initially

21   said that she didn't know if his mom had one and she said she was

22   not quite sure if he had one in his home but she thought he did and

23   she didn't think he used it, but she wasn't positive so that's why

24   I went with, initially with don't know; but then the more I thought

25   about it, I thought it was more appropriate to be a no opportunity.

1    So I initially put a no opportunity and put an X in it and then

2    circled the don't know; but because she had indicated that she

3    didn't think he had one in his apartment, I went with the no

4    opportunity.

5            I did make an error, I should have probably X'd this one

6    out and then circled this one really big.  If you'll move the page

7    up a little bit.

8    Q.  This way (INDICATING)?

9    A.  Yes, please.  Further.  Down here at the bottom, you can see

10   how I was wrestling with whether to write that as a no opportunity

11   or a don't know.  I indicated it as a don't know.  I had changed my

12   mind to go to a no opportunity but did not go back and fix this, so

13   that's why I went ahead and did it.

14           Whether you had a no opportunity or don't know, they're

15   still one point so it wouldn't change the scoring at all.  So I

16   apologize to the court for making that clerical error.

17   Q.  Do you want this back?

18   A.  Yes, please.

19           THE COURT:  Just a clarification though, if this had been

20   the third don't know then that would be an indication that that

21   shouldn't be used as a protocol?

22           THE WITNESS:  Yes, ma'am.  It still gives you good

23   information about what the person can and cannot do; but in terms

24   of getting a score, the manual indicates that that is not the way

25   that this is supposed to be scored.  One of the subdomains, as you

1    can see -- Mr. McMahon, if you can grab this one just to show the

2    judge -- on this, on communication personal I had indicated on the

3    protocol that I had one too many to score.  But again I was using

4    this, as I indicated in my report, for informational purposes.

5    It's in that long, long footnote.

6           See right here where I draw a line from it and say "one

7    too many DK to score according" and around the side it will say "to

8    manual".  And that's why I put the footnote in my report, again to

9    try to be as transparent as possible.

10   BY MR. McMAHON:

11   Q.  I want to address that suggestion that once you reach a certain

12   number of NO's or don't knows that you're supposed to stop the

13   process, is that true?  I guess you can't score it, but does that

14   mean you have to close your book and go?

15   A.  Not -- no.  It means that if you have one subdomain that is

16   blank on a certain domain, you can't score that domain.  You can

17   prorate that domain.  If you have two domains that have one

18   subdomain that is unscorable because of a lack of information, then

19   you cannot score that subdomain, and obviously you wouldn't be able

20   to get an adaptive behavior composite.

21          In no way does it mean that you have to absolutely stop

22   giving the test.  Because no matter what, if you administer a

23   semi-structured interview it's still going to give you good

24   information whether it's a semi-structured, structured or

25   unstructured interview.  For example, when we all did interviews

1    with Vance Ceaser, that wasn't a structured interview, it wasn't a

2    semi-structured interview but you still get good information from a

3    person.

4    Q.  And there were other sources of information apart from Javetta

5    Cooper's Vineland protocol, that was only one small portion of the

6    sources that you consulted regarding Hardy's adaptive functioning,

7    correct?

8    A.  That's correct.

9    Q.  Any other comments regarding the "off manual" criticisms?

10   A.  One of the criticisms was about age mixing.  And just to

11   clarify -- can you ELMO this page?

12         As you can see on that page on the bottom right corner,

13   it has the 17:6 to 17:11.  What I am indicating there is the area

14   from the manual that I am obtaining the information from, not that

15   that was the individual's age at the time.  So I was using those

16   norms in which to compare what Ms. Cooper had or how Ms. Cooper had

17   rated Mr. Hardy at that time.

18         I asked her to think about the time around Curtis's death

19   because she knew him and that was a marker in time that she could

20   use.  But in no way, shape, or form could I ask a woman to think

21   about 25 years and say on the date of Curtis Hardy's death, this

22   would have been his level of functioning on that day.

23   Q.  Aren't you supposed to use one age throughout as a reference

24   point?

25   A.  In a perfect world, yes; but doing retrospective analysis of a

```
1    person's adaptive functioning is definitely not perfect.

2    Q.  Did Marc -- who is Marc -- the name Marc Tasse' was mentioned

3    earlier this week.  Who is he?

4    A.  He is a researcher out of the University of South Florida that

5    does a lot of work on adaptive behavior assessments, as well as

6    mental retardation.

7    Q.  He is pretty highly respected?

8    A.  I don't know him personally, but at least from his scholarly

9    publications and what he does in the field, yes, definitely.

10            MR. McMAHON:  And to remind the court, he was retained by

11   the defendant in the Mark Shields case in Memphis.

12   BY MR. McMAHON:

13   Q.  Actually, does an article by Tasse' address the criticisms

14   level that you in reference to Javetta Cooper's protocol?

15   A.  To some degree.

16   Q.  Could you go into those?

17   A.  Yes.  The first thing is that --

18   Q.  By the way, when was his article published?

19   A.  It was one of the ones that just came out in Applied

20   Neuropsychology.

21   Q.  Do we have the name?

22   A.  Yes.  It's "Adaptive Behavior Assessment and the Diagnosis of

23   Mental Retardation in Capital Cases."

24   Q.  I believe the court already has our article, but go ahead.

25            THE COURT:  I was about to ask you.
```

1   BY MR. McMAHON:

2   Q.  Go ahead.

3   A.  In *Applied Neuropsychology* 2009, Volume 16, pages 1 through 10.

4   That's what it indicates on my copy, this is one of the blue lines.

5   A blue line meaning that this is a prepublication copy.

6   Q.  Go into Tasse's addressing the criticism level, that was the

7   question.

8   A.  Okay.  Dr. Tasse' indicates the same thing that I've been

9   stating is that these types of assessments inherently have error,

10  and that there is no research available that addresses what amount

11  of error you have when you're actually doing a retrospective

12  assessment of an individual's adaptive functioning.

13          In fact, on page 7 of his article under Retrospective

14  Assessment, it says, "It should be noted that there is no research

15  available examining the reliability or error rate of adaptive

16  behavior assessments obtained retrospectively."  That's one of the

17  first things to note is that deviations from the protocol in a

18  perfect world should not occur.  In a perfect world we wouldn't be

19  doing a retrospective assessment and in a perfect world we wouldn't

20  have to go "off manual".

21          But again, you're trying to do the absolute best job that

22  you can and get as much information as you can, and I am trying to

23  do a comparison between someone who had known him in a

24  developmental period with another individual who had known him for

25  much longer but outside of the developmental period and try to get

1    as much information as I could.  The same problem that I indicated,

2    though, with Toni Van Buren's assessment is the same with Javetta

3    Cooper-Franklin.

4           At issue, and this is what Dr. Tasse', another quote from

5    page 7, "At issue is the respondent's ability to correctly recall

6    from memory the assessed individual's actual performance.  Memory

7    degradation is a real issue and we do not have any solid research

8    regarding the forgetting curve regarding someone's recollection of

9    another person's adaptive behavior."

10          And so again, no matter if I went off manual or

11   Dr. Swanson did it absolutely perfectly, you're still going to have

12   an error rate that is unknown.

13          The next thing is that in Dr. Tasse's article it

14   indicated:  "Identify a clear time period during which you want the

15   respondent to focus their report of the individual's adaptive

16   behavior."

17   Q.  How does that address the criticism?

18   A.  In terms of time period?

19   Q.  Right.

20   A.  He goes on to say, i.e. or an example later on, when the person

21   was in elementary school, not the third day of 2nd grade when the

22   person was seven years, one month and two days.

23          Later in the article he also indicated something else

24   like, e.g., use an assessed time frame; e.g. when a person was 17

25   years old.  So I thought it was more important to get Ms. Cooper's

1    cumulative knowledge of what she knew about Mr. Hardy to be as

2    accurate as possible, because I don't think with any degree of

3    accuracy you can say on one day a person knew someone and they knew

4    about their adaptive abilities on that day.

5            In two of the domains, the two subdomains that were

6    scorable I had indicated that I used the 22 to I think 29 period

7    because that was when she had known Mr. Hardy again when he came

8    back into her life with regard to their child.

9    Q.  Does Dr. Tasse' discuss that there is no known retroactive

10   error rate?

11   A.  Yes, he does.  Again, I believe that's on page 7.

12   Q.  What does that mean no known, there's no -- what is a

13   retroactive error rate?

14   A.  Meaning that if you do a retroactive or retrospective

15   assessment of an individual, you have no way to determine what the

16   error rate would be, that there is no research.  Because what you

17   would have to do is actually measure someone's memory at time A,

18   get their accurate recollections of an individual at time A; and

19   then at time B say, all right.  Now I want you to think back five

20   years in the past or ten years in the past, 20, 25 years in the

21   past, and now I want you to tell me what you can recall about the

22   individual and give the same protocol.

23            That research from what Dr. Tasse' is saying, and

24   again -- or based upon what Dr. Tasse' is saying, he is saying that

25   there is no research available examining the reliability or error

```
 1   rate of adaptive behavior assessments that are administered
 2   retrospectively, so such we don't know how reliable these kinds of
 3   measures are.  So again, you're trying to do the best that you can.
 4   Q.  Okay.
 5   A.  And I think Dr. Swanson and I both would agree if momma had
 6   been available, we both would have asked her.  But she wasn't.  And
 7   even then you're still going to have a big issue of the error rate,
 8   memory degradation, and the other issues that we've discussed.
 9   Q.  Does he discuss how clinical judgment plays into this?
10   A.  Absolutely.  He says that it's important for the clinician to
11   use his or her clinical judgment and determine when it is viable to
12   conduct a standardized adaptive behavior scale and when it's not.
13           And he goes on to say that in the latter case, it's
14   possible to conduct a series of semi-structured interviews with
15   multiple respondents who have reliable information about specific
16   periods of time, like when he was in elementary school or have
17   knowledge of the individual in one specific context such as when
18   that individual worked at a specific place.
19   Q.  And if we could, there is a chart, you did summarize in a graph
20   form Hardy 's adaptive function according to the Cooper protocol?
21   A.  Yes.
22   Q.  And if you could discuss that one as it's displayed?
23   A.  Okay.  This is taken from my report.  Again, obviously the
24   communication domain was not scored, as there are no scores next to
25   it.  Daily living skills is not scored because there are no scores
```

1    next to it.  As is socialization.

2            Under the subdomains, I went ahead and put their names

3    and then included not enough information.  And in my report if you

4    refer to the footnotes, it says that I could not score the one test

5    but I was using it for informational purposes only.  And so I felt

6    like I was being as clear and as honest as I possibly could.

7    Q.  So the information from both Toni Van Buren and Javetta Cooper

8    was certainly not perfect, correct?

9    A.  No way.

10   Q.  You had to go on?

11   A.  Absolutely.

12   Q.  I want to at this point, I just want to clear up something for

13   the record regarding Theresa Minor, okay.  Did you offer to

14   reschedule or to otherwise accommodate Ms. Minor on March 22nd when

15   she was interviewed by you --

16           THE COURT:  That's actually on the transcript of the

17   interview.

18           MR. McMAHON:  Huh?

19           THE COURT:  That's actually on the transcript.

20           MR. McMAHON:  It's on Page 1 of the transcript.

21           THE COURT:  Yes, I'm aware of that.

22           MR. McMAHON:  Okay.  We'll move on.  Your Honor, I want

23   to ask you to just briefly discuss the fact that Dr. Hayes

24   interviewed personnel from the St. Bernard Parish Prison, they will

25   be testifying in person, so I don't want to accumulate and go into

1    depth.

2    BY MR. McMAHON:

3    Q.  But I want to put up cites from the literature, and I think we

4    alluded to these earlier in the proceeding, regarding use of

5    correctional officers.  So let's get this up, Dr. Hayes, and we can

6    quickly go through this, please.

7    A.  Certainly.  Again, correctional officers -- any data is only as

8    good as the information that you get, it's only as good as the

9    source that you have.  And the same is true for correctional

10   officers.  But it doesn't mean that you throw out the baby with the

11   bath water, you have to as a professional determine what is a good

12   source of information and what is not.

13           In my opinion, the correctional officers, especially if

14   an individual has been incarcerated for 15 years, are absolutely

15   necessary to interview.  And as Young and colleagues indicate in

16   *Professional Psychology:  Research and Practice*, which is an APA

17   journal and peer reviewed, that:  "90 percent of evaluators use

18   correctional officer reports of inmates of adaptive functioning to

19   use in their own evaluations, but the difference is how much weight

20   each placed on this information."

21   Q.  And let's go to the next display, and quoting from another

22   evaluator.  And for the record, talk about this, please.

23   A.  This slide is from the same article, and it says:  "One

24   evaluator stated that the information you get from correctional

25   officers will show whether an inmate, for example, can keep himself

1  clean, make sense when he talks, can make logical requests, can

2  process information provided by the officer, can look after his

3  health by putting in requests to see medical personnel, can take of

4  himself in there, may be able to work and able to write letters

5  home."

6  Q.  And finally, again from that same article by Young, Bocconcini,

7  Conroy and Lawson.

8  A.  The final quote from that article:  "There does not seem to be

9  a clear reason why correctional officers cannot be interviewed,

10  given that it is up to the evaluator to decide how much weight to

11  place on this information."

12  Q.  Let's touch upon the various adaptive functioning domains.

13  A.  Okay.

14  Q.  And I see that there are three on the left-hand side in the

15  display -- conceptual, social and practical -- which are in turn

16  broken down by different, I guess, subdomains on the right-hand

17  side of the display, correct?

18  A.  That's correct.

19  Q.  Can you just very briefly comment on each domain and the

20  subdomains?

21  A.  I think this is been gone over pretty well by Dr. Cunningham

22  and Dr. Swanson, but the domain s on the left are the AAIDD

23  subdomains and the ones on the right are from the DSM-IV.  And in

24  this slide they're broken down so you could kind of see how they

25  would match up to each other.  The ones on the left, the AAIDD, are

1    conceptual, social and practical; the ones from the DSM are:

2    Communication, functional academic skills, self-direction, leisure,

3    social/interpersonal skills, use of community resources, home

4    living, health, safety, self-care and work.

5    Q.  And I think also on the Vineland itself, the subdomains are

6    actually broken down further, for example, communication has under

7    it subsets, correct?

8    A.  That's correct.

9    Q.  And what are the subsets -- I guess, I mean, it's almost

10   self-defining, but what are you looking for in the adaptive

11   subdomain of communication?

12   A.  What you're looking at is information about a person's speech,

13   language, listening skills, the things that are needed for

14   communicating with other people, including their vocabulary,

15   responding to questions, conversational skills.

16   Q.  And under communication, what are the subsets of that?

17   A.  Under the communication domain on the Vineland, the subsets of

18   that are receptive, expressive and written.

19   Q.  I want to go into -- let's go to communication and we'll talk

20   about the receptive area, okay?

21   A.  Okay.

22   Q.  And what does that mean?  For example, on the Vineland I think

23   one of the queries is listens to an informational talk for 30

24   minutes.  Correct?

25   A.  Correct.

1   Q.  What was Toni Van Buren -- how did Dr. Swanson grade on the

2   Toni Van Buren protocol?

3   A.  She indicated that Mr. Hardy was never able to do that.

4   Q.  And what did she assign?

5   A.  A zero.

6   Q.  What information did you glean from the records and the

7   interview with Javetta Cooper?

8   A.  What I gleaned from the records was that Mr. Hardy did go to

9   church, he went to church with his mother when he was younger, he

10  went to church when he was older; in fact, he was the person who

11  reportedly got Toni Van Buren involved in the church and got her

12  baptized at Greater St. Stephen.  As part of his FBI records he

13  even had a membership card to the Greater St. Stephen Church in his

14  FBI information.  That was provided to me at my request.

15          So like, for instance, Toni Van Buren to me on page 21 of

16  my transcript indicated when I ask her, "Did y'all go to church?"

17  She said, "We did, he was the one that actually -- I won't, I don't

18  want to say introduced me to church because both of my grandmothers

19  always, but, you know, once I got older he was the one that

20  suggested."

21  Q.  And did you get any information from your interview with Paul

22  Hardy regarding that area, that specific query?

23  A.  Yes.  Mr. Hardy had knowledge of the church radio schedule as

24  far as I could tell.  He said that he listened to Steve Allen at

25  nine o'clock, 9:30 Debra P. Martin --

1   Q.  I think that was a transcription, that should have been Debra

2   Morton?

3   A.  I believe so, I think it was transcription error.

4   Q.  Paul Morton's wife?

5   A.  Right.  In any of the transcripts, in any of the supplemental

6   materials, they are all subject to transcription error.

7   Q.  Right.  Please go on.

8   A.  Okay.  Then I listened to Pastor Blake's son, then 12 o'clock

9   the news on, I listen to Pastor Mitchell, I listen to one o'clock

10  Flam Fling (PHONETIC), and then five o'clock I listen to Pastor

11  Phoenix and then Pastor Triplett.

12  Q.  And that is from page 88 of the transcript of your interview

13  with Hardy?

14  A.  That's correct.

15  Q.  And again, I think there's two other related queries in the

16  Vineland, listens to an informational talk for 15 minutes, listens

17  to a story for at least 15 minutes, and those sources there also

18  apply to those two questions as well, correct?

19  A.  Certainly.  If an individual can listen to an informational

20  talk for 30 minutes, he or she can definitely listen to an

21  informational talk for 15 minutes.

22  Q.  Let's go to the area of expressive communication.  What's that?

23  A.  Expressive communication is your ability to actually express

24  yourself in language, not in written format but in spoken format.

25  The tone, rate, volume, fluency of your speech, vocabulary that you

1  use, the way that you modulate your voice, you can give directions,

2  you move from topic to topic, if you can explain your ideas in

3  various ways, if you can stay on topic in conversations and things

4  like that.

5  Q.  And the specific query was modulates tone of voice, volume and

6  rhythm appropriately.  Now, what did Dr. Swanson, what grade did

7  she assign that in the Van Buren protocol?

8  A.  Again, Dr. Swanson's rating the information that she got from

9  Toni Van Buren, and so she's assigning a score based upon what was

10  told to her.

11  Q.  Isn't that what I said?

12  A.  I am not sure, I just want to make sure that it's clear that

13  Dr. Swanson is not rating him, it's really Toni Van Buren; and

14  based upon that information Dr. Swanson is taking that and giving

15  the rating; such that if the information from Toni Van Buren is

16  inaccurate, then Dr. Swanson's rating would be inaccurate as well.

17  Q.  What was the rating?

18  A.  Okay.  The rating was a one.

19  Q.  What does that mean, again, just to refresh?

20  A.  A one as indicated in the protocol, if the individual sometimes

21  performs the behavior independently or partially performs the

22  behavior independently.

23       If you don't mind, just for the record, let me tell you

24  what a zero is because I said never before but I would rather read

25  you exactly what it says.

1  Q.  Go ahead.

2  A.  "If the individual never performs the behavior or never

3  performs it independently."

4  Q.  What did Javetta Cooper have to say about that?

5  A.  With regard to modulating his tone of voice, volume, rhythm

6  appropriately, I believe that Javetta Cooper said that he talked

7  with his hands often, I can't remember exactly, let me flip to that

8  in the Vineland.  Javetta Cooper said he had no problem with that.

9  Q.  And did you also listen to tape recorded conversations of Paul

10  Hardy both from jail from the Orleans Parish prison and the

11  St. Bernard Parish Prison?

12  A.  I did.

13  Q.  And the wiretaps from the investigation?

14  A.  I did.

15  Q.  And what conclusions did you draw from them regarding that

16  query?

17  A.  There was no indication to me on any of those recordings that

18  he had any difficulty modulating the tone of his voice, changing

19  the volume of the voice, and having -- or having difficulty with

20  the rhythm.  Sometimes he talks fast, but that wouldn't be like a

21  prose issue.

22  Q.  Page 83, Toni Van Buren, her interview with you, what does she

23  say from your interview?

24  A.  She said I think his voice more or less stayed at the same --

25  at a level tone, but he used his hands a lot to talk.  And so

1    excuse me, I said, I thought it was Javetta Cooper, it was Toni Van

2    Buren who talked about him talking with his hands.

3    Q.  And what observations did you make in this particular area when

4    you interviewed Paul Hardy?

5    A.  He evidenced no difficulty in this area with me during the

6    evaluation.

7    Q.  Let's go to the next question on the Vineland:  Give simple

8    directions, for example, on how to play a game or how to make

9    something.  How did Van Buren score him or rate him?

10   A.  As a one.

11   Q.  What information were you able to derive from records and any

12   interviews?

13   A.  From just an example from one of the records was the testimony

14   of Gail Stewart during the first sentencing phase, when he told her

15   that when she heard from his brother to have him give her a call,

16   that's a sample direction.

17   Q.  And what about from the Toni Van Buren interview with you?

18   A.  She indicated on page 81:  "Uh-huh, he would tell me like I

19   want you to go to the store and pick up, you know, this for me and

20   call so and so and tell them that for me."

21   Q.  And what about from your interview with Paul Hardy?

22   A.  He said on page 138, "We have a stick and you put like three

23   cans and one can at the top" -- and this is regarding how to play

24   Cool Cans.  "We have a stick and you put like three cans and one

25   can at the top, so if I hit that can when you swing -- well, you

1    trying to hit the ball but if you don't hit the ball but hit the

2    can, you're out.  You know what I'm saying."

3    Q.  This is not exhaustive because especially the phone calls from

4    prison are very instructive on this point, are they not?

5    A.  Definitely.  We could sit here all day if we wanted to go

6    through each and every instance possible.

7    Q.  We've been sitting here all day all right.

8    A.  But, no, what I'm talking about is not meant to be exhaustive

9    but to give some reasonable, some reasonable and behavior driven

10   and recorded explanations.

11   Q.  Let's go to the next area.  Easily moves from one topic to

12   another, which is what I'm trying to do right now.  Toni Van Buren

13   rating?

14   A.  Toni Van Buren rated him as a one.

15   Q.  How about information derived from records or the interview

16   with Javetta Cooper?

17   A.  Information derived from the record is there was no real

18   difficulty evidenced with this during the current evaluation or in

19   prior evaluations.  There was also no problem indicated with regard

20   to this during the interview with Toni Van Buren.

21   Q.  Anything from your interview with Toni Van Buren?

22   A.  She had said that I had said -- so it was normal for y'all to

23   be talking about something and for him to say, oh, and by the way,

24   switch to another topic of conversation and Toni Van Buren said

25   yeah.

1   Q.  Did you derive anything from your interview with Hardy?

2   A.  Yes.  I asked him what kind of things did you enjoy, did you

3   and Toni enjoy doing.  He said be with the kids.  Actually this

4   isn't a good example.  But --

5   Q.  Let's move on.

6   A.  There are others.

7   Q.  The next query is, explains ideas in more than one way; for

8   example, this was a good book, it was exciting and fun to read, et

9   cetera.  How did Toni Van Buren score him?

10  A.  Actually as a two.

11  Q.  Did you note any difficulties during the clinical interview?

12  A.  Not specifically.  Actually, this one I put in there just to

13  show on some things actually there was a discrepancy between what

14  Toni Van Buren and Javetta Cooper thought he could do.  Javetta

15  Cooper thought he couldn't do that as well as Toni Van Buren did.

16  Q.  Did you address this at all in your interview with Hardy?

17  A.  I did.  I said, what did you like about him?  He said, he's

18  black, and nobody like him, you know --

19  Q.  I think you're speaking about Donovan McNabb, the quarterback

20  for the Eagles?

21  A.  Yes, thank you for the context.

22  Q.  Okay.  Go ahead.

23  A.  "He's black and nobody likes him, you know, and this man went

24  to, what, three championship NFC football games?"  And so he is

25  explaining some of the reasons why he likes him.

1   Q.  For the record, what page on the transcript is that?

2   A.  Page 176.

3   Q.  The next question:  Stays on topic in conversations, does not

4   go off on tangents.  How did Toni Van Buren score?

5   A.  As one.

6   Q.  What about information derived from records?

7   A.  He generally stays on topic from the telephone calls that I can

8   tell.  I don't think anyone 100 percent of the time will ever not

9   go off on any tangents, and so I actually think that question is

10  probably not the best in the world because I don't know anyone who

11  doesn't go off on tangents from time to time.

12  Q.  And on page 82 of your interview with Toni Van Buren, she said,

13  "I would say probably switch up a lot."  Correct?

14  A.  Uh-huh.  That was consistent.

15  Q.  Let's go to:  Says complete home address, with or without zip

16  code, when asked.  How did Toni Van Buren rate Hardy?

17  A.  As a zero.

18  Q.  What about information that you were able to glean, did you

19  address that?

20  A.  I did.  Just a behavioral example from prior to his being

21  incarcerated were the various gun applications that indicated his

22  name and address, as well as other information.

23  Q.  Did you ask Toni Van Buren during your interview with her

24  whether he knew his address?

25  A.  I did.  On page 81 to 82 I said, "You said he knew his

1    address."  And she said, "uh-huh."

2    Q.  Did you ask the address on -- actually referring to page 307 of

3    your interview with Hardy, was he able to give his old address?

4    A.  He was.  He said 7079 Barrington Court, New Orleans East.

5    Q.  The next item on the Vineland gives complex directions to

6    others, for example, to a distant location, for a recipe with many

7    ingredients or steps, et cetera.  How did Toni Van Buren rate him?

8    A.  Toni Van Buren rated him as a zero.

9    Q.  How about Javetta Cooper?

10   A.  Javetta Cooper --

11   Q.  Or information not --

12   A.  She had actually -- she and I differ on our recollections of

13   what was said.  She had told me that he gave her directions of how

14   to take the bus to his home in the Calliope after they had met.

15   She said on the stand it was Terry, but she had told me that it was

16   Mr. Hardy, Paul Hardy, was the one who had given her the directions

17   on how to take the bus to his home.

18   Q.  In your interview with Paul Hardy did you broach this topic?

19   A.  Yes.  And I have to say, some of the criticisms surrounding

20   this was just because I truly didn't know where things were and I

21   was confused.  I lived uptown before but I don't know where all of

22   the projects are.  And so I am trying to, for myself, try to figure

23   out where everything is in relation.

24            So I asked him, the Calliope was where?  And if you think

25   about him coming from New Orleans East and you're on I-10 and

1   you're getting off at I guess the Claiborne exit.  He says, "You

2   come off the I-10, you make that right, you come down Martin Luther

3   King.  It's right there going towards Broad.  Between Claiborne and

4   Broad?"  And then he said no --

5   Q.  Differentiate between your question and his response, so go

6   ahead.

7   A.  I'm sorry?

8   Q.  I said differentiate -- that was your question, "Between

9   Claiborne and Broad," right?

10  A.  Yes, that was my question, I'm sorry.

11  Q.  Just differentiate between that and continue.

12  A.  And he said, no.  I said, "Is it off Earhart?"  And he said,

13  "No.  Earhart further down around Broad."

14  Q.  What page is that?

15  A.  That was page 79 to 80.

16  Q.  And I think actually that was flashed up on the screen

17  yesterday that excerpt -- or not yesterday but during the week.

18          And finally under expressive communications, the question

19  was:  Describes a realistic long range goal that can be done in six

20  or more months.  The example says I want to buy a bike so I'll

21  baby-sit and run errands to ear enough money to buy it, et cetera.

22  What was Toni Van Buren's rating?

23  A.  She had indicated a zero.

24  Q.  And how about other information and/or with the interview with

25  Javetta Cooper?

1    A.  During my interview with Mr. Hardy, he indicated that he wanted

2    to get an education like a trade --

3    Q.  No, I'm talking about Javetta Cooper.

4    A.  Oh, I'm sorry.

5    Q.  It's information derived from records and/or the interview with

6    Javetta Cooper.

7    A.  I apologize, it's been a long day so I may be hearing you a

8    little off, so forgive me.

9           Javetta Cooper said not to her, that he couldn't do that

10   to her.  He said he wanted to get a car but now how he was going to

11   pay for it.

12   Q.  How about from Toni Van Buren's transcript?

13   A.  The only real reference to a future plans there was just that

14   he wanted to be a good father to his children.  No specific plans.

15   Q.  And what about from your interview with Hardy?

16   A.  He stated that he wanted to get an education, like a trade,

17   work so I could take care of my kids.

18           MR. McMAHON:  Okay.  Your Honor, at this point I would

19   like to play, we think these are essential telephone calls from the

20   St. Bernard Parish Prison.  They're each probably about 15 minutes

21   in duration, and we've got nine of them.  I mean, I know, Judge,

22   but we just think that they're essential to this.  So if we want to

23   take a break and then after the break we can roll right into the

24   calls, it's up to the court.

25           THE COURT:  I am just wondering, since this is bench, do

1    you have transcripts of these conversations?

2              MR. McMAHON:  No, no.

3              MS. FOURNET:  And, your Honor, I would just like to

4    confirm that these are, in fact, calls that we have been previously

5    given.

6              MR. McMAHON:  Yes indeed.

7              MS. FOURNET:  That's the only question I had.

8              MR. McMAHON:  I know we discussed it, but this is --

9              THE COURT:  I have no problem with listening to it, I

10   just wish there were transcripts that we could move faster.  I will

11   be happy, I will be able to listen to the calls anyway, I just hate

12   to take up --

13             MR. McMAHON:  I think between transcribing the videotaped

14   interview with the defendant, which was very lengthy, the

15   interviews with Van Buren and the others, we just didn't have time,

16   couldn't do it.

17             THE COURT:  Let's go ahead and do the first one and then

18   we'll take a break.  We can do the first one and that will be the

19   time to break.

20        (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

21             THE COURT:  Are you going to ask her questions or do I

22   need --

23             MR. McMAHON:  Yes.

24             THE COURT:  Go ahead and do this one.

25   BY MR. McMAHON:

1    Q.  Dr. Hayes, that conversation between Hardy, his sister Linda,

2    his daughter Tonya and another woman, what does that -- what does

3    that tell you about his expression?  And let me point to like when

4    he advised his daughter "don't give your power to no man," things

5    like that, how is that call informative?

6    A.  I think that call is informative for a number of reasons.  Like

7    he is expressing himself not using direct literal speech but using

8    either idioms or proverbs or whatever you would like to call them,

9    but he says things like that, don't give your power to no man.  And

10   then he goes on explain himself saying that you can be friends with

11   a man and then he goes on.

12   Q.  Anything else that you noted during that call?

13   A.  I did.  A number of things were that he could switch topics in

14   the conversation without any difficulty, he was talking about

15   Lionel and when he was going to get out of the halfway house and

16   then he started talking about the change in attorneys and then on

17   to how he did not like one of the deputies, Sergeant DesRoche, to

18   talking about his daughters and don't give any of your power to any

19   man.

20          After that he talked about, he used like the term "you

21   got too many irons in the fire" indicating that -- his mother told

22   him that before that he didn't know what it was back then when his

23   mother had said it but that he felt now that it was true.

24   Q.  Was he introspective about his prior experiences?

25   A.  Yes, he was.  He also indicated a clear understanding that one

1    should not talk on the phone about sensitive details and followed

2    the instruction of others.  He was able to explain how he liked his

3    attorneys in more than one way.  He was able to modulate his tone

4    of voice and expression, and again he speaks relatively rapidly but

5    it sounds like that is consistent with the entire family.

6    Q.  Did he indicate he understood the bifurcated nature of these

7    proceedings?

8    A.  Yes.  He even used, I believe this is a quote, "two-phase

9    process".

10   Q.  Anything else regarding that call that you noted?

11   A.  He had no problems with giving directions about what he wanted

12   people to do in that telephone call.  He had recall of

13   conversations that he had previously with others, he was able to

14   describe his mood, indicated his interaction with other inmates,

15   only with regard to Sergeant DesRoche and how the two of them

16   apparently did not get along, this is outside the area of

17   expressive speech.

18           But with regard to his health and safety, you recall that

19   he had broken his toe in Tangipahoa Parish, that he wanted to get

20   some additional treatment, that Sergeant DesRoche in some way or

21   another had denied that treatment.  He also had indicated that, and

22   this was confirmed through interview with Sergeant DesRoche that

23   she had found his medication in another person's jail cell, and as

24   such the medication was denied him in the future.

25           So he started taking another medication for acid reflux,

1  and that's a quote from him, acid reflux and said he was taking

2  Tums.  He also used the expression "pick my battles" with regard to

3  Sergeant DesRoche.  He also had no problems correcting other people

4  when he thought that they were wrong, and he would say, no, no, no.

5  He didn't interrupt people too badly.  He would try to get their

6  attention and say listen, listen, listen, listen, while they were

7  still going on.  But it sounded like it was a family that tended to

8  talk over each other a bit.

9          And at one point they were all talking and he said the

10  more older you get, the wiser you get, another idiom or proverb.

11  Q.  Anything else?

12  A.  And then he talked about learning from mistakes.  So I think

13  those are the salient features of that phone call.

14          THE COURT:  Yes, we will take a break.

15          THE DEPUTY CLERK:  All rise.

16      (WHEREUPON, A RECESS WAS TAKEN.)

17      (OPEN COURT.)

18          THE DEPUTY CLERK:  All rise.

19          THE COURT:  Have a seat, please.  And the defense wants

20  to make a motion or comment?

21          MS. FOURNET:  I guess it's more in the manner of notice,

22  your Honor.  On Mr. Hardy's behalf, Dr. Hayes has raised in her

23  testimony the issue of discussion she had with Dr. Gregory Olley,

24  Dr. Stephen Greenspan and Dr. James Flynn.  We wanted to give

25  notice as soon as possible, your Honor, that we do intend to call

1    one or all of those three individuals on rebuttal to recount the

2    content of those conversations.  And to discuss any possible bias

3    on the part of the witness.

4            We would ask that instanter subpoenas be issued for those

5    three witnesses.  And parenthetically, your Honor, we have reached

6    some but not all of those witnesses.  We don't know how hard it

7    would be to accommodate their schedules, and we would ask for some

8    consideration by the court that they be allowed to testify and be

9    cross-examined by telephone, if necessary.  We're going to make

10   every effort to get them here, but we don't --

11           THE COURT:  We also have video conferences facilities.

12           MS. FOURNET:  That would probably be even better, your

13   Honor.

14           THE COURT:  That might be better than the expense of

15   trying to bring them in, if we can arrange it.  I'm sure we could

16   arrange the videoconference.

17           MS. FOURNET:  And the court would be willing to

18   accommodate us on a video conference?

19           THE COURT:  Yes, if for no reason for having to bring

20   them in.  Do you have any problem with videoconferences?

21           MR. MILLER:  No, your Honor.

22           THE COURT:  Keep track of that.  Jay Susslin -- let's

23   plan on doing it by videoconference.

24           MS. FOURNET:  Thank you, your Honor.

25           THE COURT:  Mike, do you have a second tape?

1          MR. McMAHON:  Yes, your Honor.

2   BY MR. McMAHON:

3   Q.  Dr. Hayes, still on the domain of expressive and receptive

4   communication, we would like to play the second call --

5          THE COURT:  Wait a minute.  Michele, you were talking

6   instanter subpoenas, that was to physically get them here?

7          MS. FOURNET:  Yes, your Honor, it was, but now that

8   you've said video conferencing, I think that may be preferable to

9   the court and to them.  So I don't know that we need the subpoenas.

10         MR. LARSON:  We wouldn't need the subpoenas, we'll try to

11  schedule the video conference.

12         THE COURT:  Okay.  No problem.  Okay.  I'm sorry, Mike, I

13  apologize.

14         MR. McMAHON:  And again, we're on the subdomains of

15  receptive and expressive communication, and we'll play the second

16  call from the St. Bernard Parish Prison.

17     (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

18  BY MR. McMAHON:

19  Q.  Dr. Hayes, is there anything in that call that relates to the

20  communication domain, subdomain?

21  A.  Yes.

22  Q.  Can you enumerate some of the things that you noticed?

23  A.  Certainly.  Mr. Hardy was able to modulate the tone of -- he

24  was definitely able to modulate the tone of his voice, the volume

25  and the rhythm.  Again, the family talks fast and they talk over

1    each other.  He was able to give simple directions.  He pretty much

2    stayed on a couple of topics there that was about being a good

3    parent and trying to be there for his children, even from jail.

4            He generally stayed on topic and didn't go off on

5    significant tangents because that kind of was the theme of that

6    conversation, and described a goal there that he wanted his

7    children to remain close and together.  While that was not

8    necessarily a personal goal for him, one that he could necessarily

9    carry out, it was a goal that he hoped would be carried out in

10   terms of his children in the future and hopefully one that he can

11   facilitate by having the family talk to each other.

12   Q.  Does it also comment on social interpersonal relationships and

13   use of community resources in any way?

14   A.  Definitely.  He still has developed and maintained

15   relationships with his children.  Certainly there are some that, at

16   least from the limited telephone calls that I've reviewed, that he

17   knows more than others; but he's definitely maintained contact with

18   these individuals through the years.  And he's using what resources

19   he has available to him to try to achieve a certain outcome.

20           MR. McMAHON:  And if we can go into the third call,

21   Mr. Nguyen.

22       (WHEREUPON, THE AUDIO RECORDING WAS PLAYED.)

23   BY MR. McMAHON:

24   Q.  Dr. Hayes, and again, looking at the adaptive domains and

25   subdomains such as use of community resources, social and personal

1    skills and the receptive and expressive communication.  Does that

2    tell you anything about Hardy's adaptive functioning, did you make

3    notes of anything from that conversation?

4    A.  I did.

5    Q.  And could you enumerate those for the court, please.

6    A.  Sure.  One of the things that I've seen in the past three calls

7    is that Mr. Hardy definitely asks other people about what they've

8    been doing and what things they have been interested in lately,

9    like in this one he asked if his daughter was being tutored in

10   Algebra.  He definitely had good recall of telephone numbers, that

11   seemed pretty basal.  He had showed concern for other's welfare.

12   He seemed frustrated when things had not gotten done quickly enough

13   for him.

14          He definitely was able to modulate his tone of voice,

15   carry on conversations without any problems, give simple

16   directions.  He's still carrying or having relationships with his

17   children and with other people and trying to establish and maintain

18   those relationships, as could be seen when he was speaking with

19   Linda that they had not spoken in awhile; and so he was telling

20   his, I guess his daughter, to plug in Linda's telephone number into

21   her cell phone so that they could more easily get in touch with

22   each other.  So he was understanding that that was a possibility as

23   well.

24          He was calling other people --

25   Q.  How about the address?

1   A.  I'm sorry?

2   Q.  How about the address?

3   A.  With regard to the address, he was telling the address of the

4   jail, he was talking about it being off Paris Road and the zip code

5   there as well.

6   Q.  Anything else?

7   A.  Again, he was following the directions of his attorney, he was

8   doing what his attorneys had said.  And one of the things that's

9   interesting as well is even from jail, he still tries to discipline

10  his children and make sure that they're on the straight and narrow.

11  Q.  Go on to the next call.

12          THE COURT:  Let me ask you something about this, this is

13  starting to get cumulative in terms of the observations.  And I

14  have no problem with listening to all of the phone conversations,

15  off manual, so to speak, not in court while we're all sitting here.

16  I would rather, if we could, continue with live testimony and I'll

17  listen to the rest of the tapes.

18          MR. McMAHON:  All right.  That's fine.

19          THE COURT:  Great.  Thank you.

20  BY MR. McMAHON:

21  Q.  Dr. Hayes, could you go to your report under the communications

22  section for anymore information derived from your sources that

23  speak to the domain of communication?

24  A.  Yes.  I reviewed the penalty phase testimony of Dorothy

25  Richardson, who was Ms. Dot, who had owned the small business that

1    was close to Mr. Hardy's home.  And in that she had indicated that

2    Mr. Hardy had no problems speaking to her and that it was easy to

3    communicate with him.  She reported that he seemed like a normal

4    kid; and when asked whether he was a normal student, Ms. Robinson

5    indicated he was all right.  And that was her penalty phase

6    testimony from April 30th of 1996.

7    Q.  Let's go to the written subdomain under communication.

8    A.  Okay.

9    Q.  And the Vineland item, write simple correspondence at least

10   three sentences long; for example, post cards, thank you notes,

11   e-mail, et cetera.  How did Toni Van Buren rate Hardy in that, for

12   that question?

13   A.  She rated him as a one.

14   Q.  Did Javetta Cooper or any other source of information address

15   that?

16   A.  Javetta Cooper indicated that they didn't go to school

17   together, she never was with him when he was reading a book that

18   she could recall, and she wouldn't know what the grade levels would

19   be; but she knows that he writes now letters to his daughter, but

20   she didn't have any specific information.

21   Q.  Other sources?

22   A.  Oh, excuse me.  There's been several --

23   Q.  How about Lionel Hardy?

24   A.  I'm sorry?

25   Q.  Lionel Hardy?

1    A.  Of course.  Lionel Hardy's testimony was such during this court

2    that he indicated that they would have monthly correspondence with

3    each other.

4         But there was also other communication, and written

5    communication in the Bureau of Prisons files such as letters

6    requesting that he be allowed to communicate with Toni Van Buren or

7    another individual.

8    Q.  Okay.  Let's go to the next item in the Vineland, writes

9    report -- again, under written -- writes reports, papers or essays

10   at least one page long, may use computer.  And what was the Toni

11   Van Buren score?

12   A.  A zero.

13   Q.  And again, information from records and/or the interview with

14   Javetta Cooper, do you have anything to add to that?

15   A.  Again, there is no indication of him having any problems

16   writing since he was incarcerated.  His handwriting is neat, no

17   difficulties.  Obviously he has no access to computers and he had

18   written Lionel, obviously I don't have -- those are not accessible

19   to me so I can't know if the reports or papers or essays, they're

20   clearly not letters, and so this is not a situation he has to be

21   involved in on a day-to-day basis these days.

22   Q.  The next Vineland item:  Writes complete mailing and return

23   address on letters or packages.  Toni Van Buren rated him what?

24   A.  A zero.

25   Q.  And did you get any -- did you get information from any records

1    or any other source that addressed that question?

2    A.  I did.

3    Q.  Can you elaborate for the court?

4    A.  I think one of the most telling things is clearly it's not on a

5    letter or package, but he did know his name and address and was

6    able to write that on the various gun applications as we discussed.

7    There have also been no difficulties noted with him being able to

8    send correspondence from jail.

9    Q.  Any evidence at all to suggest that somebody else filled out

10   those applications for him?

11   A.  None that I saw.

12   Q.  The next question:  Reads and understands material of at least

13   6th grade level.  Toni Van Buren rated him what?

14   A.  A zero.

15   Q.  And did you get any information that addressed that question?

16   A.  I did.  His reading comprehension on the ABLE was measured to

17   be greater than a high school level, and if you give me just a

18   second --

19        MS. FOURNET:  Your Honor, if I might.  We appear to be

20   simply at this point reading this very lengthy chart that

21   Dr. Swanson -- I think we're on page 91 -- that Dr. Swanson

22   discussed in her direct.  I am just wondering, almost verbatim, I

23   am just wondering if it serves any useful purpose to simply read

24   from the report.

25        THE COURT:  Is it from the report?  If that's all we're

1    doing, I'd rather not do that.  Dr. Hayes, are we in your report?

2              THE WITNESS:  We are in my report at that point on

3    page --

4              MS. FOURNET:  91, I believe.

5              THE COURT:  Oh, yeah, okay.

6              MS. FOURNET:  I am not seeing we're adding anything to

7    what's on this chart is my problem in terms of efficiency.

8              MR. McMAHON:  Your Honor, I am building a record, and

9    what I am doing is going down every Vineland question and exploring

10   the evidence with Dr. Hayes, both in relation to what Toni Van

11   Buren scored and then what she was able to discern from other

12   information and from the interviews.  So I know it's tedious but I

13   think --

14             THE COURT:  The report is in the record though, to the

15   extent that she is simply reading.

16             MR. McMAHON:  Her report is in the record, right.

17             THE COURT:  I don't want to spend time just reading a

18   178-page report into the record.  If there's anything that she

19   wants to add to any these things, that's fine.  I consider the

20   report in the record as if she is testifying to it.  I have no

21   problem with that.

22             MR. McMAHON:  Okay.

23             THE COURT:  I am writing copious notes and I just

24   realized I didn't need to.

25   BY MR. McMAHON:

1    Q.  On that question, did you physically observe Mr. Hardy's cell

2    down at the St. Bernard Parish jail?

3    A.  I did.

4    Q.  Did you see books or other reading paraphernalia in there?

5    A.  I did.

6    Q.  Relate that to the court.

7    A.  There is obviously a Bible that was in his cell, there was a

8    book by a gentleman I think called -- named Tim LaHaye.  There was

9    a dictionary, there were writing materials, legal pads, a legal pad

10   or papers with writing on those.  Those -- obviously there were

11   other things, but those would be more along the daily living skills

12   domain, and I'm sure we'll go over them at that time.

13           But one thing I did want to add is that even on the

14   Kaufman Test of Educational Achievement that was given by

15   Dr. Swanson, his reading was measured to be at the 14th percentile

16   which was at the 6th grade level with regard to that question.

17           MR. McMAHON:  Your Honor, at this point I want to display

18   copies of the inmate medical request form, sick calls from the

19   St. Bernard Parish Prison.

20   BY MR. McMAHON:

21   Q.  If we can get the first one up there, Dr. Hayes, I want to blow

22   that up.  What's the date of that?

23   A.  That is November 21st of 2006.

24   Q.  Actually I think the date is November 29th.  The roll-in

25   date --

1    A.  You're right, I'm sorry.  November 29th of 2006, so eight days

2    after he rolled into St. Bernard.

3    Q.  From what you've been able to gather --

4         MR. McMAHON:  And again, your Honor, we'll have the

5    personnel from the St. Bernard Parish Prison testify.

6    BY MR. McMAHON:

7    Q.  But did Paul Hardy write that?

8    A.  Yes, appears to be his handwriting.

9    Q.  And can you read what it says there?

10   A.  "Since St. Tammany is playing games with my medical records, I

11   would like to get an X-ray on my foot.  My lawyer will be down here

12   today or tomorrow.  Can he see a copy of my medical records or we

13   will take it up with the Marshal."

14   Q.  And if you could scroll down to the bottom of the page.  And

15   what does it say?

16   A.  It has Paul Hardy --

17   Q.  I think that's his signature.  But what's written at the bottom

18   was written by then Sergeant DesRoche, correct?

19   A.  I believe so.

20   Q.  But whose signature is that (INDICATING)?

21   A.  Paul Hardy's.

22   Q.  Let's go to the next one, please.  What does that purport to

23   be?

24   A.  That is I guess a personally constructed sick call form that

25   was written by Paul Hardy on August 19, 2007.

```
 1   Q.  What does it say?
 2   A.  "Could you give me some BENGAY for my big right toe, it's been
 3   aching me lately.  Also some athlete's foot cream."
 4   Q.  Everything spelled correctly there?
 5   A.  Everything is spelled correctly, yes.
 6   Q.  Athlete's foot properly punctuated?
 7   A.  It is.
 8   Q.  Let's go onto the next, please.  What does that say?
 9   A.  It's a March 23rd, 2008 inmate medical request form signed by
10   Paul Hardy that says:  "Could I get some Tolnaftate for athlete's
11   foot?"
12   Q.  Are you familiar with Tolnaftate?
13   A.  No.
14   Q.  Have you looked it up?
15   A.  No, I haven't.
16   Q.  You're not sure whether that's the proper name for an athelte's
17   foot medication -- treatment?
18   A.  I had asked Sergeant DesRoche and she said it was.
19   Q.  Next one, please.  Dated April 9, '08.  Can you read that?
20   A.  Yes.  Again, it's a sick call request form signed by Paul
21   Hardy.
22            "Nurse, I asked you could my family bring me some Head
23   and Shoulder, ear drops, and some Carmex for chapped lips.  Is it
24   still okay."
25   Q.  Are you familiar with Carmex?
```

1   A.  I am.

2   Q.  And did he spell that right?

3   A.  I can't remember if it's right or not.

4   Q.  Is that a medication for chapped lips?

5   A.  Yes, it is.

6   Q.  Next one, please.  What's that dated?

7   A.  That is July 29th, 2008.

8   Q.  And could you read it?

9   A.  Yes, of course.  "Could I get some laxative medicine."

10  Q.  Laxative spelled correctly?

11  A.  Yes, it is.

12  Q.  Medicine spelled correctly?

13  A.  Yes, it is.

14  Q.  Next one.  Dated October 5, '08?

15  A.  That's right.

16  Q.  Could you read that?

17  A.  Yes.  "Could I get some anti-funga cream."

18  Q.  F-U-N-G, can you make out the end of the G?

19  A.  It looks like a G-A, you can probably see it a little bit

20  better from there.  It looks like a G-A.  Possibly an L was cut off

21  in copying, possibly it never existed.

22  Q.  And the last sick call, can you please put it up.  Dated

23  November 17th of '08.  Could you read that, please?

24  A.  Of course.  "Could I get some triple antibiotic ointment?"

25  Q.  Anything spelled incorrectly?

1   A.  No.

2   Q.  So triple was correct, antibiotic and ointment are all spelled

3   correct?

4   A.  If my spelling skills are adequate, then, yes.

5   Q.  Let's go to the next subdomain of daily living skills.  And

6   again, without repetition, noting that your report is in the

7   record -- I did introduce it into the record in order to expedite

8   things -- is there anything you would like to add under that

9   subdomain under personal to bring to the attention of the court

10  that has not already been -- that's not already in your report or

11  especially if there's anything in your transcript of the interview

12  with Toni Van Buren or the transcript of the interview with Paul

13  Hardy, and if you could be concise that would be appreciated.

14  A.  There were some things that weren't in my report related to the

15  last one that we were talking about, the communication.

16          But in terms of --

17  Q.  That weren't in your report?

18  A.  No.

19  Q.  So we're back to written communication?

20  A.  Well, it was things like items from telephone calls where he

21  would say things like that girl is strong minded; he talked about

22  boys as friends, but not boyfriends; you're going sideways on me;

23  getting your beauty rest; hands-on training, two-part phase,

24  bumping heads, experience is a good teacher.  It was just

25  illustrative of -- just insightful comments that were being made

1    about the telephone call.

2    Q.  I think we want to expedite things for the court.

3    A.  Okay.  I'm sorry.

4    Q.  I think we just want to concentrate on if there's anything not

5    in your report but perhaps in a transcript that you would like to

6    bring to the court's attention.  And again, let's try to be

7    concise.  Okay?

8    A.  Okay.

9    Q.  So we'll going on to daily living skills under the personal

10   subdomain.

11           THE COURT:  Page 92.

12           THE WITNESS:  In terms of daily living skills, some of

13   the things that I noticed was during some of the telephone calls he

14   was often asking for lotion and cream that be brought to him at the

15   jail.  He knew things like where his barber was, he said it was

16   Jack's on Claiborne, that was included in my transcript.  He was

17   talking about another hair shop being on the corner of Dumaine and

18   Broad that he used to -- that he used to frequent.  Those are

19   things that are not specifically in my report.

20           THE COURT:  Okay.

21   BY MR. McMAHON:

22   Q.  How about seeks medical help in an emergency, for example,

23   recognizes symptoms of serious illness or injury such as shortness

24   of breath, chest pain, uncontrolled bleeding.  Toni Van Buren gave

25   him a zero.  Is there anything, anything there that you saw that

```
 1   was inconsistent with that response?

 2   A.  Well, one thing was that Javetta Cooper said that he had helped

 3   her take a child to the emergency room.

 4        Another thing was that Toni Van Buren on page 84 of the

 5   transcript said I asked her, "Would he have known like if he had

 6   got stabbed, he needed to go to the hospital?"  She said, "Uh-Huh.

 7   Would he have known to call 911?"  And she said, "I think so,

 8   yeah."

 9   Q.  And turning to page 168 of your interview with Paul Hardy, did

10   you bring up this issue?

11   A.  Yes.  I was giving him a scenario where possibly his son had

12   fallen off the monkey bars and what would you do in that situation.

13   He initially said, well, that never happened.  But then I talked to

14   him about -- not whether did he fall off the monkey bars, but if

15   this had possibly occurred what would he have done and he had a

16   gash on his head?  And Mr. Hardy said I would bring him to the

17   hospital, right?

18   Q.  The next question:  Follows directions for healthcare

19   procedures, special diet or medical treatments.  Toni Van Buren

20   rated him a zero, but did you ask her in the interview about that?

21   And just very quickly summarize that exchange.

22   A.  I had asked her like if he had gotten stabbed and had gotten

23   out of the hospital, if an individual -- if he was told that he

24   needed to keep the wound dry and clean or I had asked her -- it's

25   hard to summarize it, let me just read it:  "Like if they said
```

1    after he got stabbed that you need to not take a shower and keep

2    your arm dry for two days, would he do that?"  And she said,

3    "Uh-Huh."

4    Q.  And did you ask basically the same question -- that was page 84

5    of her interview, correct?

6    A.  That's correct.

7    Q.  Page 312 of the Hardy interview, did you essentially bring up

8    the same subject?

9    A.  I did.

10   Q.  And did he -- let me ask a question.  And did he actually

11   mirror Toni Van Buren's response?

12   A.  Not -- well, he said similar.  I asked him if he had a bandage

13   what would you do, and he says, "Well, you don't take the bandage

14   off and you keep it clean."

15   Q.  Let's move on.  Makes appointments for medical and dental

16   checkups.  Toni Van Buren rated him a zero.  And did you ask her

17   about -- in her interview did you ask her about the dental work?

18   A.  I did.

19   Q.  And how does that inform you at all about that particular

20   question?

21   A.  Well, the informative thing to me is that she didn't know about

22   that part of his life.  He clearly had dental work, I believe he

23   had dentists cards with him at the time of his arrest.  And she

24   said that she did not know, that she wasn't sure how he made those

25   appointments and went to those appointments.

1    Q.  Is there any other information that you have that's not

2    contained in your report that would inform the court on that

3    particular item?

4    A.  Sure.  One of the things that I thought was significant is that

5    he really does have a good idea about what medications are and what

6    they're used for.  He's discussed, in one way or another, Claritin,

7    Tums, Formula 44D, Triple Antibiotic Ointment, orthopedic.

8    Q.  In the next area:  Uses a microwave oven for heating, baking or

9    cooking; that is, sets times, power settings, etc.  And Toni Van

10   Buren rated him a two.  Anything else we need to know or the court

11   needs to know relative to that that's not in the record, that's not

12   in your report or in the calls?

13   A.  Well, obviously Lionel Hardy indicated that the family did not

14   have a microwave, and so that would have been a no opportunity.  I

15   had asked Toni Van Buren, "You said that he could make things in

16   the microwave or sandwiches and things like that but he never

17   really cooked that you can recall."  And she said no.  So that

18   suggested to me that he was able to do that in the future; but

19   again, he was being rated at either 17:5 or 18:5, and so that would

20   be an inaccuracy there.

21   Q.  And Javetta Cooper testified that he could indeed use a

22   microwave?

23   A.  I don't recall what he said to tell you the truth.

24   Q.  Yesterday.

25   A.  Yeah, I don't remember.

1  Q.  All right.  Washes dishes by hand or loads and uses the

2  dishwasher.  Rated a zero.  Anything to add to the court under that

3  domain?

4  A.  I think significant there is that he had worked as a porter and

5  a busboy at a restaurant and he had also indicated that he did

6  dishwashing as necessary.  Javetta Cooper had indicated to me that

7  he was very clean and neat, and I think those were the significant

8  things there.

9  Q.  Sweeps, mops or vacuums the floor thoroughly.  We just heard a

10 call where he spoke about a vacuum.  Toni Van Buren rated him

11 another zero there.  What did Javetta Cooper say about his

12 tidiness?

13 A.  She said that when a room in the home would be cleaned up that

14 he would actually go behind her to clean up.

15 Q.  And what did Toni Van Buren testify about cleaning the yard?

16 A.  She indicated that he would clean the back yard.

17 Q.  And again, just for the court, page 319 of Hardy's interview,

18 can you quote what he told you?

19 A.  Yes.  "I would sweep and mop, mop the floor."

20 Q.  The next question of the Vineland:  "Clears table completely,

21 for example, scrapes and stacks dishes, throws away disposable

22 items, et cetera."  Van Buren gave him a one.  And anything to

23 indicate that was an underreport?

24 A.  He worked as a porter and busboy at a restaurant, so it shows

25 that he would be able to do that type of activity.  He indicated

1    that he would bus tables, he would clean the tables off.

2    Q.  And that's page 192 of your interview with Hardy?

3    A.  That's correct.

4    Q.  The next item:  Uses household products correctly; for example,

5    laundry detergent, furniture polish, glass cleaner, etc.  Rated a

6    zero, but didn't he know the names of various household cleaning

7    products?

8    A.  Yes.

9    Q.  And can you elaborate a little bit for the court?

10   A.  During his interview with me he talked about using things like

11   Comet, Pine-Sol, and he was able to describe how to use those

12   items.  Obviously I didn't have a mop and Pine-Sol and Comet and a

13   tub for him to clean.

14   Q.  Did you supply the name Comet or did he?

15   A.  No.  I had said on page 317, "What do you use to clean the tub

16   with?"  He said Comet.  I asked him to explain how he would do it,

17   and he said, "Put the Comet in the tub and clean around the tub and

18   then run the water."

19   Q.  The next one:  Cleans one or more rooms other than bedroom.

20   Van Buren rated him zero.  Is this contradicted -- we don't have to

21   go into gory detail about Javetta Cooper.

22   A.  Again, she had just said he was neat and tidily and would clean

23   up after her to ensure that it was to his standards and that he

24   wanted to keep his children clean and where he was clean.

25            MR. McMAHON:  Your Honor, we actually went through this,

1   we were here until one A.M. this morning, Dr. Hayes and myself and

2   the other members, and I want to make sure that -- we went through

3   this and we do want to expedite things, but I want to make sure

4   that -- this kind of threw off our method here.  So, you know, I

5   know the court has read the report, but it's difficult now to kind

6   of ask Dr. Hayes to say, well, is there anything else out there

7   that's not in your report because we are going through this, you

8   know, we are pretty much going through this line by line in the

9   Vineland and these various adaptive functions.

10          THE COURT:  All I am asking is you not just read off

11  what's already on here and go directly, as you've been doing, to

12  anything that' not on this chart and anything else.  I have no

13  problem with that.  But I don't want to spend time having her read

14  what's on the chart and then add something, that's all.

15          MR. McMAHON:  Are you comfortable with that, Dr. Hayes?

16          THE WITNESS:  Sure.

17          MR. McMAHON:  I want to make sure that we build a record

18  here.  Let's go on to the next.

19  BY MR. McMAHON:

20  Q.  Cleans one or more rooms other than the bedroom.  Van Buren

21  rated him as a zero.  What did Javetta Cooper -- and again, Javetta

22  Cooper testified to the opposite, correct?

23  A.  Correct.

24  Q.  Anything else that you need to add to that?

25  A.  I think that one of the things that -- can I ask a question?

1        THE COURT:  Yes.

2        THE WITNESS:  Do you want me to talk about what the

3   guards have told me or do you want them to talk about that?

4        MR. McMAHON:  They'll talk about it, yeah.

5        THE WITNESS:  But in terms of like his commissary

6   accounts and things like that he has his own deodorant, his own

7   toothbrush, he offered to buy fingernail clippers, things like that

8   since in jail.

9   BY MR. McMAHON:

10  Q.  And Toni Van Buren rated him a two, he knows enough to use a

11  sharp knife to prepare his food.

12       Let's go on to another zero by Toni Van Buren was uses

13  stove or oven for heating, baking, or cooking; that is turns burner

14  on and off, sets oven temperature, et cetera.  He got a zero on

15  that.  Is that inconsistent with other things that you've learned?

16  A.  He had said himself that he'd warm things up on the stove, cook

17  spaghetti and meat balls.  And while -- let me just say that seems

18  to be consistent in that he would be able to use the stove, would

19  be able to warm up things like spaghetti and meat balls.  He says

20  that he was able to fry chicken and that he was able to warm up

21  things as well.

22  Q.  Like what?

23  A.  He said pork and beans and wieners, I remember that.

24  Q.  Okay.  Let's go on.  Prepares food from ingredients that

25  require measuring, mixing and cooking, a zero.  And I think that we

1  saw the piece from the video regarding of frying the fish?

2  A.  That's correct.

3  Q.  How about another zero by Van Buren, washes clothing as needed.

4  Any inconsistencies from other sources that you've been able to

5  develop?

6  A.  No difficulty was noted there by Javetta Cooper.  The issue

7  there is with, I believe with before, was with the as needed.

8  Obviously his mother was the one who did the majority of the

9  cooking and the cleaning and the washing in the home.  This

10  question says washes clothing as needed.  So when his mother did

11  not apparently wash the clothes for whatever reason that day, when

12  it was needed he was able to do that with no difficulty according

13  to Javetta Cooper.

14  Q.  Now we're on to the community subdomain.  The item on the

15  Vineland:  Watches and listens to programs for information; for

16  example, weather report, news, educational programs, et cetera.

17  Toni Van Buren rated him zero on that.  And I think we went over

18  this, but can you elaborate on information derived actually from

19  the defendant himself?

20  A.  He indicated that he listened to church every day and that he

21  also watched the news -- or not watched the news but probably

22  listened to the news -- well, to tell you the truth, I'm not sure

23  whether it was through his radio with regard to the news or the

24  television with the news.

25  Q.  Counts change from the purchase of one, does that implicate

1    that he can't count change or what?  What does that mean?

2    A.  A one indicates a sometimes.  According to the manual it

3    indicates circle one if the individual sometimes performs the

4    behavior independently or partially performs the behavior

5    independently.

6    Q.  Was he able to count change for you?

7    A.  Yes, he was.

8    Q.  I refer to page 361 of the interview.

9           And next, computers didn't exist -- computers certainly

10   in his environment, he didn't have a computer, right?

11   A.  No.

12   Q.  And Lionel Hardy confirmed that fact.

13          Evaluates quality and price when selecting an item to

14   purchase.  Van Buren gave him a zero.  Do you have any information

15   that's inconsistent with that zero response?

16   A.  Yes, I do.  My information and the records that I have are that

17   he's diligent with his commissary accounts.  When there are issues

18   with that, he apparently takes it up with the appropriate

19   individual and manages and checks all of his accounts accordingly

20   to make sure that he got what he had quartered and to ensure that

21   it didn't come in a damaged package or damaged packaging.

22   Q.  In fact, he was quite fastidious about that, correct?

23   A.  According to the officers, yes.

24          MR. McMAHON:  Your Honor, we'll elaborate on this with

25   the witnesses from St. Bernard.

```
 1              THE COURT:  Okay.

 2   BY MR. McMAHON:

 3   Q.  I'll direct your attention to page 258 of your own interview.

 4   Did he kind of talk about value there in a context?

 5   A.  He did.  He was talking about a car and he said, "I sold the

 6   Peugeot because it cost too much money.  When they break, you

 7   know."

 8   Q.  Van Buren gave him a zero for a base.  Time limit, or breaks;

 9   for example, lunch or coffee breaks.  Was there anything there that

10   you've been able to learn that would call into question that

11   particular response?

12   A.  There were.

13   Q.  Elaborate.

14   A.  Okay.  Ms. Van Buren was first off unaware that he had held a

15   job at Ernst Cafe, and so I am not sure that she would have enough

16   information to be able to say whether he was able to obey time

17   limits or coffee breaks.  There were from what I recall some of the

18   various wire tap conversations, he would say, I'll call you back at

19   a certain time, he was within about ten minutes or so from what I

20   recall on that.

21              I asked him about if he got in trouble for, at work for

22   not coming back in time, and he said, no, he would be right there.

23   Javetta Cooper had indicated he was punctual.  I think during the

24   interview, if I am correct, he said he did get into trouble one

25   time, once or twice for being late, if I'm right; but I think he
```

1    said generally he was punctual.

2    Q.  Uses a savings or checking account responsibly; for example,

3    keeps the money in the account, tracks balances carefully, etc.

4    Van Buren rate gives him a zero.  Anything to contradict that about

5    his adaptive functioning?

6    A.  Certainly.  Ms. Van Buren wasn't aware that he had a checking

7    or savings account when they were acquainted.  In fact, in my

8    interview with her she said, "I don't know if it was a checking or

9    savings, I don't know that.  I can't remember the guy's name.  He

10   told him he could put some money in the bank and get a credit card

11   and that was the way he could rent cars and stuff and just put

12   money in the bank."  So she wasn't aware whether he had a checking

13   or savings account.

14   Q.  Did you bring that up with Mr. Hardy during the interview?

15   A.  I did.

16   Q.  And what did he say?

17   A.  He said, "Yeah, the lady at the bank told me don't put all of

18   this money into the bank.  So she scared me, so I took all of the

19   money out of the bank."

20   Q.  And Dr. Swanson's own reports indicated that Hardy actually

21   pulled money out of the bank when he realized that he would have to

22   pay tax on the interest, correct?

23   A.  That was what was indicated in her report to the best of my

24   recollection.

25   Q.  Another item:  Travels at least five to ten miles to unfamiliar

1    destinations; that is, bikes, uses public transportation, or drives

2    himself.  Van Buren scores a zero.  Is that inconsistent with other

3    information you've gleaned?

4    A.  It is, to an extent.  The reason being because it says

5    unfamiliar.  I have no way of knowing what is familiar and

6    unfamiliar to Mr. Hardy, but the surveillance logs show no

7    difficulty traveling around New Orleans.  But again, whether these

8    areas are familiar or unfamiliar to him, I don't know.  So . . .

9          MS. FOURNET:  Your Honor, if I may, I didn't mean to cut

10   you off, Dr. Hayes, if you weren't through.  Are you through with

11   your answer?

12         THE WITNESS:  Sure.

13         MS. FOURNET:  Your Honor, I just wanted to point out for

14   the record, I believe it's been suggested that Dr. Swanson in her

15   report or elsewhere indicated that Mr. Hardy removed cash from his

16   bank to avoid taxes.  That's been said twice, I think once it was

17   taxes, once it was interest.  Dr. Swanson, to my knowledge, has

18   never represented that and there's absolutely nothing in the record

19   to that effect to my knowledge.

20         THE COURT:  Okay.

21         MS. FOURNET:  And I would appreciate if Mr. McMahon is

22   going to frame questions that he would frame his questions in terms

23   of what's in the record and not extraneous information that exists

24   nowhere.

25         MR. McMAHON:  Actually it is in her report, and let me --

1           THE WITNESS:  I have it.  It's on page 9, the first

2    paragraph.

3           MR. McMAHON:  Reading from her report, your Honor, page

4    9.  "He could not balance a checkbook or banking statement.  He

5    once opened a banking account but he became concerned when the

6    cashier started making jokes about the money and withdrew the money

7    and placed it in a safe.  He did not realize that he would have to

8    pay taxes on the interest."

9           Henceforth, I would appreciate it if Ms. Fournet would

10   not interrupt my examination, and confine her inaccurate

11   observations to cross.

12          MS. FOURNET:  Your Honor, it was not an inaccurate

13   observation.  He has represented that Dr. Swanson said that he

14   withdrew --

15          MR. McMAHON:  The report is in the record.

16          MS. FOURNET:  I would appreciate being allowed to finish

17   what I have to say.

18          THE COURT:  All right.  Do it quickly, please.

19          MS. FOURNET:  The report does not say, nor has anyone on

20   either side ever suggested that that money was withdrawn to avoid

21   taxes and interest.  What she says in the report is --

22          MR. McMAHON:  Your Honor, the report speaks --

23          THE COURT:  Let her finish.  Let her finish, Mr. McMahon.

24          MS. FOURNET:  I would appreciate common courtesy.  Thank

25   you.

1    THE COURT:  Go ahead.

2    MS. FOURNET:  The report says that he did not understand

3    about taxes and interest, which is a totally separate issue and

4    supports her diagnosis.  It's very clear from everything that was

5    said, including what was said to Dr. Hayes, that he withdrew that

6    money because the lady at the bank said something that scared him.

7    THE COURT:  Okay.

8    MS. FOURNET:  Now, if we're going to frame our questions,

9    I am only suggesting that we frame them consistently and accurately

10    with what's in the record and not try to spin things our way.

11    THE COURT:  I tell you -- okay.  All right.  All right.

12    Proceed, Mr. McMahon, and I'll memorize everything that's in all of

13    these three-ring binders so I'll know if some nuance is inaccurate.

14    MR. McMAHON:  We'll try to assist the court.

15    THE COURT:  Thank you.

16    BY MR. McMAHON:

17    Q.  We were on travels at least five to ten minutes to unfamiliar

18    destinations.  Van Buren gave him a zero.  Let's talk about other

19    information that you've gathered that contradicts that --

20    THE COURT:  I think that we actually covered that.  She

21    was talking about the surveillance logs and she was indicating she

22    did not know what neighborhoods were familiar or unfamiliar to him.

23    I think that's where we were, were we not, Dr. Hayes?

24    THE WITNESS:  I believe so.

25    THE COURT:  Okay.

1    BY MR. McMAHON:

2    Q.  What about -- did you ask Hardy that regarding going to

3    unfamiliar destinations?

4    A.  I had said to him, "It sounds like you've traveled a good bit.

5    Where have you been?"  He said he went to Sacramento to go visit

6    Lionel in prison.  He had gone there with his mother and I believe

7    his father.

8    Q.  And what pages was that on?

9    A.  That was 232 to 233.

10   Q.  Okay.  Manage his own money; for example, pays most or all own

11   expenses, use checks or money orders for purchases as needed.  Van

12   Buren gave him a zero.  But didn't she contradict that in her own,

13   actually in her own testimony and in her interview with you?

14   A.  She said, "Yeah, I worked but I didn't pay bills, he paid the

15   bills."  Then I asked, "How did he get the bills paid?  He would

16   give me the money to go pay the bills, I did all of that."

17   Q.  But he would pay, the indication being he paid the bills?

18   A.  He gave the money to pay the bills.

19   Q.  Made sure the bills were paid?

20   A.  Correct.

21   Q.  Has held full-time job for one year.  Now, Van Buren gave him a

22   zero, and I think we already have information to contradict that

23   assertion, correct?

24   A.  I don't know that it was a full-time job for one year.  He

25   has -- in terms of legal employment, I am aware that he had worked

1    at three different places, one being with Ernst Cafe and he had

2    made around $2,700, and the minimum wage at that time was around

3    $3.35.  And so if that was the case, he would have worked around

4    800 hours.  I believe he only got about $30 dollars from Aramark,

5    which would have been the Superdome concessions.  And then later

6    the Meals on Wheels and I think that was a little over 600 if I

7    recall correctly.

8              In terms of illegal employment, he certainly had held a

9    job for more than one year.

10   Q.  Applies for or uses personal credit cards responsibly; for

11   example, does not exceed credit limit, pays on time, et cetera.

12   Toni Van Buren gives him a zero, correct?

13   A.  That's correct.

14   Q.  She was not aware of the various accounts he had, correct?

15   A.  Not in my interview.

16   Q.  And we were able to -- we tried to get records for a lot of

17   these accounts and stores but the records were not available.  But

18   is there anything to indicate that he did not maintain those

19   accounts responsibly?

20   A.  There's no indication to suggest that.  In fact, there are

21   some, I guess, receipts or payment confirmations that were included

22   in the FBI records.

23   Q.  Which the court has.

24   A.  Yes.

25   Q.  The next domain and subdomain, the next domain is socialization

1    with the subdomain of interpersonal relationships.  Question:

2    Imitates relatively complex actions several hours after watching

3    someone perform them; for example, shaving, putting on make up,

4    hammering nails, et cetera.  Van Buren gives a score of one, but is

5    that almost a question that defines someone who is profoundly

6    retarded?

7    A.  No, not at all.

8    Q.  Go ahead.

9    A.  A profoundly retarded person would be pretty low functioning.

10   I mean, you're in the -- around the 20s in terms of your IQ level.

11   And so some people in the profoundly mentally retarded range may be

12   able to do that, but I don't know that the majority of people in

13   that range would be able to do that.

14   Q.  But back to more of the street, was Hardy able to basically --

15   do you have information inconsistent with that score actually from

16   what Hardy told you himself?

17   A.  Yes.

18   Q.  Elaborate a little bit.

19   A.  He had indicated that after -- that the only thing that he had

20   learned after seeing someone do something was how to measure coke,

21   meaning cocaine.

22   Q.  Acts when another person needs a helping hand; for example,

23   holds door open, picks up dropped items, etc.  Van Buren gives him

24   a one.  Do you think that's an underreport?

25   A.  I don't think that one is an underreport based upon her

1    perception of Mr. Hardy, because during my interview with her she

2    had indicated that Mr. Hardy would definitely hold the door open

3    for old people and other people like that, but that he would not

4    hold the door open for her.  And so I think that's accurate based

5    upon her perception of Mr. Hardy.

6    Q.  What about other information?

7    A.  Other information suggests that Mr. Hardy actually was a

8    relatively giving individual who would help other people out when

9    they needed a hand like bringing the medicine to an older person or

10   bringing the woman beer or doing various things for people.

11   Q.  Do you remember the testimony of Albertine Arceneaux

12   (PHONETIC)?

13   A.  I do.

14   Q.  Would that address that particular adaptive question?

15   A.  It does.  And so again, I think that's Toni's world view but

16   not what he would necessarily do with other individuals.

17   Q.  Shows same level of emotions as others around him or her; for

18   example, does not downplay or overdramatize the situation.  Van

19   Buren gives him a zero.  Don't the phone calls from St. Bernard

20   contradict that?

21   A.  I believe they do.

22           MR. McMAHON:  Again, your Honor.

23           THE COURT:  Uh-huh.

24   BY MR. McMAHON:

25   Q.  Next.  Keeps a comfortable distance between self and others in

1   social situations; for example, does not get too close to another

2   person when talking, et cetera.  Van Buren gives him another zero.

3   Did you find any inconsistencies relative to that score?

4   A.  Two things:  When I interviewed Toni Van Buren on page 89, I

5   said, "You know how there's talk of personal space now, like some

6   people get in your personal space, they're right there or they're

7   way too far away.  Did he keep a good enough distance, did he ever

8   get in your space like when y'all were not arguing or something?"

9   And he said, no.  Additionally, I talked to Paul and he said, "I

10  keep a comfortable distance, I never do like talking close in

11  nobody face."  That was from page 336 of his transcript.

12  Q.  Okay.  Talks with others about shared interests; for example,

13  sport, TV shows, summer plans, etc.  Van Buren gives him a one.

14  Any comments about that rating?

15  A.  I think that that is wrong.

16  Q.  Why?

17  A.  I think what is clear and abundantly clear from the telephone

18  conversations is that he's quite interested in the lives of the

19  people that he was talking to.  In fact, like when he was talking

20  to his sister Linda, I believe, if I am correct, he was asking her

21  about a niece, I think.  He would ask the daughter about what was

22  going on in her life, how are things going with her, how was

23  school.  He would basically ask other people about what was going

24  on with them and talk with them about the things that were going on

25  with them.

1170

1    Q.  Van Buren gave him a zero on the question of chooses not to say

2    embarrassing or mean things or ask rude questions in public.  Hardy

3    himself addressed this, didn't he?

4    A.  He said that, yes, he said, "No, I don't think I would because

5    I was teased growing up so I know how it feels."

6    Q.  And what pages is that from?

7    A.  That's 338 to 339.

8    Q.  Places unreasonable demands on friendship; for example, does

9    not expect to be a person's only friend or to have the friend

10   always available, et cetera.  Van Buren gives him a zero.  What did

11   Hardy himself say about this?

12   A.  I asked him, "Did you ever expect to be one of your friends

13   only friend?"  And he said, "No, they can do what they want to do."

14   And that was on page 339.

15   Q.  Let's go on, actually skip ahead to:  Demonstrates

16   understanding of hints of indirect cues in conversation; for

17   example, knows what yawn may mean, I'm bored, or quit subject may

18   mean I don't want to talk about that, et cetera.  And then Van

19   Buren gives him a one.  Is that an underreport in your opinion?

20   A.  I believe so.

21   Q.  Why?

22   A.  No difficulty was reported by Greg Williams or Javetta Cooper.

23   And again I asked him, "Like if I started looking at my watch and

24   yawning and stuff and we had been talking, what would that mean?"

25   And he said, "I guess you're ready to go, huh?"  And that was on

1    page 341.

2    Q.  What about the phone calls about -- didn't he pick up on cues

3    from the -- and again, since we can't play them all the way through

4    at least in open court, aren't there instances from jailhouse phone

5    calls where he does pick up on certain cues?

6    A.  Yes.

7    Q.  Do you remember one just off the top of your head?  I know it's

8    difficult.

9    A.  I do.  Certainly I wouldn't be able to tell you which call it

10   was.  But he is talking to his daughters and he would say, what's

11   up?  Something to that effect, and they would say, "nothing,

12   Daddy," usually.  And then he would say, "What's wrong?  I can hear

13   it in your voice, what's wrong?"  And then would question his

14   daughters further about what was going on with them from

15   information that he had picked up in the conversation.  Or in the

16   tone of their voice.

17   Q.  Plays simple games that require keeping score; for example,

18   kick ball, pick-up basketball, et cetera.  Van Buren gives him a

19   zero.  Do you feel again regarding that adaptive area that that is

20   an underreport?

21   A.  Yes.

22   Q.  Shows good sportsmanship; that is, follow rules, not overly

23   aggressive, etc.  Another zero.  Do you have other information

24   regarding that adaptive function to suggest that is an underreport?

25   A.  I do.  I had actually gone to the St. Bernard Parish jail and

1    observed Mr. Hardy prior to meeting him.  I was able to observe him

2    both when he was on the yard and when he was in the tier.  And I

3    observed him doing a number of things, including playing

4    basketball, playing a card game and interacting with other

5    individuals.

6            During the basketball game, I can't hear what they're

7    saying, obviously, but you could see him like if one of them makes

8    a good shot they would slap each other's hands like good job, if

9    you know what I mean when they're going by.  Even I saw him one

10   time someone from the other team did a particularly good shot and

11   he did the same thing for that guy as well.

12   Q.  Follows rules in complex games or sports; for example,

13   football, soccer, volleyball, et cetera.  Another zero.  Did you

14   actually observe him at the St. Bernard Parish Prison playing

15   basketball?

16   A.  I did.

17   Q.  Did he appear to understand the game?

18   A.  He did.

19   Q.  Could you go into that with a little more detail with the

20   judge, unless it's cumulative from your report.

21   A.  It won't take but a minute.  Mr. Hardy was -- he wasn't the

22   best basketball player out there, certainly he was a little shorter

23   than the guy that was the best basketball player out there in my

24   opinion.  But he was able to do bounce passes, straight passes; he

25   couldn't dribble through his legs, but he could dribble without

1    looking at the ball.  He only dribbled with one hand, he was able

2    to make shots using the backboard, as wells as going straight into

3    the goal.

4              He cooperated well with his team mates.  And he was

5    actually in this situation what I would characterize as the point

6    guard, he was the individual who would usually bring in the ball

7    and then call the plays or tell people kind of what to do, not

8    always but some of the time.  If he had the ball and was dribbling,

9    he would use his other hand to tell somebody kind of where to go

10   (DEMONSTRATING).  And then he went from there, the play ensued.

11   Again, that wasn't every time but many times.

12   Q.  The next item a one was given by Van Buren, plans fun

13   activities with more than two things to be arranged; for example, a

14   trip to a beach or park that requires planning, transportation,

15   food, recreational items, etc.  For example, would dinner and movie

16   qualify under that or what?

17   A.  I would think so because it's more than two things to be

18   arranged.

19   Q.  Do you have information -- do you think that one is a down

20   play?

21   A.  In terms of what Toni Van Buren knew, I don't know.  I don't

22   know that he took her out all that much, and so she gave him a

23   sometimes; and so I don't necessarily disagree with that based upon

24   the information that I have from her.  I know that -- he had

25   indicated that either he and Toni or someone had gone to see like

1    out to dinner, to a concert or something like that, but I don't

2    think that was a routine activity that they did.  But I think

3    that's Toni's view of what they did.

4    Q.  Shows understanding that gentle teasing with family and friends

5    can be a form of human or affection.  Van Buren gives him another

6    zero.  Doesn't she actually contradict this herself in her

7    interview with you?

8    A.  She indicated that he wouldn't tease the children -- he

9    wouldn't tease her in a playful or ribbing way but he would with

10   the children.

11   Q.  And once again, regarding that adaptive area, I think there's

12   evidence of that from the jailhouse phone calls as well with his

13   daughters?

14   A.  Definitely.

15   Q.  Chooses to avoid dangerous or risky activities; for example,

16   jumping off high places, picking up hitchhikers, driving

17   recklessly.  Van Buren gives him a zero.  Do you feel based upon

18   other information you've learned that is an underreport?

19   A.  In some ways because he was involved in a very high risk

20   occupation, but it seemed like he took steps to manage the risk.

21   He ensured that guns were at different places and around where he

22   was going, that he had guns with him.  He often times had other

23   people with him.  I think he managed that well as indicated by him

24   working in the drug business for greater than ten years.

25          He also said that he didn't go to bars because he didn't

1    want anybody to jump him at bars and was concerned about that.

2            And so I don't think he chose to avoid dangerous or risky

3    activities because that was part of his basic occupation, but he

4    did try to manage the risk by limiting the amount of harm that

5    would come to him or his family.

6    Q.  Talk a little bit about personal hygiene, taking care of

7    himself with various products.  Did anybody ever -- do you have any

8    information whatsoever to suggest that Hardy did nothing but

9    maintain good personal hygiene and he knew how to take care of

10   himself?

11   A.  Based upon the information available to me, it's indicated that

12   Mr. Hardy does take good care of himself and did take good care of

13   himself.

14   Q.  Without assistance from others?

15   A.  That's correct.

16   Q.  Any indication anybody had to help him maintain himself?

17   A.  Not to my knowledge.

18   Q.  Did the commissary, did the commissary reports also indicate

19   that he was cognizant of personal hygiene and made purchases

20   consistent with that --

21   A.  Yes, they did.

22   Q.  -- awareness?

23            MR. McMAHON:  Your Honor, I would just like to run

24   through real quick -- by the way, what time is it?

25            THE COURT:  Five, ten minutes to five.  Do you want to

1    take a break?

2                MR. McMAHON:  Huh?

3                THE COURT:  Do you want to take a break?

4                MR. McMAHON:  How long do you want to go?

5                THE COURT:  I want to go to about six.  So it's ten

6    minutes to five, do you want to take ten minutes and talk about all

7    of this deodorant?

8                MR. McMAHON:  Yeah, let's take a break.

9                THE COURT:  Okay.  Take a short break.  The last break of

10   the day.

11               THE DEPUTY CLERK:  All rise.

12        (WHEREUPON, A RECESS WAS TAKEN.)

13        (OPEN COURT.)

14               THE DEPUTY CLERK:  All rise.

15               THE COURT:  Okay.  Have a seat, please.

16   BY MR. McMAHON:

17   Q.  Dr. Hayes, we are about to display various commissary records

18   from the St. Bernard Parish Prison, so I would ask Mr. Nguyen to

19   start us off.

20               Actually there's a code group personal hygiene, and do

21   you see what is -- what corresponds to that entry?

22   A.  Women's deodorant.

23   Q.  And the date of that is March 9th of this year?

24   A.  That's correct.

25   Q.  All right.  Arthur, can we go onto the next one.  March 16th.

1    He bought four stamps, did he not?

2    A.  He did.

3    Q.  And anything else noteworthy in that list of items?

4    A.  The playing cards that are down at the bottom.

5    Q.  Next one, Arthur.  And this is April the 6th.  Down at the

6    bottom, he bought -- that's the second battery, second time that a

7    battery is showing up.  On the first one we saw, the one dated

8    March 9th, were you able to determine why is Hardy getting a

9    battery in the jail?

10   A.  He had a music player, I am using the trade name of Walkman,

11   but I don't remember what the trade name actually was; but it was

12   headphones connected to like a music player.

13   Q.  Mr. Nguyen, next one, please.

14   A.  Not headphones but earbuds.  Headphones go around your head,

15   these were earbuds.

16   Q.  That's a variety of different food items?

17   A.  That's correct.

18   Q.  Next one, Arthur.  And this is a couple of days, it's April the

19   8th, and we have a credit, correct?

20   A.  That's right.

21   Q.  And were you able to -- do you know what that's about there?

22   A.  I think he was charged for pop tarts and he didn't get them or

23   something like that.  And so he had discussed it with the guard and

24   then it was credited back to his account.

25   Q.  And he recognized that and he actually complained to one of the

1    officers and got the credit on his account, correct?

2    A.   That's my understanding, yes.

3    Q.   And from your understanding, Mr. Hardy maintains his commissary

4    account with great vigilance, does he not?

5    A.   Yes.

6    Q.   Next one, Arthur, dated should be April 13th.  And again, here

7    mainly food items, candy, pastries, beverages, right?

8    A.   That's right.

9    Q.   Next one, Arthur.  April 20th.  More food, candy, other items

10   of comestibles.

11            April 27, you can keep going, Arthur, right -- not --

12   next one.  Keep going.  Again, now at the top he orders more

13   deodorant?

14   A.   That's right.

15   Q.   And anything else there of note to you or that again kind of

16   comments on his adaptive functioning?

17   A.   He bought three Mother's Day cards and it's around the time of

18   Mother's Day such that he would be able to get the cards and get

19   them mailed off in the proper time for Mother's Day.

20   Q.   When is Mother's Day?  I guess that's, what, the first Sunday

21   in May?

22   A.   I know it's in May.

23            THE COURT:  Early May.

24            MR. McMAHON:  Second.

25   BY MR. McMAHON:

1   Q.  So he's done this in enough time to get the cards out and mail

2   it?

3   A.  That's correct.

4   Q.  Next one dated May 4.  What do we see there, if anything,

5   relative to personal hygiene or his own -- again, commenting on

6   adaptive functioning that you can glean?

7   A.  He obtained cotton swabs, he bought stamps --

8   Q.  How many stamps?

9   A.  Two.  And he bought a thank you card.

10  Q.  Next one, Arthur.  May 11.  Bought a toothbrush?

11  A.  He did.

12  Q.  And another battery?

13  A.  That's right.

14  Q.  May 18th.  More variety of food, candy, chips, pastries.

15          May 26th.  More deodorant, four stamps, four plain

16  envelopes and one 9 by 12 manila envelope.  Is that a comment at

17  all on any adaptive area?  At least -- not a definitive statement,

18  but something you would take into account?

19  A.  It suggests that he is mailing things.  And the women's

20  deodorant, in that regard from speaking with the guards, they said

21  that that was actually better and caused less underarm problems

22  than the men's deodorant so that the individuals that were in the

23  jail tended to get the women's deodorant than the men's deodorant.

24  So I didn't want you to think that that was an issue with him

25  having any gender identity problems or not being able to order the

1    right deodorant.

2    Q.  May 1 -- I'm sorry, June 1.  I'm tired, too.  Personal hygiene,

3    what do we have in that category?

4    A.  Cough drops.

5    Q.  And another birthday card?

6    A.  That's correct.

7    Q.  And last one -- and again, this is just a random sample,

8    correct?

9    A.  I asked for a couple of months and I think that's what was

10   provided.

11   Q.  Okay.  Finally, last one, which is dated June the 8th.  And do

12   we have more personal hygiene items?  And for the record, what are

13   they just real quick?

14   A.  They are a toothbrush, as well as deodorant.

15   Q.  And another, again at the bottom, another AA battery?

16   A.  That's correct.

17             MR. McMAHON:  Your Honor, at this point I was prepared to

18   play a couple of videos.  I know the court wanted to go until six

19   but we may want to break.  Dr. Hayes informed me she is just

20   exhausted.

21             THE COURT:  What are the videos of?

22             MR. McMAHON:  The Dawn Dedeaux videos.

23             THE COURT:  Oh, okay.

24             MR. McMAHON:  It's up to the court, but Dr. Hayes did

25   tell me she is really tired.

1        THE COURT:  Okay.  Yeah, we can break.  You have, let's

2  see, Dr. Hayes and then you have some witnesses from the jail?

3        MR. McMAHON:  We will definitely finish Monday morning

4  without a doubt.

5        THE COURT:  Well, we have cross-examination of Dr. Hayes.

6        MR. McMAHON:  We will finish Monday morning.

7        THE COURT:  You'll finish the direct of Dr. Hayes Monday

8  morning.

9        MR. McMAHON:  Yes.

10        THE COURT:  Okay.  And then cross, I don't know how long

11  cross will take, and then you have two or three people from the

12  jail?

13        MR. McMAHON:  Three.

14        THE COURT:  Three people from the jail.

15        MR. McMAHON:  And they will be relatively short.

16        THE COURT:  Okay.  You may step down.  What I would like,

17  it's become very obvious to me that this is going be -- I am not

18  going to be able to turn this decision around in any short order.

19        MR. McMAHON:  Right.

20        THE COURT:  And I am a little concerned about -- well,

21  Monday is the deadline for sending out the questionnaire, Monday is

22  when we're supposed to send out the questionnaire for the trial.  I

23  definitely don't want to do that because I just -- I thought there

24  was going to be plenty of time between this decision-making process

25  and the trial date and it's not looking so good.

1           MR. McMAHON:  Exactly.

2           THE COURT:  And I am not too interested in running the

3   meter on the defense if it turns out that it's favorable to you.

4           MR. McMAHON:  Sure.

5           THE COURT:  I am overwhelmed with this material.  How

6   wedded are you all to our trial date?  I guess I need to really ask

7   the government because you're the one that's waited the longest

8   time.

9           MR. McMAHON:  How wedded are we?

10          THE COURT:  Yes.

11          MR. McMAHON:  Your Honor, after 15 years.  No, we're not

12  wedded to that date.

13          THE COURT:  All right.  I really need time on this one.

14  I hoped to get it out within a month, but I can see that I have a

15  lot of work to do.

16          MR. McMAHON:  I do not envy the court's position.  But,

17  no, we are not wedded to that date.

18          THE COURT:  Are you guys all right with that, too?

19          MS. FOURNET:  Yes, ma'am.  I do have a totally separate

20  request before we leave today, but that's fine.

21          THE COURT:  Okay.  We need to get a motion in from one

22  side or the other on continuing the trial date.  Anyone want to

23  volunteer to file a motion?

24          MS. FOURNET:  We'll file one on Mr. Hardy's behalf.

25          THE COURT:  You can put in there it's going to take me

```
 1   significant time to sort all of this out for Atkins and obviously

 2   it's a serious issue.

 3             Yes, what's your other issue?

 4             MS. FOURNET:  Your Honor, there is a particular article

 5   on one of the government's exhibits that we do not have and we

 6   would like to have.

 7             THE COURT:  Okay.

 8             MS. FOURNET:  It's one by Young and Boccacci.

 9             MR. McMAHON:  We'll get that.

10             MR. MILLER:  I'll get that to you.

11             MS. FOURNET:  Would it be possible to get it this

12   evening?

13             MR. MILLER:  I think possibly it may be.

14             MS. FOURNET:  Thanks.

15             THE COURT:  Please, all sides remember, anything that's

16   not already in the record that you've referenced in any way I

17   really want copies of, particularly articles.  I'm very interested

18   in any kind of scholarly articles.

19             I actually before this hearing I just went on West Law

20   and got a couple of law review articles that were really helpful

21   just explaining the terrain.  This is a whole other discipline.  So

22   I'm particularly interested in anything that helps explain.

23             Okay.  Nine o'clock Monday morning?

24             MR. McMAHON:  Yes, ma'am.

25             THE COURT:  That okay with everybody?
```

1        MR. MILLER:  Yes, your Honor, thank you.

2        THE COURT:  Thank you.

3        THE DEPUTY CLERK:  All rise.

4     (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

5

6                    *  *  *  *  *  *

7

8                 REPORTER'S CERTIFICATE

9

10    I, Karen A. Ibos, CCR, Official Court Reporter, United States

11 District Court, Eastern District of Louisiana, do hereby certify

12 that the foregoing is a true and correct transcript, to the best of

13 my ability and understanding, from the record of the proceedings in

14 the above-entitled and numbered matter.

15

16

17                    _____

18                 Karen A. Ibos, CCR, RPR, CRR

19                 Official Court Reporter

20

21

22

23

24

25