```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2    ***********************************************************
      UNITED STATES OF AMERICA
 3
                                    Docket No. 94-CR-381(C)
 4    v.                            New Orleans, Louisiana
                                    Tuesday, September 22, 2009
 5
      PAUL HARDY
 6    ***********************************************************

 7
                   TRANSCRIPT OF ATKINS HEARING PROCEEDINGS
 8            HEARD BEFORE THE HONORABLE HELEN G. BERRIGAN
                     UNITED STATES DISTRICT JUDGE
 9                         VOLUME VII

10

11    APPEARANCES:

12    FOR THE PLAINTIFF:          UNITED STATES ATTORNEY'S OFFICE
                                  BY:  MICHAEL E. McMAHON, ESQ.
13                                     MARK A. MILLER, ESQ.
                                  500 Poydras Street, Room HB-210
14                                New Orleans, LA 70130

15
      FOR THE DEFENDANT:          HERBERT V. LARSON, JR., ESQ.
16                                650 Poydras St., Suite 2105
                                  New Orleans, LA 70130
17

18                                MARILYN MICHELE FOURNET, ESQ.
                                  715 St. Ferdinand
19                                Baton Rouge, LA 70802

20
      Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR
21                                500 Poydras Street, Room HB-406
                                  New Orleans, Louisiana 70130
22                                (504) 589-7776

23


24
         Proceedings recorded by mechanical stenography, transcript
25    produced by computer.
```

1376

1    I N D E X

2

3

4    WITNESSES FOR THE GOVERNMENT:                    PAGE/LINE:

5

6    JILL HAYES

7

8      Continued Cross-Examination by Ms. Fournet     1377/11

9

10     Redirect Examination by Mr. McMahon            1503/18

11

12

13

14

15                      EXHIBIT INDEX

16

17                                                     PAGE/LINE:

18

19   Exhibit 2                                         1391/1

20

21   Exhibit 10                                        1463/25

22

23

24

25

P R O C E E D I N G S

(TUESDAY, SEPTEMBER 22, 2009)

(MORNING SESSION)


     (OPEN COURT.)

          THE COURT:  Dr. Hayes, you're still under oath.

          THE WITNESS:  Thank you, your Honor.

          MS. FOURNET:  May I proceed, your Honor?

          THE COURT:  Yes, ma'am.

                    CONTINUED CROSS-EXAMINATION

BY MS. FOURNET:

Q.  Dr. Hayes, I think we've pretty much agreed to disagree about

whether criminal behavior can be part of the equation in adaptive

functioning; is that correct?

A.  I am not sure what your personal opinion on it was, so I would

be unable to say if we agreed or disagreed.

Q.  When I say we I mean the experts --

          THE COURT:  I take judicial notice that you disagree on

whether it's appropriate.

          MS. FOURNET:  I think I can leave that.

BY MS. FOURNET:

Q.  You do, in fact, think that it is appropriate to consider

criminal behavior in making an adaptive behavior determination,

correct?

A.  I think that's one piece of data, among many, especially if

1    it's a pattern.

2    Q.  And you would agree that this is different from the principles

3    that Dr. Swanson went over in her direct testimony coming from the

4    User's Guide and other sources; is that correct?

5    A.  I don't recall what Dr. Swanson said about that in her

6    testimony, but I know it is different from what the User's Guide

7    says.

8    Q.  Can we agree, though, that as the criminal behavior becomes

9    less complex and more simple, it tells us less about a person's

10   adaptive functioning?

11   A.  I think that still tells us information about a person's

12   adaptive functioning and that it's less complex.

13   Q.  Certainly you wouldn't equate someone like Bernie Madoff, who

14   we discussed yesterday, with someone who goes into a shed and

15   steals a bicycle, those are very different types of behavior,

16   aren't they?

17   A.  Yes.

18   Q.  And one would indicate a much higher level of functioning than

19   the other, would you agree with that?

20   A.  That's correct.

21   Q.  So let's talk about since you think this is a factor that is

22   one of the factors it is relevant to consider, let's talk about

23   Mr. Hardy's drug dealing.  Okay?

24   A.  Okay.

25   Q.  You believe, if I've understood your previous testimony, that

1    Mr. Hardy's drug dealing is an activity that is relevant to your

2    determination of his adaptive functioning level; is that correct?

3    A.   In as much as Mr. Hardy's drug dealing involved planning,

4    organization, work-related behaviors, yes.

5    Q.   Now, Mr. Hardy, as far as we can tell from what you've seen and

6    heard, Mr. Hardy's drug dealing began when his brother Curtis would

7    get him to drop off drugs and pick up money when he was 13, 14

8    years old, is that your recollection?

9    A.   Yes.

10   Q.   Now, it is not unusual, is it, for higher functioning smarter

11   guys in the drug business to prey on guys with mental retardation

12   and use them as "mules"?

13   A.   That's not unusual.

14   Q.   And after his tenure with his brother Curtis, according to what

15   he told you, Mr. Hardy met another drug dealer who, as Mr. Hardy

16   put it, took him under his wing and showed him how to sell drugs;

17   is that pretty accurate?

18   A.   I don't recall what was exactly said, but if you can show it to

19   me.

20   Q.   Okay.  It would be page 206, lines 6 through 11.

21            THE COURT:  Is this of her interview with Hardy?

22            MS. FOURNET:  Yes, ma'am.

23            THE COURT:  206 you said?

24            MS. FOURNET:  Yes, 206 is what I have, Judge, line 6

25   through 11.

1       THE WITNESS:  Yes.

2   BY MS. FOURNET:

3   Q.  He did say that, didn't he?

4   A.  He said, "We all were selling drugs, me, Wayne and Lionel.  But

5   I met this guy and, like, he took me under his wing, that mean

6   like, you know, he say, Brother, you can hang with me so I'm

7   hanging with him so he had drugs, so I'm working for him so he's

8   showing me how to go."

9   Q.  And then after this other individual took him under his wing,

10  he decided at some point, did he not, that he needed to try to do

11  it on his own?

12  A.  I'm not sure at what point that would be.

13  Q.  I understand that.  But he did decide at some point that he

14  wanted to do it on his own, didn't he?

15  A.  That's my understanding.

16  Q.  And that was because he felt like these older guys were

17  "pimping him" and he got tired of "getting beat", is that what he

18  told you?

19  A.  Again, I don't recall.

20  Q.  Again I'll cite you to the pages, this would be page 208, lines

21  12 through 13.

22  A.  Thank you.  (WITNESS READS DOCUMENT.)  Yes, he said that.

23  Q.  And he felt like he was doing all of the dirty work and these

24  guys were letting him take all of the risks so he would get in

25  trouble and not them; isn't that what he told you?

```
1    A.   Yes.

2    Q.   So basically he figured out he was being used again, didn't he?

3    A.   I don't know that I would call it used, I would call it

4    something like an apprenticeship.

5    Q.   Okay.  An apprenticeship.  So getting beat and getting taken

6    advantage of by older and smarter criminals is in your opinion is

7    being an apprentice to those individuals?

8    A.   I think he was learning the drug trade under those individuals'

9    tutor and that individuals who are learning from other people how

10   to do is a certain task or job, typically get paid less as well.

11   Q.   Now, once he started selling on his own, according to what

12   Mr. Hardy conveyed to you, he was not a boss in any sense of the

13   word according to him, was he?  And I'm going to refer you to page

14   199, lines 5 to 9.

15   A.   He says that in the transcript, but he indicates differently in

16   some of the audio tapes.

17   Q.   Well, let's, if you don't mind, stick with the question I'm

18   asking you.  He says in that passage, "I was never the boss, you

19   know, it's --" isn't that what he says?

20   A.   That's what he says in that passage.

21   Q.   And then here is another dash, isn't there, and you interrupt

22   him again, don't you?

23   A.   I don't know if I interrupt him or if he just pauses.

24   Q.   Do you think maybe Mr. Hardy was getting ready to give you a

25   more detailed description of his role?
```

1   A.  I don't know.

2   Q.  In fact, it was not a drug business or a drug organization, was

3   it, it was Paul Hardy and three guys selling rock cocaine, wasn't

4   it?

5   A.  It's my understanding that Mr. Hardy ran about half of the

6   Florida project in terms of the drug trade there.  I am not aware

7   of how many employees he had underneath him.

8   Q.  Where did you get this information about half the Florida

9   project?

10  A.  I believe it was in the FBI information.

11          MS. FOURNET:  I'm very sorry, Judge, apparently I forgot

12  to turn off my phone.

13          THE COURT:  Just stomp her purse.

14          The FBI information was the source.

15  BY MS. FOURNET:

16  Q.  So somewhere in the FBI information that says he had half the

17  Florida project?

18  A.  I believe so.

19  Q.  And who was the source of that information?

20  A.  As I sit here right now, I can't tell you.

21          THE COURT:  I don't want to sound like a broken record,

22  but I assume I have the FBI materials as part of the government's

23  proposal?

24          MS. FOURNET:  You do, your Honor, and it's also in our

25  three notebooks numbered differently.

```
1              THE COURT:  Okay.  Just doing my obsessive checking.
2    BY MS. FOURNET:
3    Q.  And this started when his involvement in the drug business
4    started when some guys from the project came up and said, bro, you
5    need some help, isn't that what he told you?
6    A.  I don't recall exactly what he said.
7    Q.  That would be page 203, lines 18 to 21.
8    A.  "Bra, you know, you need some help, so hell yeah."
9    Q.  Now, his instructions to these guys were not complicated, were
10   they, they were basically just go to the corner and sell the stuff;
11   isn't that what he told you?
12   A.  I believe so.
13   Q.  Let's put that exhibit up there.  And read that highlighted
14   passage there, if you don't mind.
15   A.  Okay.  "Um, what kind -- I mean, when you were working selling
16   drugs and you had the people who were working for them, I mean,
17   what did you tell them to do?  Just sell the drugs.  Like what?
18   Did you ever have to say, I need you to go here, there or wherever?
19   No, it would just be on the corner.  They ain't had to go nowhere.
20   The people would just come to them."
21   Q.  So basically, here is the drugs, go to the corner and sell
22   them, that's how he portrayed his involvement in the drug trade; is
23   that correct?
24   A.  That's correct.
25   Q.  And he also told you that he certainly didn't go out of the
```

1   state or even out of the city to buy drugs, because as he put it,

2   "he wasn't going to get on no highway," isn't that what he told

3   you?

4   A.  I don't recall exactly what he said.

5   Q.  That would be page 202, line 1.

6   A.  I think he's talking about selling bad drugs right there.

7   Q.  Yes, I think that's the wrong --

8          THE COURT:  201?  Bottom of 201.

9          MS. FOURNET:  I'm sorry, it's the top of 202, line 1.

10         THE WITNESS:  Okay.  He said, "I ain't getting on no

11  highway, no indeed."

12  BY MS. FOURNET:

13  Q.  So this is not a guy, at least according to him, that ever left

14  the city or the state to buy large amounts of drugs; is that

15  correct?

16  A.  That's what he had indicated.

17  Q.  And you certainly don't have any information from any of the

18  material that you have that he did that, do you?

19  A.  No, I do not.

20  Q.  And the truth is that even after these guys helped him, he

21  really wasn't very good at this even small time drug dealing, was

22  he?

23  A.  I would disagree.

24  Q.  You would disagree.  Let me ask you some specific questions.

25  You've seemed to suggest at vary times that he could weigh cocaine

1    but really he couldn't, could he?

2    A.  He had indicated that marks were made on the scale and that he

3    was able to weigh the cocaine.

4    Q.  What he said was, and that's generally accurate, what he said

5    was, am I not correct, somebody gave him a triple beam and showed

6    him the lines where the cocaine would cost $25 or $50 or whatever

7    amount and he learned to memorize where those marks were on the

8    triple beam, correct?

9              THE COURT:  Are you in the transcript?

10             MS. FOURNET:  Yes.  It would be page 206, lines 24 to 25;

11   also page 335, lines 11 through 12; also page 391, lines 23 to 29;

12   and 392, lines 1 through 12.

13             THE WITNESS:  Can you say those again?

14   BY MS. FOURNET:

15   Q.  Yes.  206, 24 to 25; 335, lines 11 to 12; 391, lines 23 to 25;

16   and 393, lines 1 to 12.

17             And I don't know, Dr. Hayes, if you can recall what I

18   just said is accurate, I don't know that you need to go back and

19   look at the transcript.  If you have some difference with what I'm

20   saying, that would be a different story.  I mean, do you recall

21   that that's how he described weighing drugs?

22   A.  I recall that he had described that he used a triple beam scale

23   and that a guy had showed him what marks on the scale equated to

24   the different amounts of cocaine, 25, 50, 100, things like that.

25   Q.  But he never indicated to you that he could weigh out a gram or

1    two grams or half a gram, did he?

2    A.  He indicated that there were marks on the scale that would tell

3    him how much to charge for each amount or weight of cocaine.

4    Q.  So the answer is no?

5    A.  I don't know what a gram goes for, so if a gram is $100 then he

6    can weigh a gram.  I'm sorry, I don't know how much cocaine is on

7    the street.

8           MS. FOURNET:  Judge, I would ask that the witness be

9    directed to answer the question yes or no.

10          THE COURT:  Try it again.  Ask it one more time.

11   BY MS. FOURNET:

12   Q.  He never indicated to you that he knew how to weigh out a gram,

13   half a gram, or two grams, did he?

14          THE COURT:  As grams?

15          MS. FOURNET:  As grams.

16          THE WITNESS:  He referred to it as this is a $25 gram,

17   this is a $50 gram, this is $100 gram.  That's the way he referred

18   to it.

19          THE COURT:  Where are you, Dr. Hayes?

20          THE WITNESS:  I am on page 392, lines 23 to 25 -- or 23

21   to -- yeah, 23 to 25.

22          THE COURT:  Okay.

23   BY MS. FOURNET:

24   Q.  Okay.  Now, does it make any sense to you that there would be a

25   $50 gram, a $25 gram, two different amounts for the same weight?

1  A.  I think what he was referring to is parts of a gram, that this

2  is how much -- how many grams you get for $25, how many grams you

3  get for $50 and how many grams one gets for $100.

4  Q.  Let me ask the question again and I would ask for a yes or no.

5  Does it make any sense for a gram to cost two different amounts?

6           MR. MILLER:  Judge, she did answer it and it did make

7  sense to her in the way she explained it.  So I think he did answer

8  it.

9           THE COURT:  I think the record speaks for itself.

10           MS. FOURNET:  Thank you.  I agree.

11  BY MS. FOURNET:

12  Q.  Let me digress a little bit because I meant to do this in the

13  beginning.  Dr. Hayes, did you have any discussions with the

14  government after you completed court yesterday about your

15  testimony?

16  A.  None.  They said I am doing fine, keep it up.  But nothing

17  about my testimony.

18  Q.  Okay.  Now, getting back to Mr. Hardy's drug dealing.  In

19  addition to not really knowing how to use the triple beam, he also

20  had somebody else cook the drugs for him, didn't he?

21  A.  The first part of your question said in addition to not

22  understanding how to use the triple beam --

23           THE COURT:  Ms. Fournet, so we don't bog down on

24  challenging parts of your question that are not relevant to the

25  question you're asking, please just ask a direct question so we can

```
 1   move a little faster.
 2            MS. FOURNET:  Yes, your Honor.
 3   BY MS. FOURNET:
 4   Q.  In fact, Mr. Hardy also couldn't catch on to cooking the
 5   cocaine, could he?
 6   A.  I don't believe he cooked the cocaine, I think Greg Williams
 7   did.
 8   Q.  Well, in his words didn't he say he would pay the guy to cook
 9   the cocaine because he could not, and these are his words, "catch
10   on how to do it."?
11            THE COURT:  Page?
12            MS. FOURNET:  That's at page 200, lines 9 to 13.
13   BY MS. FOURNET:
14   Q.  He says at line 11, "I don't know how to do it, you know what
15   I'm saying.  I would pay the guy to do it and I never could catch
16   on.  I would see him do it, I couldn't get it."  He was talking
17   about cooking cocaine there, isn't he?
18   A.  He is.
19   Q.  And it's clear from that passage that he had watched this
20   individual cook cocaine and could -- felt like he could describe it
21   but he is telling you he couldn't do it?
22            MR. McMAHON:  Objection, this is repetitive.
23            MS. FOURNET:  I'll move on, your Honor.
24            THE COURT:  It's the same thing --
25            MS. FOURNET:  I'll move on, your Honor.
```

1      THE COURT:  Please do, sustained.

2  BY MS. FOURNET:

3  Q.  The largest amount he ever purchased, according to you -- or

4  excuse me, according to him, was a kilo; is that correct?

5  A.  I don't recall exactly how much but that seems to be about

6  right.

7      THE COURT:  What's the page on that?

8      MS. FOURNET:  That would be page 201, line 204, your

9  Honor.

10      THE COURT:  Line 204, I don't think so.

11      MS. FOURNET:  I'm sorry, that's obviously a typo.

12      THE WITNESS:  204, line 1.

13      THE COURT:  Okay.  Go ahead.

14  BY MS. FOURNET:

15  Q.  He told you he paid $30,000 for this kilo, didn't he?  That

16  would be 204, lines 4 and 5.

17  A.  I am not sure if he's indicating that's how much he paid or

18  that's how much he sold it for, he was saying that it was a drought

19  in the industry, in the drug industry at that time and so it was up

20  to $30,000 for a kilo.

21  Q.  Well, would you agree that a person's ability to, for instance,

22  calculate a profit, whether he's in the business of selling

23  groceries or selling drugs, is an indicator of how well he's

24  functioning?

25  A.  I would agree.  But being able to calculate a profit is a good

1    thing when one is in business.

2    Q.  And you, I think, on several occasions have equated this drug

3    dealing with a business, albeit an illegal business; am I correct?

4    A.  Yes.

5    Q.  So it would be important for you to understand in evaluating

6    his adaptive functioning whether he understood the concept of a

7    profit, what a profit meant, how to tell if he was making a profit,

8    would you agree with that?

9    A.  I don't know that he needs to know the vocabulary word profit,

10   but I think he would need to know that he was making money in

11   excess of what he spent.

12   Q.  And you heard, did you not, both Lionel Hardy and Dr. Swanson,

13   and I'll refer to her specific testimony here, you heard

14   Dr. Swanson testify that Mr. Hardy thought if he paid $400 for

15   drugs and sold them for $800 that he thought he made an $800

16   profit.  Do you recall that testimony?

17   A.  No, I don't.

18   Q.  Do you recall Lionel Hardy's testimony wherein he indicated

19   that his brother had no concept of profit?

20   A.  I recall him talking about profits, but I don't recall if he

21   said he had no concept.

22   Q.  But you would agree that this would be one area that you would

23   want to explore with Mr. Hardy to determine how well he was

24   functioning in this drug dealing business, as you describe it?

25   A.  Certainly.

1  Q.  Exhibit 2.  Let's look at how you explored that.  This is page

2  205, lines 1 through 15.  Now here you ask him a very specific

3  question --

4          THE COURT:  What page again, I'm sorry?

5          MS. FOURNET:  This is 205, your Honor, lines 1 through

6  15.

7          THE COURT:  Okay.  Thank you.

8  BY MS. FOURNET:

9  Q.  And you ask him a question that appears to be directed to

10  determining how well he understands profit.  If you bought $30,000

11  worth of cocaine, how much could you get that for?  And then he

12  answers, "Trying to see back then, I would break it down, you

13  know."  You say yeah.  And he says, "Like I would break it down

14  so --"  And then you say, "What would you end up with?"  And he

15  says, 45.

16          So he is telling you he buys it for 30,000 and sells it

17  for $45,000.  So far so good.  What do you do next?  What's the

18  next thing you say?

19  A.  I said, "so you'd make 15,000?"  He said, "15 profit."

20  Q.  So, Dr. Hayes, you're giving him the answer, aren't you?

21  A.  He already told me the answer.  He already said that if he

22  spent $30,000 on cocaine he would get back 45,000.

23  Q.  But he didn't tell you how much profit he would make, did he?

24  A.  He was clear on how much money he would get if he sold $30,000

25  of cocaine.

```
1    Q.  Dr. Hayes, what does profit mean to you?

2    A.  Profit means how much money one obtains when one sells X, Y or

3    Z.

4    Q.  It is what you sell the product for minus what you pay for the

5    product --

6             MR. McMAHON:  Your Honor, this is argumentative.  The

7    transcript speaks for itself.

8             THE COURT:  Overruled.  Go ahead.

9    BY MS. FOURNET:

10   Q.  Isn't that what it is?

11   A.  I would agree that in most cases that would be it, I would

12   agree that in this situation that he indicated that if he sold 30,

13   he would get back 45.  I think he was clear on how much profit he

14   was getting.

15   Q.  Okay.  Where does he tell you of his own volition how much

16   profit he makes on this transaction, show me where he says that,

17   where he tells you as opposed to you telling him.

18   A.  Using your specific definition of profit, then he doesn't say

19   that he makes $15,000 in profit.

20   Q.  You're the only one that says $15,000, aren't you?

21   A.  Yes.

22   Q.  You don't see a problem with asking a question like that in a

23   mental retardation evaluation and providing the answer, you don't

24   see a problem with that?

25   A.  Not in that situation because you and I see this differently.
```

```
1   He had indicated how much he got back.
2   Q.  And then you break it down even more for him, don't you?
3   A.  Uh-huh.
4   Q.  You say -- I need to find my place here.  So like for every $10
5   that you would spend you would make 15, so you would get about $5
6   profit out of every $10; that's what you said, isn't it?
7   A.  Yes.
8   Q.  And again, that's you supplying that information, that's not
9   him supplying that information to you, correct?
10  A.  No.  He is not, I am trying to understand the drug trade.
11  Q.  I see.  And he -- once you go through that recitation of the
12  dollar profit, he says, "Yeah, something like that, I guess."
13  Right?
14  A.  Yes.  I think what he is referring to is at times you get more,
15  at times you get less.
16  Q.  So you would agree that people with mental retardation, and
17  this has been discussed here, do have an acquiescence bias; in
18  other words, they have a tendency to say yes when perhaps they may
19  not understand what the person is saying?
20  A.  I agree.
21  Q.  And you still think that this is an appropriate way to
22  determine whether this man understands profit?
23  A.  In this situation, yes.  Mr. Hardy displayed numerous, numerous
24  times where he would disagree with something that I was saying and
25  would add in more information.  I didn't feel like he had an
```

1    acquiescence bias.

2    Q.   That's kind of in the same category as the gullibility

3    yesterday.   In your opinion all of the way through these seven

4    hours of interviewing of Mr. Hardy, you saw no evidence of

5    acquiescence bias; is that what you're saying?

6    A.   At times if I would ask him a question, he would say yes.   So

7    if you consider him saying yes an acquiescence bias, then I think

8    the majority of us would have an acquiescence bias.   When "no" was

9    appropriate or when he needed to add more information, he did.

10   Q.   I am going to ask the question again and I am going to ask for

11   a yes or no answer.   Are you suggesting that there are no instances

12   of acquiescence bias by Mr. Hardy throughout this entire seven hour

13   interview with him?

14   A.   Can you define how you would indicate acquiescence bias should

15   be?

16   Q.   Well, it is a phenomenon that --

17           THE COURT:   Dr. Hayes, you're the expert on this one so

18   you have to tell us if in your professional opinion you saw any

19   indication in your interviews with him of an acquiescence bias.

20           THE WITNESS:   Not as I sit here right now.   I thought

21   there were certain things where he would tell me yes and certain

22   things where he would tell me no and certain things where he would

23   give me more explanation.   So it to me was a relatively normal

24   interview.

25           As I sit here right now, I can't think of specific

1    examples where there were or weren't; but when you look at the

2    totality of the information in the interview, I think it indicates

3    that there was not an acquiescence bias.

4    BY MS. FOURNET:

5    Q.  Mr. Hardy also had a safe, didn't he?

6    A.  He did.

7              THE COURT:  Say what?

8              MS. FOURNET:  A safe.

9              THE COURT:  A safe, okay.

10   BY MS. FOURNET:

11   Q.  We're not talking about a fancy safe, are we?

12   A.  I don't have pictures of the safe.

13   Q.  Well, he got the first one from K-Mart, didn't he?

14   A.  I think so when it was one of the lock and key ones.

15   Q.  And it was a small safe, was it not?

16   A.  I believe so.

17   Q.  It was a safe that did not bolt to the floor, wasn't it?

18   A.  I don't recall.

19   Q.  And you heard Lionel Hardy testify that the safe was covered

20   with a cardboard box that had a TV on top of it in the middle of

21   the room, did you hear that testimony?

22   A.  I believe so.

23   Q.  And if that testimony is correct, Mr. Hardy made no effort to

24   hide the safe, did he?  Or at least hide it very well?

25   A.  He did hide it.

1  Q.  But he didn't hide in a closet or under the floor or under the

2  bed, he put it under a cardboard box in the living room, didn't he?

3  A.  He didn't hide it under the floor or under the bed, he hid it

4  in the living room.

5  Q.  And evidently, according to his brother, although it wasn't

6  bolted to the floor, he thought it was too heavy to pick up,

7  correct?

8  A.  I don't recall.  Are we talking about the safe from K-Mart or

9  the other safe that was a combination safe?

10 Q.  Frankly, I am not clear on which safe it was and I don't know

11 that Mr. Lionel Hardy was.  But whatever safe Mr. Lionel Hardy

12 tried to talk to his brother about, his brother indicated to him

13 that he thought it was too heavy for somebody to steal.  Is that

14 correct, do you remember that testimony?

15 A.  Honestly I don't.

16 Q.  You were here for Mr. Hardy's testimony?

17 A.  I was.

18 Q.  And Dr. Swanson's testimony?

19 A.  Yes.  I've been here for seven days now -- yeah, seven days.

20 Q.  And it's your understanding, I think this is in your

21 chronological summary of records, Exhibit F in your report at page

22 13, it's your understanding that he had a grand total of slightly

23 over $4,000 in his safe when his house was searched, does that

24 sound right?

25 A.  I believe so.

1  Q.  Now, maybe you don't know enough about drug dealing to answer

2  this question, but I'll ask it anyway.  That's not exactly an

3  amount consistent with large scale drug dealing, is it?

4  A.  I wouldn't think that is a tremendous amount of money in terms

5  of a drug cartel.  I don't know drug dealing in terms of how much

6  money one gets for how much drugs.  I don't use or sell drugs.

7  Q.  Did you hear Dr. Swanson testify that her understanding from

8  Mr. Hardy was that his drug dealing, as she put it, very basic and

9  that he was a second line drug dealer?

10  A.  I recall that.

11  Q.  And not even a very good one because he couldn't perform basic

12  drug dealing functions, did you hear her explain that?

13  A.  I was a little confused about what she was meaning there.

14  Q.  Well, I mean, you also heard Lionel Hardy describe Mr. Hardy's

15  somewhat pathetic efforts to try to cook the cocaine himself,

16  didn't you?

17  A.  Yes.

18  Q.  And from your live sources that you interviewed as opposed to

19  whatever you might have seen in the FBI records, you have no

20  information that he ever was a high level, large scale drug dealer,

21  do you?

22  A.  Just a second.  I had interviewed Sammy Williams and Sammy

23  Williams had indicated that Mr. Hardy was the head of his own crew

24  and that he was the leader of the cohort rather than the followers.

25  He stated that Mr. Hardy was the one in charge and others referred

```
 1    to Mr. Hardy and his crew.  He had never seen Mr. Hardy physically

 2    sell drugs, but that was his knowledge.

 3               I had also at one point talked to, at some point through

 4    all of this, Special Agent Kathy Adams with the FBI; and she had

 5    indicated that, to her knowledge, the most that he had bought was a

 6    kilogram of cocaine as well and that he had sold this primarily in

 7    the Florida project, and that he sold not only crack cocaine but

 8    also powder cocaine.  And that's the information that I have.

 9    Q.  So Special Agent Adams also told you that the most he ever

10    purchased was a key?

11    A.  Yes.

12    Q.  Or kilo?

13    A.  Yes.  What she said is to her knowledge that's all that he had

14    purchased at a time.

15    Q.  I'm sure you don't want to rely on making these evaluations on

16    speculations or vague information, do you?

17    A.  No.  That's why I tried to indicate a qualifier there that to

18    her knowledge that was the most that he had ever bought.

19    Q.  Did you say you interviewed Sammy Williams or did you just read

20    his testimony?

21    A.  No, I spoke with him.

22    Q.  And Sammy Williams was Len Davis' partner, was he not?

23    A.  That's correct.

24    Q.  Did he tell you what he meant by crew?

25    A.  He did.
```

1   Q.  And how many people did he say were in this alleged crew?

2   A.  He didn't tell he how many people were in the crew.

3   Q.  Did he tell you the names of the people in the alleged crew?

4   A.  No.

5   Q.  Did he tell you how much cocaine, as Special Agent Adams did,

6   did he give you any idea about how much cocaine Mr. Hardy was

7   selling and in what amounts?

8   A.  No, he did not.

9   Q.  So the crew could have been three guys on the corner selling

10  the rocks, couldn't it?

11  A.  That's one possibility.

12  Q.  Now, if, in fact, that was the level of dealing in which

13  Mr. Hardy was engaged, we're not talking about a very complex

14  operation, are we?

15  A.  I still would disagree.

16  Q.  You would disagree, okay.  Well, elaborate on that.

17  A.  It's certainly not a drug cartel but you still have to have

18  product, you still have to have inventory, you still have to have

19  accounts receivable, accounts payable, you still have to have

20  employees, you still have to maintain protection for the drugs, for

21  the guns, for the money; you still have to know who to bring the

22  crack to to get it cooked, when to go get it, different things like

23  that.

24          And so I remember Dr. Cunningham referred to this as like

25  a lemonade stand, I would disagree.  This is not a lemonade stand.

1    It's something that also, drug dealing, you have to be relatively

2    cautious about it, you have to be careful that you don't get

3    caught, you have to evade police and other individuals that are

4    trying to hurt you to move in on your turf.

5            So I would disagree with the lemonade stand analogy, and

6    say that I don't agree that this is just a street level drug

7    dealer, because a street level drug dealer to me is what Mr. Hardy

8    was doing previously, which was selling drugs on the street for

9    another individual before he decided to go into business for

10   himself.

11   Q.  Dr. Hayes, isn't it true that an 11 year old child can hide

12   from momma when he's doing something wrong to avoid getting caught;

13   isn't a child capable of that?

14   A.  Some 11 year old children, yes.

15   Q.  And, in fact, you are saying that this is a relatively high

16   level of functioning, even though he didn't know how to calculate a

17   profit; is that correct?

18   A.  We disagree on how -- on what he termed in his testimony as to

19   how to calculate a profit.

20   Q.  Well, we do agree that he didn't know how to cook the cocaine,

21   correct?

22   A.  According to his brother and Mr. Hardy.

23   Q.  So do you think they're lying, did Lionel Hardy make up that

24   story; is that what you're saying?

25           MR. McMAHON:  I am going to object to that, did he make

1  up that story.  Who knows.

2          THE COURT:  That's speculative, she doesn't know.  Let's

3  move on.

4  BY MS. FOURNET:

5  Q.  And even though he only could use the triple beam scale in a

6  rudimentary way, that is he couldn't weigh grams --

7          THE COURT:  Let me interrupt.  We are cycling back, let's

8  really try to just on to new stuff because I really want to try to

9  move faster today.

10         MS. FOURNET:  Yes, ma'am.

11         THE COURT:  If we're plowing new ground, I won't slow you

12  down; but if you start replowing, we need to not do that.

13         MS. FOURNET:  You just tell me, Judge, I'll take your

14  lead.

15         THE COURT:  You just replowed.

16  BY MS. FOURNET:

17  Q.  Ms. Hayes, school is another area where Mr. Hardy told you that

18  school he could not, as he put it, catch on; is that correct?

19  A.  I recall that.

20  Q.  You know that there is some evidence that he really tried

21  because you know at one point he went on his own Vance Ceaser for

22  tutoring, don't you?

23  A.  On one day.  If you think going to someone for one day to get

24  tutored is really trying.

25         THE COURT:  Go ahead.

BY MS. FOURNET:

Q. And no one made him go to see Mr. Ceaser for any tutoring, did they, as far as you know?

A. Not to my knowledge.

Q. And Mr. Ceaser described getting a little frustrated with Mr. Hardy because Mr. Hardy just wasn't getting it, didn't he?

A. You would again have to point me to the area of Mr. Ceaser's testimony.

Q. Well, we'll move on, it's in the transcript, it speaks for itself.

A. Okay.

Q. He did tell you that in elementary school he did a little better because teachers would try to help him; isn't that what he told you?

A. Yes.

Q. And in your own report at page 45 you also note that Mr. Hardy did pretty okay from kindergarten through the 6th grade, correct?

A. From what I recall he had grades of good and satisfactory.

Q. But it was in middle school where he started having the problems, is that your recollection, from what he told you and from what his transcripts indicate?

A. I believe in his 8th grade transcript indicated that he had about a 2.0 average, best as I recall.

Q. But there was a pattern in middle school, according to him, of where he really had some trouble?

1   A.  Again, can you point me to the area that I am referring?

2   Q.  I cannot because I do not have a note of it.  So we'll just let

3   that transcript speak for itself.

4   A.  Okay.

5   Q.  And these difficulties continued until early high school when

6   he finally dropped out, didn't they?

7   A.  If you consider a C average, difficulties in 8th grade and the

8   next grade he had about a 1.2 and then the next grade around 1.35

9   and when he attended school in the 11th grade he had about a C

10  average prior to dropping out.

11  Q.  We're going to talk about those grade averages, but it does so

12  happen, according to the DSM, and tell me if you disagree with

13  this, that a person with mild mental retardation can acquire

14  academic skills by their late teens up to about the 6th grade

15  level; is that correct?

16  A.  Yes.  Some places say 3rd to 6th.

17  Q.  And you mentioned grade point averages.  On page 48 of your

18  report you do some recalculations of Mr. Hardy's grade point

19  average from what Dr. Swanson did, do you not?

20  A.  Yes.

21             THE COURT:  What page?

22             MS. FOURNET:  This would be page 48 of the report, your

23  Honor.

24  BY MS. FOURNET:

25  Q.  And I believe, if I recall correctly, that was because his

1    transcripts indicated a couple of F's that you thought should have

2    been incompletes?

3    A.  As Dr. Swanson and I think both pointed out, it looked like the

4    Cs and the Fs -- Dr. Swanson pointed out the C's looked like they

5    were calculated into his grade point average, but it appeared also

6    that the F's were as well.

7    Q.  And your report indicated that Dr. Swanson calculated his grade

8    point average at a 1.069; is that your recollection?

9    A.  I don't recall but that doesn't sound out of the ball park.

10   Q.  Well, please take a look at page 48 of your report.

11   A.  I just saw it when I looked down.

12   Q.  Now, you recalculated it, didn't you?

13   A.  Yes.

14   Q.  I am just curious, Dr. Hayes.  How much time did you devote to

15   recalculating this grade point average?

16   A.  I don't recall.

17   Q.  Well, in any event you came up with, as opposed to

18   Dr. Swanson's 1.069, you came up with a grade average of 1.125,

19   didn't you?

20   A.  I believe so.

21   Q.  So you actually in recalculating this GPA added 6/100 of a

22   point, approximately, to his grade point average; is that correct?

23   A.  Let me get the calculator out.  .056.

24   Q.  Close enough.  Around 6, rounded off that's 6/100 of a point,

25   isn't it?

1    A.  That's correct.

2    Q.  And you devote three quarters of a page to this 6/100 of a

3    point discrepancy, don't you?

4              THE COURT:  That's all right.  The record speaks for

5    itself, let's move on.

6    BY MS. FOURNET:

7    Q.  That's still not a good average, is it?

8    A.  No, it's still a little bit above a D.

9    Q.  Now, would you agree that a person with mild mental retardation

10   needs supports in school to, as Mr. Hardy put it, catch on?

11   A.  I think that anyone needs supports in school to "catch on".

12   Q.  But isn't it true that a person with any level of mental

13   retardation, including a mild level, would need supports that a

14   student with an average IQ level, an average functioning level, may

15   not require?

16   A.  I think that a student with mild mental retardation would

17   likely need more supports than a student of average intelligence.

18   Q.  And clearly Mr. Hardy did not get those supports, correct?

19   A.  I do not know what supports he obtained and what he didn't.  My

20   knowledge is that he didn't receive any special education services.

21   Q.  And he also told you at several point s, did he not, that

22   starting in about middle school that the attention he had gotten

23   earlier in his school career was no longer there and he pretty much

24   had to fend for himself; isn't that what he told you?

25   A.  That's what he and most individuals tell me when they hit 6th

1   grade, you start switching classes and you don't get the same level

2   of teacher support that you did before in terms of --

3           THE COURT:  Let me just jump in, and this is not in any

4   way to be a criticism, but if at all possible to just listen to the

5   question and answer the specific question.  She asked you if that's

6   what Mr. Hardy told you and then you said that's what most students

7   tell me and you went off.  If you would, because I really want --

8   you know, I want to get this done and so it's very important that

9   questions be clear, answers be clear.  So if he told you that, the

10  answer would be, yes, he told you that.  If he didn't, then you

11  don't remember it and with you might need a citation.

12          THE WITNESS:  Okay.

13          THE COURT:  Please.  And I don't mean that as a

14  criticism, I know you're on cross-examination so you're

15  understandably weary, but I just think we need to move faster and

16  be less -- just try to move faster.  Okay, Ms. Fournet.

17          Do you want to ask the question again, but I think,

18  again, the record probably speaks for itself.

19          MS. FOURNET:  I think it speaks for itself, Judge, and I

20  am eliminating -- and the reason I am pausing a minute, I am

21  eliminating some questions.  I understand the court's concern and,

22  trust me, I share your concern.

23          THE COURT:  Okay.

24  BY MS. FOURNET:

25  Q.  You don't have any indication that his poor performance in

```
 1    school was lack of effort, do you?  Other than his poor attendance
 2    at times?
 3    A.  Other than his poor attendance, no.
 4    Q.  Isn't it likely, Dr. Hayes, that Mr. Hardy dropped out of
 5    school because he did not have the present ability to keep up with
 6    the rest of the kids?
 7              MR. McMAHON:  Objection, speculative.
 8              THE COURT:  Do you have any -- can you answer the
 9    question based on your interviews with him or in your analysis of
10    his adaptive behavior?  If you feel you can, you can; if you feel
11    you can't, you can't.
12              THE WITNESS:  He had indicated that he was having
13    problems catching on and that he got tired of going to school
14    anymore because he was having to walk to school in the cold and he
15    didn't have a proper coat, and he indicated those were the reasons
16    why he dropped out.
17    BY MS. FOURNET:
18    Q.  Are you suggesting, Dr. Hayes, that he was not motivated and
19    that's why he dropped out and that's why he didn't do well; is that
20    your suggestion?
21    A.  That is one hypothesis, certainly, especially given the fact
22    that in 11th grade when he attended school fairly regularly he did
23    well.  Especially after not attending regularly in the 9th and 10th
24    grades.
25    Q.  Would you -- you're familiar with Dr. Gregory Olley, are you
```

1  not?

2  A.  I am.

3  Q.  And would you agree with Dr. Olley when he says that poor

4  motivation is better used for the diagnosis of mental retardation

5  than used against it?

6  A.  I believe that in the general population that that may be true,

7  but I believe in Mr. Hardy's case in these circumstances that

8  that's not true.

9  Q.  So you don't agree with that statement by Dr. Olley in the

10  context of this mental retardation evaluation, is that what you're

11  saying?

12  A.  What I was trying to say is that Mr. Hardy in the 11th grade

13  appeared to be motivated and did fine.

14          MS. FOURNET:  Your Honor, again, you've instructed the

15  witness and I would ask --

16          THE COURT:  I think the question was whether you agree or

17  not with Mr. Olley's I guess more general statement that poor

18  motivation -- I can't remember what the rest of it was.  So if

19  you'll again, just focus on the particular question.  If you feel

20  you need to elaborate for some reason, please do so, but please

21  focus on the question first.

22          Try it again, Ms. Fournet, why don't you ask it again.

23  BY MS. FOURNET:

24  Q.  Do you agree -- are you suggesting that Dr. Olley's position

25  that poor motivation militates in favor of a diagnosis of mental

1    retardation, for some reason does not apply in this particular

2    evaluation?

3    A.  I think in this particular evaluation there are reasons why it

4    does not apply.

5              MS. FOURNET:  And that, Judge, you should have this

6    article, that is Dr. Olley's article with Ann Cox in the special

7    2009 volume of *Applied Neuropsychology*.  And I think you have all

8    of the articles in that particular volume.

9              THE COURT:  Okay.

10   BY MS. FOURNET:

11   Q.  Now, you repeatedly emphasized in your report, do you not, that

12   Terry Hardy did a lot better in school?

13   A.  I believe in the section where I was discussing Terry Hardy, I

14   indicated that he did better in school than Mr. Hardy.

15   Q.  And your report also at page 49 takes the position, does it

16   not, that it makes sense to compare Terry Hardy's school records

17   with Paul Hardy's school records, because according to you, and I

18   am quoting you here, mental retardation is "substantially

19   heritable".  Do you recall using that phrase?

20   A.  No.  I used since intelligence is substantially heritable.

21   Q.  Okay.  I apologize, that is more accurate.

22   A.  And since Mr. Hardy and his siblings shared the same home

23   environment.

24   Q.  Intelligence is substantially heritable.  So you're not

25   suggesting that mental retardation is substantially heritable, or

1  are you?

2  A.  Mental retardation I believe has a genetic component in about

3  35 percent of cases, if I am getting my statistics correct.

4  Q.  And it's not a disease, it's a symptom that is associated with

5  various syndromes and diseases, correct, it may have a genetic

6  component?

7        THE COURT:  Let's move on.

8  BY MS. FOURNET:

9  Q.  Like down syndrome, for instance.

10  A.  Down syndrome, now that I think about it, it's more like 5

11  percent would be hereditary, and down syndrome would be something

12  that would be genetically caused.

13  Q.  So I want to make sure I understand the last percentage you

14  gave.  Are you saying that the 35 percent was incorrect and that 5

15  percent of cases of mental retardation have a known genetic

16  component; is that what you're saying?

17  A.  I think around 5 percent have a genetic component.  When I was

18  thinking about the 35 percent, I think about 35 percent are unknown

19  causes.

20  Q.  In many instances, as you just pointed out, the etiology of

21  mental retardation is completely unknown; is that correct?

22  A.  That's correct.

23  Q.  And of course there is no question that both Terry and Linda

24  Hardy did much better in school and in life than did Paul Hardy; do

25  you agree with that?

1    A.  Yes.

2    Q.  And of course the etiology of mental retardation has a number

3    of risk factors, some but not all of which are biomedical; would

4    you agree with that?

5    A.  Yes.

6    Q.  And that's in the AAMR --

7              MS. FOURNET:  Judge, red book at 125.  I'll just call it

8    the red book for short.

9    BY MS. FOURNET:

10   Q.  Others are social, behavioral, and educational risk factors;

11   would you agree with that?

12   A.  For mental retardation?

13   Q.  Yes.

14   A.  No.  I think there are others as well, and would include things

15   like prenatal illnesses, infections, different birth defects of the

16   brain and spinal cord can cause difficulties in those areas.  And

17   so I wouldn't just agree with that.

18   Q.  Well, and let me clarify, Dr. Hayes, I am not suggesting that

19   that's an exclusive list.  But you would agree that there are

20   social, behavioral, and educational risk factors for mental

21   retardation, would you not?

22   A.  Yes.

23             MS. FOURNET:  And, again, Judge that's in the red book at

24   page 125.

25   BY MS. FOURNET:

1   Q.  So the truth is that if Mr. Hardy has mental retardation it

2   could be from any number of combinations of those factors we just

3   discussed and the other ones you mentioned; is that correct?

4   A.  You would have to break down the risk factors for me to

5   indicate which ones you think he would apply.

6   Q.  I'll move on.

7            THE COURT:  Thank you.

8   BY MS. FOURNET:

9   Q.  Now, there is even somewhat of a suggestion in your interviews

10  with all of these people that there may have been some genetic role

11  in this case.  Are there not such indications?

12  A.  Yes.

13  Q.  Because virtually everyone, or not everyone but a significant

14  number of people described Paul Hardy's mother as somewhat slow; is

15  that correct?

16  A.  Yes.

17  Q.  Now, would you agree that if one child in a family has mental

18  retardation, whether it's because of genetic or other reasons, that

19  does not mean that all of the siblings will have mental

20  retardation, does it?

21  A.  I agree.

22  Q.  So the fact that no one has claimed Terry Hardy was mentally

23  retarded, which you state at page 58 of your report, is really

24  pretty meaningless in terms of an assessment of Paul Hardy, isn't

25  it?

1   A.   No.   I think that I needed to write that Mr. -- that Terry

2   Hardy had not been to my knowledge ever indicated to fall in the

3   mentally retarded range, especially given the correlation between

4   siblings and intelligence.

5   Q.   But, I mean, Dr. Hayes, aren't there families where you have --

6   and I'll use the Kennedy family as sort of an outstanding example.

7   Aren't there families where you have a whole slew of normal

8   children and you have one child who has mental retardation?

9   A.   Certainly.

10  Q.   So the fact that John Kennedy didn't have mental retardation

11  and Bobby Kennedy didn't have mental retardation, and all of the

12  other Kennedys didn't have mental retardation would not cause you

13  to doubt that the one sister who was diagnosed with mental

14  retardation, that that was a genuine diagnosis, would it?

15  A.   No.

16  Q.   And the fact that Terry and Linda Hardy outperformed Paul

17  could, in fact, be because they could catch on a lot more easily,

18  as he put it, just as the other Kennedys could catch on a lot more

19  easily than the sister with retardation; do you agree with that?

20  A.   That's one hypothesis.

21  Q.   Now, you will agree that Paul Hardy has never in his life lived

22  independently; that is, he's never lived alone in an apartment like

23  his brother Lionel has done; you would agree with that?

24  A.   I would agree that Paul Hardy has never lived independently.

25  Q.   First he lived with his mother, correct?

1   A.  Correct.

2   Q.  And then he lived with different women, who also took care of

3   him as his mother did; is that correct?

4   A.  Right.

5   Q.  And the DSM says at page 39, does it not, and tell me if you

6   disagree with this, that individuals with mild mental retardation

7   can usually live successfully in the community, either

8   independently or in supervised settings but only with appropriate

9   supports.  Would you agree with that portion of the DSM?

10  A.  I have seen a couple of instances of individuals with mild

11  mental retardation that because their families were so involved in

12  their lives and had taught these individuals so well in terms of

13  their adaptive functioning, in terms of planning for the future

14  when the parents would not be around anymore, that they were able

15  to function in the community with very limited to almost no

16  supports.

17          But I believe that they were the exception to the rule.

18  And so typically I would agree with what you just said.  But I

19  think there are some people where that may change just a tad.

20  Q.  And the truth is that Mr. Hardy actually had some supports

21  after he left home, and while he was at home, all be it informal

22  supports; that is, he had momma taking care of him, he had Toni Van

23  Buren taking care of him, he had some guys out on the street

24  driving him around and that type of thing.  So he did have some

25  supports, didn't he?

1    A.  I am reluctant to use the term support because it appears that

2    you're equating the need for support with mental retardation.

3    There are many individuals who go straight from momma's house to a

4    living together situation that are not mildly mentally retarded.

5    And so the use of the term support is what I'm getting a bit hung

6    up on because I think there are many people whose mom washed their

7    clothes for them and did all of the cooking and cleaning and then

8    went straight to an environment where they were living with someone

9    else who had a traditional role such as that as well.  So what I am

10   having a problem with is the term support.

11   Q.  Well, the individuals that you're describing, that type of

12   individual who undoubtedly exist, does that type of individual have

13   to have a girlfriend show him how to get around a neighborhood in

14   the very city in which he lives?

15   A.  If it's an area that he is unfamiliar with, I could certainly

16   see that you would have one person in the driver's seat and one

17   person in the passenger seat as the navigator, I could certainly

18   see that.

19   Q.  And would such a person that you just described be unable, for

20   instance, to drive out of the city to a nearby city such as Baton

21   Rouge without assistance?

22   A.  I would think that that individual would be able to drive to

23   Baton Rouge, especially since it's you just go straight down I-10.

24   Q.  So if Mr. Hardy was unable to drive to Baton Rouge without

25   assistance on his own, then he would not fit into the category you

1    described of people who just live, go live with women and function

2    reasonably well, would he?

3    A.  Not necessarily.  My mother wouldn't drive to Baton Rouge by

4    herself without another person but I don't think she's mentally

5    retarded.  You have to look at the information in totality.

6    Q.  He told you, did he not, that his mother cooked for him, and

7    then when he got older he went to restaurants; isn't that what he

8    told you?

9    A.  Yes.

10   Q.  And he told you he could cook some stuff in the can such as

11   spaghetti and meatballs and pork and beans, but that was about it;

12   correct?

13   A.  Pork and beans and wieners.

14   Q.  Now, you did get him to agree he was not a gourmet cook,

15   correct?

16   A.  I don't recall but I don't think he was a gourmet cook.

17   Q.  Do you think he knew what gourmet even means?

18   A.  I didn't quiz him on that vocabulary word as much as I can

19   recall.

20   Q.  But in any event, cooking limited to spaghetti and meatballs in

21   the can is pretty limited cooking, correct?

22   A.  I would agree.

23   Q.  And he told you at one point, and this is something I believe

24   Dr. Swanson discussed, he told you he knew how to fry fish but it

25   was pretty apparent he was just reciting what he had seen his

1417

1    mother do, wasn't it?

2    A.  He had said that he could fry fish.

3    Q.  And then he tried to describe it but he didn't even describe it

4    very well, did he?

5    A.  He, from the best of my recollection, said that you would put

6    corn meal on it.  I asked him how you get the corn meal to stick,

7    and he said water or something to the best of my recollection.  And

8    then he had talked about flipping it over in the pan.

9    Q.  Well, he said corn meal or whatever is what he said, isn't it?

10    A.  Okay.

11    Q.  That would be page 181, line 6.

12    A.  Okay.  Excuse me for saying corn meal or something instead of

13    corn meal or whatever.

14    Q.  And he said water or something to make it stick, correct?

15    A.  Right.

16    Q.  Now, he didn't describe that task with anymore specificity, did

17    he talk about heating up the oil or how long it took to heat up the

18    oil or any of that?

19    A.  No, he did not talk about that.

20    Q.  Did you hear Dr. Swanson testify that she gave him a little

21    test with dials for the stove and he did not understand those

22    dials?

23    A.  That's what she had indicated.

24    Q.  But in any event, you didn't ask him anymore in-depth questions

25    about this process of cooking fish, did you, other than what do you

```
 1    use for the batter and what do you get to make the batter stick,

 2    correct?

 3    A.   That's what I asked him, it's in the transcript.

 4    Q.   How to season it, when to tell it was done, you didn't ask him

 5    any of that?

 6              MR. McMAHON:  Repetitive.

 7              THE COURT:  Yeah, let's move on.

 8              MS. FOURNET:  I'll move on, your Honor.

 9    BY MS. FOURNET:

10    Q.   Instead, what you did was you went to talk about cereal and

11    pork and beans, both of which he could do; is that correct?

12    A.   I remember that we talked about cereal and pork and beans and

13    that was consistent with what Toni Van Buren had indicated.

14    Q.   And this business about being able to fry fish is totally

15    inconsistent, is it not, with what you learned about his cooking

16    skills, or his supposed cooking skills, from any number of other

17    witnesses, except for Javetta Franklin, correct?

18    A.   That's correct.

19    Q.   And Javetta Franklin, who as you know, you indicated said he

20    could fry chicken, you are aware that she's denying she ever said

21    that to you, correct?

22    A.   Yes.

23    Q.   Will you agree that there's a difference between verbally

24    describing a task and actually doing a task?

25    A.   Correct.
```

1   Q.  And that the person who can describe a task may not actually be

2   able to perform that task, would you agree with that?

3   A.  That's possible.

4   Q.  Now, Mr. Hardy knew how to drive, did he not?

5   A.  Yes.

6   Q.  Of course he told you, and I believe others may have told you,

7   that he had to pay a guy to give him the answers to the driving

8   test; is that correct?

9   A.  That's what I recall.

10  Q.  And nobody told you, did they, that Paul Hardy could not drive

11  alone?

12  A.  I believe it was somewhere in a record that it had indicated

13  that he couldn't, that he always drove with another individual.  I

14  think someone had indicated that they could never recall him not

15  driving with another individual.

16  Q.  But your witness -- the witnesses that you interviewed

17  indicated to you that he often drove with other individuals because

18  he had trouble finding his way around; isn't that what they told

19  you?

20  A.  To tell you the truth, I don't recall the exact indicators.

21  Q.  Well, the record will -- if you want to look, we'll

22  certainly --

23  A.  Do you want to move on?  That's fine, too.

24          THE COURT:  What are we doing now?  Are you waiting for

25  an answer?

1          MS. FOURNET:  If she wants to do a word search, Judge, I

2     don't know that it's necessary.

3          THE COURT:  Let's speed up, let's keep it rolling a

4     little faster.

5     BY MS. FOURNET:

6     Q.  He and others told you he had to have someone with him a lot of

7     the time, especially if he was in unfamiliar neighborhoods; isn't

8     that what people told you?

9     A.  That's what I recall.

10    Q.  And always outside the city of New Orleans, correct?

11    A.  To the best of my recollection.

12    Q.  Now, you gave him a little test on directions, do you recall

13    that?

14    A.  I asked him various directions at different times.

15    Q.  And I believe you have heard Dr. Swanson testify and other

16    witnesses told you that Paul Hardy could find his way around

17    familiar areas in New Orleans, just not unfamiliar areas; was that

18    your understanding?

19    A.  I've heard that.

20    Q.  Now, during the course of your test on directions he told you

21    he had a friend named Jeanette who lived on Broad Street, do you

22    remember that?

23    A.  No.

24    Q.  That would be pages 355, lines 20 to 21.

25          And you gave him an address of 1542 Tulane.  Do you

1    recall that?

2    A.  Yes.

3    Q.  And what is at the corner of Tulane and Broad?

4    A.  Civil District Court, is it -- it's the courthouse, I don't

5    know which.

6    Q.  It's the state courthouse, isn't it?

7    A.  Okay.  I didn't know it was civil district or criminal

8    district.

9    Q.  You imagined that it would be likely that Mr. Hardy would know

10   where the courthouse in New Orleans is?

11   A.  It's possible.

12   Q.  Did you give him an address in Metairie and ask him to find

13   that one?

14   A.  No.  We talked about the Lakeside Mall and Lakefront Arena,

15   things like that.  I didn't ask him.

16   Q.  Did you give him a map and ask him to show you how the map

17   worked?

18   A.  No, I did not.

19   Q.  Ms. Van Buren -- we're going to talk a little bit about

20   Mr. Hardy's employment history now.

21        Ms. Van Buren told you that she had to take him to

22   deliver meals for Meals on Wheels until he learned how to do it,

23   didn't she?

24   A.  I believe that she said that she was with him until he got the

25   route down.  But I also believe she had indicated that she enjoyed

1    being with him and doing this activity as well.

2    Q.  Well, that was in response -- well, scratch that.

3            In fact, he had another job at the Superdome, I believe

4    that job has been mentioned briefly, but he had another job at the

5    Superdome, didn't he?

6    A.  He did.

7    Q.  And that posed the same kind of problem, didn't it?  And I am

8    going to refer to page 193, lines 5 to 13.  And he tells you, does

9    he not, he had some kind of job preparing food, it's unclear what

10   it was.  But he goes on to say, "They were telling us to go

11   somewhere, I didn't know where, I didn't even know where I was

12   supposed to go.  They ain't had nobody like -- well, you have

13   people with you when you go this place and they tell you what to

14   do.  They'll tell us, well, you go this way.  I didn't know where

15   it was so I just left."  Isn't that what he told you?

16   A.  That's what he said.

17   Q.  Of course we don't know exactly what the job was or what kind

18   of traveling he had to do because you didn't ask, correct?

19   A.  Well, on the page before he had indicated that he and Wayne had

20   the job at the Superdome, this was during the Super Bowl in 1985 he

21   thought, which was the correct year.  And he said, "We were

22   supposed to do something, we went there and I know we was in the

23   kitchen that been so long ago --"

24            MS. FOURNET:  Judge, again, I mean --

25            THE COURT:  Ask the question again.

```
 1   BY MS. FOURNET:
 2   Q.  We don't know because you didn't ask exactly what that job
 3   consisted of, do we?
 4   A.  I believe I did ask on the page before that he said he knew
 5   that he was going to be in the kitchen, and he had indicated that
 6   he didn't know where he was supposed to go or what he was supposed
 7   to do.
 8   Q.  But he also said in that passage we just read, did he not, he
 9   didn't have people telling him where to go and he didn't know where
10   to go so he just left the job; isn't that what he said?
11   A.  Yes.
12   Q.  And then he had a job at Ernst Cafe?
13   A.  Correct -- well, not then after, before.
14   Q.  All right, before.  So prior to the Superdome job he had the
15   job at Ernst Cafe?
16   A.  Correct.
17   Q.  And of course Lionel worked there and Lionel got him the job,
18   is that your understanding?
19   A.  My understanding, yes.
20   Q.  And Lionel had to help him fill out the application, you heard
21   that testimony, didn't you?
22   A.  That's what Lionel indicated.
23   Q.  Do you have any reason to doubt that?
24   A.  Well, certainly Lionel is not an unbiased responder.
25   Q.  Okay.  The Ernst Cafe job was pretty menial, wasn't it?
```

```
 1    A.  I believe so.

 2    Q.  He was picking up trash, cleaning the bathrooms, cleaning the

 3    sidewalks, that's what he told you?

 4    A.  Washing dishes when needed, busing tables I think.

 5    Q.  He said he might help out with the dishwashing is what he told

 6    you, correct?

 7    A.  Right, that's what I said washing dishes when needed.

 8    Q.  This is not --

 9              THE COURT:  Okay.  That's a good example.  You had three

10    questions, all three got confirming that it was a menial job.

11    Let's move on.

12              MS. FOURNET:  Yes, ma'am.

13    BY MS. FOURNET:

14    Q.  Was there anything --

15              MS. FOURNET:  Let me skip ahead, Judge.

16              THE COURT:  Thank you.

17              MS. FOURNET:  I am trying to hear you.

18              THE COURT:  Okay.  Thank you.  Anything new, fine; but we

19    don't to replow.

20              MS. FOURNET:  I understand.

21    BY MS. FOURNET:

22    Q.  Let's talk about Mr. Hardy's ability to manage money.  We've

23    already discussed the fact that he had another guy renting cars for

24    him, correct?

25    A.  At one point.
```

1   Q.  And then he went out and got a secured Visa because somebody

2   else told him to do it, correct?

3   A.  Another person suggested that, yes.

4   Q.  And then he briefly opened a bank account, correct?

5   A.  I have no idea how long the bank account was open.  I believe

6   there was a deposit slip close to the time that he was arrested.

7   Q.  But then he closed it when the lady looked at him funny and he

8   felt like she was telling him he shouldn't put his money in the

9   bank; isn't that what he told you?  Page 210, lines 10 to 14.

10  A.  He was saying that he started bringing a lot of money to the

11  bank and the lady at the bank had told him don't put all of this

12  money in the bank, so she scared him and he took all of the money

13  out of bank was his report at that time.

14  Q.  So according to him that's why he took the money out the bank,

15  not because of interest or taxes; is that correct?

16  A.  He didn't tell me that.

17  Q.  Did he tell you anything during the course of this interview

18  that suggested to you that he understood the concept of interest?

19  A.  I don't believe we discussed the concept of interest.

20  Q.  He told you, did he not, throughout this interview, and I am

21  just speaking in the global sense, that he could not catch on, as

22  he put it, to a lot of things.  He used that term over and over

23  again, didn't he?

24  A.  He indicated at times that he couldn't catch on to things.

25  Q.  Skipped school because he couldn't catch on, correct?

1    A.  I recall that he said that.

2    Q.  Dropped out of school because he couldn't catch on, correct?

3    A.  That was one of the reasons.

4    Q.  Went to adult education with Wayne Hardy and his friend Gerald

5    and was trying to catch on but just couldn't do it; is that what he

6    told you?

7    A.  That's what he indicated.

8    Q.  He could play Pacman when he was younger but he couldn't catch

9    on to Donkey Kong; isn't that what he told you?

10   A.  That's what I recall.

11   Q.  Even when he was on death row he told you he couldn't catch on,

12   didn't he?

13   A.  I believe that's correct, related to the GED classes.

14   Q.  He told you on death row they would give him a book and he

15   would tell them he couldn't catch on in no five minutes, I think is

16   how he put it; isn't that what he told you?

17   A.  Can you direct me to the page?

18   Q.  Page 112, lines 3 to 5.

19   A.  He said that they would just give him a book and try to show

20   him something in five minutes, and he said that he was unable to

21   catch on in a five minute time period.

22   Q.  And, in fact, it wasn't that he didn't try even when he was in

23   jail, was it; I mean, didn't he tell you that there was a deputy at

24   Tangipahoa Parish Prison who would watch TV with him and help

25   explain what words meant?

1    A.  I don't recall if it was a deputy or another inmate that had

2    graduated from Tulane.

3    Q.  Well, I believe on page 112 at lines 12 through 19 he said it

4    was a deputy.

5              And, in fact, when he was on the streets, he couldn't

6    even catch on to cooking cocaine into crack; isn't that what he

7    told you?

8    A.  Again, I was looking at where you were saying that it was a

9    deputy.  And he says it was one white guy.  I don't see the deputy.

10   Q.  Okay.  So it may not have been a deputy.  It may have been

11   another inmate.

12   A.  Correct.

13   Q.  But somebody was watching TV with him and telling him what

14   words meant?

15   A.  What some words meant.

16   Q.  You spent seven hours with him?

17   A.  About that.

18   Q.  Do you have any reason to believe that when he told you he

19   couldn't catch on to things he really could catch on?

20   A.  I think that when he's talking about catching on that it's

21   relative to what he believes, and so I believe that he probably

22   thought that.

23   Q.  He probably really couldn't catch on?

24   A.  No, I don't think that because his memory scores were in the

25   low average to average range which suggests that he has no

1    difficulty with memory.

2    Q.  Okay.  I'll move on from that response.

3            Now, in doing your adaptive functioning assessment you

4    also interviewed some of the same witnesses who appeared in

5    Dr. Swanson's initial report, did you not?

6    A.  Yes.

7    Q.  And in addition to those witnesses you also interviewed

8    additional witnesses not interviewed by Dr. Swanson, at least

9    initially; is that correct?

10   A.  That's correct.

11   Q.  In fact, you relied heavily on these witnesses that were not,

12   as you put it, offered by the defense; is that correct?

13   A.  I don't recall how I put it, but I relied on all of the

14   information that was contained in my report in coming to my

15   conclusions.

16   Q.  Well, the reason I use that terminology is page 59 of your

17   report it appears that you take the position that witnesses you

18   interviewed who were not "offered by the defense," and that's your

19   language, put Mr. Hardy as average or above average compared to

20   other people or other inmates, while defense witnesses had a

21   different opinion that Mr. Hardy was more limited.  Do you

22   recognize that language on page 59 of your report?

23   A.  I think my report the pagination is a little bit different, but

24   I remember saying that in my report.

25   Q.  You recognize that verbiage?

1    A.  I just remember saying something to that effect.

2    Q.  Okay.  Now, do you have any basis to suggest or believe that

3    the witnesses that you describe as "offered by the defense," such

4    as Ms. Minor, we'll start with her, were exaggerating or lying?

5    A.  There were inconsistencies between what was written in

6    Dr. Swanson's report and what Ms. Minor had indicated to me.

7    Q.  So the answer is yes?

8    A.  Yes.

9    Q.  So you do have reason to believe they were exaggerating or

10   lying?

11   A.  I am not trying to say that these individuals are exaggerating

12   or lying.  What I'm trying to say is that there were

13   inconsistencies between what was written in Dr. Swanson's report

14   and what was indicated to me.

15   Q.  So the answer is, no, you're not suggesting that they were

16   exaggerating or lying?

17   A.  No, I don't think that they were lying.  It's either -- it

18   could be a number of different reasons for why we got different

19   information.

20   Q.  No two people will tell the same story exactly the same, even

21   if they're talking about the same person, will they?

22   A.  They may not use the exact same words but the consistency is

23   generally there if both people witness the same event.

24   Q.  And the consistency was there, wasn't it, Dr. Hayes?

25   A.  There was some but there was some inconsistencies as well.

1    Q.  But generally, their accounts of what Paul Hardy was like at

2    the ages they described were generally consistent, were they not?

3    A.  In Theresa Minor's case I don't think so.

4    Q.  What about the rest of them?

5    A.  I think that Toni Van Buren was generally consistent; I think

6    Vance Ceaser was generally consistent; I think that Greg Williams,

7    there were a couple of inconsistencies, but I think he was

8    generally consistent.

9    Q.  So Ms. Minor was inconsistent in what respect?

10   A.  Let me find that part of my report.  And when I say consistent,

11   I mean consistent within the two interviews, not necessarily

12   consistent with the record if that makes sense.  Hold on I'm still

13   trying to find Ms. Minor.

14            MR. McMAHON:  Page 69.

15   BY MS. FOURNET:

16   Q.  So when you say the two interviews, you mean as between

17   Dr. Swanson's interview and your interview?

18   A.  Correct.

19   Q.  Okay.

20   A.  Thank you.  Dr. Swanson indicated in her report that Ms. Minor

21   had indicated that Mr. Hardy had a speech impediment, but when I

22   asked Ms. Minor if he had any problems with his speech, she stated,

23   "Unh-unh, I didn't imagine he did."

24   Q.  But didn't she also tell you when you'd talk to him he would

25   just stare at you and would get frustrated and walk away and that

1   she did have trouble communicating with him?

2   A.  She said that he would walk away, and she wasn't sure if that

3   was due to defiance or due to difficulties.  There were others that

4   were inconsistencies in Ms. Minor's report to me and Dr. Swanson as

5   well.

6   Q.  But on the question of deficits both in your interview and in

7   the interview with Dr. Swanson and in her testimony to this court,

8   you would agree, would you not, that Ms. Minor described a child

9   who suffered from some noticeable deficits compared to her son who

10  was around the same age.  You would agree with that consistency on

11  that point, wouldn't you?

12  A.  She had indicated that, as far as I know that he was not as

13  quick to catch on to things that her son had been, but she also

14  indicated that he appeared to be normal.

15  Q.  So the answer is, yes, in all three of those contexts, your

16  interview, the Dr. Swanson interview and her court testimony, she

17  described a child with some noticeable deficits, didn't she?

18  A.  I don't think I would go as far as to say deficits because she

19  said that he had problems communicating effectively and opening up.

20  That could be because she wasn't his mother and didn't feel

21  comfortable with her.  I don't know that I would call that a

22  deficit in and of itself.

23          THE COURT:  Let's move on.

24  BY MS. FOURNET:

25  Q.  Dr. Swanson -- Dr. Hayes, you interviewed, according to your

1    report, three correctional officers; is that correct?

2    A.  Three correctional officers and then just generally asked

3    questions to other individuals like when I was sitting in the booth

4    watching him play basketball.

5    Q.  And that would be the correctional officers were Lieutenant

6    Shannon DesRoche, and Corporal Ryan Laylle and Deputy Gary Adams;

7    is that correct?

8    A.  Yes, that's correct.

9    Q.  Now, I think you conceded in your report and perhaps have

10   conceded in your testimony, that individuals who work for law

11   enforcement could have their own biases; is that correct?

12   A.  Everyone has their own biases.

13   Q.  So the answer is yes?

14   A.  Yes.

15   Q.  And of course you would agree that these officers, to the

16   extent they observed Mr. Hardy, observed him at an age when he was

17   in his late 30s and early 40s; is that correct?

18   A.  That's correct.

19   Q.  Now, you indicated on your direct testimony that you had given

20   these officers sort of a little rating scale, one to 100, do you

21   recall that testimony?

22   A.  Yes.

23   Q.  And I think you indicated that one of the officers gave him a

24   100 out of 100; is that correct?

25   A.  Yes.

```
 1   Q.  So which officer was that?
 2   A.  That was Sergeant DesRoche, now Lieutenant DesRoche.
 3   Q.  So he is --
 4           MR. McMAHON:  She.
 5           MS. FOURNET:  I am referring to Mr. Hardy.  Thank you
 6   though.
 7   BY MS. FOURNET:
 8   Q.  According to Lieutenant DesRoche, he is at the very top, he is
 9   up there at Einstein level, is that what you took that 100 to mean?
10   A.  Not at all because I asked her to compare him to other inmates.
11   Q.  I see.
12   A.  Einstein wasn't an inmate as far as I know of.
13   Q.  According to her he's the smartest inmate at St. Bernard Parish
14   Prison, correct?
15   A.  I asked them to --
16           THE COURT:  Do we need to dwell on this?
17           MS. FOURNET:  No, ma'am.
18           THE COURT:  Okay.  Let's move on.
19           MS. FOURNET:  I'll move on.
20           THE COURT:  Thank you.
21   BY MS. FOURNET:
22   Q.  Dr. Hayes, you would agree that a prison is a highly supportive
23   and restricted environment, would you not?
24   A.  I would agree that it's highly restrictive.  The nature of the
25   supports in a prison I think are questionable.
```

1  Q.  I mean, in a prison the inmates are told when to eat, when to

2  sleep, their contact with the environment is controlled; isn't all

3  of that true?

4  A.  Yes.

5  Q.  And don't you agree that interviewing someone who has seen him

6  only in that supportive environment precludes you from getting a

7  real picture of how he would perform on the outside?

8  A.  I believe that it does not equate or equal to exactly how he

9  would perform on the outside, but that it would give you a very

10  good picture of what he is able to do in a stressful and difficult

11  environment such as jail.

12  Q.  You selected some quotes, did you not, in your earlier

13  testimony from an article by Dr. Mark Tasse', do you recall that?

14  A.  Yes.

15  Q.  And in that very same article do you recall this quote from

16  Dr. Tasse':  "Correctional officers and other prison personnel

17  should probably never be sought as respondents to provide

18  information regarding adaptive behavior of an individual in a

19  prison setting, unless there is absolutely no one alive who could

20  provide any information regarding the individual's functioning

21  prior to incarceration."  Do you recall that quote?

22  A.  No.  And I didn't memorize the whole article.

23  Q.  Do you agree with that position by Dr. Tasse'?

24  A.  No, not in this situation.

25        MS. FOURNET:  And again, Judge, that would be in the

1    article in *Applied Neuropsychology* that is in the package you

2    should have.

3              THE COURT:  All right.  Can we move to something new?

4    We've been at it for about an hour and a half, so we can take a

5    break.  Are you about to move to something new?

6              MS. FOURNET:  Let me just flip through here, Judge.

7              THE COURT:  Flip through sounds good.

8              MS. FOURNET:  Well, I didn't men for my questioning.  I

9    am trying to eliminate questions as I go.

10             THE COURT:  Again, I am not trying to curtail anything

11   new, I just want to avoid repetition.

12             MS. FOURNET:  I understand, Judge, I am trying to hear

13   you; on the other hand, I don't want to leave out anything that I

14   feel is important.

15             THE COURT:  I agree.  All right.

16             MS. FOURNET:  And if I could just be given a few more

17   minutes to finish the prison part?

18             THE COURT:  Okay.  Go ahead.

19             MS. FOURNET:  And I'll try to expedite it as much as I

20   can.

21             THE COURT:  Okay.  Go ahead.

22   BY MS. FOURNET:

23   Q.  Is it your opinion, you noted in your report that Mr. Hardy

24   noticed changes in jail policies and routines, do you recall that?

25   A.  I recall that.

1  Q.  And is it your opinion that a person with mild mental

2  retardation is categorically incapable of keeping up with changes

3  and rules and procedures in prison?

4  A.  Of course not.

5  Q.  Okay.  There are other passages in there wherein you indicate

6  that guards found Mr. Hardy's Tagamet in the cells of other

7  inmates.  Do you think a person with mild mental retardation is

8  incapable of handing a pill to somebody else?

9  A.  No, I do not.

10 Q.  Or of enjoying pornography?

11 A.  No.

12 Q.  Or hiding contraband that he is not supposed to have?

13 A.  I don't think that's incompatible with mild mental retardation.

14 Again, you have to look at the totality of the information.

15 Q.  Would a person with mild mental retardation necessarily lack

16 the ability to ask for more toothpaste if he needed it?

17 A.  No.

18 Q.  And you indicated that there was some writing done by Mr. Hardy

19 in prison.  Now, you're aware, are you not, that it's very common

20 in prison for other inmates to write or rewrite for inmates who are

21 less skilled at that, you know that, don't you?

22 A.  Yes.

23 Q.  And, in fact, you had some information from the McMillan

24 brothers that Mr. Hardy had a habit of getting other inmates to

25 write for him or copy what he wrote so it would be more legible,

1    you had that information, didn't you?

2    A.  I don't know that they said habit, but I know that they said in

3    a letter to Judge Berrigan had another individual copy it so it

4    would be more legible, there was one instance of that.

5             MS. FOURNET:  I would refer the court on that point,

6    Judge, to the 302 of the McMillan brothers which is at our page

7    No. JH000722.

8             THE COURT:  Okay.

9    BY MS. FOURNET:

10   Q.  And you had information from others, such as Toni Van Buren and

11   Lionel, that it was not uncommon for Mr. Hardy to have others fill

12   out or write for him on different forms; is that correct?

13   A.  I recall Lionel saying he completed an employment application

14   and I believe Toni said that she had done the same, but I am not

15   positive on that.

16            MS. FOURNET:  Judge, this may be a good breaking point.

17   I am kind of through the prison stuff.

18            THE COURT:  All right.  Let's take 10 or 15 minutes.

19            THE DEPUTY CLERK:  All rise.

20        (WHEREUPON, A RECESS WAS TAKEN.)

21        (OPEN COURT.)

22            THE DEPUTY CLERK:  All rise.

23            THE COURT:  Be seated please.

24            MR. LARSON:  Judge, our client is not here.

25            THE COURT:  How are you doing with the progress of your

```
 1   notes?

 2             MS. FOURNET:  Judge, I'm thinking -- my goal is to finish

 3   it today, that's my goal.

 4             THE COURT:  I hope.

 5             MS. FOURNET:  I know.  I hope so, too, Judge.  I am

 6   moving as fast as I can and I am eliminating stuff as I go.

 7             THE COURT:  I made my distinction I think clear.  Yes,

 8   Mark.

 9             MR. MILLER:  There's also some indication that there's

10   additional experts that they intend to call that we don't know

11   about.

12             THE COURT:  Well, you have your rebuttal potential, but

13   we already know who they are.

14             MS. FOURNET:  We did give the court notice several days

15   ago about Dr. Flynn and Dr. Greenspan.

16             THE COURT:  Yes.

17             MR. MILLER:  They're going to be calling these people

18   now?  Do we get reports?  What are they going to testify about?

19             THE COURT:  I assume it's just rebuttal.

20             MS. FOURNET:  It is for rebuttal.

21             THE COURT:  Rebuttal of Dr. Hayes.

22             MR. MILLER:  So we're going to go through the same thing,

23   so they're going to have three more experts to testify as to --

24             THE COURT:  No, I would assume it's not -- to me it would

25   be rebuttal with respect to what Dr. Hayes said about conversations
```

1    with them.

2              MR. MILLER:  Yes, that's my understanding, I have no

3    objection to that.  But I'm talking about going beyond the discrete

4    conversation that they had.

5              THE COURT:  Yeah.  No, I think that's what's appropriate

6    for rebuttal.  I don't think we get into --

7              MR. MILLER:  If that's all it is, your Honor, obviously

8    it would be proper rebuttal.

9              THE COURT:  Right.

10             MR. MILLER:  But anything beyond that we would object to.

11             THE COURT:  I agree.

12        (WHEREUPON, THE DEFENDANT ENTERED THE COURTROOM.)

13             THE COURT:  Mr. Hardy is here, so, Ms. Fournet, front and

14   center.

15             MS. FOURNET:  Yes, ma'am.

16             May I proceed, your Honor?

17             THE COURT:  Yes, please do.

18   BY MS. FOURNET:

19   Q.  Dr. Hayes, we were talking about the fact that there are

20   indications that Mr. Hardy, like many other inmates, has

21   occasionally has inmates write for him or copy his work; is that

22   correct?

23   A.  There was one note of that in the record that I reviewed.

24   Q.  Now, in the material that you got from the government, you

25   received reams and reams of paperwork showing that Mr. Hardy bought

1  guns; is that correct?

2  A.  No.  Reams would indicate 500 pages and I don't think it was

3  that many.

4        THE COURT:  Okay.  Let's cut down on the hyperbole in

5  your questions and let's try to do this a little more

6  cooperatively.  I am getting a little inpatient now.

7        MS. FOURNET:  Yes, your Honor.

8  BY MS. FOURNET:

9  Q.  You did receive documents reflecting firearms transactions, did

10  you not?

11  A.  Yes.

12  Q.  And you relied on those documents for your determination that

13  Mr. Hardy had adequate adaptive functioning; is that correct?

14  A.  I relied on those documents as well as everything that was

15  indicated in my report.

16  Q.  Let's look at a set of those documents.  This is --

17        MS. FOURNET:  And, Judge, this is by our numbering system

18  JH000760.

19  BY MS. FOURNET:

20  Q.  Do you recognize this as one of the forms, Dr. Hayes?

21  A.  I don't know the forms in particular but that looks like one.

22  Q.  And this is a form, is it not, completed on April 13th, 1991,

23  for a .9 mm gun; is that correct?

24  A.  I believe so.

25  Q.  And what does it indicate is Mr. Hardy's height on April 13,

1    1991?

2    A.  Five-six.

3    Q.  Let's look at another form.  What is the date of purchase on

4    this form?

5              MS. FOURNET:  And for the record and for the benefit of

6    the court, this is JH000761.

7    BY MS. FOURNET:

8    Q.  What day was this form completed?

9    A.  May 17, 1991.

10   Q.  So we're talking about a little over a month later, correct?

11   A.  I believe so.

12   Q.  And what is Mr. Hardy's height according to that form?

13   A.  Five-nine.

14   Q.  So these two forms so far reflect that Mr. Hardy had grown

15   approximately three inches between April and July; is that correct?

16   A.  I don't know that he had grown, I would say one indicated

17   five-six, one indicated five-nine; his height probably remained

18   consistent.

19   Q.  And then a third form dated July of 1991, correct?

20   A.  Correct.

21   Q.  And he's now back to five-foot-seven.  Correct?

22   A.  Yes.

23   Q.  So according to these forms he was five-six in April, five-nine

24   in May, and five-seven in July; is that correct?

25   A.  According to the forms.

1   Q.  Wouldn't that indicate to you that either he doesn't know his

2   own height or somebody filled out these forms for him?

3   A.  It appears to be his handwriting so I would think that he was

4   indicating that he was somewhere between five-six and five-nine.

5           THE COURT:  What's the number of that last one in

6   your exhibits?

7           MS. FOURNET:  That's JH000762.

8   BY MS. FOURNET:

9   Q.  And of course we're talking about a drug dealer buying not just

10  a couple of guns but a number of guns in his own name instead of

11  buying untraceable guns off the street, correct?

12  A.  I have the gun receipts that you have, so I think he bought a

13  number of guns.

14  Q.  In his own name?

15  A.  Yes.

16  Q.  Now, you also interviewed Faith Price, correct?

17  A.  Correct.

18  Q.  And I believe you indicated earlier that Special Agent Cosenza

19  went with you on this interview as well?

20  A.  Correct.

21  Q.  And Ms. Price could not recall many of the details of the

22  relationships or many specific facts about Mr. Hardy; is that

23  correct?

24  A.  Yes.

25  Q.  Couldn't say if he was a leader or follower?

1        MS. FOURNET:  That's on page 81, Judge, of the report.

2   I'll move on.

3        THE COURT:  Thank you.

4   BY MS. FOURNET:

5   Q.  Didn't know about any of his jobs?

6   A.  That's correct.

7   Q.  They never lived together or did school work together; correct?

8   A.  That's right.

9   Q.  And she said he didn't have any apparent problems with

10  directions; correct?

11  A.  I believe that's what she indicated.

12  Q.  And you didn't ask her about the apparent part; that is, you

13  didn't determine specifically what she knew or observed about his

14  sense of direction; is that correct?

15  A.  I would have simply asked her do you -- tell me about his sense

16  of direction, and she said seemed normal to me or something to that

17  effect.

18  Q.  And of course no one has ever told you Mr. Hardy could not

19  drive, so it wasn't surprising when she said that he would drive,

20  was it?

21  A.  No.

22  Q.  She had no knowledge of whether he was gullible?

23  A.  Not to her knowledge when she indicated to me.

24  Q.  So Ms. Price, in fact, told you nothing that would detract from

25  a finding of mental retardation, did she?

1    A.  She had indicated that he seemed like anybody else, that he was

2    normal.

3    Q.  Okay.  Now, with regard to Javetta Franklin, you heard

4    Ms. Franklin testify, didn't you?

5    A.  Yes, I did.

6    Q.  And you read Dr. Swanson's letter to me in which she described

7    her interview with Javetta?

8    A.  I did but that was about a month ago.

9    Q.  Okay.  And so obviously you're aware, and she also testified in

10   court, so you're aware that she described a somewhat different

11   encounter than your report would suggest?

12   A.  Yes.

13   Q.  Now, when you went to interview Ms. Franklin, you listed the

14   items that you brought with you.  I can't remember if you listed

15   the Vineland manual.  Did you bring the Vineland manual with you?

16   A.  I brought parts of the Vineland manual with me.

17   Q.  You brought parts of the Vineland manual.  What parts did you

18   bring?

19   A.  Like the scoring directions in the back, I think it might be

20   Appendix E as in elephant.  There's also another place I believe in

21   chapter two that lists the various questions, I had that copied and

22   with me.  Those were the parts of the manual that I recall

23   bringing.

24   Q.  And do you recall that you brought all of Appendix E with you?

25   A.  I believe so, yeah.

1    Q.  And Appendix E, just for the record, is the appendix in the

2    Vineland manual where you can refer to sort of an expanded

3    explanation of what a particular question is seeking, is that a

4    pretty fair description of what that appendix does?

5    A.  Yes.

6    Q.  And did you consult with that appendix while you were asking

7    Ms. Franklin the questions?

8    A.  I don't recall.  I remember having it out but I don't recall if

9    I flipped to it.

10   Q.  At the time of your interview with Ms. Franklin, did you have

11   that second book, the expanded Vineland manual?

12   A.  No, I did not.

13   Q.  Did you -- you didn't have it on your person I gather, but did

14   you have it, did you own it?

15   A.  No, I did not at that point.

16   Q.  Do you own it now?

17   A.  Yes.

18   Q.  And when did you get it?

19   A.  I believe either -- I believe it was last week.

20   Q.  So that's another book you got during the hearing?

21   A.  Yes.

22   Q.  And that particular expanded version has a section, does it

23   not, on retrospective assessments?

24   A.  It has a few paragraphs.

25   Q.  Now, you've already indicated that you brought the FBI agent

1    with you.  Tell me, Dr. Hayes, what is the literature in mental

2    health assessments that supports your taking non-clinical law

3    officers to a clinical interview?  Tell me where someone has

4    written that that is an acceptable procedure for a clinical

5    interview for forensic purposes?

6    A.  The clinical interview was not conducted with the law

7    enforcement officers present, so I believe that mischaracterized

8    what occurred.

9           And so I cannot tell you where it says that you must

10   bring law enforcement officers with you, I can't point you to a

11   reference and I don't know that one exists.

12          THE COURT:  I may have misunderstood.  Did you say

13   there's no reference to where law enforcement officers must be

14   brought with you, is that what you said?

15          MS. FOURNET:  That's what she said.

16          THE COURT:  I think the question was do you know of any

17   authority that talks about whether it's appropriate to bring law

18   enforcements to a clinical interview?

19          THE WITNESS:  I thought I was answering that so I must

20   have misspoke.  None that I am aware of.

21          THE COURT:  Okay.

22   BY MS. FOURNET:

23   Q.  You are aware, are you not, of the long description in the

24   Vineland manual about establishing rapport with a witness?

25   A.  Correct.

1    Q.  And is it your view that having an FBI agent knock on the door

2    first and show his badge is conducive to establishing rapport?

3    A.  Establishing rapport is between myself and the individual.  The

4    FBI agent was knocking on the door for another reason, so I am

5    not -- you're -- what are you meaning in the question?

6    Q.  Well, wouldn't you think that having an interview begin by an

7    FBI agent knocking on the door, saying FBI, and showing the

8    potential interviewee a badge would undermine the effort to

9    establish rapport with that person?  That is not exactly setting

10   the stage for a friendly interview, is it?

11   A.  I believe that almost any time someone gets a knock on the door

12   from an FBI that would make them a bit nervous.  But I took great

13   steps to insure that rapport was established.

14   Q.  And -- go ahead, I didn't mean to interrupt you.

15   A.  So I don't think it's a good thing to always have an FBI agent

16   present with you to do interviews, but I think in this situation

17   that it didn't affect the interview.

18   Q.  Well, you knew, did you not, where this young lady was located,

19   where her address was, correct?

20   A.  No, I did not.

21   Q.  Well somebody knew, otherwise how did you get there?  The FBI

22   knew where she was?

23   A.  Yes.

24   Q.  So you knew how to get to where she was, didn't you, or you had

25   somebody willing to tell you that --

```
 1              THE COURT:  Let's speed it up.  Speed it up.
 2    BY MS. FOURNET:
 3    Q.  Dr. Hayes, you testified on direct that you did not notify
 4    Ms. Franklin first because as the mother of Mr. Hardy's child you
 5    were afraid she would "blow you off"; isn't that what you said?
 6    A.  I don't remember if I used that expression but I agree with it.
 7    Q.  So you thought it was appropriate to sort of do an unannounced
 8    visit to her; is that correct?
 9    A.  In this situation I didn't feel like I had another choice.
10    Q.  Well, let me ask you this.  I mean, isn't it correct that you
11    did a number of interviews with a number of witnesses, such as
12    Ms. Minor and Vance Ceaser and Toni Van Buren here at the
13    courthouse; is that correct?
14    A.  Yes.
15    Q.  And those appointments that were requested by you and you
16    mentioned earlier you requested the videotaping, did you not?
17    A.  Yes.
18    Q.  And Mr. Hardy's lawyers and the rest of his team cooperated in
19    that endeavor, did they not; in other words, they went out and
20    contacted the witnesses, they made sure the witnesses got to the
21    courthouse, they made them available for you to do your videotaped
22    interviews, didn't they?
23    A.  With the exception of Tony Minor.
24    Q.  With the exception of Tony Minor, that's correct, isn't it?
25    A.  Yes.
```

```
 1   Q.  And it didn't occur to you that it might facilitate your

 2   interview to have one of the government attorneys contact one of

 3   the defense attorneys and see if we could assist you --

 4              MR. McMAHON:  Objection, speculative.

 5              MS. FOURNET:  I don't see why it's speculative, your

 6   Honor.

 7              THE COURT:  It's a little far afield.  We know what

 8   happened and I think what's important is what happened, not what

 9   might have happened under other circumstances.  So go on to

10   something different.

11   BY MS. FOURNET:

12   Q.  What you have described in your direct testimony is a very

13   cordial interview with Ms. Franklin, but, in fact, she refused to

14   let you in her apartment; isn't that correct?

15   A.  She did not allow me into her apartment.

16   Q.  And of course it is your responsibility, not hers, as a

17   psychologist to be clear with her who you are and why you were

18   there; is that correct?

19   A.  Correct.

20   Q.  Do you recognize this?

21   A.  Certainly.  Yeah.

22   Q.  This is the ethical principles of psychologists and code of

23   conduct, and this is the one for informed consent, is it not?

24   A.  Correct.

25   Q.  And this is rule or Cannon 3.10, Informed Consent, and that is
```

1   what requires you to obtain an informed consent of the individual

2   using language that is reasonably understandable any time you

3   conduct an assessment.  Is that what that says?

4   A.  Yes.

5   Q.  Did you probe with Ms. Franklin to determine if she understood

6   who you were, which side you were on and why you were there?

7   A.  She clearly understood, so, yes, I did.  In fact, one of the

8   first things she said to me is I knew you were coming.

9   Q.  And this is another standard, is it not, a standard or rule or

10  Cannon 9.03, and it also requires informed consent in assessments,

11  does it not?

12  A.  Yes.

13  Q.  And it gives several exceptions, and would you agree that this

14  situation was not an exception to the requirement for informed

15  consent?

16  A.  I don't believe this was necessarily an exception in terms of

17  informed consent.  But I was not assessing Ms. Cooper-Franklin, I

18  was assessing Mr. Hardy.  So it is a bit of an exception, but I

19  don't believe that it's one that's outlined in that particular part

20  of the ethics code.

21  Q.  And are you familiar with the standards for educational and

22  psychological tests, and specifically are you familiar with

23  Standard 12?  Do you recognize that?  I'll hold this.  Would you

24  like me to approach so you can see this?

25  A.  Oh, no, I am familiar with them.

1   Q.  Do you know what I'm talking about?

2   A.  Yes.

3   Q.  Are you familiar with that standard?

4   A.  Yes, I am.

5   Q.  And that standard says, does it not, "The tester should try to

6   create a non-hostile environment."?

7   A.  Yes.

8   Q.  And it says that, "The social amenities of respect, politeness,

9   and due regard for extenuating circumstances are relevant guides

10  for insuring the dignity of persons."  Do you agree with that?

11  A.  Absolutely.

12  Q.  And it also says, and this is an important part of this, "A

13  major source of error may arise when examinees do not like or trust

14  the test, the tester, or the test situation, and therefore make no

15  special effort to do well in it."  Do you agree with that?

16  A.  I would agree.

17              THE COURT:  Is this in your packet of materials?

18              MS. FOURNET:  Yes, it is, your Honor.

19              THE COURT:  Okay.  No problem.  Go ahead.

20  BY MS. FOURNET:

21  Q.  And after the FBI agent came to the door, and left, Mr. McMahon

22  came to the door with you; is that correct?

23  A.  I believe Mr. McMahon walked to the door.  I can't recall

24  whether he introduced himself or not.  But I remember that when he

25  sat down he was back in the car that was quite a ways away.

1    Q.  Well, he's a pretty big guy, isn't he?

2    A.  Mr. McMahon?

3    Q.  Yes.

4    A.  He's right there (INDICATING).

5            THE COURT:  Take judicial note of the size of

6    Mr. McMahon.

7    BY MS. FOURNET:

8    Q.  Do you think that might have been a little intimidating to

9    Ms. Franklin?

10   A.  I don't know what would be considered intimidating to

11   Ms. Franklin, but she didn't appear intimidated at all.

12   Q.  Well, that's not what she is saying now, is it?

13   A.  It's not what she's saying now.

14   Q.  Of course you didn't say to her, if you don't talk to me you'll

15   be in trouble, you didn't say anything like that?

16   A.  No.  In fact, I told her, like I told other people, that, you

17   know, this is voluntary, you don't have to speak with me if you

18   don't want to.  And she said, no, I want to go ahead and do this.

19   Q.  Of course this was all on the heels of the FBI knocking on the

20   door and showing a badge --

21           THE COURT:  Okay, we're replowing.

22   BY MS. FOURNET:

23   Q.  Dr. Swanson testified that she held up the test for Ms. Van

24   Buren.  Did you do that for Ms. Franklin?

25   A.  Did I hold it up?

1    Q.   And say this is the instrument?

2    A.   I did not hold it up and say this is the instrument.

3    Q.   Is it your position that Ms. Franklin's description of your

4    interview is untruthful?

5    A.   I do.

6    Q.   And you indicated in your notes that this interview with

7    Ms. Franklin took about 45 minutes; is that correct?

8    A.   That's correct.

9    Q.   Now, this was a retrospective test, was it not?

10   A.   Yes.

11   Q.   And that meant you had to determine Paul's age at the time or

12   times she knew him, establish rapport and all of that; is that

13   correct?

14   A.   That's correct.

15   Q.   And does that 45 minutes include that?

16   A.   Yes, it does.

17   Q.   So in that 45 minutes you established rapport, you focused her

18   on a particular age or ages of Ms. Franklin, and you went through

19   the Vineland form; is that what you're saying?

20   A.   Yes.

21   Q.   Were you putting the twos and the ones and the zeros on the

22   form as you went or did you go back and do that later?

23   A.   I believe the majority of them I did as I sat there.  I don't

24   know if I went back and put some in later.

25   Q.   And there were some handwritten notes that we were supplied in

1    discovery, there was some typed notes and some handwritten notes

2    from you on this interview.  Do you recall that?

3    A.  Yes.

4    Q.  The handwritten notes, were you taking those notes at the time

5    or did you do those handwritten notes later?

6    A.  I took them at the time.

7    Q.  Now, you've had -- you are familiar with how the Vineland

8    works, are you not?

9    A.  Certainly.  Can I clarify?

10   Q.  Yes, go ahead.

11   A.  There were some notes that were on the Vineland that I had also

12   had in the regular notes, and I probably would have put those

13   handwritten notes in a bit later because I wouldn't have duplicated

14   effort at that point.

15   Q.  You would have put handwritten notes on the Vineland from later

16   or you would have put the handwritten notes on your handwritten

17   notes?

18   A.  On the regular form, on just the handwritten form.

19   Q.  Okay.  You know that the Vineland is like an IQ test, it's

20   normed on a certain age and other demographics, correct?

21   A.  Yes.  But it's not like an IQ test.

22   Q.  Well, I realize that.  But I mean, it's similar to the IQ test

23   in that --

24              THE COURT:  Replow, replow.

25              MS. FOURNET:  Okay, okay.

```
 1              THE COURT:  Go ahead.  Move on.
 2    BY MS. FOURNET:
 3    Q.  In the manual there's an entire section, is there not, which
 4    begins on page 11 that's titled Constructive Adaptive Behavior, do
 5    you remember that?
 6    A.  I don't have the Vineland manual memorized.
 7    Q.  Well, if it says on page 11 of the manual that adaptive
 8    behavior is age related, would you agree with that?
 9    A.  Yes.
10    Q.  And on a Vineland it's not the age of the person you're
11    interviewing, it's the age of the person that you're evaluating
12    that's critical; is that not correct?
13    A.  That's correct.
14    Q.  And the tests are given to examine usually present knowledge,
15    so you can just use the age of the person at the time the test is
16    given, right?
17    A.  That was the way that the Vineland was developed, it was based
18    upon present knowledge.
19    Q.  And, in fact, the Vineland was originally developed to
20    determine what supports a person needed, correct?
21    A.  That at that time did --
22    Q.  At least in part.
23    A.  Yes.
24    Q.  And this type of evaluation is a little different because it's
25    retrospective; is that correct?
```

1456

1   A.  It's a lot different because it's retrospective.

2   Q.  And the experts in this area, including the AAMR, have approved

3   the Vineland as a standardized objective test that is appropriate

4   for determining adaptive functioning in a retrospective assessment;

5   is that correct?

6   A.  I believe so.

7   Q.  Now, we all know that you did not put the age of Paul Hardy on

8   the cover of the Vineland test, correct?

9   A.  Correct.

10  Q.  And I think you said you put NA but you didn't really mean not

11  applicable, correct?

12  A.  No.  I tried to write what I was meaning later in the test that

13  in a narrative format to give more information.

14  Q.  And you are aware that in the expanded manual on page 29 there

15  is a passage that says the examiner should emphasize that all

16  interview questions are in reference to the individual's

17  functioning at the designated earlier age.  Does that sound right?

18  A.  Yes.

19  Q.  Now it doesn't say ages, does it, it says age?

20  A.  That's correct.

21  Q.  And would it be logical to conclude that that is because you

22  can't norm the test on the population of one age if you have more

23  than one age in the test?

24  A.  The test was not normed for retrospective assessment and so

25  that doesn't apply.

1  Q.  Actually in the case of Ms. Franklin, you came up with two

2  ages, didn't you?

3  A.  I did.

4  Q.  And you didn't put either one on the cover, correct?

5  A.  Not on the cover.

6  Q.  Now when you talked to Ms. Franklin and you questioned her in a

7  particular subdomain, and if I recall your Vineland manual you

8  would have the age range written out in the right-hand margin; is

9  that correct?

10 A.  On that -- on the one part I believe so.

11 Q.  Were you -- the manual also instructs you to make sure that

12 when you're talking about a particular age range that you focus

13 those questions and make sure that your interviewee is focused on

14 that particular age range; is that correct?

15 A.  Correct.

16 Q.  And did you do that with Ms. Franklin?

17 A.  I did.

18 Q.  And you said that you referred to Appendix E periodically

19 during this interview?

20 A.  I think I had indicated that I was not sure if I was looking at

21 it then but I know I had it with me.

22 Q.  Well, you know that that appendix is important because it more

23 fully explains what a particular question means, don't you?

24 A.  Correct.

25 Q.  And with respect to page 5 of your manual, I mean of your

1    protocol, you have Question 20 there which has to do with an

2    informational talk.  Do you recall that?  And we can go ahead and

3    put page 5 up there.

4    A.  I think I just got it.

5            MS. FOURNET:  We hadn't planned to use this as an

6    exhibit, Judge, but we'll put it up there.

7            THE WITNESS:  Okay.

8            THE COURT:  Go ahead.

9    BY MS. FOURNET:

10   Q.  Do you see No. 5 -- I'm sorry, No. 20 there?

11   A.  Yes.

12   Q.  And you gave Mr. Hardy a two there, didn't you?

13   A.  I did.

14   Q.  Now, based on what did you give him a two?

15   A.  She had indicated that he went to church and that he also had

16   attended school.

17   Q.  Did she say she attended church or school with him?

18   A.  No.

19   Q.  Now, are these answers, Dr. Hayes, supposed to be based on what

20   a person has heard about the individual or what a person has

21   actually observed the individual do?

22   A.  In the best case scenario, it would be based upon what an

23   individual had observed.

24   Q.  But the manual doesn't allow you, does it, to score this test

25   based on what a person may have heard about the person being

1   evaluated, does it?

2   A.   Not if you're giving it under standard conditions.

3   Q.   So you will concede you were not following the manual?

4   A.   I will concede that I was not giving it under standard

5   conditions because it's a retrospective assessment.

6   Q.   In the manual or the expanded manual, are there exceptions made

7   for following the manual in a retrospective assessment, to your

8   knowledge?

9   A.   The expanded manual to my knowledge indicates a way that this

10  should be done, but it also doesn't go into the significant error

11  rate that would be involved with regard to retrospective

12  assessments and memory degradation and other things like that.  So

13  the expanded manual actually, it may touch on it but it doesn't go

14  into it in detail.  Things such as this are not always perfect, you

15  have to do the best that you can in some situations.

16          THE COURT:  Let me jump in for a moment if I could.  In

17  light of that, wouldn't it be more significant to make sure that

18  the knowledge is first hand as opposed to hearsay?

19          THE WITNESS:  Certainly.

20          THE COURT:  Okay.  Thank you.

21  BY MS. FOURNET:

22  Q.   I mean, presumably there might have been people out there who

23  went to church or school with them, that you could have gotten more

24  direct information from on this?

25  A.   It would have been nice to have found someone that I could have

1    spoken to, that's why I wanted to speak to Linda Hardy and Terry

2    Hardy; but unfortunately she was the only individual that had

3    knowledge of his behavior around the time of the developmental

4    period injury, which was around 18 years old, 17 and a half, 18.

5    So there was no other person that I could speak to who would be

6    able to discuss that.

7    Q.  Did you consult with Appendix E when you asked this question?

8    A.  I don't remember if I consulted.  I had indicated that earlier

9    that I had it with me and I don't recall if I flipped to look at

10   different things or not.

11           MS. FOURNET:  May I approach the witness, your Honor?

12           THE COURT:  Yes.  I'd like to kind of move on though.

13           MS. FOURNET:  One more?

14           THE COURT:  Okay.  Go ahead.

15           MS. FOURNET:  For the record, this is page 302 of the

16   Vineland manual.  Would you read --

17           MR. McMAHON:  Is that Appendix E?

18   BY MS. FOURNET:

19   Q.  Would you read the description of the expanded description of

20   what Question 20 means?

21   A.  "Score one if the individual listens for more than 15 minutes

22   but fewer than 30 minutes.  If the individual attends only to

23   information of particular interest to him or her for 30 minutes,

24   score one."

25   Q.  Did you ask, did you frame the question to Ms. Franklin in that

1   way?

2   A.  I asked her if he had -- I believe we were talking about things

3   that he did and he didn't do.  And I had asked her do you know if

4   he was able to listen to various talks or other things for more

5   than 20 or 30 minutes, or more than 30 minutes, and she said, "He

6   attended church so I guess.  He did this when he needed to."  And

7   then she said, "Yeah, and he went to school as well, something to

8   that effect.

9   Q.  I notice you have a note there with all kind of little arrows

10  drawn and something about cumulative knowledge.  Is there anywhere

11  in the Vineland manual or the expanded Vineland manual where the

12  people who designed the test ratify that you can ask questions

13  based on a person's "cumulative knowledge" as opposed to a person's

14  knowledge of the individual at a particular age range?

15  A.  To tell you the truth, what I am referring to here, I had asked

16  her for two particular times.  I think when you're asking someone

17  to look back 25 years or so, they may not be able to give you a

18  particular date so I asked her to rate around Curtis's death.

19        The second time I asked her to rate based upon her

20  knowledge of him around the time of his arrest.  So -- and the

21  around the time of his arrest would be what she had known about him

22  throughout his life.  And so I am not sure, I haven't done a key

23  word check in terms of cumulative in the manual, but I think that

24  was appropriate because it was based upon her knowledge of him from

25  when they met until when he was arrested.

1  Q.  All right.  Let's look at page 12 of your protocol.  And on

2  this page you gave Mr. Hardy a number of twos, didn't you?

3  A.  Yes.

4  Q.  And this would have been in the domestic subdomain?

5  A.  That's correct.

6  Q.  Two on washing dishes, sweeping, clearing the table and so on.

7  Now, you have over here in the right-hand margin, you have 22 to

8  29; is that correct?

9  A.  Correct.

10  Q.  Now, does that mean that you focused all of these questions as

11  the manual requires you to do within that age range of 22 to 29?

12  A.  What I am referring to are the -- I am trying to get it up

13  here.  As you can see the way this is in the Vineland, it starts at

14  22 on one set of norms and actually goes up to 49 years.  And so

15  this was based upon her knowledge of him, like I had said, around

16  the time of his arrest, but it was based upon her knowledge of him

17  to that point.

18        But I asked her to think about around the time of his

19  arrest but I didn't give her a specific day.  So it is based on her

20  cumulative knowledge of the defendant, and what I'm trying to do

21  are indicate which normative tables I am taking things from.

22  Q.  But the question was, did you focus the questions on this

23  subdomain when you talked to Ms. Franklin, did you say to

24  Ms. Franklin I want you to stay, when you answer these questions,

25  between the ages -- when you knew Paul when he was between the ages

1    of 22 and 29, did you tell her that?

2    A.   I asked her to think about what she knew about him around the

3    time of his arrest.  And for some of the questions, it's obvious

4    that she was basing it on prior knowledge of him as well.

5    Q.   Okay.  And you actually scored those answers even when it was

6    clear she was basing the answer on prior knowledge, correct?

7    A.   Yes, I did.

8    Q.   So, for instance, on No. 22, you gave her a two when he is

9    talking about or she is talking about something Mr. Hardy's mother

10   did prior to the time that he was 22, correct?

11   A.   Yes.  She didn't -- from my knowledge of what she had indicated

12   to me, after they had broken up, she would see him various time to

13   time; but she said when they had known each other that his mother

14   did it but that when he needed to he would wash his clothes.

15   Q.   So even though you have 22 to 29 in the right-hand column here,

16   these answers are not limited to that age range necessarily?

17              THE COURT:  Replowed.  You already covered that.

18              MS. FOURNET:  Yes, ma'am.

19   BY MS. FOURNET:

20   Q.   Is there anywhere in the manual that allows you to do this, to

21   score one subdomain on different time periods at which the person

22   knew the interviewee -- or at which the interviewee knew the

23   person?

24   A.   None that I can recall.

25   Q.   Exhibit 10.  You will agree, will you not, Dr. Hayes, that

1  under the manual if a caregiver performs an activity, at least

2  according to the manual such as momma frying the chicken, at least

3  according to the manual that's supposed to be a zero, you agree

4  that the manual says that, don't you?

5  A.  Yes.

6  Q.  Now, you took -- and then you will agree, and I don't want to

7  belabor this, but you will agree that there was an additional, on

8  your score sheet, subdomain that the manual said that you should

9  not score and you scored anyway, correct?

10 A.  There was one, the other one I had indicated earlier that I

11 made an error on the one sheet, I showed you how I was wrestling

12 with what to give based upon that and actually crossed it out,

13 crossed it out in another spot.  So I changed my mind from three

14 don't knows to two don't knows and one no opportunity based upon

15 the microwave.

16 Q.  But you will concede that under the manual you should not have

17 scored the domestic subdomain the way you did, do you agree with

18 that?

19 A.  No, I think I should have.  I changed it to two don't knows.

20 It doesn't reflect it in this because I forgot to go back and

21 actually write two in and one there.  It doesn't change the score,

22 the scoring continued.  So I thought I had covered that earlier

23 saying that I had written -- checked no opportunity, put an X

24 through that and then I put an or and then put another circle

25 through the don't know, and then crossed out the three and crossed

```
 1   out another thing, and I changed my mind to go back to the no
 2   opportunity after thinking about what was said to me more.  And
 3   that's why that one was scored.
 4          THE COURT:  I think you may be talking about two
 5   different subsections.  There was one subsection that shows a three
 6   and it should have been a two.  You may be ships passing in the
 7   night, I am not sure.
 8          MS. FOURNET:  I have been completely lost in the thicket
 9   of that last answer, so I will move on.
10          THE COURT:  Okay.  Thank you.
11   BY MS. FOURNET:
12   Q.  You do concede that you shouldn't have scored the personal
13   subdomain but you did, correct?
14   A.  I said I even wrote it on the protocol to be as transparent as
15   possible, one too many don't know to score according to the manual.
16   Q.  So you drew a little arrow that said in the margin you weren't
17   supposed to score that but you scored it anyway?
18   A.  Yes.
19   Q.  Do you think that someone who is not trained understands what a
20   too many DK is?
21          THE COURT:  I know that was asked, that specific question
22   was asked and answered sometime within the last 48 hours.
23          MS. FOURNET:  I'm pulling, Judge.  I'm pulling exhibits,
24   I'm pulling questions, I'm doing the best I can.
25   BY MS. FOURNET:
```

1    Q.  Do you recall, Dr. Hayes, giving an affidavit in a federal case

2    in Maricopa County in 2006 in which you averred various aspects of

3    standardized testing in the context of adaptive behavior?

4              THE COURT:  Do you?

5              THE WITNESS:  Not that specific one.

6              MS. FOURNET:  I'm sorry, Judge, I don't want to just

7    blind side her.  I am trying to get a full copy of her affidavit.

8    Here it is.

9              May I approach the witness, your Honor?

10             THE COURT:  Yes.  Okay.  Go ahead.

11   BY MS. FOURNET:

12   Q.  Do you recognize that affidavit --

13   A.  I do.

14   Q.  -- Dr. Hayes?

15             I am going to ask you to focus on page -- do you

16   recognize this as one page, and I believe this may be a page 5,

17   Paragraph 13 of your affidavit?

18   A.  Yes.

19   Q.  Would you read the highlighted portion of that affidavit,

20   please.

21   A.  "The interview procedure is described in the test manual.  This

22   includes instructions about how to introduce and describe the test

23   to the respondent and guidelines for test administration.  Also

24   included are scoring procedures, scoring criteria, and guidelines

25   for interpreting test data.  All of the above procedures are

designed to reduce measurement error and increase the reliability
and validity of the instrument."

Q.  Are you not recognizing there that the guidelines for test
administration and the scoring criteria have an effect on the rate
of error in the test?

A.  Certainly.  It doesn't apply to this situation.

Q.  Oh, okay.  So that doesn't apply to this situation?

A.  That's not a retrospective assessment, this case is not related
to retrospective assessments.  This case is related to whether an
individual had mental retardation at that moment in time.

Q.  So what your position is, what we have highlighted there in
your affidavit only applies to non-retrospective assessments; is
that what you're saying?

A.  Pretty much.  Because as you had indicated and I believe
everybody's heard as Dr. Tasse' had indicated in his article, that
the reliability and error rate in retrospective assessments is
completely unknown.  If you're giving an assessment to an
individual that is sitting right there and her parents are there
and other caregivers are there, you certainly should do things
exactly by the book.

        But when you have no idea what the error rate and the
reliability are of the assessment that you're doing, especially
when you're asking someone to look back 25 years, it's not a
standard assessment by any means.

Q.  And then you took these scores, did you not, and you put them

1    in a chart next to Toni Van Buren's scores and next to a third

2    column that goes on pages and pages in your report, don't you?

3    A.  I put the ratings based upon what Ms. Franklin had indicated to

4    me based on the interview that I had done with her right next to

5    Toni Van Buren's and went on for pages and pages and pages.

6             MS. FOURNET:  I'm scratching, Judge.

7    BY MS. FOURNET:

8    Q.  You also, I think you dropped a footnote on one particular

9    subdomain, personal, that says that you're using the scores in the

10   personal subdomain, I think this is your quote, "for informational

11   purposes only."  Is that correct?

12   A.  Yes.

13   Q.  And where in the Vineland manual or the expanded Vineland

14   manual does it permit you to score a Vineland or any specific

15   subdomain of the Vineland for informational purposes only?

16   A.  It does not say that one should score a subdomain if you have

17   more than two don't knows and she had three.  She rated Mr. Hardy

18   as having three don't knows in that section.  So I still believed

19   that it would be helpful for comparison purposes and for

20   informational purposes to include that.  But I also footnoted that

21   in my report as we've discussed.

22   Q.  And the beginning of your report -- and I'm sorry I can't cite

23   the page number, I don't have it here -- but when you get into the

24   Vineland results, you begin that section of your report with sort

25   of a laudatory description of this test, do you not?  And I am

1  going to quote here, tell me if this sounds wrong, "The Vineland II

2  survey forms are well suited for evaluation and diagnosis of mental

3  retardation because of their comprehensive content and careful

4  development and standardization.  The norm referenced data provide

5  reliable and valid estimates of an individual's adaptive behavior

6  and ranking in comparison with the national normative group."

7       Do you recall that language?

8  A.  Yes, and I agree with it.

9  Q.  So you're pretty much lauding that test as a valid and reliable

10  instrument to measure the adaptive behavior, correct?

11  A.  Actually, in that situation I believe I'm quoting from the

12  Vineland manual in terms of what they say.

13  Q.  Do you agree with that?

14  A.  I think under standard conditions it is.

15  Q.  Okay.  And then having given the test and included in your

16  report with a laudatory introduction, you then criticize the test,

17  do you not, pages 106 and 107 of your report?

18  A.  Yes.

19  Q.  And, in fact, at page 105 you refer to one criticism of the

20  Vineland being that the person, as you put it, penalized if he does

21  not usually perform the task without help or reminders?

22  A.  That's correct.

23  Q.  But you gave the test anyway, so you praised it, you criticized

24  it, but then despite the criticism you gave it; is that correct?

25  A.  I was putting the information that was included in the Vineland

1    manual for reference purposes, so I don't think I was lauding it.

2           After I used the same measure so that there could be a

3    direct comparisons between what Ms. Van Buren had said and what

4    Ms. Javetta Cooper-Franklin had said, and then I indicated at kind

5    of in my opinion of what was going on in the situation, my opinion

6    of difficulties that were apparent in this Vineland.

7    Q.  Well, Dr. Hayes, you have repeatedly described this testing

8    situation as non-standard and different and one that the rules in

9    the manual did not apply to is my understanding of what you've

10   said.  Couldn't you have simply interviewed Ms. Franklin rather

11   than circling all of those little twos and ones and given the court

12   simply a narrative of what she had to say without circling all of

13   those numbers and creating the appearance that you did with this

14   test?

15   A.  I believe that what I did was the right thing to do.  I believe

16   it was helpful and I hope it is helpful to the court so you can see

17   how two raters lineup.

18          Also, I do think it's helpful, even if you can't score

19   all of the parts of the Vineland, to use it as a guide to

20   interviewing.  And so whether I circled the twos or the ones or not

21   in this situation it still would have been helpful.

22   Q.  So you concluded that that would be better than just giving the

23   court a narrative?

24          MR. MILLER:  Judge, we have plowed this ground.

25          THE COURT:  Yes, move on.

1    BY MS. FOURNET:

2    Q.  When you put it on the chart and you have that chart and you

3    have several different columns, you have the Toni Van Buren column,

4    you have the Javetta Franklin column, and you have the other column

5    that's just sort of a mishmash of information; is that an accurate

6    description of that chart?

7    A.  I wouldn't say it's a mishmash, it refers to information from

8    records and other interviews with me.

9    Q.  In the first column we have Toni Franklin's -- Toni Van Buren's

10   scores that are reflective of Paul Hardy as she knew him at a

11   particular defined age, whether it was slightly above or slightly

12   below 18; is that correct?

13   A.  Yes.  We have what she had indicated Paul Hardy was like the

14   day that she met him, which was obviously an incorrect date.

15   Q.  And in the second column we have Javetta Franklin's scores

16   which reflect her cumulative knowledge of him at various ages,

17   correct?

18   A.  At the two ages that I mentioned, one being around the time of

19   Curtis's death, and the other being prior to him going to jail.

20   Q.  And then some prior I think you stated earlier?

21   A.  Yes, of course.

22   Q.  And then in the third column we have Paul Hardy at various

23   ages, we have Paul Hardy at 42 years old in prison, we have Paul

24   Hardy at different times in life.  So that third column is not

25   focused on a particular age or age range at all, is it?

```
 1    A.  No, it's giving you information available from other sources.
 2    Q.  Now, we heard in this courtroom, we heard some phone calls that
 3    Paul Hardy made; is that correct?
 4    A.  Yes.
 5    Q.  And you commented on these --
 6              THE COURT:  Are you switching to a new area?
 7              MS. FOURNET:  This is just two or three questions if you
 8    want me to go ahead and get through it --
 9              THE COURT:  Yes, that would be good.
10              MS. FOURNET:  -- and then we can break.
11    BY MS. FOURNET:
12    Q.  How old approximately would Mr. Hardy have been in those
13    telephone calls?
14    A.  I believe that the telephone calls from the St. Bernard Parish
15    jail were this year, so he would have been 41 or 42.
16    Q.  And he's been in prison in a restricted environment for 15
17    years since his arrest at the time he made those calls; is that
18    accurate?
19    A.  I believe so, yes.
20              MS. FOURNET:  That's all I have -- I mean, this is a good
21    breaking point, this is not all I have, your Honor.
22              THE COURT:  I would like to finish with Dr. Hayes today,
23    so what I would like to do is maybe give you a little extra time at
24    lunch to go over your notes and I think -- I think the main issue
25    is just not replowing.
```

```
1              MS. FOURNET:  I understand, Judge, I am trying very hard.

2              THE COURT:  I understand and I understand it's important,

3    but I've been hearing a lot of repetition.  So it's ten after 12,

4    so 1:30, would that help you focus if I give you a little extra

5    time?

6              MS. FOURNET:  Yes, your Honor.

7              MR. McMAHON:  Housekeeping.  I do have the correctional

8    officers from St. Bernard here now.  So as not to inconvenience

9    them, would it be safe just to send them home and tell them to come

10   back first thing in the morning?

11             THE COURT:  I would think between finishing cross and

12   redirect, if we could finish Dr. Hayes with any cross and redirect

13   I would consider myself blessed.  So, yes, you can tell them to

14   come tomorrow morning.

15             MR. McMAHON:  Thank you.

16             THE COURT:  All right.  And I have nothing to do tonight,

17   so midnight.

18             MS. FOURNET:  It won't be that late, Judge.

19             THE COURT:  Okay.  Good deal.

20             THE DEPUTY CLERK:  All rise.

21             THE COURT:  Thank you.

22        (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

23

24              P R O C E E D I N G S

25              (AFTERNOON SESSION)
```

1

2          (OPEN COURT.)

3               THE COURT:  Have a seat.

4               MS. FOURNET:  If I could just communicate a little bit to

5     my paralegal, Judge, about exhibits.

6               May I proceed, your Honor?

7               THE COURT:  Uh-huh.

8     BY MS. FOURNET:

9     Q.  Dr. Hayes, we have already discussed that you interviewed some

10    of the defense adaptive behavior witnesses, did you not?

11    A.  Yes.

12    Q.  And that would include Toni Van Buren, Theresa Minor, Vance

13    Ceaser, and Greg Williams, correct?

14    A.  Yes.

15    Q.  And they came to you voluntarily, they could have refused to

16    come but they came anyway; is that your understanding?

17    A.  I believe so.

18    Q.  Do you agree with Dr. Swanson that a semi-structured interview

19    is appropriate for these types of interviews as well as appropriate

20    for a Vineland interview?

21    A.  What types of interviews, the interviews with Toni Van Buren

22    and Greg Williams and Vance Ceaser?

23    Q.  Yes.

24    A.  They could be, it depends on the situation.

25    Q.  Well, is a semi-structured interview, that is an interview, as

1  I understand it, that consists of open-ended questions and probing

2  and that sort of thing.  Is that generally the sort of procedure

3  you used with Toni Van Buren and the other adaptive behavior

4  witnesses that you met with at the courthouse?

5  A.  I did not give them a semi-structured interview because it was

6  already indicated that the Vineland was inappropriate for

7  Mr. Williams, Ms. Minor, and Vance Ceaser.  I asked Toni Van Buren

8  a number of questions that I typically ask most individuals that I

9  interview.

10  Q.  So do you consider that in interviewing adaptive behavior

11  witnesses it is okay to use leading and other types of questions

12  that you would not use in the Vineland interview?

13  A.  If you mean by leading like "is it the case that," then, yes,

14  from time to time I think it's almost unavoidable for people to ask

15  questions like that.  It's a way of asking questions.

16  Q.  Well, you would agree that open-ended questions in general are

17  more likely to get you more information than leading questions,

18  would you agree with that?

19  A.  It'll get you information that is less structured.  If you're

20  looking for certain types of information or certain areas of

21  information you may have to lead the person more and ask them more

22  direct questions.

23  Q.  And you found Ms. Van Buren to be cordial and cooperative

24  during the course of your interview with her, did you not?

25  A.  I did.

1476

1    Q.  In fact, you told her this was not meant to be unpleasant or

2    adversarial and she seemed to accept that, correct?

3    A.  Yes.

4    Q.  Now, obviously there were some differences between your age

5    calculations, though slight, and Dr. Swanson's calculations about

6    when Ms. Van Buren may have known Paul Hardy, at what age he would

7    have been when she knew him?

8    A.  There was a difference, yes.

9    Q.  And both your calculations and Dr. Swanson's would put that age

10   at either slightly before or slightly after he turned 18; is that

11   correct?

12   A.  That's correct.

13   Q.  And the truth is, tell me if you agree with this, is that if a

14   person is impaired at 18 years and 7 months, the chances are that

15   he was also impaired at 17 years and 364 days, would you agree with

16   that?

17   A.  Generally though there are situations where that may not be the

18   case, such as the affidavit that you provided, that was a case

19   where it was my opinion that a woman was likely mentally retarded

20   in the past, and due to her family support and encouragement

21   through the years that she -- her adaptive behavior no longer fit

22   the criteria.

23        So I generally agree with that statement, but not in

24   every case.

25   Q.  And what Ms. Van Buren described to you in that interview was a

1    person with some limitations, wasn't it?

2    A.  I'll have to see if she used the word limitations.  I recall

3    her stating that as she thought back that she thought that he may

4    be limited.

5    Q.  She told you, did she not, that he could maybe make a sandwich

6    or cereal but nothing even slightly more complicated like scrambled

7    eggs; didn't she tell you that?  And that would be at her

8    transcript page 29.  Do you remember her saying that?

9    A.  Yes.

10   Q.  And she told you, just as he had told you, did she not, that a

11   lot of people around him took advantage of him, or as she put it

12   walked all over him?  And that would be on page 21 of your

13   transcript.

14   A.  I remember that she had thought that he was taken advantage of

15   by his friends, or by people who he considered to be friends.

16   Q.  Now, that's a pretty important reference, is it not, because

17   gullibility is an area that everyone recognizes can't be tested,

18   you have to rely on antidotal information; is that correct?

19   A.  Generally, yes.

20   Q.  So it would be important, would it not, to explore any

21   suggestion of gullibility with an adaptive behavior witness, would

22   it not?

23   A.  Typically, yes.

24   Q.  And certainly Ms. Van Buren gave you a basis that created a

25   suggestion that gullibility might have been an issue with

```
 1   Mr. Hardy; is that correct?
 2   A.  Correct.
 3   Q.  Let's look at how you explored that issue with Ms. Van Buren.
 4   And this is at page 21 of the Van Buren interview.  And I am trying
 5   to figure out what I have here as opposed to what's on the screen.
 6   She had told you a lot of people used him, took his kindness, you
 7   know, and just walked all over him.  Do you remember him saying
 8   that?
 9   A.  I don't have an independent recollection but the transcript
10   reflects what was said.
11   Q.  Well, it's on that transcript isn't it, there in yellow?
12   A.  Yes.
13   Q.  And then you say in what way?  Correct?
14   A.  Yes.
15   Q.  And then she says that he was, he had a lot of love for older
16   people.  But then she says, "A lot of people know if he had and I
17   don't even want to say they needed, they just wanted.  You know,
18   they would go to him for it."  And then she says, "um . . ."  And
19   you change the subject, don't you?
20   A.  I do.
21   Q.  You do not think it was important to let her finish what
22   appears to be a description of this man's vulnerability to being
23   used or manipulated by other people?
24   A.  I did follow-up on that on page 65 of my transcript when I
25   asked him did you ever feel like he was taken advantage of.
```

1  Q.  Okay, that's correct.  On page 65 you did ask him:  Did you

2  feel like he was taken advantage of?  And she said yes.  Correct?

3  A.  She said yeah.

4  Q.  And then you say by who, correct?

5  A.  Correct.

6  Q.  And then she says people that he considered friends; is that

7  correct?

8  A.  Correct.

9  Q.  Now that's pretty consistent with what he had told you, isn't

10 it, and we went over some of that earlier either today or yesterday

11 that people he considered his friends he felt had used him in

12 retrospect, so she is basically corroborating what he's told you,

13 isn't she?

14 A.  Yes, she is.

15 Q.  She also -- she talked to you about his poor sense of direction

16 and about the fact that she went with him to show him the way on

17 meals -- for his Meals on Wheels job, is that correct?

18 A.  I remember that she was with him.  Can you point me to the

19 place where it says that she had to go with him?

20 Q.  Okay.  I am going to put it on the screen, this would be page

21 37 of the Van Buren interview.

22        And note the highlighted portion there:  "Why did you go

23 with him?  I think it was on the first day, he asked me to come

24 with him and there forward I just went with him a lot.  When it

25 came to doing stuff like that, we did a lot together before Paul

1   got into the streets.  Um, I don't know, I just ..."  Right?  Am I

2   right so far?

3   A.  Correct.

4   Q.  You keep saying people pause but these dots indicate she either

5   paused or you interrupted her; is that correct?

6   A.  That's what it would suggest.

7   Q.  And it does appear that she may have been getting ready to

8   explain to you why it was necessary for her to accompany him on

9   these types of trips until, in much the same way that you did with

10  the profit issue with him, you supplied the answer, correct?

11  A.  I'm sorry, you would need to break down the question.

12  Q.  Well, instead of letting her finish you gave her a response,

13  did you not?

14  A.  I am not sure if she was finished or whether she wasn't

15  finished at that point.  But the next thing that I said was, "It

16  was enjoyable to be with him?"

17  Q.  So she didn't volunteer that, you supplied that, correct?

18  A.  Obviously that's what I said.

19  Q.  And she also told you in a different part of the transcript, at

20  page 42, that even when he would -- I'm sorry, I'm having trouble

21  reading my notes here.  Even if she wasn't with him when he was

22  outside of New Orleans or even in unfamiliar areas of New Orleans,

23  he would have to have somebody with him; is that correct?  And I am

24  looking at page 42 of the Van Buren interview.

25  A.  (WITNESS READS DOCUMENT.)  Okay.

1  Q.  Isn't she saying in that excerpt that when he traveled inside

2  New Orleans or outside New Orleans if it was an unfamiliar area

3  that he would have to be having somebody driving him or with him?

4  A.  That he would have someone with him.  Or driving, it indicates

5  both.

6  Q.  Okay.  And she also described his learning to drive as a hard

7  process, on page 34 of that interview, did she not?

8  A.  Again, if you have it.

9  Q.  I don't think we have an exhibit and I'll just keep moving.

10  A.  Okay.

11  Q.  Do you recall that she told you that even after he learned he

12  would drive two miles an hour and it would take him forever to get

13  anywhere?  And that would also be page 34 of the transcript, do you

14  recall that?

15  A.  Um . . .

16  Q.  Well, again, the transcript will speak for itself.

17  A.  Okay.

18  Q.  You had plenty of information, did you not, Dr. Hayes, from

19  Mr. Hardy, from Ms. Van Buren, from Tony and from other witnesses

20  that Mr. Hardy had to have people with him because he could not

21  find his way, at least in unfamiliar places, you had information to

22  indicate that from various sources, did you not?

23  A.  I recall that from Ms. Van Buren, not from Vance Ceaser, not

24  from Mr. Minor -- I'm mean not from Ms. Minor, excuse me.  I

25  believe Javetta Cooper had recalled him being alone.  And so I

1   think that Mr. Hardy and Ms. Van Buren had indicated that he

2   typically had people with him.

3           The surveillance records indicated that he didn't always

4   have people with him as indicated there.  So I had conflicting

5   sources of information.

6   Q.  You considered it conflicting that you had videos of him

7   driving the car alone; is that what you're saying?

8   A.  The videos, I mean, that is one area of inconsistency.  When

9   Toni Van Buren says that he would drive just two miles an hour and

10  then she said did it get any better and she says it doesn't get any

11  better until 1988 when we saw him in the videotapes.  Given that

12  she had indicated that that was when he apparently got better was

13  that year.

14          Again, you still don't know quite where she is coming

15  from in terms of when did it get better, when did it not get

16  better.  So it is what it is.  The surveillance tapes showed him

17  driving alone.

18  Q.  And Mr. Williams also told you, did he not, that he never would

19  have expected Mr. Hardy to be able to drive himself to Atlanta to

20  those games and that's why he had to do it for him, didn't he tell

21  you that?

22  A.  I believe he said that he was a tow truck driver, he knew

23  directions and that's why he always would drive is because he was a

24  tow truck driver.

25  Q.  So the answer is yes?

1  A.  Not the way that you phrased the question the answer is a no.

2  Q.  Okay.  Ms. Minor told you, did she not, at page 41 that

3  Mr. Hardy would get frustrated when he was trying to talk to her

4  because he was having trouble communicating; is that correct?

5  A.  On page 41 of my report?  Because there is --

6  Q.  No, on page 41 of the transcript of the interview with Ms. Van

7  Buren.

8  A.  Oh, Ms. Van Buren and not Ms. Minor?

9  Q.  Did I say Ms. Minor, I didn't intend to say Ms. Minor.

10        Ms. Van Buren told you, did she not, that Mr. Hardy would

11  get frustrated in trying to communicate with her sometimes because

12  he had trouble getting his point across?

13  A.  Yes, she said that she believed that she got frustrated when he

14  could not get his point across.

15  Q.  And Ms. Minor told you the same thing, didn't she?  Well, if

16  you have to look, Dr. Hayes.  You don't recall that independently?

17  A.  I am just trying to be as accurate as possible.

18  Q.  I certainly appreciate that.  But you do not recall that

19  independently?

20  A.  I recall her saying that he had difficulty with communicating

21  with her what he was wanting to say, but she was unsure of whether

22  what he was doing was defiance or not defiance and she described

23  him as normal.

24  Q.  Well, you heard her explain in her testimony what she meant by

25  defiance, didn't you?

1    A.  I did.

2    Q.  Now, Ms. Van Buren also told you that --

3              THE COURT:  Let me jump in here again.  So far what

4    you've been doing is citing her to parts of the transcript but then

5    not really asking any questions, just saying isn't it true, isn't

6    is true, and then going on to something else.  Unless you're going

7    to ask Dr. Hayes a question about what you're going over, I don't

8    need to just have it repeated back because I am going to read it

9    myself again.

10             So unless you're going to ask her a question, let's just

11   not highlight.  Do you understand what I'm saying?

12             MS. FOURNET:  I understand, Judge.  Frankly, I am

13   reluctant to ask questions because the answers are so lengthy that

14   I'm afraid it would take even more time.  So I am trying to avoid

15   that.  If you want me to avoid entirely doing that --

16             THE COURT:  I just don't need to have us read parts of

17   the record and stuff that's already in the record and then move on.

18   I mean, it's like, if you want to ask her a question about it or

19   don't you think that that's evidence of, you can do that.  Unless

20   you want to do that, I just assume move on to something that --

21   where it matters who is in the witness box, I guess.  Anybody can

22   be in the witness box if all we're going to do is go over the

23   testimony.

24             MS. FOURNET:  That's very true, your Honor.

25             THE COURT:  Okay.

```
1    BY MS. FOURNET:

2    Q.  You also led Ms. Van Buren, did you not, when she tried to

3    explain to you that -- she tried to explain to you that when she

4    got older, this is when she began looking back, this is when she

5    realized that some of the stuff she had taken for granted she now

6    realized was evidence of impairments.  Do you remember her telling

7    you that?

8    A.  I remember that she said it was only as an adult and when she

9    was in this area that she realized it.

10   Q.  And then when she told you that getting other people to do

11   things for him was his way of getting things done, you asked

12   another leading question, didn't you?

13   A.  I don't know.  I don't have the transcript memorized.

14   Q.  Let's look at page 44 of the Van Buren transcript and let's

15   begin with if.

16   A.  "If he was in the drug life, having somebody with you would be

17   a good thing, right?"

18   Q.  Now, would you describe that as a leading question?

19   A.  Yes.

20   Q.  And she agreed with it?

21   A.  Yes, she did.

22   Q.  And then you got her to affirm what you had just led her to

23   agree with, didn't you?

24   A.  Well, I gave her a possible reason to ask her if that could be

25   one possible variable.  Sometimes people haven't considered things
```

1    until they're an adult and so you may want to give them other

2    options to consider other than the fact that he may be

3    intellectually impaired.

4    Q.  Well, the truth is that prior to this leading question here she

5    had not said one word to you about having these people with him

6    because he was in the "drug life," had she?

7    A.  Not that I recall --

8    Q.  And she had talked about --

9    A.  -- because she didn't give me the information about his drug

10   life.

11   Q.  I'm sorry.  And she had talked about this business of needing

12   people with him all the time, and having a poor sense of direction,

13   she had talked about that fairly extensively, hadn't she?

14   A.  I'm not sure when the extensiveness of the needing directions

15   came up.  I remember there was other talk about it on page 66.  And

16   so I am not quite sure when the extensiveness of the directions

17   occurred.

18   Q.  Now, it would not be unusual, would it, Dr. Hayes, in your

19   experience -- you've had experience with people with mental

20   retardation in their families?

21   A.  Yes.

22   Q.  And it is not unusual, is it, for loved ones and families of

23   people who are especially mildly impaired, not to realize at the

24   time that there was an impairment going on, that's not unusual, is

25   it?

1    A.  Most families will realize that a loved one is slow or

2    something like that when the child hits school because that's where

3    usually those types of deficits are displayed.  Like Dr. Swanson

4    had said in her testimony, even children recognize other children

5    as being slow or different, and so I do think that most people

6    would be identified at some point prior to them turning around 37

7    that someone else was slow.

8    Q.  Well, and there were people who even at the time recognized

9    that something was different about Mr. Hardy, weren't there, for

10   instance, Ms. Minor saw that there was something different about

11   him when he was a little boy, didn't she?

12   A.  That's what she indicated.

13   Q.  And Mr. Williams also indicated to you that he had always

14   noticed that Mr. Hardy was not particularly bright, I think may be

15   the way he put it; is that correct?

16   A.  I think he used, it was a different phrase, but I believe

17   that's the case.

18   Q.  Or the elevator didn't go all the way to the top or something

19   of that nature?

20   A.  Something.

21   Q.  And, of course, Ms. Van Buren at the time she knew Mr. Hardy

22   first, as you yourself has pointed out, she was pretty young and

23   only about 14 years old; is that correct?

24   A.  Excuse me, I was just looking back.  I believe he was speaking

25   about Mr. Hardy's mother when he said, "She was a few cans short of

1   a six pack herself." And said then, "So you know, the elevator got

2   stuck in-between floors, so to speak."

3   Q.  I am not as concerned with the terminology here as with the

4   fact that Mr. Williams indicated to you that it was his observation

5   that Mr. Hardy was, I'll go back to my first example, not extremely

6   bright or not very bright?

7               MR. McMAHON:  Asked and answered, Judge.

8               THE COURT:  One more time.

9               MS. FOURNET:  She seems to be retracting it now, your

10  Honor.

11              THE COURT:  Answer that question, please.

12              THE WITNESS:  He did not believe he was overly bright.

13  BY MS. FOURNET:

14  Q.  Okay.  I don't think I ever got an answer to this.  Ms. Van

15  Buren back when she knew him was young and relatively

16  unsophisticated, at least at the relevant time period when she met

17  Mr. Hardy; is that correct?

18  A.  Yes, which is another reason for the Vineland issue.

19  Q.  And she told you as you've discussed that she just -- she

20  filled out applications for him and that she didn't question doing

21  that sort of thing, that she just "did it"?

22  A.  I recall her saying that.

23  Q.  He could apparently write his name, address and telephone

24  number; is that correct?

25  A.  As well as I could tell from the records that were provided to

1   me.

2   Q.  And she told you that, too, didn't she?

3   A.  I believe she did.

4   Q.  Now, a person being able to write their name and address and

5   telephone number, a mildly mentally retarded person can do this; is

6   that correct?

7   A.  Some can, some can't.

8   Q.  And at one point she seemed to be headed toward talking to you

9   about his comprehension and you interrupted her again, didn't you?

10  A.  I have no idea.

11  Q.  And I'll show you that.  Do we have page 39?  She says, "I

12  never questioned none of it."  You asked her about the name,

13  address and telephone number.  And then she says, "I know he could

14  write his name, I know he could write his address, I know he could

15  write his telephone number.  You know, I know he could answer

16  questions.  I don't know how far into understanding ..."  Would it

17  appear to you that Ms. Van Buren was trying to address the question

18  of whether he really understood the job application process and

19  whether she really understood anything more than a few basic

20  questions?

21  A.  Actually I don't know because I followed back up with another

22  question to try to clarify about did he ever fill out any

23  applications for anything.

24  Q.  Well, you didn't follow back with another question, you

25  interrupted her, didn't you?

```
1    A.  Again, you keep asking me if I interrupted her.  One of the

2    things that I say at the beginning of the interview typically is

3    that sometimes if I have enough information I'll cut you off

4    because I think I have enough information on the topic.  I don't

5    know in the situations where there's ". . ."  If a thought was just

6    left trailing or whether I cut her off.  I have no way of

7    memorizing every behavior and question I had on the interview.

8    Q.  And you felt like you had enough information about whether this

9    man really understood how the job application and hiring process

10   worked that you didn't need to probe anymore deeply into this area,

11   you just needed to ask her a question?

12   A.  I probed more into his understanding of different things on

13   different areas.

14   Q.  She told you that she was -- she was consistent with other

15   witnesses also, was she not, in how she described Marie Hardy?

16   A.  She was.

17   Q.  And, in fact, you got information from a number of witnesses,

18   including Faith Price and others, that Ms. Marie Hardy seemed to,

19   as Mr. Williams put it, be one beer short of a six pack or

20   something to that effect?

21          THE COURT:  We have been over this several times.

22   BY MS. FOURNET:

23   Q.  Mr. Williams also told you that Paul couldn't take care of

24   nothing and he would get Greg Williams to do and he never went

25   anywhere by himself?
```

1          MR. McMAHON:  To reiterate again the court's concern,

2     it's not a question, it's an iteration of the transcript.

3          THE COURT:  Please let's not read the transcripts, let's

4     ask questions.

5     BY MS. FOURNET:

6     Q.  Did Mr. Williams also describe Mr. Hardy as someone who was

7     easily manipulated?

8     A.  I believe he had indicated that there was nothing that he would

9     not do for his friends and that he thought that that was one of his

10    best qualities.

11    Q.  Well, he told you, did he not, that Mr. Hardy was a believer in

12    whatever you told him; is that what he said?  Never mind.

13    A.  Yes.

14    Q.  In his description of Mr. Hardy's rank in the drug selling

15    business, as you put it, was consistent with what Mr. Hardy himself

16    told you, wasn't it?

17    A.  Can you refer me to where you're speaking?

18    Q.  That is he indicated that Mr. Hardy was just a lookout man or

19    man who walked the path, page 51.

20    A.  I believe that's when he was referring to, at the bottom of

21    page 50, the top of page 51, "Paul used to work with a guy from

22    uptown that was a drug dealer, he used to be a lookout man or walk

23    the pack.  That's all Paul ever done."  I believe he was referring

24    to when he was younger.

25    Q.  Okay.  In fact, did Mr. Williams ever say in the course of that

1    interview that Mr. Hardy was the leader of a so-called drug

2    organization?

3    A.  No.  He described himself as a leader.

4    Q.  And, in fact, you at one point supplied Mr. Williams with the

5    term drug organization, didn't you, in much the same way that you

6    supplied answers in other situations; am I correct?  That you used

7    that term on page 51?

8    A.  I do.  I was saying so we were discussing other things before

9    that related to his mother, and so following back up on something

10   earlier I believe I said, "So when he was young, he started being a

11   lookout, and then he graduated up in the drug organization."

12   Q.  And that's your word, not his, isn't it?

13   A.  That's my word.

14   Q.  You interviewed Theresa Minor, correct?

15   A.  I did.

16   Q.  And you heard her testify in court?

17   A.  Yes, I did.

18   Q.  And she gave a pretty vivid description of the challenges Paul

19   had, Paul Hardy had as a child, didn't she?

20   A.  She gave a vivid description of how he was unable to tie his

21   shoe.  I'm still unaware whether he had Velcro shoes.

22   Q.  She also described how he would get frustrated or flustered

23   when he couldn't do something, didn't she?

24   A.  I believe that she testified that when he couldn't do something

25   he would usually leave the room.  In my interview she described him

1    as a committee of one, that he would make his own decisions and

2    then would leave.

3    Q.  We've talked about masking, have we not?

4    A.  Yes.

5    Q.  And Ms. Minor indicated in her interview with you that

6    Mr. Hardy masked because he was ashamed to say he didn't know,

7    didn't she tell you that?  Didn't she tell you that her son would

8    tell her if he didn't know something but Paul would be ashamed to

9    tell her?

10   A.  I don't believe she used the word masked.

11   Q.  No, I am not suggesting tat she did.  She did use the word

12   shamed though, didn't she?

13   A.  Shamed?

14   Q.  Shamed.

15   A.  Yes, she said that -- "I said to myself, well, he is just being

16   defiant --" Let me start again because I obviously messed up the

17   quote.

18   Q.  It's a simple question, Dr. Hayes.  Did she say that he was

19   shamed that he could not perform certain tasks?

20   A.  She says that at the time she said to herself, "Well, it's just

21   being defiant, he don't want to, you know, participate, but I guess

22   he was shamed to say he didn't know."

23          THE COURT:  Ms. Fournet, we are doing the same thing.

24   All we're doing is reading out portions of the transcript, which is

25   in the record which I am going to consider.  And to the extent that

1    you're asking Dr. Hayes questions, obviously she has a different

2    view of the significance of the evidence, you're probably not going

3    to get an answer that you particularly want.

4         So I don't know how much further we want to go with this

5    kind of questioning.

6         MS. FOURNET:  I'll move on, your Honor.

7         THE COURT:  All right.

8    BY MS. FOURNET:

9    Q.  Would you agree, Dr. Hayes, that these folks were pretty

10   consistent with each other on some pretty important points:  The

11   driving, the sense of direction, the cooking, the gullibility, the

12   vulnerability to manipulation, the apparent impairments of Marie

13   Hardy?  You got some pretty consistent information across these

14   various witnesses, didn't you?

15   A.  You added about five things at the end and I can't tell you

16   that I believe that they're all consistent with each other, nor

17   with the records.

18   Q.  Okay.  You got a number of descriptions of Mr. Hardy by even

19   people in his own community as being different or slow, didn't you?

20   A.  Descriptions from people in his community?

21   Q.  Never mind.  His school records are also consistent with

22   someone who was having trouble achieving, were they not?  Because

23   his grades, while there may have been some variation, his grades

24   were generally low?

25   A.  If you look at where his class rank was, he was generally in

1    the middle of the pack to a little below.  And so if you want to

2    say that a half to a little bit lower than a half of the students

3    at Booker T. Washington all have these difficulties, then I would

4    agree.  But compared to his peers, he did not.

5    Q.  And his IQ scores, the 1996 IQ scores were also relatively low,

6    were they not?

7    A.  Yes, they were.

8    Q.  Now, beginning at page 111 of your report.  And for the next 64

9    pages of this 178 page report you document evidence that, facts or

10   information that you describe as evidence of adaptive behavior, do

11   you not?

12   A.  Evidence or non-evidence of adaptive behavior.  There were

13   indications of both.

14   Q.  Now, if you look at page 111 you've divided into domains the

15   information, and you went over some of this with Mr. McMahon, and

16   you described this as a list of various adaptive behavior domains

17   and evidence of Mr. Hardy's adaptive behavior as reflected in those

18   records or during these interviews; is that correct?

19   A.  Yes.

20   Q.  And obviously what you included in those 64 pages was a capsule

21   version of what you consider evidence of adaptive behavior on

22   Mr. Hardy's part; is that correct?

23   A.  Either adaptive behavior for or against.

24   Q.  Okay.  Well, in fact, the vast majority of what you list on

25   these pages are evidence of competencies, not of deficits, you

1    would agree with that, wouldn't you?

2    A.   Correct.   This is based primarily on the records because all of

3    the interviews are contained as appendices to the record, so one

4    can review them themselves and come to their conclusions.

5    Q.   Let's talk about those competencies.   Page 114, Mr. Hardy was

6    observed conversing with other inmates.   Do you consider conversing

7    with other inmates a competency that would undermine a diagnosis of

8    mild mental retardation?

9    A.   No.   But again, that is one area in a multitude that one must

10   consider in coming to a conclusion or not as to whether an

11   individual has mild mental retardation or not.

12   Q.   Ms. Van Buren indicated, this is page 116, Ms. Van Buren

13   indicate that Mr. Hardy dressed appropriately for the weather.   I

14   assume you mean -- you meant to put a coat on when it was cold and

15   not to wear a coat when it was hot, is that basically what you

16   meant about dressing appropriate?

17   A.   Correct.

18   Q.   Does that ability in any way undermine a diagnosis of mild

19   mental retardation?

20   A.   It does not undermine it, but again it is one factor in a

21   multitude that should be considered when one is trying to come to a

22   diagnosis as to whether an individual is mentally retarded or not.

23   Q.   I'll just through a tick list and I'll ask you whether any of

24   these would undermine a diagnosis of mental retardation in order to

25   save time.

1              At pages 117 to 118, Mr. Hardy had such items as

2    toothpaste and soap in his cell; page 126, Mr. Hardy was polite and

3    friendly during the evaluation; page 127, Mr. Hardy kept secrets

4    about females; page 129, Mr. Hardy had pictures of scantly clad

5    females in his cell phone during the evaluation; page 155,

6    Mr. Hardy indicated that his mother's name was Marie Hardy and he

7    reported her telephone number, he recalled her date and place of

8    birth.  Do you consider that knowing his mother's name undermines a

9    diagnosis of mild mental retardation?

10   A.  No.  But you gave a long list of things other than that.  One

11   of the things you said is that he had pictures of scantly like clad

12   women in his cell phone.  I don't think he had a cell phone in

13   jail.

14              THE COURT:  She meant to say cell.

15              MS. FOURNET:  I meant to say cell.  I'm sorry.  I did

16   mean to say cell.  Thank you for correcting me.

17   BY MS. FOURNET:

18   Q.  This is page 162, he enjoyed going to children's birthday

19   parties; page 165, Mr. Hardy put on earphones to listen to music;

20   page 172, Mr. Hardy bought cough drops at the commissary.  Tell me

21   which of those items, and trust me they are only illustrative,

22   which of those items undermine a diagnosis of mild mental

23   retardation in your view?

24   A.  None of them undermine but they all go to adaptive behaviors

25   that an individual has that would make that individual more towards

1    the mentally retarded end or not.  For example, children's birthday

2    parties is he would enjoy being around other people and attending

3    functions with groups of individuals.

4          Cough drops, that would mean that he was able to order

5    those cough drops from the commissary, recognized what they were

6    for, and then used them as necessary.

7          So you can take each of these things and say may or may

8    this not be an indicator of mild mental retardation, and almost all

9    of them will say, well, maybe, maybe not.  But it's when you put

10   them together in combination that results in my opinion that

11   Mr. Hardy is not a person with mental retardation.

12   Q.  So these are some of the factors that weigh in favor of that

13   opinion is what you're saying?

14   A.  These and many, many others.

15   Q.  Dr. Hayes, would you agree that DSM indicates that there are no

16   exclusionary criteria for mental retardation?

17   A.  What do you mean?  Can you refer me to the quote when it's

18   referring to that?  You mean just because a person can drive it

19   doesn't mean that he or she is mentally retarded?

20          THE COURT:  Is not mentally retarded, I think.

21          THE WITNESS:  Oh, I'm sorry.

22   BY MS. FOURNET:

23   Q.  Exclusionary criteria, isn't that a term of art in your

24   profession?

25   A.  When you use criteria then it's going to make it more

1    scientifically driven.  As far as I can remember, in terms of the

2    diagnostic criteria for mental retardation, just so I won't belabor

3    the point even more, there was Criterion A, Criterion B,

4    Criterion C.  And I don't remember there being in terms of any

5    exclusionary criterion, anything other than those.  If you talk

6    about behaviors, that's another issue.

7    Q.  What is your understanding of what exclusionary criteria, the

8    term which I understand is a term of art?

9    A.  In my opinion when you talk about, like here, I've got the

10   diagnostic criteria for mental retardation, I believe this is from

11   the Fourth Edition of the DSM, I am not sure, it's just sitting

12   here.  These are the diagnostic criteria.  If an individual does

13   not meet the diagnostic criteria such as, say, onset before the age

14   of 18 years, that would exclude an individual from a diagnosis of

15   mental retardation.  So that would be an exclusionary criteria.

16   Q.  So you're saying there are exclusionary criteria for mental

17   retardation?

18   A.  Certainly.  If a person doesn't have significantly subaverage

19   intellectual functioning, that's an exclusionary criteria.  If a

20   person does not have significant impairments in adaptive

21   functioning or substantial impairments, that's an exclusionary

22   criteria.  If a person didn't manifest these deficits prior to the

23   age of 18, then that's an exclusionary criteria.

24   Q.  Well, rather than take up the court's time looking for it, that

25   is your understanding of exclusionary criteria; in other words, if

1    he doesn't meet Criteria A that means that's excluded?  That's what

2    exclusionary criteria means in your profession?

3    A.  When one is speaking about the *Diagnostic and Statistical*

4    *Manual of Mental Disorders*, the disorders that are included in

5    there have different criteria.  If a person does not meet those

6    criteria than then that individual is excluded from being able to

7    be labeled with that diagnosis.

8    Q.  And as I understand it, and maybe I am wrong about this so

9    please correct me, my understanding of exclusionary criteria is

10   that no matter what other diagnosis a person has, if he meets the

11   criteria for mental retardation, you must diagnosis him with mental

12   retardation; that is my understanding of not having exclusionary

13   criteria.  Is that not your understanding?

14   A.  Not in terms of the DSM.  You had referred to the DSM.  What

15   you're saying now is no matter what diagnosis a person has that if

16   he or she meets diagnostic criteria for mental retardation, then he

17   or she would be diagnosed with mental retardation?

18   Q.  Yes.  Is that your understanding of how this assessment is

19   supposed to work?

20   A.  That's my understanding.  You can have comorbidity, a person

21   can be mentally retarded and also be depressed.

22   Q.  Dr. Hayes, do you look at your job as an evaluator in this

23   context or others regarding mental retardation, do you look at your

24   job as one of ferreting out all evidence of things Mr. Hardy could

25   do and focus on them to show that he did not have mental

1    retardation; is that how you perceive your task?

2    A.  Not at all.

3    Q.  Of course you, yourself, have recognized that a person with

4    mild mental retardation can function reasonably successfully in

5    society and in the community with -- often with some assistance but

6    he can do that, can he not?

7    A.  Many individuals with mild mental retardation can function

8    reasonably in society with some assistance.

9    Q.  And that means that a person who is mildly mentally retarded

10   can hold a job, can get married, can finish high school, at least

11   in some instances; is that not correct?

12   A.  I would agree that many people with mild mental retardation can

13   get married and can hold a job.  I am not familiar with statistics

14   on whether individuals with mild mental retardation, what are their

15   completion of high school rates in terms of getting a diploma

16   versus getting a certificate, I don't have that data off the top of

17   my head.

18   Q.  Now, you have stated earlier with respect to the first

19   criterion for mental retardation that you have an opinion that

20   Mr. Hardy was not malingering; is that correct?

21            THE COURT:  We have been over this a lot.

22            MS. FOURNET:  I am just recapping, Judge, I have like

23   five more questions.

24            THE COURT:  All right.  Go, go, go.

25            MS. FOURNET:  I am recapping your earlier testimony.

```
 1              THE COURT:  Okay.
 2   BY MS. FOURNET:
 3   Q.  You have an opinion that he was not malingering, correct?
 4   A.  I do not believe that he was malingering with regard to the
 5   definition as it exists in the DSM.
 6   Q.  And you also have not pointed to any behavioral indications in
 7   any of the records that would suggest any explanation for reduced
 8   effort, such as fatigue or hunger or any of that; is that correct?
 9   A.  One of the indicators could be fluctuating attention and there
10   were fluctuating attention scores such as in digit span backwards,
11   Trails B, thing like that.  So we definitely had fluctuating
12   attention, which was one of the reasons why I went with
13   inconsistency.
14   Q.  And you still have questions about the reliability of those IQ
15   scores, but you're not saying affirmatively that they're
16   unreliable, are you?
17   A.  I am saying affirmatively that they are unreliable.
18   Q.  Okay.  And you simply take the position that there was not
19   sufficient evidence in your view of adaptive functioning deficits
20   for him to meet the second criteria of mental retardation; is that
21   correct?
22   A.  It was my opinion that based upon the totality of the
23   information available to me at the time that I wrote the report and
24   as I sit here today, that Mr. Hardy does not meet Criterion B for
25   the diagnostic criteria for mental retardation.
```

1    Q.  Or C, correct?

2    A.  Or C.

3    Q.  So you have an opinion, a final opinion.  And as far as I can

4    discern, the only opinions that you formed during the course of the

5    evaluation were the following: (A) you have an opinion that

6    Mr. Hardy was not malingering, correct?  (B) you have an opinion

7    that he met none of the three criteria for mental retardation.

8    Those are the only opinions, I believe, that you have stated either

9    in your report or in this courtroom.  Is that correct?

10   A.  Can you repeat that again because you lost me on one of them

11   because I thought you were saying one thing and you said something

12   else.

13          MS. FOURNET:  Never mind, never mind.  Thank you.  I

14   tender.

15          THE COURT:  A lot of redirect was done on cross.  If you

16   have redirect, come on up.

17                         REDIRECT EXAMINATION

18   BY MR. McMAHON:

19   Q.  Talking about, Dr. Hayes, your sources.  You reviewed much more

20   information than did Dr. Swanson.  Why?  Why was it important here?

21   A.  Obviously because this is a capital case and because the

22   additional sources of information will shed a great deal of light

23   on Mr. Hardy's functioning in and around the time of the crime as

24   well as before the time of the crime.  Those other sources of

25   information would give you information about how he's functioning

1    up until today.

2              So just relying on the self-report of Ms. Van Buren and

3    the other individuals that we've discussed I thought was poor

4    practice.

5    Q.  Going to the Dedeaux videos.  Have you seen other videos, for

6    example, one called Urban Warrior Scrapbook with Wayne Hardy, did

7    you look at that one?

8    A.  Yes.

9              MS. FOURNET:  Your Honor, I would submit that this is

10   outside the scope of cross-examination and I would object to it.

11             MR. McMAHON:  Actually, it's not.

12             THE COURT:  I don't remember if you asked questions --

13   you did ask questions about the videos, so go ahead.

14             MS. FOURNET:  Not about whatever one he is talking about.

15             THE COURT:  That's okay.  Go ahead, Mike.

16   BY MR. McMAHON:

17   Q.  And there was at least one other video exclusively devoted to

18   Wayne Hardy shot by Dawn Dedeaux, are you familiar with that one,

19   too?

20   A.  I recall.

21   Q.  So in response to the questioning on cross-examination that

22   Wayne Hardy seemed to be the more voluble of the two, actually he

23   was, for lack of a better term, the star of Dawn Dedeaux's little

24   video series, correct?

25             MS. FOURNET:  Judge, I object to the leading.

```
 1              MR. McMAHON:  She is an expert, your Honor.
 2              THE COURT:  But this is not in her expert area.  So
 3    please don't lead unless it's in the expert area.
 4              MR. McMAHON:  Okay.
 5    BY MR. McMAHON:
 6    Q.  That driving -- I think there was a misconception.  That
 7    driving video we saw, were they on their way to a murder scene or
 8    did it just happen upon a murder scene?
 9    A.  To tell you the truth, I don't know that they went over in the
10    video, whether they were on their way or they happened upon it.  I
11    know that that occurred later in the video scene.  And so I don't
12    know what the intention was initially.
13    Q.  You didn't see a police scanner in that car, did you?
14    A.  No, not at all.
15    Q.  I mean, it seems ludicrous to suggest that they're driving on
16    their way --
17              MS. FOURNET:  Judge, I object.
18              THE COURT:  Sustained.
19              MR. McMAHON:  I'm sorry, I couldn't resist, Judge.
20              THE COURT:  That's all right.
21    BY MR. McMAHON:
22    Q.  Was there any evidence regarding malingering of any of the
23    other I guess possibilities such as or intervening factors such as
24    fatigue, hunger, distraction, things like that?
25    A.  Those are certainly possibilities that --
```

1  Q.  The question was, was there any evidence that you were able to

2  discern that those existed?

3  A.  Say the things again.

4  Q.  In reference to the suggestion, well, that the reduced level

5  in, for example, the neuropsychological testing was the result more

6  of these other intervening factors such as fatigue, hunger,

7  distraction as opposed to simply not trying hard enough?

8  A.  There was no evidence of fatigue that I can recall that was

9  noted.  None of hunger that I can recall.  And distraction, he had

10  inconsistent attention.  And so in as much as attention and

11  concentration are related, there was evidence of inconsistent

12  attention, which was suggesting inconsistent effort.

13  Q.  And talking about street smarts.  Isn't the fact that a person

14  may be street smart in their own milieu, I mean, that really

15  dovetails precisely into the definition of adaptive functioning,

16  correct?

17  A.  Correct.  In fact, I think that's something that's been lost in

18  the weeds here is that you have to consider a person in his or her

19  own culture and environment and what was necessary for that person

20  to adapt properly in that area.

21  Q.  And would you agree that adaptive standards are not lower, for

22  example, in the ghetto, but the ghetto has its own people -- I

23  don't want to say ghetto, but in the criminal subculture, they

24  develop their own sets of skills, would that be an accurate

25  statement?

1  A.  I think that they do.  Depending on where you grew up.  Like,

2  for example, I grew up in Georgia on the coast.  I had to learn how

3  to crab.  If you grew up in the -- in Kansas you may not know how

4  to do that.

5        People are dependent on their cultures and the

6  environment is important, and so using all people to compare one

7  individual to is not going to be representative of how that

8  individual functions in his or her environment.

9  Q.  Adaptive deficits have to be significant, do they not?

10  A.  It has to significantly impair their ability or a person's

11  ability to operate in his or her culture and world.

12  Q.  In reference to masking, I mean masking doesn't mean completely

13  being able to totally hide deficits from those closest to you for

14  20 years, correct?

15  A.  Correct.

16  Q.  I mean, there has to be some evidence at the time even though a

17  person may be masking in some area or trying to mask, people are

18  going to know and they're going to realize as such --

19        MS. FOURNET:  Your Honor, I object to the testifying.

20        THE COURT:  Yeah, we are testifying.

21  BY MR. McMAHON:

22  Q.  Can you mask everything forever?

23  A.  Not in my opinion.

24  Q.  Regarding gullibility.  Is generosity gullibility?

25  A.  No.

1  Q.  And is it a sign of gullibility when perhaps people realize in

2  retrospect that their generosity was not appreciated?

3  A.  No.

4  Q.  The testimony and your interview with Hardy regarding the

5  rental car man, that was a self-report?

6  A.  I believe Mr. Hardy brought up the rental car man.

7  Q.  And in reference to the testimony on cross-examination when

8  Ms. Fournet directed you to pages 199, 203 and 202 of the

9  transcription of your interview with Hardy, from what you're able

10 to discern, the people who operate in the drug trade, the conduct

11 of their business is not marked by niceties, is it, it's a

12 cut-throat trade?

13 A.  That's my understanding.

14 Q.  And who said Hardy was not a very good drug dealer, anybody?

15 A.  Give me a second, I'm trying to process through a few people.

16 Q.  Let me move on.  Is there any evidence whatsoever that Paul

17 Hardy was simply a mule or a street corner pusher?

18 A.  There was evidence that he --

19 Q.  I am not talking about earlier in life.  I'm talking about once

20 he hit, you know, once he graduated to his own crew, organization,

21 is there any evidence in that operation what he was doing then that

22 he was merely a mule or a simple street corner pusher?

23 A.  None whatsoever.

24 Q.  Paul Hardy was not from the Florida project, was he?

25 A.  No, he was not.

1  Q.  He grew up in the Calliope project, did he not?

2  A.  Yes, he did.

3  Q.  So he adapted to drug trade in the Florida project, did he not?

4  A.  Yes, he did.

5  Q.  Do you read the newspapers on a regular basis?

6  A.  No.

7  Q.  You don't.  Do you know that in New Orleans now, in fact --

8          MS. FOURNET:  Judge, I object to the testifying and

9  information obtained from newspapers that the witness has said she

10  didn't read.

11          MR. McMAHON:  I'll move on.

12          THE COURT:  There's only so much we can control, Mike

13  McMahon, we're doing the best we can, but he's a little bit like

14  Mike Fawer, if you don't mind the comparison, but you're just hard

15  to control so we'll do the best we can.

16          MR. McMAHON:  I'll actually take that as a compliment.

17          THE COURT:  Good.  I'll have to ask Mike Fawer if he

18  feels the same.

19  BY MR. McMAHON:

20  Q.  Are you aware that there is a great deal of neighborhood

21  rivalry in New Orleans, especially in the drug trade?

22  A.  Absolutely.

23  Q.  So it does take a degree of adaptation to move from the

24  Calliope to operate in the Florida?

25  A.  Yes, it does.  Adaptation and social skills and the ability to

1    get along in another environment.

2    Q.  And Hardy was able to operate without being caught dealing

3    drugs for a number of years; in fact, but for the wire tap he would

4    not have been caught or at least that's how he was caught, correct?

5            MS. FOURNET:  Judge, I object to the testifying.

6            THE COURT:  Yeah, you really --

7            MR. McMAHON:  Yes, ma'am.

8    BY MR. McMAHON:

9    Q.  Is it a sign of mental retardation if you show up for work but

10   nobody's there to direct you and really you don't know what to do,

11   as in that Superdome, the Aramark scenario?

12   A.  No, it's not.

13   Q.  Do you have any objective evidence to suggest that it was other

14   prisoners, and not Mr. Hardy, who wrote his letters or filled out

15   his commissary requests or his medical sick leaves?

16   A.  No, I do not.

17   Q.  Was Special Agent Cosenza involved in the interview with

18   Javetta Cooper?

19   A.  No.  He simply knocked on the door, verified who she was, and

20   indicated that he had someone that wanted to talk to her.

21   Q.  Do you recall upon arriving in the Dallas area that we

22   initially went to, you, myself and Special Agent Cooper -- Special

23   Agent Cosenza in looking for Ms. Cooper originally went to a

24   development first where we thought she might live?

25   A.  Yes.

1    Q.  Did she live there?

2    A.  No.

3    Q.  So you did not know ahead of time where Javetta Cooper lived?

4    A.  No, I did not.

5    Q.  Did not Ms. Cooper tell you that she would not agree to meet

6    with you at an alternative date or time?

7    A.  That is true.

8    Q.  Terry Hardy would not interview after consulting with defense

9    counsel, would he?

10   A.  No, he would not.

11   Q.  Nor did Linda Hardy?

12   A.  No, she did not.

13   Q.  Do you still stand by your feeling that by attempting to

14   arrange an interview with Javetta Cooper by remotely and by long

15   distance ahead of time she would have, and to use the phrase, she

16   would have blown you off and she would not have cooperated, do you

17   still stand by that opinion?

18   A.  Definitely.

19   Q.  Just to correct for the record, you mentioned surveillance

20   tapes.  Did you mean to say logs?

21   A.  Yes.

22   Q.  You talked about Toni Van Buren's age relative that there was

23   an issue regarding her role as a Vineyard (SIC) respondent.  Can

24   you very briefly elaborate on that for the court?

25   A.  It's Vineland, not Vineyard.  Freudian slip.

```
1              MR. McMAHON:  My mind --

2              THE COURT:  You just want a drink, that's all.

3              MS. FOURNET:  Your Honor, if we're going to go through

4     the age calculations again of when Ms. Van Buren --

5              THE COURT:  Ms. Fournet, I think he is doing fine, I

6     think he's moving along pretty quickly, and I think it's not going

7     to last too long.  So go ahead.

8              THE WITNESS:  I think that there was not only the issue

9     of the age calculation, there is the issue of inconsistencies

10    between what Ms. Van Buren said and what the records reflected.  I

11    also feel like Dr. Swanson's Vineland did have some errors in it,

12    we all make errors, I think that they were probably just

13    oversights.

14             But another thing that -- for significant concern is that

15    she asked Ms. Van Buren to rate Mr. Hardy on basically the day that

16    she met him.  Whether that was 17:5 or 18:5, whatever that date is,

17    there is absolutely no way that she would be able to rate Mr. Hardy

18    based upon the day that she met him.

19    BY MR. McMAHON:

20    Q.  And of course a reference to the ellipses, whether it was an

21    interruption by you or a natural course of the conversation, these

22    are -- those all -- when Ms. Fournet was questioning you on these

23    various transcript excerpts, all of those were videotaped as well

24    to inform the court, correct?

25    A.  Certainly.  I feel it's more intellectually honest to
```

```
 1   videotape.
 2              MR. McMAHON:  That's all I have, your Honor.
 3              THE COURT:  Okay.  All right.  What I would like to do, I
 4   assume your officers have gone home.  It's a quarter of three and I
 5   can kind of -- what I would like to do, if we're going to recess
 6   for the day, I would like to start tomorrow at eight and then
 7   you'll have your officers here for eight --
 8              MR. McMAHON:  Yes.
 9              THE COURT:  -- and then -- you have three?
10              MR. McMAHON:  Yes, ma'am.  Yes, your Honor.
11              THE COURT:  And then you all presumably should be
12   prepared to do rebuttal, start rebuttal tomorrow.
13              MR. LARSON:  Your Honor, we are.  If we could have a
14   brief conference.
15              THE COURT:  Do you want to talk about scheduling, too?
16              MR. LARSON:  Yes, Judge.
17              THE COURT:  Do you want to do that in the back?
18              MR. LARSON:  Please.
19              THE COURT:  You may step down, you're done.
20              THE WITNESS:  Thank you, your Honor.
21              THE COURT:  All right.  Let's go to the back.
22              THE DEPUTY CLERK:  All rise.
23          (WHEREUPON, A RECESS WAS TAKEN.)
24          (OPEN COURT.)
25              THE COURT:  We're back on the record, and this has to do
```

1   with the possibility of calling Dr. Flynn and Dr. Greenspan.

2           MR. LARSON:  Your Honor, Herbert Larson on behalf of Paul

3   Hardy.  Your Honor, we had proposed to call in rebuttal Dr. James

4   Flynn to offer testimony regarding the applicability of the Flynn

5   Effect as across all IQ levels with specific reference to the

6   WAIS-R IQ examination, which was the one that was administered to

7   Paul Hardy on two occasions.

8           The purpose of calling Dr. Flynn would be, in our

9   opinion, to rebut the testimony of Dr. Hayes with regard to that

10  specific, very specific point that she felt that the only studies

11  that addressed the applicability of the Flynn Effect to people with

12  IQs in the 70 to 75 range came from a study by Kanaya that only

13  addressed the WISC-R test, which is given to adolescents or

14  younger, people below the age of 17 and younger.

15          And our purpose would be to offer the specific testimony

16  of Dr. Flynn that as to why the effect should, in fact, be applied,

17  even in light of the fact that the only research data apparently in

18  which they have had test-retest situations is the Kanaya study.

19          THE COURT:  Kim, can you put the mikes on?

20          With respect to Dr. Flynn, a couple of issues.  One, I

21  wanted to determine if, in fact, in Dr. Hayes's expert report,

22  previously tendered to the defendant, whether she, in fact, had

23  addressed the issue of the applicability of the Flynn Effect to

24  borderline, adults with borderline intelligence, which she had, in

25  fact, addressed that; but in the various articles that she cited in

1    her report she did not mention the Kanaya study and the issue of

2    her discounting of the Kanaya study because it was based only on

3    children did not arise until she was actually on the stand

4    testifying.

5            So to that extent, I think the issue of whether or not

6    the Kanaya study or the results of the Kanaya study would be

7    applicable to adults would be a proper area of rebuttal.

8            My next concern was that Dr. Flynn, any information by

9    Dr. Flynn himself, his qualifications, his CV have not been

10   disclosed previously to the government.  We also explored to some

11   extent in the back what Dr. Flynn would actually say or what

12   Dr. Cunningham might say after having conversed with Dr. Flynn, and

13   basically it was to the effect that if the Kanaya study shows a

14   Flynn Effect in borderline mentally retarded children, which is up

15   to the age of 17, then it would be illogical to assume that there

16   would be no Flynn Effect after the age of 18 with adults of

17   borderline intelligence, that's essentially what Dr. Flynn would

18   say.

19           Dr. Cunningham essentially could make the same deduction

20   based on his experience, and I understand he is going to be called

21   as a rebuttal witness.  And so I don't see -- and I think also, if

22   I recall also Dr. Cunningham listed in his documents in support of

23   his opinion, both the Kanaya study and also Dr. Flynn's own study

24   which has an elephant in the title of it, which apparently I have

25   not read it recently, I scanned it, I read it before but have not

1    read it recently, I gather indicates that the Flynn Effect to be

2    applicable in the lower intelligence ranges as well for adults.

3         So I think there is sufficient rebuttal available to the

4    defense and it's not necessary to call Dr. Flynn and it would be

5    prejudicial to the government to call Dr. Flynn in light of the

6    lack of any prior notice that he might be a potential rebuttal

7    witness.

8         I think that covers -- did I cover the points as far as

9    Dr. Flynn is concerned?  Is the government satisfied?

10        MR. MILLER:  I believe so, yes, your Honor.

11        THE COURT:  Michele, do you want to address

12   Dr. Greenspan?

13        MS. FOURNET:  With respect to Dr. Greenspan, your Honor.

14   First, Dr. Greenspan would adopt Dr. Flynn's opinion on the Kanaya

15   study and would testify that he is familiar with Dr. Flynn and

16   Dr. Flynn's work and that he agrees completely with what Mr. Larson

17   just described as Dr. Flynn's position on the applicability of the

18   Flynn Effect to adults in the lower IQ range.

19        Further, and secondly, Dr. Cunningham -- I'm sorry,

20   Dr. Greenspan would testify that he is an active member of AAIDD,

21   he would give a description of that organization, he would differ

22   with Dr. Hayes's description of that organization as solely an

23   advocacy organization, and would further explain that this is the

24   premiere organization for professionals in the field of mental

25   retardation of all sorts, and that it has a very important research

1    component; that it is more than an advocacy organization, that is

2    it is the premiere research oriented organization in the field of

3    mental retardation in the country.

4            Further, and No. 3, Dr. Greenspan would testify that he

5    has reviewed Dr. Hayes's report.  And while he has not reviewed all

6    of the underlying documents that support that report, simply from

7    reading the face of the report, it is apparent to Dr. Greenspan

8    that Dr. Hayes did not focus on deficits and that while she

9    mentioned deficits a time or two, the primary, indeed almost

10   exclusive focus, of the report is on competencies.  He would

11   reiterate that a person with mental retardation can have

12   competencies, and that in focussing on competencies she is taking

13   the completely inappropriate analytical approach to performing a

14   mental retardation assessment and that this is a fundamental flaw

15   in her conclusions.

16           He would further testify that this type of focus is what

17   he would describe as cherry picking and that when experts engage in

18   this type of approach to a mental retardation assessment and in

19   this report in particular that this expert is acting as an advocate

20   for her side rather than as a scientist.

21           And that is the summary of what Dr. Greenspan would say.

22           THE COURT:  Okay.  My concern about Dr. Greenspan from

23   prejudice to the government's standpoint is the same as Dr. Flynn,

24   that they had no prior notice that Dr. Greenspan might possibly be

25   a witness in this case.  Obviously no expert report, no curriculum

1   vitae and so forth.

2          We also, with respect to the first -- and also I think

3   it's unnecessary to call Dr. Greenspan for the following reasons:

4   With respect to him saying that he agrees with Dr. Flynn, we have

5   in the record, as I already indicated, Dr. Flynn's own articles.

6   We also have Dr. Swanson having already testified and

7   Dr. Cunningham already testified that they agree with the Flynn

8   Effect and those two experts were given, the government was given

9   plenty of notice about both of those experts, so I think it would

10  be redundant.

11         With respect to the organization as an advocacy

12  organization, I have no problem with -- well, actually I have no

13  problem with Dr. Cunningham or Dr. Swanson addressing that because

14  I think that is proper, would be proper rebuttal as to what kind of

15  organization this organization is, and I'm sure both Dr. Cunningham

16  and Dr. Swanson are capable of doing that.  I also have no problem

17  if the defense wants to provide to me the mission statement or any

18  documents from that organization that self-describe what its

19  purpose is or describe what they do.

20         So again, I don't think Dr. Greenspan is needed for that.

21         With respect to Dr. Greenspan's opinion that Dr. Hayes's

22  report was focused on strengths rather than deficits, there is

23  evidence already in the record, including I believe the user's

24  manual for the Vineland that indicates that it should be focused on

25  deficits, not on strengths.  Plus I think both Dr. Swanson and

 1   Dr. Cunningham testified to that effect.  So there's sufficient

 2   evidence in the record already as to that particular criticism of

 3   Dr. Hayes's report.

 4          As far as cherry picking goes and being agenda driven and

 5   advocate, that would be beyond the expertise of Dr. Greenspan to

 6   testify to, so those are the reasons why I don't think -- that's

 7   why I precluded both Dr. Flynn and Dr. Greenspan from being called.

 8          Anything I did not cover, from the government's

 9   standpoint?

10          MR. MILLER:  Nothing from the government.  Thank you,

11   very much, your Honor.

12          THE COURT:  We are going to start at nine because as I

13   understand it we will have the St. Bernard Parish deputies, I

14   understand that Dr. Cunningham is not going to be lengthy, and it's

15   unknown yet at this point if Dr. Swanson's going be recalled, but I

16   assume that her testimony would not be a full direct examination

17   again either.

18          Do you have anybody else besides -- I understand

19   Dr. Woods is not available tomorrow?

20          MS. FOURNET:  Not at this point.

21          THE COURT:  Because we don't want to have redundant

22   rebuttal either.

23          MS. FOURNET:  I seriously doubt.  I can't promise we

24   won't call Dr. Woods, but I don't even know that he'll be here for

25   us to call.

1          THE COURT:  Okay.  So at this point it would be

2  Dr. Cunningham for sure and possibly Dr. Swanson as your rebuttal

3  witnesses, and you just have the three correctional officers

4  tomorrow morning?

5          MR. MILLER:  Yes, your Honor.

6          MR. McMAHON:  That's correct.

7          THE COURT:  I think we can happily start at nine o'clock.

8          MR. MILLER:  Thank you, your Honor.

9          MS. FOURNET:  Thank you, your Honor.

10          THE COURT:  Mr. Larson, is there anything else you want

11  to say for the record?

12          MR. LARSON:  Yes, your Honor.  I will be filing a motion

13  for continuance of the sentencing hearing before midnight tonight.

14          THE COURT:  Okay.  Y'all get some rest.

15          THE DEPUTY CLERK:  All rise.

16      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

17

18                      *  *  *  *  *  *

19

20                      REPORTER'S CERTIFICATE

21    I, Karen A. Ibos, CCR, Official Court Reporter, United States
   District Court, Eastern District of Louisiana, do hereby certify
22  that the foregoing is a true and correct transcript, to the best of
   my ability and understanding, from the record of the proceedings in
23  the above-entitled and numbered matter.

24

25                      Karen A. Ibos, CCR, RPR, CRR
                        Official Court Reporter