UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA            CRIMINAL ACTION

VERSUS                              NO. 94-381

PAUL HARDY                          SECTION "C"

## OPINION

I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    a. The AAMR & DSM-IV-TR Definitions of Mental Retardation . . . . . . . . . . . . 4

    b. The Expert Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.   ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    **a. Factor One: Significantly Subaverage Intellectual Functioning . . . . . . . . . 12**

        1. The Cutoff IQ Score . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2. Hardy's IQ Score . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

           i.  The Flynn Effect in General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

           ii. The Flynn Effect as Applied to Hardy . . . . . . . . . . . . . . . . . . . . . . . 25

        3. The Adequacy of Hardy's Effort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

           i.   Practice Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

           ii.  Personality Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

           iii. Other Discrepancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

           iv.  Malingering/Response Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        4. Other Evidence of Hardy's IQ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        5. The 1996 Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    **b. Factor Two: Significant Limitations in Adaptive Functioning . . . . . . . . . . 60**

        1. The Definition and Assessment of Adaptive Functioning/Behavior . . . . 61

        2. Retrospective Diagnosis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

        3. Hardy's Level of Adaptive Functioning . . . . . . . . . . . . . . . . . . . . . . . . 68

           i.  Dr. Swanson's Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

               A.  Dr. Swanson's VABS-II Assessment of Hardy Based

on Tony Van Buren . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

    B. <u>Dr. Hayes' Interview with Toni Van Buren</u> . . . . . . . . . . 79

    C. <u>Dr. Swanson's Other Interviews</u> . . . . . . . . . . . . . . . . . . 85

    D. <u>Dr. Swanson's Interviews and Testing of Hardy</u> . . . . . . 87

*ii. Dr. Hayes' Assessment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

    A. <u>Dr. Hayes' VABS-II Assessment of Hardy Based on</u>

    <u>Javetta Cooper</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

    B. <u>Criticism of Dr. Swanson's Evaluation</u> . . . . . . . . . . . . . 92

    C. <u>Other Evidence of Hardy's Level of Adaptive</u>

    <u>Functioning</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

      *a. Additional Interviews* . . . . . . . . . . . . . . . . . . . . . . 94

      *b. Direct Observation* . . . . . . . . . . . . . . . . . . . . . . . . 96

      *c. Records and Other Sources* . . . . . . . . . . . . . . . . 98

*iii. The Court's Findings of Fact* . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

**c. Factor Three: Onset Before Age 18** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **114**

**III.   CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **117**

**APPENDIX A** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **120**

Remaining Reasons Cited by Dr. Hayes for Discrediting Dr. Tetlow's IQ Test

**APPENDIX B** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **131**

Dr. Hayes' Alternative Sources for Estimating Hardy's IQ

    *a. School Records* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

    *b. Family Data* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

    *c. Lay Opinions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

    *d. Demographic Imputation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

**APPENDIX C** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **139**

Defense Diagnoses in 1996 and Their Similarities to Mild Mental Retardation

**APPENDIX D** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **147**

Interviews and Other Information Relevant to Adaptive Behavior

    *a. Dr. Hayes' Interview with Theresa Minor* . . . . . . . . . . . . . . . . . . . . . 147

    *b. Dr. Hayes' Interview with Vance Ceaser* . . . . . . . . . . . . . . . . . . . . . 148

    *c. Dr. Hayes' Interview with Greg Williams* . . . . . . . . . . . . . . . . . . . . 150

    *d. Dawn Dedeaux Videos* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

    *e. Hardy's Telephone Calls from Jail* . . . . . . . . . . . . . . . . . . . . . . . . . . 155

**APPENDIX E** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **162**

Dr. Hayes' List of Additional Facts Relevant to Hardy's Adaptive Behavior

a. *Communication* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

b. *Self Care* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

c. *Home Living* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

d. *Social/Interpersonal Skills* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

e. *Use of Community Resources* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

f. *Self Direction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

g. *Functional Academic Skills* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

h. *Work* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

i. *Leisure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

j. *Health & Safety* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

This matter comes before the Court on a motion for pre-trial determination of mental retardation filed by Paul Hardy ("Hardy"), the defendant in this capital case. An evidentiary hearing was held on September 14–18, 2009, and September 21–23, 2009, and the matter was taken under advisement. Having thoroughly considered the record, the evidence and testimony adduced at trial, and the law, the Court now issues its opinion.

## I.  BACKGROUND

Hardy stands convicted of two crimes for which the government seeks the death penalty: (1) conspiracy to injure, oppress, threaten and intimidate Kim Groves ("Groves") and another person in the right to be free from the use of unreasonable force by one acting under color of law and in the right to provide information to law enforcement authorities about a federal crime, resulting in the death of Groves, in violation of 18 U.S.C. § 241; and (2) deprivation of Groves' civil rights in violation of 18 U.S.C. § 242 and 2.  Hardy claims that he is mentally

retarded and is therefore ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), and the Federal Death Penalty Act, 18 U.S.C. § 3596(c).[1] The propriety of determining the issue before the Court without a jury and pre-trial is uncontested, as is Hardy's burden of proof by a preponderance of the evidence.

### a.    The AAMR & DSM-IV-TR Definitions of Mental Retardation

Mental retardation is a developmental disability, the definition of which the Court derives from the two sources recognized by the Supreme Court in *Atkins*: The American Association on Mental Retardation ("AAMR"), now known as the American Association on Intellectual and Developmental Disabilities ("AAIDD"), and the American Psychiatric Association ("APA").

The AAMR/AAIDD defines mental retardation in the 10th edition of its standard reference work as follows:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18.

MENTAL RETARDATION DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (2002) ("AAMR 10TH EDITION").[2]

---

[1]Section 3596(c), added in 1994, provides in relevant part: "A sentence of death shall not be carried out upon a person who is mentally retarded."

[2]The AAMR definition is accompanied by five assumptions:

(a) Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.
(b) Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor and behavioral factors.

The definition and diagnostic criteria for mental retardation of the APA is contained in its standard reference work, the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION TEXT REVISION (2000) ("DSM-IV-TR"). It provides in relevant part that a diagnosis of mental retardation requires:

> A. Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).
>
> B. Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living. social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.
>
> C. The onset is before age 18 years of age.

DSM-IV-TR at 49.

The DSM-IV-TR categorizes mental retardation as mild, moderate, severe, and profound, with a residual category of "mental retardation, severity unspecified." *Id.* at 42–44. Mild mental retardation is associated with an IQ of

---

(c ) Within an individual, limitations often coexist with strengths.
(d) An important purpose of describing limitations is to develop a profile of supports.
(e) With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve.

AAMR 10TH EDITION at 13; USER'S GUIDE at 3; Deft. Exh. 5.

50–55 to 70–75,[3] and the DSM-IV-TR further describes it as follows:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable."  This group constitutes the largest segment (about 85%) of those with the disorder.  As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0–5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age.  By their late teens, they can acquire academic skills up to approximately the sixth-grade level.  During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV-TR at  43.

The American Psychological Association's Division of Mental Retardation and Developmental Disabilities ("Division 33") echoes this point and further elaborates:

> People classified with mild MR evidence small delays in the preschool years but often are not identified until after school entry, when assessment is undertaken following academic failure or

---

[3]According to the DSM-IV-TR:

Borderline Intellectual Functioning describes an IQ range that is higher than that for Mental Retardation (generally 71–84). . . . [A]n IQ score may involve a measurement error of approximately 5 points, depending on the testing instrument.  Thus, it is possible to diagnose Mental Retardation in individuals with IQ scores between 71 and 75 if they have significant deficits in adaptive behavior that meet the criteria for Mental Retardation.  Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information.

DSM-IV-TR at 48.

emergence of behavior problems.  Modest expressive language delays are evident during early primary school years, with the use of 2- to 3-word sentences common.  During the later primary school years, these children develop considerable expressive speaking skills, engage with peers in spontaneous interactive play, and can be guided into play with larger groups.  During middle school, they develop complex sentence structure, and their speech is clearly intelligible.  The ability to use simple number concepts is also present, but practical understanding of the use of money may be limited.  By adolescence, normal language fluency may be evident.  Reading and number skills will range from 1st- to 6th- grade level, and social interests, community activities, and self-direction will be typical of peers, albeit as affected by pragmatic academic skill attainment.  Baroff (1986) ascribed a mental age range of 8 to 11 years to adults in this group.  This designation implies variation in academic skills, and for a large proportion of these adults, persistent low academic skill attainment limits their vocational opportunities.  However, these people are generally able to fulfill all expected adult roles.  Consequently, their involvement in adult services and participation in therapeutic activities following completion of educational preparation is relatively uncommon, is often time-limited or periodic, and may be associated with issues of adjustment or disability conditions not closely related to MR.

AM. PSYCHOL. ASS'N, MANUAL OF DIAGNOSIS AND PROFESSIONAL PRACTICE IN

MENTAL RETARDATION 17–18 (John W. Jacobson & James A. Mulick eds., 1996).

The Supreme Court in *Atkins* recognized that the two "official" definitions

of mental retardation are similar, but left to states the "task of developing

appropriate ways to enforce the constitutional restriction upon [their] execution of

sentences." *Atkins,* 536 U.S. at 317.  In doing so, it noted that:

[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18.  Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to

communicate, to abstract from mistakes and learn from
experience, to engage in logical reasoning, to control impulses,
and to understand the reactions of others.  There is no evidence
that they are more likely to engage in criminal conduct than
others, but there is abundant evidence that they often act on
impulse rather than pursuant to a  premeditated plan, and that in
group settings they are followers rather than leaders.  Their
deficiencies do not warrant an exemption from criminal
sanctions, but they do diminish their personal culpability.

*Atkins*, 536 U.S. at 318.

The AAIDD recognizes that, with regard to persons with mental retardation

or intellectual disabilities ("MR/ID") in the criminal justice system,

some criminal defendants fall at the upper end of the MR/ID severity
continuum (i.e. people with mental retardation who have a higher IQ)
and [they] frequently present a mixed competence profile.[4]  They
typically have a history of academic failure and marginal social and
vocational skills.  Their previous and current situations frequently
allowed formal assessment to be avoided or led to assessment that was
less than optimal.

ROBERT L. SCHALOCK, ET AL, USER'S GUIDE: MENTAL RETARDATION DEFINITION,

CLASSIFICATION AND SYSTEMS OF SUPPORTS—10TH EDITION 18  (AAIDD 2007)

("USER'S GUIDE") (citations omitted).  According to the most recent manual from

the AAIDD, INTELLECTUAL DISABILITY DEFINITION, CLASSIFICATION, AND

SYSTEMS OF SUPPORT, 51–52 (2010)("AAIDD 11TH EDITION"),[5] the higher IQ

---

[4]Indeed, "[m]ost individuals with mental retardation who commit criminal
acts display mild mental retardation."  J.G. Olley & A.W. Cox, *Assessment of
Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior
Assessment Systems-II*, *in* ADAPTIVE BEHAVIOR ASSESSMENT SYSTEM:
ASSESSMENT AND APPLICATIONS FOR PROFESSIONAL AND PARAPROFESSIONAL
PRACTICE 381, 383 (P.L. Harrison & T. Oakland 2008) (S-12) [hereinafter Olley &
Cox Study]

[5]The Court relies throughout primarily on the 10th edition of the AAMR's
standard reference work as that was the edition in effect at the time of the hearing.

8

mentally retarded are also "more likely to mask their deficits and attempt to look more able and typical than they actually are."  Moreover, "persons with ID typically have a strong acquiescence bias or a bias to please that might lead to erroneous patterns of responding."[6]

### b.    The Expert Witnesses

Three expert psychologists testified at the hearing.  All had the necessary education and credentials to testify as experts in psychology and all had published extensively in their respective areas of interest.  They have each received recognition for their work as psychologists, but their professional experience with the mentally retarded varies.

The first psychologist, Mark D. Cunningham, Ph.D., was called by the defendant and accepted by the Court as an expert in forensic and clinical psychology.  Dr. Cunningham received his bachelor degree with a major in psychology from Abilene Christian College in 1973.   He received his masters and Ph.D. in clinical psychology from Oklahoma State University in 1976 and 1977, respectively.  He had an clinical internship at the National Naval Medical Center in 1977-1978, and participated in part-time post doctoral training at Yale University School of Medicine between 1979 and 1981.  He is licensed in sixteen states

---

However, to the extent the 11th edition offers greater explication of a concept, the Court will occasionally cite to it.  This is the approach taken by the AAMR itself, which for example directs clinicians conducting retrospective assessments to use *currently* relevant guides.  USER'S GUIDE at 20.  The edition the Court uses is ultimately irrelevant since the fundamental principles relevant here are present in both editions, so the Court will try to cite what it considers the clearer of the two.

    [6]*Id.* at 52.

including Louisiana, and he is board certified in clinical psychology and forensic psychology by the American Board of Professional Psychology.

Dr. Cunningham testified that he has performed many mental retardation assessments in a forensic context, including determinations of competency to stand trial, social security eligibility and for *Atkins* purposes. He has co-authored a paper on *Atkins* determinations and has testified extensively in federal capital cases.

The second expert, Victoria Swanson, Ph.D., was also called by the defendant. Dr. Swanson is a licensed psychologist who was accepted by the Court without objection as an expert in mental retardation. She has specialized in the field of mental retardation and developmental disabilities throughout her 35 year career. She received her bachelors degree in psychology from the University of Southwestern Louisiana in 1973 and then began working with the intellectually disabled in rural Louisiana. Dr. Swanson received her masters degree from Northwestern State University in 1991, writing her thesis on the Vineland test, a test of adaptive behavior. She has continued her work in the area of mental retardation and received a Ph.D. in psychology in 1999 from Louisiana State University. She is licensed in Louisiana.

Dr. Swanson testified that she has either performed or supervised approximately 6,000 assessments for mental retardation, and has administered approximately 300 IQ tests a year along with over 10,000 Vineland tests of adaptive behavior. She estimated that less than one percent of those assessments related to litigation in court, and less than that related to an *Atkins* determination.

Numerous awards and distinctions from the AAMR and AAIDD are included on her curriculum vitae, and she has served as the President of the National Psychology Division of the AAMR.

The third psychologist who testified at the hearing, Jill S. Hayes, Ph.D., was called by the government. She received a bachelors degree in psychology from Armstrong State College in 1990, a masters in applied psychology from Augusta State College in 1992, a masters degree in clinical psychology from Louisiana State University in 1995 and a doctorate in clinical psychology with a specialty in neuropsychology and a minor in behavioral neurology from Louisiana State University in 1998. She did a one-year internship at the Medical University of South Carolina in 1997-1998, followed by a one-year fellowship at Louisiana State University Health Sciences Center in 1998-1999. She is licensed in Louisiana as a neuropsychologist and clinical psychologist, and is licensed as a clinical psychologist in Arizona.

Dr. Hayes testified that she has performed about 20 mental retardation assessments and 10 Vineland tests since receiving her license in 1998. She identified at least five articles authored by her that involved some aspect of mental retardation, three of which concerned malingering. Over the defendant's objection, the Court accepted Dr. Hayes as an expert in the area of mental retardation based on her publications, education, teaching and court experience. It considered the defense objection as relevant to the weight to be given her testimony regarding mental retardation, not its admissibility.

11

## II.  ANALYSIS

The diagnostic criteria for mental retardation developed by the APA and AAMR contain three essential factors: significantly subaverage intellectual functioning, significant limitations in adaptive behavior, and onset prior to age 18. The Court will discuss Hardy's showing as to each.

### a.  Factor One: Significantly Subaverage Intellectual Functioning

The first criterion for a diagnosis of mental retardation requires "significant limitations . . . in intellectual functioning,"[7] or put another way, "significantly subaverage intellectual functioning."[8]  The APA and AAMR define this to mean an IQ score approximately two standards deviations below the mean of 100, taking into consideration the standard error of measurement for the IQ test used.[9]

### 1.   The Cutoff IQ Score

Two standard deviations below the mean of the test relevant here would be a score of 70.  That is not, however, the cutoff score typically used, because the APA and AAMR direct that the test's measurement error must be taken into account when interpreting its result.[10]  The AAMR has noted that the standard error of measurement ("*SEM*")

---

[7]AAMR 10ᵀᴴ EDITION at 1.

[8]DSM-IV-TR at 49.

[9]DSM-IV-TR at 41–42, 48–49; AAMR 10ᵀᴴ EDITION at 57–59.

[10]AAMR 10ᵀᴴ EDITION at 57 ("The assessment of intellectual functioning through the primary reliance on intelligence tests is fraught with the potential for misuse if consideration is not given to possible errors in measurement.").

has been estimated to be three to five points for well-standardized measures of general intellectual functioning. This means that if an individual is retested with the same instrument, the second obtained score would be within one *SEM* (i.e., ± 3 to 4 IQ points) of the first estimate about two thirds of the time. . . . Therefore, an IQ of 70 is most accurately understood not as a precise score, but as a range of confidence with parameters of at least one *SEM* (i.e., scores of about 66 to 74; 66% probability), or parameters of two *SEMs* (i.e., scores of 62 to 78; 95% probability). . . . This is a critical consideration that must be part of any decision concerning a diagnosis of mental retardation.[11]

As can be gathered from the above, the range typically given for IQ scores is plus or minus four to eight points. All the experts in this case agree that a score of 75 should be used as the upper bound of the IQ range describing mild mental retardation.[12] Indeed, there is almost universal agreement on this point.[13] The Court therefore finds as a factual matter that a diagnosis of mental retardation requires an IQ score of 75 or less on one of the standard IQ tests.

2.   Hardy's IQ Score

Hardy was not given an IQ test until 1996, when—in about a one month period—he was twice tested using the same standard measure of intelligence (the

---

[11]*Id.* at 57 (citations omitted).

[12]Govt. Exh. 1 at 31 (Dr. Hayes); Deft. Exh. 1 at 1 (Dr. Swanson); Deft. Exh. 19 at 5 (Dr. Cunningham); *see also* Rec. Doc. 2123 at 29–30, 35 & Rec. Doc. 2124 at 269, 341 (Dr. Cunningham); Rec. Doc. 2126 at 888 (Dr. Swanson); Rec. Doc. 2126 at 953 (Dr. Hayes).

[13]DSM-IV-TR at 48; AAMR 10ᵀᴴ EDITION at 58–59; *see, e.g.*, *Bobby v. Bies*, 129 S. Ct. 2145, 2149–50 (2009) (describing expert testimony that set the cutoff at 75); *In re Hearn*, 376 F.3d 447, 454 n.6 (5th Cir. 2004) (citing with approval the AAMR's definition).

WAIS-R).[14]  Dr. L. Mulry Tetlow administered the first test in February 1996,

which yielded a Full Scale IQ score of 73.   The second WAIS-R test was given by

Dr. Daniel Martell in March 1996 and yielded a Full Scale IQ score of 76.   The

government and defense psychologists agree that the first February 1996 test is the

most reliable estimate of Hardy's IQ, assuming adequate effort, because "practice

effects" could have artificially enhanced Hardy's score on the second test.[15]   So,

assuming adequate effort was made, Hardy's score on the most reliable of the two

tests of his IQ falls within the range of scores diagnostic of mild mental

retardation.   "The *Atkins* Court recognized that IQ scores from 70 to 75 are

generally considered to be the cutoff for the intellectual functioning prong of the

test for mental retardation."   *Wiley v. Epps*, __ F.3d ___, 2010 WL 4227405, at *12

(5th Cir. 2010) (citing *Atkins*, 536 U.S. at 309).   While that score would be

sufficient to satisfy the first criterion for a diagnosis of mental retardation, the

Court is not persuaded that Hardy's score of 73 is the best estimate of his true IQ.

Rather, for the reasons that follow, the Court finds that Hardy's score must be

corrected for a phenomenon referred to as the Flynn Effect.

      *i.*    *The Flynn Effect in General*

      When a new IQ test is developed, but before it is released for general use, it

is given to a large group of people (ideally reflective of the demographics of the

population at large) in order to create a standardized norm.   Once those test results

---

[14]Deft. Exh. 33-EE; Deft. Exh. 33-FF.

[15]Deft. Exh. 34-NN at 14-15; Govt. Exh. 1 at 40.

are collected, the average or mean score of the group is declared as 100, with a bell shaped curve sloping off on either side reflecting higher and lower intelligence from the average.  In order to further categorize the shape of that curve, called a normal distribution, a concept called the standard deviation is used, which here has a numerical value of 15.[16]  As noted above, scores below approximately two standard deviations, i.e., 30 points, of the mean of 100 fall into the range associated with mental retardation.[17]

After an IQ test is standardized according to this process it is released for use in the population at large.  The scores of those persons subsequently taking the test are determined by comparing their results to the standardized norms.   Hence the continuing accuracy of those norms is crucial in assessing the validity of individual test scores.

In a series of studies beginning in the early 1980's, Dr. James R. Flynn determined that IQ test scores have steadily increased over the years.  He found this to be true across almost all developed countries and across many versions of the test for IQ.[18]  The cause of this increase is largely unknown, although some

---

[16]*See* Rec Doc. 2123 at 31; Rec. Doc. 2126 at 737-38.

[17] Lois A. Weithorn, *Conceptual Hurdles to the Application of* Atkins v. Virginia, 59 HASTINGS L.J. 1203, 1214–15 (2008); *United States v. Davis*, 611 F. Supp. 2d 472, 475 (D. Md. 2009).

[18]Dr. Flynn has published these results in numerous professional psychology journals, and most of these publications are included in the record for reference. James R. Flynn, *IQ Gains and the Binet Decrements,* 21 J. OF EDUC. MEASUREMENT 283 (1984);  James R. Flynn, *The Mean IQ of Americans: Massive Gains 1932 to 1978,* 95 PSYCHOL. BULL. 29 (1984) (Study Exhibit No. 36 ["S-36"]); James R. Flynn, *Massive IQ Gains in 14 Nations: What IQ Tests Really*

speculate that improved socioeconomics, education and even better nutrition have increased the scores, that the test themselves have become more sophisticated, or that perhaps people are simply getting "smarter." *See, e.g.*, *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1277–78 (N.D. Ala. 2009). Dr. Flynn was able to consistently document this phenomenon through comparative studies encompassing many years of data. The amount of the average increase in IQ is approximately three points per decade, or 0.33 points per year.

When a new IQ test is developed, it is standardized through a *current* population sample, creating a "new" average of 100. Since this new test is normed with a population that has steadily done better ("is smarter") than the prior generation, the "new" average of 100 is actually "higher" than the old 100. For example, if the old test—normed as it was before the population "got smarter"—were given today, the average score would not be 100, but something closer to perhaps 103. But when the new test is standardized, that "old 103" must be redefined as the "new 100," because the average score of the test is defined to be 100. What this means in practical terms is that someone who receives a score of 80 on a test that was normed a decade ago could be expected, on average, to score

---

*Measure,* 101 PSYCHOL. BULL. 171 (1987) (S-37); James R. Flynn, *WAIS-III and WISC-III: IQ Gains in the United States from 1972 to 1995*, 86 PERCEPTUAL & MOTOR SKILLS J. 1231 (1998); James R. Flynn, *The Hidden History of IQ and Special Education: Can the Problem Be Solved?*, 6 PSYCHOL. PUB. POL'Y & L. 191 (2000) (S-38); James R. Flynn, *Tethering the Elephant: Capital Cases, IQ and the Flynn Effect,* 12 PSYCHOL. PUB. POL'Y & L. 170 (2006) (S-26); James R. Flynn, *Capital Offenders and the Death Sentence*, PSYCHOL. IN MENTAL RETARDATION & DEV'L DISABILITIES, Vol. 32, No. 3 (2007) (S-27).

a 77 on a newly normed test—without any actual change in his intelligence.

Respected psychologists have reviewed and accepted Dr. Flynn's findings. Dr. Stephen Greenspan is a member of the Ad Hoc Committee on Mental Retardation and the Death Penalty, created by Division 33 of the American Psychological Association, which focuses on mental retardation and developmental disabilities.  He admits to being "initially skeptical" of the Flynn Effect, but, after study, he has become "firmly convinced that the use of the Flynn Effect to adjust individual IQ scores is an appropriate, indeed essential, practice."[19]  Echoing Dr. Flynn, he suggests that correction for "the Flynn Effect is a useful, and valid, method for increasing the likelihood that a psychologist will correctly diagnose MR in someone deserving of that label."[20]  He noted that this is particularly helpful in the case of mild mental retardation, because "mild MR is still a somewhat inadequately defined category."[21]  In a later article, Dr. Greenspan explained that the purpose of correcting for the Flynn Effect in IQ testing

> is not to correct for possible changes in actual intelligence in an individual or subgroup but rather to ensure that all individuals (regardless of their demographics) are measured by the same yardstick when being compared to an arbitrary (70 or 75) general population diagnostic criterion.[22]

---

[19]Stephen Greenspan, *Issues in the Use of the "Flynn Effect" to Adjust IQ Scores when Diagnosing MR*,  PSYCHOL. MENTAL RETARDATION & DEV'L DISABILITIES, Vol. 31, No. 3, at 6 (2006) (S-28).

[20]*Id.*

[21]*Id.* at 7.

[22]Stephen Greenspan, *Flynn-Adjustment is a Matter of Basic Fairness: Response to Roger B. Moore, Jr.*, PSYCHOL. MENTAL RETARDATION & DEV'L DISABILITIES, Vol. 32, No. 3 at 8 (2007) (S-29).

Another psychologist, Dr. J. Gregory Olley, also a member of Division 33 and chairman of the Ad Hoc Committee on Mental Retardation and the Death Penalty, has concluded that the Flynn Effect is a real phenomenon that must be accounted for.  "It is important," he wrote, "to understand this 'Flynn Effect' because a person's IQ score may be artificially raised if an out of date test is given. A study by Kanaya, et al., indicated that persons with mental retardation may be particularly susceptible to this effect."[23]

The Kanaya Study referenced by Dr. Olley was published in 2003 and dealt with children being evaluated for special education services.[24]  It was an exhaustive survey, spanning 36 years of data and drawing information from thousands of scores on IQ tests across various geographical regions, neighborhoods and socioeconomic statuses.  For those children in the borderline intelligence range, their scores dropped on average from a 78.4 on the older test to a 73.9 on the newer test, or a drop of 4.5 points.  For those in the mild mental retardation range, their scores dropped even more—from, on average, a score of 64.2 to one of 58.9, or a drop of 5.3 points.

Professional organizations in the field of psychology have taken note of the

---

[23]Caroline Everington & J. Gregory Olley, *Implications of: Issues in* Atkins v. Virginia, *Defining and Diagnosing Mental Retardation*," Vol. 8 J. Forensic Psychol. Practice 1, 7 (2008) [hereinafter Everington & Olley Study] (S-25).

[24]Tomoe Kanaya, Matthew H. Scullin & Stephen J. Ceci, *The Flynn Effect and U.S. Policies: The Impact of Rising IQ Scores on American Society Via Mental Retardation Diagnoses*, 58 AM. PSYCHOL. 778, 787 (2003) [hereinafter Kanaya Study] (S-39) (discussing how school budgets may prevent acquisition of an expensive newer test until all copies of the older tests are used).

Flynn Effect as well.  The AAIDD,[25] the successor to one of the two organizations

whose definition of mental retardation the Supreme Court favorably referenced in

*Atkins*,[26] provides this recommendation to clinicians:

> 4.  Recognize the "Flynn Effect."  In his study of IQ tests across populations, Flynn discovered that IQ scores have been increasing from one generation to the next in all 14 nations for which IQ data existed.  This increase in IQ scores has been dubbed the Flynn Effect. . . . The main recommendation resulting from this work is that all intellectual assessments must use a reliable and appropriate individually administered intelligence test.  In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times.  In cases where a test with aging norms is used, a correction for the age of the norms is warranted.  For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-II was set at 100 when it was originally normed in 1995 (published in 1997).  However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005.  Hence, using the AAMR 2002 System, significant deficits in intellectual functioning of "at least two standard deviations below the mean" the approximate Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).  Thus the clinician needs to use the most current version of an individually administered test of intelligence and take into consideration the Flynn Effect as well as the standard error of measurement when estimating an individual's true IQ score.[27]

According to Dr. Cunningham, the WAIS-III TECHNICAL MANUAL also

notes the reality of IQ score inflation because of the Flynn Effect.  It gives an

inflation rate of about 0.3 points per year after the test is normed, consistent with

---

[25]As previously indicated, the AAMR has since been renamed the AAIDD.

[26]*Atkins,* 536 U.S. at 309 n. 3, 317.

[27]USER'S GUIDE at 20-21.  In its most recent publication, the AAIDD again reiterates this recommendation.  AAIDD 11TH EDITION at 37.

the rate reported by Dr. Flynn.  Deft. Exh. 19 at 3-4.  The *Handbook of Assessment in Persons with Intellectual Disability*[28] acknowledges the significance of the Flynn Effect as well, and the substantial support for its applicability—including in the Borderline and Mentally Retarded range.  It specifically recommends that evaluators "seriously consider the Flynn effect" in making a diagnosis.[29]  Finally, and most recently, defense psychologist Dr. Cunningham conducted an extensive literature review, which he later published in a peer-reviewed journal, that found the Flynn Effect is "well-established" and recommends that IQ scores be "Flynn-corrected."[30]

The Fifth Circuit has not yet ruled on the validity of the Flynn Effect.  In *In re Salazar*, a Texas habeas case on federal review, the Fifth Circuit  "express[ed] no opinion" on the scientific validity of the Flynn Effect or its applicability to individual test scores, because it noted that even if the correction were applied in that case, Salazar's IQ score would still be above 70, the cut-off used by Texas for *Atkins* purposes.  443 F.3d 430, 433 & n.1 (5th Cir. 2006).  Similarly, in *In re Mathis*, another Texas habeas case, the Fifth Circuit again declined to pass on the validity of the Flynn Effect, finding that Mathis' IQ score of 64 (without a Flynn

---

[28]Johnny L. Matson, *Handbook of Assessment in Persons with Intellectual Disability*, 34 INT'L REV. RES. MENTAL RETARDATION (2007)(S-4).

[29]*Id.* at 87- 93.

[30]Gilbert S. Macvaugh III & Mark D. Cunningham,  *"Atkins v. Virginia: Implications and Recommendations for Forensic Practice,"* 37 J. OF PSYCH. & L. 131, 148, 151 (2009) [hereinafter Macvaugh & Cunningham Study] (S-30); Rec. Doc. 2164, Swanson 17.

correction), along with other evidence, made out a prima facie case that he was

mentally retarded and therefore able to proceed with a successive habeas petition.

483 F.3d 395 (5th Cir. 2007).  In an unpublished opinion, *Thomas v. Quarterman*,

the Fifth Circuit dealt with yet another Texas habeas case that involved the Flynn

Effect, but not in a context where it could independently determine the validity of

the phenomenon.  335 F. App'x 386 (5th Cir. 2009).  Rather, the case presented the

complex AEDPA question of whether "reasonable jurists would not debate that the

state court decision" to reject the Flynn Effect "was reasonably based on the

evidence before it."  *Id.* at 392.[31]

    In other instances, the Fifth Circuit has granted certificates of appealability

to state habeas petitioners claiming that the state courts erred by not finding them

mentally retarded for reasons including the failure of the state's expert to inform

the state courts of the Flynn Effect.  *Pierce v. Thaler*, 355 F. Appx. 784, 794-795

(5th Cir. 2009) (per curiam) (unpublished); *see also Maldonado v. Thaler*, 2010

WL 3155236, at *4 (5th Cir. 2010) (per curiam) (unpublished).

    Several district courts within the Fifth Circuit have dealt more directly with

---

    [31]More specifically, the state trial court had conducted an extensive
evidentiary hearing on mental retardation, making hundreds of factual findings,
and concluding that the petitioner was not mentally retarded.  At the hearing, the
defense expert argued that the Flynn Effect should be applied to all of Thomas'
scores, while the state expert opined that it was inappropriate to adjust individual
scores for the Flynn Effect.  The state court found the expert testimony offered by
the state to be more  persuasive.  The Fifth Circuit noted that the state court
reached these conclusions based on the witnesses and evidence before it, and
considering the deference that must be accorded state court findings on federal
habeas review, found that the state court decision was "reasonably based on the
evidence before it."  335 F. App'x at 392.

the application of the Flynn Effect.  In *Butler v. Quarterman*, a state capital habeas case, the district court first acknowledged that *Salazar* and *Matthis* "neither accepted nor rejected the validity of the Flynn Effect."  576 F. Supp. 2d 805, 814 (S.D. Texas, 2008).  It then noted that in the state court proceeding, the state and defense experts agreed that the Flynn Effect is generally accepted in the psychological community and disagreed only as to how much correction is necessary to account for its effect.  The defense expert argued for a correction of .3 points per year, in line with Dr. Flynn's conclusions.  The state's expert, Dr. George Denkowski, contended that a correction of only .13 points per year should be applied.  As in *Thomas*, the state court credited the state's expert and found that Butler was not intellectually deficient.  Significantly, the federal district court found that the state court, while correctly identifying the governing legal rule, arguably "unreasonably" applied the rule to the facts of the case.  The court specifically found that Dr. Denkowski's view that only a .13 point per year correction was appropriate for the Flynn Effect was "not supported by other, credible, evidence."  *Id.* at 816.  While the district court did not grant habeas relief, it did issue a certificate of appealability on the basis that the state court's ruling on intellectual deficiency "was based almost entirely on . . . Dr. Denkowski's heavily disputed opinions."

In *Wiley v. Epps*, the district court confronted a situation where the state court had refused to hold an evidentiary hearing on mental retardation at all.  668 F. Supp. 2d 848 (N.D. Miss. 2009).  The district court granted an evidentiary

hearing, and all the experts in that case agreed that the Flynn Effect was accepted by the relevant professional community and "must be taken into consideration in evaluating Petitioner's scores." *Id.* at 894.  The district court therefore did take it into consideration and calculated Wiley's scores both with and without correction for the Flynn Effect.  Without correction for the Flynn Effect, three of Wiley's five prior IQ scores were below the Mississippi cutoff score of 75; with the Flynn adjustment, four of the five fell below. *Id.* at 895-97.  The district court then concluded that "once all of Petitioner's IQ scores . . . are adjusted for test obsolescence (the Flynn Effect), the confidence interval for each of those tests results overlaps at 68 to 70." *Id.* at 898.  It then added that, "[e]ven if test obsolescence is not considered," Wiley had established by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning. *Id.* The court went on to find that Wiley was in fact mentally retarded and exempt from the death penalty.

The Fifth Circuit Court of Appeals recently affirmed this decision. *Wiley*, __ F.3d __; 2010 WL 4227405 (5th Cir. Oct. 27, 2010).  However, it once again declined to pass on the validity of the Flynn Effect, upholding the district court finding that, even without correction for the Flynn Effect, Wiley had significant subaverage intellectual functioning

While the Fifth Circuit has not definitively passed on the Flynn Effect, cases from the Fourth and the Eleventh Circuits expressly endorse use of the Flynn

Effect, sometimes even requiring it to be considered.[32]  *E.g.*, *Thomas v. Allen,* 607 F.3d 749, 753 (11th Cir. 2010) ("An evaluator may also consider the 'Flynn effect,' a method that recognizes the fact that IQ test scores have been increasing over time . . . . Therefore, the IQ test scores must be recalibrated to keep all test subjects on a level playing field."); *Holladay v. Allen*, 555 F. 3d 1346, 1350 n. 4, 1358 (11th Cir. 2009) (crediting the psychologist that concluded the IQ scores needed to be adjusted for the Flynn Effect);  *Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005) (remanding for an evidentiary hearing in part because the district court "refused to consider relevant evidence, name the Flynn Effect evidence."); *Davis*, 611 F.Supp. 2d at 488 ("In conclusion, the Court finds the defendant's Flynn effect evidence both relevant and persuasive, and will, as it should, consider the Flynn-adjusted scores in its evaluation of the defendant's intellectual functioning."); *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1278 (N.D. Ala. 2009) ("It also is undisputed that Professor Flynn's recommendation - i.e., 'deduct 0.3 IQ points per year [three points per decade] to cover the period between the year the test was normed and the year in which the subject took the test - is a generally accepted adjustment.");  *Green v. Johnson*, 2006 WL 3746138, at *45 (E.D. Va. 2006) ("Considering all of the case law and evidence, this Court concludes that the Flynn Effect should be considered when determining whether Green's scores fall at least two standard deviations below the mean. There is sufficient evidence in the

---

[32]The Court has been unable to find a case from a circuit court that holds that the Flynn Effect does not exist or that it may not be corrected for.

record to show the Flynn Effect is recognized throughout the profession."); *see also United States v. Parker,* 65 M.J. 626 (N-M. Ct. Crim. App. 2007).

As already noted, Hardy's score of 73 places him in the range of mild mental retardation after considering the standard error of measurement, and without correcting for the Flynn Effect.   Nevertheless, the Court's obligation is to ascertain the best estimate of Hardy's IQ.  In light of the substantial evidence supporting the existence of the Flynn Effect, the Court concludes that Hardy's score of 73 should be corrected to take it into account.

### ii.     The Flynn Effect as Applied to Hardy

Paul Hardy was given the WAIS-R IQ test in 1996 and obtained a Verbal IQ score of 74, a Performance IQ score of 76, and a Full Scale IQ score of 73.  The defense expert, Dr. Cunningham, opined in his report that this score was inflated due to the Flynn Effect.  He noted that the WAIS-R was originally normed in 1978, but Hardy took the test eighteen years later.  Applying the inflation rate of .3 points per year, Hardy's Full Scale score should, according to Dr. Cunningham's report, be corrected by 5.4 points, to below 68.[33]  Dr. Cunningham testified to the same effect at the hearing, reaffirming his belief in the validity of the Flynn Effect, the appropriateness of reducing Hardy's score to 67.5 or 68 to account for it,[34] and the

---

[33]Deft. Exh. 19 at 5; Rec. Doc. 2123 at 69; Rec. Doc. 2124 at 338-39.

[34]Rec. Doc. 2123, 50-51, 65-67, 69; Rec. Doc. 2124, 272-73.  Dr. Cunningham was one of the experts who testified in Hardy's first sentencing hearing in 1996.  He acknowledged at the 2009 hearing that, in 1996, he was unfamiliar with the Flynn Effect, and hence did not apply it to Hardy's score.  He testified that had he been aware of it, he would have applied it and then, because

Flynn Effect's wide acceptance in scientific circles based on substantial research published in peer-reviewed journals.[35]

Dr. Swanson affirmed that the Flynn Effect "is a well-established statistical phenomenon" and testified that it should be recognized and applied in a retrospective diagnosis, regardless of any lingering controversy in the larger community of psychologists.  Deft. Exh. 1 at 5; Rec. Doc. 2125 at 698-699.

The government's expert, Dr. Hayes, agreed that the Flynn Effect exists with respect to those persons of normal intelligence.  However, she was skeptical that it applies to persons with IQ scores below 75, like Hardy.  Part of her reasoning was that almost all of the studies that have been done on the Flynn Effect dealt with people in the normal range of intelligence.[36]  She did  acknowledge that one "really good study" was done with those in the borderline and mentally retarded ranges (the Kanaya Study cited by Dr. Cunningham[37] and discussed earlier in this opinion).  The authors of the study concluded that, on the basis of the means, medians, and regression estimates:

> [T]he size of the Flynn effect in these groups is very close to Flynn's (1998) estimate of a 5.3-point difference between the average scores of the older WISC-R and the average scores of the newer WISC-III norms.  So, our best estimate is that the Flynn effect falls between 5

---

the resulting score would have been below 70, he would have likely referred Hardy for a formal evaluation for mental retardation.  *Id.* at 244-45.

[35]Rec. Doc. 2123 at 52-55.

[36]Rec. Doc. 2128 at 1070.

[37]*Id.* at 1071; Kanaya Study, *supra* n. 24.

and 6 IQ points in the mild MR and borderline ranges, almost exactly the same magnitude that Flynn found in the middle of the IQ distribution.[38]

Dr. Hayes was nonetheless skeptical that these results were transferable to adults because IQ tests geared for children were used.  Defense counsel probed this objection at the hearing, first pointing out that those tests are used up to the age of 17 and then asking,"What happens when somebody turns 17 years and one day?" Dr. Hayes denied that she was saying the Flynn Effect would then simply disappear and suggested instead only that more research is needed.[39]  That is, after declaring that the Flynn Effect is "100 percent"[40] applicable to adults within the normal range of intelligence, and is applicable to those 17 years of age and younger who are mentally deficient, Dr. Hayes claimed that the "jury is still out"[41] on whether it is applicable to mentally deficient adults.

On rebuttal, Dr. Cunningham relayed a discussion he had with Dr. Flynn regarding Dr. Hayes' view.  Dr. Flynn "could identify no logical reason why this phenomenon (the Flynn Effect) would exist at age 17 and then suddenly cease to exist simply because someone had moved out of the zone of eligibility for the WISC and into adulthood, where they would be given some rendition of the

---

[38]*Id.* at 784.

[39]Rec. Doc. 2128 at 1093 ("I am not saying that the Flynn Effect won't be there, but I am saying that we need more data.").

[40]Rec. Doc. 2129 at 1290.

[41]*Id*. at 1290.

WAIS."[42]   Moreover, Dr. Hayes candidly acknowledged that "the best researchers in this area all say that, yes, the Flynn Effect holds water in people with mental retardation."[43]   When asked if she was aware that her view on the Flynn Effect is an "outlier position in the profession," she agreed.[44]   And finally, she testified that "I think my opinion related to the Flynn Effect is not consistent with what the research says in the field."[45]

These candid concessions would be reasons enough for the Court to disregard Dr. Hayes' opinion on the applicability of the Flynn Effect to Hardy's score.  They are not, however, the only reasons the Court does.  Dr. Cunningham noted that research from the first version of the WAIS forward, which includes the WAIS-R, indicates that the Flynn Effect is operative in adults with IQs in the 70 to 75 range.[46]  So, there is in fact published, peer-reviewed research supporting the existence of the Flynn Effect for the test Hardy took and the IQ range in which his score fell.

For example, Dr. Cunningham referenced a study by Jean Spuill and Brett L.

---

[42]Rec. Doc. 2131 at 1587.  The Court notes that this conversation, which was not objected to at the hearing, is admissible as part of the basis of Dr. Cunningham's expert opinion.  FED. R. EVID. 703.

[43]Rec. Doc. 2128 at 1074-75.

[44]Rec. Doc. 2129 at 1302.

[45]*Id.* at 1239.

[46]*Id.* at 1587-88.

Beck, which compared performance on the WAIS and the WAIS-R.[47]  They gave
both tests to 108 people applying for special education services, the average age of
whom was 25.5 years.  Those in the borderline range of intelligence, which was
identified as those having a Full Scale IQ of 70–84, averaged 4.75 points lower on
the new test.[48]

Dr. Cunningham also testified about a meta-analysis of 13 studies, involving
participants with an average age of 29.5, conducted by Dr. Herman Spitz.  While
Spitz found that at an IQ level in the lower 60s, the Flynn Effect on the WAIS to
the WAIS-R flattened out or even reversed,[49] Spitz also found a clear Flynn Effect
in the IQ range of 70 to 75.[50]  Hardy scored a 73, which puts him well within the
range of people who exhibit the Flynn Effect according to Dr. Spitz's meta-
analysis.

Dr. Cunningham also cited a 2007 study by Suzanne Fitzgerald, Nicola S.
Gray and Robert J. Snowden.  It compared the scores on the WAIS-R and the

---

[47]Jean Spruill & Brett L. Beck, *Comparison of the WAIS and WAIS-R:
Different Results for Different IQ Groups*, 19 PROF. PSYCHOL. RES. & PRAC. 31-34
(1988) (S-21).

[48]Rec. Doc. 2123 at 58-59.

[49]Herman H. Spitz, *Variations in Wechsler Interscale IQ Disparities at
Different Levels of IQ*, 13 INTELLIGENCE 157-67 (1989) [hereinafter Spitz Study]
(S-20).

[50]Rec. Doc. 2123 at 58.

newer WAIS-III in the lower ranges of IQ.[51]  This is significant as Paul Hardy was given the WAIS-R test, the older test.  The researchers gave both tests to 45 individuals with diagnosed learning difficulties.  Their scores were on average 4.1 points lower on the new test, which is in line with the predicted Flynn Effect.[52]

Dr. Hayes cited some of the same studies, but claimed that her literature review revealed that "the majority of researchers have found that the Flynn Effect is either smaller in adults with Lower IQ's or that the Flynn Effect can 'reverse' itself in individuals with IQ's in the mentally retarded range."[53]  To the extent the studies already discussed also support a "reverse" Flynn Effect, they only do so for persons with an IQ too low to be relevant (under approximately 65), while they in fact prove the Flynn Effect exists in the relevant IQ range—Hardy's range. Several other studies cited by Dr. Hayes were also performed on people more severely mentally retarded than Hardy,[54] and so are likewise not helpful since Hardy's score does not fall in those ranges.  Of course, if it had, presumably there

---

[51]Suzanne Fitzgerald, Nicola S. Gray & Robert J. Snowden, *A Comparison of WAIS-R and WAIS-III in the Lower IQ Range: Implications for Learning Disability Diagnosis*, 20 J. APPLIED RES. INTELLECTUAL DISABILITIES 323-30 (2006) (S-15).

[52]Rec.Doc. 2123 at 59.

[53]Govt. Exh. 1 at 40.

[54]*E.g.,* Morton L. Light & Williams R. Chambers, *A Comparison of the Wechsler Adult Intelligence Scale and Wechsler-Bellevue II with Mental Defectives*, 62 AM. J. MENTAL DEFICIENCY 878-81 (1958) (S-18); Cheryl L. Simon & James R. Clopton, *Comparison of WAIS and WAIS-R Scores of Mildly and Moderately Mentally Retarded Adults*, 89 AM. J. MENTAL DEFICIENCY 301-04 (1984) (S-19); Spitz Study, *supra* n. 49.

would have been no dispute at all that he is mentally retarded.  To the extent Dr. Hayes claims that Hardy is not mentally retarded, she cannot claim that studies based on people far more mentally retarded than him prove the Flynn Effect does not apply to him.

Dr. Hayes' last two criticisms of the Flynn Effect will be dealt with only briefly.  In the first, she opines that some researchers believe adjusting for the Flynn Effect is unscientific and not supported by the data, citing a 2007 article by George C. Denkowski and Kathryn M. Denkowski.[55]  However, the main thrust of that article is to criticize Dr. Flynn for claiming that the WAIS-III results should not only be adjusted for 0.3 points per year in general, but also adjusted downward an additional 2.34 points because the scores were already inflated as of the time the test was normed.  Fortunately, it is not necessary for the Court to enter into that thicket as Hardy did not take the WAIS-III test, but rather the WAIS-R.

Dr. Hayes next cited a survey showing that a majority of psychologists did not, at the time of the study, correct IQ scores for the Flynn Effect as part of their regular practice.  The survey, by Leigh D. Hagan, Eric Y. Drogin and Thomas J.

---

[55]George C. Denkowski & Kathryn M. Denkowski, *WAIS-III IQs of Criminal Defendants with a Mental Retardation Claim Should not be Reduced for the"Flynn Effect"*, 25 AM J. FORENSIC PSYCHOL. 41(2007) (S-14).  It is worth noting that this is the same Dr. Denkowski who was sharply criticized by the district court in *Butler v. Quarterman*, 576 F. Supp. 2d 805 (S.D. Tex. 2008).  The court there found Dr. Denkowski's views on the Flynn Effect was not supported by credible evidence.  It is also the same Dr. Denkowski whose methods for evaluating mental retardation are so questionable that the AAIDD 11TH EDITION specifically cautioned against adopting his practice.  *Id.* at 53.

Guilmette[56] does in fact make that finding, but the Court does not find it

particularly relevant.  Regardless of what most psychologists do, the evidence

before the Court indicates that correcting for the Flynn Effect is a "best practice" in

the field and therefore should be done.  In any event, Dr. Swanson testified that the

profession recognizes that correction for the Flynn Effect in a retrospective

assessment is distinctly appropriate.  Rec. Doc. 2124 at 698-99.  In response to a

point similar to Dr. Hayes' that was advanced by the government in *Davis*, that

court responded as follows:

> The goals of an IQ assessment are dramatically different in the
> clinical versus the forensic setting. In the clinical context, the
> purpose of such an assessment is typically to get an accurate
> picture of the individual's current functioning so that
> appropriate systems of support may be devised to assist that
> individual in everyday living. In most cases, a recently-normed
> instrument will be used for the IQ assessment, rendering
> unnecessary any Flynn adjustments.
>
> In the forensic context, however, where an individual's
> eligibility for a death sentence depends on a somewhat arbitrary
> numerical cutoff, precision and accuracy in determining that
> individual's IQ score, both at present and in the past, become
> critically important. Eligibility for the death penalty is not a
> lottery, and a greater effort to achieve accurate results is both
> necessary and appropriate.
>
> Apart from eligibility for certain entitlement programs, in the
> clinical setting, the precise value given to an individual's IQ has
> very little consequence, so there would be very little gained by
> adjusting the numerical score to account for changed norms
> when the clinician could simply take the phenomenon into
> account when interpreting the scores.

---

[56]Leigh D. Hagan, Eric Y. Drogin & Thomas J. Guilmette, *Adjusting IQ
Scores for the Flynn Effect: Consistent with the Standard of Practice?*, 39 PROF.
PSYCHOL. RES. & PRAC. 619-25 (2008) (S-16).

611 F. Supp. 2d at 488.

The Court finds that the Flynn Effect is well established scientifically and that Dr. Hayes' skepticism is unpersuasive.  Hence, the Court will correct for the Flynn Effect in determining Hardy's IQ.  The WAIS-R was normed in 1978 and Hardy took the test in 1996, eighteen years later.  Applying Dr. Flynn's formula, Hardy's score of 73 is in fact a score of 67.06.[57]  Applying the same standard error of measurement used above, Hardy's Full Scale IQ must be said to fall somewhere between 62.06 and 72.06.

As already noted, even without the Flynn Effect, and assuming adequate effort, Hardy's performance on the 1996 IQ test by Dr. Tetlow demonstrates that he has significantly subaverage intelligence and therefore meets the first criterion of the definition of mental retardation.  As Dr. Hayes did not administer her own IQ test to Hardy,[58] the Court must credit Dr. Tetlow's results unless they cannot be

---

[57]The calculation is .33 points per year times eighteen years, which equals 5.94 points.

[58] The Court notes that Dr. Hayes testified that she declined to administer her own IQ test because of the Court's requirement that any testing be videotaped.  She stated that videotaping potentially violated the American Psychological Association Ethics Principles by "placing confidential test procedures in the public domain" and that it might also offend copyright laws.  Rec. Doc. 2127 at 1020-21; Rec. Doc. 2129 at 1254-55.  The Court notes her view is not universal.  Dr. Hayes herself testified that other psychologists have videotaped their IQ testing and that the government could have requested another psychologist to do the evaluation but it did not.  Rec. Doc. 2129 at 1254-1255.  It is worth noting that in a case in this district, *United States v. Nelson*, 419 F.Supp.2d 891 (E.D.La. 2006), the government retained Dr. Matthew Thompson as their expert and he in fact videotaped his IQ testing procedures with the defendant.  Nonetheless, the defendant bears the burden of proving that he is mentally retarded.  Therefore, the government has no obligation to test the defendant or present its own evidence on

treated as reliable evidence of Hardy's IQ.  Dr. Hayes claims these results are not in fact reliable, citing a number of alleged inconsistences in Hardy's performance. The Court now turns to those objections.

       3.     <u>The Adequacy of Hardy's Effort</u>

Dr. Hayes gives a number of reasons in her report for dismissing the IQ score obtained by Dr. Tetlow.  They can be grouped into three broad categories: (1) the claim that Hardy failed to demonstrate expected practice effects on some tests, indicating a lack of effort; (2) personality testing of Hardy suggests a tendency to malinger; and (3) other miscellaneous discrepancies in the data.  The Court discusses each in turn.

       *i.*     *Practice Effects*

Dr. Hayes noted that Hardy took the WAIS-R test twice within one month, first with Dr. Tetlow and then with Dr. Martell, the government's psychologist at the time.  She testified that Hardy should therefore have obtained a higher IQ score with Dr. Martell because of the concept of "practice effects."  That is, having already taken the identical test with Dr. Tetlow, Hardy should have done better when he later took it with Dr. Martell.  The Court is inclined to agree as a matter of common sense.  And, in fact, Hardy did do better with Dr. Martell than with Dr. Tetlow—Hardy's Full Scale IQ rose, as did his score on seven of the WAIS-R's subtests.

_____

this issue.

Dr. Hayes contended this was not sufficient evidence of the expected practice effect, however, as Hardy's scores decreased on two of the WAIS-R's sub-tests—the Picture Arrangement and the Object Assembly subtests—that are the most sensitive to practice effects.[59]  The Court first notes that, regardless of how Hardy performed on those two subtests, he clearly demonstrated overall improvement during the testing by the government.  That improvement is inconsistent with any malingering strategy and is indicative of adequate effort.  Furthermore, as Dr. Cunningham explained, the two subtests at issue, of Picture Arrangement and Object Assembly, have the lowest reliability rating—or, put another way, the highest standard error of measurement.[60]  So, while Hardy's scores may have declined on those two subtests, they are the most unreliable ones.[61]  Meanwhile, his scores improved on the seven more reliable subtests.

Moreover, Dr. Cunningham noted that Hardy's two subtest score declines were still "well within the standard error of measurement" for those subtests.  In

--------

[59]Govt. Exh. 1 at 23-24; Rec. Doc. 2127 at 1025-27.  At a later point in her testimony, Dr. Hayes refers to the Picture "Completion" subtest as a test in which Hardy's scores declined.  Rec. Doc. 2129 at 1334.   In fact, he doubled his score on the Picture Completion test with Dr. Martell, which is wholly consistent with the expectation from practice effects.  *See* Govt. Exh. 1, att. 4 at 6.   Presumably, Dr. Hayes misspoke and meant the Picture *Arrangement* subtest, in which his score declined from a 7 to a 5.  *Id.*

[60]Rec. Doc. 2123 at 88-89, 91.  The standard error of measurement for those in Hardy's age group is 1.50 for the Picture Arrangement test and 1.71 in the Object Assembly test.   Deft. Exh. 30 at 33.

[61]Rec. Doc. 2123 at 91.

fact, similar or greater score declines occurred within the normative sample.[62]  Dr. Cunningham explained that expected variations within the normative sample are often set at a 90 percent range, meaning that 90 percent of the standardization sample had variations within that range.[63]  He reported that only one of Hardy's scores was outside the 90 percent variation range of the normative sample,[64] and that one was in a positive direction, consistent with the expected practice effects.[65]  Dr. Cunningham also noted in his report that to the extent that Hardy's improvement was more modest than that of many others, this is "unsurprising . . . given that persons with deficient intelligence may profit less from learning opportunities."[66]  Hence, any reduced practice effect is supportive of a finding of mild retardation.

Dr. Hayes mentioned neither the 90 percent range nor the standard error of measurement in her report or in her direct testimony, apparently considering them irrelevant.  When questioned about these two particular subtests on cross-examination, she opined that Hardy's two score declines were "statistically significant" because his scores were outside one standard deviation of the norming

---

[62]*Id.*

[63]Rec. Doc. 2131 at 1596.

[64]*Id.* at 1594.

[65]*Id.* at 1594-95.

[66]Deft. Exh. 19 at 5-6.

group that took the test.[67]  But when pressed on whether one standard deviation was in fact "statistically significant," she could not bring herself to answer one way or the other and instead stated that "the fact that he is doing worse when he should be doing better is what you should be focusing on."[68]  The Court finds this reasoning perplexingly circular, because consideration of the standard error of measurement and assessment of whether a change in score is statistically significant is essential in determining whether Hardy did in fact do "worse" in the first place.

Dr. Hayes makes substantially the same kind of argument concerning Hardy's performance on the neuropsychological testing by Dr. Martell in late March of 1996 and that by Dr. Kevin Bianchini in early April of that year.  Dr. Hayes pointed out that, on the Wechsler Memory Scale-Revised, Hardy received an Attention/Concentration Index Score of 80 during Dr. Martell's evaluation, but scored only 70 two weeks later when assessed by Dr. Bianchini.  From this she concluded that "the reliability and validity of the psychological and neuropsychological assessment data is questionable and is likely an underestimate of [Hardy's] true abilities."[69]

---

[67]Rec. Doc. 2129 at 1335.

[68]*Id.*

[69]Govt. Exh. 1 at 24.  In her testimony at the hearing, she elaborated on another test, the Trail Making Test ("TMT"), Part B, which is a measure of abstracting ability.  At the earlier testing, with Dr. Martell, Hardy completed this test in 83 seconds but two weeks later, despite the presumed practice effect, it took him 117 seconds to complete the same test.  Rec. Doc. 2127 at 1029.

Yet, exactly as with the two IQ tests, Dr. Hayes again bypassed that test's standard error of measurement when drawing her conclusions.  Dr. Cunningham testified that the variation in Hardy's score was still within the 90 percent reliability range of the standardization sample.[70]  With respect to Hardy's drop from 80 to 70 on the Attention/Concentration Index of the Wechsler Memory Scale, Dr. Cunningham had several additional relevant observations.

First, the standardization sample for that test was less than 400 people and did not include those in Hardy's age range, with some scholars recommending the test not be used with individuals in the excluded age ranges.[71]  Second, Dr. Cunningham testified that few of the subtests meet "even minimal standards for reliability."[72]  He asserted that, moreover, all of Hardy's scores were within the applicable standard error measurement.[73]  With respect to the Attention/Concentration Index in particular, he testified it is the most reliable of the various tests, but still subject to a broad standard error of measurement.

In fact, according to Dr. Cunningham, Hardy's Attention/Concentration score of 80 with Dr. Martell had a range of 73 to 90.  His score of 70 with Dr. Bianchini fell within a range of 64-81.  As the ranges of the two scores

---

[70]Rec. Doc. 2131 at 1599.

[71]Rec. Doc. 2123 at 93-94.

[72]*Id.* at 94.

[73]*Id.* at 97.

substantially overlap,[74] Dr. Cunningham testified that the score of 70 is not "meaningfully less than an 80."[75]  Put more technically, the "score discrepancy of nine to ten points is well within the 14-point discrepancy at a 95 percent confidence interval," ergo the difference is "not statistically significant."[76]

The rest of Dr. Hayes' alleged inconsistencies in Hardy's neuropsychological testing fall prey to the same problems:  There is no evidence of inconsistency, at least using the standard quantitative methods of her field.[77]  Dr. Cunningham is hardly an outlier in his use of such methods.  When asked at the first trial about Hardy's drop in scores on the neuropsychological testing, Dr. Bianchini answered that "there is a normal sort of variability that goes along with these tests.  There's a range within people tend to perform.  Someone could, you know, vary within that range and it not be especially significant.  So say, for example, if the standard variability on a test is ten points, if somebody is two to

---

[74]*Id.* at 95.

[75]*Id.* at 96-97.

[76]*Id.*

[77]For example, Dr. Hayes noted that Hardy's re-test score on the Category Test fell by one point.  Rec. Doc. 2127 at 1035-40.  Dr. Cunningham noted that this was well within the 90 percent reliability range for variation.  She also noted that Hardy's scores on the California Verbal Learning Test ("CVLT") and the Rey Auditory Verbal Learning Test ("RAVLT") declined.  While she thought those declines were "probably statistically meaningful," she admitted that she did not even look up the standard errors of measurements for the majority of the tests she discussed.  Rec. Doc. 2129 at 1268; *see also id.* at 1324, 1327-29.  In light of that, the Court finds her observations in this area to be unpersuasive.

three points lower, that's just statistical fluctuation."[78]

Perhaps Hardy did not benefit from *as great* a practice effect as others might have.  This may indicate, as suggested by Dr. Cunningham earlier, a "deficient intelligence" in that Hardy may have a lesser capacity to benefit from learning opportunities.[79]  Whatever it indicates, the Court has seen no evidence that it indicates Hardy failed to make an adequate effort on the IQ test with Dr. Tetlow.  First, other than the two WAIS-R subtests (and Hardy *did* show overall improvement the second time he took the WAIS-R) none of the tests Dr. Hayes discusses are tests of intelligence.  Moreover, Hardy's scattershot pattern of improvement and decline on these other tests is not consistent with a rational malingering strategy.[80]  The Court sees no reason to assume Hardy failed to make an adequate effort with Dr. Tetlow on the IQ test when no evidence indicates malingering in the other testing data.

Second, Dr. Bianchini himself gave Hardy high marks for effort, noting in his report that Hardy was "reluctant to give up when he could not remember all the correct responses," as, for example, when Hardy "did not want to move on to the next trial on the RAVLT until he had thought of every possible correct response to the previous trial."  He also concluded that Hardy "appeared to put forth much

---

[78]Deft. Exh. 18-4 at 244-45.

[79]Deft. Exh. 19 at 5-6.

[80]Recall that Hardy performed better for the *government's* expert in most of the instances of an alleged inconsistency here.

40

effort in an attempt to solve each task" and that his scores were a "valid measure of his current level of functioning."[81]

Lastly, as discussed before, each of the inconsistencies Dr. Hayes claims exist here could, according to the standard understanding in the profession, be due to chance. Dr. Hayes' overall argument appears to be that test score discrepancies, if enough are present, raise red flags, regardless of whether the differences in scores are statistically meaningful.[82] The Court frankly finds this testimony unsettling, as it evidences a casual attitude towards the science that undergirds IQ testing, and more specifically, the proper statistical interpretation of the various tests at issue. Based on the evidence in the record on this point, the Court must credit Dr. Cunningham's succinct criticism: "eyeballing test scores" for discrepancies, as Dr. Hayes did, is not appropriate.[83]

### ii.   *Personality Testing*

The next indicator of malingering/response bias identified by Dr. Hayes was Hardy's results on the Minnesota Multiphasic Personality Inventory - 2 ("MMPI-2"). Quoting from Dr. Martell's report, she stated that Hardy "was inconsistent in answering questions and over-reported his level of psychopathology in an effort to appear more disturbed than he really is."[84]

---

[81]Deft. Exh. 18-5 at 4.

[82]Rec. Doc. 2129 at 1270.

[83]Rec. Doc. 2131 at 1598.

[84]Govt. Exh. 1 at 24, quoting Dr. Martell's report, Govt. Exh. 1, att. 4 at 9.

Unfortunately, the details of Hardy's MMPI administered by Dr. Martell are no longer available and Dr. Martell did not describe the specific test results that led him to his conclusion.[85]  Nevertheless, Dr. Cunningham candidly noted that Dr. Tetlow also administered the MMPI to Hardy and likewise came up with a very elevated score on the same issue.  He also agreed that one interpretation of that elevated score is that Hardy was deliberately exaggerating his pathology.  Other explanations include test resistance, situational stress or marginal reading ability.[86]

As it turns out, the Court need not delve too deeply into these issues.  Dr. Cunningham testified that the standardization group for the MMPI did not include borderline or mentally retarded people.  In fact, nearly 75 percent of the group had some college education.  For that reason, Dr. Cunningham and a co-author, Dr.

---

[85]Rec. Doc. 2123 at 101-02.

[86]*Id.* at 102-03, 110.  With respect to reading ability, Dr. Cunningham testified that the MMPI-2 calls for the person taking the test to have an 8th grade reading level in order to comprehend the questions and answer appropriately. Contemporaneously with Hardy taking the MMPI, he was also given the Wide Range Achievement Test-Revised, which tests word recognition only, not comprehension, and he scored at only the 5th grade level.   Similarly, when Dr. Swanson tested him more recently for reading comprehension, he tested at the level of an in-coming 6th grader.  *Id.* at 104.  In light of that, Dr. Cunningham questioned the validity of the elevated pathology scores, suggesting that Hardy may have simply found the material too difficult to understand.  *Id.*  Dr. Cunningham acknowledges that Hardy was given a reading comprehension test in prison which indicated he read at a 13th grade level.  However, as he points out, this is an untimed test, which could have been taken back to the cell.   The test taking conditions are simply unknown and the results are wholly inconsistent with his other reading scores.  *Id.* at 105-07.  The Court gives credence to the reading recognition scores that show Hardy' word comprehension level at the time he took the MMPI to be no greater than a 5th grader, or a full three grade levels below the minimum required for this test.

Macvaugh, recently wrote that "[t]he MMPI is not an appropriate instrument for any purpose in the assessment of persons who may be suspected to have mental retardation."[87]  Dr. Hayes agreed that an MMPI is not an appropriate test to give to someone who is mentally retarded.[88]

Obviously, the issue is whether in fact Paul Hardy is mentally retarded.  If he is, then both Dr. Cunningham and Dr. Hayes agree that the MMPI results are meaningless.  Consequently, the assessment of whether Hardy is or not retarded must be made without considering his MMPI.

Dr. Hayes next highlighted Hardy's results on the The Millon Clinical Multiaxial Inventory - II, administered by Dr. Tetlow in February 1996. According to him, its results "may indicate a broad tendency to magnify the level of experienced illness or a characterological inclination to complain and to be self-pitying...or may convey feelings of extreme vulnerability, which are associated with a current episode of acute turmoil."[89]  Dr. Hayes included it because it indicated Hardy possibly had a tendency to magnify his psychological problems.[90]

The Court notes that, at the time he took the test, Hardy was incarcerated for the instant capital crimes.  Dr. Bianchini noted in his evaluation that Hardy's

---

[87]*Id.* at 109, 112.  *See also* Macvaugh & Cunningham Study, *supra* n. 30 at 177.

[88]Rec. Doc. 2128 at 1054.

[89]Govt. Exh. 1, att. 2.5 at 60; *Id.* at p. 24.

[90]Rec. Doc. 2128 at 1055.

brother Wayne had recently been murdered, and that Hardy saw a psychiatrist in prison and was on medication as a result.[91]  These circumstances might very well qualify as an "episode of acute turmoil" that may very well have induced "feelings of extreme vulnerability."  But whether or not they do or did, this test, like the MMPI, also requires an 8th grade reading level to comprehend its questions.[92]  And, again as with the MMPI, both Dr. Hayes and Dr. Cunningham agree that this test is not appropriate for people who are mentally retarded.[93]  So, the Court finds this test score irrelevant for the same reasons it found the MMPI score to be irrelevant.

### iii.    Other Discrepancies

Only two of Dr. Hayes' additional discrepancies deserve much serious discussion.  They involve Hardy's performance on two clinical tests, the Wechsler Adult Intelligence Scale - Revised (WAIS-R) Digit Span Subtest and the "Serial 7's" test.

Dr. Hayes noted that Hardy could recite a four digit number backwards when tested by Dr. Tetlow using the Digit Span Subtest in February 1996, but when he was asked to do the same task some weeks later for Dr. Bianchini on the Wechsler Memory Scale-Revised, he could only successfully recite two numbers

---

[91]Deft. Exh.18-5 at 3.  Dr. Bianchini has both the date and the year incorrect regarding Wayne Hardy death.  He evaluated Hardy in early April 1996, and in his report states that Wayne Hardy was killed on "June 18 of this year (1986)."  Wayne's mother, Marie Hardy, testified in April, 1996, that Wayne Hardy had been killed in January of that year.   Deft. Exh. 34-UU at 24.

[92]Rec. Doc. 2123 at 117.

[93]Rec. Doc. 2123 at 116-17; Rec. Doc. 2128 at 1055-56.

backwards.[94]  The Court's initial reaction to this "discrepancy" is to regard it as *de minimis*—hardly the kind of evidence needed for the Court to throw out Dr. Tetlow's IQ test.

Dr. Hayes is correct that Hardy was able to correctly recite a four digit number backwards when Dr. Tetlow tested him, however he was only able to do that one time successfully.  A second attempt failed.  He was also able to recite backwards two sets of three digits and two sets of two digits.[95]  When Dr. Bianchini tested him, Hardy was only able to recite two digits backwards, failing twice at trying to recite three.[96]  Worth noting, however, is that even though he failed at reciting three digits backward for Dr. Bianchini, he actually got all the numbers correct, but in a forward sequence instead of backwards  (4-9-3 he recited as 9-3-4 instead of 3-9-4 and 5-2-6 he recited as 2-6-5 instead of 6-2-5).

So, for both Dr. Tetlow and Dr. Bianchini, Hardy was able to recite two digits backwards; for Dr. Tetlow he was able to recite three and four digits backwards, and with Dr. Bianchini, he got the three digits correct, but went forward instead of backward.  Noteworthy also is that for the *forward* digit span test, Hardy's performance was consistent between the two test sessions as the

_____

[94]Govt. Exh. 1 at 23; Rec. Doc. 2127 at 1024.  *See also* Govt. Exh. 1, atts. 2 & 2.5.  The Court notes that  Dr. Tetlow's psychological testing is included as an exhibit, but was not given an exhibit number; the Court has identified it as Govt. Exh. 1, att. 2.5 in the index to those exhibits.

[95]Govt. Exh. 1, att. 2 at 1.

[96]*Id.* at 3.

differences are not statistically significant.[97]  In addition, Dr. Cunningham testified that the digit span subtest is "remarkably sensitive to distraction or preoccupation."[98]  Considering Hardy's overall performance on this digit span subtest, the Court finds that Hardy's mix-up on the three digit backward sequence to be *de minimis*.

Dr. Hayes was also concerned that Dr. Swanson stated that Hardy was unable to count backwards from 100 by sevens, yet he was able to do so with Dr. Hayes, using his fingers.[99]  When Dr. Swanson testified at the *Atkins* hearing, she elaborated that Hardy first requested to use paper and pencil for the task and she told him no.  Dr. Swanson also told Hardy that he could not use his fingers; he had to count in his head.  She said that he went six backwards from one hundred, instead of seven, and then said he could not do it.[100]  In her hearing testimony,  Dr. Hayes testified Hardy was able to complete the task in a minute and fifteen seconds, and that Dr. Cunningham, in his 1996 report, likewise stated Hardy did not have difficulty with the task.[101]  However, as is apparent from the video, Dr.

---

[97]With Dr. Tetlow, Hardy could recite up to seven digits forward one time successfully, failing a second attempt.  With Dr. Bianchini, Hardy could recite up to six digits forward successfully twice but failed at seven digits.  Govt. Exh. 1, att. 2 at 9 & att. 2.5; *see also* Rec. Doc. 2123 at 98-99 (testimony of Dr. Cunningham that the difference is not statistically significant).

[98]Rec. Doc. 2123 at 101.

[99]Govt. Exh. 1 at 25.

[100]Rec. Doc. 2126 at 845.

[101]Rec. Doc. 2128 at 1057-58.

Hayes allowed Hardy to use his fingers in doing the counting.  Dr.  Cunningham testified that the proper way to do the test is for the person to hold the numbers in their head and subtract, without external props, like counting fingers as Hardy did. In Dr. Cunningham's opinion, Hardy actually performed "serial ones" for Dr. Hayes because he counted down, one by one, on his fingers through each seven digit sequence.[102]  He did point out that it had diagnostic value in that Hardy needed to use the manual aid to help him, which illustrated his concreteness of thought and is consistent with mental retardation.[103]

With respect to his own testing of Hardy in 1996, Dr. Cunningham recorded that Hardy completed the task without error but did so slowly and by calculating outloud, similarly to what he did with Dr. Hayes.[104]  Dr. Bianchini also asked Hardy to do the Serial 7's test and he reported Hardy finished it in 36 seconds. This is significantly shorter than the time that Dr. Hayes reported, when Hardy used his fingers, and it appears likely that Dr. Bianchini did not have Hardy count below 65,[105] which would account for that discrepancy.  His report is silent as to whether Hardy used his fingers or counted aloud.[106]

---

[102]Rec. Doc. 2123 at 123.

[103]*Id.* at 123-24.

[104]Rec. Doc. 2124 at 290.

[105]Govt. Exh. 1, att. 2 at 51. On "Serial 7's," the time is indicated as 36 and errors as none, but the checklist stops at 65.

[106]Deft. Exh. 18-5 at 6.

With respect to Serial 7's, the Court concludes that Hardy is apparently able to complete the task, but only by either counting outloud or using his fingers, and taking considerable time.  His performance is consistent.

The Court finds the remaining alleged discrepancies cited by Dr. Hayes to be in essence insignificant.  The Court nevertheless feels an obligation to address them given the gravity of the issue before it.   Therefore, a discussion of them is incorporated into "Appendix A," attached to this opinion.

### iv.     Malingering/Response Bias

The Court has serious concerns with Dr. Hayes' treatment of the first substantive issue addressed in her report, "Malingering/Response Bias,"[107] which relates to the adequacy of Hardy's effort.  Dr. Hayes began by citing the DSM-IV-TR's criteria regarding when malingering should be suspected, which include a medicolegal context and the presence of antisocial personality disorder.[108]  After noting that Hardy was obviously being tested in a medicolegal context, Dr. Hayes spent considerable time in her report and testimony discussing why Hardy could be diagnosed with antisocial personality disorder, even going so far as to present a PowerPoint presentation on the topic.[109]  And, Dr. Hayes affirmatively stated in her report that "Markers indicative of malingering were evident in Mr. Hardy's psychological assessment measures and available records" and then lists as

---

[107]Govt. Exh. 1 at 21.

[108]Id. at 21-22.

[109]Id. at 22; Rec. Doc. 2127 at 1013-19; Govt. Exh. 4 at 20.

"examples" four pages of these alleged discrepancies in his assessment.[110]

This particular issue caused a significant excursion down an *Alice in Wonderland* rabbit hole that turned out to be largely unnecessary.  Despite clearly indicating by the above that Hardy's IQ assessment evidenced malingering, Dr. Hayes ultimately stated repeatedly on the witness stand, but unfortunately not until cross-examination, that she did not believe Hardy malingered at all.[111]

Dr. Hayes would have been considerably more helpful to the Court had she been similarly forthcoming in her report, and at the outset of her direct testimony.  As it was, the defense spent a considerable amount of time eliciting repetitive evidence, ultimately unnecessary, that the discrepancies cited by Dr. Hayes were not indicative of "malingering" because they charted no logical course of

---

[110]Govt. Exh. 1 at 23-27.  Also, on page 27 of her report, in a section entitled as an opinion regarding "the issue of malingering or response bias," Dr. Hayes again stressed the medicolegal context and Hardy's Anti Social Personality Disorder traits, and she faulted the defense psychologists for failing to administer more recent malingering tests.

[111]On cross-examination, Dr. Hayes was asked if she is saying Hardy malingered, and she answered, "No, not at all."  Rec. Doc. 2129 at 1265.  Shortly thereafter, she repeated, "So in my opinion at this point as I sit here and testify, I don't believe he is malingering." *Id*. at 1267.   Still later, she reiterated,  "I do not believe that Mr. Hardy was intentionally producing false or grossly exaggerated symptoms for secondary gain based upon the information that I have."  *Id.* at 1311.  She again repeats several times that she did not believe he malingered.  *Id.* at 1311-12.   She later testified that she has had cases where she believed the person malingered but repeats that her opinion in this case is that Hardy did not malinger.  *Id*. at 1323.

"malingering strategy."[112]  Likewise her testimony regarding whether Hardy met the characteristics of anti-social personality disorder was irrelevant.

With respect to the issue of malingering, Dr. Bianchini tested Hardy for it in 1996 with the Portland Digit Recognition Test.[113]  He testified at the first sentencing hearing that Hardy "did fine . . . with no indication of malingering."[114] The government's psychologist, Dr. Martell, tested Hardy with the Dot Counting Test and the Memory for Fifteen Items Test.[115]  He described Hardy as "cooperative and friendly throughout most of two days of examination and testing" and that on "tests specifically designed to detect efforts to malinger brain damage, his performance was within acceptable limits."[116]

Dr. Hayes acknowledged that these malingering tests in 1996 were all within

---

[112]See for example, Rec. Doc. 2123 at 90, 91-92, 97, 101, 113-14.  This allegation of "malingering" extended beyond just the language of her report. During Dr. Hayes' trial testimony, the government used slides, for example, entitled "Malingering Performance."   Rec. Doc. 2127 at 1027; Govt. Exh. 4 at 21.

[113]Govt. Exh. 1, att. 2 at 46.

[114]Deft. Exh. 35-VV at 227, 248.  In his report, Dr. Bianchini stated that  "Mr Hardy showed no attempt 'fake bad' on this test. Out of 72 trials, he made 63 correct responses.  This is well within the normal limits for a valid response.  This lack of evidence of malingering on this validity check combined with the lack of test results suggesting efforts to 'fake bad' strongly supports the validity of this patient's performance on this battery as a whole." Deft. Exh. 18-5 at 11.

[115]Govt. Exh. 1, att. 4 at 2.

[116]Id. at 4.  Dr. Martell did find an "inconsistent pattern" in Hardy's results, which he said "suggests that (Hardy) may not have been putting forth his best effort..."  Id.  His objections are no different than those of Dr. Hayes, who ultimately adopted his view.

normal limits, but she then suggested that the specific tests used are either ineffective in a mentally retarded population or have yet to be evaluated in that population.[117]  This was a puzzling position for her to take, since she maintained that Hardy is not mentally retarded.  Nevertheless, she opined that the tests used by government psychologist Dr. Martell, the Dot Counting Test and the Memory for Fifteen Items Test, "fare poorly in distinguishing individuals with mental retardation from those feigning this level of functioning."[118]  But that is only true if the person does poorly on the test, not well, as Hardy did.  As Dr. Cunningham testified, these tests are designed to look difficult, but are in fact easy. Consequently, if someone who is mentally retarded scores poorly, *then* the examiner might be concerned whether the low score was due to deliberate lack of effort.  But if a person scores well on it, even a mentally retarded person,  then it indicates he is making good effort despite the disability.  Only poor scores create the issue raised by Dr. Hayes, not good scores like Hardy's, as indicated in the testimony of Dr. Cunningham.[119]  So the issue raised by Dr. Hayes, aside from being contrary to her own assessment of Hardy's intellectual functioning, is in fact no issue at all.

The Court concludes, as did Dr. Hayes ultimately, that Hardy did not malinger during any of his testing in 1996.  The Court also concludes that Dr.

---

[117]Rec, Doc. 2128 at 1062; Govt. Exh. 1 at 28.

[118]*Id.*

[119]Rec. Doc. 2123 at 131-33.

Hayes alternative claim—that Hardy's IQ test results were "inconsistent" and that perhaps it was not his "best effort," due to any number of reasons, such as being hungry, or the room being at an uncomfortable temperature, or having an upset stomach or not feeling well, or having attentional difficulties[120]—are not supported by any evidence either.

Dr. Hayes concluded based on all of the above that, "to a reasonable degree of psychological certainty, Mr. Hardy's amount of effort expended on the 1996 and 2008 assessment measures were inconsistent" and therefore the results indicated no more than Hardy's "minimum" level of functioning.[121]

Yet Dr. Hayes conceded that none of the several psychologists who testified indicated any problems with Hardy's level of effort during the testing.[122]  And, as described above, a number of the alleged inconsistencies were not, in fact, inconsistencies at all.  Others were largely insignificant, merely minor variations to be expected within any repetitive testing procedures.  And others were actually consistent with someone who is mildly mentally retarded.

The Court concludes that Dr. Hayes inappropriately discounted data supportive of the accuracy of the IQ testing, and disregarded essential scientific principles, such as the standard error of measurement in reaching her opinions.

---

[120]Rec. Doc. 2129 at 1266, 1313.

[121]Govt. Exh. 1 at 29; *see also* Rec. Doc. 2128 at 1093; Rec. Doc. 2129 at 1191.

[122]Rec. Doc. 2129 at 1340, 1336-37.

The Court finds that Dr. Hayes' rationale for rejecting the reliability of Hardy's 1996 IQ test results is unpersuasive.

> 4.    Other Evidence of Hardy's IQ

Both the APA and AAMR/AAIDD indicate that a diagnosis of mental retardation should be made based on IQ test results where it is possible to perform such a test.[123]  As the Court has concluded that Hardy made an adequate effort on the most accurate IQ test in evidence, it need not look to other sources to measure his intelligence.  But because Dr. Hayes discounted Hardy's score as unreliable, she sought to determine his intelligence using other methods.  Her sources fall into several categories: (1) school records; (2) data about his family; (3) the opinions of lay persons; and (4) demographic variables.

The Court, in keeping with the views of the APA and AAMR/AAIDD, has and will rely on Hardy's IQ test score to determine whether he meets the first criterion of the definition of mental retardation.  A discussion of Dr. Hayes' testimony concerning these other sources of information is nevertheless both instructive and necessary.  It is instructive, as the relevant evidence is consistent with the conclusion that Hardy has significantly subaverage intelligence functioning.  It is necessary, as Dr. Hayes' testimony on these other sources informs the Court's assessment of her overall credibility.  The Court provides a discussion of the problems with her testimony in "Appendix B," attached to this

---

[123]AAMR 10TH EDITION at 51–52; DSM-IV-TR at 41–42.

opinion.

<u>5.</u>    <u>The 1996 Testimony</u>

The Court now must now address the "elephant in the room" from the 1996

IQ testing.  While the Court has been critical of segments of Dr. Hayes' evaluation

for failing to adhere to the scientific methodology of her field, the Court is equally

concerned, and for the same reason, with the questionable conclusions of two of

the defense psychologists from 1996.  Both of these psychologists opined that the

tests of Hardy's IQ *underestimated* his cognitive abilities, which they claimed to be

in the normal range—despite his scores to the contrary.

The first, Dr. Tetlow, administered the WAIS-R test to Hardy and scored his

Full Scale IQ as 73, which could have led to a diagnosis of mild mental

retardation.[124]  Nonetheless, Dr. Tetlow did not diagnose Hardy as mentally

retarded because he was of the opinion that, based on Hardy's

> educational and socioeconomic background, I estimate that his actual
> functioning and cognitive functioning is not an adult in the low
> average but actually about 10 points higher, so he would just be an
> adult normal.[125]

At the same time Dr. Tetlow testified to this, he stated that Hardy "does give the

impression of being more intelligent than he really is."[126]  He also noted that

Hardy's lowest score was in "comprehension," which is the "measure of how much

---

[124]Govt. Exh. 1, att. 2.5 at 1; Deft. Exh. 33-EE at 1.

[125]Deft. Exh 35-VV at 181.

[126]*Id*. at 181-182.

one has picked up from one's environment, the do's and don't's and should and shouldn't from the environment."[127]  There Hardy "scored a three, which is very, very low, which a very small percentage of people score any lower than that."[128]  Yet Dr. Tetlow ignored the results of his scientifically based testing and surmised that Hardy's IQ was in fact significantly higher.

The second defense psychologist, Dr. Cunningham, accepted Dr. Tetlow's findings as to Hardy's IQ score and also thought it underestimated Hardy's cognitive abilities.  He testified that Hardy's scores "are probably about 15 points lower than his true intellectual horsepower,"[129] and he therefore did not diagnose Hardy with mental retardation.  Instead, Dr. Cunningham diagnosed him with "post-traumatic personality disorder" on Axis II of the DSM-IV (Personality Disorder Not Otherwise Specified, #301.9).  When asked in 1996 to explain why, he testified:

> There is some research, Matarozo is one of the guys that has written in this area, that indicates that when you give standardized intelligence tests like this, that blacks score about 15 points lower nationally than you would statistically expect, so for — you know, this number is only relevant as you compare it to other people, and so when you compare this number to a black population, it really is more like —

---

[127]Deft. Exh. 35-VV at 182.  This is the kind of intelligence focused on by the AAMR in its definition of mental retardation.  *See, e.g.*, AAMR 10TH EDITION at 40 ("As reflected in this definition, intelligence is not merely book learning, a narrow academic skill, or test-taking smarts.  Rather, it reflects a broader and deeper capacity for comprehending our surroundings — catching on, making sense of things, or figuring out what to do.").

[128]Deft. Exh. 35-VV at 182.

[129]*Id*. at 66.

when you're looking at the distribution, it's more like an I.Q. of 90, so . . . .[130]

Dr. Cunningham further suggested that language problems and "cultural components . . . suppress performance on these tests."[131]

In his 2009 expert report and testimony at the *Atkins* hearing, Dr. Cunningham repudiated his earlier conclusion that Hardy's IQ test results in 1996 underestimated his cognitive skills.  He did, however, maintain that his earlier testimony was consistent with research data available in 1996, which suggested socio-economic factors were at play and so Hardy's score should be compared to others of his race, rather than the population in general.[132]  In his own words, he "was making a race based adjustment . . . as compared to other black Americans," which led him to testify that Hardy has "an IQ of 88 rather than 73."[133]  Like Dr. Tetlow, Dr. Cunningham ignored the actual, scientific test results used to diagnose mental retardation in his field to come to this conclusion.

At the *Atkins* hearing, Dr. Cunningham stated he no longer believed that race-specific scoring was appropriate, explaining:

> It is now my view that whatever the etiologies of an observed IQ score (e.g. genetic, neurological insult, deprivation), this score is most meaningfully understood in comparison to all Americans rather than

---

[130]*Id.* at 66-67; *see also* Rec. Doc. 2123 at 198-199.

[131]Rec. Doc. 18-6 at 67.

[132]Deft. Exh. 19 at 1–2.

[133]Rec. Doc. 2123 at 198.

in comparison to a specific racial or ethnic group.[134]

In recognizing the validity of the use of national norms at the *Atkins* hearing, Dr. Cunningham admitted his 1996 IQ enhancement was "an attempt to be more culturally sensitive," that it was not a "*sound diagnostic procedure*" and it was "regretful."[135]  It is true that Dr. Cunningham did not administer an IQ test to Hardy in 1996, and was not engaged to provide an IQ assessment.[136]  That does not excuse his use of unsound diagnostic procedures to the extent he ventured an opinion on IQ.

In addition to Dr. Cunningham's disregard of the actual test results back in 1996, the Court is also disturbed by the complete reversal of Dr. Cunningham's position now.  The Court must question whether it is a reversal of convenience simply to accommodate a finding of mental retardation.  Furthermore, even in 1996 (prior to *Atkins*), a federal statute prohibited the execution of the mentally retarded, and so the possibility of mental retardation *should* have been explored.   It was Dr. Cunningham's—and defense counsel's—duty to consider this issue, which they apparently neglected to do.[137]

---

[134]*Id.*

[135]Rec. Doc. 2123 at 199 (emphasis added).

[136]Deft. Exh. 18-6 at 16-18, 27-64, 71-72.

[137]The Court is mindful of the Supreme Court's caveat that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury."  *Atkins*, 536 U.S. at 321.  While defense counsel was entitled to make a strategic choice whether to raise mental retardation based on all the facts,

Nevertheless, all the experts in this case now agree that it was error to provide a race-based enhancement to Hardy's IQ score in 1996.  Dr. Hayes agrees that Hardy's scores should not be compared only to African-Americans but to all Americans.[138]  She pointed out that the publishers of the WAIS-R tried to make the normative sample as demographically similar to the American population as possible, so that comparing any individual's score to it would be appropriate.[139]  Dr. Hayes also opined that Hardy's IQ score of 73 in 1996 should have triggered a further inquiry into mental retardation,[140] a view currently shared by Drs. Swanson and Cunningham.  Indeed, even in 1996, Dr. Cunningham concluded that Hardy has "impaired intellectual development."[141]

For these reasons, the Court concludes that Dr. Cunningham's reversal of opinion on this one issue is an honest one and not result-driven.  Indeed, it took some degree of professional courage for him to re-appear in this case and admit his own mistake, one apparently shared by at least some others at that time.  The Court

---

Dr. Cunningham was, as a professional psychologist, obliged to provide an objective appraisal of Hardy's level of intellectual functioning.

[138]Govt. Exh. 1 at 39–40.

[139]*Id.* at 39-40; *see also* Andres Barona, Cecil R. Reynolds & Robert Chastain, *A Demographically Based Index of Premorbid Intelligence for the WAIS-R*, 52 J. CONSULTING & CLINICAL PSYCHOL. at 885 (1984) [hereinafter Barona Study] (S-13) (noting that the new standardization sample for the WAIS-R was selected "to reflect more precisely the population of the United States and thus increase the accuracy and generalizability of the test.").

[140]Rec. Doc. 2129 at 1192.

[141]*Id.* at 64, 66.

also appreciates Dr. Cunningham's contrition, which it will take into account going forward.

To recapitulate, all the experts in this case agree that Hardy's IQ of 73 puts him in the range where a diagnosis of mild mental retardation must be considered. Moreover, as detailed in Appendix C, the actual findings made by Dr. Cunningham in his earlier assessment of Hardy, including a possible diagnosis of attention deficit disorder[142] and mild brain injury from multiple head traumas during the developmental years[143] (facts confirmed by Dr. Bianchini[144]), along with the diagnosis of an unspecified Personality Disorder,[145] share characteristics in common with mild mental retardation. Furthermore, the results of the Rorschach test administered by Dr. Tetlow uncovered a similar pattern,[146] as further discussed in Appendix C.

In effect, the various defense experts in 1996 circled around a diagnosis of mild mental retardation, but because both Dr. Tetlow and Dr. Cunningham believed the IQ scores were an underestimate of Hardy's intellectual functioning,

---

[142]Deft. Exh. 18-6 at 19-20; DSM-IV at 83-85.

[143]Deft. Exh. 18-6 at 21.  Dr. Cunningham recited six separate incidents reported by Hardy or family members where Hardy was struck in the head prior to the age of 18, including at least one with a loss of consciousness, which could be significant if the head injuries caused Hardy's mental retardation, as they were sustained prior to age 18.

[144]Deft. Exh. 18-4 at 221–22, 227–29, 243–44, 249; Deft. Exh. 18-5 at 12.

[145]Deft. Exh. 35-CCC at 3.

[146]Govt. Exh. 1, att. 2.5 at 25, 27–29; *see also* Appendix A.

neither one drilled down into that possibility.  The Court finds that, notwithstanding the differences between the testimony at the 1996 hearing and this one, Hardy has established by a preponderance of the evidence that his intellectual functioning is approximately two standard deviations below the mean.  He therefore possesses significantly subaverage intellectual functioning as that term is used to diagnose mental retardation.  The Court now turns to the other criteria relevant to this diagnosis.

    **b.**    **Factor Two: Significant Limitations in Adaptive Functioning**

Hardy has established that he has significantly subaverage intellectual functioning, which is the first prong of the mental retardation test.   The Court must now consider whether he exhibits

> [c]oncurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

DSM-IV-TR at 49.  Or, in the words of the AAMR, whether he has "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."  AAMR 10TH EDITION at 8; *see also* AAIDD 11TH EDITION at 6.

Those two standards define what is referred to as the "adaptive behavior" prong of the diagnosis of mental retardation developed by APA and

AAMR/AAIDD.  It concerns "'how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.'"  *Wiley,* 2010 WL 4227405, at *15 (quoting DSM-IV-TR at 42).

### 1.    The Definition and Assessment of Adaptive Functioning/Behavior

The definition of this prong is less settled than that for intellectual functioning.  For IQ, the APA and AAMR/AAIDD are in substantial agreement on the standard to be used:  a score of 75 or below on one of the generally accepted tests of intelligence.  For adaptive behavior, the current version of the APA's guidance requires concurrent deficits in at least two of eleven relatively specific areas of adaptive functioning.  *See* DSM-IV-TR at 49.  The AAMR/AAIDD takes a more holistic approach and treats adaptive behavior as a global characteristic that finds expression in three relatively abstract areas of functioning—conceptual, social, and practical—and requires deficits in just one of these three general domains.  *See* AAMR 10ᵀᴴ EDITION at 13; AAIDD 11ᵀᴴ EDITION at 6.  That is, "the three broad domains of adaptive behavior in [the AAMR's] definition represent a shift from the requirement . . . that a person have limitations in at least 2 of the 10 specific skill areas listed in [the AAMR's] 1992 definition," which was the model for the approach still used by the APA.  AAMR 10ᵀᴴ EDITION at 73; Deft. Exh. 1 at 2; Govt. Exh. 1 at 60–61.  The AAIDD moved away from that model because "[t]he three broader domains of conceptual, social, and practical skills . . . are more consistent with the structure of existing measures and with the body of research on

adaptive behavior."  AAMR 10TH EDITION at 73, 78.

While these differences in definition deserve note, they are ultimately of no consequence to the Court's task.  Just as in *Wiley*, where the Fifth Circuit noted that the AAMR's definition has diverged from that of the APA, 2010 WL 4227405, at *15 n.13, the Court need not decide which is preferable or correct, because the differences between them are mostly theoretical.  Both the APA and the AAMR direct clinicians to the same standardized measures of adaptive behavior, such as the Vineland Adaptive Behavior Scales–II (VABS-II) and the AAMR's Adaptive Behavior Scale (ABS).[147]  *See* DSM-IV-TR at 42; AAMR 10TH EDITION at 76–78.  Still, as evidenced by the DSM-IV-TR's referral of clinicians to the AAMR's instruments, *see* DSM-IV-TR at 42, the AAMR/AAIDD has taken the lead in developing the guidelines for interpreting the results of those tests.  So the Court finds it appropriate to rely on the AAMR/AAIDD's procedures for evaluating a subject's level of adaptive functioning.[148]

The AAMR uses the following criteria for determining whether someone has significant limitations in adaptive functioning:

---

[147] Referred to as the AAMR ABS, as it was published before the change in name, and now in a second edition, the ABS-II.

[148] This does not mean that the APA's approach deserves less weight, but only that the AAMMR/AAIDD's is better developed.  The APA devotes only two paragraphs to adaptive behavior in its standard reference work and refers the reader elsewhere for information concerning the relevant tests;  the AAMR, on the other hand, devotes chapters to the concept and has played a key role in developing the assessment instruments used.

> [P]erformance [must be] at least two standard deviations below the
> mean of either (a) one of the following three types of adaptive
> behavior: conceptual, social, or practical, or (b) an overall score on a
> standardized measure of conceptual, social, and practical skills.

AAMR 10ᵀᴴ EDITION at 14.  The AAMR repeatedly emphasizes that a diagnosis of

significant limitations should be made whenever a person has performance at least

two standard deviations below the mean in any of the three domains (or in the total

score).  *See id.* at 74, 76, 78.

A person is assessed to determine whether he meets the AAMR's

operational definition by using one or more of five standardized tests: the VABS-II

and ABS-II mentioned above, as well as the Scales of Independent

Behavior–Revised (SIB-R), the Comprehensive Test of Adaptive

Behavior–Revised (CTB-R), and the Adaptive Behavior Assessment System

(ABAS).  AAMR 10ᵀᴴ EDITION at 77, 87–90.  As with the tests of IQ, the scores on

these tests for each domain, as well as the overall score, must be evaluated in light

of the standard errors of measurement for the test.  *Id.* at 79; USER'S MANUAL at

12-13.  "If a person has a score that does not meet the cutoff but is within one

standard deviation of the cut-score, it is advised that the score be reevaluated for

reliability or the individual should be reassessed with another measure." AAMR

10ᵀᴴ EDITION at 79.

None of the generally accepted scales of adaptive behavior rely on direct

observation or self report of typical behaviors by the individual being evaluated.

*Id.* at 85.  Instead, they direct clinicians to gather information about the person's

level of adaptive functioning from third parties.  In selecting the informant, it is "essential that people interviewed about someone's adaptive behavior be well-acquainted with the typical behavior of the person over an extended period of time, preferably in multiple settings."  *Id.*  "Observations made outside of the context of community environments typical of the individual's age peers and culture warrant severely reduced weight."  *Id.*  The informants should also be asked to provide information about the person's day-to-day level of functioning, as well as data on the amount of support the person needs in order to carry out any of the relevant functions.  *Id.* at 74–75; AAIDD 11ᵀᴴ EDITION at 45, 47; Deft. Exh. 1 at 7.

      2.    Retrospective Diagnosis

Unlike in a medical, educational, or social services context, the law is concerned with what was rather than what is.  The point of an *Atkins* hearing is to determine whether a person was mentally retarded at the time of the crime and therefore ineligible for the death penalty, not whether a person is currently mentally retarded and therefore in need of special services.  Because of this, the diagnosis of mental retardation in the *Atkins* context will always be complicated by the problems associated with retrospective diagnosis.

These problems are only compounded by the fact that both the APA and AAMR define mental retardation as a developmental disability and limit the diagnosis to those persons who exhibited the required characteristics prior to age 18.  As those under the age of 18 are already constitutionally ineligible for the death penalty, *Roper v. Simmons*, 543 U.S. 551 (2005), no clinician evaluating a

person for purposes of an *Atkins* hearing will ever be evaluating the person prior to age 18.  Mental retardation in the *Atkins* context must therefore be diagnosed, if it is to be diagnosed at all, retrospectively in every sense of the word.

So, while the APA speaks of "concurrent deficits or limitations in present adaptive functioning,"[149] and while some courts appear to have interpreted this language as directing consideration of how a person functions today rather than how he did at the time of the crime,[150] it is clear that the assessment of mental retardation for purposes of *Atkins* looks backwards—past even the time of the crime and back into the developmental period.[151]  Certainly a person's level of adaptive functioning in the present might provide some information about his abilities during the developmental period as, all things being equal, a person without limitations in the present is less likely to have had limitations before, and a person with limitations today is more likely to have had them during the

---

[149] DSM-IV-TR at 49.

[150]*United States v. Shields*, No. 04-20254, at slip op. 3 (W.D. Tenn. 2009).

[151]The concurrence of deficits in intellectual functioning and adaptive behavior referred to in the DSM-IV-TR is best understood as meaning that, during the developmental period, a person must exhibit deficits in both categories at the same time.  Understood that way, the language excludes from the diagnosis those who, despite a low IQ, did not develop deficits in adaptive functioning until later (or vice versa, for example if an injury causes a low IQ after the developmental period).  Even if a person's level of adaptive functioning outside of the developmental period were relevant, it is clear from *Atkins* that it would be the level of adaptive functioning at the time of the crime, not the time of hearing, that is relevant.  *See Atkins*, 536 U.S. at 315–21; *see also Pizzuto v. State*, 202 P.3d 642, 648 (Idaho 2008) ("[*Atkins* prohibited] the imposition of a death sentence upon offenders who are mentally retarded at the time of their crime.").

developmental period.  But particularly with the mildly mentally retarded, who tellingly used to be labeled the "educable," DSM-IV-TR at 43, the AAMR/AAIDD has been clear that a person's current strengths and weaknesses are not the best evidence of the relevant facts in an *Atkins* hearing.  *See, e.g.,* AAIDD 11TH EDITION at 95–96 (relegating contemporary assessment to a possible additional tool); *id.* at 46 (noting retrospective diagnosis requires evaluation of subject's "previous functioning").

With IQ, which is a relatively stable, immutable trait,[152] the problems associated with retrospective diagnosis mostly disappear.  A person's IQ tested after the developmental period is, absent intervening trauma or injury, likely to be quite close to the IQ that would have been obtained had the person been tested prior to age 18.[153]  The closest that retrospectivity comes to influencing the IQ prong of the test is the Flynn Effect.  But that phenomenon is an artifact of the instruments used to assess intelligence, not a consequence of retrospective diagnosis per se.[154]  Evaluating someone's adaptive behavior, on the other hand, is less stable even in theory, and difficult to assess in practice, and all the more so when done retrospectively.

_____

[152]*E.g.*, AAMR 10TH EDITION at 51–59.

[153]*See* Macvaugh & Cunningham Study, *supra* n. 30, at 156 (citing Everington & Olley, *supra* n. 23).  This is not to say that *assessments* of IQ, such as performance on an IQ test, may not vary.  *See id.*

[154] With the Flynn Effect, the comparison group is improving over time. With adaptive behavior, there is the possibility that the test subject has improved over time.

The committee of the APA responsible for mental retardation, Division 33, as well as the AAMR/AAIDD have developed guidelines to help clinicians navigate the difficulties associated with retrospective diagnosis. The guidelines in the AAIDD's USER'S GUIDE are the most detailed. Relevant to adaptive behavior, they direct clinicians to:

> (1) Conduct a thorough social history;
>
> (2) Conduct a thorough review of school records;
>
> . . . .
>
> (6) Recognize that self-ratings have a high risk of error with regard to adaptive behavior;
>
> (7) Conduct a longitudinal evaluation of adaptive behavior; and
>
> (8) Not use past criminal or verbal behavior in assessing adaptive behavior.

USER'S GUIDE at 18-22; Deft. Exh. 7. The third recommendation states in full that the assessment of adaptive behavior should:

> (a) use multiple informants and multiple contexts; (b) recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's peers and culture; (c) be aware that many important social behaviors, such as gullibility and naivete, are not measured on current adaptive behavior scales; (d) use an adaptive behavior scale that assesses behaviors that are currently viewed as developmentally and socially relevant; (e) understand that adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum; (f) realize that adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning.

USER'S GUIDE at 20.

Dr. Swanson opined that the literature also recommends having the informants focus on adaptive behavior closest to the developmental period that the informant is confident about discussing.[155]  When the informant has a clear memory of that period, whatever age it is, the examiner should log that age as the date of the defendant's functioning for purposes of scoring and comparison with age-normed tables.[156]  Dr. Hayes cited this portion of Dr. Swanson's report and noted her agreement.[157]

### 3.    Hardy's Level of Adaptive Functioning

Turning to the experts' evaluations of Hardy's level of adaptive functioning, the Court was struck at how different the assessments were, as compared to the intellectual functioning prong.  The Court's earlier task was, at bottom, a question of whether Hardy achieved a particular score on one of the standard measures of intelligence.  Moreover, the examples of acceptable IQ tests given by the AAMR/AAIDD and APA, and tests actually administered to Hardy, are themselves objective.  Their questions have right or wrong answers, their task-based challenges can either be completed or not within specified periods of time, et cetera.  The APA and AAMR/AAIDD elected to make the first prong of their definitions of mental retardation an essentially objective exercise in comparing two numbers—a score and a cutoff—and replaced individual clinicians' judgment with

---

[155] Deft. Exh. 1 at 6 (citing Olley & Cox Study, *supra* n. 4 at 389–390).

[156] *Id.*

[157] Govt. Exh. 1 at 61–62.

the consensus judgment of the profession.[158]

The evaluation of a person's adaptive functioning involves significantly more subjective clinical judgment.  That judgment is still constrained to some extent by the criteria spelled out by the APA and AAMR/AAIDD, as well as the use of standardized tests.  Yet the selection of the tests used to assess adaptive behavior, the persons selected as informants, the conduct of the interviews, and the ultimate interpretation of the tests' results are a good deal more dependent on subjective clinical judgment than the assessment of IQ.  The AAMR/AAIDD implicitly acknowledges this subjectivity in the very structure of its reference work.  In addition to the chapter devoted entirely to the topic of clinical judgment, the chapter on adaptive behavior has a lengthy section on the role and importance of it in assessment, AAMR 10TH EDITION at 85–87, one noticeably lacking from the chapter on intelligence.  *See also Wiley*, 2010 WL 4227405, at *16 ("The assessment of adaptive functioning deficits is no easy task.  Because its conceptualization 'has proven elusive,' adaptive functioning 'historically has been assessed on the inherently subjective bases of interviews, observations, and professional judgment.'" (internal quotation marks omitted)).

This greater degree of subjectivity has two consequences.  First, as the

---

[158] The only serious disputes on the first prong are over whether the standard error of measurement and the Flynn effect should be taken into account when determining the score.  While those two issues are arguably subject to clinical judgment, the first prong of the test remains largely objective.  They affect only the value at which the score is set.  Put another way, the decision whether to apply the Flynn effect or to adjust for the standard error of measurement may be subjective, but the effect of applying them is not.

degree to which a matter is left to an individual clinician's judgment increases, so does the degree to which the Court must rely on its assessment of the relative competence and credibility of the individual experts before it to resolve disputes between them.

Second, as the need for clinical judgment increases, so does the opportunity for disputes between clinicians. This case is a perfect example. On the objective prong of the test—significant limitations in intellectual functioning—it is worth repeating that the government and defense experts, despite the reams of paper that seemed to separate them, were not all that far apart. The government's expert, Dr. Hayes, agreed that Hardy's IQ score of 73 was within the zone of possible mild mental retardation and should have provoked further inquiry.[159] It was only her skepticism about the reliability of the 1996 test results that caused her to conclude that Hardy had not established to her satisfaction that he has a sufficiently low IQ to be diagnosed as mentally retarded.[160]

On the other hand, with regard to adaptive behavior, the defense and government experts are diametrically opposed. Dr. Swanson found that Hardy's level of adaptive functioning during the developmental period fell at least two standard deviations below the mean in seven of the DSM-IV-TR's eleven sub-domains of adaptive functioning (only two are required for a diagnosis of mental retardation). Dr. Hayes found no deficiencies at all, in any of the sub-domains,

---

[159]Rec. Doc. 2129 at 1192.

[160]Govt. Exh. 1 at 43–44.

based on her analysis.

This dramatic discrepancy may reflect the difficulty of diagnosing mild mental retardation in persons with higher IQs, as pointed out in the IQ section of this opinion, or the looseness and subjectivity of the adaptive behavior prong as compared to the relative preciseness of an IQ score range. A layperson, for example, might not even notice the deficiencies of a mildly mentally retarded person, unless required to work with that person on a close basis.[161]  Many, if not most, mildly retarded people fit into their communities fairly well.[162]  Finally, the differing assessment of the experts in this case regarding adaptive behavior may also result from their varying experience and competence. The Court concludes that all three factors were at play, as will be seen below.

The experts in this case each prepared a report on Hardy's level of adaptive functioning. The first, by Dr. Swanson, was prepared based on her review of Hardy's academic, medical, psychiatric, work, and prison records, along with interviews of: (1) Toni Van Buren, the mother of three of Hardy's children; (2) Theresa Minor, the first cousin of Hardy's mother and the mother of Tony Minor; (3) Tony Minor, one of Hardy's close childhood friends; (4) Vance Ceaser, another of Hardy's childhood friends; and (5) Greg Williams, one of Hardy's friends from young adulthood. Dr. Swanson also interviewed Hardy on several occasions from April through November of 2008, when she performed academic assessments and

---

[161]Rec. Doc. 2125 at 614.

[162]*Id.* at 615.

adaptive and academic probes in addition to her diagnostic interview.

The second report, by Dr. Hayes, was prepared based on a similar data set. In addition to the people interviewed by Dr. Swanson (excepting Tony Minor), Dr. Hayes also interviewed: (1) Lieutenant Shannon Desroche, Corporal Ryan Laylle, and Deputy Gary Adams, law enforcement officers familiar with Hardy from his incarceration at the St. Bernard Parish Jail; (2) Terry Hardy, Hardy's brother; (3) Faith Price, the mother of one of Hardy's sons; (4) Javetta Cooper, the mother of one of Hardy's daughters; (5) Sammie Williams, who met Hardy a few times through Len Davis, Williams' former partner at the New Orleans Police Department; and (6) various New Orleans Parish School Board employees.

Both Dr. Swanson and Dr. Hayes noted that their evaluations had to be made retrospectively.  In a part of Dr. Swanson's report with which Dr. Hayes was in agreement,[163] she provided an overview of the problems associated with retrospective diagnosis and the ways that clinicians grapple with them.  "To overcome this obstacle, experts in the field of mental retardation recommend that the examiner seek adaptive behavior information from several sources and to look for the convergence of findings."[164]  Those sources typically include school, medical, psychiatric, work, military, Social Security, and prison records, as well as interviews with "[i]ndividuals who have had the opportunity to observe the offender as he interacted in his home, neighborhood, and community during the

---

[163]Govt. Exh. 1 at 60–61.

[164]Deft. Exh. 1 at 6.

developmental period (i.e., prior to or as near the age of 18 as possible)."[165]

In another section of Dr. Swanson's report with which Dr. Hayes agreed,[166] she reviewed several of the tests used to search for convergence in these sources of data, namely the VABS-II, the SIB-R, and the second edition of the Adaptive Behavior Assessment System (ABAS-II).  These instruments, which Dr. Swanson wrote are the "three preferred standardized instruments currently used in assessing adaptive behavior[,] with the VABS-II and ABAS-II being the 'gold standard' in these types of assessments," provide the  structure for a clinician's evaluation of a person's level of adaptive functioning.[167]  They also provide a method of standardizing the evaluation of a person's level of adaptive functioning relative to the general population, and that allows clinicians to apply the recommendation of the AAMR/AAIDD that a finding of significant limitations in a person's adaptive behavior should be made only when the level of adaptation falls below approximately two standard deviations from the mean level of adaptive functioning in the population.[168]

An evaluation using the VABS-II, which is the instrument both Dr. Swanson and Dr. Hayes elected to use, provides standardized scores in four areas or domains of adaptive functioning—communication, daily living, socialization, and motor

---

[165]*Id.*

[166]Govt. Exh. 1 at 61.

[167]*Id.* at 6–7.

[168]*Id.* (citing Olley & Cox Study, *supra* n. 4 at 384-403).

skills—as well as an overall standardized score, called the Adaptive Behavior Composite (ABC).[169]  Dr. Swanson used Toni Van Buren as the informant for her VABS-II assessment, while Dr. Hayes used Javetta Cooper.  The Court will discuss each expert's assessment in turn.

        *i.*     *Dr. Swanson's Assessment*

As mentioned above, the relative experience and competence of the competing experts is an important factor to consider in evaluating their opinions. Dr. Swanson has essentially devoted her entire professional career to the assessment and treatment of the mentally retarded.   She testified that in her 35-year career, she has conducted over 10,000 assessments using the VABS-II and its forerunner.[170]  At APA and AAMR/AAIDD conferences, she seeks out the programs on the VABS-II to attend.  As newer versions of the test were promulgated, she regularly participates in the workshops presented by the publishers to explain any change in the procedures.[171]  Prior to her administration of the VABS-II to Toni Van Buren, the most current manual was not yet published. Nevertheless, Dr. Swanson attended an in-service program on the new manual, and discussed it with one of the authors, prior to meeting with Toni Van Buren.  Once the expanded version came out, she compared her administration of the VABS-II

---

[169]*Id.* at 6–7, 17–19.

[170]Rec. Doc. 2125 at 587, 724.

[171]*Id.* at 724.

to Toni Van Buren and was satisfied it was in compliance.[172]

Dr. Swanson also elaborated on what the clinician should be looking for in assessing an individual in their community.  As a person grew up, when did the person learn a certain skill, what did it take to teach him that skill, how many supports were necessary, did others step in to do the task for him, and finally, even within that community, did people recognize he was slower than others?[173]

A.    Dr. Swanson's VABS-II Assessment Based on Toni Van Buren

Dr. Swanson used the results of a semi-structured interview with Toni Van Buren to complete a VABS-II assessment of Hardy's level of adaptive functioning. As is recommended, her interview of Van Buren was limited to Van Buren's recollection of Hardy's "habitual or typical performance" in "day-to-day activities" during only the developmental period, i.e., prior to age 18.[174]  Based on that interview, Dr. Swanson calculated Hardy's VABS-II scores for his level of adaptive functioning at age 18 as follows:

|  | **Standardized Score** | **%tile Rank** | **Level** |
|---|---|---|---|
| Communication | 66 | 1%tile | MILD |
| Daily Living | 68 | 2%tile | MILD |
| Socialization | 67 | 1%tile | MILD |
| *Motor Skills | 100 | 50%tile | ADEQUATE |

[172]*Id.* at 721-24.

[173]*Id.* at 623, 644, 660, 676.

[174]*Id.* at 6–7, 17–18.

| ABC | 65 | 1%tile | MILD |

\* Motor skill scores are not included in Hardy's ABC score because of his age.

On the various sub-domains of those four main domains, Dr. Swanson reported that Hardy scored:

| Domains/ Subdomains | Standardized Score | Standard Deviation < Mean | Age-Equivalent Score |
|---|---|---|---|
| **Communication** | **66** | **-2.27** | |
| Receptive Language | 9 | -2.00 | 6:6 |
| Expressive Language | 9 | -2.00 | 6:7 |
| Written Language | 8 | -2.33 | 8:1 |
| **Daily Living** | **68** | **-2.13** | |
| Personal | 9 | -2.00 | 8:6 |
| Domestic | 9 | -2.00 | 10:0 |
| Community | 10 | -1.67 | 11:9 |
| **Socialization** | **67** | **-2.20** | |
| Interpersonal Relations | 9 | -2.00 | 6:7 |
| Play & Leisure Time | 9 | -2.00 | 7:7 |
| Coping Skills | 9 | -2.00 | 7:1 |
| **Motor Skills** | **100** | **at Mean** | |
| Gross Motor Skills | 16 | +0.33 | 22+ |
| Fine Motor Skills | 14 | -.033 | 6:6 |
| **ABC** | **65** | **-2.33** | |

Based on these scores, Dr. Swanson concluded that, during the

developmental period, Hardy's level of adaptive functioning fell at least two
standard deviations below the mean in seven of the eleven sub-domains of adaptive
functioning listed in the DSM-IV-TR definition of mental retardation.[175]  That is,
Hardy exhibited significant limitations in communication, functional academic
skills, self-care, home living, social/interpersonal skills, leisure, and self-
direction.[176]  As noted in Part 1, a DSM-IV-TR diagnosis of mental retardation
requires significant limitations in only two of the eleven areas.

Moreover, Hardy's scores on three of the four major domains of adaptive
functioning fell at least two standard deviations below the mean, and did so in the
three domains that correspond to the areas of adaptive functioning listed by the
AAMR/AAIDD in its definition of mental retardation.[177]  His composite or overall
score, the ABC score, was also at least two standard deviations below the mean
level of adaptive functioning in the population. Based on these results, Dr.
Swanson concluded that Hardy exhibited significant limitations in his level of
adaptive functioning during the developmental period.[178]

Dr. Swanson's report did not, however, rely solely on Hardy's scores on the
VABS-II to reach the conclusion that he satisfies the second criterion for a

---

[175] Although Hardy scored -2.00 standard deviations or below on eight of the
subdomains of the VABS-II, the first two communication subdomains correspond
to a single DSM-IV-TR area of adaptive functioning.

[176] *Id.* at 19.

[177]*See supra* pp. 61-62.

[178]Deft. Exh. 1 at 18–19.

diagnosis of mental retardation.  Dr. Swanson also discussed at length Van Buren's specific responses to the VABS-II questions.  For example, Van Buren reported that, when Hardy was 17.5 years old, he could not listen to a 30-minute story or a 15- to 30-minute informational talk because of his poor attention span.[179]  While Hardy could carry on a conversation, he had difficulty giving directions to others, such as directions to a street address.  While his money and math skills were better than his reading skills, he still relied on Van Buren to make all of his personal purchases.  She also had to manage his medications as well as his choices of clothing.  Van Buren reported that Hardy lacked basic domestic skills, so she had to assume a number of those responsibilities for him.  Thus, while Hardy had strengths, such as a basic ability to interact with others, the portrait painted by Van Buren was of a person with significant limitations.

B.      Dr. Hayes' Interview with Toni Van Buren[180]

Dr. Hayes also interviewed Toni Van Buren.  The interview lasted  for two hours and 45 minutes and was videotaped.[181]  This was particularly helpful to the

---

[179]The following is a summary of the material appearing in Dr. Swanson's report.  Deft. Exh. 1 at 19-21.

[180]Dr. Hayes' actual conclusions about Hardy's adaptive behavior will be discussed later in this opinion.  Her videotaped interviews are being included here because they allowed the Court to directly evaluate the credibility of the persons being interviewed.   Both the videotaped interviews and transcripts thereof are included as exhibits; the Court's references to the substance therein is to the transcripts.  *See* Govt. Exh. 1, atts. A-E, CDs 2-5;  Deft. Exhs. 8-11; 13-16.

[181]The government did not request that Dr. Swanson's interviews be videotaped prior to their completion, while the defense did timely request videotaping of Dr. Hayes' interviews.  The Court notes the usefulness of

Court because it allowed the Court to directly observe Van Buren, hear her narrative directly and make an independent assessment of her credibility, rather than having it filtered through Dr. Swanson's evaluation.  It also provided additional substantive information.

Hardy was Van Buren's first boyfriend,[182] and while she had a long term relationship with him, and they had three children together, Van Buren is still apparently bitter about his rampant infidelity.  In the 16 years since his incarceration, she has had only minimal conversation with him when he calls to speak to his children.[183]  This largely offsets any favoritism towards him she might have otherwise been suspected of having.  Nevertheless, she clearly has love for him as the father of their children[184] and this potential bias has been considered by this Court.  All in all, the Court found Van Buren to be remarkably forthcoming with Dr. Hayes[185] and credible.[186]

---

videotaping, which allows the Court to make its own credibility determinations, and recommends to future judges that interviews such as these on both sides be required to be videotaped.

[182] Govt. Exh. 1, att. A at 11.

[183] *Id.* at 25.

[184] *Id.* at 17, 25.

[185] For example, she candidly described Hardy as "very whore-ish."  *Id.* at 23.

[186] Dr. Hayes included in her report a narrative of arrests of Toni Van Buren, presumably to cast doubt on her credibility.  Govt. Exh. 1 at 62.  Van Buren testified at the *Atkins* hearing to a criminal conviction for possession of heroin. Rec. Doc. 2125 at 474.  Regardless, the Court has viewed the lengthy interview and found that Van Buren was candid with regard to Paul Hardy, any criminal

While Van Buren did not know Hardy well prior to the age of 18, she did know him very well in the immediate years that followed.  They dated for three years prior to the birth of their first child, Paula,[187] in 1989, and lived together through the birth of two more children over the next five years until his arrest.[188]

 She described how, from when she first met him, Hardy had a difficult time getting his point across and how he would get frustrated when people did not understand him.[189]  Even now, when she tries to talk to him, "he just really just don't understand" and the more she explains, the more he does not understand, and "then he gets frustrated and then he get me frustrated."[190]  She pointed out in particular that Hardy's interpretation of Bible passages, which he conveys to their children, is contrary to what she believes the passages mean.[191]

Van Buren related how in every facet of his life, Hardy relied on others to do things for him.  Hardy's mother, Marie, did all the cooking, cleaning and washing of clothes in the Hardy household as Paul was growing up.[192]  When she first

_____

history notwithstanding.   Her testimony at the *Atkins* hearing was likewise consistent with her interview with Dr. Hayes.

[187] Govt. Exh. 1, att. A at 13.

[188] *Id.* at 4; *see also* Rec. Doc. 2125 at 454-55, 458-59, 462.

[189] Govt. Exh. 1, att. A at 41, 78-79.

[190] *Id.* at 62.

[191] *Id.* at 79-80; Rec. Doc. 2125 at 468-69.

[192] Govt. Exh. 1, att. A at 14.

began dating Hardy, he "always had someone to drive him over."[193]   Once they were involved, Hardy would ask her to buy his clothes.[194]   She never knew him to do any shopping by himself.[195]   He gave her money to buy things for their children.[196]   He would join the children in parties, but did not do any of the planning.[197]   He never went to the store for her, nor helped around the house with cooking or washing clothes or dishes or mopping the floor.[198]   He could make a sandwich or fix cereal, but nothing more elaborate.[199]   She recalled one time when he attempted to change their daughter's diaper, he spread newspaper over the floor, "had wipes everywhere" and a shirt tied around his face, before he abandoned the effort.[200]

Hardy would give Van Buren the money to pay their bills.  She never knew him to make any payments himself.[201]   If something broke in the house, he would

---

[193] *Id.* at 9.

[194] *Id.* at 28, 41.

[195] *Id.* at 72.   Rec. Doc. 2125 at 462.

[196] Govt. Exh. 1, att. A at 33.

[197] *Id.* at 34, 89-90.

[198] *Id.* at 28-29, 85.

[199]*Id.* at 29, 63.

[200] *Id.* at 30; Rec. Doc. 2125 at 467.

[201]Govt. Exh. 1, att. A at 54.

call someone to fix it, "[h]e is not a handy guy at all."[202]  He had no concept of time and as a result was chronically late.[203]  They sometimes took the bus together but she did not recall him ever taking a bus on his own.[204]  When they were first dating, he encouraged her to stay in school but he would not try to help her with any of her studies, nor did she ask him to.[205]  He did not know how to use a thermometer.[206]  When they eventually decided to get an apartment of their own, Hardy asked his sister, Linda, to find a place for them, which she did.[207]  After that, Hardy's brother, Terry, bought a house and Hardy and Van Buren stayed there.[208]

Hardy learned to drive after he and Van Buren had dated awhile, and would drive very very slowly at first and did not improve for a long time.[209]  He never fixed his own car.[210]  He also would not drive anywhere he was not familiar with[211]

---

[202] *Id.* at 63.

[203] *Id.* at 55.

[204] *Id.* at 72; Rec. Doc. 2125 at 457.

[205] *Id.* at 75.

[206] *Id.* at 83.

[207] *Id.* at 16.

[208] *Id.* at 18.

[209] *Id.* at 35-36. Even though Van Buren was three and a half years younger than Hardy, she learned to drive before he did.  Rec. Doc. 2125 at 457.

[210] Govt. Exh. 1, att. A at 35.

[211] *Id.* at 42, 66.

and if he traveled outside the state, someone else would always go with him.[212]  At one point, he learned of a job with Meals on Wheels, delivering meals.  Van Buren went with him for the interview and filled out the paperwork for him.[213]  When he got the job, she rode with him to tell him which streets to go to.[214]  In terms of leisure activities, she described his only hobby as "females" and that he did not like fishing, playing sports, reading the newspaper or magazines, nor games,  nor did they talk about current events.[215]

Van Buren also described Hardy as too kindhearted, always trying to please the next person, and that many people "used him, took a lot of his kindness and . . . just walked over him."[216]  When asked if Hardy's brother, Wayne, was "slower" than Paul, she said "Paul was slower because Wayne knew a lot of ways to manipulate Paul.  He knew what to say to Paul to get Paul moving and doing whatever it was he wanted Paul to do."[217]   She also described how a friend of Hardy's told him he could get a credit card to rent cars if he opened a bank account, so he did.  As she put it, "a lot of stuff Paul did, it was because people told

---

[212] *Id.* at  43-44.

[213] *Id.* at 38.  She stated later that she had never seen him fill out an application for anything.  *Id.* at 39.

[214] *Id.* at 37.

[215] *Id.* at 26, 57, 70-71, 92.

[216] *Id.* at 21.

[217] *Id.* at 49-50.

him to."[218]  He sought advice from people he thought knew more than him.[219]

Hardy was generous with money, and "a lot of people clung to him a lot because

they could get him to give and to do whatever they asked him to do."[220]  She felt he

was taken advantage of by people he considered to be friends and that he was too

trusting.[221]

In retrospect, Van Buren thinks Hardy might have been slow.  "[A] lot of

things . . . he just didn't do on his own.   Always had somebody to do things for

him . . . He just didn't do . . . things on his own."[222]

C.    Dr. Swanson's Other Interviews[223]

This portrait was corroborated by others who knew Hardy at a much

younger age, such as Theresa Minor.[224]  She recalled that Hardy was slow

academically and a quiet child who had a speech impediment when he was

younger.  Despite the fact that her son, Tony, and Hardy were about the same age,

she thought that Hardy performed at a much lower level.  At ages four or five,

Hardy's inability to express himself was so frustrating to him that he would give

---

[218] *Id.* at 39.

[219] *Id.* at 79.

[220] *Id.* at 64-65.

[221] *Id.* at 65.

[222] *Id.* at  61.

[223] Deft. Exh. 1 at 10–12.

[224] *See id.* at 10.

up or cry.  She recalled that Hardy was often teased by other children for being the slowest among them, and she thought that Hardy was the slowest of all his siblings.

Tony Minor reported many of the same observations as his mother, based on his longstanding friendship with Hardy during childhood.[225]  Hardy struggled in school, to the point that reading was difficult for him well into middle school, and he functioned at a much lower level than his siblings, relying on them to cover for his deficits.  Vance Ceaser, another childhood friend of Hardy's, corroborated the reports from the Minors.[226]  For example, when Hardy and Ceaser were in high school, Ceaser attempted to tutor Hardy to help him pass.  He reported that it was impossible to do so.  That was hardly the first of Hardy's academic troubles however.  Ceaser recalled that, when they were in the 9th grade together, Hardy's reading, writing, and math skills were at an elementary school level.

Greg Williams, who met Hardy when he was about 20 years old, provided additional support for Dr. Swanson's conclusion that Hardy did not develop the usual adaptive behaviors.[227]  For example, Hardy relied on Williams to drive him when he needed to leave town.  Williams noted that Hardy relied on him during these trips, and at other times, for basic skills such as interpreting his bank and credit card statements.  Hardy was unable to care for possessions such as his car and made irrational choices, like continuing to make expensive repairs to his car

---

[225] *See id.* at 10–11.

[226] *See id.* at 12.

[227] *See id.* at 11–12.

long after it was economically sensible to do so.

The Court has had the benefit of reviewing videotaped interviews conducted by Dr. Hayes with Toni Van Buren, Theresa Minor, Vance Ceaser, and Greg Williams.[228]  The Court finds that, based on its review of these videotapes, each informant is credible and the information they provided is consistent with that in Dr. Swanson's report.  A full review of each tape appears in Appendix D, along with the Court's review of several other video and audiotapes submitted by the government as evidence about Hardy's level of adaptive functioning.

### D.    Dr. Swanson's Interviews and Testing of Hardy

In addition to the descriptive and narrative evidence discussed above, which supports the conclusion Dr. Swanson reached after applying the VABS-II, she also reviewed Hardy's medical and school records.  They were inconclusive on the issues of mental retardation but tended to demonstrate that Hardy had limited functional academic skills.[229]  So, Dr. Swanson conducted academic and adaptive probes on Hardy.[230]  She discovered that his reading fluency, assessed at 88 easy words ("sight" and "Dolch words") per minute, and accuracy, determined to be 97%, were average for a third-grader, but significantly below that of an average adult.  His reading comprehension was only 50%.  While his comprehension score

---

[228]Govt. Exh. 1, atts. CDs 2-5; Deft. Exhs. 13-16.

[229] Deft. Exh. 1 at 12–13.

[230] *Id.* at 21–23.

increased to 60% when Hardy was asked to read slightly more complicated materials such as a newspaper, his fluency and accuracy scores declined.

Hardy's math skills were slightly better than his reading skills, but still limited. His measurement and time-telling skills were limited in word problems, although he was able to use a calendar better. He exhibited significant deficits in domestic skills, such as reading oven and stove-top dials and using a washing machine, dryer, measuring cups, and a thermometer. His money skills were basic. For example, he could count money and make change with some effort, but he could not budget or manage money.

In a number of other areas, such as phone skills, health and safety matters, transportation, the use of reference materials and the like, Hardy performed at only a basic level, if that. He acknowledged that he has difficulty learning new tasks, including vocational ones, which likely accounts for his being employed only once (and briefly).[231] The assessments of his level of academic attainment, discussed above in the IQ section, put him between the 6th and 7th grade in reading skills, in the 6th grade in math skills, and the 3rd grade in writing skills.

Based on this substantial additional corroboration of Hardy's scores on the VABS-II found during her interviews, observations, and direct assessments of Hardy, Dr. Swanson concluded that he should be diagnosed with mild mental

---

[231] *Id.* at 14, 23. As it turns out, Hardy held two legitimate jobs, one with Meals on Wheels for some months and then as a porter/bus boy at Ernst Café. Govt. Exh. 1 at 157.

retardation.

ii.    *Dr. Hayes' Assessment*

Dr. Hayes has considerably less experience with the assessment of mental retardation as compared to Dr. Swanson.  In her entire career, she has done about 80 supervised and unsupervised assessments relating to mental retardation.[232]  Of those, she has performed approximately 20 mental retardation assessments and only ten VABS-II assessments since receiving her license in 1998[233] as compared to Dr. Swanson's over 10,000.  She also has had no training in administering the VABS-II since receiving her license.[234]  Unlike Dr. Swanson, Dr. Hayes did not attempt to obtain any formal training or advice from the authors of the latest manual, which was used in connection with this case.[235]  She testified that she felt it was unnecessary, given her experience in administering ten VABS-II in the past.[236]

A.    Dr. Hayes' VABS-II Assessment of Hardy Based on
Javetta Cooper

Dr. Hayes used the results of an interview with Javetta Cooper to complete a

---

[232]Rec. Doc. 2126 at 955.

[233]Rec. Doc. 2129 at 1208-09, 1223, 1226-27.

[234]*Id.* at 1223.

[235]*Id.* at 1224-1226.

[236]*Id.* at 1225-26.  Dr. Hayes also stated that she met one time with a group of colleagues to informally talk over the changes, but does not recall who was present.  *Id.* at 1231-32.

VABS-II assessment of Hardy's level of adaptive functioning, using Cooper's cumulative knowledge of Hardy.[237]  Based on that interview, Dr. Hayes calculated Hardy's VABS-II scores for his level of adaptive functioning as follows:

| Domains/ Subdomains | Standardized Score | Percentile Rank | Age-Equivalent Score |
|---|---|---|---|
| *Communication | -- | -- | |
| Receptive Language | 15 | 50th | 18 |
| Expressive Language | 11 | 10th | 8:7 |
| Written Language | -- | -- | -- |
| **Daily Living | -- | -- | |
| Personal | 12 | 16th | 17:3 |
| Domestic | 11 | 10th | 13:9 |
| Community | -- | -- | -- |
| *Socialization | -- | -- | |
| Interpersonal Relations | 14 | 36th | 16:0 |
| Play & Leisure Time | 12 | 16th | 14:0 |
| Coping Skills | -- | -- | -- |
| Motor Skills | N/A | N/A | |
| Gross Motor Skills | N/A | N/A | N/A |
| Fine Motor Skills | N/A | N/A | N/A |
| ABC | -- | -- | -- |

---

[237] Govt. Exh. 1 at 86 n. 64 ("[T]he age ranges used to compare Mr. Hardy's adaptive functioning were either 17:6 to 17:11 or 22:0 to 29:11 since this reflects Ms. Cooper's cumulative knowledge of the defendant.").

\* 17:6 to 17:11 age norms used; \*\* 22:0 to 29:11 age norms used.

As can be see from the above, Dr. Hayes did not score Hardy on any of the three general domains of adaptive functioning, she did not administer the motor skills domain portion of the test, and she did not compute an overall score. She explained that she was unable to tabulate the scores marked in the table as "– " because Cooper was unable to provide sufficient information. In fact, she indicated that one of the scores she did report, that listed for the "Personal" sub-domain under "Daily Living," could not be relied on as "Ms. Cooper did not have enough information to rate Mr. Hardy on three items," so the score could be used only "for informational purposes."[238]

Dr. Hayes nevertheless conducted a comparison of the scores she obtained for Hardy against the scores Dr. Swanson obtained through her application of the VABS-II to her interview with Van Buren. Her comparison reveals that, for questions that both Cooper and Van Buren answered, Cooper scored Hardy higher than Van Buren 38 times, lower than Van Buren twice, and gave the same score 6 times.[239] No comparison was possible for the remaining 28 questions that Dr. Hayes selected for comparison. Of note, many of the discrepancies were of only one response level, such as between a score from Van Buren that Hardy was "sometimes" able to perform the task without help or reminders and a score from

---

[238] *Id.* at 86–87 n. 66.

[239] *Id.* at 88–105.

Cooper indicating that he "usually" did.

The remainder of this portion of Dr. Hayes' report on adaptive behavior briefly discusses the shortcomings of the VABS-II.[240]  It does not reflect that Dr. Hayes reached a definitive conclusion concerning Hardy's level of adaptive functioning based on the VABS-II or any other test.  Instead, the rest of her report indicates that she turned to other sources of information, some of which Dr. Swanson used as well.

After consulting these other sources, Dr. Hayes concluded that "[t]here is little evidence to suggest that Mr. Hardy had any substantial limitations or problems performing the activities of daily living required for personal and social sufficiency."[241]  She also noted several ways in which she believes Dr. Swanson erred, making the point that, in her opinion, Dr. Swanson did not have "comprehensive information about Mr. Hardy's adaptive strengths and weaknesses during the developmental period" and therefore she should have "rule[d] out a diagnosis of mental retardation."[242]  Put another way, Dr. Hayes was of the opinion that Dr. Swanson lacked sufficient evidence for her conclusion and, in any event, her conclusion was wrong after considering the proper evidence.  The Court will summarize Dr. Hayes' reasons on each point.

## B.    Criticisms of Dr. Swanson's Evaluation

---

[240] *Id.* at 105–06.

[241] *Id.* at 176.

[242] *Id.* at 175.

Dr. Hayes' chief criticism of Dr. Swanson was for her reliance on Van Buren as a VABS-II informant.[243]  She first noted that, based on the record evidence available, it was doubtful that Van Buren knew Hardy prior to age 18 as she reported to Dr. Swanson and, moreover, Van Buren's knowledge of Hardy around the developmental period was limited.  Dr. Hayes also indicated that Van Buren's recollections were "inherently unreliable" because she was interviewed at age 37 concerning her impressions of Hardy that she formed in early teens.[244]  She noted that better informants, such as Hardy's siblings, should have been used.  And she considered many of Van Buren's answers to the questions on the VABS-II inconsistent with the "collateral interviews and/or that of other informants or records,"[245] principally highlighting her conflict with Cooper's account.

The remainder of Dr. Hayes' concerns about the quality of the data on which Dr. Swanson based her conclusion concern minor discrepancies between what sources told her and what they told Dr. Swanson.  For example, she noted that there were apparent discrepancies between the account of Greg Williams concerning "[w]hat documents [he] read to Mr. Hardy and Mr. Hardy's

---

[243] *Id.* at 62-63.

[244] Retrospective diagnosis will always interpose this challenge to some degree or another.  The Court notes that Van Buren was no more remote from experience with Hardy's adaptive behavior than any of the other potential VABS-II candidates, such as the one selected by Dr. Hayes.  Informants with more recent experience lack knowledge of Hardy during or close to the developmental period and none of them knew him as well as Van Buren.

[245] *Id.* at 66.

understanding of documents" and the specific type of encouragement Theresa

Minor gave Hardy's mother concerning his poor performance in school.[246]

### C.   Other Evidence of Hardy's Level of Adaptive Functioning

The evidence Dr. Hayes used to support her conclusion that Hardy in fact

does not have significant limitations in his adaptive functioning came from a

number of interviews as well as her direct observations of Hardy and a review of

records.

### a.   Additional Interviews[247]

Dr. Hayes' interviews with various prison officials, such as Lieutenant

Desroche and Corporal Laylle, indicated that they found Hardy "manipulative,

calculating, and methodical."[248]  He did not strike them as gullible, was pleasant in

his interactions with them, exercised authority over other prisoners, had good

penmanship and spelling, completed sick-call requests, helped other inmates with

"legal stuff," was diligent about his prison commissary accounts, and otherwise

---

[246] *Id.* at 70–71, 76.

[247] Dr. Hayes lists one of Hardy's siblings, his older brother Terry Hardy, as an additional source of information at the beginning of her report.  *Id.* at 4. However, her discussion of her interview with him makes clear that they did not discuss Hardy's adaptive functioning.  *Id.* at 65-66.  Her interviews with the informants Dr. Swanson spoke to—Theresa Minor, Vance Ceaser, and Toni Van Buren—support the conclusion that Hardy has deficits in adaptive behavior, as discussed above in the section on Dr. Swanson's report.  Dr. Hayes challenges the accuracy of only Van Buren's account, and simply discounts that of Ceaser and the Minors as based on limited experience.  *Id.* at 66.

[248] *Id.* at 77.

seemed to function normally.[249]  Another prison official, Deputy Gary Adams, reported that Hardy offered him a bribe to "turn his head for a few minutes."[250] The last law enforcement officer Dr. Hayes interviewed was Len Davis' ex-partner Sammie Williams, who has been convicted of a drug felony.  He met Hardy on only a few occasions and did not seem to have much experience with Hardy's performance of the relevant behaviors, but "[h]e did not perceive [Hardy] as slow or mentally retarded."[251]

In addition to Javetta Cooper, whose narrative account accords with her ratings of Hardy as somewhat slow, but not significantly limited in his adaptive functioning,[252] Dr. Hayes also interviewed Faith Price, the mother of one of Hardy's children.[253]  Price had not had any substantive communication with Hardy in years and "could not recall many details of their relationship and/or many specific facts," which precluded Dr. Hayes from administering an adaptive functioning questionnaire to her.[254]  She corroborated the accounts from others that Hardy was "a sweet person" and that they mostly "watched movies and hung

---

[249] *Id.* at 77–80.

[250] *Id.* at 80.

[251] *Id.* at 107.

[252] For reasons that will shortly become apparent, the Court finds no need to summarize her account in greater detail and directs the interested reader to pages 83–86 of Dr. Hayes' report.  Govt. Exh. 1 at 83-86.

[253] *Id.* at 81-82.

[254] *Id.* at 81.

around with each other."[255]  She also corroborated the fact that Hardy's mother was "not the smartest person," although she noted that she was "a good mom."[256]  She did not report that Hardy's adaptive behavior seemed limited, at least in the behaviors she observed.  However, she was not familiar with his work history, did not have experience living with him or doing schoolwork with him, and otherwise appeared to lack experience with Hardy in a number of the activities assessed as part of an adaptive behavior evaluation.[257]

### b.    Direct Observation

Dr. Hayes observed Hardy at his prison and also inspected his cell.  She noted that he was able to play basketball well and that he had several books, such as *The Bible*, a dictionary, and *Soul Harvest: The World Takes Sides*, written by Tim LaHaye and Jerry B. Jenkins.[258]  Underneath his bed, she found multiple letters and cards, including notes Hardy had written.  She observed that he appeared to be well-integrated with the other prisoners and played cards with them, even dealing.[259]

Dr. Hayes' clinical interview with Hardy, which lasted approximately seven hours and is videotaped and part of the record, revealed to her no abnormalities

---

[255] *Id.*

[256] *Id.* at 82.

[257] *Id.* at 81-82.

[258] *Id.* at 107-08.

[259] *Id.* at 109–10.

other than poor enunciation and concrete answers to questions, with particular trouble answering those in a "what if" style.[260]  While the Court is aware that caution is called for when assessing someone's own self report, the Court did find segments of Hardy's interview to be helpful to the overall decision to be made.  As Dr. Hayes herself noted, Hardy "appeared to try to answer all questions honestly and openly"[261] and the Court agrees.

Hardy acknowledged repeatedly with Dr. Hayes his inability to "catch on" in school to what was being taught.[262]  He described his attempt to go to adult education classes, where the teachers "just throw the book right there" and he could not "catch on."[263]  He even tried to go to school on Death Row but condemned inmates were not permitted.[264]  He told her that he watches TV with other inmates, who tell him what a word means and he also looks words up.[265]

Hardy's observations about his drug trafficking are also worth noting.  He acknowledged he was unable to learn to convert powder cocaine to crack, so he

---

[260] *Id.* at 110-11; Govt. Exh. 1, att. CD-1; Deft. Exh. 17.  An inability to think abstractly is consistent with mild mental retardation and Dr. Hayes repeatedly had difficulty in eliciting other than concrete answers from Hardy to abstract hypotheticals.  *See, e.g.,* Govt. Exh. 1, att. E at 74-75, 167-68, 279-80, 351-52.

[261] Govt. Exh. 1 at 110.

[262] Govt. Exh. 1, att. E at 101, 106, 107, 108, 111, 112.

[263] *Id.* at 111.  *See also id.* at 127, 390, 391.

[264] *Id.* at 111.

[265] *Id.* at 112.

hired someone to do that for him.[266]  When asked if he ever got drugs from out of state, he immediately answered, "No indeed no . . . I ain't getting on no highway. No indeed."[267]  He explained that he had about three people selling drugs for him from the project, who would come up to him to offer to sell.  Within the project, different blocks were known for which drug was being sold - coke, weed, heroin.[268]  When Dr. Hayes asked him what he told his sellers to do, Hardy seemed puzzled and answered, "Just sell the drugs."  She then asked if he ever told them to locate at a certain place, and he answered, "No.  It would just be on the corner.  They ain't had to go nowhere.  The people will come to them."[269]

While the Court is aware of the possibility that Hardy was deliberately downplaying his drug involvement, his answers appear on the video to be spontaneous and candid.

c.    *Records and Other Sources*

The bulk of Dr. Hayes' report on adaptive behavior consists of her categorization of the above facts and the rest of the evidence that she assembled on the topic of adaptive behavior, which she presented under headings that correspond to the domains of adaptive behavior listed in the DSM-IV-TR.[270]  The evidence

---

[266]*Id.* at 199-200.

[267]*Id.* at 201-202.

[268]*Id.* at 203.

[269]*Id.* at 305-306.

[270] *Id.* at 111–75.

from this part of her report that is even arguably relevant and is not covered elsewhere in this opinion is summarized in Appendix F, using the same order as appears in Dr. Hayes' report. Controverted and uncontroverted statements are included.

### iii.    The Court's Findings of Fact

As should be clear at this point, the Court is confronted with diametrically opposed narratives on the issue of Hardy's adaptive functioning. In deciding which to credit, the Court has the benefit of the reports prepared by Drs. Swanson and Hayes in addition to their testimony at the hearing and a more limited report from Dr. Cunningham on this issue. It has also had the benefit of being able to view the videotapes of Dr. Hayes' interviews, along with a number of other records. Finally, the Court heard testimony at the hearing from Lionel Hardy, Theresa Minor, Toni Van Buren, Javetta Cooper, Lieutenant Desroche, Corporal Laylle, and Deputy Adams. Each class of sources informed the Court's approach to this issue, and each led to the following findings on which the Court bases its ultimate conclusion.

The Court finds that Dr. Swanson's assessment of Hardy's level of adaptive functioning is the far more persuasive one that was presented, and it credits her conclusion that Hardy has significant impairments in adaptive functioning sufficient to diagnose him as mildly mentally retarded. While there may be room for clinicians to debate particular items and how they were scored, Dr. Hayes' criticisms and alternative conclusions are simply not persuasive enough to

overcome the compelling showing  made by Dr. Swanson.

First, Dr. Hayes' main criticism of Dr. Swanson's assessment—that Van Buren was an inappropriate informant on which to administer the VABS-II—is not entitled to great weight.  On the question of the age at which Van Buren met Hardy, Dr. Swanson acknowledged at the hearing that it is possible she first met him after age 18.[271]  The matter is not entirely clear, but even if the Court assumes that Van Buren first met Hardy at age 18:6, as contended by the government, rather than at 17:6, as Dr. Swanson initially believed, the VABS-II scores Dr. Swanson reported are then inflated and in fact *overestimate* Hardy's level of adaptive functioning.  Dr. Swanson explained that comparing Hardy against age-normed scores of those younger than he in fact was would make him appear to be higher functioning:  "[I]f you run [a score] it — it goes down at 18:6, not up."[272]  That is because the normative group "should have learned something in a year,"[273] yet Hardy would not have been held accountable for that growth because he would have been compared to those without that additional year of maturation.  As Hardy was already two standard deviations below the mean of those aged 17:6, there is no question that, if he were scored against 18:6 norms, he would still satisfy the AAMR/AAIDD's cutoff on each of the seven sub-domains where Dr. Swanson found him deficient.

---

[271] Rec. Doc. 2126 at 739–40.

[272] *Id.* at 743.

[273] *Id.*

At the same time, Dr. Hayes is correct in that Van Buren did not know Hardy very well during the developmental period. But, as Dr. Swanson explained, Van Buren was the *best* informant available, even though she might not have been the ideal one. The ideal informant would be one who had Van Buren's extensive experience with Hardy in all relevant domains, *and* knew him prior to the age of 18. Unfortunately, neither party has been able to identify such a person, although Van Buren knew him the most intimately in the years immediately after he turned 18.

Second, while Dr. Hayes suggested that Hardy's siblings would have made more appropriate informants, neither she nor Dr. Swanson was able to perform the kind of interview the VABS-II requires with any of them. That said, after Dr. Hayes highlighted this issue in her report, Dr. Swanson responded by redoubling her efforts to interview Hardy's siblings and was ultimately able to speak with Linda, Terry, and Lionel Hardy,[274] the last of whom also testified at the hearing. So, Dr. Swanson's final opinion—which was rendered at the hearing—did benefit from interviews with Hardy's siblings. The recollections of each only offered more evidence that Hardy had limited adaptive functioning.[275]

Dr. Swanson's interviews of Hardy's siblings revealed that, contrary to what might have been expected, they would not have been the best informants after

---

[274] Rec. Doc. 2125 at 609.

[275] *E.g.*, Rec. Doc. 2124 at 372–91 (Lionel Hardy); Rec. Doc. 2125 at 640 (Linda Hardy, Terry Hardy, Lionel Hardy); *Id. at* 649 (Terry Hardy).

all.[276]  Linda Hardy was six years older than Hardy and their mother kept her inside most of the time because their area of the projects was so dangerous.[277]  Linda Hardy responded by keeping to herself and mostly staying in her bedroom.[278]  Based on her interview, Dr. Swanson concluded "she didn't know very much about what was going on with Paul."[279]  At the hearing, Lionel Hardy confirmed Dr. Swanson's impression, testifying that Linda Hardy was not close to Hardy while they were growing up.[280]  Even were that not the case, Linda Hardy  left home when Hardy was 12 years old and rarely visited after moving out.[281]

Terry Hardy left home when Hardy was 14 and also rarely visited.[282]  Even before that, he was not close to Hardy.[283]  Some evidence of that must be inferred from the fact that, despite trying several times before she prepared her report, Dr. Swanson—the defense expert for his brother facing the death penalty—was unable

---

[276] *Id.* 609.

[277] *Id.* at 608–10.

[278] *Id.*

[279] *Id.* at 610.

[280] Rec. Doc. 2124 at 365; *see also*, *id.* at 365–66 ("Q: Do you feel like Linda and Paul really knew each other very well?  A: No."); *id.* at 366 ("Q:  And was that because Linda pretty much kept to herself?  A: Yes.").

[281] *Id.* at 367.

[282] *Id.*

[283] *Id.* at 366.

to arrange a meeting with Terry Hardy.[284]  She attributed this to the fact that, like Linda Hardy and all of the Hardy children, the experience of growing up in the projects was extremely negative and so Terry Hardy had tried to put it behind him.[285]  However, once Dr. Swanson was able to establish a rapport with Terry Hardy, he was able to provide useful information about Hardy's poor academic performance as Terry Hardy was only three years older.[286]

   With Hardy's siblings unable to take Van Buren's place, the only other potential informant with experience approaching Van Buren's familiarity with Hardy is Javetta Franklin, nee Cooper.[287]  Cooper knew Hardy well for only a brief period of time—four months[288]—and has a limited recollection of that time, as evidenced by the number of questions on the VABS-II she was unable to answer (totaling over one third of the set of questions Dr. Hayes selected for comparison).[289]  Based on this, as well as her two interviews with Cooper,[290] Dr.

---

[284] Rec. Doc. 2125 at 608.

[285] *Id.* at 608–09.  Dr. Swanson also noted that this distance from one another is not unusual in large families and that it has been her experience in *Atkins* cases that siblings do not necessarily make the best informants.  *Id.* at 605-607.

[286] *Id.* at 610.

[287] Price's recollection is too limited, while Theresa and Tony Minor did not have substantial experience with Hardy post-childhood.  Vance Ceaser did not have experience with Hardy in multiple contexts, just as Greg Williams and the other persons interviewed did not have sufficient experience with Hardy either (to say nothing of experience with him close to the developmental period).

[288] Rec. Doc. 2126 at 734.

[289] In addition, Cooper was interviewed by Dr. Hayes under highly stressful circumstances.  Dr. Hayes made no prior attempt to contact her but showed up at

Swanson concluded that she was an inappropriate informant for the VABS-II.[291] That kind of dispute would not ordinarily be enough to discredit another expert's decision to rely on a source, but the problems with relying on Cooper go deeper. After speaking with Dr. Hayes and providing the best, if still weak, evidence against Hardy on the adaptive behavior issue, Cooper substantially revised her testimony. In fact, she revised it to such a degree that she ended up testifying for the defense.[292] This led Dr. Hayes to back away from reliance on Cooper, calling her "an unreliable informant."[293]

The Court agrees with Dr. Hayes that Cooper proved herself to be unreliable, and it therefore has difficulty crediting anything based on Cooper's word. This applies equally to her hearing testimony in Hardy's favor as well as the account that she initially gave Dr. Hayes. In fact, even without her flip-flop, the Court would have had difficulty crediting Cooper's account. Except for the opinions of the prison officials discussed below, she provided the outlier testimony in this case.

---

her door, with an FBI agent, who announced to Cooper that Dr. Hayes wanted to speak to her. Even Dr. Hayes reported that Cooper was initially crying she was so upset over the encounter and refused to allow Dr. Hayes into the house for the interview. Rec. Doc. 2128 at 1101-04.

[290]Rec. Doc. 2125 at 600.

[291]Rec. Doc. 2126 at 810. Dr. Swanson also noted that, based on Cooper's account of how she was questioned, Dr. Hayes did not properly administer the VABS-II to her. Id. at 756, 760–61. The Court observes, but need not pass on the appropriateness of, the disputed method by which Dr. Hayes interpreted the test scores against multiple age groups. Id. at 865.

[292]Rec. Doc. 2125 at 514–73.

[293]Rec. Doc. 2129 at 1198.

That she ended up doing so in both directions renders her opinion worthless.

The foregoing explains why the Court is unable to credit Dr. Hayes' criticisms of Dr. Swanson's assessment. Van Buren was the best informant available. If, despite being the best available, she truly lacked sufficient knowledge of Hardy's level of adaptive behavior during the relevant time, perhaps "best" would not be good enough. But that can hardly be argued here. Unlike, for example, Sammie Williams, who had only occasional contact with Hardy, in a narrow category of circumstances, and long after he turned 18, Van Buren is the mother of three of Hardy's children,[294] she lived with Hardy for six or seven years,[295] and she met him at least very close to the developmental period.[296]

The Court finds that, based on Van Buren's interview and hearing testimony, as well as Dr. Swanson's opinion, Van Buren had sufficient experience with Hardy's level of adaptive functioning during the relevant period to permit a finding whether or not Hardy satisfies the APA and AAMR/AAIDD's criteria for this prong. Her testimony establishes that he does. Dr. Swanson paired Van Buren's account with multiple independent sources of information pointing to the same conclusion, and she conducted her evaluation in a manner consistent with the assessment guidelines developed by the AAMR/AAIDD, including those for retrospective determinations of mental retardation. The Court finds Dr. Swanson's

---

[294]Rec. Doc. 2125 at 453.

[295]*Id.* at 462.

[296]*Id.* at 482; Rec. Doc. 2126 at 739–40.

account to be credible.  The Court finds that Hardy satisfies the adaptive behavior prong of the test for mental retardation as set out by both the AAMR/AAIDD and the APA.

The Court finds Dr. Hayes' alternative theory—that Hardy has no deficits in any domain of adaptive behavior—to be completely unpersuasive.  Even ignoring the problems with Cooper's testimony, who was the only informant to provide much support for the conclusion that Hardy functioned normally, Dr. Hayes' ultimate opinion was tainted by the use of evidence that the AAMR/AAIDD has cautioned against allowing into the assessment of adaptive behavior.  For example, many of the facts Dr. Hayes cites concern Hardy's level of functioning while in prison—a highly structured environment and one in which Hardy lives long after exiting the developmental period.  Yet one of the AAIDD's "key factors" in the assessment of adaptive behavior requires that "the person's strengths and limitations in adaptive skills should be documented within the context of community and cultural environmental typical of the person's age peers."  AAIDD 11TH EDITION at 45.  An institutional environment of any kind necessarily provides "hidden supports" whereby the inmates or residents are told when to get up, when to eat, when to bathe, and their movements are highly restricted.[297]  As Dr. Swanson noted, "When you live in the community, it suddenly becomes your responsibility to make these decisions for yourself, to put them in the appropriate

---

[297]Rec. Doc. 2125 at 635.

order, to make sure they are done in a timely way."[298]  Moreover, the AAMR notes that specialized instruments, appropriately normed, are available for at best limited use if behavior is not to be evaluated relative to age peers, but to others similarly situated in an institution.  AAMR 10TH EDITION at 83; AAIDD 11TH EDITION at 51; USER'S GUIDE at 23.  Dr. Hayes did not mention or make use of such instruments or assessment approaches.

Neither are the prison officials Dr. Hayes interviewed likely to be particularly good informants.[299]  For example, in this case they painted a portrait of Hardy as among the most sophisticated inmates they have ever met.  The Court finds this difficult to believe given that, whatever dispute there may be about whether Hardy has an IQ low enough to qualify as mentally retarded, it is clear he is at best in the range of borderline intellectual functioning.  In addition, prison officers' observations are limited to an extremely unusual set of circumstances, and are likely to be filtered through their experience with other prisoners, many of whom may also suffer from intellectual limitations.  Their intuitive "control group" is therefore not representative of the general population, while the diagnosis of mental retardation must be made with reference to average levels of functioning in the general population.

Additionally, prison custodians are law enforcement officers responsible for the criminals they oversee, and the potential for friction is ever present.  For

---

[298]*Id.*

[299]*E.g.*, Olley & Cox Study, *supra* n. 4 at 386.

instance, in this case, Lt. Shannon Desroche, the medical supervisor at the St. Bernard Parish jail, was called as a government witness.   She had told Dr. Hayes that of all the inmates she had encountered, Hardy was "the most dangerous and manipulative."[300]  She testified at the hearing that Hardy was intelligent, communicated well, was not gullible, was a leader on the cellblock and in control.[301]  But when asked if she had "anything against Hardy" or "any beef with him or anything," she answered, "Not at all, not at all."[302]  However, the records from the St. Bernard Parish jail indicate a dispute several years in duration between then Sergeant Desroche and Hardy over his complaints of a toe injury.   Desroche recorded in the jail records that Hardy and his attorney complained about the jail's handling of the alleged injury, which Desroche consistently maintained was not serious.  Desroche even went so far as to then regularly document Hardy's physical activities at the jail because she "felt it necessary . . . as detainee Hardy has made threatening statements to Sgt. Desroche about what he will do if he doesn't get the treatment he wants."[303]  For Lt. Desroche to assert she had no dispute with Hardy was disingenuous.[304]

---

[300]Govt. Exh. 1 at 77.

[301]Rec. Doc. 2131 at 1536, 1539, 1542.

[302]*Id.* at 1538.

[303]Govt. Exh. 1, att. 7.

[304]Dr. Hayes did not note in her lengthy report or her testimony this potential bias on the part of Lt. Desroche, although she listed the St. Bernard Parish Jail records as among the documents she reviewed.  Govt. Exh. 1 at 9.

Furthermore, Dr. Hayes in her comparative charts indiscriminately mixed Hardy's capabilities in much later years, with other witness' assessments when he was much younger, apparently seeking to discredit the earlier accounts.   This ignored the significant issue of *when* a skill is learned.   As Dr. Swanson pointed out, "Not seeing a deficit at 26 doesn't mean maybe there wasn't a deficit earlier developmentally."[305]   For example, that Hardy was able to master the basic game of basketball in his 30's or 40's in jail[306] does not mean he had that skill level in his 20's or younger.   Hardy tries to learn and when he does not know or is not sure of the  answer to a question, he seeks it out from the examiner,[307] if not later.   That Dr. Hayes saw a dictionary in Hardy's cell at the St. Bernard Parish jail is not surprising.[308]

Finally, while Dr. Hayes concluded she was unable to tabulate the relevant scores for Hardy using the VABS-II with Cooper, she did not select another informant or attempt to employ another test.  The AAMR/AAIDD has been quite clear that the use of standardized instruments is preferable when assessing a person's level of adaptive behavior.  *E.g.*, AAMR 10TH EDITION at 76–78, 81–91; *see also* AAIDD 11TH EDITION. at 47–5; USER'S MANUAL at 13.  Dr. Hayes offers

---

[305]Rec. Doc. 2125 at 623-24.

[306]Govt. Exh. 1 at 107-08.

[307]Rec. Doc. 2126 at 839-40.   Dr. Hayes noted in her report that Hardy made good effort when she interviewed and tested him. Govt. Exh. 1 at 110-11.

[308]Govt. Exh. 1 at 108.

no explanation for failing to try additional methods of obtaining a standardized score for Hardy.

Even if the Court were to ignore all of these concerns, it notes that the account Cooper gave Dr. Hayes initially, as well as the additional evidence cited in Dr. Hayes' report, does not refute Dr. Swanson's conclusion that Hardy suffers from mild mental retardation.  Virtually all of Hardy's acts, cited by Dr. Hayes in her own detailed assessment of Hardy's adaptive behavior, are capable of being performed by someone with mild mental retardation, particularly one with a higher IQ in that range.[309]  In *Wiley*, the state tried to argue that the defendant could not be deemed mentally retarded based on the credible testimony of an expert because he "often provided money to help pay household bills, possessed skill repairing vehicles and frequently helped friends and neighbors with auto repairs, provided transportation for others, volunteered for military service, and was a reliable worker who quit school to go to work to provide for his family."  2010 WL 4227405, at *15.  The Fifth Circuit rejected the argument, noting that the expert testimony in the case indicated that such abilities were still consistent with mild mental retardation.  *Id.*

Hardy can, at best, be said to try to be a good father.  No evidence was presented that he could do things like volunteer for military service, repair cars on his own, or work reliably.  In fact, all the evidence was to the contrary.   The *Wiley* court could have just as well been describing this case when it noted that, despite

---

[309]Govt. Exh. 1 at 111-75.

many strengths,

> [t]he record shows that Wiley consistently relied on others for
> virtually all direction of his life and daily living, including finances,
> healthcare, and employment.  Wiley relied on his grandmother and
> then his wife to handle his money.  Although he was a hard worker,
> Wiley primarily worked manual labor jobs and relied on his in-laws to
> find him work.  Wiley's grandmother stated that when Wiley's
> grandfather died, Wiley was unable to make basic decisions about the
> farm, and he instead sought advice from his grandfather's friends.  He
> later sought help from his in-laws even after he and his wife separated.
> As a child, Wiley was slow to master hygiene, dressing, and toileting
> skills, and his older sister had to help teach him how to dress and
> groom.  Wiley's grandmother bought his clothes and made selections
> for him when he was as old as fifteen, and then his wife took over that
> task when he moved in with her family.  Although Wiley helped
> around the house with the trash and yard work, his grandmother and
> then his wife did all the cooking, cleaning, and laundering.

2010 WL 4227405, at *19.

The expert testimony in this case is no less clear than it was in *Wiley* on a

point that mental health professionals all recognize:  the mildly mentally retarded

have strengths as well as weaknesses.  As Dr. Cunningham explained, quoting

from the MANUAL OF DIAGNOSIS AND PROFESSIONAL PRACTICE IN MENTAL

RETARDATION:

> People classified with mild MR evidence small delays in the
> preschool years but often are not identified until after school entry . . .
> This designation implies variation in academic skills, and for a large
> proportion of these adults, persistent low academic skill attainment
> limits their vocational opportunities.  However, *these people are
> generally able to fulfill all expected adult roles.*[310]

The mildly mentally retarded "usually live independently or semi-independently in

---

[310]Deft. Exh. 19 at 7 (emphasis added).

the community and . . . . [o]ften the mildly mentally retarded persons 'pass' in the community.  In other words, neither their appearance nor demeanor, particularly on brief interaction, reveals the severity of their intellectual deficiency."[311]

Hardy's life history and presentation do not mark him as among the severely or profoundly mentally retarded, the image of whom the phrase "mentally retarded" probably conjures in the mind of a lay person.  His impairments are subtler, his strengths more pronounced.  Clinical judgment is the key to segregating those in this category who should be diagnosed with mental retardation from those who should not be.   The Court finds that Dr. Swanson's 35 years experience assessing and training mentally retarded individuals, as well as her extraordinarily vast experience with administering the Vineland adaptive behavior assessment itself, renders her clinical judgment far more persuasive and reliable than that of Dr. Hayes.  Dr. Swanson's evaluation is also the most consistent with all the other evidence before the Court.

Finally, while the AAIDD recommends against using past criminal behavior as a measure of adaptive behavior or as relevant to mental retardation, the Court finds consideration of criminal conduct to be useful as one of many factors to consider.

Prior to his conviction on the current charges, Hardy had not been convicted of a felony, misdemeanor, municipal violation or a traffic violation.  He had been

---

[311] *Id.*

arrested six times on felony charges and twice on municipal misdemeanors.[312]  One such arrest was for first degree murder, for which he was tried and found not guilty.[313]  Other arrests were for mostly drug related violations, and several were for being a felon in possession of a firearm, which were refused, presumably for the obvious reason that he had no prior felony convictions.[314]

Despite his lack of any prior convictions, Hardy was a reasonably successful street level crack cocaine distributor within the projects.   The Court concludes, however, as did Dr. Swanson, that a person with mild mental retardation is capable of running such an operation.[315]  Unfortunately, also, the Court concludes that a person with mild mental retardation can take a gun and shoot someone.[316]  In fact, even assuming Hardy's guilt on all the charges for which he has been arrested, none of them appear to require skills beyond the capacity of a person with mild mental retardation, particularly one functioning at a higher IQ level within that range.[317]  *Atkins* itself contemplated that those capable of committing capital

---

[312]Deft. Exh. 33-BB.

[313]*Id.*  While it is not entirely clear, he may have been arrested on another separate first degree murder charge which was refused.

[314]*Id.*

[315]Rec. Doc. 2125 at 708-09.

[316]Rec. Doc. 2125 at 708.

[317]The Court likewise finds that the various offenses alleged in the FBI records, none of which resulted in a conviction, are within the capabilities of someone with mild mental retardation to commit. Deft. Exh. 34-KK.  *See also* Rec. Doc. 2126 at 849-50.

crimes, which as a practical matter are only those crimes involving intentional homicide, may be mentally retarded.

The Court finds Hardy's willingness to do the bidding of Len Davis, even though Hardy had no personal animosity towards Kim Groves, probative as well. According to the most recent manual from the AAIDD, "persons with ID typically have a strong acquiescence bias or a bias to please that might lead to erroneous patterns of responding."[318] Len Davis did have a strong and overbearing personality. Greg Williams tried to warn Hardy that Davis was not a good choice for friendship,[319] but Hardy apparently could not discern that himself, insisting that Davis was "cool."[320]

### c.    Factor Three: Onset Before Age 18

The final prong of the definition of mental retardation concerns its age of onset. The APA and AAMR require that the significant limitations in intellectual and adaptive functioning, assessed on prongs one and two, arose during the developmental period, that is, before the person turned 18 years old. *See* AAMR 10TH EDITION at 1; DSM-IV-TR at 49.

The foundation for this finding has largely been already presented through the Court's analysis of the IQ and adaptive behavior prong, and needs relatively

---

[318]AAIDD 11TH EDITION at 51-52.

[319]Govt. Exh. 1, att. B at 40.

[320]*Id.* at 41.

brief treatment here.  Based on the evidence presented there, the Court is satisfied that Hardy's intellectual and adaptive deficits originated during the developmental period, that is prior to the age of 18.

The Court first turns to the records of Hardy's academic performance before age 18, which is the kind of information on which *Wiley* relied when discussing the age of onset.  2010 WL 4227405, at *20.  Hardy's school records, discussed in detail in part *i* of Appendix B, clearly demonstrate that his functional academic skills were significantly limited during the developmental period.  They also support the conclusion that Hardy's intelligence was at least as low during his school years as it was when Dr. Tetlow tested him.  Additionally, as IQ is a relatively stable characteristic of a person, there is no reason to suspect that an IQ test of Hardy after 18 fails to reflect the IQ he had before 18.

Second, the testimony from the informants who unquestionably knew Hardy during the developmental period establishes that he had significantly limited functioning long before age 18.  Theresa and Tony Minor testified that Hardy seemed slow even as a four- to five-year-old child.[321]  They also offered specific evidence concerning his deficits in communication, functional academic skills, social/interpersonal skills, leisure, and self direction.[322]  Vance Ceaser, who has known Hardy since kindergarten, provided testimony that bookended the developmental period when he recounted Hardy's grade school troubles and then

---

[321]*See* Deft. Exh. 1 at 10–11; *see also* Rec. Doc. 2124 at 434–35.

[322]*Id.*

described Hardy's extreme difficulties with high school.[323]  This again demonstrates that Hardy's low intellect and limited functional academic skills arose prior to age 18, along with Hardy's several other deficits to which Ceaser testified.[324]  Whether or not Van Buren met Hardy slightly before his eighteenth birthday or slightly afterwards, no evidence was presented to indicate his level of functioning has dramatically increased or decreased at any point in his life.  There is therefore no reason to think that her impression of Hardy as significantly limited at age 18:6 does not accurately represent his level of functioning a mere six months before.  Indeed, her impression of Hardy is consistent with the credible witnesses who knew him from the toddler age all the way through high school.[325]

Dr. Swanson, the findings of whom the Court has already credited, determined that Hardy satisfied the age of onset criterion.[326]  So did Dr. Cunningham.[327]  Dr. Hayes does not challenge this point in itself, but rather whether Hardy made the requisite showing on the first two prongs.[328]

---

[323]*See id.* at 12.

[324]*Id.*

[325]As noted above, *see supra* pp. 103–04, the Court does not credit Cooper's testimony on Hardy's level of adaptive functioning and therefore need not consider it on this final prong.

[326]Deft. Exh. 1 at 24.

[327]Deft. Exh. 19 at 10.

[328]*See* Govt. Exh. 1 at 177 ("Mr. Hardy did not (prior to age 18 and on October 13, 1994) and does not (currently) have significant limitations in intellectual functioning and/or adaptive behavior.").

The Court finds the lack of controversy on this point consistent with the remainder of the evidence of the record.  For example, while the etiology of Hardy's mental retardation is unknown, something that the AAMR notes is not unusual, *see* AAMR 10ᵀᴴ EDITION AT 125, he did suffer at least six head injuries prior to turning 18.[329]  Those caused a mild brain injury,[330] which seems as likely to have caused Hardy's deficits as other factors, such as the possible genetic source suggested by his mother's apparent limitations.  But whatever has caused Hardy's mental retardation, all of the evidence points to it having done its work before Hardy was 18 years old.  That is all that matters.[331]

The Court has already noted that the diagnosis of mental retardation in the *Atkins* context will always involve some level of uncertainty because, at least as a practical matter, it will always have to be made retrospectively.  Neither the Court nor the experts were present during Hardy's developmental period.  Each of us must therefore rely on the recollections of those credible informants who were present to determine whether Hardy should have been diagnosed as mentally retarded when he was younger.  Their testimony clearly indicates that he should have been.

### III.  CONCLUSION

As part of this assessment, the Court has once again listened to the series of

---

[329]Deft. Exh. 18-6 at 21.

[330]*Id.*

[331]*E.g.*, Olley & Cox Study, *supra* n. 4 at 385.

chilling telephone conversations between Len Davis, Sammy Williams, and Paul Hardy the night of Kim Groves' murder.[332]  The tapes disclose Davis' utter contempt for Kim Groves, his insistence that she be killed, and his growing impatience and berating of Paul Hardy for not moving quickly enough to do his bidding.

All Kim Groves did was be a good citizen.  Instead of ignoring police abuses, she made the concerted effort to report it to the internal affairs division of the police department.[333]  For that good deed, she paid with her life.  The tapes once again reveal the outrageous arrogance of this crime, the appalling abuse of police authority and its senseless cruelty.  It was a crime that deserves universal condemnation and severe punishment.  Nevertheless, the evidence establishes by more than a preponderance of the evidence that Paul Hardy is mentally retarded and therefore cannot be sentenced to death.  Len Davis is currently on death row. Paul Hardy will be sentenced to the only penalty available, life imprisonment, at the appropriate time.

Accordingly,

---

[332]Govt. Exh. 1, att CD-16.

[333]The Court has listened to the taped interview of Kim Groves, which appears as Track 26 on the same CD.  *Id.*

IT IS ORDERED that a sentence of death as to Paul Hardy is prohibited.  A
sentencing date shall be set.

New Orleans, Louisiana, this 24th day of November, 2010.


HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

## APPENDIX A

*Remaining Reasons Cited by Dr. Hayes for Discrediting Dr. Tetlow's IQ Test*

As noted in the opinion, Dr. Hayes gave additional reasons for her belief that Hardy's score on the IQ test administered by Dr. Tetlow could not be treated as credible.  The Court now addresses each in turn.

First, Dr. Hayes noted that when Hardy was arrested and booked in 1994, he purportedly gave a history of having lost consciousness once when he was 16 years old.  When he was evaluated by both Dr. Martell and Dr. Bianchini, he apparently told them he had lost consciousness twice.[334]  In Dr. Hayes' testimony, she characterized this as a discrepancy between what Hardy told different "evaluators."[335]

The Court does not find this discrepancy meaningful.  Its review of the one page "History & Physical Examination" from the booking records indicates a cursory checklist of a range of possible ailments, apparently based on the self-report of the prisoner as he is checked into custody.[336]  Dr. Cunningham testified that based on his experience, such examinations are "likely rapid and superficial,[337]

---

[334]Govt. Exh. 1 at 25.

[335]Rec. Doc. 2128 at 1056-57.

[336]Deft. Exh. 35-YY.  Alongside the typed query of "Head injury" was a  "y" and "loc 16 yrs of age."  Presumably this means "yes" and "loss of consciousness 16 years old age."

[337]Rec. Doc. 2123 at 121.

as is in fact borne out by the form.[338]   This "evaluation" contrasts dramatically with the studied and lengthy formal examinations conducted by Dr. Martell and Dr. Bianchini, and their detailed reports.  What *is* significant is not what Hardy may or may not have said at booking but that he gave both Dr. Martell and Dr. Bianchini a consistent history regarding loss of consciousness.[339]   Furthermore, as Dr. Cunningham appropriately pointed out, people with normal intelligence reporting their histories will give inconsistent details;[340] this being particularly likely in a distracting circumstances such as being booked into jail.  Noteworthy, also, is Dr. Cunningham's comment that if a person is mentally deficient, the ability to remember and to bring up such details is even more problematic.[341]   However, this Court finds the discrepancy, if it existed, to signify nothing of significance, one way or the other.

Similarly, Dr. Hayes' next claimed discrepancy—that Hardy told Dr. Bianchini that he did not miss school much when in fact he was often truant[342]—is also *de minimis*.  Moreover, it is hardly evidence of a malingering strategy as, if true, such a fact would tend to detract from a diagnosis of mental retardation, not enhance it.  As Dr. Cunningham pointed out, Hardy's school attendance may well

---

[338]Deft. Exh. 35-YY.  The remaining 27 items have a "n" at the top and a line drawn down through the rest of the column.

[339]Govt. Exh. 1, att. 4 at 3; Deft. Exh. 18-5 at 2.

[340]Rec. Doc. 2123 at 119.

[341]*Id.* at 119-20.

[342]Govt. Exh. 1 at 25; Rec. Doc. 2128 at 1057.

have been good  throughout elementary school although it was not so in high school.[343]  Regardless, as already noted, people with normal intelligence give inconsistent histories, not to mention the natural tendency to want to appear in a favorable light.  Furthermore, Dr. Cunningham observed that people who are in fact intellectually deficient do not have the same full memory recall or the capacity to bring it up on demand as those with normal intelligence.   However, as with the discrepancy regarding loss of consciousness, this Court finds it too insignificant to support any position.

The next discrepancy noted by Dr. Hayes was that Hardy was unable to name the governor of Louisiana during Dr. Swanson's evaluation, but that he was able to do so for Dr. Hayes.  This was during the "adaptive behavior" examination by both doctors, the second prong of a diagnosis of mental retardation.  He also was able to name the mayor, a senator and the problems the particular senator had had.[344]  At the outset, the Court is perplexed as to how Hardy answered questions in adaptive behavior evaluations done in 2008 and 2009 undermines his performance on IQ testing a dozen years earlier.   Even if relevant, which the Court doubts, Dr. Hayes' evaluation came after Dr. Swanson's, and as Dr. Cunningham suggested, Hardy may have made a point of finding out who the governor was since he could not answer the question.[345]  Hardy has a history of doing exactly

---

[343]Rec. Doc. 2123 at 120.

[344]Govt. Exh. 1 at 25; Rec. Doc. 2128 at 1058-59.

[345]Rec. Doc. 2123 at 125.

that.  When Dr. Martell examined him in 1996, Hardy had already been given the
WAIS-R by Dr. Tetlow.  Dr. Martell noted in his report that when  Hardy was re-
tested on the same test, "he (Hardy) commented that he was concerned about not
giving answers that would be different from those he gave previously, so as not to
significantly change his test performance.  *He stated he had looked up some
answers after Dr. Cunningham's testing and he knew answers that he had not
given previously.*"  Govt. Exh. 1, att. 4 at 4 (emphasis added).[346]        In short, the
Court finds Hardy's unawareness of who the governor was when asked by Dr.
Swanson, and his correct response when asked by Dr. Hayes at a later date is
insignificant and completely irrelevant to whether his 1996 testing was reliable.

Dr. Hayes' next concern is likewise comparing the adaptive behavior
evaluation done by her and Dr. Swanson, in 2008 and 2009, specifically that Hardy
was unable to interpret proverbs correctly with Dr. Swanson but could do so with
Dr. Hayes.   One example was to ask Hardy what  "blood is thicker than water"
means and he said, "That we stick together.  Brothers gonna stick together."  She
also asked him what "kick the bucket" meant and he said "Somebody died.."[347]
The Court observes first that it agrees with Dr. Cunningham that "kicking the
bucket" is not a proverb in that it does not require any philosophical understanding

---

[346]Obviously, the statement by Dr. Martell erroneously identified Dr.
Cunningham as administering the first 1996 test when, in fact, it was adminstered
by Dr. Tetlow.   The Court finds this minor error does not detract from its
substance for present purposes.

[347]Govt. Exh. 1 at 25.

or abstract reasoning to understand its meaning.[348]  It is simply a popular
expression and very well known.  With regard to blood being thicker than water,
the Court concurs with Dr. Cunningham that Hardy got part of the expression
correct - that relatives stick together - but he did not articulate the more abstract
meaning of the expression, namely that in a showdown between someone who is
related and someone who is not, the nonrelative will lose.[349]

More importantly, it appears that Hardy's haphazard performance on idioms
and proverbs is actually fairly consistent over time.  When asked during testing
with Dr. Tetlow in 1996 what "strike while the iron is hot" meant, Hardy
answered, "Strike while you are mad," which Dr. Tetlow scored as a zero.[350]  Dr.
Hayes likewise agreed that was not a correct answer.[351]  When asked by Dr. Tetlow
what is meant by "shallow brooks are noisy" and "one swallow doesn't make a
summer," Hardy did not know.[352]  Dr. Bianchini likewise quizzed Hardy on idioms
and proverbs, with the possible scores being "General", "Concrete" and
"Incorrect."  When asked what "Don't cry over spilt milk" meant, he answered, "If
you lose something, don't worry about it" which Dr. Bianchini scored as
"General", meaning correct.  When asked what was meant by "a drowning man

---

[348]Rec. Doc. 2123 at 126-27.

[349]*Id.* at 127.

[350]Govt. Exh. 1, att. 2.5 at 14.

[351]Rec. Doc. 2129 at 1264.

[352]Govt. Exh. 1, att. 2.5 at 14.

will clutch at a straw," Hardy answered, "He will grab for help" which Dr. Bianchini scored as "concrete," but not general, so partially correct.  Hardy was unable to offer an interpretation of either "Rome wasn't built in a day" or "a golden hammer breaks an iron door" or "still waters run deep."[353]  In summary, with Dr. Bianchini, out of five proverbs, Hardy offered no interpretation of three of them, a concrete interpretation of one of them and a correct general interpretation of only one.

Consequently, contrary to Dr. Hayes' limited comparison of her evaluation with Dr. Swanson, this Court concludes that Hardy's ability to interpret idioms and proverbs has been consistent over time, and also consistent with mild mental retardation in that Hardy's ability to abstract the principle underlying a proverb is very limited.

Dr. Hayes' next discrepancy was Hardy's performance on various memory measures tested by Dr. Bianchini.  Specifically, she noted that his verbal and visual memory on the Wechsler Memory Scale was in the average range, but was mildly impaired on the Neurobehavioral Cognitive Status Examination.  His "attention" as measured by the Memory Scale was in the mild to moderately impaired range, but on the Neurobehavioral Cognitive Status Exam, his attention was in the average range.[354]  First of all, the Court notes that these scores are not widely disparate -

---

[353]*Id.*; Govt. Exh. 1, att. 2 at 20.

[354]Govt. 1 at 25-26; Rec. Doc. 2128 at 1059-60.  *See also* Govt. Exh. 1, att.2 at 2-3, 28-30; Deft. Exh. 18-5.

average is the next higher score to mildly impaired.   Secondly, as has already been discussed, the Wechsler Memory Scale has reliability issues and a rather broad standard error of measurement.  Likewise, as Dr. Cunningham testified, the Neurobehavioral Cognitive Status Examination is simply a screening measure for cognitive functioning, that assesses different areas in a simplified way.  It is a "very gross screen."[355]   Its reliability problems are even more problematic than that of the Wechsler.[356]   Dr. Cunningham noted that half the people who take it, even without anything wrong with their brain, fail some portion.[357]   Dr. Hayes acknowledged it is a brief measure.[358]   As it turned out, her specific concern was that on the CVLT, another test given by Dr. Bianchini, Hardy was able to recall ten words out of sixteen, but on the Neurobehavioral Cognitive Status Examination ("NCSE"), he could remember just two of four.   To her that "just does not make sense."[359]   It may however make sense as an indication that Hardy is cognitively impaired.  In fact, Dr. Bianchini noted with respect to another of his tests that evaluated speed of information processing and mental flexibility that Hardy's "scores were unreliable due to variation between trials which is common with

---

[355]Rec. Doc. 2123 at 128-29.

[356]*Id.* at 130.

[357]*Id.* at 129.

[358]Rec. Doc. 2128 at 1059.

[359]*Id.* at 1059–60.

individuals whose intellectual functioning is below average."[360]   Dr. Bianchini did

in fact offer a suggested diagnosis of "Nonpsychotic Mental Disorder following

Organic Brain Damage," which he assumed resulted from multiple head injuries.[361]

As is noted in Appendix C, Dr. Bianchini uncovered other deficits that are

consistent with mild mental retardation.

Dr. Hayes's next concern was an alleged discrepancy in Hardy's academic

test scores.[362]   In the 9th grade, on the California Test of Basic Skills ("CTBS"),

Hardy's math achievement was in the 87th percentile rank when compared to large

city peers, and in the 10th grade he was at the 60th percentile rank.[363]   However

when tested by Dr. Tetlow in 1996, his math skills were measured at the 9th

percentile rank compared to a nationally standardized sample, indicating he was

functioning at the 6th grade level.[364]   Dr. Swanson tested him in 2008 and he came

out at the 16th percentile rank which likewise indicated 6th grade level.[365]   Dr.

Hayes acknowledged that the school tests were based on large city norms as

opposed to national norms, and his scores would be expected to go down when

compared to national norms, but she still estimated he would have scored in the

---

[360]Deft. Exh. 18-5 at 7.

[361]*Id.* at 12.

[362]Govt. Exh. 1 at 26; Rec. Doc. 2128 at 1060-61.

[363]Govt. Exh.1, att. 5; Deft. Exh. 18a-2 at 5, 6, 8, 9; Deft. Exh. 33-GG.

[364]Govt. Exh. 1, att. 2.5 at 3.

[365]Deft. Exh. 34-NN at 24.

average range.[366]  This, of course, is speculative since comparing national and big city norms is akin to comparing apples and oranges.

While Dr. Hayes highlighted Hardy's arithmetic scores on the CTBS, his reading scores on the same test were significantly lower.  In 1980, when he was 12 years old,  Hardy's CTBS score in reading put him in the lower 25 percentile even compared to large city norms.  Two years later, in 1982, at age 14, Hardy had dropped to the bottom 10 percentile compared to other large city test takers.   A year later, at age 15,  he improved up to 20 percent.

Dr. Cunningham testified regarding data collected in 1997 which showed dramatic swings in CTBS scores at various Orleans Parish elementary schools from year to year, including the one Hardy attended years earlier.  In his opinion, these dramatic scoring swings were a statistical impossibility and questioned the validity of the testing procedures.[367]  While these apparent irregularities occurred well after Hardy attended the school in question, they do indicate that what purports to be a uniform national test can in fact be undermined.

On the other hand, no allegation has been made that any improprieties occurred in either Dr. Tetlow's testing or Dr. Swanson's.  Dr. Tetlow's testing in 1996 and Dr. Swanson's testing in 2008, even though twelve years apart are

---

[366]Rec. Doc. 2128 at 1061; Rec. Doc. 2129 at 1293-94.

[367]Rec. Doc. 2123 at 173-78.  For example, at Chester Elementary where Hardy attended years earlier, scores one year for 3rd graders were at the 13th percentile and then a year later, at the 62nd percentile, a 49 percent improvement in achievement testing in one year.  *Id.* at 176-77.

essentially the same - Hardy's arithmetic skills are at the 6th grade level. Noteworthy also is that with respect to reading, Dr. Tetlow's testing in 1996 showed Hardy at the 5th grade level and  Dr. Swanson's testing, a dozen years later, showed a one grade improvement, to 6th grade.   The consistency is compelling and the Court accepts these assessments as a true gauge of Hardy's level of achievement.

Finally, the last "discrepancy" highlighted by Dr. Hayes was in comparing Hardy's scores on the Adult Basic Learning Examination ("ABLE"), taken when he was in prison in Terre Haute, Indiana, and the Kaufman Test of Educational Achievment, Brief Form ("KTEA-Brief Form"), which Dr. Swanson gave him.   Dr. Hayes acknowledges that the ABLE is not equivalent to the KTEA but maintained that  "score comparisons are informative nonetheless."[368]  The comparison graft shows that on the ABLE, Hardy consistently scored at a higher grade level than he did on the KTEA.   For example, on the ABLE in reading comprehension, he scored at the 13th grade level, which is post high school graduate, while on Dr. Swanson's test, he was the equivalent of a 6th grader, an obviously huge difference. A significantly lesser discrepancy occurred on language/writing where he scored at the 4th grade, 9th month on the ABLE and 3rd grade, 7th month on the KTEA.  Again, Dr. Hayes found these inconsistent findings in 2000 and 2007/2008 to cast doubt on the reliability of his IQ testing in 1996.[369]

---

[368]Govt. Exh. 1 at 26-27, Rec. Doc. 2128 at 1061-62.

[369]Rec. Doc. 2128 at 1062.

Unfortunately, the circumstances under which Hardy took the test at Terre Haute are unknown.[370]   It is an untimed test, and it may have been administered as a group or individually or proctored by supervisors or the inmates may have been able to simply take it back to their cells.[371]   In the latter instance, someone else could have assisted.   Hardy's grade in reading comprehension, equivalent to a college freshman, is obviously inconsistent with his 4th grade 9th month score in language/writing on the same test, and it is also grossly inconsistent with Dr. Tetlow's individualized testing in 1996,  Dr. Swanson's individualized testing in 2008, and Hardy's poor grades throughout high school.

The Terre Haute score is also inconsistent with Hardy's scores on the CTBS when in the 9th grade, for example, Hardy scored in the 10th percentile in reading, compared to large city norms, meaning 90 percent of students read better than him, and that score would have gone even lower when compared to national norms.[372] Under the circumstances, it is apparent that the reading comprehension grade on the ABLE is the unreliable score since it is inconsistent with every other indicator of Hardy's performance level.  For Dr. Hayes to cite it as an example to cast doubt on the far more exhaustive examinations conducted in 1996 and 2008 is the tail wagging the dog.

---

[370]Rec. Doc. 2123 at 107; Rec. Doc. 2128 at 1089.

[371]Rec. Doc. 2123 at 105-06.

[372]Govt. Exh. 1 at 51.

# APPENDIX B

### *Dr. Hayes' Alternative Sources for Estimating Hardy's IQ*

Having rejected Hardy's 1996 IQ scores as unreliable, Dr. Hayes then turned to other sources to inform her opinion as to Hardy's intellectual functioning.  The Court now turns to those considerations.

### a.    *School Records*

Dr. Hayes first consulted Hardy's public school records.[373]  She concluded that, from kindergarten through 6th grade, Hardy regularly attended school and earned grades of "Good" and "Satisfactory."[374]  While not mentioned by Dr. Hayes, the DSM-IV-TR states that persons with mild mental retardation can acquire academic skills up to the 6th grade level.[375]  Once Hardy reached high school, however, both his attendance and grades plummeted.[376]  He finally quit school while officially in the 11th grade.  According to records from Booker T. Washington High School, Hardy's class rank was 160 out of 353 students in 9th grade, 269 out of 500 in 10th grade and 254 out of 412 in 11th grade.[377]  While those ranks might not immediately suggest Hardy is mentally retarded, their accuracy is highly suspect.

---

[373]Govt. Exh. 1 at 44-48.

[374]Govt. Exh.1 at 45; Deft. Exh. 18a-2.

[375]DSM-IV-TR at 43.

[376]Deft. Exh. 33-GG.

[377]Govt Exh. 1 at 47; Rec. Doc. 2128 at 1084-85.

For example, Hardy dropped out of Booker T. Washington in November 1983, yet the school recorded him as completing the semester and even assigned him final grades.[378]  Anecdotal evidence in the record indicates that, during the relevant period, students at New Orleans schools like Hardy's were passed onto the next grade whether they completed the course work successfully or not.  Linda Hardy, Paul Hardy's oldest sister, testified in 1996 that Booker T. Washington "had a lot of teachers that didn't really care.  They would like promote students and even if they failed, you know, they probably wouldn't put that they failed on their report cards, but they promote them knowing that they probably shouldn't graduate.  They didn't care about - they didn't care about that."  She left Booker T. Washington High School  "because I wanted to graduate" and transferred to another school and did in fact graduate.[379]  Linda Hardy is one of two successful Hardy siblings, out of seven.  She not only graduated high school, but attended some college and at the time of the 1996 trial worked as an accountant for Tulane Medical School.[380]  Vince Ceaser, who was the same age as Hardy and attended the public schools with him, described the school system "as a joke . . . it was terrible."[381]  Greg Williams likewise was surprised when Dr. Hayes told him that Hardy had reached the 11th or

---

[378]Govt. Exh. 1 at 48.

[379]Deft. Exh. 34-UU at 66.

[380]*Id.* at 61.

[381]Govt. Exh. 1, att. D at 17-18.

12th grade and suggested he was socially promoted.[382]

Additionally, the Court has already found the academic testing by Dr. Tetlow and Dr. Swanson to be reliable, and they both scored Hardy in 1996 and 2008 respectively at no better than the 6th grade level.  These findings further support the suspicion that Hardy, and others, were simply passed along academically even though they had not in fact passed the required courses.[383]   Achievement to the 6th grade level is consistent with mild mental retardation, and only very  questionable evidence  suggests that Hardy progressed beyond that level.   The  credible evidence indicates that in fact Hardy never did achieve beyond 6th-grade-level academic skills, and the Court finds his pattern of academic achievement to be consistent with a diagnosis of mild mental retardation.

Dr. Hayes also noted that special education classes were available at Booker T. Washington, based on a form which indicated "no" with respect to Hardy.[384] This observation is of marginal significance however.  Dr. Olley has noted that, "in communities where there is widespread poverty, it is possible for a child to go through school without a placement in Special Education."[385]  In *Davis*,[386] the court did not consider it particularly important that the defendant had not been classified

---

[382]Govt. Exh. 1, att. B at 52.

[383]*See also* Deft. Exh. 18-6 at 65-66.

[384]Rec. Doc. 2128 at 1080; Deft. Exh. 18a-2 at 13.

[385]Everington & Olley Study, *supra* n. 23 at 12.

[386]611 F. Supp. 2d at 483.

as mentally retarded during his school years, because schools have a strong bias against classifying a student as retarded and parents do not want the label or the stigma associated with it.  Finally, Vince Ceaser indicated that students were, in fact, informally separated into different classes, based on achievement, and that Hardy was in a track for slower students.[387]  The Court finds that Hardy's academic record at the very least does not detract from the conclusion that he is mildly mentally retarded.

### b.    Family Data

Dr. Hayes also compared Hardy to his older brother, Terry Hardy, on the basis that "intelligence is substantially heritable" and they shared the same home environment.[388]  She then noted that Terry Hardy scored better than his brother on several standardized achievement tests.[389]  Even if the Court were inclined to accept a family member's achievements as some evidence of Hardy's intelligence, Dr. Hayes painted a seriously misleading picture by focusing only on Terry Hardy.  Out of seven children, Terry and Linda Hardy did succeed, graduating high school and attending some college, but Hardy's four other siblings did not fare well.  Both

---

[387]Govt. Exh 1, att. D at 23-24, 25, 28-29.

[388]Govt. Exh. 1 at 49.

[389]Rec. Doc. 2128 at 1087-89.  Dr. Hayes devised her own formula to convert Paul Hardy's scores to national norms, even though his scores were actually recorded only as to large city norms.   Before doing so, she contacted two statisticians about whether that was appropriate - one told her no, that it was "not okay in the statistical realm" and the other thought it would be "okay."  She went forward with her calculations.  Rec. Doc. 2129 at 1290-93.

Curtis and Wayne Hardy were involved in crime and were ultimately murdered, Lionel Hardy served time in prison and James Hardy was an alcoholic and drug user.[390]  Marie Hardy, the mother, was apparently mentally slow as well.[391]  So, while the Court is skeptical of comparing family members to determine IQ at all, if such a comparison is to be made, Dr. Hayes should have also included the academic records and achievement scores of Curtis, James, Wayne, Lionel and possibly even Marie Hardy.  Comparing Hardy to only one of his six brothers and sisters—and one of only two siblings to prosper—is indicative of selection bias.

c.    *Lay Opinions*

Dr. Hayes also looked to the opinions of persons who were familiar with Hardy to make an assessment of Hardy's intellectual abilities.  Specifically, she interviewed several correctional officers at the St. Bernard Parish Jail, and also several of Hardy's former girlfriends.[392]  It remains unclear to the Court how, precisely, correctional officers and Hardy's ex-girlfriends were able to provide accurate enough estimates of his intelligence for purposes of a diagnosis of mental retardation.  In any event, discussion of Dr. Hayes' interviews of people who knew Hardy was more appropriately dealt with in the adaptive behavior section of this opinion, and this discussion was deferred until then.

d.    *Demographic Imputation*

---

[390]Deft. Exh. 18-6 at 73.

[391]Govt. Exh. 1, att. B at 51.

[392]Govt. Exh. 1 at 55-56.

The Court turns last to Dr. Hayes' suggestion that a meaningful estimate of Hardy's IQ could be obtained using his demographic characteristics.[393]  As Dr. Cunningham explained, and Dr. Hayes agreed, this is typically used in civil litigation when a person has had a head injury, but has had no pre-injury IQ test to assess his pre-injury cognitive level.  The estimate is based on comparing the individual to those of similar race, occupation, education, and other factors, whose IQ is known.[394]

Dr. Hayes used the following characteristics to assess Hardy: his age at the time of the crime, educational level of 9-11years, classification as a semi-skilled laborer, being an African-American from the South, and coming from an urban environment.[395]  She stated that when these demographics are input into a regression equation, Hardy is revealed to have an IQ in the Low Average range.[396]

Yet Dr. Hayes did not disclose several features of this demographic method, ones that had she disclosed would have rendered the results essentially meaningless.   First, she failed to disclose that the absolute lowest score that a

---

[393]*Id.*at 54.

[394]Rec. Doc. 2123 at 163, 164; Rec. Doc. 2128 at 1092.

[395]The Court is skeptical of Dr. Hayes' crediting Hardy with an education level of 9-ll years and also of her classification of him as "semi-skilled."

[396]Govt. Exh. 1 at 54, citing Barona Study, *supra* n. 139 at 885-87.

27-year-old African-American male could achieve using the particular

regression equation she employed is a 72.47, even assuming the lowest

possible scores in every other category, such as education and occupation.[397]  If

the question is whether Hardy has an IQ of approximately 70 or lower, then

using a test that *can never* return a score of lower than 72.47[398] for a person of

his age, race, and sex is not only meaningless in an *Atkins* context,  but highly

misleading.

Second, the standard error of measurement for this demographic method is

very large, slightly over 12 points.[399]  Therefore, the 95 percent confidence interval

for this method's estimate of Hardy's IQ ranges from the high 40s up to the upper

90s.[400]  When Dr. Hayes declared Hardy to be in the Low Average Range

according to this method, she said nothing about this being, at best, a very gross

---

[397]Rec. Doc. 2123 at 165; under the Barona Study calculations, the IQ begins
with a starting point of almost 55, which already assumes the person is at least no
more than Mildly Mentally Retarded.  Rec. Doc. 2123 at 166.  Again, this may
well be realistic in the typical civil context when someone has suffered a brain
injury and an attempt is being made to estimate their post-injury IQ.

[398]*See* Barona Study, *supra* n. 139 at 886-87.  Dr. Cunningham performed a
sample calculation using his estimates of Hardy's education and occupational
skills.  Rec. Doc. 2123 at 166-67.

[399]Barona Study, *supra* n. 139 at 886.

[400]Rec. Doc. 2123 at 165.  In order to determine the 95 percent confidence
interval for the hypothetical 27 year old African-American male, whose lowest
possible score is a 72.57, the standard error of 12.14 is multiplied by 1.96 which is
23.79.  That figure is then subtracted from72.57 to give the bottom cut off for the
confidence interval, and then added to 72.57 to give the upper cut off for the
confidence interval.

estimate with a huge margin of possible error.

The Court does not know if Dr. Hayes was simply unaware of the limitations attendant to this method and its obvious inapplicability, or whether she knew and testified as she did anyway.  In either case, her use of and testimony concerning this method further case doubts on her credibility in the eyes of the Court.

# APPENDIX C

*Defense Diagnoses in 1996 and Their Similarities to Mild Mental Retardation*

Having accepted Hardy's IQ score as an under-representation of his cognitive strength,  Dr. Cunningham naturally did not consider mental retardation as a possible diagnosis in 1996.  Nevertheless, after interviewing Hardy and various family members over an extensive period of time, Dr. Cunningham diagnosed Hardy with possible disorders that parallel many of the characteristics of mental retardation.   One was an Axis II, Personality Disorder Not Otherwise Specified under the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, FOURTH EDITION (1994) ("DSM-IV").   The diagnostic criteria for a Personality Disorder is as follows:

A.   An enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture. This pattern is manifested in two (or more) of the following areas:

(1) Cognition  (i.e., ways of perceiving and interpreting self, other people, and events)

(2) Affectivity (i.e., the range, intensity, lability, and appropriateness of emotional response)

(3) interpersonal functioning

(4) impulse control

B.   The enduring pattern is inflexible and pervasive across a broad range of personal and social situations.

C.   The enduring pattern leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D.   The pattern is stable and of long duration and its onset can be traced back at least to adolescence or early adulthood.

E.   The enduring pattern is not better accounted for as a manifestation or

consequence of another mental disorder.

F.      The enduring pattern is not due to the direct physiological effects of a
        substance (e.g., a drug of abuse, a medication) or a general medical
        condition (e.g., head trauma).[401]

In *Atkins*, the Supreme Court noted that mentally retarded persons "have
diminished capacities to understand and process information, to communicate, to
abstract from mistakes and learn from experience, to engage in logical reasoning,
to control impulses, and to understand the reactions of others,"[402] and "their
demeanor may create an unwarranted impression of lack of remorse for their
crimes."[403]

As already noted, the DSM-IV-TR diagnostic criteria for Mental Retardation
includes:

B.      . . . deficits or impairments in present adaptive functioning (i.e.
        the person's effectiveness in meeting the standards expected for
        his or her age by his or her cultural group) in at least two of the
        following areas: communication, self-care, home living,
        social/interpersonal skills, use of community resources, self-
        direction, functional academic skills, work, leisure, health, and
        safety.
C.      The onset is before age 18 years.

Dr. Cunningham also gave serious consideration to diagnosing Hardy with

---

[401]DSM-IV at 633, 673.

[402]536 U.S. at 318.

[403]*Id.* at 321.

Attention Deficit Disorder.[404]  Hardy reported to him that he had difficulty paying attention in school, he disliked reading and puzzles and "things that took sustained and kind of low-stimulation concentration," and he was easily bored and distracted.[405]  In assessing Hardy,  Dr. Cunningham found evidence of restlessness, under-achievement, insecurity, low frustration tolerance, employment relationship instability and, of course, criminal activity,[406] all of which are consistent with Attention Deficit Disorder.  At the same time, the  first diagnostic definition of that disorder likewise shares characteristics with mental retardation:

> (1) inattention: six (or more) of the following symptoms of inattention have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level:
>
> (a) often fails to give close attention to details or makes careless mistakes in schoolwork, work, or other activities
>
> (b) often has difficulty sustaining attention in tasks or play activities
>
> (c) often does not seem to listen when spoken to directly
>
> (d) often does not follow through on instructions and fails to finish school work, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions)
>
> (e) often has difficulty organizing tasks and activities

---

[404]Deft. Exh. 18-6 at 19-20.

[405]*Id.* at 19-20.

[406]*Id.* at 20.

(f) often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (such as schoolwork or homework)

(g) often loses things necessary for tasks or activities (e.g., toys, school assignments, pencils, books, or tools)

(h) is often easily distracted by extraneous stimuli

(i) is often forgetful in daily activities

Dr. Swanson likewise testified at the *Atkins* hearing that frequently mild mental retardation is associated with hyperactivity and inattentiveness similar to Attention Deficit Disorder.[407]

Finally, a third consideration for Dr. Cunningham in 1996 was that Hardy suffered from a mild brain injury from multiple head trauma.[408]  He then recited six separate incidents reported by Hardy or family members where Hardy was struck in the head prior to the age of 18, including at least one with a loss of consciousness.  This is significant because if Hardy is mentally retarded and it is as a result of head injuries, a substantial number occurred prior to the age of 18, the third criteria for a diagnosis of mental retardation.

Dr. Bianchini was retained in 1996 to assess Hardy for possible brain damage.[409]  He concluded that Hardy suffered from "significant neurocognitive

---

[407]Rec. Doc. 2125 at 679.

[408]Deft. Exh. 18-6 at 21.

[409]Deft. Exh. 18-4 at 221-22, 229.

141

residual" brain damage which he assumed was caused by multiple head injuries.[410]
He did not give him an IQ test, but did review the test results of Dr. Tetlow.  He
detected problems with Hardy that also parallel some of the characteristics of mild
mental retardation.  He noted that Hardy's "common sense reasoning and social
judgment" scored at the lst percentile, indicating that 99 percent of the population
exceeded him.[411]  He also observed that Hardy's Wechsler Memory Scale-Revised
Attention and Concentration Index score was below expected levels, "given his
obtained IQ scores."[412]  Of course, Hardy's 1996 IQ score had not been adjusted
for the Flynn Effect, and consequently was inflated.   The Wechsler Memory Scale
results may well have been consistent with Hardy's true IQ of below 70.  Dr.
Bianchini also commented that on another of the tests he gave Hardy that his
scores were unreliable "due to variation between trials which is common with
individuals whose intellectual functioning is below average."[413]  Later in his report,
he noted Hardy was below average in word knowledge, language comprehension,
reading and spelling, some of which he attributed to his lesser education,[414] but he
also found deficits that "wouldn't be explained by his impoverished educational

---

[410]Deft. Exh. 18-5 at 12; Deft. Exh. 18-4 at 227, 229.

[411]Deft. Exh. 18-5 at 5.

[412]*Id.* at 7.

[413]*Id.*

[414]*Id*. at 9; Deft. Exh. 18-4 at 239.

background alone."[415]  His best score was in the Wisconsin Sort Test, but that was

a test he had done with Dr. Martell two weeks earlier, and Dr. Bianchini attributed

some of that success to practice effects.[416]  Like Dr. Cunningham, Dr. Bianchini

also saw signs of Attention Deficit Disorder, but likewise could not make that a

definitive diagnosis.[417]

The Court finds that, once attention is focused on the issue, it is easy to see

other indicators of mild mental retardation in the results of Hardy's 1996

evaluations.  A Rorschach test administered by Dr. Tetlow, for which Hardy's

"cooperation" was noted as "excellent,"[418] was scored using a computer-based

interpretation.  Much of Hardy's assessment was consistent with mild mental

retardation.

> The subject is in considerable stimulus overload and, as such, is
> highly vulnerable to loss of control and becoming disorganized under
> stress.  People in this psychological situation usually have histories
> that include numerous events marked by faulty judgment, emotional
> disruption, and/or ineffective behavior.  They are chronically
> vulnerable to ideational and/or affective impulsiveness and typically
> function adequately for extended periods only in environments that
> are highly structured and routine and over which they have some
> sense of control.[419]

***

---

[415]Deft. Exh. 18-4 at 230.

[416]Deft. Exh. 18-5 at 11; Deft. Exh. 18-8 at. 2; Deft. Exh. 18-4 at 240-41.

[417]Deft. Exh. 18-5 at 12; Deft. Exh. 18-4 at 243-244, 249.

[418]Govt. Exh. 1, att. 2.5 at 31.

[419]*Id.* at 25.

He does not seem to be very introspective.  In other words, he is less involved with self awareness than is usually the case... His self image and/or self value tend to be based largely on imaginary rather than real experience.  People such as this are often less mature and frequently have very distorted notions about themselves.[420]

\*\*\*

He apparently is less socially mature than might be expected.... As a result, his relationships tend to be more superficial and less easily sustained.[421]

\*\*\*

It is likely that he will manifest many more dependency behaviors than usually is expected.  He is prone to rely on others for direction and support and his expectations concerning relationships tend to be somewhat naive.  People such as this usually expect others to be more tolerant of their needs and demands and also expect them to act in accord with those needs and demands.[422]

\*\*\*

His (information) processing activity is marked by underincorporation, that is, he tends to scan stimulus fields hastily and haphazardly, often neglecting critical bits or cues in a stimulus field.  Underincorporation creates a potential for faulty mediation that can lead to less effective behavior patterns.[423]

\*\*\*

The quality of his processing is not very complex or sophisticated.  Instead, it tends to be simplistic and quite conservative.  In fact, the quality of his processing activity often falters significantly to an unsophisticated, less mature

---

[420]*Id.* at 27.

[421]*Id.*

[422]*Id.* at 28.

[423]*Id.*

level.  This is common only among very young children or older subjects who have notable cognitive deficits. Such processing difficulties often lead to mistranslations of inputs and can produce adjustment problems.  A careful evaluation of his cognitive functioning is warranted.[424]

*** 

His approach to processing, especially during problem solving and/or decision making activities, tends to be irregular.  This is more common among young children and its presence here suggests a failure to develop economical or efficient processing habits.[425]

---

[424]*Id.* at 29.

[425]*Id.*

# APPENDIX D

*Interviews and Other Information Relevant to Adaptive Behavior*

With the exception of Tony Minor, Dr. Hayes also interviewed the other informants that Dr. Swanson relied upon.  These interviews were videotaped, which provided the Court the advantage of direct assessment of credibility as well as additional helpful information, unfiltered by Dr. Swanson.

### a.    *Dr. Hayes' Interview with Theresa Minor*

The Court viewed Theresa Minor's video tape and found her recollections of Hardy's abilities to be credible.[426]  She recalled that Hardy, as a child and compared to her son, did not understand how to play various children's games, including checkers, let alone a more complex game like chess.[427]  She said that Hardy would become "flustered" and then "would get disgusted and leave, or go in another room."[428]  She thought at the time he perhaps was just being defiant, but in retrospect, she now believes he felt ashamed and was unable to open up and admit he did not know how to play the particular game.[429]  She also stated several times

---

[426]Govt. Exh. 1, att. CD-3; Deft. Exh. 15.

[427]Govt. Exh. 1, att. C at 5-6.  At the hearing, Theresa Minor also related bringing home a pre-school toy shoe to teach a child how to tie a shoe.  Her son, Tony, was able do it but Hardy could not figure out how to do it.  Rec. Doc. 2124 at 430-432.

[428] Govt. Exh. 1, att. C at 6-7.

[429] *Id.* at 6.

that Hardy could not communicate effectively.[430]  If she asked him something, he would just stare at her or could not answer.[431]  When asked what Hardy liked doing, she answered, "I guess watching TV."[432]

Minor felt something "was wrong" with Hardy, and she tried talking to Hardy's mother, Marie, perhaps to have Hardy tested, but since Marie herself dropped out of school, Minor realized she was wasting her energy and effort.[433]  At the hearing, Minor elaborated that Hardy was "slower" than the other children his age.[434]

Minor reported to Dr. Hayes that Hardy was passive and easily influenced by others.  When asked to elaborate, she said that if someone else wanted to get into trouble, Hardy would go along with it.[435]  She stated repeatedly her regret that she was unable to "reach him."[436]

       *b.*       *Dr. Hayes' Interview with Vance Ceaser*

---

[430] *Id.* at 18, 20.

[431] *Id.* at 20.

[432] *Id.*

[433] *Id.* at 16, 17.  Greg Williams said that Hardy's mother was "a few cans short of a six-pack herself" and that the "elevator got stuck in between floors," which the Court understands to indicated she had limited intellectual abilities. Govt. Exh. 1, att. B at 51.

[434] Rec. Doc. 2124 at 434, 435.

[435] Govt. Exh. 1, att. C at 19.

[436] *Id.* at 16, 21.

Dr. Hayes' also conducted a videotaped interview with Hardy's childhood friend Vance Ceaser, who was the same age as Hardy and attended the same elementary schools and high school.[437]  Notably, Ceaser has not spoken to Hardy since the early 1980's,[438] and therefore has no ongoing current friendship with him. The Court viewed the videotape of Ceaser's interview and found him very credible.

Ceaser reported that while he and Hardy started in the same elementary school classes, they were subsequently separated based on standardized test results.[439]  Hardy was placed in the "lower level classes," not special education, but classes for "slower" students.[440]  Ceaser himself was not in gifted classes, but above average classes, while Hardy was in "below average" classes.[441]  Ceaser also noted that Hardy tried out for the band in junior high school, playing the trumpet, but he "just couldn't . . . he didn't really do well at all."[442]

Around 1983-84, when Ceaser was a junior in high school and after Hardy had dropped out, Hardy approached him about tutoring him in math to help him get

---

[437]Govt. Exh. 1, att. D at 5-6; *id* at CD-D; Deft. Exh. 16.

[438]Govt. Exh. 1, att. D at 7–8.

[439] *Id.* at 17, 24.

[440] *Id.* at 28.

[441] *Id.* at 29.

[442] *Id.* at 38.

back into school.[443]   Hardy has been placed in an algebra class that Ceaser said

was "ridiculous" because Hardy did not have the ability to understand algebra.[444]

One night, Ceaser tried to tutor Hardy in algebra, but "the more I tried to explain it

to him, the more he didn't get it, the more he sort of joked around and goofed

around."[445]   Since Hardy did not seem to be "catching on," Ceaser gave up on

tutoring him after that one attempt.[446]

Ceaser also reported that Hardy never played football or basketball, and that

Hardy "basically sat around the neighborhood . . . chatting with other guys."[447]   He

said Hardy did not really participate, but mostly joked around, sat back and

watched.[448]   When asked if Hardy ever played Monopoly with Ceaser (a relatively

complex game), Ceaser responded with an adamant "No, no, no. No."[449]

c.    *Dr. Hayes' Interview with Greg Williams*

Dr. Hayes' videotaped interview of Greg Williams provided substantial

---

[443] *Id.* at  8.

[444] *Id.* at 27-28.

[445] *Id.* at 29-30.   Dr. Swanson noted that one of Hardy's arguable strengths
was that he turned into "the class clown" which allowed him to mask what he did
not know or understand.   Rec. Doc. 2125 at 649.

[446] Govt. Exh. 1, att. D at 30.

[447] *Id.* at 9–10.

[448] *Id.* at 22.

[449] *Id.* at 12.

additional information.[450]   The Court notes that Williams was relaxed, forthcoming, and credible.  Williams took Hardy to Atlanta for several New Orleans Saints games.  Williams was the one to rent the car, do all the driving and arrange for the hotel.[451]   When asked why Hardy never drove, Williams laughed and said, "He didn't know where he was going."[452]   As far as going out of town in general, Williams insisted that Hardy "never went nowhere by his self."[453]

With regard to checking into a hotel, "he couldn't do that.  He didn't do it."[454]  On one occasion when they did not have a prior reservation, Williams told Hardy to check in.  But Hardy demurred, asking Williams to go ahead and take care of the check-in for them both.[455]

Williams was genuinely surprised when Dr. Hayes told him that Hardy continued into the 11th or 12th grade.[456]  He told her that Hardy "wasn't that bright" and suggested he got caught in "that cycle where they just pass you on."[457]   As has

---

[450]Govt. Exh. 1, att. CD-5; Deft. Exh. 14.

[451]Govt. Exh. 1, att. B at 22.   As with Toni Van Buren, Dr. Hayes included in her report, a criminal history of arrests for Greg Williams.   Criminal history notwithstanding, the Court found Williams to be credible in his recollections of Paul Hardy.  Govt. Exh. 1 at 73, n. 57.

[452] Govt. Exh. 1, att. B at 28.

[453] *Id.* at 34.

[454] *Id.* at 32.

[455] *Id.* at 33.

[456] *Id.* at 51.

[457] *Id.* at 52.

already been discussed, Hardy's actual academic abilities peaked around the 5th or 6th grade level, and the evidence in the record suggests that he was otherwise socially promoted without completing the work.  Williams also said that Hardy occasionally would bring something written to him and ask him to explain what it meant.[458]

Williams said he did not think Hardy knew how to play any sports, nor did they play cards.[459]  While Williams took Hardy to several Saints' games in Atlanta, he said that Hardy did not really follow the game — "He just wanted to be there."[460]  Williams did not know Hardy to have any hobbies except women, and said that he had four or five girlfriends, and always kept one with him.[461]

Williams reported that Hardy could not fill out an application form, such as a job application.  He would bring it home for Van Buren to fill it out.[462]   Hardy also owned a 1985 Cutlass which he continued to take to the dealer to fix, even into the 1990's.  Williams told him how that was not necessary, but Hardy "had in his mind that nobody was going to fix the car right but the dealer", and whoever told Hardy that had misled him.[463]

---

[458] *Id.* at 41-42.

[459] *Id.* at 25.

[460] *Id.* at 9, 33.

[461] *Id.* at 9, 35, 46 .

[462] *Id.* at 39.

[463] *Id.* at 45.

Finally, Williams described Hardy as having "a good heart.  If you ask him for something, there's nothing he wouldn't do for ya."[464]   He also said that if he called Hardy, needing something, "he wouldn't question it, he'd do whatever I ask him to do for me."[465]   He indicated that Hardy was gullible with his friends, saying that "he was a believer in whatever you told him"; "if he called you his friend . . . he would believe everything you'd tell him."[466]

Williams' also told Dr.  Hayes that Hardy had a "lil' prepaid (credit) card" and he was so excited to have it, he would show it to everyone.   Williams was also asked if Hardy was gregarious and talkative, and Williams said no - "Paul was more like to his self";  he did not like "hanging out" or going to clubs.[467]  When asked why, Williams surmised that Hardy could not "relate to you on a certain level" and so stayed to himself.[468]

Interestingly, Williams knew Len Davis, considered him very arrogant and bossy.[469]   Williams told Hardy that he did not like Davis, and he did not want Hardy bringing him around.   Hardy however insisted that Davis was "cool."[470]

---

[464] *Id.* at 5.

[465] *Id.* at 38.

[466] *Id.* at 49.

[467] *Id.* at 20-21, 46, 49.

[468] *Id.* at 49.

[469] *Id.* at 40.

[470] *Id.* at 41.

d.    *Dawn Dedeaux Videos*

Several videos were introduced into evidence.   One is entitled "Drive By Shooting."[471]  The Court has viewed this video.  In it, Hardy is driving a vehicle with his younger brother, Wayne Hardy, in the back seat.   Hardy is driving rather slowly, but competently.   Noteworthy to the Court is that Wayne Hardy does the vast majority of the voice over for the video.  Noteworthy also is that two rap songs are played during the video, with Wayne singing not only the chorus, but individual verses as well.   Hardy, on the other hand, is silent except for an occasional chime in to snippets of the chorus of the songs.

A second video is entitled "City Park."[472]  The Court has also viewed this video.  It features Wayne Hardy initially driving the vehicle,[473] then Wayne Hardy, Paul Hardy and another man leaving the car to sit at a table in City Park to continue the filming.  What is noteworthy to the Court about this video is that Wayne Hardy again completely dominates the conversation.   After about sixteen minutes of a Wayne Hardy monologue, the videographer specifically asks some questions of Paul Hardy.   Paul Hardy responds but then within a minute or two, Wayne Hardy interrupts and once against monopolizes the conversation.  This is consistent with an observation by Dr. Swanson - that Wayne Hardy, even though

---

[471]Govt. Exh. 1, att. CD-6.

[472]Govt. 1, att. CD-7.

[473]The prosecution identified Wayne Hardy as the person in the New York Yankees shirt and Hardy wearing the cap.  Rec. Doc. 2129 at 1189.

younger than Hardy, learned to "stand up and answer for him and do for him," as did others in the family when they anticipated it was something Hardy could not do.[474]

The videos portray Paul Hardy as passive, barely communicative, and content to have his younger brother speak for him.  This is consistent with his tendency to depend on others and is not inconsistent with mild mental retardation.

>    e.    *Hardy's Telephone Calls from Jail*

The government presented as evidence two discs of telephone calls made by Hardy from jail to various friends and family members over the past several years.  One disc contained twenty-eight calls from St. Bernard Parish Jail made in a little over a month in 2009.[475]   The other disc contained sixty telephone calls from Orleans Parish Prison, the dates unspecified, of which approximately half were not actually completed calls.[476]   The Court has listened to all the calls, several of them more than once.[477]

With an IQ of approximately 68, adjusted for the Flynn Effect, or an unadjusted IQ of 73, Hardy falls within the category identified by the AAIDD as

---

[474]Rec. Doc. 2125 at 639.

[475]Govt. Exh. 1, att. CD-14.

[476]Govt. Exh. 1, att. CD-15.  In most of those instances, Hardy was able to give a brief message before the phone call was terminated.

[477]Unfortunately, transcripts do not exist for the calls nor are they identified other than by the phone number called, virtually all of which are repeat numbers. Consequently, it is not feasible to identify each call cited.

"Individuals with Mental Retardation with a Higher IQ."

> These individuals...manifest subtle limitations that are frequently difficult to detect, especially in academic skills, planning, problem solving and decision making, and social understanding and judgment.[478]

As already noted, Hardy's academic skills were clearly deficient and consistent with mental retardation.   These phone calls are relevant to his planning, problem solving, decision making, social understanding and judgment.   The phone calls evidence similar deficiencies in those areas that are consistent with mild mental retardation.

Hardy's telephone conversations are simplistic, inarticulate and frequently rambling and repetitive.   His vocabulary is limited, his thinking concrete.   He asks simple open ended questions about what various people are doing day to day and give very basic advice.  For example, in one conversation, he advises one of his daughters, several times, to talk to her big sister and, on another occasion,  to obey her mother.   He advises one daughter that "money isn't everything." and tells his son that "Don't get in trouble as it's hard as hell to get out of it."  On several occasions he tells several of  his children "Don't do stupid ass shit" or "crazy ass shit."

Some of his advice is sexual in nature, essentially telling his daughters to not let men take advantage of them ("Don't give your power to no man."). Considering Hardy's early life of maintaining sexual relationships with several women at one time, this advice presumably comes from his own experience, rather

---

[478]USER'S GUIDE at 16.

than any abstract notions of appropriate sexual relations.  In fact, Hardy's most detailed advice regarding sexuality is startlingly explicit.  It occurs when he is advising a young man, perhaps his son, on what he should do to sexually satisfy his partner.  Hardy even jokes with the young man's girlfriend to find out if in fact the young man has followed his advice.

Hardy does evidence genuine affection and concern for his children, often asking how they are doing in school, encouraging them to study, and also to go to church, and telling them frequently that he loves them.  On a few occasions, when one of his children is monosyllabic, he asks if something is wrong.   However,  on at least one occasion, he seemed to unreasonably lose his temper with one of his daughters, misreading her reserve as an affront to him personally.  On the other hand, at times he appears to have forgotten relevant details about his children, such as whether one of his children has a job.

One of the few in depth conversations appears to be with his oldest daughter. She is critical of men, saying they are "weak" and Hardy defends them on the basis that they get "put into predicaments" where they "had no choice."   He cites his own upbringing in the housing project, and not having a father.   His daughter answers that that is an excuse for a child but not later.   Hardy explains that talking to his psychologists made him understand how his upbringing affected him.   It is unclear whether Hardy is simply parroting back what the doctors and lawyers have told him or whether he has actual insight.

A number of Hardy's comments are religious in nature, although again

simplistic and concrete.  He declares that "God's got all power" and that "Satan comes to destroy."   He claims to have asked God to "guide me true" and that his goal is to "do right and get my life together."   Tellingly, he describes how he went to church when he was younger but "didn't understand it."   He says at the jail he watched videos that "would break it down" to where he could understand it.  Along the same lines, he recalls his mother telling him that he had "too many irons in the fire" and he did not understand what that meant either at the time.  This is consistent with Hardy's difficulty with abstract concepts, a characteristic of mental retardation.

In a significant number of the conversations, Hardy largely listens while others talk   In that capacity, with a few very rare exceptions, he affirms what the speaker is saying, acquiescing to their view, another characteristic of those who are mildly retarded.  On another occasion, he has a series of conversations with his son who is furious that his car has not been properly repaired by apparently a friend of Hardy's.   Hardy repeatedly tries to calm his son down, but is utterly ignored while his son continues to rant and rage over the treatment.  Hardy is unable to get him to listen.

On the other hand, Hardy is successful at directing whoever he has called to hook in other phone numbers so he can talk to more people in the one call.  He also repeatedly requests that money be put into his jail account and that his children bring him items, such as soap, creams and over the counter medicines.  While he asserts himself in these conversations, the goals are basic, concrete material needs.

At one point, Hardy shows very poor judgment in being highly critical of one of the sergeants at the St. Bernard Parish Jail, calling her a liar and "a bitch" when he had to know the conversation was recorded (at the beginning of each phone conversation, an automatic voice advises both speakers that the conversation is being recorded).   He had already stated that his lawyer told him to not talk about his case on the telephone, presumably because it is recorded, but he was unable to abstract that advice to the lack of wisdom in criticizing one of his overseers.   In fact, in a later conversation with one of his attorneys, he again complains about the same sergeant and his lawyer advises him, again, that they should not be having this discussion on the telephone.

Finally, it is worth noting with respect to Toni Van Buren, that she is frequently the conduit for Hardy's conversations with his children, handing the phone to them after accepting the call.   On one occasion when Hardy attempts to talk with her, she cuts him off, clearly indicating that her relationship with him is edgy at best.   This is relevant to whether Van Buren can be considered biased or unbiased in her view of his abilities.

In summary, in these numerous conversations, Hardy's "planning" consists largely of simple requests for items to be brought to the jail.   His "problem solving" is likewise simplistic pieces of advice to his children.   The phone conversations deal with very little "decision making."    He does appear to have a healthy relationship with most of his children, which indicates "social

understanding" of familial relationships.  Finally, his "judgment" is again simplistic and unsophisticated and at times questionable, such as discussing intimate sexual matters with his son's girlfriend, and speaking derogatorily about jail employees on the telephone, which he knows are recorded.

Dr. Hayes testified that Hardy was able to stay on topic in the phone conversations, as well as switch topics, that telling his daughter "don't give your power to no man" and other such expressions indicated a capacity to use idioms, that he modulated his tone appropriately, could give directions, ask appropriate questions, express concern, indicate he had learned from his mistakes and had overall maintained relationships with his children and others even while incarcerated.[479]   The Court concurs with Dr. Hayes that Hardy evidenced these capacities, but well within the capabilities of persons with a higher IQ in the mild mental retardation range.   As the DSM-IV described, adults with mild mental retardation "usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings."[480]   Dr. Cunningham also testified that "on a continuum" mildly mentally retarded people are capable of abstract thinking, including understanding some idioms, can experience "at least superficial

---

[479]Rec. Doc. 2128 at 1132-35, 1137-40.

[480]DSM-IV-TR at 43.

insight" and can feel empathy and establish emotional bonds.[481]

The Court finds the telephone conversations from jail to be consistent with the diagnosis of mild mental retardation.

---

[481]Rec. Doc. 2124 at 233-36.

# APPENDIX E

*Dr. Hayes' List of Additional Facts Relevant to Hardy's Adaptive Behavior*

The following is a summary of various facts, not subsumed within the Court's discussion elsewhere, that Dr. Hayes cited in concluding that Hardy does not have the required deficits in adaptive behavior.

a.      *Communication*[482]

A family friend testified during the penalty phase at Hardy's trial that he had no trouble speaking to her and seemed like a "normal kid";

Dr. Bianchini reported that Hardy had normal fluency, articulation, animation and word formation;

When questioned by the FBI, Hardy was able to understand their questions and provide answers tending to exculpate himself or showing that a case could not be made against him;

Hardy has written letters on specific topics and completed telephone number requests while in prison;

b.      *Self Care*[483]

Hardy wore fashionable clothes at the time he met Van Buren;

Hardy wore clothing appropriate to the weather;

---

[482] Govt. Exh. 1 at 111–16.

[483] *Id.* at 116–18.

If Hardy saw someone shaving, he could do it as well;

Hardy has purchased grooming items while in prison, some of which he keeps in his cell;

In October 1994, the FBI noted that Hardy stopped at a business called Family Dentistry for an hour;

*c.*     *Home Living*[484]

Hardy ironed his brother's clothes for him;

Hardy's chores around the family home were limited to possibly cleaning up the mess in the backyard caused by his family's dogs;

Although never for long periods of time, Hardy helped a friend sew his Mardi Gras Indian outfits after the friend showed him how to do it;

Hardy could use or was at least aware of the proper use of Ajax, Comet, Windex, Pine Oil/Pine Sol, and Raid;

If he saw someone hammer a nail, Hardy could do the same;

Hardy occasionally cooked for Cooper, liked a clean home, and would help with cleaning;

During the clinical evaluation, Hardy indicated how to heat a canned meal, heat and test baby formula, and change a diaper;

He was able to measure units of cocaine;

---

[484] *Id.* at 118–25.

Hardy knew to keep meats in the freezer and milk in the "icebox";

He knew that, if one smells smoke or suspects fire, one should leave the house and call 911;

Believed ADT installed an alarm system at his home;

He had difficulty assembling items that came with instructions and connecting audiovisual equipment;

d.    *Social/Interpersonal Skills*[485]

Hardy and his family regularly attended church;

Hardy would, according to a social history prepared by Dr. Cunningham, video tape the frequent outings on which he took his children for them to have fun;

He would not open doors for Van Buren even when her hands were full, but would do so for an elderly person;

Hardy attended to an elderly friend with cancer, going so far as to giving her a ride and sitting with her at the clinic;

He was not a sore loser;

He was erratic in his behavior with Van Buren, but typically followed through on promises if he made them;

Hardy bought Mother's Day cards while in prison and was generally thoughtful and considerate of others;

---

[485] *Id.* at 125–30.

He was good with children, as attested to by a number of different people;

A woman would usually travel with Hardy to maintain possession of his gun;

e.    *Use of Community Resources*[486]

Hardy purchased guns, insurance, and a Sam's Club membership;

He was registered to vote and has a driver's license;

Hardy kept current on several charge accounts and made deposits at a bank;

He reportedly bought a house for his brother and put it in the brother's name, bought another house with an acquaintance, and owned yet another;

Len Davis needed to remind Hardy to press the "End" button after concluding a cell phone call;

Hardy was able to use a beeper with some of the contacts using codes instead of their names;

He was observed driving distances of up to 30 miles;

It was not certain whether Hardy knew his zip code; Van Buren thought he did not, yet several gun license applications in his name listed the correct zip code;

He provided for his children;

Hardy made a warranty claim after ear buds he bought with an audio device while in prison broke;

---

[486] *Id.* at 130–39.

*f.*     *Self Direction*[487]

Hardy was allowed to get food stamps for his mother at a time when Lionel and Wayne Hardy were also living at home;

He took an active leadership part, with apparent understanding of the fact, in the crimes for which he was convicted (along with others), and he was a careful drug dealer;

None of Hardy's defense attorneys have argued that he is incompetent to stand trial;

Hardy was able to find his brother's gravesite without directions;

Van Buren thought Hardy was impulsive, but Dr. Bianchini did not;

*g.*     *Functional Academic Skills*[488]

(All substantially summarized elsewhere)

*h.*     *Work*[489]

In exchange for quarters with which to play, Hardy helped a family friend out at her game room after school for several years;

Dr. Tetlow was of the opinion that Hardy could run an organization;

He held a number of odd jobs for short periods or time or performed them

---

[487] *Id.* at 139–51.

[488] *Id.* at 151–56.

[489] *Id.* at 156–61.

intermittently, with his longest employment being as a porter/busboy/kitchen helper at a restaurant in New Orleans;

Hardy applied for several jobs for which he was not hired, but knew his date of birth, social security number, telephone number, and address;

He learned to play Three Card Monte to take people's money;

Hardy stretches allotted time limits in prison;

He was usually able to support himself except for a few "lean times" when Van Buren supported them;

Hardy had a safe in his home for part of the time that he lived with Van Buren, and he kept money in it instead of a bank;

i.    *Leisure*[490]

Hardy eluded "the feds" by jumping out of a car and playing football in the projects;

Hardy went to a gun range with Van Buren once and visited another shooting range on a number of occasions;

He played Pac Man, but not Nintendo;

Jail deputies have observed Hardy playing spades, rummy, poker, and "down the river," in addition to playing checkers and dominoes;

He communicated with another inmate by passing notes through a window

---

[490] *Id.* at 161–66.

when they were playing basketball;

Hardy had a half-priced hotel card, church membership card, Blockbuster video card;

He apparently listens to music;

j.      *Healthy & Safety*[491]

After he was stabbed, Hardy went to "Toro [sic] Hospital";

Hardy was able to follow hospital discharge instructions for himself and his children;

The reason Hardy carried guns was to protect himself, which, in addition to protecting his children, was also the reason he bought a guard dog;

He has sought medical care for himself while in prison, including filling out forms;

Hardy was in several motor vehicle accidents within a short span of time in the mid-1980s, which led to a number of follow-up appointments for his injuries that included head trauma;

He has long-standing ear and sinus troubles;

When treated for a rash, he reported that he had been putting Calamine lotion on it;

Hardy has had dental work;

---

[491] *Id.* at 166–75.

He has survived five attempts to kill him;

He has not been adjudged mentally defective or committed to a mental institution;

In 1989, Hardy required stitches to his head after getting into fights;

Hardy has sought treatment for a number of minor ailments and has filled prescriptions for himself before.